UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————X
)
ESTATE OF ALKIVIADES MEIMARIS and )
HELEN MEIMARIS,                    )          1:18-cv-4363
              Plaintiffs,          )
                                   )
                                   )
         -against-                 )          **COMPLAINT**
                                   )          **AND DEMAND**
                                   )          **FOR JURY TRIAL**
JOSEPH E. ROYCE, LAWRENCE A. BLATTE, )
TULIO PRIETO , JAIME LEROUX and    )
TBS Shipping Services Inc.,        )
              Defendants.          )
————————————————————————X

    PLAINTIFFS, The Estate of Alkiviades Meimaris and Helen Meimaris, as and for this Complaint against Defendants, Joseph E. Royce, Lawrence A. Blatte, Tulio Prieto, Jaime Leroux and TBS Shipping Services Inc. allege, upon knowledge and information and belief, as follows:

### PRELIMINARY STATEMENT

    1.    Plaintiffs bring this action to recover the losses suffered at the hands of Defendants, Joseph E. Royce, Lawrence A. Blatte, Tulio Prieto, Jaime Leroux and TBS Shipping Services Inc. for compensatory damages of at least $20 million, special damages of $20 million, exemplary damages of $20 million and punitive damages of at least $50 million.

    2.    Plaintiffs and defendants had a long standing relationship.  They were not only business partners, but very good friends.   They attended social functions together and socialized outside of the work place.

    3.    On or about   1993, Captain Alkis Meimaris, Joseph Royce and Gregg McNelis formed TBS Shipping International and TBS Commercial Group.   Later on, Lawrence Blatte became a partner.   The home office for both companies was 612 East Grassy Sprain Road, Yonkers, New York.   Joseph Royce and Gregg McNelis had the commercial background of shipping.  Captain Meimaris, understood the technical aspects of the shipping industry, as he was a former Captain with an impressive resume in the technical field .  Lawrence Blatte, had no knowledge of the shipping industry.

    4.    Captain Meimaris, Mr. Royce and Mr. McNelis worked very hard growing the business, from owning 7-9 ships to over 32 ships.  Due to this success,  in 2005, TBS Shipping International went public and was listed on The NASDAQ.   The TBS Commercial Group remained a private entity held by the four shareholders .

    5.    In February of 2006, Captain Meimaris retired from TBS International.   He continued to consult for the Company, went to Brazil several times on business trips for the Company and attended yearly agency meetings held in Yonkers,  New York.

6.    On or about October 2011, Captain Meimaris and his wife, Helen Meimaris, received a call from attorney  Tulio Prieto.  Mr. Prieto told Mr. and Mrs. Meimaris that he was

faxing over a document to be signed.  The Meimaris' asked Mr. Prieto what type of document this was.  Mr. Prieto stated that it had to do with Meimaris' 10 % ownership of  shares in TBS Commercial Group.  Mr. Prieto asked Captain Meimaris if Mr. Royce had spoken to him about the document.  Captain Meimaris stated that no one had spoken to him about the document. Captain Meimaris' fax machine was not working so Mr Prieto said that he would send it to the office, located at 612 East Grassy Sprain Road, Yonkers, NY, as the Captain's daughter, Alkistis Meimaris worked for the Company.  Mr. Prieto advised Captain Meimaris to speak to Mr. Royce if he needed clarification regarding this document.

7.      Later that day Alkistis Meimaris , who worked as Deputy Compliance Officer  and Head of Global Corporate Development and Training for the Company, was approached by Mr. Royce's cousin, Tara Demakes, who was Vice-President of Quality and Compliance Officer. Ms. Demakes gave Alkistis the document prepared by Mr. Prieto. Ms. Demakes stated to Alkistis, "you do realize that the Meimaris' are giving up all rights and interests in TBS Commercial Group for no compensation ." Alkistis asked whether anyone else In the company was giving up their shares. Ms. Demakes stated that no one else was giving up their shares. Alkistis promptly called her parents and told them if any documents are received by them to not to sign anything and explained what Ms. Demakes told her.

8.      The next day, Captain Meimaris contacted Mr. Royce to discuss the document. Mr. Royce told Captain Meimaris  that he would explain it to Alkistis since he was going out of town, and that he and Captain Meimaris could meet when he got back from his business trip.

9.      Sometime later that week, Mr. Royce asked to speak with Alkistis Meimaris.  They went into a conference room where Mr. Royce told Alkistis that he wanted her father to relinquish his shares in TBS Commercial Group to protect him from the  impending reorganization which was going to take place for TBS International.  Alkistis asked him if anyone else was doing this.  Mr. Royce responded  that Jim Bailey was relinquishing his shares.  Alkistis assured Mr. Royce that she would relay this to her parents.  Mr. Royce said he would meet with the Captain upon his return from his business trip.

10.     In December of 2011, Defendant Mr. Royce visited Captain and Mrs. Meimaris in their home at 4 Crescent Way, Fort Lee, New Jersey.   Present were Captain Meimaris, Helen Meimaris,  and their daughters, Angel Meimaris and Alkistis Meimaris and their granddaughter Eleni Papageorgiou.   Mr. Royce proceeded to ask Captain Meimaris and Helen Meimaris to transfer their shares and relinquish all rights in TBS Commercial Group to him for no compensation.  Captain Meimaris and Mrs. Meimaris adamantly declined.  Captain Meimaris told Mr. Royce, "we built this company together, traveling, not seeing our families to make it successful and now you want me to give everything up for no compensation?"   Captain Meimaris was devastated that's his business partner and long time friend would ask this of him.  Captain Meimaris and his wife flatly refused to transfer the shares. Mr.  Royce left.

11.     In May of 2012, Mr. Royce terminated Alkistis Meimaris from employment because upon information and belief, Captain Meimaris  would not transfer his shares .

12.     Captain Meimaris became absorbed in caring for his wife who was very ill and assumed his shares in TBS Commercial Group were still in existence.

13.     In the summer of 2013, Captain Meimaris learned that his shares in TBS Commercial Group no longer existed, that his friend and partners had squeezed him out of TBS Commercial Group and had used TBS Commercial group as part of the Reorganization package with the banks for TBS International.  In that transaction the banks took 90% of TBS International and Joseph Royce, Gregg McNelis and Lawrence Blatte took the other 10% of TBS International as shares.   Captain Meimaris was squeezed out of his interests in TBS

International and TBS Commercial Group by his friends and partners.     In a telephone conversation with Gregg Mcnelis, Captain Meimaris asked Gregg what happened to his shares. Mr. McNelis hung up the phone without responding.

14.     Captain Meimaris fell into a deep depression.     He was uncommunicative and unresponsive when spoken to.     He could not believe that his friends, whom he trusted implicitly, whom he built the companies with, had defrauded him.

15.     In October 2013, Captain Meimaris was diagnosed with non small cell lung cancer.

16.     Knowing of his illness, prognosis and impending death, Captain Meimaris authored an affidavit outlining what Defendants had done while his daughter wrote a parallel Affidavit supporting his testimony.

17.     The last words to come out of Captain Meimaris' mouth were apologies to his wife and children, including Alkistis for what had happened.

## PARTIES

18.     Plaintiff, Estate of Captain Alkiviades Meimaris, deceased, having lived at 4 Crescent Way, Fort Lee, New Jersey, having done business in New York for over 20 years.

19.     Plaintiff, Helen Meimaris, living at 4 Crescent way, Fort Lee, New Jersey.

20.     Upon information and belief, Defendant  Joseph E.  Royce is a citizen of New York and does business in New York.

21.     Upon information and belief, Defendant, Lawrence A. Blatte, is a citizen of New York and does business In New York.

22.     Upon information and belief,  Defendant, Tulio Prieto, is a citizen of New York and does business in New York.

23.     Upon information and belief, Defendant Jaime Leroux does business in New York.

24.     Upon information and belief, Defendant TBS Shipping Services Inc.  has its principle place of business in New York.

## JURISDICTION AND VENUE

24.     This Court has diversity jurisdiction over the case pursuant to 28 U.S.C. §1332, as the Defendants reside in New York and Ecuador and the Plaintiffs reside in New Jersey and the amount in controversy is over $75,000.00.  Venue in this Court is proper pursuant to 28 U.S.C. 1391.

## STATEMENT OF FACTS

### Captain Meimaris Affiliation with Defendants

25.     Paragraphs1 through 24 are adopted as if fully set forth herein.

26.     Captain Meimaris joined COTCO Shipping in 1987 as Director of Operations.  He was hired by Joseph Royce and Michael Hudner, partners of COTCO for his extensive expertise

and experience in the technical and operational knowledge of ships.   Captain Meimaris became a Captain at the age of 30 years old and had held many executive positions prior to joining COTCO.   Joe Royce and Michael Hudner knew only the commercial and financial aspects of shipping.

27.    In or about 1992, Joe Royce and Michael Hudner had a falling out.  They parted ways after a contentious litigation.  Mr. Hudner asked Captain Meimaris to join him in his company B&H Shipping.  Captain Meimaris declined the invitation as he considered Mr. Royce a close friend.  Therefore, he remained with Mr. Royce.

28.    In 1993, Mr. Royce, Captain  Meimaris, Mr. McNelis and (later Mr. Blatte)formed TBS International and TBS Commercial Group.  All had shipping knowledge with the exception of Mr. Blatte. Mr. Blatte was an Attorney and friend of Mr. Royce, whose firm, Rosen & Reade  had handled the litigation between Mr. Royce and Mr. Hudner with regard to COTCO.   Upon information and belief, Mr. Blatte, became a partner in TBS International in direct conflict with his position as Senior Partner at Rosen & Reade.   Upon information and belief, this led to Mr. Blatte being fired from Rosen & Reade for his indiscretion.

29.    Captain Meimaris' interests in TBS International are as follows:
       Pre Listing 2005: 75,000 Class A shares, 75,000 Class B Shares, 130,000 Class C
       Shares and 75,000 Preference Shares

       Post-Listing:   369,322 Class A Shares and 609,888 Class B Shares


       Captain Meimaris' interests in TBS Commercial Group are as follows: 10% ownership.

30.    From the period of 1993-2005, Captain Meimaris, Mr. Royce and Mr. McNelis worked together around the clock to grow the business.   They were constantly on endless business trips.  They grew the business, beginning with 7-9 old ships, and by 2005, to over 31 ships.

31.    Mr. Blatte worked at TBS prior to being fired from Rosen & Reade.  He then came on full-time after he was fired from Rosen & Reade.    He was only at TBS because he was a friend of Mr. Royce.  It was speculated that he was allowed to join the Company as an executive because he allegedly had negative information about Mr. Royce. Mr. Blatte would show up whenever he wanted to work,  getting paid to  play computer games.

**TBS International listed on the NADAQ**

32.    In 2005, all their hard work paid off. The Company was so successful that the  partners decided to do an IPO and list TBS International on the NADAQ.  In 2005, TBS International was listed on the NADAQ.  TBS Commercial Group remained a private entity in the hands of the original shareholders.

33.    In 2006, Captain Meimaris decided to retire.  He was 75 years old and wanted to make room for the next generation and enjoy his family.  Mr. Royce asked him to reconsider, but he did not. He retained his shares in TBS International and his 10% ownership In TBS Commercial Group.  He remained as a consultant through 2011 and continued to advise Mr. Royce when needed making several business trips to Brazil for the Company. He continued to attend all of the Company's semi-annual and annual meetings.  He also continued his close friendship with Mr. Royce.  Captain Meimaris received no compensation as founder or partner compensation or severance when he retired.

34.     In May of 2006, at Captain Meimaris' 75th birthday party, his partner, Mr. McNelis told everyone in the room, that TBS'  success was due to Captain Meimaris and that they could not have achieved what they did without him.

**Captain Meimaris daughter is Hired by Joseph Royce**

35.     In October of 2006, Captain Meimaris' daughter Alkistis, interviewed with Mr. Royce. He hired her as Head of Global Corporate Development and Training and Deputy  Compliance Officer, for which because of her background she was fully qualified   She began work on November 6, 2006

36.     In December of 2006, Tara Demakes, Joseph Royce's cousin told Alkistis Meimaris and Captain Meimaris that Lawrence Blatte did not want the Meimaris' as part of the TBS Commercial Group any longer.

**TBS international Bank Reorganization**

37.     The success of TBS International was short lived.  By 2010-2011, Mr. Royce and Mr. Blatte had run TBS to the ground, making self serving bad decisions and sinking millions of dollars into ventures which everyone advised them not to.     Contrary to advice, they imprudently invested over 60 million dollars into a venture in Brazil.  In fact, they had sent Captain Meimaris to Brazil several times to advise them about 3 ships.  Captain Meimaris and other professionals vehemently were opposed to the Brazil venture, and when they continuously advised them against getting involved, they were dropped from conference calls, leaving Mr. Royce and Mr. Blatte alone to pursue the venture with shareholder money.  After mismanagement by Mr. Royce and Mr. Blatte depleted company funds, the decision was made to enter into a reorganization.

38.     Ultimately, as a result, the shareholders lost all of their holdings.

39.     Captain Meimaris had close to a million shares which were lost as a result of the reorganization.  Captain Meimaris had tried to sell the shares in the years prior; however,  Mr. Blatte had stopped him several times.  Mr. Blatte kept telling him to hold off on selling because it did not look good that a major shareholder was selling.  Unknown to Captain Meimaris, Mr. Blatte and Mr. Royce were selling their shares.

40.     Captain Meimaris lost the results of his life's work with due to Mr. Blatte's and Mr. Royce's deeds.

**Mr. Royce and Mr. Blatte   Breach their  Fiduciary Duty and commit Fraud on Captain Meimaris and the Banks**

41.     In 2012, A plan was presented to the banks for the reorganization of TBS International. The plan provided for, in short, that the banks would hold 90% ownership of TBS International and the other 10% ownership would be held by the original primary shareholders of TBS International.  The bank upon information and belief accepted the plan only if TBS Commercial Group was part of the Reorganization Plan.

42.     Mr. Royce,  Mr.  Blatte  and Mr. McNelis became the holders of the 10% ownership in the TBS International which emerged from the Plan.  They used TBS Commercial Group as leverage to negotiate the Plan.

43.    Not only was Captain Meimaris squeezed out of TBS International by his partners, but they used TBS Commercial Group, in which he had a 10% Interest, without his consent.

44.    In October of 2011 Mr. Prieto had tried to get Captain Meimaris to sign over all of his interests In TBS Commercial Group without compensation.  Captain Meimaris refused.

45.    In October of 2011, Mr. Royce had tried to convince Captain Meimaris daughter, Alkistis, that he was helping out Captain Meimaris by having him sign over his shares to Mr. Royce.  Mr. Royce tried to convince Alkistis, that others were doing the same. Mr. Royce tried fraudulently to induce Captain Meimaris to sign over his shares by stating others were doing the same.

46.    In December 2011, Royce went to Captain Meimaris' home, and in front of Captain Meimaris,  Helen Meimaris, Angel Meimaris, Alkistis Meimaris and Eleni Papageorgiou, Mr. Royce tried again to get Captain Meimaris to hand over his shares to Mr. Royce with no compensation.  Mr. Royce simply told Captain Meimaris he needed them.  Captain  Meimaris flatly refused.  Helen Meimaris and Captain Meimaris both asked Mr. Royce how he could expect  Captain Meimaris to turn over his life's work for no compensation.  Captain Meimaris and Helen Meimaris both asked Mr. Royce why the other partners were not relinquishing their shares.  Mr. Royce did not respond.

47.    Upon information and belief, Mr. Royce and Mr.  Blatte gave the banks the  perception that they had full rights to TBS Commercial Group.

48.    Upon information and belief, Mr. Royce and Mr. Blatte not only defrauded Captain Meimaris out of his interests in TBS International and TBS Commercial Group, but they defrauded the Banks into believing that TBS Commercial Group had the consent of all of the shareholders to be used in the Reorganization.

**Captain Meimaris daughter fired from TBS International**

49.    In May, 2012, Captain Meimaris Daughter Alkistis was fired from TBS International.  She was told that her position was no longer relevant.  Captain Meimaris believed that this was a direct retaliation for his failure to turn over his stocks.  His daughter's position as Compliance Officer was not only relevant but necessary for the Company. Someone his daughter had hired took over her position.

**Jaime Leroux's Breach of Fiduciary Duty based on Fraud**

50.    Jaime Leroux was President of TBS Ecuador, one   of the companies under TBS Commercial Group.  Captain Meimaris had gone to Ecuador many many times and had helped to obtain warehouses for the Commercial Group on prime real estate in Ecuador.   In 2011, Mr. Leroux asked Captain Meimaris to buy some of his interest in a property he was thinking about buying.  Captain Meimaris told Mr. Leroux that he must ask Mr. Royce first, as Mr. Royce  was his friend and partner.  Captain Meimaris asked Mr. Royce.  Mr. Royce told Captain Meimaris to speak with Mr. Blatte.  Mr. Blatte told Captain Meimaris he could not buy the interest.  Instead, Mr. Blatte and Mr. Royce purchased the property in the name of TBS Commercial Group and upon information and belief, in their own names.

51.    In March 2013, Jaime Leroux, purportedly a good friend of Captain Meimaris , called Captain Meimaris to Find out what was going on with TBS Commercial Group.   Mr. Leroux spoke to Captain Meimaris and Alkistis.   Mr. Leroux stated that he was trying to reach Mr. Royce, but could not.

52.     In June 2013, Mr. Leroux called Captain Meimaris and his daughter, Alkistis.  He asked them  to send him paperwork documenting his interests in TBS Commercial Group.  Alkistis sent Mr. Leroux the documents.  Mr. Leroux stated to Captain Meimaris and Alkistis that he would protect Captain Meimaris' interests and that Captain Meimaris had his word that he would not let Captain Meimaris' interests be jeopardized by Mr. Royce and Mr. Blatte.  Mr. Leroux would call Captain Meimaris almost every month, feigning friendship, but trying to obtain information about Mr. Royce and what was happening at TBS.

53.     In September 2013, Jaime Leroux came to the United States and met with Captain Meimaris, Helen and Alkistis.  He again reiterated that he would protect The Captains interests in TBS Ecuador from Mr. Royce,  Mr. Blatte and Mr. McNelis.

54.     In 2014, after Captain Meimaris had passed away, Mr. Leroux came to the United States and met with Helen and Alkistis.   Mr. Leroux said that Captain Meimaris' shares no longer existed and that the shares were in the hands of Mr. Blatte, Mr. Royce and Mr. McNelis.

55.     Mr. Leroux had breached his fiduciary duty owed to Captain Meimaris and participated and facilitated the theft committed by Mr. Blatte and Mr. Royce.  Mr. Leroux as President of TBS Ecuador could have stopped Mr. Royce and Mr. Blatte, as his signature was needed to change the share structure of the Company, however he not only allowed them to steal Captain Meimaris' shares, upon information and belief, Mr. Leroux helped facilitate the fraud.

**Captain Meimaris passes away**

56.     In October 2013, Captain Meimaris was diagnosed with non small cell lung cancer which had spread to other parts of his body.

57.     Knowing of his illness, prognosis and impending death, Captain Meimaris wrote an affidavit outlining what Defendants had done to him and his daughter Alkistis wrote a parallel Affidavit supporting his testimony.  Both Affidavits were duly notarized.

58.     The last words to come out of Captain Meimaris mouth was an apology to his wife and children for what had happened to his shares at the hands of the Defendants.   Captain Meimaris also apologized to his daughter, Alkistis, who had been fired by Joseph Royce in retaliation.

59.      Captain Meimaris passed away on December 7, 2013.

**BASIS FOR DAMAGES**

60.     By breaching their fiduciary duty to Captain  Meimaris and committing fraud, the defendants caused Captain Meimaris and his wife to suffer pecuniary loss.  Captain Meimaris had put his  life into building TBS International and TBS Commercial, for which he worked day and night and on weekends.  Defendants disregarded that he was a partner and shareholder. Defendants unlawfully jettisoned Captain Meimaris rights by disregarding his shares in TBS International and his 10% ownership of TBS Commercial Group.   Defendants fraudulently usurped a business opportunity presented to Captain Meimaris, causing Captain Meimaris and his wife Helen, both to suffer pecuniary loss.

61.     The pecuniary harm caused to Captain Meimaris and Helen, his wife, is in the amount of $20 million dollars.  The special damages which Captain Meimaris and Helen are owed from

the defendants is in the amount of $20 million dollars.  The plaintiffs pray for an additional $50 million dollars in punitive damages.

### FIRST CAUSE OF ACTION FOR COMMON LAW FRAUD
(Breach of Fiduciary Duty based on Fraud usurping a  Corporate Opportunity)

62.     Plaintiff's repeats and reasserts   the allegations of paragraphs 1 through 61 as though fully set forth herein.

63.     In 2011 Jaime Leroux approached Captain Meimaris to become a business partner and enter into an agreement with him, in an unrelated venture to TBS Commercial Group, concerning the purchase of property and/or buildings (the "Agreement")   Mr. Leroux was looking for an investor.

64.     Captain Meimaris approached Joseph Royce just to let him know that he would be entering into this agreement with Mr. Leroux.  Joseph Royce was Captain Meimaris' partner, as was Mr. Blatte.  They both owed a fiduciary duty to Captain Meimaris as partners.  Mr. Royce also owed a fiduciary duty to Captain Meimaris as a majority shareholder.

65.     Mr. Royce and Mr. Blatte told Captain Meimaris that he could not enter into the agreement with Mr. Leroux as  it was in conflict with his interests in TBS.

66.     Mr. Royce and Mr. Blatte knowingly falsely represented to Mr. Meimaris that it was a conflict of interest for him to enter into a contract with Mr. Leroux with the intent of having Captain Meimaris   refrain from entering into the Agreement himself. Their statement was deliberately misleading and a material misrepresentation of the truth.

67.     Mr. Royce and Mr. Blatte both knew that this opportunity which Mr. Leroux presented to Captain Meimaris had nothing to do with Captain Meimaris' interests in TBS Commercial Group or his interests in TBS International. Mr. Royce and Mr. Blatte were both well aware that it was not a conflict of interest.  However, theywanted the business opportunity for themselves. They deliberately made the statement to Captain Meimaris with the intent to deceive him.  Mr. Royce knew that Captain Meimaris would trust and believe him as they were longtime friends. In doing this, Mr. Royce and Mr. Blatte breached the duty of care, duty of loyalty and duty of honesty owed to Captain Meimaris.

68.     Captain Meimaris ultimately relied on Mr. Royce's and Mr. Blatte's   misleading representations, to his detriment did not enter into the agreement with Mr. Leroux, thereby losing this business opportunity. Captain Meimaris had no knowledge of the falsity of Mr. Royces's statement and relied on the statement as he always trusted Mr. Royce and believed his words to be true.

69.     Mr. Leroux told Captain Meimaris that he had spoken with Mr. Royce and Mr. Blatte. Mr. Leroux stated that Mr. Royce and Mr. Blatte had told him that they wanted the opportunity for themselves.  Therefore, Mr. Blatte's and Mr. Royce's misleading representations to Captain Meimaris were a deliberate plan to deter Captain Meimaris from pursuing and benefitting from a business opportunity.

70.     Upon information and belief Mr. Royce and Mr.  Blatte entered into the Agreement with Mr. Leroux concerning the warehouses.   They did so either unilaterally or through TBS Commercial Group.

71.     Mr. Royce and Mr. Blatte   usurped this opportunity from Captain Meimaris, thereby committing fraud and fraudulently breaching their fiduciary duty to Captain Meimaris.

72.     Captain Meimaris' reliance on the Defendants statements resulted in injury to him. He lost a lucrative business opportunity.

73.     Defendants not only committed statutory fraud, including but not limited to §349 of the Deceptive Practices Act under General Business Law, but also committed  common law fraud upon Captain Meimaris.   Defendants committed all elements of Common Law Fraud. Defendants also committed all elements of breach of fiduciary duty upon Captain Meimaris. Further, Defendants knew of Captain Meimaris' condition of Trigeminal Neuralgia and took advantage of him in his state of illness.

74.     Defendants fraud and breach of fiduciary duty based upon Fraud caused the Plaintiffs pecuniary damage, specific damage and exemplary damage.

75.     Plaintiffs seek punitive damages against defendants to deter them from engaging in such practices again.

## SECOND CAUSE OF ACTION
(Fraudulently inducing Captain Meimaris to not sell his shares in TBS International)

76.     Plaintiff's repeats and reasserts   the allegations of paragraphs 1 through 75 as though fully set forth herein.

77.     Captain Meimaris had on various occasions tried to sell off the bulk of his shares in TBS International.  He was 80 years old and wanted to enjoy the fruits of his labors with his wife and children.

78.     His partners, Mr. Royce and Mr. Blatte had told him that he must consult them any time he wanted to sell shares.  They also told him that he was an insider, and as such, could only trade within the  trading window as mandated by the Company.  The trading window opened up every few months or so.  Captain Meimaris agreed to apprise Mr. Royce and Mr. Blatte of how many shares he traded and that he would trade only within the company trading window.

79.     Each time Captain Meimaris approached Mr, Royce and Mr. Blatte about selling a bulk of his shares, he was told that he could not sell a lot of shares.  He was specifically told by Mr. Royce and Mr. Blatte, that if a major shareholder of the company sold shares it would not look good to the public and jeopardize the company.  They stated outright that "it would hurt the Company if you sold a lot of shares".  This was a misleading material misrepresentation of the truth. Mr. Royce and Mr. Blatte intended for Captain Meimaris to rely on their statements.

80.     Captain Meimaris relied on Mr. Royce's and Mr. Blatte's statements.  He respected the wishes of his partners, believing their logic of why he should not sell shares. He did not want to jeopardize the Company in any manner and therefore did not sell any of his shares.

81.     In particular, in May of 2008, Captain Meimaris was asked to stop selling his shares by the defendants.   This can be confirmed by Frank Pitella, the former Comptoller of TBS International who recalls that Captain Meimaris was asked to stop trading.

82.     Captain Meimaris abided by the Defendants request not to sell any more shares in May 2008.  He relied on the Defendants statements that it would hurt the Company.   Captain

Meimaris had absolutely no knowledge that Mr. Royce's and Mr. Blatte's statements about trading his shares was false. He relied on its truth because he trusted his friends and partners.

83.     Meanwhile, Defendants collectively sold  over 1,600,000 shares in the period of time between May 2008 and August 2008, and Gregg McNelis, Captain Meimaris' other partner, sold 375,000 because the price of shares were high at $51.00 per share.  Captain Meimaris was not aware that Mr. Royce and Mr. Blatte were actually selling such a large amount of their shares and that he had been lied to by Mr. Royce and Mr. Blatte, about selling his own shares.

84.     Once again, Captain Meimaris was tricked by Mr. Royce and Mr. Blatte.    They fraudulently induced Captain Meimaris to not sell his shares, so that they could sell their own shares.

85.     Defendants had represented to Captain Meimaris that selling a bulk of his shares would harm the Company.   This representation was untrue, as they were in fact selling enormous amounts of shares at that time.    They knew when they made the statement to Captain Meimaris that the statement was false.   The statement was made with the intent to deprive Captain Meimaris of the right to sell his shares at a high price and with the intent to deprive him of money from the sale of shares. They knew Captain Meimaris would listen to them and they fraudulently induced him not to act by their deliberate material misrepresentations.   Captain Meimaris relied on their representations and did not sell.

86.     Upon information and belief Mr. Royce and Mr. Blatte knew that their Company would be going into a reorganization and they wanted to get rid of some of their shares so as not to lose money, from a drop in share price thereby preventing Captain Meimaris from selling his shares.

87.     Captain Meimaris was left with almost a million shares which were valueless because the Company went into reorganization before Captain Meimaris had the chance to sell them, following instruction not to sell by his partners/friends.

88.     These Defendants owed a fiduciary duty to Captain Meimaris, as partners and majority shareholders, which they breached by fraudulently inducing Captain Meimaris not to sell shares.    They blatantly and deliberately misled Captain Meimaris with material misrepresentations of the truth.   They breached the duty of care, duty of loyalty and duty of honesty owed to Captain Meimaris thereby committing statutory fraud and common law fraud on Captain Meimaris.   Further, Defendants knew of Captain Meimaris' condition of Trigeminal Neuralgia and took advantage of him in his state of illness.

89.     These Fraudulent acts and breach of fiduciary duty caused the Plaintiffs pecuniary damage, specific damage and exemplary damage.

90.     Plaintiffs seek punitive damages against defendants to deter them from further engaging in such practices again.

### THIRD CAUSE OF ACTION
(Breach of Fiduciary Duty based on Fraudulently pushing Captain Meimaris out of the Bank Reorganization deal)

91.     Plaintiff's repeats and reasserts  the allegations of paragraphs 1 through 90 as though fully set forth herein.

92.     In 2010-2011, the founding shareholders of TBS International were working on an agreement whereby they would put $10 million into the Company.

93.     Captain Meimaris learned of this agreement with the banks and asked Mr. Royce on a few occasions if he needed to do anything.  Mr. Royce told Captain Meimaris that they were handling it and not to worry about his interests.  Captain Meimaris asked Mr. Royce if he needed to put any money in for the deal.  Mr. Royce told him not to worry about it, that they were handling it , that he would let Captain Meimaris know if they needed anything and that they were protecting his interests.

94.     It was later found out that Mr, Royce, Mr, Blatte and Mr. McNelis took preferred shares in TBS International as a result of the Agreement among themselves.

95.     When TBS International began to go through the reorganization process, Captain Meimaris, as a founding shareholder, asked Mr. Royce again if there was anything needed from him.  Mr. Royce told him not to worry, that it was being handled.

96.     In February 2012, the Reorganization Plan was introduced to the Bankruptcy Court. The Reorganization Plan provided for the banks owning 90% of the Company and for 10%of the Company to be owned by Mr. Royce, Mr. Blatte and Mr. McNelis.  They had used their preferred shares to remain as shareholders in the reorganization.

97.     Captain Meimaris' partners had fraudulently pushed him out of  10% ownership of the new TBS.

98.     These partners owed a fiduciary duty to Captain Meimaris, as partners and majority shareholder, to include him in the deal and they fraudulently kept him out,  leading the banks to believe that Captain Meimaris had no interest in the Company in which he was one of the founders.

99.     Mr. Royce had made a material and deliberate false and misleading representation to Captain Meimaris that he did not need to participate in their Agreement and that he did not need to put money into it and that his interests were protected.  Mr. Royce knew that his representation was false and untrue.  Mr. Royce made his statement with the intent to deceive Captain Meimaris and prevent Captain Meimaris from protecting his interests by participating with the other defendants in the Agreement/Deal.

100.     Mr. Royce and Mr. Blatte knew that the Company would be going into a reorganization and they wanted to protect their interests while denying another founding partner, Captain Meimaris, the right to protect his interests.  The Defendants breached the duty of care, duty of loyalty and duty of honest to Captain Meimaris. These Defendants committed statutory fraud and common law fraud on Captain Meimaris as well as breaching their fiduciary duty owed to him Further, Defendants knew of Captain Meimaris' condition of Trigeminal Neuralgia and took advantage of him in his state of illness.

101.     Captain Meimaris reasonably relied on Mr. Royce's representations.

102.     This Breach of Fiduciary Duty based upon Fraud caused Plaintiffs pecuniary damage, specific damage and exemplary damage.

103.     Plaintiffs seek punitive damages against defendants to deter them from further engaging in such practices.

**FOURTH CAUSE OF ACTION**
(Fraudulently stealing Captain Meimaris' shares and interests in TBS Commercial Group)

104.    Plaintiff's repeats and reasserts  the allegations of paragraphs 1 through 103 as though fully set forth herein.

105.    Defendants, Tulio Prieto and Mr. Royce had tried on several occasions to have Captain Meimaris give up his shares (10% ownership ) in TBS Commercial Group.

106.    Mr. Prieto sent Captain Meimaris a document to sign, through Tara Demakes,   which stated that Captain Meimaris was giving up all of his rights and interests in TBS Commercial Group for no compensation.  Captain Meimaris refused to sign this document .

107.    Mr, Royce had tried to convince Captain Meimaris' daughter Alkistis Meimaris, that others were also giving up their shares in TBS Commercial Group.   She did not believe Mr. Royce and told her father he was lying.

108.    Mr.  Royce went as far as going to Captain Meimaris' home in December 2011 to ask Captain Meimaris and Helen Meimaris to give up their shares in TBS Commercial Group. Captain and Mrs. Meimaris flatly refused,  telling Mr. Royce that Captain Meimaris would not give up his life's work for no compensation.

109.    In 2012, TBS Commercial Group was used in the TBS International Reorganization.

110.    Upon information and belief, TBS Commercial Group was a condition precedent to the TBS International Reorganization.

111.    Captain Meimaris was never asked, nor consented to the use of TBS Commercial Group, a private entity owned solely by Captain Meimaris, Mr. Royce, Mr. McNelis and Mr. Blatte.

112.    Defendants used The TBS Commercial Group without Captain Meimaris' consent or knowledge.

113.    Defendants defrauded Captain Meimaris by using an entity in which he was 10% owner knowledge or consent.

114.    Defendants defrauded the Banks into thinking that Defendants had the right to use TBS Commercial Group as part of the TBS International Reorganization.

115.    Defendants benefitted from the use of TBS Commercial Group at the expense of Captain Meimaris.

116.    Upon information and belief, Defendants either forged Captain Meimaris' consent to the use of TBS Commercial Group, or closed and reopened the Companies in the TBS Commercial Group under other names and ownership, or they simply unilaterally dropped Captain Meimaris from his position in  the Companies in then Group.

117.    Defendants committed Fraud with the intent to deprive Captain Meimaris of his shares.

118.    When Defendants submitted TBS Commercial Group as part of the TBS International Reorganization without the knowledge or consent of Captain Meimaris, they were committing Fraud on the Banks as well as on Captain Meimaris.

119.    The Defendants use of TBS Commercial Group as part of the Reorganization was a material misrepresentation to the Banks as to which defendants had no authority.   The Defendants deliberately misled the Banks into to believing that all of the members of the TBS Commercial Group agreed to this submission.   Defendants statements were material and misleading.

120.    TBS Commercial Group was a condition of the reorganization. The Banks, relying on Defendants representations continued on with the reorganization of TBS International.

121.    The Defendants made these representations with the intent to deceive the Banks, inducing the banks to continue with the reorganization, which the Banks did.

122.    The Banks justifiably relied on the Defendants representations.

123.    TBS Commercial Group was not at liberty to be used in the reorganization without the consent of its 10% shareholder, Captain Meimaris.   Therefore, the reorganization should be deemed null and void based upon such a material misrepresentation.

124.    Defendants acted with the intent to deprive Captain Meimaris of his shares.   When Defendants had approached Captain Meimaris to transfer his shares to them, Captain Meimaris believed that his refusal to transfer meant that he still retained his 10% ownership in TBS Commercial Group. The Defendants failure to let to Captain Meimaris know  of the fact that they were using TBS Commercial Group as  part of the reorganization was intentional.  The Defendants intended to deprive Captain Meimaris of his shares by not divulging to him what was going on with the reorganization.    Captain Meimaris relied on this omission to his detriment.  He was left with no shares in TBS Commercial Group.

125.    The Defendants committed statutory fraud and common law fraud against the Banks and against Captain Meimaris. Defendants owed Captain Meimaris a fiduciary duty as partners and majority shareholder.  They breached their duty of care, duty of loyalty and duty of honesty owed to Captain Meimaris.   Further, Defendants knew of Captain Meimaris' condition of Trigeminal Neuralgia and took advantage of him in his state of illness.

126.    These blatant acts of Fraud and breaches of fiduciary duty caused Plaintiffs pecuniary damage, specific damage and exemplary damage.

127.    Plaintiffs seek punitive damages against defendants to deter them from engaging in Such practices again.

## FIFTH CAUSE OF ACTION
(Fraudulent transfer of Captain Meimaris' interests in TBS Ecuador by Jaime Leroux)

128.    Plaintiff's repeats and reasserts  the allegations of paragraphs 1 through 127 as though fully set forth herein.

129.    In 2012, Jaime Leroux requested that Captain Meimaris send him documents indicating his ownership in TBS Commercial Group.   This documentation was sent to Mr. Leroux.

130.    In 2013, Mr. Leroux came to the United States and during a dinner meeting assured Captain Meimaris, Helen Meimaris and Alkistis Meimaris that he would protect Captain Meimaris' interests and never give Captain Meimaris' shares up to Mr. Royce or Mr. Blatte. Captain Meimaris relied on this assurance.

131.    In 2014, Mr. Leroux came to the United States and during a dinner meeting told Helen Meimaris and Alkistis Meimaris that Captain Meimaris' shares no longer existed and that he had nothing to do with this.  Mr. Leroux stated that Mr. Royce, Mr.  Blatte and Mr. Mcnelis held all the shares in TBS Ecuador.

132.    Upon information and belief, as President of TBS Ecuador, Mr. Leroux facilitated the transfer of Captain Meimaris' shares to Mr. Royce, Mr. Blatte and Mr. McNelis and or the closing of the original TBS Ecuador and reopening of a new TBS Ecuador without Captain Meimaris as a shareholder.

133.    Mr. Leroux as the President of TBS Ecuador had made a representation to Captain Meimaris that his shares would be safe with Mr. Leroux as President.

134.    Captain Meimaris relied on this representation of Mr. Leroux and felt confident that his shares in TBS Ecuador were safe based upon Mr. Leroux's representations. Captain Meimaris also had asked Mr. Leroux, on at least three occasions, for the documents in spanish which indicated his interest in TBS Ecuador.   Mr. Leroux kept promising to send them to Captain Meimaris, however, he never did.   Mr. Leroux knew that his statement of keeping Captain Meimaris' shares safe was untrue.  It was a material statement which was deliberately made to mislead Captain Meimaris.  Captain Meimaris had no knowledge that it was  false.

135.    Upon Information and belief, Mr. Leroux not only knew about Captain Meimaris' shares being stolen from him by Mr. Royce and Mr. Blatte, but Mr. Leroux helped to effectuate the transfer as President of TBS Ecuador.

136.    Upon information and belief, Mr. Leroux had requested the documents from Captain Meimaris to use to transfer Captain Meimaris' shares to Defendants.   Mr. Leroux intended to deceive Captain Meimaris when he requested the documents and when he told Captain Meimaris that he would protect Captain Meimaris' interests.

137.    Captain Meimaris justifiably relied on Mr. Leroux's representations and was caused harm.

138.    Mr. Leroux and the other Defendants committed statutory fraud and common law fraud on Captain Meimaris.  Mr. Leroux and the other Defendants as partners and major shareholder breached the duty of care, duty of loyalty and duty of honesty owed to Captain Meimaris.  Mr. Leroux knew of Captain Meimaris' condition of Trigeminal Neuralgia and took advantage of him in his state of illness.

139.    This Breach of Fiduciary Duty based upon Fraud caused Plaintiffs pecuniary damage, specific damage and exemplary damage.

140.    Plaintiffs seek punitive damages against defendants to deter them from further engaging in such practices.


**SIXTH CAUSE OF ACTION**
(Conspiracy to commit Fraud)

141.    Plaintiff's repeats and reasserts  the allegations of paragraphs 1 through 140. as though fully set forth herein.

142.    Defendants Mr. Royce, Mr.   Blatte and Tulio Prieto conspired to deprive Captain Meimaris of his interest in TBS Commercial Group.

143.    Mr. Prieto tried to get him to sign over his shares in writing.

144.    Mr. Royce tried to force him to transfer his ownership through lies by telling Captain Meimaris' daughter that others were doing the same.

145.    When all else failed, Mr. Royce asked for the shares outright in December of 2011.

146.    When Captain Meimaris would not transfer his ownership in TBS Commercial Group, the Defendants conspired to take them away from Captain Meimaris by other means, which they ultimately did.

147.    Defendants Mr. Royce and Mr. Blatte conspired to usurp the business opportunity presented to  Captain Meimaris by Jaime Leroux in Ecuador.

148.    Defendants hatched a plan to tell Captain Meimaris that the Ecuador business opportunity was in conflict with his interests in TBS.  Captain Meimaris believed the defendants and did not pursue the opportunity.   Defendants pursued the opportunity for themselves, carrying out their conspiracy by obtaining it for themselves.

149.    Defendants conspired to deprive Captain Meimaris' rights to obtain preferred shares in TBS International.  They formulated a plan whereby they would tell Captain Meimaris that he did not need to do anything and to leave everything up to them and that his interests would be protected.   Defendants furthered the conspiracy by putting the plan into action to   push Captain Meimaris out of their own Agreement/Deal to obtain the shares in TBS.

150.    Defendants conspired to deprive Captain Meimaris the rights to cash in his shares to TBS International.  In order to prevent him from selling they hatched a plan to tell Captain Meimaris that it would hurt the Company if he sold a lot of his shares.  They carried out this plan to Captain Meimaris' detriment.

151.    Defendants conspired to prevent Captain Meimaris from participating in the Reorganization of TBS International.  Knowing that they were headed for a reorganization they planned to take preferred shares in TBS International so that they could receive an interest in the new company after the reorganization.  They planned to tell Captain Meimaris that he need not  do anything with regard to contributing to the Agreement/Deal reached by Defendants and they would  protect his interests. Defendants furthered their conspiracy plan to Captain Meimaris' detriment.

152.    Upon information and belief, the mastermind behind these conspiracies to commit fraud and breach of fiduciary duty was Mr. Blatte.  Mr. Blatte, had no shipping knowledge. Mr. Blatte, who upon information and belief had participated in many underhanded unethical plots to benefit himself,  had told Tara Demakes in 2006, that he did not want the Meimaris' as part of the TBS Commercial Group.

153.    Mr. Blatte, upon information and belief devised the plans to not only usurp business opportunities from Captain Meimaris and prevent him from selling his shares in TBS International but to take away his interests in TBS Commercial Group. Mr. Blatte also devised

the Plan to keep Captain Meimaris out of the TBS International Reorganization and deny him the rights of preferred shares..

154.    Mr. Blatte with the assistance of Mr. Royce conspired to ruin Captain Meimaris financially and take away his rightful holdings and opportunities.

155.    Defendants conspired to commit fraud on Captain Meimaris by hatching plots to deprive him of his shares in the new company after the reorganization, by conspiring to deprive him of his shares in TBS International, by conspiring to deprive him of cashing in his shares in TBS International, by depriving him of a business opportunity and by depriving him of his shares in TBS Ecuador.  Further, Defendants knew of Captain Meimaris' condition of Trigeminal Neuralgia and took advantage of him in his state of illness.   These parties agreed to commit fraud and breach fiduciary duties owed to Captain Meimaris and they took various actions to further their agreements as herein stated, completing their conspiracy against Captain Meimaris.

156.    These Conspiracies to commit Fraud and breach of fiduciary duties caused Plaintiffs pecuniary damage,  specific damage and exemplary damage.

157.    Plaintiffs seek punitive damages against defendants to deter them from further engaging in such practices.

## SEVENTH CAUSE OF ACTION
### (TBS SHIPPING SERVICES INC. Knowledge of Fraud)

158.    Plaintiff's repeats and reasserts  the allegations of paragraphs 1 through 157. as though fully set forth herein.

159.    Upon Information and belief TBS Shipping Services Inc. and its principals had knowledge of Captain Meimaris' ownership in TBS Commercial Group.   Captain Meimaris' name had been all over all documents concerning TBS Commercial Group.

160.    Upon information and belief TBS Shipping Services Inc. and it's principals failed to question Captain Meimaris' exclusion from new agreements involving TBS Commercial Group.

161.    Upon information and belief TBS Shipping Services Inc. and it's principals were well aware of all of the actions of the other Defendants including the theft, the fraud and the conspiracy.

162.    This Defendant had the opportunity to opt out of the wrongdoings  and illegal actions of the Defendants, yet they chose not to.

163.    This Defendants participation in all of the wrongdoings and illegal actions caused Plaintiffs pecuniary damage,  specific damage and exemplary damage.

164.    Plaintiffs seek punitive damages against defendants to deter them from further engaging in such practices.

## **PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff's respectfully pray for relief against Mr. Royce, Mr. Blatte, Mr. Prieto, Mr. Leroux and TBS Shipping Service s Inc. as follows:**

(A)   Compensatory damages for Breach of Fiduciary Duty based upon Fraud for usurping the corporate opportunity;

(B)   Compensatory damages for Fraudulent Inducement for Captain Meimaris to sell his shares and breach of fiduciary duty;

(C)   Compensatory damages for Breach of Fiduciary Duty based upon Fraud for pushing Captain Meimaris out of the TBS International Reorganization deal;

(D)   Compensatory damages for Fraudulently stealing and dispensing with Captain Meimaris 10% interest in TBS Commercial Group and breach of fiduciary duty;

(E)   Compensatory damages for the Breach of Fiduciary duty based upon Fraud for Jaime Leroux facilitating the transfer of Captain Meimaris' shares;

(F)   Compensatory damages for Conspiracy to commit Fraud and Conspiracy to breach fiduciary duties owed to Captain Meimaris ;

(G)   Compensatory damages in no less than $20 million for injury resulting from the loss of the 10% interest in TBS Commercial Group and the lost business opportunity from all Defendants;

(H)   Special damages in the amount of $20 million representing the amount of money Captain Meimaris could have received has he been allowed to sell his shares from all Defendants and representing all of the breach of fiduciary duties by the Defendants;

(I)   Exemplary damages in the amount of $20 million representing the harm  amount caused by Defendants wanton willful misconduct.

(J)   Punitive damages for the wanton, malicious and intentional Breaches of Fiduciary Duty based upon Fraud, Fraud and Conspiracy to commit Fraud, in the amount of $50 million, from all Defendants;

(K)   Interest, Costs and reasonable Attorney's fees incurred by the Plaintiffs in the prosecution of this action and

(L)   Any other such further relief as the Court deems Just and Proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury for all issues so triable in this action.

Dated:  May 16, 2018
        New York City, New York

By:     /s/ Alkistis G. Meimaris, Esq.

        Alkistis G. Meimaris, Esq. For Plaintiffs

        ALKISTIS G. MEIMARIS, ESQ.
        244 5th Avenue Suite M250
        New York, New York   10001
        (201) 615-3220 phone
        alkistism@aol.com  email