> THIS SOLICITATION IS BEING COMMENCED TO OBTAIN ACCEPTANCES OF THE DEBTORS' PLAN PRIOR TO THE FILING BY THE DEBTORS OF THEIR VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE OR COMPLYING WITH APPLICABLE NON-BANKRUPTCY LAW, ALTHOUGH THE DEBTORS BELIEVE IT DOES. FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE DEBTORS EXPECT PROMPTLY TO SEEK AN ORDER OF THE BANKRUPTCY COURT (i) APPROVING (a) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WITH RESPECT TO THE PLAN AND BEING IN COMPLIANCE WITH APPLICABLE NON-BANKRUPTCY LAW AND (b) THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE AND (ii) CONFIRMING THE PLAN. **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. PREVAILING U.S. EASTERN TIME ON FEBRUARY 14, 2012**, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THE DEBTORS MAY COMMENCE THEIR CHAPTER 11 CASES PRIOR TO THE VOTING DEADLINE.

## DISCLOSURE STATEMENT

### Dated: January 31, 2012

**Prepetition Solicitation of Votes in Respect of Joint Prepackaged Chapter 11 Plan**

of

**TBS SHIPPING SERVICES INC. AND ITS AFFILIATES, WHICH ARE LISTED ON APPENDIX 1, ANNEXED HERETO**

AS OF THE DATE OF THIS DISCLOSURE STATEMENT, TBS SHIPPING SERVICES INC. AND ITS AFFILIATES LISTED ON APPENDIX 1 HAVE NOT COMMENCED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT SOLICITS ACCEPTANCES OF THE PLAN AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT THE PLAN.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  PLEASE BE ADVISED, HOWEVER, THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE HEREOF UNLESS SO SPECIFIED. THE DEBTORS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION CONTAINED HEREIN.   IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125(g) OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE. ALL PERSONS HOLDING CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS SHOULD EVALUATE THIS

DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS IN ACCORDANCE WITH FEDERAL RULE OF EVIDENCE 408.

**THE DEBTORS' BOARDS OF DIRECTORS (OR EQUIVALENTS THEREOF, AS APPLICABLE) HAVE APPROVED THE PLAN AND RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL IMPAIRED CLASSES ENTITLED TO VOTE (CLASSES 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73)) VOTE TO ACCEPT THE PLAN. IN ADDITION, THE PARTIES TO THE PLAN SUPPORT AGREEMENT, INCLUDING THE AGENTS FOR THE DEBTORS' VARIOUS DEBT SECURITIES HAVE APPROVED THE PLAN AND RECOMMEND ITS ACCEPTANCE.**

THE DEBTORS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. *SEE* SECTION V.I. – "CONDITIONS PRECEDENT TO CONSUMMATION." THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ARE DESCRIBED UNDER SECTION V.G. – "PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS." DISTRIBUTIONS WILL BE MADE ONLY IN COMPLIANCE WITH THESE PROCEDURES.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS AND INTERESTS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

IF THE RESTRUCTURING OF INDEBTEDNESS CONTEMPLATED BY THE PLAN IS NOT APPROVED AND CONSUMMATED, THERE CAN BE NO ASSURANCE THAT THE DEBTORS WILL BE ABLE TO EFFECTUATE AN ALTERNATIVE FINANCIAL RESTRUCTURING OR SUCCESSFULLY EMERGE FROM THEIR CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND SOME OR ALL OF THE DEBTORS MAY BE FORCED INTO A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY

CODE OR UNDER THE LAWS OF OTHER COUNTRIES. AS REFLECTED IN THE LIQUIDATION ANALYSIS, THE DEBTORS BELIEVE THAT IF THEY ARE LIQUIDATED UNDER CHAPTER 7 OR OTHERWISE, THE VALUE OF THE ASSETS AVAILABLE FOR PAYMENT OF CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUE OF THE DISTRIBUTIONS CONTEMPLATED BY AND UNDER THE PLAN.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE EQUITY INTERESTS TO BE ISSUED UNDER THE PLAN WILL NOT HAVE BEEN, OR BE, THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "_SEC_") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "_SECURITIES ACT_") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR FOREIGN COUNTRY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS OR THE LAWS OF ANY FOREIGN COUNTRY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE OR FOREIGN SECURITIES REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTORS' MANAGEMENT DID NOT PREPARE THE PROJECTIONS IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("_GAAP_") OR INTERNATIONAL FINANCIAL REPORTING STANDARDS ("_IFRS_") OR TO COMPLY WITH THE RULES AND REGULATIONS OF THE SEC OR ANY FOREIGN REGULATORY AUTHORITY.

THE PROJECTIONS AND FORWARD-LOOKING STATEMENTS HEREIN ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. SEE SECTION VIII. – "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN WHICH, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE REORGANIZED DEBTORS AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTORS, THE REORGANIZED DEBTORS, THEIR

ADVISORS, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. NEITHER THE DEBTORS' INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS AND THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY.

THE PROJECTIONS SET FORTH HEREIN ARE PUBLISHED SOLELY FOR PURPOSES OF THIS DISCLOSURE STATEMENT. THE PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED IN THIS DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS WILL PROVE CORRECT OR THAT THE DEBTORS' OR REORGANIZED DEBTORS' ACTUAL RESULTS WILL NOT DIFFER MATERIALLY FROM THE RESULTS PROJECTED IN THIS DISCLOSURE STATEMENT. THE DEBTORS AND THEIR PROFESSIONALS DO NOT UNDERTAKE ANY OBLIGATION, EXPRESS OR IMPLIED, TO UPDATE OR OTHERWISE REVISE ANY PROJECTIONS OR INFORMATION DISCLOSED HEREIN TO REFLECT ANY CHANGES ARISING AFTER THE DATE HEREOF OR TO REFLECT FUTURE EVENTS, EVEN IF ANY ASSUMPTIONS CONTAINED HEREIN ARE SHOWN TO BE IN ERROR. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, INCLUDING THOSE ASSOCIATED WITH THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, COMMODITY PRICE FLUCTUATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS AND OTHER MARKET AND COMPETITIVE CONDITIONS.

HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.

SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT; MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

IN THIS DISCLOSURE STATEMENT, THE DEBTORS RELY ON AND REFER TO INFORMATION AND STATISTICS REGARDING THEIR INDUSTRY. THE DEBTORS OBTAINED THIS MARKET DATA FROM INDEPENDENT INDUSTRY PUBLICATIONS OR OTHER PUBLICLY AVAILABLE INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SOURCES ARE RELIABLE, THE DEBTORS HAVE NOT INDEPENDENTLY VERIFIED AND DO NOT GUARANTEE THE ACCURACY AND COMPLETENESS OF THIS INFORMATION.

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF THE PLAN ...................................................... 1

    A. OVERVIEW OF CHAPTER 11 ...................................................................3

    B. ECONOMICS AND EFFECT OF THE PLAN TRANSACTIONS ................................3

    C. SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ...................................................................................8

    D. SUMMARY OF TREATMENT AND PROJECTED RECOVERIES ...........................8

II. GENERAL INFORMATION ................................................................................ 15

    A. THE COMPANY'S BUSINESS ................................................................15

    B. THE DEBTORS' PREVIOUS CHAPTER 11 CASE ......................................17

    C. DEBTORS' PREPETITION CORPORATE STRUCTURE ...............................17

    D. DEBTORS' PREPETITION CAPITAL STRUCTURE ...................................20

        1. Preferred Stock ........................................................................ 20

        2. Common Stock .......................................................................... 20

        3. Prepetition Secured Debt ............................................................ 20

        4. Bank of America Facility ........................................................... 21

        5. Royal Bank of Scotland Facilities ................................................ 22

        6. DVB Facility ............................................................................ 22

        7. Credit Suisse Facility ................................................................. 22

        8. AIG Facility ............................................................................. 23

        9. Bareboat Charters ..................................................................... 23

        10. Unsecured Trade Debt .............................................................. 23

III. EVENTS LEADING TO THE CHAPTER 11 CASES ................................................. 23

    A. IMPACT OF GLOBAL RECESSION ..........................................................24

    B. AMENDING AND RESTATING THE PREPETITION CREDIT FACILITIES ..........25

IV. THE ANTICIPATED CHAPTER 11 CASES ........................................................... 26

    A. RELIEF TO BE SOUGHT AT OR NEAR THE OUTSET OF THE CHAPTER 11 CASES ...................................................................27

        1. Scheduling Motion for Combined Disclosure Statement and Confirmation Hearing ........ 27

        2. Motion to Extend Deadline to File Schedules and Statements of Financial Affairs or Waive Requirement to File Schedules and Statements of Financial Affairs Upon Confirmation of Plan ......................................................... 28

        3. Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Superpriority Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Liens and Superpriority Claims to DIP Lenders,

i

(IV) Providing Adequate Protection, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing ............................................................................. 28

4.   Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Superpriority Financing from Credit Suisse AG, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Liens and Superpriority Claims to DIP Lenders, (IV) Providing Adequate Protection, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing ............................. 31

5.   Motion For Order (I) Authorizing Debtors to (A) Continue Existing Cash Management System, Bank Accounts, and Business Forms and (B) Continue Ordinary Course Intercompany Transactions; and (II) Granting an Extension of Time to Comply With the Requirements of Section 345(b) of the Bankruptcy Code ......................................................................................................... 33

6.   Motion for Interim and Final Orders (A) Authorizing Debtors to Pay Certain Prepetition Claims of Critical and Foreign Vendors and Certain Administrative Claimholders; and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers ........................................................ 33

7.   Motion for Interim and Final Orders Confirming the Protections of Sections 362 and 365 of the Bankruptcy Code and Restraining Any Action in Contravention Thereof ...................................................................................... 35

8.   Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Salaries, and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Similar Benefits, and (C) Continue Employee Compensation and Benefit Programs ................................. 35

9.   Motion for Interim and Final Orders (A) Authorizing the Debtors to Continue Insurance Coverage Entered Into Prepetition and to Pay Obligations Relating Thereto; and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers .................................................................... 35

10.  Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services To, or Discriminating Against, the Debtors on Account of Prepetition Invoices; (B) Determining That the Utilities Are Adequately Assured of Future Payment; (C) Establishing Procedures for Determining Requests for Additional Assurance; and (D) Permitting Utility Companies to Object to Such Procedures ............................................................. 36

11.  RBS Settlement Agreement Assumption Motion ................................................ 36

12.  Plan Support Agreement Assumption Motion ..................................................... 36

B.   ADMINISTRATIVE MOTIONS .................................................................................... 36

1.   Professional Retention Applications and Professional-Related Motions ............ 37

V.   SUMMARY OF THE PLAN ............................................................................................ 37

A.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............... 38

B.   TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN: ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS ....................................................................................................... 39

1.  Administrative Expense Claims .................................................................. 39

2.  Professional Compensation Claims ............................................................ 40

3.  Priority Tax Claims ..................................................................................... 40

4.  U.S. Trustee Fees ........................................................................................ 40

5.  BOA/DVB DIP Facility Claims ................................................................. 40

6.  Credit Suisse DIP Facility Claims ............................................................. 41

C.  CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND
EQUITY INTERESTS ........................................................................................41

1.  Summary ..................................................................................................... 41

2.  Classification of Claims and Interests ....................................................... 41

3.  Effect of Non-Voting; Modifications ......................................................... 42

4.  Treatment of Classes 1(1)-(73): Other Priority Claims ............................. 42

5.  Treatment of Classes 2(1)-(73): Other Secured Claims ............................ 43

6.  Treatment of Classes 3(1), 3(2), 3(3), and 3(61)-(67): DVB Syndicate Claims ................. 43

7.  Treatment of Classes 4(1)-(60): BOA Syndicate Claims .......................... 43

8.  Treatment of Classes 5(1), 5(2), 5(68), and 5(69): Credit Suisse Claims ........................... 44

9.  Treatment of Classes 6(1)-(3), and 6(70)-(73): AIG Claims ..................... 44

10. Treatment of Classes 7(1)-(2):  RBS Syndicate Claims ............................ 45

11. Treatment of Classes 8(1)-(73): General Unsecured Claims ...................... 45

12. Treatment of Classes 9(1)-(73): Intercompany Claims .............................. 45

13. Treatment of Classes 10(1)-(73): Subordinated Claims ............................ 46

14. Treatment of Classes 11(1)-(73): Interests ............................................... 46

15. Disclaimer Governing Unimpaired Claims ................................................ 47

16. Controversy Concerning Impairment ......................................................... 47

D.  PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY
IMPAIRED CLASSES, AND CONSEQUENCES OF NON-
CONFIRMABILITY ...........................................................................................47

1.  Voting Rights ............................................................................................. 47

2.  Acceptance Requirements .......................................................................... 47

3.  Cram Down ................................................................................................. 47

4.  Global Enterprise/Tabulation of the Votes ................................................ 48

5.  Non-Confirmability .................................................................................... 48

E.  MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION
GOVERNANCE OF REORGANIZED DEBTORS .............................................48

1.  General Settlement of Claims .................................................................... 48

2.   Sources of Consideration for Plan Distributions .................................................. 48

3.   Rule 2004 Examinations ......................................................................................... 50

4.   Continued Existence .............................................................................................. 50

5.   Re-vesting of Assets .............................................................................................. 50

6.   Implementation Transactions ................................................................................ 50

7.   Cancellation of Securities and Agreements .......................................................... 51

8.   Reorganized Debtors; New TBS Parent ............................................................... 52

9.   Post Effective Date Management .......................................................................... 52

10.  Directors and Officers of New TBS Parent and the Reorganized Debtors .......... 52

11.  New Articles of Association and New Bylaws of the Reorganized Debtors ........ 52

12.  Management Incentive Plan .................................................................................. 53

13.  Employment, Retirement, Indemnification, and Other Related Agreements ....... 53

14.  Effectuating Documents; Further Transactions .................................................... 54

15.  Entity Action ......................................................................................................... 54

16.  Section 1146 Exemption ....................................................................................... 55

17.  Preservation of Causes of Action ......................................................................... 55

18.  Non-occurrence of Effective Date ........................................................................ 56

F.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 56

1.   Assumption and Rejection of Contracts and Unexpired Leases ........................... 56

2.   DVB Bareboat Charters ......................................................................................... 56

3.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ........... 57

4.   Cure of Defaults .................................................................................................... 57

5.   Contracts and Leases Entered into after the Petition Date .................................... 58

6.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 58

7.   Reservation of Rights ............................................................................................ 58

G.  PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR
    TREATING AND RESOLVING DISPUTED CLAIMS ............................................... 58

1.   Distributions .......................................................................................................... 58

2.   Distribution Record Date ...................................................................................... 59

3.   Cash Payments ....................................................................................................... 59

4.   Delivery of Distributions ...................................................................................... 59

5.   Minimum Cash Distributions ................................................................................ 59

6.   Withholding Taxes ................................................................................................ 59

7.   Unclaimed Property ............................................................................................... 60

8.   Disputed Claims .................................................................................................... 60

9.    Objections to Claims ................................................................................ 60

10.   Compromises and Settlements .................................................................. 60

11.   Reservation of Debtors' Rights ................................................................ 61

12.   No Distributions Pending Allowance ....................................................... 61

13.   No Postpetition Interest on Claims........................................................... 61

14.   Claims Paid or Payable by Third Parties ................................................. 61

15.   Effect of Acceptance of Distribution ....................................................... 61

H.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............62

1.    Discharge................................................................................................... 62

2.    Releases ..................................................................................................... 63

3.    No Successor Liability .............................................................................. 66

4.    Release of Liens ........................................................................................ 66

5.    Term of Injunctions .................................................................................. 66

6.    Binding Effect ........................................................................................... 66

7.    Dissolution of the Committee.................................................................... 66

I.    CONDITIONS PRECEDENT TO CONSUMMATION ...........................................67

1.    Conditions Precedent ................................................................................ 67

2.    Conditions to Confirmation ...................................................................... 67

3.    Conditions to Effective Date ..................................................................... 67

4.    Waiver ....................................................................................................... 68

5.    Effect of Failure of Conditions upon the Plan ......................................... 68

J.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT .....................69

K.    MISCELLANEOUS PROVISIONS OF THE PLAN .................................................71

1.    Plan Supplement ....................................................................................... 71

VI.   SOLICITATION AND VOTING PROCEDURES .................................................. 75

A.    PERSONS ENTITLED TO VOTE ON THE PLAN .....................................................75

1.    Voting Classes ........................................................................................... 75

2.    Presumed Acceptance of the Plan ............................................................. 75

3.    Presumed Rejection of the Plan ................................................................ 75

B.    THE SOLICITATION PACKAGE ..............................................................................76

C.    VOTING INSTRUCTIONS .........................................................................................76

D.    VOTING TABULATION.............................................................................................80

VII.  CONFIRMATION PROCEDURES ..................................................................... 80

v

A. COMBINED DISCLOSURE STATEMENT AND CONFIRMATION HEARING ..................................................................................................81

B. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..............81

    1. Best Interests of Creditors Test/Liquidation Analysis........................................ 82

    2. Feasibility ........................................................................................................... 84

    3. Acceptance by Impaired Classes ........................................................................ 86

    4. Confirmation Without Acceptance by All Impaired Classes .............................. 86

    5. No Unfair Discrimination ................................................................................... 87

    6. Fair and Equitable Test....................................................................................... 87

VIII. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................................................. 88

A. RISK FACTORS RELATED TO CONFIRMATION, EFFECTIVENESS, AND IMPLEMENTATION...............................................................................................88

    1. Parties in Interest May Object to the Company's Classification of Claims and Interests .............................................................................................................. 88

    2. Failure to Satisfy Vote Requirement .................................................................. 88

    3. The Company May Not Be Able to Secure Confirmation of the Plan ............... 88

    4. Nonconsensual Confirmation ............................................................................. 89

    5. A Party in Interest May Object to the Amount or Classification of a Claim...... 90

    6. Risk of Non-Occurrence of the Effective Date................................................... 90

    7. Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan ..................................................................................................................... 90

    8. Debtors' Exclusive Period Challenges ............................................................... 90

B. RISK FACTORS RELATED TO THE BUSINESS OF THE REORGANIZED DEBTORS ...............................................................................................................90

    1. The global financial crisis has had, and may continue to have, an impact on the Company's business and financial condition .................................................... 90

    2. The Company and the shipping industry experience very high volatility in revenues and costs ............................................................................................. 91

    3. Significant recent additions to the fleets of many ocean shipping companies have contributed to an excess supply of dry bulk vessels in all classes and resulted in heavy pressure on freight rates ........................................................................... 91

    4. Adverse weather conditions have significantly decreased the volume of many dry bulk cargoes and may continue to do so in the future ......................................... 92

    5. High or volatile oil prices could adversely affect the global economy and the Company's results of operations, and the Company may be unable to pass along increased fuel costs to the Company's customers. ................................................ 92

    6. Rising inflation in China could result in decreased demand for shipping services and further declines in shipping rates ................................................................... 92

7.   The Company's business depends to a significant degree on the stability and continued growth of the Asian and Latin American economies ........................................... 92

8.   Certain of the Company's vessel expenses are primarily inelastic, and any unexpected decrease in revenue would harm the Company's results ................................. 93

9.   A significant number of the Company's vessels will exceed their estimated economic useful life during the next three years .................................................. 93

10.  As the Company's fleet ages, the risks associated with older vessels could adversely affect the Company's operations ......................................................... 93

11.  There are risks associated with the purchase and operation of secondhand vessels ........... 94

12.  Vessel dry-docking could adversely affect the Company's operations ............................. 94

13.  The South American joint venture, Log-Star, could result in unmet strategic business expectations and a greater than expected commitment of resources .................. 95

14.  The Company depends upon a limited number of customers for a large part of the Company's revenue ........................................................................... 95

15.  The Company's competitive advantage in niche markets may be eliminated ................... 95

16.  In the highly competitive international shipping market, the Company may not be able to compete with new entrants or established companies with greater resources ........ 95

17.  Shortages of and rising costs to hire qualified crews, officers and engineers could adversely affect the Company's business .............................................................. 96

18.  The Company is subject to regulation and liability under environmental laws that could require significant expenditures and adversely affect the Company's financial condition, results of operations and cash flows .................................................... 96

19.  Failure to comply with international safety regulations could subject the Company to increased liability, adversely affect the Company's insurance coverage, and result in a denial of access to, or detention in, certain ports. ............................................... 97

20.  The shipping industry has inherent operational risks, which may not be adequately covered by insurance. ............................................................................... 97

21.  Compliance with environmental and other laws and regulations could adversely affect the Company's business ................................................................. 97

22.  The majority of the Company's revenue is derived from operations outside the United States and may be adversely affected by actions taken by foreign governments or other forces or events over which the Company has no control ............... 98

23.  Foreign currency exchange rates may adversely affect the Company's results ................. 99

24.  Acts of piracy on ocean-going vessels have increased recently in frequency and magnitude, which could adversely affect the Company's business ................................... 99

25.  The Company could be adversely affected by violations of the U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws ...................................... 100

26.  Marine claimants could arrest the Company's vessels, which could damage the Company's on-time performance reputation and result in a loss of cash flow ................. 100

27.  Governments could requisition the Company's vessels during a period of war or emergency, resulting in a loss of earnings ...................................................... 100

28. Legislative or regulatory action could materially and adversely affect the Company ........................................................................................................ 100

29. The Company Relies, To A Significant Degree, Upon Affiliated Service Companies ..................................................................................................... 101

C. RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS ...............................................................................................101

1. Financial Information Is Based on the Company's Books and Records and, Unless Otherwise Stated, No Audit Was Performed. ................................................... 101

2. Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary. .............................. 101

D. RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN ..............................................................................102

1. The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs, and Capital Expenditures. ........................................ 102

2. The New Common Stock is Speculative. ................................................................ 103

3. The New Common Stock and the Debt Issued Pursuant to the New Credit Agreements, the BOA/DVB Exit Facility, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility Are New Issues of Securities for Which There Is No Prior Market and the Trading Market for Equity Interests and the Debt Issued Pursuant to the New Credit Agreements, the BOA/DVB Exit Facility, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility May Be Limited.................. 103

4. The Company May be Required to Record a Significant Charge to Earnings If Its Long-Lived Assets or Goodwill Becomes Impaired. ....................................................... 104

5. It May Be Difficult For Holders of New Common Stock to Obtain or Enforce Judgments Against New TBS Parent In the United States. The Same Applies For Creditors Under the New Credit Agreements, the Exit Facilities, the New Senior Secured Loan Facility in Respect of Judgments Against Borrowers and Guarantors of the Debt Issued Pursuant to Such New Credit Agreements, Exit Facilities, New Senior Secured Loan Facility. ....................................................................... 104

6. The Rights and Responsibilities of New Common Stock in New TBS Parent Will Be Governed by Bermuda Law and Will Differ in Some Respects From the Rights and Responsibilities of Shareholders Under U.S. Law, and Shareholder Rights Under Bermuda Law May Not Be as Clearly Established as Shareholder Rights Are Established Under the Laws of Some U.S. Jurisdictions............................................ 105

7. Management Shareholders May Become the Holders of a Large Portion of New TBS Parent Shares. In that Case, Management Shareholders Will Have Substantial Control Over New TBS Parent, Which Could Limit the Ability of Other Holders of New TBS Parent Equity Interests to Influence the Outcome of Key Transactions, Including a Change of Control. ......................................................... 106

8. New TBS Parent Will Have Anti-Takeover Provisions In Its Memorandum of Association and Bye-Laws That May Discourage a Change of Control.......................... 106

E. DISCLOSURE STATEMENT DISCLAIMER ..........................................................106

1. Disclosure Statement Not Yet Approved ........................................................ 106

2. Information Contained Herein Is for Soliciting Votes ..................................... 107

3. No Legal, Business, or Tax Advice Is Provided to You by this Disclosure
Statement ........................................................................................................ 107

4. No Admissions Made ...................................................................................... 107

5. Failure to Identify Litigation Claims or Projected Objections ........................ 107

6. Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover
Transfers and Assets ....................................................................................... 107

7. Information Was Provided by the Company and Was Relied Upon by the
Company's Professionals ................................................................................. 108

8. Potential Exists for Inaccuracies, and the Company Has No Duty to Update ................. 108

9. No Representations Outside this Disclosure Statement Are Authorized ......................... 109

F. LIQUIDATION UNDER CHAPTER 7 .......................................................................110

IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ............................... 110

A. TAX CONSIDERATIONS OF THE PLAN ...............................................................111

B. OWNERSHIP OF NEW DEBT ..................................................................................113

C. OWNERSHIP OF NEW COMMON STOCK .............................................................114

D. SALE, EXCHANGE OR OTHER TAXABLE DISPOSITION OF NEW TBS
PARENT SHARES .....................................................................................................114

E. POSSIBLE TREATMENT OF TBS HOLDINGS LIMITED OR ITS
SUBSIDIARIES AS A PASSIVE FOREIGN INVESTMENT COMPANY ..............114

F. POSSIBLE TREATMENT OF TBS HOLDINGS LIMITED OR ITS
SUBSIDIARIES AS A CONTROLLED FOREIGN CORPORATION ......................115

G. TREATMENT OF DISTRIBUTIONS IF TBS HOLDINGS LIMITED IS NOT
A CFC .........................................................................................................................115

H. LOSS OF SHIPPING TAX EXEMPTION .................................................................116

I. BACKUP WITHHOLDING AND INFORMATION REPORTING FOR U.S.
HOLDERS ...................................................................................................................116

X. CERTAIN IRISH TAX CONSEQUENCES ................................................................ 116

A. CAPITAL GAINS TAX...............................................................................................116

B. STAMP DUTY ............................................................................................................117

C. VALUE ADDED TAX .................................................................................................117

D. IRISH TAX ISSUES FOR THE SHAREHOLDERS ..................................................117

XI. CERTAIN BERMUDA TAX CONSEQUENCES........................................................ 117

XII. CONCLUSION AND RECOMMENDATION ............................................................ 117

EXHIBIT A JOINT PREPACKAGED PLAN OF REORGANIZATION

**EXHIBIT B LIQUIDATION ANALYSIS**

**EXHIBIT C PROJECTIONS**

**EXHIBIT D PLAN SUPPORT AGREEMENT**

**EXHIBIT E BOA/DVB TERM SHEET**

**EXHIBIT F AIG TERM SHEET**

**EXHIBIT G CREDIT SUISSE TERM SHEET**

**EXHIBIT H RBS SETTLEMENT AGREEMENT**

**EXHIBIT I BOA/DVB COMMITMENT LETTER**

**EXHIBIT J BOA/DVB DIP FACILITY TERM SHEET**

**EXHIBIT K BAREBOAT CHARTER TERM SHEET**

**EXHIBIT L NEW EMPLOYMENT AGREEMENT TERM SHEET**

**EXHIBIT M NEW MANAGEMENT INCENTIVE PLAN TERM SHEET**

**EXHIBIT N TBS COMMERCIAL TERM SHEET**

**EXHIBIT O EQUITY AND CORPORATE GOVERNANCE TERM SHEET**

## I.    INTRODUCTION AND SUMMARY OF THE PLAN

TBS Shipping Services Inc. and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "***Debtors***" or the "***Company***"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims and Interests in connection with the solicitation of votes to accept or reject the *Joint Prepackaged Plan of Reorganization for the Debtors under Chapter 11 of the Bankruptcy Code*, dated January 31, 2012 (as the same may be amended, modified, or supplemented from time to time, the "***Plan***"). The Plan is being proposed by the Debtors and is anticipated to be filed with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").  A Uniform Glossary of Terms for the Plan Documents, including this Disclosure Statement, is attached as **Appendix B** to the Plan and is incorporated herein by reference.

Attached as exhibits to this Disclosure Statement are copies of the following documents: (a) the Plan (**Exhibit A**); (b) the Liquidation Analysis (**Exhibit B**), which sets forth estimated recoveries in a chapter 7 liquidation of the Debtors, as compared to estimated recoveries under the Plan; (c) the Projections (**Exhibit C**), which sets forth the analysis, and related financial projections, showing that, after the Effective Date, the Debtors will be able to fund their ongoing business and debt service obligations and will likely not require further financial reorganization; (d) the Plan Support Agreement (**Exhibit D**), exclusive of exhibits thereto; (e) the BOA/DVB Debt Term Sheet (**Exhibit E**); (f) the AIG Term Sheet (**Exhibit F**); (g) the Credit Suisse Term Sheet (**Exhibit G**); (h) the RBS Settlement Agreement (**Exhibit H**); (i) the BOA/DVB DIP Commitment Letter (**Exhibit I**); (j) the BOA/DVB DIP Facility Term Sheet (**Exhibit J**); (k) the Bareboat Charter Term Sheet (**Exhibit K**); (l) the New Employment Agreement Term Sheet (**Exhibit L**); (m) the New Management Incentive Plan Term Sheet (**Exhibit M**); (n) the TBS Commercial Term Sheet (**Exhibit N**); and (o) the Equity and Corporate Governance Term Sheet (**Exhibit O**).  In addition, for those Holders of Claims entitled to vote under the Plan, a Ballot (together with voting instructions) for the acceptance or rejection of the Plan is separately enclosed.

The Plan represents a compromise and settlement of various significant Claims against the Debtors.  The Plan seeks to preserve the value of the Debtors for their Creditors while recognizing and balancing the fact that the Debtors' Prepetition Lenders have claims against the Debtors that, absent such compromise and settlement, may result in the Prepetition Lenders receiving a recovery at a substantial discount to par, and leaving the Debtors' junior creditors and equity Holders without any recovery.

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS AND THE BEST POSSIBLE PROSPECT FOR THE DEBTORS' SUCCESSFUL REORGANIZATION.   THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

THE DEBTORS INTEND TO COMMENCE CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THE CONCLUSION OF THE SOLICITATION PERIOD OR AS SHORTLY THEREAFTER AS REASONABLY PRACTICABLE AND TO USE ANY PREPETITION ACCEPTANCES OF THE PLAN THAT ARE RECEIVED PRIOR TO THE CONCLUSION OF THE SOLICITATION PERIOD TO OBTAIN CONFIRMATION OF THE PLAN.  HOWEVER, THE DEBTORS RESERVE THE RIGHT TO COMMENCE THE CHAPTER 11 CASES PRIOR TO THE CONCLUSION OF THE SOLICITATION PERIOD AND SEEK TO USE ANY PREPETITION ACCEPTANCES OF THE PLAN THAT ARE RECEIVED PRIOR TO COMMENCEMENT OF SUCH CASES, TOGETHER WITH ANY POSTPETITION ACCEPTANCES OF THE PLAN RECEIVED IN ACCORDANCE WITH SECTION 1125(g) OF THE BANKRUPTCY CODE, TO OBTAIN CONFIRMATION OF THE PLAN.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the Plan.  Only Claims in Classes 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73) are Impaired by and entitled to receive a distribution under the Plan, and only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan.  The foregoing Classes consist of the Holders of Claims arising under the Existing DVB Credit Agreement, the Existing BOA Credit Agreement, the existing Credit Suisse Credit Agreement, and the Existing AIG Credit Agreement.  Claims or Interests in Classes 1(1)-(73), 2(1)-(73), 7(1), 7(2), 8(1)-(73), 9(1)-(73), 10(1)-(73), and 11(4)-(73) are Unimpaired by the Plan, and the Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan.  These Unimpaired Classes include Holders of General Unsecured Claims, Subordinated Claims (to the extent such Claims exist), and Interests in all of the Debtors' subsidiaries except TBS International plc, TBS International Limited, and TBS Holdings Limited.  Interests in Classes 11(1)-(3) are Impaired by and not entitled to receive a distribution under the Plan and are deemed to have rejected the Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the rationale for the Debtors' decision to seek chapter 11 protection, significant events that are expected to occur during the Chapter 11 Cases, and the anticipated organization, operations, and liquidity of the Reorganized Debtors upon successful emergence from chapter 11.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' operations, the Debtors' projections, and other related matters.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES HERETO AND THERETO IN THEIR ENTIRETY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN IS CONTROLLING.  IF ANY INCONSISTENCY

EXISTS BETWEEN THE PLAN AND THE TERMS OF THE CONFIRMATION ORDER, THE CONFIRMATION ORDER IS CONTROLLING.

## A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, any holder of a claim against or equity interest in a debtor, and all other persons as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

A debtor may propose a plan of reorganization prior to the filing of a chapter 11 case, and may solicit certain holders of claims against and interests in the debtor to vote to accept or reject the plan.  Prior to soliciting acceptances of a chapter 11 plan proposed prior to the filing of a chapter 11 case, section 1125(g) of the Bankruptcy Code requires a debtor to prepare a disclosure statement that complies with applicable non-bankruptcy law; in the Debtors' circumstances, applicable non-bankruptcy law generally requires that a disclosure statement contain information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  The disclosure statement must accompany any solicitation of votes with respect to a plan.  Votes to accept or reject a plan that are solicited and received before the filing of a chapter 11 case and in conjunction with a disclosure statement that complies with applicable non-bankruptcy law are deemed, pursuant to section 1126(b) of the Bankruptcy Code, to be votes to accept or reject such plan in such chapter 11 case.  Similarly, votes to accept or reject such plan received after the commencement of a chapter 11 case, but in connection with a pre-filing solicitation, may be treated as votes to accept or reject such plan.  The purpose of this Disclosure Statement, prepared in accordance with the requirements of section 1125(g) of the Bankruptcy Code, is to provide disclosure relative to the Plan in compliance with applicable non-bankruptcy law.

## B.    ECONOMICS AND EFFECT OF THE PLAN TRANSACTIONS

As described in more detail below, the Debtors' business operations have been adversely affected by the overall slowdown of the global economy, the attendant downward pressures upon freight rates, increased fuel costs, industry over-capacity, and a lack of liquidity in the credit

markets. The Debtors' current capital structure requires that the Debtors make interest and amortization payments in amounts that, in the time frames set forth in the Prepetition Credit Agreements, cannot be supported by the Debtors' current revenue. Through the Plan, the Debtors will restructure their obligations under their Prepetition Credit Agreements to rationalize their interest and amortization payment schedule. The Debtors' obligations under the RBS Credit Facility have already been fully discharged, pursuant to the RBS Settlement Agreement, in exchange for the return of the vessels securing these obligations to RBS. In addition, the Plan will enable the Debtors to replenish their fleet strength through the ability to charter in additional vessels.

The Debtors have four lending groups (led by BOA, DVB, Credit Suisse, and AIG, respectively) which have loaned money to the Debtors to finance the acquisition of vessels. These financings are evidenced by the Existing BOA Credit Agreement, the Existing DVB Credit Agreement, the Existing AIG Credit Agreement, and the Existing Credit Suisse Credit Agreement. Pursuant to the Plan, the BOA and DVB lending groups will be consolidated into a single lending group that will, effectively, be the primary lenders to the Reorganized Debtors. Credit Suisse and AIG will only be entitled to repayment from the cash generated by the vessels that secure the obligations owed to each lending group. Thus, for example, revenue generated by the vessels securing the Reorganized Debtors' obligations to Credit Suisse will only be used to pay the expenses of those vessels, which include operating expenses, an allocated share of overhead and other administrative expenses, and repair and drydock expenses, and to service the debt owed to Credit Suisse. Similarly, revenue generated by the vessels securing the Reorganized Debtors obligations to AIG will be used to support the expenses of those vessels and service the debt owed to AIG. To effectuate this contemplated restructuring, the Debtors' Prepetition Credit Agreements will be restructured in accordance with the terms of the BOA/DVB Debt Term Sheet, the AIG Term Sheet, the Credit Suisse Term Sheet, and the RBS Settlement Agreement. Specifically:

- amounts owed pursuant to the Existing BOA Credit Agreement and the Existing DVB Credit Agreement will be restructured into a new term loan with two tranches—the New Senior Secured Cash Pay Loan Tranche, which is a second lien term loan in the amount of $30 million with a maturity date of September 30, 2016;[1] and the New Senior Secured PIK Loan Tranche, which is a second lien payment-in-kind/toggle term loan in the amount of approximately $121,000,000[2] that has a maturity date of June 30, 2017;[3] *provided*, *however*, that as a condition precedent to the receipt of its

---

[1] At the Debtors' election, interest on the New Senior Secured Cash Pay Loan Tranche will accrue at either (a) the Eurodollar Rate (as defined in the Existing BOA Credit Agreement) plus 400 basis points (with a 1.00% Eurodollar Rate floor) or (b) the "Base Rate" plus 300 basis points. The "Base Rate" will be the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus .50%, (c) one month LIBOR plus 1.00%, and (d) 2.00% per annum.

[2] The actual amount of the New Senior Secured PIK Loan Tranche may be higher, possibly materially higher, depending upon the actual amounts outstanding under the Existing BOA Credit Agreement and the Existing DVB Credit Agreement.

[3] If paid in Cash, interest will accrue on the New Senior Secured PIK Loan Tranche at the same rate as interest on the New Senior Secured Cash Pay Loan Tranche. If not paid in Cash, interest will accrue on the New Senior Secured PIK Loan Tranche at a rate that is 2.00% higher than the rate that interest accrues on the New Senior Secured Cash Pay Loan Tranche.

portion of such Consideration, each Holder of a BOA Syndicate Claim or a DVB Syndicate Claim must first comply with the New Credit Agreement Distribution Procedures;

- amounts owed pursuant to the Existing Credit Suisse Credit Agreement will be restructured into the Amended and Restated Credit Suisse Credit Agreement, which is a term loan in the amount of at least $18,307,428[4] with an interest rate of LIBOR plus 300 basis points[5] and a maturity date of June 30, 2017, pursuant to which Credit Suisse will receive the cash flows generated by the vessels that secure the Existing Credit Suisse Credit Agreement until such time as the Amended and Restated Credit Suisse Credit Agreement can be fully repaid; *provided*, *however*, that as a condition precedent to the receipt of its portion of such Consideration, each Holder of Credit Suisse Claims must first comply with the New Credit Agreement Distribution Procedures;

- amounts owed pursuant to the Existing AIG Credit Agreement will be restructured into the Amended and Restated AIG Credit Agreement, which is a term loan in the amount of approximately $4.5 million that will mature at least 180 days after the Effective Date,[6] pursuant to which AIG will receive the cash flows generated by the vessels that secure the Existing AIG Credit Agreement until such time as the Amended and Restated AIG Credit Agreement can be fully repaid through the sale of such vessels, which sales are expected to occur within 180 days of the Effective Date; *provided*, *however*, that as a condition precedent to the receipt of its portion of such Consideration, each Holder of AIG Claims must first comply with the New Credit Agreement Distribution Procedures;

- pursuant to the RBS Settlement Agreement, amounts owed pursuant to the RBS Credit Agreement have, prior to the Petition Date, been satisfied by the turnover to RBS of the vessels that secure the RBS Credit Agreement. The Debtors will assume the RBS Settlement Agreement during the Chapter 11 Cases and fully perform any remaining obligations in connection therewith.

To finance the Chapter 11 Cases, there will be two separate debtor in possession facilities. One, for $41.3 million, will be extended by certain lenders that are party to the Existing BOA Credit Agreement or the Existing DVB Credit Agreement. The other, for $1.5 million, will be extended by Credit Suisse. The funds extended by the BOA and DVB lenders

---

[4] As noted below, any amounts borrowed under Facility B of the Debtors' Credit Suisse DIP Facility will be rolled into the Amended and Restated Credit Suisse Credit Agreement and added to this amount. Also, the amount listed only includes interest accrued on the Existing Credit Suisse Credit Agreement through the Record Date. Additional interest that accrues on the Existing Credit Suisse Credit Agreement will be added to the principal amount of the Amended and Restated Credit Suisse Credit Agreement.

[5] If the amount outstanding pursuant to the Amended and Restated Credit Suisse Credit Agreement falls below 70% of the market value of the vessels that secure such Agreement, the interest rate becomes LIBOR plus 250 basis points.

[6] Interest will accrue on the Amended and Restated AIG Credit Agreement at the greater of (a) 7.00% per annum or (b) the LIBOR Rate (as defined in the Existing AIG Credit Agreement) plus 350 basis points.

will be used to support vessels pledged to secure the Existing BOA Credit Agreement and the Existing DVB Credit Agreement; the funds extended by Credit Suisse will be used to support vessels pledged to secure the Existing Credit Suisse Credit Agreement and pay certain Credit Suisse fees that are reimbursable under the Existing Credit Suisse Credit Agreement.

On the Effective Date, amounts borrowed by the Debtors pursuant to the $41.3 million BOA/DVB DIP Facility during the Chapter 11 Cases will either be paid on the Effective Date (to the extent of excess cash (as provided in such Facility) or refinanced by the BOA/DVB Exit Facility, which is a first lien term loan with a maturity date of June 30, 2014.[7] The basic terms of the BOA/DVB DIP Facility and the BOA/DVB Exit Facility are set forth on the BOA/DVB DIP Facility Term Sheet, attached hereto as Exhibit J.

On the Effective Date, amounts borrowed pursuant to the Credit Suisse DIP Facility will be refinanced by the Credit Suisse Exit Facility, which will consist of a working capital facility and a term loan facility. Only cash generated from the vessels that secure the Existing Credit Suisse Credit Agreement will be available to pay the Credit Suisse DIP Facility and the Credit Suisse Exit Facility. The basic terms of the Credit Suisse DIP Facility, the Credit Suisse Exit Facility, and the Amended and Restated Credit Suisse Credit Agreement are set forth on the Credit Suisse Term Sheet, attached hereto as Exhibit G.

The Plan provides that Holders of General Unsecured Claims, including trade creditors, will be Unimpaired under the Plan. Unimpairment of these entities is essential to the uninterrupted continuation of the business of the Reorganized Debtors and, therefore, to the maximization of the going concern value of the Reorganized Debtors.

Interests in TBS International plc, TBS International Limited, and TBS Holdings Limited will be cancelled in accordance with the Implementation Memorandum, and TBS International plc and TBS International Limited will be dissolved in accordance with Irish and Bermuda law, respectively. New Interests in TBS Holdings Limited will be issued to New TBS Parent. In consideration for agreeing to combine their obligations and accept the terms of the New Senior Secured Loan facility, ninety percent of the Interests in New TBS Parent will be initially granted to Holders of BOA Syndicate Claims and DVB Syndicate Claims through the issuance of the New Class A Common Stock to such Holders. Ten percent of the Interests in New TBS Parent will be initially granted to the senior management team that will manage the Reorganized Debtors—Joseph Royce, Gregg McNelis, Lawrence Blatte, and Fred Lepere. These managers are the current senior management of the Debtors. The Interests issued to management, pursuant to the New Management Incentive Plan, will be in the form of New Class B Common Stock. In accordance with the New Management Incentive Plan, the recipients of the New Class B Common Stock will have the right to receive, pursuant to the vesting schedule and milestones related thereto set forth in the New Management Incentive Plan, additional shares of New Class B Common Stock,[8] which, if all of the milestones are met, would represent up to 55% of the

---

[7]   At the Debtors' election, interest on the DIP Facility will accrue at either (a) LIBOR plus 550 basis points (with a 1.50% LIBOR floor) or (b) the "Base Rate" plus 450 basis points. The "Base Rate" will be the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus .50%, and (c) one month LIBOR plus 1.00%.

[8]   The additional shares of Class B Common Stock which could be issued pursuant to the New Management Incentive Plan upon the achievement of milestones will be unvested unless and until such milestones are

Footnote continued on next page

New Common Stock.  As set forth in more detail in the Equity and Corporate Governance Term Sheet attached hereto as Exhibit O, the New Class A Common Stock shall be entitled to preferred return of $500,000, and the New Class B Common Stock will have a catch-up preferred return of $55,555; after which all dividends will be paid pro rata.  The holders of New Class A Common Stock shall have the right to nominate 3 members of the New TBS Parent board of directors, and the holders of New Class B Common Stock shall have the right to nominate 2 members of the New TBS Parent board of directors, and it is currently anticipated that the members of the New TBS Parent board of directors will also serve, to the extent permitted by applicable law in the jurisdiction of incorporation, as directors of the Reorganized Debtors.  Other matters pertaining to corporate governance will be as set forth in the Equity and Corporate Governance Term Sheet.  To preserve the corporate structure of the Debtors for the benefit of all Creditors, Intercompany Claims will be preserved under the Plan.  Similarly, Intercompany Interests in the Reorganized Debtors (other than TBS International plc, TBS International Limited and TBS Holdings Limited) will be reinstated under the Plan.

On the Effective Date, New TBS Parent will enter into the TBS Commercial Management Agreements with TBS Commercial Group Ltd. and Beacon Holdings Ltd. and certain of their wholly-owned subsidiaries (together, the "*Affiliate Management Companies*") as set forth in the TBS Commercial Term Sheet, attached hereto as Exhibit N.  The TBS Commercial Management Agreements will govern the relationship between the Reorganized Debtors and the Affiliate Management Companies and the Non-Affiliate Management Companies.  Entry into the TBS Commercial Management Agreements is a condition precedent to the Effective Date.  The form of the TBS Commercial Management Agreements will be substantially in the form filed in the Plan Supplement.

On the Effective Date, New TBS Parent will also enter into the TBS Commercial/Beacon Holdings Option Agreement with the Affiliate Management Companies, pursuant to which New TBS Parent shall have the option until June 30, 2012 to require the Affiliate Management Companies to dissolve foreign operations, close foreign offices used exclusively by the Affiliate Management Companies, and use reasonable commercial efforts to transition the workforce of the Affiliate Management Companies to New TBS Parent and its direct and indirect subsidiaries (to the extent requested by New TBS Parent), in each case subject to the terms and conditions of the TBS Commercial/Beacon Holdings Option Agreement.  The basic terms and conditions of the TBS Commercial/Beacon Holdings Option Agreement are set forth in the TBS Commercial Term Sheet, attached hereto as Exhibit N.

Prior to filing the Chapter 11 Cases, Beekman Shipping Corp., and Fairfax Shipping Corp. (the "*Chartering Debtors*") will enter into amended bareboat charter agreements with respect to the M/V Laguna Belle and the M/V Seminole Princess, respectively (the "*DVB Bareboat Charters*").  The DVB Bareboat Charters will govern the relationship between the Chartering Debtors and the owners of the M/V Laguna Belle and the M/V Seminole Princess,

---

Footnote continued from previous page

achieved.  For Bermuda corporate law purposes, it may be necessary to issue such unvested shares as New Class C Common Stock.  If so, the New Class C Common stock will be automatically converted into New Class B Common Stock when, if, and to the extent that a vesting event occurs.

respectively, during the Chapter 11 Cases.  Pursuant to the DVB Bareboat Charters the daily charter rate for the M/V Laguna Belle and the M/V Seminole Princess will be fixed at $4,000 per day, as set forth in more detail in the Bareboat Charter Term Sheet, attached hereto as Exhibit K. On the Effective Date, the DVB Bareboat Charters will be further amended in accordance with the Bareboat Charter Term Sheet (as so amended, the "***Amended DVB Bareboat Charters***"). Pursuant to the Amended DVB Bareboat Charters, the Reorganized Debtors will have the right to operate the M/V Laguna Belle and the M/V Seminole Princess until February 1, 2015 (with a one year extension option) at a rate of $4,000 per day ($4,500 per day during the one year extension period), and will have the option to purchase each of the vessels, all as set forth more fully in the Bareboat Charter Term Sheet.  On the Effective Date, the Debtors will assume the DVB Bareboat Charters as amended as provided in the Amended DVB Bareboat Charters.

As a result of the restructuring contemplated by the Plan, the Reorganized Debtors will be able to take advantage of market opportunities to sell vessels, but will retain the ability to replenish their fleet, through long-term and other charter arrangements, to efficiently provide the highest quality shipping services.  In this way, the Debtors' overall carrying costs will be reduced, but the Debtors will still be well-positioned to take advantage of current demand and the expected recovery in the global economy.

The Debtors believe that the restructuring contemplated by the Plan will provide sufficient working capital to (i) fund the Company's emergence from chapter 11, (ii) appropriately capitalize the Reorganized Debtors, and (iii) facilitate the implementation of the Reorganized Debtors' business plan.   The Debtors believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases, would diminish the value of the Debtors' business and assets; result in significant delays, litigation, and additional cost; and substantially lower, and in certain cases eliminate entirely, the recoveries for Holders of Allowed Claims.

## C.     SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

**THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND THE PROJECTED RECOVERIES UNDER THE PLAN.  *THE PROJECTED RECOVERIES SET FORTH BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.*  REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.  THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS.**

## D.     SUMMARY OF TREATMENT AND PROJECTED RECOVERIES

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| Unclassified | Administrative Expense Claims | These Claims are Unimpaired.  The Plan provides for payment of each Allowed Administrative Expense Claim in full in Cash. | 100% |
| Unclassified | Professional Compensation Claims | These Claims are Unimpaired.  The Plan provides for payment of each Allowed Professional Compensation Claim in full in Cash. | 100% |
| Unclassified | Priority Tax Claims | These Claims are Unimpaired.  The Plan provides that each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, or at the Debtors' election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code. | 100% |
| 1(1)-(73) | Other Priority Claims | These Claims are Unimpaired.  The Plan provides for payment of each Allowed Other Priority Claim in full in Cash. | 100% |
| 2(1)-(73) | Other Secured Claims | These Claims are Unimpaired.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Other Secured Claim in Classes 2(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed Other Secured Claims. | 100% |
| 3(1), 3(2), 3(3), and 3(61)-(67) | DVB Syndicate Claims | These Claims are Impaired.  Each Holder of an Allowed DVB Syndicate Claim shall receive its Pro Rata Share, based on the aggregate DVB Syndicate Claims and BOA Syndicate Claims,[9] of (a) the  New Senior Secured Cash Pay Loan Obligations, which are payable pursuant to a second lien term loan in the | 100% of the face amount of the DVB Syndicate Claims[13] |

_____

[9]   The Debtors' estimate that Holders of DVB Syndicate Claims will receive approximately 17% of the aggregate consideration distributable to the Holders of DVB Syndicate Claims and BOA Syndicate Claims.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|----------------------------------|
|       |                           | amount of $30 million with a maturity date of September 30, 2016;[10] (b) the New Senior Secured PIK Loan Obligations, which are payable pursuant to a second lien payment-in-kind/toggle term loan in the amount of approximately $121,000,000[11] that has a maturity date of June 30, 2017;[12] and (c) the New Class A Common Stock to be issued on the Effective Date, which shares shall be subject to dilution by the New Class B Common Stock issued pursuant to the New Management Incentive Plan; *provided, however,* that as a condition precedent to the receipt of its portion of such Consideration, each Holder of DVB Syndicate Claims must first comply with the New Credit Agreement Distribution Procedures. **If a Holder of a DVB Syndicate Claim does not opt out of the release provisions of Section 9.2.3 of the Plan, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.** |                                  |

---

Footnote continued from previous page

[13] Although the face amount of the New Senior Secured Cash Pay Loan Obligations and the New Senior Secured PIK Loan Obligations distributable to the Holders of the DVB Syndicate Claims is equal to the face amount of the DVB Syndicate Claims, the actual value of those obligations is materially less than the face amount due to their below market terms, including but not limited to the low interest rate, extended maturity, and limited covenants.

[10] At the Debtors' election, interest on the New Senior Secured Cash Pay Loan Tranche will accrue at either (a) the Eurodollar Rate (as defined in the Existing BOA Credit Agreement) plus 400 basis points (with a 1.00% Eurodollar Rate floor) or (b) the "Base Rate" plus 300 basis points. The "Base Rate" will be the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus .50%, (c) one month LIBOR plus 1.00%, and (d) 2.00% per annum.

[11] The actual amount of the New Senior Secured PIK Loan Tranche may be higher, possibly materially higher, depending upon the actual amounts outstanding under the Existing BOA Credit Agreement and the Existing DVB Credit Agreement.

[12] If paid in Cash, interest will accrue on the New Senior Secured PIK Loan Tranche at the same rate as interest on the New Senior Secured Cash Pay Loan Tranche. If not paid in Cash, interest will accrue on the New Senior Secured PIK Loan Tranche at a rate that is 2.00% higher than the rate that interest accrues on the New Senior Secured Cash Pay Loan Tranche.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 4(1)-(60) | BOA Syndicate Claims | These Claims are Impaired. Each Holder of an Allowed BOA Syndicate Claim shall receive its Pro Rata Share, based on the aggregate DVB Syndicate Claims and BOA Syndicate Claims,[14] of (a) the New Senior Secured Cash Pay Loan Obligations, which are payable pursuant to a second lien term loan in the amount of $30 million with a maturity date of September 30, 2016;[15] (b) the New Senior Secured PIK Loan Obligations, which are payable pursuant to a second lien payment-in-kind/toggle term loan in the amount of approximately $121,000,000[16] that has a maturity date of June 30, 2017;[17] and (c) the New Class A Common Stock to be issued on the Effective Date, which shares shall be subject to dilution by the New Class B Common Stock issued pursuant to the New Management Incentive Plan; *provided*, *however*, that as a condition precedent to the receipt of its portion of such Consideration, each Holder of BOA Syndicate Claims must first comply with the New Credit Agreement Distribution Procedures. **If a Holder of a BOA Syndicate Claim does not opt out of** | 100% of the face amount of the BOA Syndicate Claims.[18] |

---

[14] The Debtors' estimate that Holders of BOA Syndicate Claims will receive approximately 83% of the aggregate consideration distributable to the Holders of DVB Syndicate Claims and BOA Syndicate Claims.

[15] At the Debtors' election, interest on the New Senior Secured Cash Pay Loan Tranche will accrue at either (a) the Eurodollar Rate (as defined in the Existing BOA Credit Agreement) plus 400 basis points (with a 1.00% Eurodollar Rate floor) or (b) the "Base Rate" plus 300 basis points. The "Base Rate" will be the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus .50%, (c) one month LIBOR plus 1.00%, and (d) 2.00% per annum.

[16] The actual amount of the New Senior Secured PIK Loan Tranche may be higher, possibly materially higher, depending upon the actual amounts outstanding under the Existing BOA Credit Agreement and the Existing DVB Credit Agreement.

[17] If paid in Cash, interest will accrue on the New Senior Secured PIK Loan Tranche at the same rate as interest on the New Senior Secured Cash Pay Loan Tranche. If not paid in Cash, interest will accrue on the New Senior Secured PIK Loan Tranche at a rate that is 2.00% higher than the rate that interest accrues on the New Senior Secured Cash Pay Loan Tranche.

[18] Although the face amount of the New Senior Secured Cash Pay Loan Obligations and the New Senior Secured PIK Loan Obligations distributable to the Holders of the BOA Syndicate Claims is equal to the face amount of the BOA Syndicate Claims, the actual value of those obligations is materially less than the face amount due to their below market terms, including but not limited to the low interest rate, extended maturity, delayed amortization and limited covenants.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | the release provisions of Section 9.2.3 of the Plan, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein. | |
| 5(1), 5(2), 5(68)-(69) | Credit Suisse Claims | These Claims are Impaired. The Holder of the Allowed Credit Suisse Claim shall receive the Credit Suisse Consideration, which consists of the obligations arising under the Amended and Restated Credit Suisse Credit Agreement; *provided*, *however*, that as a condition precedent to the receipt of such Consideration, the Holder of the Credit Suisse Claim must first comply with the New Credit Agreement Distribution Procedures. **If the Holder of the Credit Suisse Claim does not opt out of the release provisions of Section 9.2.3 of the Plan, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.** | 100% of the face amount of the Credit Suisse Claims.[19] |
| 6(1)-(3), 6(70)-(73) | AIG Claims | These Claims are Impaired. The Holder of the Allowed AIG Claim shall receive the AIG Consideration, which consists of the obligations arising under the Amended and Restated AIG Credit Agreement; *provided*, *however*, that as a condition precedent to the receipt of such Consideration, the Holder of the AIG Claim must first comply with the | 100% of the face amount of the AIG Claims.[20] |

---

[19] Although the face amount of the obligations arising under the Amended and Restated Credit Suisse Credit Agreement is equal to the face amount of the Credit Suisse Claims, the actual value of those obligations is materially less than the face amount due to the Amended and Restated Credit Suisse Credit Agreement's below market terms, including but not limited to the low interest rate, extended maturity, delayed amortization and limited covenants.

[20] Although the face amount of the obligations arising under the Amended and Restated AIG Credit Agreement is equal to the face amount of the AIG Claims, the actual value of those obligations is materially less than the face amount due to the Amended and Restated AIG Credit Agreement's below market terms, including but not limited to the low interest rate, extended maturity, delayed amortization and limited covenants.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|------------------------------|-----------------------------------|
| | | New Credit Agreement Distribution Procedures. **If the Holder of the AIG Claim does not opt out of the release provisions of Section 9.2.3 of the Plan, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.** | |
| 7(1)-(2) | RBS Syndicate Claims | These Claims are Unimpaired.  The Debtors have returned to the RBS Agent the vessels (listed in the RBS Settlement Agreement) that were Collateral under the RBS Credit Agreement and, in exchange, have been fully released from all RBS Syndicate Claims, as more fully set forth in the RBS Settlement Agreement.  The Debtors' limited ongoing obligations with respect to the Holders of RBS Syndicate Claims are set forth in the RBS Settlement Agreement, which the Debtors intend to assume during the Chapter 11 Cases. | 100% |
| 8(1)-(73) | General Unsecured Claims | These Claims are Unimpaired.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed General Unsecured Claim in Classes 8(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed General Unsecured Claim.  Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the applicable Debtor (or, after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General | 100% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | Unsecured Claim. | |
| 9(1)-(73) | Intercompany Claims | These Claims are Unimpaired. Except to the extent that a Holder of an Allowed Intercompany Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Intercompany Claim in Classes 9(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed Intercompany Claim. | 100% |
| 10(1)-(73) | Subordinated Claims | These Claims are Unimpaired. Except to the extent that a Holder of a Subordinated Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Subordinated Claim in Class 14 shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed Subordinated Claim. The Debtors are unaware of any Subordinated Claims. | 100% |
| 11(1) | Interests in TBS International plc | Interests in Class 11(1) are Impaired. Under the Plan, all Interests in TBS International plc shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date. The holders of Interests in TBS International plc shall not receive or retain any property under the Plan on account of such Interests. | 0% |
| 11(2) | Interests in TBS International Limited | Interests in Class 11(2) are Impaired. Under the Plan, TBS International Limited shall be dissolved and its Interests shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date. The Holders of Interests in TBS International Limited shall not receive or retain any property under the Plan on account of such Interests. | 0% |
| 11(3) | Interests in TBS Holdings Limited | Under the Plan, the existing Interests in TBS Holdings Limited shall be cancelled and all rights and interests therein shall be terminated | 0% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | | as of the Effective Date.  The Holders of Interests in TBS Holdings Limited shall not receive or retain any property under the Plan on account of such Interests.  New Interests in TBS Holdings Limited shall be issued to New TBS Parent. | |
| 11(4)-(73) | Other Interests | Interests in Classes 11(4)-(73) are Unimpaired.  Except as set forth in the Plan, Interests in Classes 11(4)-(73) shall be reinstated. | N/A |

## II.    GENERAL INFORMATION

### A.    THE COMPANY'S BUSINESS

Founded in 1993, the Debtors provide ocean transportation services that offer worldwide shipping solutions to a diverse client base of industrial shippers.  The Debtors operate liner, parcel and bulk transportation services and time charter services, supported by a fleet of multipurpose tweendeckers and handysize and handymax dry bulk carriers.  In contrast to container vessels, which require cargoes to be packaged in uniform containers, or large dry bulk vessels, which can carry only a limited number of types of cargo in a single vessel, the vessels owned and operated by the Debtors provide flexibility which allows the Debtors to accept different types of cargoes for carriage, including steel products, salt, sugar, grain, fertilizers, chemicals, metal concentrates and aggregates as well as general and project cargoes.

The following diagram shows a typical multipurpose tweendeck ship fitted for different types of cargo:



The Debtors target niche markets, including trade routes, ports and cargoes that are not effectively served by container and large dry bulk vessel operators.  The Debtors' vessels are able to navigate and service many ports with restrictions on vessel size that cannot be served by larger container vessels and dry bulk vessels.  The Debtors have developed their franchise around key trade routes between Latin America and Japan, South Korea and China, as well as ports in North America, Africa, the Caribbean, and the Middle East.  The Debtors differentiate

15

themselves from their competitors by offering their Five Star Service which includes: (i) ocean transportation; (ii) projects; (iii) operations; (iv) port services; and (v) strategic planning.

The Debtors operate liner, parcel, and bulk services on various trade routes. The Debtors provide services globally in more than 20 countries to over 300 customers through a network of affiliated service companies. The following chart provides detail regarding the geographic services offered by the Debtors.

| Service | Routes | Cargoes |
|---------|--------|---------|
| TBS Pacific Service | *Eastbound:* Japan, South Korea, and China to the West, North, and East Coasts of South America *Westbound:* Peru, Ecuador and Chile to East Asia | Steel products, project and general cargo  Minerals, metals, and fishmeal |
| TBS Latin America Service | Northbound: Brazil to the Caribbean basin and the West Coast of South America *Southbound:* Colombia to Brazil and Argentina | Steel products, project and general cargo  Coal and petroleum coke |
| TBS North America Service | *Southbound:* North America to the Caribbean basin and South America *Northbound:* Caribbean to North America | Agricultural products, steel products, project and general cargo  Limestone and aggregates |
| TBS Middle East Carriers | Middle East region, including ports in the United Arab Emirates, to Qatar and Kuwait | Bulk aggregates |
| TBS Ocean Carriers | United Arab Emirates to East Africa, Red Sea | Coal and cement |

In addition to the services described above, the Debtors also time charter-out vessels on an individual customer basis through TBS Ocean Carriers. A time charter is a contractual arrangement under which a ship-owner is paid for the use of a vessel at a daily rate for a fixed period of time. Generally, the Debtors time charter-out vessels on a long-term basis to customers seeking vessel tonnage, and on a short-term basis to reposition a vessel.

As of January 30, 2012, the Debtors controlled a fleet of 41 vessels, consisting of 39 owned vessels and two vessels leased under bareboat charters with purchase options.

As part of their efforts to deleverage their businesses and modernize their fleets, recently the Debtors sold a handful of older vessels. On October 19, 2011, the Debtors entered into agreements to sell two vessels to an independent party for an aggregate sales price of $11.2 million. The sales closed on November 16 and November 26, respectively. In addition, in December 2011, the Company closed an agreement to sell one vessel for a sales price of $4.8 million. Proceeds from these sales were used to repay remaining obligations under a $13 million term loan facility with Joh. Berenberg, Gossler & Co. KG (the "***Berenberg Facility***"). All

remaining obligations under the Berenberg Facility were repaid prepetition.  The Debtors also entered into agreement to sell two additional vessels in January 2012 for an aggregate sales price of $7.7 million.  Proceeds from this sale and others will be used to reduce the Debtors' secured debt obligations.

The Debtors' vessels are owned or leased through 41 different Marshall Islands subsidiaries (each, a "*Vessel Owning Subsidiary*" and collectively, the "*Vessel Owning Subsidiaries*").  All of the Vessel Owning Subsidiaries (along with some former Vessel Owning Subsidiaries) are Debtors in the Chapter 11 Cases.  Each Vessel Owning Subsidiary owns or leases a single vessel which is chartered to bareboat charterers or manning agents located in the Philippines that supply the crews necessary to operate the vessel.  The crewed vessels are then chartered back by the Philippine charterers and manning agents to TBS Worldwide Services Inc., which in turn places the vessels in the Debtors' service, making them available for voyages on trade routes and time charters to customers.  The Debtors formerly owned six subsidiaries that each owned one vessel financed by the Holders of the RBS Syndicate Claims and pledged to secure the obligations under the RBS Credit Agreement.  Pursuant to the RBS Settlement Agreement, all of these subsidiaries (and, accordingly, the vessels owned by them) were, pursuant to the RBS Settlement Agreement and prior to the date of this Disclosure Statement, transferred to Pine Shipping, an entity designated by RBS and not affiliated with the Debtors, in exchange for, among other things, the release from the RBS Syndicate Claims as provided in the RBS Settlement Agreement.

## B.      THE DEBTORS' PREVIOUS CHAPTER 11 CASE

Prior to 1997, the Debtors conducted their business by chartering vessels owned by third parties.  Beginning in the fourth quarter of 1997, the Debtors embarked on a vessel acquisition plan in order to gain more control over the maintenance and operating costs of their fleet.

Just as the Debtors commenced the vessel acquisition plan during the late 1990s, however, the Debtors' business was negatively impacted by financial crises and economic slowdown in Asia and South America, and the Debtors became unable to service the indebtedness they had incurred to finance the vessel acquisition plan.  Consequently, on July 6, 2000, certain of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "*Previous Chapter 11 Cases*").[21]  The Previous Chapter 11 Cases were filed on a pre-negotiated basis pursuant to an agreement with certain of the Debtors' then-lenders.  The chapter 11 plan of reorganization in the Previous Chapter 11 Cases was confirmed on October 12, 2000, and became effective on February 8, 2001.

## C.      DEBTORS' PREPETITION CORPORATE STRUCTURE

TBS International plc ("*TBS Parent*") became the Debtors' ultimate parent pursuant to a corporate reorganization completed on January 6, 2010.  Prior to the corporate reorganization, TBS International Limited ("*TBS International*"), a Bermuda company, was the Debtors'

---

[21]   The Previous Chapter 11 Cases were jointly administered under the caption of *In re TBS International Ltd.*, Case No. 00-41696, in the Bankruptcy Court for the Southern District of New York.

ultimate parent. TBS International is now an intermediate holding company wholly owned by TBS Parent. TBS International owns 100% of TBS Holdings Limited, a Bermuda company that in turn owns, directly or indirectly, all of the other Debtors, the operating and Vessel Owning Subsidiaries.

The operating subsidiary Debtors include the following entities:

- *TBS Shipping Services Inc.*, which manages the "pool" of vessels in the Debtors' fleet;

- *Roymar Ship Management, Inc.*, which provides technical management services to the vessels in the Debtors' fleet;

- *TBS Worldwide Services Inc.*, which is the "pool" company that assigns the vessels in the Debtors' fleet to a particular trade route or charter; and

- *Westbrook Holdings Ltd.*, which owns the forty-nine (49) Marshall Islands Vessel Owning Subsidiaries.

An overview of the Debtors' corporate structure is as follows:

*[See next page for chart of the Debtors' corporate structure]*



TBS International plc
Organizational Structure

## D.     DEBTORS' PREPETITION CAPITAL STRUCTURE

### 1.     Preferred Stock

TBS Parent has issued common and preferred stock.  The Series A and Series B Preferred Stock was issued in 2011 in connection with the restructuring of the Debtors' Prepetition Credit Facilities described below.  As a condition to this restructuring, the lenders required three significant shareholders—all of whom are key members of management (collectively, the "***Management Shareholders***")—to provide up to $10 million of new equity capital in the form of preference shares.  The obligation of the Management Shareholders was reduced to the extent that a planned rights offering raised funds from other parties.

The Debtors completed two different issuances of preferred shares. First, on January 28, 2011, the Management Shareholders purchased 30,000 Series B Preference Shares directly from the Debtors in a private placement at a purchase price of $100 per share, for aggregate consideration of $3.0 million.  Second, in May 2011, the Debtors conducted a rights offering, entitling common stockholders to non-transferable subscription rights to purchase Series A Preference Shares.  The Management Shareholders acted as standby purchasers for up to 70,000 Series A Preference Shares in connection with the rights offering.  On May 31, 2011, TBS Parent concluded the rights offering and issued third party buyers (including some buyers who were related to the Management Shareholders) a total of 8,260 Series A Preference Shares, for aggregate consideration of approximately $0.8 million.  The Management Shareholders purchased the balance of the 70,000 Series A Preference Shares for aggregate consideration of $6.8 million.

### 2.     Common Stock

TBS Parent has issued two classes of ordinary shares:  Class A ordinary shares (the "***Class A Shares***"), which are listed on the NASDAQ Global Select Market under the symbol "TBSI" and (ii) Class B ordinary shares (the "***Class B Shares***"), which do not trade publicly. The Class A Shares and Class B Shares have identical rights to dividends, surplus and assets on liquidation; however, the holders of Class A Shares are entitled to one vote on all matters submitted to a vote of holders of common shares, while holders of Class B Shares are entitled to only one-half of one vote.  In addition, as of September 30, 2011, warrants were outstanding for the purchase of 155,122 Class A Shares and 228,149 Class B Shares.  As of December 31, 2011, certain members of the Debtors' management, including the Management Shareholders, and board of directors directly and beneficially owned 14.9% of the outstanding Class A Shares and 84.0% of the outstanding Class B Shares.

### 3.     Prepetition Secured Debt

As of September 30, 2011, the Debtors' total consolidated bank debt (excluding intercompany debt and trade debt) was approximately $335.3 million.  As of September 30, 2011, the Debtors were indebted under the following prepetition credit arrangements (together the "***Prepetition Credit Facilities***"):

| Credit Facility | Borrowers | Guarantors | No. of Vessels Collateralizing Credit Facility | Outstanding Amounts |
|---|---|---|---|---|
| Bank of America | TBS Shipping Services Inc. (as administrative borrower), and 30 subsidiaries | TBS Parent, TBS International, TBS Holdings Limited, and 27 other subsidiaries of TBS Holdings Limited | 29 | $14.1 million under term loan #1 |
| | | | | $110.8 million under term loan #2 |
| Royal Bank of Scotland | 6 subsidiaries | TBS Parent and TBS International | 6 | $144.1 million |
| DVB | 7 subsidiaries | TBS Parent, TBS International, and TBS Holdings Limited | 7 | $25.0 million |
| Credit Suisse | 2 subsidiaries | TBS Parent | 2 | $24.1 million |
| AIG | 3 subsidiaries | TBS Parent, TBS International, Sherwood Shipping Corp., and TBS Holdings Limited | 3 | $11.7 million |

### 4. Bank of America Facility

TBS Shipping Services Inc., as administrative borrower, and 30 ship-owning Debtors that are subsidiaries of Westbrook Holdings, Ltd.[22] are borrowers pursuant to that certain Credit Agreement dated July 31, 2006 (as amended, restated, supplemented, and/or otherwise modified, the "***Existing BOA Credit Agreement***" and all indebtedness incurred or available thereunder, the "***Existing BOA Facility***"). The Existing BOA Facility, as amended, consists of a term loan of $14.1 million and a second term loan facility (formerly a revolving credit facility) of $110.8 million, which is administered by Bank of America N.A. as administrative agent pursuant to the Existing BOA Credit Agreement on behalf of a group of lending parties. As of September 30, 2011, the aggregate outstanding amount owed under the Existing BOA Facility, including accrued interest, was approximately $124.9 million (the "***BOA Debt***").[23] The BOA Debt is currently secured by 28 vessels owned by the borrowers.

---

[22] The ship-owning Debtors that are borrowers under the Existing BOA Facility are as follows: Albemarle Maritime Corp., Arden Maritime Corp., Avon Maritime Corp., Birnam Maritime Corp., Bristol Maritime Corp., Chester Shipping Corp., Cumberland Navigation Corp., Darby Navigation Corp., Dover Maritime Corp., Elrod Shipping Corp., Exeter Shipping Corp., Frankfort Maritime Corp., Glenwood Maritime Corp., Hansen Shipping Corp., Hartley Navigation Corp., Henley Maritime Corp., Hudson Maritime Corp., Jessup Maritime Corp., Montrose Maritime Corp., Oldcastle Shipping Corp., Quentin Navigation Corp., Rector Shipping Corp., Remsen Navigation Corp., Sheffield Maritime Corp., Sherman Maritime Corp., Sterling Shipping Corp., Stratford Shipping Corp., Vedado Maritime Corp., Vernon Maritime Corp., and Windsor Maritime Corp.

[23] Distributions to the Holders of BOA Syndicate Claims will be based on the actual amount of the BOA Debt, including accrued interest, as of the Petition Date.

5.      **Royal Bank of Scotland Facilities**

Six ship-owning former subsidiaries—the RBS Obligors—of Westbrook Holdings, Ltd. are borrowers pursuant to that certain Loan Agreement dated March 29, 2007 (as amended, restated, supplemented, and/or otherwise modified, the "***RBS Credit Agreement***" and all indebtedness incurred or available thereunder, the "***RBS Facility***").[24]  The RBS Facility consists of a term loan of $150 million, which is administered by the Royal Bank of Scotland plc as agent pursuant to the RBS Credit Agreement on behalf of a group of lending parties (the "***RBS Lenders***").  As of September 30, 2011, the aggregate outstanding amount owed under the RBS Facility, including accrued interest, was approximately $144.1 million (the "***RBS Debt***").  The RBS Debt is secured by the six vessels owned by the RBS Obligors. TBS Parent and TBS International are guarantors under the RBS Credit Agreement.  Pursuant to the RBS Settlement Agreement, which the Debtors intend to assume during the Chapter 11 Cases, the RBS Obligors were assigned to Pine Shipping an entity designated by RBS and not affiliated with the Debtors, in full satisfaction and release of all Claims against the Debtors arising from the RBS Credit Agreement, this assignment effectuated the turnover of the RBS vessels.

6.      **DVB Facility**

Seven ship-owning Debtors that are subsidiaries of Westbrook Holdings, Ltd.[25] are borrowers pursuant to that certain Credit Agreement dated January 16, 2008 (as amended, restated, supplemented, and/or otherwise modified, the "***Existing DVB Credit Agreement***" and all indebtedness incurred or available thereunder, the "***Existing DVB Facility***").  The Existing DVB Facility consists of a term loan of $75 million, which is administered by DVB Group Merchant Bank (Asia) Ltd. as facility agent pursuant to the Existing DVB Credit Agreement on behalf of a group of lending parties.  As of September 30, 2011, the aggregate outstanding amount owed under the Existing DVB Facility, including accrued interest, was approximately $25.0 million (the "***DVB Debt***").[26]  The DVB Debt is secured by seven vessels owned by the borrowers.

7.      **Credit Suisse Facility**

Debtors Claremont Shipping Corp. and Yorkshire Shipping Corp. are borrowers pursuant to that certain Agreement dated December 7, 2007 (as amended, restated, supplemented, and/or otherwise modified, the "***Existing Credit Suisse Credit Agreement***" and all indebtedness incurred or available thereunder, the "***Existing Credit Suisse Facility***").  The Existing Credit Suisse Facility consists of a term loan facility of $40 million, with Credit Suisse as the sole lender.  As of September 30, 2011, the aggregate outstanding amount owed under the Existing

---

[24]   The ship-owning affiliates that are borrowers under the RBS Facility are as follows:  Argyle Maritime Corp., Caton Maritime Corp., Dorchester Maritime Corp., Longwoods Maritime Corp., McHenry Maritime Corp., and Sunswyck Maritime Corp.

[25]   The ship-owning Debtors that are borrowers under the Existing DVB Facility are as follows:  Bedford Maritime Corp., Brighton Maritime Corp., Columbus Maritime Corp., Hancock Navigation Corp., Hari Maritime Corp., Prospect Navigation Corp., and Whitehall Marine Transport Corp.

[26]   Distributions to the Holders of DVB Syndicate Claims will be based on the actual amount of the DVB Debt, including accrued interest, as of the Petition Date.

Credit Suisse Facility, including accrued interest, was approximately $24.9 million (the "**Credit Suisse Debt**"). The CS Debt is currently approximately $18.3 million and is secured by two vessels owned by the Debtors who are borrowers.[27]

### 8. AIG Facility

Debtors Amoros Maritime Corp., Lancaster Maritime Corp., Chatham Maritime Corp., and Sherwood Shipping Corp. are borrowers pursuant to that certain Loan Agreement dated February 29, 2008 (as amended, restated, supplemented, and/or otherwise modified, the "**Existing AIG Credit Agreement**" and all indebtedness incurred or available thereunder, the "**Existing AIG Facility**"). The Existing AIG Facility consists of a term loan facility of $35 million, with AIG Commercial Equipment Finance, Inc. as the sole lender. As of September 30, 2011, the aggregate outstanding amount owed under the Existing AIG Facility, including accrued interest, was approximately $12.3 million (the "**AIG Debt**"). According to AIG, the AIG Debt is currently approximately $4.9 million[28] and is secured by two vessels owned by the Debtors who are borrowers.[29]

### 9. Bareboat Charters

The Chartering Debtors lease two vessels from Adirondack Shipping LLC and Rushmore Shipping LLC, respectively, under bareboat charters that began on January 31, 2007 for a term of 84 months, with options to purchase the vessels at the end of the bareboat charters' term. As of December 31, 2011, the remaining obligations under the bareboat charters total approximately $16.3 million. As discussed above, these charters will be amended prior to the Petition Date and will be amended again and assumed prior to the Effective Date, all as set forth in the Bareboat Charter Term Sheet and as provided for in the Plan. Pursuant to the Amended DVB Bareboat Charters, the two chartered vessels will carry daily rates of $4,000 per day for 3 years ($4,500 per day for a one year extension period, if exercised) and will be subject to a purchase option, exercisable by the Reorganized Debtors.

### 10. Unsecured Trade Debt

The Debtors owe approximately $38 million in principal amount of unsecured trade debt as of December 31, 2011. This debt arises from the provisions of goods and services necessary to operate the Debtors' business. Pursuant to various motions related, among other things, to foreign and critical vendors, the Debtors are seeking authority to pay a portion of this debt during the Chapter 11 Cases.

## III. EVENTS LEADING TO THE CHAPTER 11 CASES

---

[27] Distributions to Credit Suisse as the Holder of the Credit Suisse Claim will be based on the actual amount of the Credit Suisse Debt. As a result of vessel sales since September 30, 2011, the amount of the Credit Suisse Claim has decreased from September 30, 2011.

[28] This amount remains subject to reconciliation by the Debtors.

[29] Distributions to AIG as the Holder of the AIG Claim will be based on the actual amount of the AIG Debt. As a result of vessel sales since September 30, 2011, the amount of the AIG Claim has decreased from September 30, 2011.

## A.    IMPACT OF GLOBAL RECESSION

Shipping revenue is influenced by a number of factors that are difficult to predict with certainty, including, without limitation, global and regional economic conditions, developments in international trade, changes in seaborne and other transportation patterns, the effect of global climate change on developing economies and agricultural production, and weather patterns. Over the past few years, a number of factors coalesced to significantly impair the Debtors' revenues and strain their ability to continue servicing their secured indebtedness. These factors, which ultimately led the Debtors' to the restructuring effectuated by the Plan, include the overall slowdown of the global economy, the attendant downward pressures upon freight rates, increased fuel costs, industry over-capacity, and the lack of liquidity in the credit markets. Given the confluence of these events, coupled with the sustained nature of the global recession, the Debtors believe that a chapter 11 filing is necessary to provide adequate financing for the uninterrupted continuation of the Debtors' operations and to implement the long-term financial restructuring that will enable the Reorganized Debtors to weather the prevailing economic and industry conditions.

Approximately 75% and 24% of the Debtors' consolidated revenue is voyage revenue (revenue derived from shipping goods for third parties) and time charter-out revenue (revenue derived from chartering vessels out to third parties), respectively. The key factors driving the Debtors' voyage revenues are the number of vessels in the fleet, freight voyage days, revenue tons carried, and freight rates. The key factors driving time charter-out revenue are the number of days vessels are charted out and the daily charter hire rates.

The daily rates paid for shipping—both in respect of time charter-out and voyage revenue—dropped dramatically in 2008 and have remained depressed since as a result of decreased demand. Moreover, any recovery in demand has been offset by an increasing supply of vessels.

Pricing from 2010 through the present, in particular, has fallen short of expectations. Starting in late May 2010, the Baltic Dry Index, which measures the demand for shipping capacity versus the supply of dry bulk carriers, declined from a high of 4,209 in May 2010 to 1,043 in February 2011; and on January 27, 2011 the Baltic Dry Index closed at 753. There were multiple causes for this decline, including, the large amount of additional tonnage from recent newbuilds in all vessel sizes, as well as natural occurrences that significantly depressed the amount of available cargoes, such as a harsh summer in the grain growing regions of Russia and Ukraine and recent devastating floods in Australia and Brazil. As a direct result of the severe imbalance of supply and demand, freight rates across the ocean shipping industry in all vessel sizes declined dramatically.

Reduced rates have persisted in 2011. For the three months ended September 30, 2011, the Debtors suffered an 11.8% year over year freight rate decrease for all cargoes. Concurrently, daily time charter equivalent rates dropped by 19.1%.

In stark contrast to the foregoing, there has been no corresponding decrease in the Debtors' costs. In fact, operating expenses have increased. For the three months ended September 30, 2011, operating costs increased by $5.2 million, or approximately 5.0%. The

principal components of this increase were rising voyage and vessel costs. The Debtors' fuel expenses, in particular, skyrocketed, increasing $6.0 million, or 35.3%. For the three months ended September 30, 2011, the average price of fuel per metric ton increased 33.6%.

The worldwide economic slowdown, and the resulting impact on demand and pricing, has had a large impact on the Debtors' financial performance. Between 2008 and 2010, the Debtors' total annual revenue decreased from approximately $611.6 million to approximately $411.9 million in 2010, a two year decline of approximately 33%.[30] The Debtors' earnings before interest, taxes, depreciation, and amortization ("*EBITDA*") for 2008 was $284 million; the Debtors' EBITDA for 2010, however, was only $87.8 million. Recent drops in freight rates have only worsened matters. For the first nine months of 2011, the Debtors' total revenue equaled approximately $282.6 million, down from $311.1 million for the first nine months of 2010. And for the last quarter of 2011, the Debtors' total revenue equaled approximately $87.1 million, down from $100.7 million for the last quarter of 2010.

Since 2008, the Debtors have taken multiple steps to reduce costs and restructure their assets to combat the decreased worldwide demand for shipping services. In particular, the Debtors have (a) discontinued their purchases of second-hand bulk carriers, (b) cancelled the construction of additional new vessels, and (c) accelerated the completion of their dry-dock and capital expenditure programs to reduce the need for similar expenditures going forward. The Debtors also prepaid substantial amounts of secured debt to reduce future interest expenses and maintain a manageable loan-to-fleet value ratio. In addition, the Debtors have discontinued cash pay incentive plans and reduced overhead. General and administrative expenses for the three months ended September 30, 2011 were $10.6 million, a decrease of $0.6 million, or 5%, versus 2010. Finally, over the past several months, the Debtors closed four separate vessel sale agreements providing $20.2 million in sale proceeds for the repayment of secured debt.

## B.    AMENDING AND RESTATING THE PREPETITION CREDIT FACILITIES

To address the financial impact on the Debtors of the difficulties in the shipping industry, the Debtors have aggressively negotiated a number of out-of-court loan amendments and waivers with their lenders. The Debtors have been in active negotiations with their lenders for over two years. In 2009, the economic downturn and its effect on the market value of the Debtors' vessels gave an indication of possible collateral coverage (loan to value) and financial covenant issues. As a result, the Debtors initiated discussions with their lenders to obtain waivers of collateral coverage requirements and existing financial covenants. Initially, the Debtors obtained waivers to the collateral coverage requirement on all credit facilities through May 14, 2010. Later, in early May 2010, the Debtors finalized the amendment and restatement of all credit facility agreements, setting new financial covenant levels, eliminating the minimum consolidated tangible net worth requirement, increasing bank margins, and redefining the computation of EBITDA.

---

[30]  Revenue numbers listed in this paragraph relate to the Debtors and certain of their affiliates that will not be filing chapter 11 cases.

Although the May 2010 credit facility amendments enabled the Debtors to temporarily avoid default, they failed to ensure the Debtors' ability to comply with their contractual obligations going forward. Global pressures on the shipping industry continued to impair the Debtors' operational performance, and it became increasingly unlikely that the Debtors would be able to satisfy mandatory principal repayments scheduled for the end of 2010. To avoid default, on November 15, 2010, certain Debtors entered into agreements with their lender groups obligating lenders to forbear from exercising their rights and remedies under the Prepetition Credit Facilities for the period November 14, 2010 through December 29, 2010 (as extended, the "**November 2010 Forbearance Agreements**"). On December 27, 2010, the Debtors and their various lender groups extended the Forbearance Agreements to January 31, 2011.

The Debtors took full advantage of the breathing room offered under the November 2010 Forbearance Agreements to negotiate with their lenders for a more global restructuring. On January 27 and 28, 2011, the Debtors and their lenders agreed to amend the terms of their Prepetition Credit Facilities (the "**Amendments**") and the Management Shareholders agreed to invest an additional $10 million in the Company as described above. The Amendments provided for revised principal repayment schedules, the waiver of existing defaults, and modified financial covenants, including covenants related to various Debtors' respective consolidated leverage ratio, consolidated interest coverage ratio and minimum cash liquidity. On April 18, 2011, the Debtors and their lenders further agreed to temporarily modify certain of the financial covenants through December 31, 2011.

On September 7, 2011, the Debtors entered into a second set of comprehensive forbearance agreements with the requisite lenders under the various Prepetition Credit Agreements (the "**September 2011 Forbearance Agreements**"). The September 2011 Forbearance Agreements obligated lenders under the Prepetition Credit Facilities to forbear until December 15, 2011 from exercising rights and remedies which may have arisen as a result of the Debtors' nonpayment of principal when due or noncompliance with their minimum cash covenants, minimum interest coverage ratio covenants, leverage ratio covenants and loan-to-value covenants under the Prepetition Credit Facilities.

Finally, on December 16, 2011, the Debtors obtained an extension of the September 2011 Forbearance Agreements until February 15, 2012 (the "**December 2011 Forbearance Agreements**"). The Debtors took advantage of the resulting forbearance period to negotiate and finalize the terms of the Plan and the RBS Settlement Agreement. Based on these efforts, the Debtors anticipate expeditious Chapter 11 Cases culminating in the confirmation of a consensual chapter 11 plan of reorganization with the support of the Debtors' lenders. The Debtors believe that the Plan implement a long-term financial restructuring that will enable the Reorganized Debtors to weather the current market pressures. In addition, the Debtors have retained the fleet size and flexibility, through the ability to charter in vessels, required quickly capitalize when the global economy recovers and market pressures subside.

## IV.    THE ANTICIPATED CHAPTER 11 CASES

The Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code when they receive (or anticipate receiving after the Petition Date) the requisite votes for acceptance of the Plan. The petitions will commence the Chapter 11 Cases. At that

time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code.  The Debtors will continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not expect the Chapter 11 Cases to be protracted.  To expedite their emergence from chapter 11, the Debtors on the Petition Date, in addition to filing this Disclosure Statement and the Plan, will file motions seeking the relief detailed below, among other relief, from the Bankruptcy Court.  Such relief, if granted, will facilitate the administration of the Chapter 11 Cases; there can be no assurance, however, that the Bankruptcy Court will grant all of the relief sought.

Chapter 11 enables the Debtors to effectuate a necessary restructuring of their financial obligations.  The Debtors believe that the transactions contemplated by the Plan will enhance the long-term growth prospects and financial performance of the Debtors, provide the Debtors with an appropriately leveraged capital structure and well position the Debtors to maintain their status as a leading provider of shipping and related services.

## A.    RELIEF TO BE SOUGHT AT OR NEAR THE OUTSET OF THE CHAPTER 11 CASES

The Debtors intend to seek certain orders from the Bankruptcy Court designed to minimize disruptions of business operations and facilitate their reorganization.  These include, but are not limited to, those described below.

### 1.    Scheduling Motion for Combined Disclosure Statement and Confirmation Hearing

The Debtors intend to file a motion (the "*Scheduling Motion*") seeking, among other things, an order scheduling a combined hearing on the adequacy of the disclosure in this Disclosure Statement and the confirmation of the Plan, on the earliest date that is convenient for the Bankruptcy Court to conduct such a hearing (the "*Combined Hearing*").  The Debtors will request that this combined hearing occur within 35 days after the Petition Date and that the Bankruptcy Court approve the procedures for the filing of objections to the adequacy of this Disclosure Statement and confirmation of the Plan.  Pursuant to the Bankruptcy Rules, the Debtors must provide notice of the Combined Hearing and the date set for the filing of objections to this Disclosure Statement and confirmation of the Plan.  The Debtors will seek approval of the form and manner of the notice of the Combined Hearing and, once approved, will mail the notice to all Holders of Claims and Interests and various other parties in interest as provided in the order with respect to the Scheduling Motion.  In addition, because the Debtors have commenced the solicitation prior to the filing of the Chapter 11 Cases and expect to obtain approval of the Plan from those Classes entitled to vote, the Debtors will request the Bankruptcy Court to order the United States Trustee not to convene a meeting of creditors.  The Debtors believe that cause exists under section 341(e) of the Bankruptcy Code for such relief.  Similarly, in accordance with the Amended Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York, General Order M-387, dated November 24, 2009 (the "*Prepack Standing Order*"), the Debtors will request that the Court direct the United States

27

Trustee not to appoint any committee of creditors or equity security holders pursuant to section 1102 of the Bankruptcy Code.

In the Scheduling Motion, the Debtors will also request that the Bankruptcy Court (i) approve the Debtors' solicitation procedures, (ii) approve the adequacy of this Disclosure Statement, and (iii) confirm the Plan, all through entry of the Confirmation Order, the proposed form of which is attached hereto as Exhibit J.

### 2.     Motion to Extend Deadline to File Schedules and Statements of Financial Affairs or Waive Requirement to File Schedules and Statements of Financial Affairs Upon Confirmation of Plan

The Debtors will request entry of an order granting additional time to file their schedules of assets and liabilities and statements of financial affairs.  The breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records and complex accounting systems.  Given the size, complexity, and geographical diversity of their business operations, the number of creditors, and the fact that certain prepetition invoices may not yet have been received or entered into the Debtors' financial accounting system, preparation of the schedules and statements of financial affairs prescribed by the Bankruptcy Rules will be complicated and time-consuming and, in fact, the information contained therein may not provide substantially more information than is available in this Disclosure Statement and the Plan.  As a result, the Debtors will request, without prejudice to their rights to seek further extensions, that the time to file their schedules and statements of financial affairs be extended until 100 days after the Petition Date.

Moreover, to the extent confirmation of the Plan occurs before the expiration of any such extended period, the Debtors will request that confirmation be deemed to act as a waiver of the requirement to file the schedules and statements of financial affairs.  Such relief is common in prepackaged chapter 11 bankruptcy cases because those parties entitled to vote have already had the opportunity to obtain an understanding of the assets and liabilities of the debtors based on the information in the disclosure statement provided to them prior to the petition date.  Finally, the Plan pays priority claims in full and Unimpairs General Unsecured Claims, and no dispute exists as to the amount of the Claims of the Prepetition Lenders.  Accordingly, the Debtors do not intend to file a motion establishing a deadline to file proofs of claim.

### 3.     Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Superpriority Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Liens and Superpriority Claims to DIP Lenders, (IV) Providing Adequate Protection, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing

If the Chapter 11 Cases are filed, the Debtors expect to have an immediate and urgent need for the use of Cash to continue to operate their businesses, to pay vendors to supply necessary goods and services, to pay employees, to satisfy other working capital and operational needs, and to fund their reorganization.  All of these requirements for the use of Cash must be satisfied for the Debtors to preserve and maintain their going-concern value and, ultimately, their ability to reorganize successfully pursuant to chapter 11.  Without use of Cash during the

Chapter 11 Cases, the Debtors would be forced to shut down their businesses, lay off employees, discontinue construction of unfinished vessels, and cease operations. This immediate and irreparable harm would be to the extreme detriment of the Debtors, their Estates and stakeholders, including the lenders under the Existing BOA Credit Agreement and the Existing DVB Credit Agreement (the "**Prepetition BOA/DVB Lenders**") that have a security interest in the Debtors' Cash currently housed in accounts held with BOA and DVB. Because this Cash is insufficient to fund the Debtors' operations, the Debtors have sought debtor-in-possession financing. Thus far, the Debtors have not identified any party willing to provide debtor in possession financing on an unsecured basis or on a secured basis subordinate to the claims of the existing secured lenders to the Debtors. Moreover, the existing secured lenders to the Debtors are unwilling voluntarily to agree to allow third party debtor in possession financing to prime their secured positions

However, certain of the lenders under the Existing BOA Facility and the Existing DVB Facility (the "**BOA/DVB DIP Lenders**") have agreed to provide debtor in possession financing (the "**BOA/DVB DIP Facility**") relative to the vessels pledged to secure the Existing BOA Credit Agreement and the Existing DVB Credit Agreement, and the lenders in those facilities have agreed, based on discussions with the agents for these facilities, to allow the debt incurred pursuant to the BOA/DVB DIP Facility to prime the existing credit facilities. The terms of the BOA/DVB DIP Facility are set forth below. Accordingly, the Debtors will file a motion (the "**BOA/DVB DIP Financing Motion**") with a proposed interim order (the "**Proposed Interim BOA/DVB DIP Financing Order**") to obtain financing and to use Cash that is pledged (the "**BOA/DVB Cash Collateral**") to secure the debt owed to the Prepetition BOA/DVB Lenders.

The BOA/DVB DIP Facility will consist of a term loan in the amount of approximately $41.3 million. TBS Holdings Limited, TBS Shipping Services Inc., each borrower under either of the Existing BOA Facility and the Existing DVB Facility and each subsidiary of TBS International plc owning an unencumbered vessel on the Petition Date will be the borrowers under the BOA/DVB DIP Facility, with all other Debtors as guarantors under the BOA/DVB DIP Facility. Bank of America, N.A. will act as the administrative agent (in such capacity, the "**BOA/DVB DIP Facility Administrative Agent**") and the collateral agent (in such capacity, the "**BOA/DVB DIP Facility Collateral Agent**"), with DVB Group Merchant Bank (Asia) Ltd. as co-agent (in such capacity, the "**BOA/DVB DIP Facility Co-Agent**"). Merrill Lynch, Pierce, Fenner & Smith Incorporated, DVB Group Merchant Bank (Asia) Ltd. and TD Bank, N.A. will act as the lead arrangers and book runners under the DIP Facility (in such capacities, the "**BOA/DVB DIP Facility Lead Arrangers**").

The obligations under the BOA/DVB DIP Facility will bear interest at a rate equal to either (a) one-month LIBOR plus 5.50% (with a LIBOR floor of 1.50%), or (b) the "Base Rate," defined as the highest of (i) the Bank of America N.A. prime rate, (ii) the Federal Funds rate plus 0.50% and (iii) one-month LIBOR plus 1.00%, plus 4.50%. Interest will be payable monthly. The Debtors will also be responsible for the payment of all reasonable and documented costs and expenses associated with the preparation, due diligence, administration, syndication and closing of all loan documentation, including, without limitation, collateral monitoring, appraisal, examination, financial advisory and other consultants' fees and expenses and the legal fees of counsel to the BOA/DVB DIP Facility Administrative Agent, the BOA/DVB DIP Facility Co-Agent, the BOA/DVB DIP Facility Collateral Agent and the BOA/DVB DIP Facility Lead

Arrangers, regardless of whether or not the BOA/DVB DIP Facility is closed. The Debtors will also pay the expenses of the BOA/DVB DIP Facility Administrative Agent, the BOA/DVB DIP Facility Co-Agent, the BOA/DVB DIP Facility Collateral Agent and each BOA/DVB DIP Lender in connection with the enforcement of any loan documentation. Amounts borrowed pursuant to the BOA/DVB DIP Facility will be repaid to the extent of excess cash, as provided in the BOA/DVB DIP Term Sheet, and otherwise refinanced pursuant to the BOA/DVB Exit Facility.

The BOA/DVB DIP Facility will be secured by (a) a first priority perfected security interest (subject to pre-existing validly perfected liens having priority over the liens securing the Existing BOA Facility and the Existing DVB Facility) in all presently owned and hereafter acquired assets of the type constituting collateral for the Existing BOA Facility and the Existing DVB Facility (other than (i) the bank account at RBS for so long as the RBS Credit Agreement is outstanding, and (ii) the proceeds and collateral pledged to Credit Suisse in connection either with the provision of adequate protection or debtor in possession financing provided by Credit Suisse, in such case related solely to the vessels pledged to Credit Suisse which secure certain of the Debtors' obligations to Credit Suisse), (b) a first priority perfected preferred mortgage and security interest, as applicable, in all currently or hereafter unencumbered assets of all Debtors; including, for the avoidance of doubt, any insurance proceeds associated with repairs of the Zuni Princess, (c) proceeds of any avoidance actions brought pursuant to sections 547, 548 or 549 of the Bankruptcy Code to recover any preferential, fraudulent or post-petition transfers, and (d) the Debtors' rights under §506(c) of the Bankruptcy Code and the proceeds thereof. The BOA/DVB DIP Lenders will also be given a super-priority administrative expense claim with priority in payment equivalent to that granted pursuant to section 364(1) of the Bankruptcy Code, over any and all other administrative expenses in the Chapter 11 Cases. The lien and the super-priority administrative expense claim granted to the BOA/DVB DIP Lenders will be senior to the adequate protection liens granted with respect to the use of DVB/BOA Cash Collateral. Such lien and administrative expense claim will, however, be subject and subordinate to the Carve-Out (as defined in the BOA/DVB DIP Financing Motion). Based on advice from their financial advisor, Lazard, the Debtors believe that more favorable financing is not available. Even if it were, it would be extremely difficult, expensive and time consuming to implement it over the objection of the Debtors' secured lenders, all of which would not serve to advance the Debtors' interest in effectuating Chapter 11 Cases that provide comfort to the market about the Debtors' ability to continue to provide uninterrupted, reliable shipping services.

Certain of the Debtors' BOA/DVB Cash Collateral and certain of the Debtors' assets are subject to security interests in favor of the lenders under the Prepetition BOA/DVB Lenders (such property subject to security interests, the "***Prepetition BOA and DVB Collateral***"). The Prepetition BOA/DVB Lenders will be afforded adequate protection in the following forms:

(a)     The Debtors will acknowledge the validity and amount of the Prepetition BOA/DVB Lenders' claims, the priority and perfection of prepetition liens, and make adequate protection payments in an amount equal to interest on all obligations under the Existing BOA Facility and the Existing DVB Facility at the highest non-default cash pay contract rate applicable to each such facility and reasonable and documented professional fees of the Agents under the Existing BOA Facility and the Existing DVB Facility;

(b)      Replacement liens (the "**BOA/DVB Adequate Protection Liens**") on postpetition assets of the type constituting Prepetition BOA and DVB Collateral (other than (i) the bank account at RBS for so long as the RBS Credit Agreement is outstanding, and (ii) the proceeds and collateral pledged to Credit Suisse in connection either with the provision of adequate protection or debtor in possession financing provided by Credit Suisse, in such case related solely to the vessels pledged to Credit Suisse, securing certain of the debtors' obligations to Credit Suissse), junior only to the liens securing the BOA/DVB DIP Facility; and

(c)      As to each of the Existing BOA Facility and the Existing DVB Facility, liens on the collateral securing the other facility, junior to the BOA/DVB DIP Facility and such other facility.  The Debtors will affirm their obligations with respect to payment of fees and expenses of the respective financial advisors and legal advisors engaged by the Agents under the Existing BOA Facility and the Existing DVB Facility.

The Adequate Protection Liens and the section 507(b) claims will be junior to liens granted to the BOA/DVB DIP Lenders and the Carve-Out, which consists of the following:  (a) allowed administrative expenses pursuant to 28 U.S.C. §1930 (a)(6), and (b) allowed fees and expenses incurred pursuant to sections 327, 328 and 1103 of the Bankruptcy Code prior to an event of default under the BOA/DVB DIP Facility, and no more than $2,500,000 for such allowed fees and expenses from and after notice of an event of default.

**4.      Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Superpriority Financing from Credit Suisse AG, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Liens and Superpriority Claims to DIP Lenders, (IV) Providing Adequate Protection, (V) Modifying the Automatic Stay and (VI) Scheduling a Final Hearing**

The immediate and irreparable harm that threatens the Prepetition DVB/BOA Lenders also threatens the lenders under the Existing Credit Suisse Credit Agreement (the "**Prepetition Credit Suisse Lender**") that have a security interest in the Debtors' Cash currently housed in accounts held with Credit Suisse.  Because this Cash is insufficient to fund the Debtors' operations, the Debtors have sought debtor-in-possession financing.  Thus far, the Debtors have not identified any party willing to provide debtor in possession financing on an unsecured basis or on a secured basis subordinate to the claims of the existing secured lenders to the Debtors.  Moreover, the existing secured lenders to the Debtors are unwilling voluntarily to agree to allow third party debtor in possession financing to prime their secured positions.

However, the lender under the Existing Credit Suisse Credit Agreement (the "**Credit Suisse DIP Lender**") has agreed to provide debtor in possession financing (the "**Credit Suisse DIP Facility**") relative to the vessels pledged to secure the Existing Credit Suisse Credit Agreement and has agreed to allow the debt incurred pursuant to the Credit Suisse DIP Facility to prime the Existing Credit Suisse Credit Agreement.  The terms of the Credit Suisse DIP Facility are set forth in the Credit Suisse Term Sheet, attached hereto as Exhibit G.  Accordingly, and in conjunction with the above-mentioned BOA/DVB DIP Financing Motion, the Debtors will file a motion (the "**Credit Suisse DIP Financing Motion**") with a proposed interim order (the "**Proposed Interim Credit Suisse DIP Financing Order**") to obtain financing and to use

Cash that is pledged (the "***Credit Suisse Cash Collateral***") to secure the debt owed to the Prepetition Credit Suisse Lender.

Claremont Shipping Corp., and Yorkshire Shipping Corp., (the "***Credit Suisse Debtors***") each a borrower under the Existing Credit Suisse Credit Agreement, will be the borrowers under the Credit Suisse DIP Facility. Credit Suisse AG will act as the administrative agent (in such capacity, the "***Credit Suisse DIP Agent***") and the collateral agent (in such capacity, the "***Credit Suisse Collateral Agent***").

The Credit Suisse DIP Facility will consist of two facilities: "Facility A" and "Facility B." Facility A will be a $1,000,000 multiple draw revolving credit facility available until September 30, 2012, to be used to fund legal and financial expenses incurred in connection with restructuring, the Chapter 11 Cases, and the negotiation of the Credit Suisse DIP Facility and the Amended and Restated Credit Suisse Credit Agreement. Facility B will be a $500,000 revolving credit facility to be used to fund the Debtors' working capital needs for the Credit Suisse Debtors. Amounts borrowed will be refinanced in accordance with the Credit Suisse Term Sheet. The Debtors will also be responsible for the payment of all reasonable and documented costs and expenses associated with the preparation, due diligence, administration, syndication and closing of all loan documentation, including, without limitation, collateral monitoring, appraisal, examination, financial advisory and other consultants' fees and expenses and the legal fees of counsel to the Credit Suisse DIP Agent, and the Credit Suisse Collateral Agent, regardless of whether or not the Credit Suisse DIP Facility is closed. The Debtors will also pay the expenses of the Credit Suisse DIP Agent, the Credit Suisse Collateral Agent, and the Credit Suisse DIP Lender in connection with the enforcement of any loan documentation. Amounts borrowed pursuant to the Credit Suisse DIP Facility will be repaid to the extent of excess cash, or otherwise refinanced, all as provided in the Credit Suisse Term Sheet.

The Credit Suisse DIP Facility will be secured by a first priority perfected security interest (subject to pre-existing validly perfected liens having priority over the liens securing the Existing Credit Suisse Credit Agreement) in all presently owned and hereafter acquired assets of the type constituting collateral for the Existing Credit Suisse Credit Agreement, and such other security interests as may be described in the Credit Suisse DIP Financing Motion. The liens and the super-priority administrative expense claim granted to the Credit Suisse DIP Lender will be senior to the adequate protection liens granted with respect to the use of Credit Suisse Cash Collateral. Such lien and administrative expense claim will, however, be subject and subordinate to the Carve-Out (as defined in the Credit Suisse DIP Financing Motion). Based on advice from their financial advisor, Lazard, the Debtors believe that more favorable financing is not available. Even if it were, it would be extremely difficult, expensive and time consuming to implement it over the objection of the Debtors' secured lenders, all of which would not serve to advance the Debtors' interest in effectuating Chapter 11 Cases that provide comfort to the market about the Debtors' ability to continue to provide uninterrupted, reliable shipping services.

Certain of the Debtors' Cash Collateral and certain of the Debtors' assets are subject to security interests in favor of the lender under the Existing Credit Suisse Credit Agreement (such property subject to security interests, the "***Prepetition Credit Suisse Collateral***"). The Prepetition Credit Suisse Lender will be afforded adequate protection in the following forms:

(a)     The Debtors will acknowledge the validity and amount of the Prepetition Credit Suisse Lender's claims, the priority and perfection of prepetition liens; and

(b)     Replacement liens (the "***Credit Suisse Adequate Protection Liens***") on postpetition assets of the type constituting Prepetition Credit Suisse Collateral, junior only to the liens securing the Credit Suisse DIP Facility; and

The Credit Suisse Adequate Protection Liens will be junior to liens granted to the Credit Suisse DIP Lender and certain other amounts as provided in the Credit Suisse Term Sheet.

5.       **Motion For Order (I) Authorizing Debtors to (A) Continue Existing Cash Management System, Bank Accounts, and Business Forms and (B) Continue Ordinary Course Intercompany Transactions; and (II) Granting an Extension of Time to Comply With the Requirements of Section 345(b) of the Bankruptcy Code**

Because of the administrative hardship that any operating changes would impose on them, the Debtors intend to seek authority, on a postpetition basis, to continue to use their existing cash management system, bank accounts and business forms, to follow their internal investment and deposit guidelines, and engage in intercompany transactions in the ordinary course of business.  Absent the Bankruptcy Court's authorization of the continued use of the cash management system and the other relief sought, the Debtors' business operations would be impeded to the detriment of their Estates and their creditors.

Continued use of the existing cash management system, bank accounts and business forms, investment guidelines, and intercompany trading practices will facilitate the Debtors' smooth and orderly transition into chapter 11, minimize the disruption of their businesses while in chapter 11 and expedite their emergence from chapter 11.  As a result of set-up time and expenses, requiring the Debtors to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Cases.  For the same reasons, requiring the Debtors to cancel their existing bank accounts and establish new accounts or requiring the Debtors to create new business forms would only frustrate the Debtors' efforts to reorganize expeditiously.

6.       **Motion for Interim and Final Orders (A) Authorizing Debtors to Pay Certain Prepetition Claims of Critical and Foreign Vendors and Certain Administrative Claimholders; and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

The Debtors operate a global transoceanic shipping services company, owning and operating 41 vessels that provide services to more than 300 customers in over 20 countries along key trade routes running between Latin America and Japan, South Korea and China, and parts of North America, Africa, the Caribbean and the Middle East.  The continued successful operation of the Debtors' business is dependent on the Debtors' ability to provide to their global customers high quality transoceanic transportation services (and logistical support in connection therewith).  Any interruption, or even perceived threat of an interruption, in those services would be disastrous to the Debtors' business.

The Debtors depend on their ability to purchase essential goods and services from select, and often irreplaceable, third party vendors and independent contractors in the United States and around the world ("**Critical Vendors**").  Many of these third party vendors, especially vendors operating entirely outside the United States ("**Foreign Vendors**"), may not be willing to do business with a chapter 11 debtor absent payment of certain prepetition claims.  Additionally, despite the extraterritorial effect of the automatic stay, it is entirely possible that certain Foreign Vendors could seek to hold vessels and their cargo under arrest in foreign ports or otherwise interfere with the Debtors' business outside the United States.  Such actions would have both an immediate impact on the Debtors' ability to operate and would have long term effects on the Debtors' ability to attract new business.  Because the Debtors' revenues are dependent upon the timely transportation and delivery of cargo, it is essential that the Debtors make arrangements to ensure payment of prepetition amounts to such Critical and/or Foreign Vendors in order to ensure the success of the Debtors' business postpetition.

The Debtors have reviewed their business relationships and identified the Critical Vendors that are so essential that the loss of their particular goods or services would cause immediate and irreparable harm to the Debtors' businesses and market share.  Vendors identified as Critical provide essential goods and services for which (a) no ready alternative vendors can be found with reasonable diligence, or (b) alternative vendors would be prohibitively expensive due to such issues as lead time, geographical remoteness, or inability to replicate preferential terms that have been locked-in with the current vendors.  It is therefore essential to the reorganization efforts that the Debtors are allowed to pay the Critical Vendors.

Also, while most of the Debtors' Critical Vendors are also Foreign Vendors, even for those Foreign Vendors who do not provide such essential and irreplaceable goods and services as to be deemed critical by the Debtors under the above framework, it is essential that the Debtors be able to pay all Foreign Vendor claims as well.  That is because while the Critical and Foreign Vendors are subject to the automatic stay as a matter of U.S. bankruptcy law, as a practical matter the Debtors' ability to enforce the stay provisions as to Foreign Vendors may be limited.  Indeed, based on the substantial experience of the Debtors' management in the industry and their knowledge of the Foreign Vendors, there is a significant risk that the Foreign Vendors may consider themselves to be beyond the jurisdiction of the Bankruptcy Court, disregard the automatic stay, and engage in conduct that disrupts the Debtors' domestic and international operations, including, but not limited to, commencing competing insolvency proceedings in foreign countries, foreclosing on or impounding the Debtors' vessels, withholding goods and services from the Debtors, asserting liens against the Debtors' vessels or other property located outside the United States, terminating service agreements, and refusing access to ports.  It is therefore equally essential to the reorganization efforts that the Debtors are allowed to pay the Foreign Vendors.

Based on their review of outstanding claims, the Debtors will request authority to pay the Critical and Foreign Vendors all prepetition amounts due to them in an estimated amount of $20.0 million (the "**Critical and Foreign Vendor Claims Cap**").

Accordingly, the Debtors will request the Bankruptcy Court to exercise its equitable powers and authorize the Debtors to pay their pre-petition obligations to the Debtors' Critical

and Foreign Vendors up to the Critical and Foreign Vendor Claims Cap as set forth in the orders entered by the Bankruptcy Court.

**7.    Motion for Interim and Final Orders Confirming the Protections of Sections 362 and 365 of the Bankruptcy Code and Restraining Any Action in Contravention Thereof**

As a result of the Debtors' worldwide operations, the Debtors have thousands of foreign creditors, customers, and counterparties to contracts that may be unfamiliar with the global-reach of the protections afforded by the Bankruptcy Code. Due to this lack of familiarity, certain Foreign Creditors may attempt to seize assets located outside of the United States to the detriment of the Debtors, their Estates, and Creditors, or may take other actions in contravention of the automatic stay imposed by section 362 of the Bankruptcy Code. In addition, Foreign Creditor counterparties to unexpired leases and executory contracts may attempt to terminate those leases or contracts due to the commencement of the Chapter 11 Cases in contravention of section 365 of the Bankruptcy Code.

To assist the Debtors in explaining the bankruptcy protections to the Foreign Creditors, the Debtors will seek an order that confirms, restates, and restrains any action taken in violation of two key protections afforded to the Debtors by the Bankruptcy Code: (a) the automatic stay provisions of section 362; and (b) the prohibition of section 365 against terminating agreements and leases due to *ipso facto* provisions. The Debtors believe that a specific order from the Court that the Debtors can present to the Foreign Creditors will assist the Debtors to explain these protections to the Foreign Creditors and dissuade many, if not all, of such Foreign Creditors from taking actions that would violate the Bankruptcy Code.

**8.    Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Salaries, and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Similar Benefits, and (C) Continue Employee Compensation and Benefit Programs**

The Debtors believe that they have valuable assets in their work force, and that any delay in paying prepetition compensation or benefits to their employees would significantly jeopardize the Debtors' relationships with their employees and irreparably harm morale at a time when the need for continued dedication, confidence, and cooperation of the Debtors' employees is most critical. Accordingly, the Debtors will seek authority to pay compensation and benefits that were accrued but unpaid as of the Petition Date, and to continue their employee benefit programs in the ordinary course of business postpetition.

**9.    Motion for Interim and Final Orders (A) Authorizing the Debtors to Continue Insurance Coverage Entered Into Prepetition and to Pay Obligations Relating Thereto; and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

In connection with the operation of their business, the Debtors maintain various insurance policies providing coverage for, among other things: hull and machinery; increased value (i.e., the difference between market value of the vessel and the insured value); war risk; loss of hire;

protection and indemnity; freight, demurrage and defense; certificate of financial responsibility (COFR) guarantee; cash on vessel in transit; professional indemnity; containers; freight forwarding/logistics; charterer's legal liability; shipowners liability to cargo; director & officers liability; employment practices; kidnap & ransom; professional liability of employed lawyers; building and personal property; corporate office general liability; automotive; and commercial excess (umbrella) (collectively, the "*Policies*"). Failure to pay any obligations associated with the Policies may harm the Debtors' estates in several ways, such as the potential for an insurance company to terminate coverage, the subsequent need to obtain replacement insurance at a likely higher price, and the adverse effect any interruption of payment would have on the Debtors' ability to finance premiums on future policies.

Accordingly, the Debtors will request the Bankruptcy Court to authorize the Debtors to pay all pre-petition and post-petition obligations associated with the Policies to ensure that the Debtors' insurance coverage is uninterrupted.

10.    **Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services To, or Discriminating Against, the Debtors on Account of Prepetition Invoices; (B) Determining That the Utilities Are Adequately Assured of Future Payment; (C) Establishing Procedures for Determining Requests for Additional Assurance; and (D) Permitting Utility Companies to Object to Such Procedures**

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. The Debtors' utilities are vital to the Debtors' ability to continue operations and exist as a going concern. On the Petition Date, the Debtors will seek an order authorizing the Debtors to provide their utilities with a deposit equal to the approximate value of two weeks' worth of utility services as the adequate assurance required by section 366 of the Bankruptcy Code. The Debtors will further request that the utilities be prevented from altering, refusing, or discontinuing service on account of any unpaid prepetition charges or the commencement of Debtors' chapter 11 cases and that the Bankruptcy Court approve procedures under which utilities could request additional assurance.

11.    **RBS Settlement Agreement Assumption Motion**

As described herein and in the Plan, the Debtors will file a motion to assume the RBS Settlement Agreement, a copy of which is attached hereto as Exhibit H.

12.    **Plan Support Agreement Assumption Motion**

As described herein and in the Plan, the Debtors will file a motion to assume the Plan Support Agreement, a copy of which is attached hereto as Exhibit D.

B.    **ADMINISTRATIVE MOTIONS**

The Debtors will seek certain relief to ease the administrative burdens of the Chapter 11 Cases on the Debtors and other parties in interest. Specifically, the Debtors will request:

1. an order directing joint administration of the Chapter 11 Cases;

2. an order (A) waiving the requirement that each Debtor file a list of creditors; (B) authorizing the filing of a single, consolidated list of the 50 largest unsecured creditors of the Debtors in lieu of filing separate lists of the 20 largest unsecured creditors of each Debtor; and (C) authorizing the Debtors to maintain a consolidated list of creditors in lieu of a matrix;

3. an order approving the retention of GCG, Inc. as balloting and claims agent; and

4. an order providing the Debtors with 60 days in which to file the reports of financial information required by Bankruptcy Rule 2015.3.

### 1.      Professional Retention Applications and Professional-Related Motions

The Debtors will seek to retain the following restructuring professionals to represent the Debtors and assist them in connection with the Chapter 11 Cases:

1. Gibson, Dunn & Crutcher LLP as bankruptcy counsel;

2. Cardillo & Corbett as special maritime counsel regarding maritime law;

3. AlixPartners, LLP as financial advisor;

4. Lazard Freres & Co., as investment banker; and

5. Other professionals used by the Debtors in the ordinary course of business.

The Debtors will also seek orders (i) authorizing implementation of orderly procedures for interim monthly payment of fees and expenses of restructuring professionals, and (ii) authorizing the employment of ordinary course professionals and setting forth procedures for their compensation.

## V.      SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED HERETO AND THERETO, AND THE DOCUMENTS FILED IN THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO

THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICTS BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.  IN THE EVENT OF ANY CONFLICTS BETWEEN THE CONFIRMATION ORDER AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE CONFIRMATION ORDER WILL CONTROL.

The Plan described herein provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to Holders of Claims against the Debtors.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the Distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their business. Under the Plan, the Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive Distributions equal to the full amount of such Claims, (ii) the Claims in certain other Classes will be modified and receive Distributions constituting of a partial recovery on such Claims, and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.  On the Distribution Date and at certain times thereafter, the Disbursing Agent will make or cause to be made the Distributions as provided in the Plan.  The Classes of Claims and Interests established by the Plan, the treatment of those Classes under the Plan, and various other aspects of the Plan are described below.

## A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders into classes that contain claims and interests that are substantially similar to the other claims and interests in such Class.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides the Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Priority Tax Claims, and DIP Facility Claims, which, pursuant to section 1123(a)(1) are not required to be classified).

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims

and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan as are necessary to permit Confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated amount of such Claim and, accordingly, the total Allowed Claims with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of the Claims and Interests and the nature of the Distributions to members of each Class are summarized below.  The Debtors believe that the consideration provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.

**B.      TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN: ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS**

**1.      Administrative Expense Claims**

Other than in respect of Professional Compensation Claims (which shall be treated pursuant to Section 2.2 of the Plan (*see* Section V.B.2., below)), on the later of (a) the Effective Date or (b) if an Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Expense Claim becomes Allowed, the Debtors will either (i) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtors and such Holder shall have agreed upon; *provided*, *however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (i).  Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (x) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (y) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the applicable Debtor (or after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Administrative Expense Claim without the need or requirement for the Holder

of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court.

## 2. Professional Compensation Claims

Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 45 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive: (a) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (i) the Effective Date or (ii) three Business Days after the order granting such Person's final fee application becomes a Final Order; or (b) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and the Reorganized Debtors (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases).  After the Confirmation Date, any requirement that Professionals employed by the Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.  All Professional Compensation Claims for services rendered after the Confirmation Date shall be paid by the Reorganized Debtors (or the Debtors prior to the Effective Date) upon receipt of an invoice therefor, or on such other terms as the Reorganized Debtors (or the Debtors prior to the Effective Date) and the Professional may agree, without the requirement of any order of the Bankruptcy Court.

## 3. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code or, at the Debtors' election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code.

## 4. U.S. Trustee Fees

U.S. Trustee Fees incurred prior to the Effective Date will be paid on the Distribution Date in accordance with the applicable schedule for payment of such fees.  Until each of the Chapter 11 Cases is closed by entry of a final decree of the Bankruptcy Court, any additional U.S. Trustee Fees will be paid by the Reorganized Debtors.

## 5. BOA/DVB DIP Facility Claims

Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims to the contrary, subject to the terms of the BOA/DVB DIP Facility, in full and final

satisfaction, settlement, release, and discharge of the BOA/DVB DIP Facility Claims, on the Effective Date, the BOA/DVB DIP Facility Claims shall be repaid to the extent of Cash held by the Reorganized Debtors in excess of the minimum liquidity requirements of the BOA/DVB DIP Facility Agreement (as provided in the BOA/DVB DIP Facility Agreement), and, subject to Holders of BOA/DIP Facility Claims satisfying the New Credit Agreement Distribution Procedures, all remaining obligations of the Debtors to BOA/DVB DIP Lenders in respect of the BOA/DVB DIP Facility Claims shall be converted into obligations of New TBS Parent and the Reorganized Debtors party to the BOA/DVB Exit Facility Agreement under the BOA/DVB Exit Facility on a dollar-for-dollar basis (as provided in and subject to the terms of the BOA/DVB Exit Facility Agreement).

### 6. Credit Suisse DIP Facility Claims

Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims to the contrary, subject to the terms of the Credit Suisse DIP Facility and Holders of Credit Suisse DIP Facility Claims satisfying the New Credit Agreement Distribution Procedures, in full and final satisfaction, settlement, release, and discharge of the Credit Suisse DIP Facility Claim, on the Effective Date, the Credit Suisse DIP Facility Claims shall be converted into obligations of the New TBS Parent and the Reorganized Debtors party to Credit Suisse Exit Facility Agreement under the Credit Suisse Exit Facility on a dollar-for-dollar basis (as provided in and subject to the terms of the Credit Suisse Exit Facility Agreement).

## C. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1. Summary

Pursuant to section 1122 of the Bankruptcy Code, the Plan designates Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date. The fact that a particular Class of Claims is designated for a Debtor does not necessarily mean there are any Allowed Claims in such Class against such Debtor.

### 2. Classification of Claims and Interests

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows: [31]

**Classes 1(1)-(73): Other Priority Claims.** Other Priority Claims in Classes 1(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

---

[31] A complete list of Classes in the Chapter 11 Cases is annexed hereto on Appendix 2

Case 1:18-cv-04363-GBD-RCW  Document 79-2  Filed 12/01/18  Page 58 of 385

**Classes 2(1)-(73): Other Secured Claims.** Other Secured Claims in Classes 2(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Classes 3(1), 3(2), 3(3), and 3(61)-(67): DVB Syndicate Claims.** DVB Syndicate Claims in Classes 3(1), 3(2), 3(3), and 3(61)-(67) are Impaired and are entitled to vote on the Plan.

**Classes 4(1)-(60): BOA Syndicate Claims.** BOA Syndicate Claims in Classes 4(1)-(60) are Impaired and are entitled to vote on the Plan.

**Classes 5(1), 5(2), 5(68), and 5(69): Credit Suisse Claims.** Credit Suisse Claims in Classes 5(1), 5(2), 5(68), and 5(69) are Impaired and are entitled to vote on the Plan.

**Classes 6(1)-(3), and 6(70)-(73): AIG Claims.** AIG Claims in Classes 6(1)-(3) and 6(70)-(73) are Impaired and are entitled to vote on the Plan.

**Classes 7(1) and 7(2): RBS Syndicate Claims.** RBS Syndicate Claims in Classes 7(1) and 7(2) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Classes 8(1)-(73): General Unsecured Claims.** General Unsecured Claims in Classes 8(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Classes 9(1)-(73): Intercompany Claims.** Intercompany Claims in Classes 9(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Classes 10(1)-(73): Subordinated Claims.** Subordinated Claims in Classes 10(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Classes 11(1)-(73): Interests.** Interests in Classes 11(1)-(3) are Impaired, are deemed to reject the Plan, and are not entitled to vote on the Plan. Intercompany Interests in Classes 11(4)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

### 3. Effect of Non-Voting; Modifications

At the Confirmation Hearing, the Debtors will seek a ruling that if no Holder of a Claim or Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the Holders of such Claims or Interests in such Class for the purposes of section 1129(b) of the Bankruptcy Code. Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to modify the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, provided such modifications are consistent with section 12.5 of the Plan (see Section V.K.1.iv. below).

### 4. Treatment of Classes 1(1)-(73): Other Priority Claims

i. *Impairment and Voting*. Classes 1(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim in Classes 1(1)-(73) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

ii. *Treatment*. On the Distribution Date, each Holder of an Allowed Other Priority Claim shall receive in full satisfaction, release, and discharge of and in exchange for such Claim: (a) payment of Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment that the Debtors and such Holder shall have agreed upon in writing; ***provided, however***, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (a) of this Section 4.1.2.

**5. Treatment of Classes 2(1)-(73): Other Secured Claims**

i. *Impairment and Voting*. Classes 2(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Other Secured Claim in Classes 2(1)-(73) as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

ii. *Treatment*. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Other Secured Claim in Classes 2(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed Other Secured Claims.

**6. Treatment of Classes 3(1), 3(2), 3(3), and 3(61)-(67): DVB Syndicate Claims**

i. *Impairment and Voting*. Classes 3(1), 3(2), 3(3), and 3(61)-(67) are Impaired by the Plan.  Each Holder of an Allowed DVB Syndicate Claim in such Classes as of the Record Date is entitled to vote such Claim to accept or reject the Plan.

ii. *Treatment*. Each Holder of Allowed DVB Syndicate Claims in Classes 3(1), 3(2), 3(3), and 3(61)-(67) shall, in full and final settlement of and in exchange for such Claims, receive its Pro Rata Share of (a) the New Senior Secured Cash Pay Loan Obligations; (b) the New Senior Secured PIK Loan Obligations; and (c) the New Class A Common Stock to be issued on the Effective Date (which shares of New Common Stock shall be subject to dilution pursuant to the New Management Incentive Plan).  The DVB Lenders shall accept the distributions on account of the Allowed DVB Syndicate Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims in all applicable Classes arising under the Existing DVB Credit Agreement; *provided*, *however*, that as a condition precedent to its receipt of a portion of such Consideration, each Holder of Allowed DVB Syndicate Claims must first comply with the New Credit Agreement Distribution Procedures.  **If a Holder of a DVB Syndicate Claim does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

**7. Treatment of Classes 4(1)-(60): BOA Syndicate Claims**

i.      *Impairment and Voting*.  Classes 4(1)-(60) are Impaired by the Plan.  Each Holder of an Allowed BOA Syndicate Claim in such Classes as of the Record Date is entitled to vote such Claim to accept or reject the Plan.

ii.      *Treatment*.  Each Holder of Allowed BOA Syndicate Claims in Classes 4(1)-(60) shall, in full and final settlement of and in exchange for such Claims, receive its Pro Rata Share of (a) the New Senior Secured Cash Pay Loan Obligations; (b) the New Senior Secured PIK Loan Obligations; and (c) the New Class A Common Stock to be issued on the Effective Date (which shares of New Common Stock shall be subject to dilution pursuant to the New Management Incentive Plan).  The BOA Lenders shall accept the distributions on account of the Allowed BOA Syndicate Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims in all applicable Classes arising under the Existing BOA Credit Agreement; *provided*, *however*, that as a condition precedent to its receipt of a portion of such Consideration, each Holder of Allowed BOA Syndicate Claims must first comply with the New Credit Agreement Distribution Procedures.  **If a Holder of a BOA Syndicate Claim does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

## 8.      Treatment of Classes 5(1), 5(2), 5(68), and 5(69): Credit Suisse Claims

i.      *Impairment and Voting*.  Classes 5(1), 5(2), 5(68), and 5(69) are Impaired by the Plan.  The Holder of Allowed Credit Suisse Claims in such Classes as of the Record Date is entitled to vote to accept or reject the Plan.

ii.      *Treatment*.  The Holder of Allowed Credit Suisse Claims in Classes 5(1), 5(2), 5(68), and 5(69) shall, in full and final settlement of and in exchange for such Claims, receive the Credit Suisse Consideration; *provided, however*, that as a condition precedent to its receipt of such Consideration, the Holder of Allowed Credit Suisse Claims must first comply with the New Credit Agreement Distribution Procedures.  **If the Holder of Credit Suisse Claims does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein**.

## 9.      Treatment of Classes 6(1)-(3), and 6(70)-(73): AIG Claims

i.      *Impairment and Voting*.  Classes 6(1)-(3), and 6(70)-(73) are Impaired by the Plan.  The Holder of Allowed AIG Claims in such Classes as of the Record Date is entitled to vote to accept or reject the Plan.

ii.      *Treatment*.  The Holder of Allowed AIG Claims in Classes 6(1)-(3), and 6(70)-(73) shall, in full and final settlement of and in exchange for such Claims, receive the AIG Consideration; *provided*, *however*, that as a condition precedent to its receipt of such Consideration, the Holder of Allowed AIG Claims must first comply with the New Credit Agreement Distribution Procedures.  **If the Holder of AIG Claims does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively,**

**absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

**10.      Treatment of Classes 7(1)-(2):  RBS Syndicate Claims**

         *i.       Impairment and Voting*.  Classes 7(1) and 7(2) are Unimpaired by the Plan.  Each Holder of an Allowed RBS Syndicate Claim in such Classes as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

         *ii.      Treatment*.  The Debtors intend to file the RBS Settlement Agreement Assumption Motion after the Petition Date and seek the Bankruptcy Court's approval of that Motion at or prior to the Confirmation Hearing.  As a result of the RBS Settlement Agreement, prior to the Petition Date, the Debtors and their non-Debtor Affiliates have returned the vessels listed in the RBS Settlement Agreement that were Collateral under the RBS Credit Agreement and, in exchange, have been released from the RBS Syndicate Claims.  If the RBS Settlement Agreement Assumption Motion is approved by the Bankruptcy Court, the Debtors and RBS will be obligated to perform the RBS Settlement Obligations, and any RBS claims against the Debtors with respect thereto will be Unimpaired.  Accordingly, Holders of RBS Syndicate Claims in Classes 7(a) and (b) shall be deemed Unimpaired hereunder.

**11.      Treatment of Classes 8(1)-(73): General Unsecured Claims**

         *i.       Impairment and Voting*.  Classes 8(1)-(73) are Unimpaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in such Classes is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

         *ii.      Treatment*.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed General Unsecured Claim in Classes 8(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed General Unsecured Claim.  Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the applicable Debtor (or, after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General Unsecured Claim.  The Debtors reserve their rights to dispute in the Bankruptcy Court or any other court with jurisdiction the validity of any General Unsecured Claim at any time prior to the Claims Objection Bar Date.

**12.      Treatment of Classes 9(1)-(73): Intercompany Claims**

         *i.       Impairment and Voting*.  Classes 9(1)-(73) are Unimpaired by the Plan.  Each Holder of an Allowed Intercompany Claim in Classes 9(1)-(73) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    *ii.    Treatment*.  Except to the extent that a Holder of an Allowed Intercompany Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Intercompany Claim in Classes 9(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed Intercompany Claim.

### 13.    Treatment of Classes 10(1)-(73): Subordinated Claims

    *i.    Impairment and Voting*.  Classes 10(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Subordinated Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    *ii.    Treatment*.  Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment or has been paid prior to the Effective Date, each Allowed Subordinated Claim in Classes 10(1)-(73) shall be reinstated, paid in full or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed Subordinated Claim.

### 14.    Treatment of Classes 11(1)-(73): Interests

    *i.    Impairment and Voting*. Class 11(1) is Impaired by the Plan.  Each Holder of an Allowed Interest in Class 11(1) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.  Class 11(2) is Impaired by the Plan.  Each Holder of an Allowed Interest in Class 11(2) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.  Class 11(3) is Impaired by the Plan.  Each Holder of an Allowed Interest in Class 11(3) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.  Classes 11(4)-(73) are Unimpaired by the Plan.  Each Holder of an Interest in Classes 11(4)-(73) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    *ii.    Treatment of TBS Parent Interests*.  Under the Plan, TBS Parent shall be dissolved and its Interests shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The Holders of TBS Parent Interests shall not receive or retain any property under the Plan on account of such Interests.

    *iii.    Treatment of TBS International Interests*.  Under the Plan, TBS International shall be dissolved and its Interests shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The Holders of TBS International Interests shall not receive or retain any property under the Plan on account of such Interests.

    *iv.    Treatment of TBS Holdings Limited Interests*.  Under the Plan, Interests in TBS Holdings Limited previously held by TBS International shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The Holders of Interests in TBS Holdings Limited shall not retain or receive any property under the Plan on account of such interests.

    *v.    Treatment of Other Interests*.  Interests in Classes 11(4)-(73) shall be reinstated.

### 15.    Disclaimer Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of the assertion of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 16.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### D.    PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASSES, AND CONSEQUENCES OF NON-CONFIRMABILITY

### 1.    Voting Rights

Each Holder of an Allowed Claim as of the Voting Deadline in an Impaired Class of Claims or Interests that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim as of the Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the Ballot Instructions.    Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Scheduling Motion.  The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described herein.

### 2.    Acceptance Requirements

An Impaired Class of Claims shall have accepted the Plan if votes in favor of the Plan have been cast by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

### 3.    Cram Down

If all applicable requirements for Confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection 1129(a)(8) thereof, the Plan will be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of subsection 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan.  If the Debtors determine that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code without eliminating the distribution to a junior Class or Classes, the Plan may, at the option of the Debtors and without the need for further action or solicitation of any kind, be modified to eliminate such distribution, the Class or Classes as to which distributions are eliminated will be deemed to be a rejecting Class or Classes, and the Plan will be treated as a request that the Bankruptcy Court confirm the Plan, as so modified, in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of

section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan.

### 4.    Global Enterprise/Tabulation of the Votes

The Debtors operate as a single, integrated worldwide enterprise.  Accordingly, the Plan constitutes a global resolution of all of the Claims against the Debtors.  In some instances, more than one of the Debtors is obligated, either as a borrower or guarantor, for a particular Claim.  In such cases, the applicable Creditor shall only be entitled to one vote to accept or reject the Plan, and such vote shall apply to all Debtors that are liable on such Claim.  If no Impaired Classes vote to accept the Plan, the Debtors reserve the right to modify the Plan.

### 5.    Non-Confirmability

If the Plan has not been accepted by the Classes of Claims entitled to vote with respect thereto in accordance with Section 5.2 of the Plan (*see* Section V.D.2. above), and the Debtors determine that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of the Plan the Debtors may seek to (a) propose a new plan or plans of reorganization for the Debtors, (b) amend the current Plan incorporated therein to satisfy any and all objections, (c) withdraw the Plan, or (d) convert or dismiss the Chapter 11 Cases.

### E.    MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTORS

### 1.    General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  Subject to Article VIII of the Plan (*see* Section V.G. below), all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

### 2.    Sources of Consideration for Plan Distributions

#### i.    Debtors' Available Cash

Cash will be available from the Debtors' operations, the proceeds of the BOA/DVB DIP Facility  and the proceeds of the Credit Suisse DIP Facility.  BOA/DVB DIP Facility Claims shall not be paid in Cash under the Plan, except to the extent provided in the BOA/DVB DIP Facility Term Sheet; rather, pursuant to Section 2.5 of the Plan (*see* Section V.B.5. above) such Claims shall be satisfied by a dollar-for dollar replacement of the DIP Facility with the BOA/DVB Exit Facility.  Credit Suisse DIP Facility Claims shall not be paid in Cash under the Plan; rather, pursuant to Section 2.6 of the Plan (*see* Section V.B.6. above), such Claims shall be satisfied by a dollar-for-dollar replacement of the Credit Suisse DIP Facility with the Credit Suisse Exit Facility.

ii.      The BOA/DVB Exit Facility

On the Effective Date, the BOA/DVB Exit Facility Obligors shall enter into the BOA/DVB Exit Facility Agreement with the BOA/DVB Exit Facility Agent and the other lenders thereto. Confirmation of the Plan shall be deemed approval of the BOA/DVB Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the BOA/DVB Exit Facility Obligors in connection therewith) and authorization and direction for the BOA/DVB Exit Facility Obligors to enter into and execute the BOA/DVB Exit Facility Agreement, subject to such modifications as they may deem to be reasonably necessary to consummate their entry into the BOA/DVB Exit Facility.

iii.     The Credit Suisse Exit Facility

On the Effective Date, to the extent there are remaining obligations under the Credit Suisse DIP Facility, the Credit Suisse Exit Facility Obligors shall enter into the Credit Suisse Exit Facility Agreement with the Credit Suisse Exit Facility Agent and the other lenders thereto. Confirmation of the Plan shall be deemed approval of the Credit Suisse Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Credit Suisse Exit Facility Obligors in connection therewith) and authorization for the Credit Suisse Exit Facility Obligors to enter into and execute the Credit Suisse Exit Facility Agreement, subject to such modifications as they may deem to be reasonably necessary to consummate their entry into the Credit Suisse Exit Facility.

iv.     The New AIG and Credit Suisse Credit Agreements

On the Effective Date, New TBS Parent and the applicable Reorganized AIG and Credit Suisse Debtors, as applicable, shall enter into the New Credit Agreements. Confirmation of the Plan shall be deemed approval of the New Credit Agreements (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith) and authorization and direction for the applicable Reorganized Debtors to enter into and execute the New Credit Agreements, subject to such modifications as they may deem to be reasonably necessary to consummate such New Credit Agreements.

v.      The New Senior Secured Loan Facility

On the Effective Date, the BOA/DVB Exit Facility Obligors shall enter into the New Senior Secured Loan Facility. Confirmation shall be deemed approval of such facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the BOA/DVB Exit Facility Obligors in connection therewith) and authorization and direction for the BOA/DVB Exit Facility Obligors to enter into and execute all instruments, documents and agreements in connection therewith, subject to such modification as may be necessary to consummate their entry into the New Senior Secured Loan Facility.

vi.     Use of Proceeds

Cash available on the Effective Date, after giving effect to any repayment of the BOA/DVB DIP Facility by the BOA/DVB DIP Facility Obligors required under the terms and conditions of the BOA/DVB DIP Facility, shall be used by the Reorganized Debtors (a) to fund the Debtors' exit from the Chapter 11 Cases, including, without limitation, the funding of (i) Allowed Administrative Expense Claims, (ii) Allowed Professional Compensation Claims, (iii) Allowed Priority Tax Claims, (iv) Allowed Other Priority Claims, and (v) Distributions to be made on the Distribution Date; and (b) to fund ongoing operating expenses of the Reorganized Debtors.

### 3.    Rule 2004 Examinations

The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 will be expressly preserved following the Effective Date.

### 4.    Continued Existence

Except as provided in the Plan and in the Implementation Memorandum, each of the Debtors, as Reorganized Debtors, will continue to exist on or after the Effective Date as a separate corporate or other applicable entity, with all the rights and powers applicable to such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under applicable law.

### 5.    Re-vesting of Assets

Except as expressly provided in the Plan, the Assets of each Debtor's Estate shall re-vest with the respective Reorganized Debtor on the Effective Date.  The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan. From and after the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, except as provided herein.  As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, except as, and to the extent, provided in the Plan.

### 6.    Implementation Transactions

In connection with implementation of the Plan, New TBS Parent and the Debtors (or, after the Effective Date, the Reorganized Debtors) (a) shall effectuate the Plan through the transactions described in the Implementation Memorandum, (b) may merge, amalgamate, dissolve, transfer assets, or otherwise consolidate any of the Debtors in furtherance of the Plan and (c) may engage in any other transaction in furtherance of the Plan.

On the Effective Date, all of the assets of TBS Parent and TBS International (other than funds estimated by the Debtors as being reasonably necessary to pay all Allowed Class 8 General Unsecured Claims against such entities and to effectuate the dissolution of such entities under Irish and Bermuda law, as set forth in the Implementation Memorandum) shall be transferred to New TBS Parent as part of the consideration to Holders of BOA Syndicate Claims and DVB Syndicate Claims.  After the Effective Date, TBS Parent and TBS International each shall be dissolved under Irish and Bermuda law, respectively.  The Implementation Memorandum shall address the specifics and mechanics of such transfer and dissolution.  Any unpaid remaining

allowed Class 8 General Unsecured Claims held against such entities shall be paid in full as provided hereunder. Certain Class 3, Class 4, Class 5 and/or Class 6 Claims against TBS Parent may survive the Effective Date solely for the purpose of aiding any consensual dissolution of TBS Parent and TBS International. The extent of such limited survival will be set forth in the Implementation Memorandum. To implement the foregoing, on the Effective Date, the following transactions shall be effectuated, all as set forth more fully in the Implementation Memorandum:

(i) New TBS Parent shall be formed outside the existing corporate structure of TBS Parent and TBS International on or prior to the Effective Date; the manner in which New TBS Parent will be formed will be as set forth in the Implementation Memorandum.

(ii) TBS Holdings Limited shall cancel all of its existing Equity Securities and issue new Equity Securities (including all of its capital stock) to New TBS Parent.

(iii) The Class A shares of New Common Stock shall be distributed to Holders of DVB Syndicate Claims and BOA Syndicate Claims as provided in the Plan and the Class B shares of New Common Stock shall be issued to the Management Shareholders.

(iv) TBS Parent and TBS International shall transfer all existing assets (including those arising under Intercompany Claims against Debtor and non-debtor affiliates) to New TBS Parent.

(v) TBS Parent and TBS International shall be dissolved post-emergence in accordance with applicable law.

On the Effective Date, New TBS Parent (i) shall reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) to satisfy the required distributions of stock under the New Management Incentive Plan. The New Common Stock issued under the Plan shall be subject to dilution based upon (i) such shares of the New Common Stock as may be issued pursuant to the New Management Incentive Plan and (ii) any other shares of New Common Stock issued post-emergence.

7.    **Cancellation of Securities and Agreements**

On the Effective Date, the Plan shall be consummated in accordance with the provisions set forth therein and, upon the effectiveness of such transactions:  (a) the Claims against the Debtors under the Prepetition Credit Agreements, or under any other Certificate, Interest, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated or, in the case of the Prepetition Credit Agreements, except as such Prepetition Credit Agreements are amended and restated pursuant to the New Credit Agreements or the New Senior Secured Loan Agreement, pursuant to the Plan), shall be cancelled, and the Reorganized Debtors shall not have any continuing obligations therefor; and (b) the Claims against and Interests in the Debtors

pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, formation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated or, in the case of the Prepetition Credit Agreements, except as such Prepetition Credit Agreements are amended and restated pursuant to the New Credit Agreements or the New Senior Secured Loan Agreement pursuant to the Plan) shall be released and discharged; ***provided, however***, that notwithstanding Confirmation or consummation, the Prepetition Credit Agreements and any other similar agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing such Holder to receive Distributions under and in accordance with the Plan.

### 8. Reorganized Debtors; New TBS Parent

On the Effective Date, the New Boards of New TBS Parent and each Reorganized Debtor shall be appointed, and each shall adopt its New Articles of Association and/or New Bylaws (as applicable). New TBS Parent and the Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other action necessary and desirable to consummate the Plan. The Corporate Governance Documents will be substantially in the form filed in the Plan Supplement.

### 9. Post Effective Date Management

Pursuant to the provisions of the Corporate Governance Documents and New TBS Parent's and the Reorganized Debtors' operative constituent documents, which may be amended from time to time, the operation, management, and control of New TBS Parent and the Reorganized Debtors shall be the responsibility of their respective boards of directors and senior officers (as provided under applicable law). Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

### 10. Directors and Officers of New TBS Parent and the Reorganized Debtors

On and after the Effective Date, the business and affairs of New TBS Parent and the Reorganized Debtors will be managed by the New Boards and the officers, directors, managers or other responsible persons identified in the Plan Supplement. Biographical information regarding these proposed officers, directors, managers, and other responsible persons will be set forth in the Plan Supplement. A schedule of the annual compensation to be paid to persons serving as executives, officers, directors, managers, or responsible persons as of the Effective Date will be set forth in the Plan Supplement. On the Effective Date, New TBS Parent and the Reorganized Debtors will enter into the New Employment Agreements with four members of the Debtors' senior management—Joseph Royce, Gregg McNelis, Lawrence Blatte, and Fred Lepere.

### 11. New Articles of Association and New Bylaws of the Reorganized Debtors

The New Bylaws and New Articles of Association (as applicable), among other things, shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. After the Effective Date, New TBS Parent and the Reorganized Debtors may amend and restate their New Bylaws and/or New Articles of Association (as applicable), as permitted under applicable laws, subject to the terms and conditions of such documents.

## 12.     Management Incentive Plan

After the Effective Date, certain members of senior management will be entitled to participate in the New Management Incentive Plan. Under the New Management Incentive Plan, participants will collectively receive 50,000 shares of New Class B Common Stock on the Effective Date (which will represent 10% of the fully-diluted vested New Common Stock on the Effective Date). Participants will also collectively receive additional shares of New Class B Common Stock,[32] which, upon the occurrence of the events and achievement of the milestones set forth in the New Management Incentive Plan, would represent up to 55% of the New Common Stock. A full description of the New Management Incentive Plan is contained in the New Management Incentive Plan Term Sheet, which is annexed hereto as Exhibit M.

## 13.     Employment, Retirement, Indemnification, and Other Related Agreements

On the Effective Date, to ensure continued top of class operations, New TBS Parent and the Reorganized Debtors will enter into the New Employment Agreements with four proven and respected members of the Debtors' senior management—Joseph Royce, Gregg McNelis, Larry Blatte, and Fred Lepere. The New Employment Agreements will be for a term of three years and will provide that the employees shall be compensated in an amount that is at least equal to their current base salaries. The basic terms of the New Employment Agreements are set forth in the New Employment Agreement Term Sheet, attached hereto as Exhibit L.

To the extent the Debtors are parties to other employment agreements as of the Petition Date, the Debtors intend to assume all employment agreements. Further, and except as set forth above, the Debtors intend to leave unaltered any and all rights (including, without limitation, any applicable notice periods, payments related thereto, and severance payments) of the Debtors' employees under their employment agreements in effect immediately preceding commencement of the Chapter 11 Cases. The Company also has, and will continue, manning agreements that provide the crews for the vessels. The crews are all Phillippine crews comprised of first-rate, dedicated, well-trained seamen who understand fully the Company's vessels, are loyal to the Company, and are one of the keys to the Company's success in meeting customer needs.

On the Effective Date, to the extent permitted by applicable law, the New Boards of New TBS Parent and the Reorganized Debtors shall, automatically and without further action on the

---

[32] The additional shares of Class B Common Stock which could be issued pursuant to the New Management Incentive Plan upon the achievement of milestones will be unvested unless and until such milestones are achieved. For Bermuda corporate law purposes, it may be necessary to issue such unvested shares as New Class C Common Stock. If so, the New Class C Common stock will be automatically converted into New Class B Common Stock when, if, and to the extent that a vesting event occurs.

part of the New Boards of New TBS Parent or the Reorganized Debtors, be authorized and directed to take any and all actions necessary and appropriate to perform under any employment agreements assumed by the Debtors, as provided in the Plan (*see* this Section V.E.13.).  The New Management Incentive Plan and the definitive documents evidencing same, shall be approved in the Confirmation Order and shall be approved by the New Boards and the holders of the New Common Stock immediately after the Effective Date in accordance with applicable law.  The New Employment Agreements shall become effective on the Effective Date, shall be approved in the Confirmation Order, and shall be approved by the New Boards and the holders of the New Common Stock immediately after the Effective Date in accordance with applicable law.

On and after the Effective Date, except as set forth above, New TBS Parent and the Reorganized Debtors shall have the authority, as determined by the New Boards, to: (a) maintain, amend, or revise existing employment, retirement, welfare, incentive, severance, indemnification, and other agreements with their active and retired directors or managers, officers, and employees, subject to the terms and conditions of any such agreement, and to continue to maintain and provide benefits, including all post-employment benefits, in connection therewith; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification, and other agreements for active and retired employees; *provided that*, as noted in Section 7.10 of the Plan (*see* Section V.E.10. above), on the Effective Date, New TBS Parent and the Reorganized Debtors will enter into the New Employment Agreements with four members of the Debtors' senior management.  The New Employment Agreements will be for a term of three years and will provide that the employees shall be compensated in an amount that is at least equal to their current base salaries.

## 14.    Effectuating Documents; Further Transactions

On and after the Effective Date, New TBS Parent, the Reorganized Debtors, and the officers and members of the New Boards, are authorized to and may, in the name of and on behalf of New TBS Parent and/or the applicable Reorganized Debtors, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## 15.    Entity Action

Upon the Effective Date, to the extent permitted by applicable law all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to:  (a) the selection of the directors and officers for New TBS Parent and the Reorganized Debtors; (b) the execution of and entry into the New Credit Agreements, the BOA/DVB Exit Facility Agreement, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility and related transaction security agreements and any other ancillary agreements relating to the foregoing, and the New Management Incentive Plan; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) and/or the Implementation Memorandum.  All matters provided for in the Plan involving the entity structure of the Debtors, the Reorganized Debtors, or New TBS Parent and any entity action

required by the Debtors, the Reorganized Debtors, or New TBS Parent in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or New TBS Parent.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or New TBS Parent, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors and New TBS Parent, including the New Credit Agreements, the BOA/DVB Exit Facility Agreement, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility and any and all other agreements, documents, securities, and instruments relating to any of the foregoing.  The authorizations and approvals contemplated in the Plan shall be effective notwithstanding any requirements under any non-bankruptcy law.

### 16.    Section 1146 Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents will forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

### 17.    Preservation of Causes of Action

Unless expressly released or waived pursuant to Article IX (*see* Section V.H. below) of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, will apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

The Reorganized Debtors reserve and will retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person will vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, will retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 18.        Non-occurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court will retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## F.        TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.        Assumption and Rejection of Contracts and Unexpired Leases

Except as otherwise provided herein or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Person, including, but not limited to, all Intercompany Contracts, shall be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date, except for any such contract or lease (a) that has been assumed, rejected, or renegotiated and either assumed or rejected on such renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) that is the subject of a motion to reject, or a motion to approve on renegotiated terms and to assume on such renegotiated terms, that has been filed and served prior to the Effective Date, or (c) that is identified on the Rejected Executory Contract and Unexpired Lease List or in the Plan.  Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases provided for herein. As described in Section 4.7 of the Plan (*see* section V.C.10. above), the Debtors intend to file the RBS Settlement Agreement Assumption Motion on or after the Petition Date and seek the Bankruptcy Court's approval of that Motion at or prior to the Confirmation Hearing.  If approved, in addition to the Executory Contracts and Unexpired Leases to be assumed pursuant to this Section 6.1, the RBS Settlement Agreement shall be an assumed contract after the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to section 6.1 of the Plan (see this Section V.F.1.) or by any order of the Bankruptcy Court, including, without limitation, the RBS Settlement Agreement, that has not been assigned to a third party prior to the Confirmation Date, shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under section 365 of the Bankruptcy Code.

### 2.        DVB Bareboat Charters

On the Effective Date, Beekman Shipping Corp. and Fairfax Shipping Corp. shall assume each of the DVB Bareboat Charters as modified by the Amended DVB Bareboat Charters. The assumption of the DVB Bareboat Charters (as modified by the Amended DVB Bareboat Charters) shall constitute a full and complete settlement of all claims of all parties arising under the DVB Bareboat Charters and any and all agreements executed or delivered in connection therewith and provide for a mutual release between the counterparties to the DVB Bareboat Charters. Pursuant to the Amended DVB Bareboat Charters, the two chartered vessels will carry daily rates of $4,000 per day for 3 years ($4,500 per day for a one year extension period, if exercised) and will be subject to a purchase option, exercisable by the Reorganized Debtors.

### 3.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

A Proof of Claim with respect to a Claim arising from the rejection of an Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of the order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and will not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims and shall be treated in accordance with section 4.8 of the Plan (see Section V.C.11. above), or, if determined to be Subordinated Claims, in accordance with section 4.10 of the Plan (see Section V.C.13. above).

### 4.     Cure of Defaults

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the Cure Claim, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 10 days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed Cure Claims to be sent to applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed and served in accordance with, and otherwise comply with, the provisions of the Scheduling Order related to assumption of Executory Contracts and Unexpired Leases. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 5.      Contracts and Leases Entered into after the Petition Date

Contracts and leases entered into during the Postpetition Period by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 6.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or in the order assuming an Executory Contract or Unexpired Lease, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to any prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Postpetition Period shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.      Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order to resolve and to alter their treatment of such contract or lease.

### G.     PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

### 1.      Distributions

The Disbursing Agent shall make or cause to be made the Distributions required under the Plan to all Holders of Allowed Claims.  No distribution shall be made to any Holder until such Holder satisfies any applicable distribution condition.

### 2.        Distribution Record Date

For purposes of the Plan, as of 5:00 p.m. prevailing U.S. Eastern Time on the Distribution Record Date, the records of ownership of Claims against the Debtors (including the claims register in the Chapter 11 Cases) will be closed.  For purposes of the Plan, the Debtors, the Estates, the Reorganized Debtors and the Disbursing Agent shall have no obligation to recognize the transfer of any of the Claims against the Debtors occurring after the Distribution Record Date, and shall be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

### 3.        Cash Payments

Any Cash payments made pursuant to the Plan shall be made in U.S. dollars or, with respect to Holders of Allowed General Unsecured Claims, any currency (including U.S. dollars), as determined by the Disbursing Agent in its sole discretion.  Cash payments made pursuant to the Plan in the form of a check will be null and void if not cashed within 180 days of the date of issuance thereof.

### 4.        Delivery of Distributions

If the Distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of such Holder.  Undeliverable Distributions shall be held by the Disbursing Agent subject to section 8.7 of the Plan (*see* Section V.G.7. below).

### 5.        Minimum Cash Distributions

Except with respect to Distributions on account of Allowed General Unsecured Claims, no Cash payment less than 25 dollars shall be made to any Holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

### 6.        Withholding Taxes

The Disbursing Agent shall comply with all withholding, reporting, certification, and information requirements imposed by any federal, state, local, or foreign taxing authority and all distributions under the Plan will, to the extent applicable, be subject to any such withholding, reporting, certification, and information requirements.

Persons entitled to receive Distributions under the Plan shall, as a condition to receiving such Distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

Any Person that does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the Ballots) to obtain such information, may be deemed to have forfeited such Person's right to such Distributions, which shall be treated as unclaimed property under section 8.7 of the Plan (see Section V.G.7. below).

### 7. Unclaimed Property

Any Person that fails to claim any Distribution to be distributed hereunder (including but not limited to, by failure to comply with the Distribution Procedures applicable to the relevant Distribution) by the Forfeiture Date will forfeit all rights to any Distributions hereunder, and shall have no claim whatsoever with respect thereto against New TBS Parent, the Debtors or their Estates, the Reorganized Debtors, or any Holder of an Allowed Claim to which Distributions are made. Upon the forfeiture of Cash, such Cash shall be the property of the Debtors or the Reorganized Debtors, as applicable; upon the forfeiture of the right to Distributions of any debt issued under any of the New Credit Agreements, the BOA/DVB Exit Facility Agreement, the Credit Suisse Exit Facility Agreement, the New Senior Secured Loan Facility, such Distributions shall be cancelled. Nothing in the Plan requires further efforts by any Person to attempt to locate or notify any other Person with respect to any forfeited property.

### 8. Disputed Claims

If the Debtors, the Reorganized Debtors or any other party in interest disputes any Claim against the Debtors, such dispute shall be (a) adjudicated in the Bankruptcy Court or in any other court having jurisdiction over such dispute, or (b) settled or compromised without any further notice to or action, order, or approval by the Bankruptcy Court, as the case may be, under applicable law. Among other things, the Debtors (on or before the Effective Date), or the Reorganized Debtors (after the Effective Date) may each elect, at their respective sole option, to object to or seek estimation under section 502 of the Bankruptcy Code with respect to any Proof of Claim filed by or on behalf of a Holder of a Claim against the Debtors.

### 9. Objections to Claims

Unless a later or different time is set by Final Order or otherwise established by other provisions of the Plan, all objections to Claims must be filed by the Claims Objection Bar Date; *provided, however*, that no such objection may be filed with respect to any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim. The failure by any party in interest, including the Debtors and the Committee to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's rights to object to, or re-examine, any such Claim in whole or in part. After the Effective Date, no party in interest shall have the right to object to Claims against the Debtors or their Estates other than the Reorganized Debtors.

### 10. Compromises and Settlements

From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtors may compromise and settle all Claims and Causes of Action, without any further approval of the Bankruptcy Court.

### 11. Reservation of Debtors' Rights

Prior to the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or other claims they may have against other Persons.

### 12. No Distributions Pending Allowance

If a Claim or any portion of a Claim is Disputed, no payment or Distribution will be made on account of the Disputed portion of such Claim (or the entire Claim, if the entire Claim is Disputed), unless such Disputed claim or portion thereof becomes an Allowed Claim.

### 13. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 14. Claims Paid or Payable by Third Parties

*i.*    Claims Paid by Third Parties

The Disbursing Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Disbursing Agent. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the Distribution to the Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### 15. Effect of Acceptance of Distribution

Acceptance of any Distribution or other property under the Plan will constitute the recipient's acknowledgement and agreement that all Claims, demands, liabilities, other debts against, or Interests in, the Debtors (other than those created by the Plan) have been discharged and enjoined in accordance with Article IX of the Plan. (*see* Section V.H. below).

## H.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### 1.    Discharge

> *i.*    Discharge of Claims Against the Debtors and the Reorganized Debtors

Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan will, as of the Effective Date: (a) discharge the Debtors, the Reorganized Debtors or any of their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including without limitation all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based on such debt has accepted the Plan; and (b) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code.  The discharge provided in this provision of the Plan will void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

> *ii.*    Injunction Related to the Discharge

**Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or any Interest in any or all of the Debtors, that are discharged pursuant to the terms of the Plan, will be permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights:   (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a Distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (e) transferring or purporting to transfer, in whole or in part or any interest in, or asserting in any case, proceeding, or court in any jurisdiction, any Claim under any Prepetition Credit Agreement; and (f) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Such injunction will extend to any successor of the Debtors, the Reorganized Debtors, and any of their Assets.  Any Person injured by any willful violation of such injunction will be entitled to recover actual**

damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

2.    Releases

    i.    Releases by the Debtors

As of the Effective Date, the Debtors in their individual capacity and as debtors in possession will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or this Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, this Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time on or prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above will not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

    ii.    Certain Waivers

Although the Debtors do not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, each Debtor understands and will waive the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtors. Section 1542 of the California Civil Code provides:

§1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

EACH DEBTOR AGREES THAT IT WILL ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND

**OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND EACH DEBTOR WILL WAIVE AND RELEASE ALL RIGHTS AND BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.  TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, EACH DEBTOR WILL WAIVE AND RELEASE ANY BENEFIT, RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

*iii.*     Releases by Holders of Claims and Interests

**For good and valuable consideration, on and after the Effective Date, Holders of Claims that (a) vote to accept or reject the Plan and (b) do not elect (as permitted on the Ballots) to opt out of the releases contained in this paragraph, will be deemed to have released and forever waived and discharged all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or this Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above will not release any post-Effective Date obligations (except Cure Claims that have not been filed timely) of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

*iv.*     Exculpation

**On and after the Effective Date, as a result of their valuable contributions to the negotiation and formulation of the Plan, none of the Exculpated Parties will have or incur**

any liability for, and each Exculpated Party will be released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, solicitation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Exculpated Parties, shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the Plan, this Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action, or liabilities that the Debtors, the Estates, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases.

*v.*      Injunction Related to Releases and Exculpation

To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released, waived, or exculpated pursuant to sections 9.2.1, 9.2.2, 9.2.3, and 9.2.4 of the Plan (*see* Sections V.H.2.i., V.H.2.ii., V.H.2.iii., and V.H.2.iv. above) will be permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities: (a) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such actions arising from or related to the Prepetition Credit Agreements; (c) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such Lien or encumbrance arising from or related to the Prepetition Credit Agreements; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (e) commencing or continuing any action, in any manner, in any place in the

world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction will extend to any successor of any Released Party or any Exculpated Party or any of its or their assets. Any Person injured by any willful violation of such injunction will be entitled to recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

### 3.        No Successor Liability

Except as otherwise expressly provided in the Plan, none of the Released Parties or the Exculpated Parties will be determined to be successors to any of the Debtors or to any Person for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character. The Released Parties and Exculpated Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan.

### 4.        Release of Liens

Except as otherwise expressly provided in the Plan, the Confirmation Order will release any and all prepetition Liens against the Debtors, the Reorganized Debtors and any of their Assets.

### 5.        Term of Injunctions

All injunctions or stays provided in, or in connection with, the Chapter 11 Cases, whether pursuant to section 105, section 362, or any other provision of the Bankruptcy Code, other applicable law or court order, in effect immediately prior to Confirmation will remain in full force and effect until the Effective Date and will remain in full force and effect thereafter if so provided in the Plan, the Confirmation Order or by their own terms. In addition, as described in this Section V.H., the Confirmation Order will incorporate various release, injunction, discharge and exculpation provisions Plan that shall be in effect after the Effective Date and, on and after Confirmation Date, the Debtors may seek further orders to preserve the status quo during the time between the Confirmation Date and the Effective Date or to enforce the provisions of the Plan.

### 6.        Binding Effect

The Plan will be binding upon, and inure to the benefit of, the Debtors and all Holders of Claims and Interests, and their respective successors and assigns, whether or not the Claims and Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

### 7.        Dissolution of the Committee

The Committee will be dissolved on the Effective Date and will not continue to exist thereafter except for the limited purposes of filing any remaining fee applications, and the

Professionals retained by the Committee shall be entitled to compensation for services performed and reimbursement of expenses incurred in connection therewith. Upon dissolution of the Committee, the members of the Committee will be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases.

## I. CONDITIONS PRECEDENT TO CONSUMMATION

### 1. Conditions Precedent

The Plan shall not become effective unless and until the following conditions have been satisfied or waived. The Debtors anticipate that all of such conditions to Confirmation and to the Effective Date will be satisfied or waived, and intend to present evidence at the Confirmation Hearing demonstrating such satisfaction or waiver. Notwithstanding the foregoing, there is a risk that some or all of the conditions to Confirmation or the Effective Date will not be satisfied or waived. See "Risk Factors Related to Confirmation, Effectiveness, and Implementation", at Section VIII.A. below.

### 2. Conditions to Confirmation

*Plan Supplement*. All documents to be provided in the Plan Supplement are in a form that is reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

*Confirmation Order*. The Confirmation Order must be entered by the Bankruptcy Court in a form reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

### 3. Conditions to Effective Date

*Confirmation Order*. The Bankruptcy Court shall have entered the Confirmation Order in a form reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

*No Stay of Confirmation*. There shall not be in force any order, decree, or ruling of any court or governmental body having jurisdiction, restraining, enjoining, or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

*Receipt of Required Authorization*. All authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

*New Loan Documentation*. The documents evidencing the New Credit Agreements, the New Senior Secured Loan Agreement, the BOA/DVB Exit Facility, and the Credit Suisse Exit Facility shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

*Employment Agreements.*   The Employment Agreements and all exhibits and annexes thereto shall be in form acceptable to the Supporting Prepetition Lenders and shall be executed by the non-Debtor counterparties thereto.

*2012 Operating Budget.*   The 2012 Operating Budget shall be in form and substance satisfactory to the Supporting Prepetition Lenders.

*The New Management Incentive Plan.*   The New Management Incentive Plan shall be in form and substance satisfactory to the Supporting Prepetition Lenders.

*Organizational Documents.*   The New Articles of Association, New Bylaws and New TBS Parent Shareholder Agreement shall each be in form and substance satisfactory to the Supporting Prepetition Lenders.

*TBS Commercial.*   The TBS Commercial Management Agreements and TBS Commercial/Beacon Holdings Option Agreement shall each be in form and substance satisfactory to the Supporting Prepetition Lenders and shall be executed by the respective parties thereto, and all conditions precedent to the effectiveness of such documents shall have been satisfied or waived.

*Implementation Transactions*.   The transactions described in the Implementation Memorandum that are required to be completed on or before the Effective Date have been completed in a manner reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

*Assumption*.   The Bankruptcy Court shall have entered orders approving the RBS Settlement Agreement Motion and the Plan Support Agreement.

**4.   Waiver**

Any of the conditions set forth in sections 10.1.1 and 10.1.2 of the Plan (see Sections V.I.2. and V.I.3. above) may be waived by the Debtors with the consent of the respective Agents for the Supporting Prepetition Lenders, which consent shall not be unreasonably withheld.

**5.   Effect of Failure of Conditions upon the Plan**

In the event that the conditions specified in section 10.1 of the Plan (see Sections V.I.2. and V.I.3. above) have not been satisfied or waived in accordance with section 10.1.3 of the Plan (see Section V.I.4. above) on or before 120 days after the Confirmation Date, then, the Debtors may then seek an order from the Bankruptcy Court vacating the Confirmation Order.   Such request shall be served upon counsel for the respective Agents for the Supporting Prepetition Lenders, the Committee, the DIP Agents, and the U.S. Trustee.   If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 60 days after the date the Confirmation Order is vacated.

## J.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- hear and rule upon all Causes of Action retained by the Debtors and commenced and/or pursued by the Debtors or the Reorganized Debtors;

- resolve any matters related to: (a) the rejection, assumption, or assumption and assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- ensure that Distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

- adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Plan Supplement, this Disclosure Statement, or the Confirmation Order;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

- resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

- approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtors, or the Reorganized Debtors, as applicable, only upon allowance thereof pursuant to the order of the Bankruptcy Court; *provided, however*, that the fees and expenses of the Debtors incurred after the Confirmation Date, including attorneys' fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation of the Plan, implementation, or enforcement of the Plan or the Confirmation Order;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if Distributions pursuant to the Plan are enjoined or stayed;

- determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Plan Supplement, this Disclosure Statement, or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

- hear and determine all matters related to (a) the property of the Debtors and the Estates from and after the Confirmation Date and (b) all disputes regarding the existence, nature or scope of the Debtors' discharge;

- enter an order or final decree concluding or closing the Chapter 11 Cases; and

- hear and determine such other matters as may be provided in the Confirmation Order
  or as may be authorized under the Bankruptcy Code.

For the avoidance of doubt, the Bankruptcy Court will not be retaining jurisdiction to interpret
and enforce the provisions of the New Credit Agreements or the New Senior Secured Loan
Facility.

## K.   MISCELLANEOUS PROVISIONS OF THE PLAN

### 1.   Plan Supplement

No later than 10 days prior to the Confirmation Hearing, the Debtors shall File with the
Bankruptcy Court the Plan Supplement, which shall contain the documents identified in the Plan
and such agreements and other documents as may be necessary or appropriate to effectuate and
further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may obtain
a copy of the Plan Supplement upon written request to the Balloting and Claims Agent.

#### i.   Exemption From Registration Requirements

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and Distribution
of any securities contemplated by the Plan shall be exempt from, among other things, the
registration requirements of Section 5 of the Securities Act and any state or local law requiring
registration prior to the offering, issuance, distribution, or sale of securities.  In addition, any
securities contemplated by the Plan will be tradable by the recipients thereof, subject to (i) the
provisions of section 1145(b)(1) of the Bankruptcy Code; and (ii) the restrictions, if any, on the
transferability of such securities and instruments.

#### ii.   Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as
determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors
on or before the Effective Date.

#### iii.   Third Party Agreements

The Distributions to the various Classes of Claims and Interests hereunder shall not affect
the right of any Person to levy, garnish, attach, or employ any other legal process with respect to
such Distributions by reason of any claimed subordination rights or otherwise.  All of such rights
and any agreements relating thereto shall remain in full force and effect, except as compromised
and settled pursuant to the Plan.  Distributions shall be subject to and modified by any Final
Order directing distributions other than as provided in the Plan.

#### iv.   Amendment or Modification of the Plan

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be
proposed in writing by the Debtors at any time before Confirmation, provided, that, to the extent
any such modification would require the consent of the Supporting Prepetition Lenders (or some
subset thereof), acting reasonably, under the Plan Support Agreement and such consent is not

obtained, such parties, to the extent applicable, may revoke their vote in favor of the Plan, as modified, and provided further, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after Confirmation and before consummation of the Plan, *provided*, *however*, that to the extent any such modification would require the consent of the Supporting Prepetition Lenders (or some subset thereof), acting reasonably, under the Plan Support Agreement and such consent is not obtained, such parties, to the extent applicable, may revoke their vote in favor of the Plan, as modified, and *provided further*, *however*, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, the Debtors shall have complied with section 1125 of the Bankruptcy Code, the Bankruptcy Court, after notice and a hearing, shall have confirmed the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. Except as specifically provided in section 12.5 of the Plan, a Holder of a Claim that has accepted the Plan prior to modification shall be deemed to have accepted such Plan as modified, *provided*, *however*, that the Plan, as modified, does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### *v.* Severability

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, the Debtors may, at their option, (a) treat such provision as invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Interests that the provision is determined to be invalid, void, or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

### *vi.* Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing at any time prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

For the avoidance of doubt, if the Confirmation Hearing is adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

### *vii.* Rules Governing Conflicts Between Documents

In the event of a conflict between the terms or provisions of the Plan and any Plan Documents other than the Plan, the terms of the Plan shall control over such Plan Documents.  In the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.  In the event of a conflict between the information contained in this Disclosure Statement and the Plan or any other Plan Document, the Plan or other Plan Document (as the case may be) will control.

*viii.*    Governing Law

Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

*ix.*    Notices

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, charges prepaid.  If to the Debtors, any such notice shall be directed to the following at the addresses set forth below:

TBS International plc
612 E. Grassy Sprain Road
Yonkers, New York 10710
Attention:      Ferdinand V. Lepere
                Senior Executive Vice President &
                Chief Financial Officer

-- with copies to –

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
Attention:      Michael A. Rosenthal, Esq.
                Matthew K. Kelsey, Esq.

  *x.*  Interest and Attorneys' Fees

  Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.  No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

  *xi.*  Binding Effect

  The Plan shall be binding upon the Debtors, the Reorganized Debtors, the Holders of all Claims and Interests, parties in interest, Persons, and Governmental Units and their respective successors and assigns.  To the extent any provision of this Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

  *xii.*  No Admissions

  As to contested matters, adversary proceedings, and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, this Disclosure Statement, or other Plan Documents shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.  Neither the Plan nor this Disclosure Statement shall be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors or any of their subsidiaries and Affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

  *xiii.*  Exhibits

  All Exhibits and Schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

  *xiv.*  Survival of Certain Indemnification Obligations

Subject to Section 7.6 of the Plan (*see* Section V.E.6. above), the obligations of the Debtors, pursuant to the Debtors' operating agreements, certificates of incorporation or formation, articles of association, by-laws, memoranda of association, or equivalent corporate governance documents, applicable statutes, or employment agreements, to indemnify individuals who prior to the Effective Date served as their respective directors, officers, managers, agents, employees, representatives, and Professionals, in respect of all present and future actions, suits, and proceedings against any of such officers, directors, managers, agents, employees, representatives, and Professionals, based upon any act or omission related to service with, for, or on behalf of the Debtors on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, will not be discharged or impaired by confirmation or consummation of the Plan but will survive unaffected by the reorganization contemplated by the Plan and will be performed and honored by the Reorganized Debtors regardless of such confirmation, consummation, and reorganization.

## VI.   SOLICITATION AND VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan:

## A.   PERSONS ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  Holders of Claims or Interests that are Unimpaired by the Plan are presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Interests that will not receive a distribution or retain any property under the Plan are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

### 1.   Voting Classes

Classes 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73) (the "***Voting Classes***") are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

### 2.   Presumed Acceptance of the Plan

Classes 1(1)-(73), 2(1)-(73), 7(1), 7(2), 8(1)-(73), 9(1)-(73), 10(1)-(73), and 11(4)-(73) are Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

### 3.   Presumed Rejection of the Plan

Classes 11(1)-(3) are Impaired under the Plan and Holders of Interests in such Classes will not receive or retain any property on account of their Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Interests in such Classes are deemed to have rejected the Plan and are therefore not entitled to vote to accept or reject the Plan.

## B.     THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

(a)     the Plan (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion);

(b)     this Disclosure Statement (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion) and all Exhibits thereto; and

(c)     the appropriate Ballot, Ballot Instructions, and Ballot return envelope.

The Voting Classes shall be served the Solicitation Package.  The Debtors shall send to each Impaired Creditor entitled to vote on the Plan (a) only the Solicitation Package appropriate for the Class or Classes applicable to such creditor, and (b) only one Solicitation Package even if such Creditor has Claims against more than one of the Debtors.  The Solicitation Package (except Ballots) can be obtained by requesting a copy from the Debtors' Balloting and Claims Agent by calling +1 (888) 418-5566.

In addition to the Solicitation Package, Holders of Claims in the Voting Classes will be sent a copy of the Plan Support Agreement.  The Plan Support Agreement binds the signatories thereto to vote in favor of the Plan and support the Plan; however, signing the Plan Support Agreement **does not** constitute a vote in favor of the Plan and all signatories to the Plan Support Agreement must separately submit a Ballot to vote on the Plan.  Each Holder of a Claim in the Voting Classes should carefully review and consider the Plan Support Agreement before signing. The Debtors will file a motion to assume the Plan Support Agreement and assumption of the Plan Support Agreement is a condition precedent to the Effective Date.

## C.     VOTING INSTRUCTIONS

Only the Holders of Claims in Classes 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73) are entitled to vote to accept or reject the Plan.  Because the Claims in the Voting Classes each arise under the Prepetition Credit Agreements, each Holder of Claims in Classes 3(1), 3(2), 3(3), and 3(61)-(67) shall only be entitled to one vote on account of such Claims, which vote shall apply in each of Classes 3(1), 3(2), 3(3), and 3(61)-(67); each Holder of Claims in Classes 4(1)-(60) shall only be entitled to one vote on account of such Claims, which vote shall apply in each of Classes 4(1)-(60); each Holder of Claims in Classes 5(1), 5(2), 5(68), and 5(69) shall only be entitled to one vote on account of such Claims, which vote shall apply in each of Classes 5(1), 5(2), 5(68), and 5(69); and each Holder of Claims in Classes 6(1)-(3), and 6(70)-(73) shall only be entitled to one vote on account of such Claims, which vote shall apply in each of Classes 6(1)-(3), and 6(70)-(73), all in accordance with Section 5.4 of the Plan (*see* Section V.D.4. above).

If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached exhibits and the instructions accompanying the Ballot.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot and return the Ballot in accordance with the Ballot Instructions.  Ballot Instructions are attached

to each Ballot.  The deadline to vote on the Plan is 5**:00 p.m. (Prevailing U.S. Eastern Time) on February 14, 2012** (the "***Voting Deadline***").

The Company has engaged GCG, Inc. as the Balloting and Claims Agent to assist in the solicitation process.  The Balloting and Claims Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.  The Balloting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File the Voting Report as soon as practicable before the Confirmation Hearing.

All Ballots must be properly executed, completed and delivered to the Balloting and Claims Agent, **so as to actually be received on or before the Voting Deadline** by using the envelope provided, or by delivery as follows:

**If sent in the envelope provided
or otherwise by <u>First Class Mail</u>:**

TBS Shipping Services, Inc.
c/o GCG, Inc.
P.O. Box 9677
Dublin, OH 43017-4977

**If sent by <u>Overnight Courier</u>
or <u>Personal Delivery</u>:**

TBS Shipping Services, Inc.
c/o GCG, Inc.
5151 Blazer Parkway, Suite A
Dublin, OH 43017

**If sent by <u>Electronic Mail</u>:**

TBSBalloting@gcginc.com
Subject Line:  Attn: TBS Shipping Services, Inc. Ballot Processing

**To be sure your Ballot is counted, your Ballot must be received by the Balloting and Claims Agent prior to the Voting Deadline.  Your Ballot will not be counted if received after the Voting Deadline.**

**EACH BALLOT ADVISES CREDITORS THAT IF THEY VOTE ON THE PLAN AND DO NOT ELECT TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN SECTION 9.2.3 OF THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES.**

**FOR PURPOSES OF THE NUMEROSITY REQUIREMENT OF SECTION 1126(C) OF THE BANKRUPTCY CODE, SEPARATE CLAIMS HELD BY A SINGLE**

CREDITOR IN A PARTICULAR CLASS WILL BE AGGREGATED AND TREATED AS IF SUCH CREDITOR HELD ONE CLAIM IN SUCH CLASS, AND ALL VOTES RELATED TO SUCH CLAIM WILL BE TREATED AS A SINGLE VOTE TO ACCEPT OR REJECT THE PLAN; *PROVIDED, HOWEVER*, THAT IF AFFILIATED ENTITIES HOLD CLAIMS IN A PARTICULAR CLASS, THESE CLAIMS WILL NOT BE AGGREGATED AND WILL NOT BE TREATED AS IF SUCH CREDITOR HELD ONE CLAIM IN SUCH CLASS, AND THE VOTE OF EACH AFFILIATED ENTITY WILL BE COUNTED SEPARATELY AS A VOTE TO ACCEPT OR REJECT THE PLAN.

CREDITORS MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTE; A *SINGLE* BALLOT THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN *SHALL NOT BE COUNTED* AS A VOTE TO ACCEPT OR REJECT THE PLAN.

BALLOTS THAT FAIL TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN *SHALL NOT BE COUNTED* AS VOTES TO ACCEPT OR REJECT THE PLAN.

ONLY BALLOTS THAT ARE TIMELY RECEIVED PRIOR TO THE VOTING DEADLINE AND THAT ARE PROPERLY EXECUTED WILL BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN UNLESS AN EXTENSION IS GRANTED BY THE DEBTORS. UNSIGNED BALLOTS *SHALL NOT BE COUNTED*.

BALLOTS POSTMARKED PRIOR TO THE VOTING DEADLINE, BUT RECEIVED AFTER THE VOTING DEADLINE, *SHALL NOT BE COUNTED*, EXCEPT IN THE DEBTORS' DISCRETION.

BALLOTS THAT ARE ILLEGIBLE, OR CONTAIN INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CREDITOR, *SHALL NOT BE COUNTED*.

IF A CREDITOR CASTS MORE THAN ONE BALLOT VOTING THE SAME CLAIM PRIOR TO THE VOTING DEADLINE, THE LAST PROPERLY EXECUTED VALID BALLOT RECEIVED PRIOR TO THE VOTING DEADLINE SHALL BE DEEMED TO REFLECT THE VOTER'S INTENT AND SUPERSEDE ANY PRIOR BALLOTS.

IF A CREDITOR SIMULTANEOUSLY CASTS INCONSISTENT DUPLICATE BALLOTS, WITH RESPECT TO THE SAME CLAIM, SUCH BALLOTS *SHALL NOT BE COUNTED*.

EACH CREDITOR SHALL BE DEEMED TO HAVE VOTED THE FULL AMOUNT OF ITS CLAIM. UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT, QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), ACCEPTANCE, AND REVOCATION OR WITHDRAWAL OF BALLOTS SHALL BE DETERMINED BY THE BALLOTING

**AND CLAIMS AGENT AND THE DEBTORS, WHICH DETERMINATION SHALL BE FINAL AND BINDING.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT. DO NOT RETURN SECURITIES OR ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

For all Holders of Claims in Classes 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73):

By signing and returning a Ballot, each Holder of a Claim in Classes 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73) will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the Holder has been provided with a copy of the Plan and this Disclosure Statement;

- the solicitation of votes for the Plan is subject to all the terms and conditions set forth in this Disclosure Statement;

- the Holder has carefully read the Ballot and the accompanying instructions;

- the vote reflected on the Ballot is binding on the Holder's successors, heirs and assigns including, without limitation, any transferee.

It is important that creditors exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by it if it is accepted by the requisite holders of Claims. The amount and number of votes required for confirmation of the Plan are computed on the basis of the total amount and number of Claims actually voting.

The Debtors may commence the Chapter 11 Cases prior to the Voting Deadline. If the Debtors do commence the Chapter 11 Cases prior to the Voting Deadline, Holders of Claims in the Voting Classes may still cast a vote to accept or reject the Plan, though the Debtors will not continue to solicit votes on the Plan. Any votes that are cast after the Chapter 11 Cases are commenced but before the Voting Deadline will be counted as votes to accept or reject the Plan in the same manner as votes cast prior to the commencement of the Chapter 11 Cases.

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTORS' CREDITORS AND THE BEST POSSIBLE PROSPECT FOR THE DEBTORS' SUCCESSFUL REORGANIZATION. THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGE ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

Any questions regarding (i) voting procedures, (ii) the Solicitation Package, (iii) the amount of a Claim, or (iv) a request for an additional copy of the Plan, Disclosure Statement, or

any Exhibits to such documents should be directed to the Balloting and Claims Agent by calling +1 (888) 418-5566.

## D.    VOTING TABULATION

To ensure that a vote is counted, the Holder of a Claim should:  (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the applicable boxes provided in the Ballot; and (c) sign and timely return the Ballot to the address set forth on the enclosed return envelope by the Voting Deadline.

The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim.  Only Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims.

Ballots received after the Voting Deadline will not be counted.  The method of delivery of the Ballots to be sent to the Balloting and Claims Agent is at the election and risk of each Holder of a Claim.  A Ballot will be deemed delivered only when the Balloting and Claims Agent actually receives the executed Ballot.  Delivery of a Ballot to the Balloting and Claims Agent by facsimile will not be accepted.  No Ballot should be sent to the Company, the Company's agents (other than the Balloting and Claims Agent), or the Company's financial or legal advisors.  The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).  The Bankruptcy Code requires the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Plan Confirmation.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith with respect to a Claim is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Company nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Balloting and Claims Agent will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "***Irregular Ballot***") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged. The Balloting and Claims Agent will be authorized to attempt to cure any deficiencies contained in Irregular Ballots received prior to the Voting Deadline to correct such deficiencies. The Voting Report also shall indicate the Company's intentions with regard to such Irregular Ballots.

## VII.    CONFIRMATION PROCEDURES

## A.    COMBINED DISCLOSURE STATEMENT AND CONFIRMATION HEARING

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  When the Debtors file the Chapter 11 Cases, they will request by separate first day motion that the Bankruptcy Court schedule a Combined Hearing to consider the Debtors' solicitation procedures, the adequacy of the Disclosure Statement, and confirmation of the Plan. Notice of the Combined Hearing will be provided to holders of Claims and Interests or their representatives (the "***Combined Hearing Notice***") as set forth in the scheduling order of the Bankruptcy Court.  Objections to the adequacy of this Disclosure Statement and confirmation of the Plan must be filed with the Bankruptcy Court by the date designated in the Combined Hearing Notice and will be governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court.  UNLESS AN OBJECTION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment:  (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Company or any successors thereto under the Plan.

- The Company has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Company will pay quarterly fees no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Company's Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the Chapter 11 Cases are closed.

### 1.      Best Interests of Creditors Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (a) accept the plan of reorganization or (b) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain under the plan of reorganization if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This requirement is referred to as the "best interests" test. To make these findings, a bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the assets of such debtor's estate were liquidated pursuant to chapter 7 of the Bankruptcy Code; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

To demonstrate compliance with the "best interests" test, the Debtors prepared the Liquidation Analysis with the assistance of their advisors, attached hereto as Exhibit B.

To prepare the Liquidation Analysis, the Debtors first estimated the range of proceeds that might be generated from a hypothetical chapter 7 liquidation of the Debtors' assets by a chapter 7 trustee charged with reducing to cash any and all of such assets in an orderly manner. The amount of cash available from such hypothetical chapter 7 liquidation would be the sum of the cash held by the Debtors at the time of the commencement of the hypothetical chapter 7 liquidation plus the proceeds from the disposition of the Debtors' non-cash assets, reduced by the costs and expenses of the liquidation. Any net cash was allocated in the Liquidation Analysis to the creditors of the Debtors in strict compliance with the distribution priorities set forth in section 726 of the Bankruptcy Code.

The Debtors then valued the recoveries to each impaired creditor class under the Plan and compared such recoveries to the recoveries that such creditors would receive in a hypothetical chapter 7 liquidation.  The Liquidation Analysis was prepared separately for each Debtor entity which owned a vessel at the commencement of the hypothetical chapter 7 liquidation but not prepared separately for any other Debtor entity.

The Liquidation Analysis demonstrates that, in every instance, the amount that each Creditor in an Impaired Class would receive under the Plan is at least equal to, and in most instances exceeds, the amount that such Creditor would receive in a hypothetical chapter 7 liquidation.

For example, the Plan and Liquidation Analysis demonstrate that (a) each Holder of BOA Syndicate Claims receives property with a face value equal to 100%[33] of its Claims under the Plan, compared to a recovery that ranges from 40% to 56% in a hypothetical chapter 7 liquidation; (b) each Holder of DVB Syndicate Claims receives property with a face value equal to 100% of its Claims under the Plan, compared to a recovery that ranges from 39% to 56% in a hypothetical chapter 7 liquidation; (c) each Holder of Credit Suisse Claims receives property with a face value equal to 100% of its Claims under the Plan, compared to a recovery that ranges from 45% to 61% in a hypothetical chapter 7 liquidation; and (d) each Holder of AIG Claims receives property with a value equal to 100% of its Claims under the Plan, compared to a recovery that ranges from 65% to 86% in a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS' ASSETS.  UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF

---

[33] The Holders of the BOA Syndicate Claims, DVB Syndicate Claims, Credit Suisse Claims and AIG Claims shall receive debt securities as consideration for the cancellation of such claims pursuant to the Plan.  The actual value of such debt securities may be less than their respective face values.

THE DEBTORS OR A CHAPTER 7 TRUSTEE. IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED WERE THE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE ACTUAL AMOUNT OF CLAIMS AGAINST THE DEBTORS' ESTATES COULD VARY SIGNIFICANTLY FROM THE ESTIMATES SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF THE DEBTORS' HYPOTHETICAL CHAPTER 7 CASES. ACCORDINGLY, THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE IN NATURE AND COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

The Liquidation Analysis is subject to the qualifications and assumptions described above and in the schedules attached to Exhibit B.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan of reorganization contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Company analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Company analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Company believes that with the restructured capital structure contemplated by the Plan, the Reorganized Debtors will have sufficient cash flow and loan availability to pay and service their debt obligations and to fund operations. This is demonstrated by the detailed Financial Projections ("**Projections**"), attached as Exhibit C.

The Projections are forward looking and are presented in this Disclosure Statement subject to the limitations set forth at pages d-f of this Disclosure Statement. Without limiting the generality of the foregoing, the Projections are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, Confirmation and consummation of the Plan in accordance with its terms; realization of the Debtors' operating strategy for the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or

regulations or generally accepted accounting principles; general business and economic conditions; competition; adequate financing; absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. The Projections were not prepared in accordance with the standards for projections promulgated by the American Institute of Certified Public Accountants, IFRS, or any similar foreign body, or with a view to compliance with published guidelines of the SEC, or any foreign regulatory body, regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other Person that the results set forth in the Projections will be achieved. Neither the Debtors' independent public accountants, nor any other independent accountants or financial advisors, have compiled, examined or performed any procedures with respect to the Projections nor have they expressed any opinion or any other form of assurance on such information or its achievability. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtors, the Reorganized Debtors, their advisors, or any other Person that the Projections can or will be achieved.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to service and pay their debt obligations and to fund their operations. Under the Plan, the Reorganized Debtors will emerge from chapter 11 with approximately $206.9 million of net debt ("**Net Debt**"), including debt issued pursuant to the New Credit Agreements, the BOA/DVB Exit Facility, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility. According to the Projections, by 2016, the Reorganized Debtors will reduce Net Debt to $23.4 million.

The Reorganized Debtors will emerge from chapter 11 with approximately $20.3 million of cash on hand. Additionally, at any time through the Projection period, the Reorganized Debtors will have in excess of $20.0 million of cash on hand generated from the Reorganized Debtors' business operations, resulting in a minimum liquidity position throughout the Projection period in excess of that required by the applicable post-Effective Date loan Documents. The cash flows in the Projections include necessary capital expenditures for continued operation of the Reorganized Debtors' businesses.

Based on the Projections, the Reorganized Debtors are projected to meet all financial covenants in the New Credit Agreements, the BOA/DVB Exit Facility, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility as set forth in the AIG Term Sheet, the Credit Suisse Term Sheet, the BOA/DVB DIP Facility Term Sheet, and the BOA/DVB Debt Term

Sheet. Accordingly, the Company believes that the Plan satisfies the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan of reorganization, accept the plan. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default and reinstates the original terms of such obligation.

Section 1126(c) of the Bankruptcy Code defines "acceptance of a plan by a class of impaired claims" as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those claims that actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Debtors shall tabulate all votes on the Plan on a non-consolidated basis for purposes of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code. If no Impaired Classes accept the Subplan with respect to any Debtor, the Debtors may modify the Plan to appropriately address the rights of the Holders of Allowed Claims with respect to such Debtor.

The Claims in Classes 1(1)-(73), 2(1)-(73), 7(1), 7(2), 8(1)-(73), 9(1)-(73), and 10(1)-(73), and the Interests in Classes 11(4)-(73) are Unimpaired under the Plan, and, as a result, the Holders of such Claims and Interests are deemed to have accepted the Plan.

The Claims in Classes 3(1), 3(2), 3(3), 3(61)-(67), 4(1)-(60), 5(1), 5(2), 5(68), 5(69), 6(1)-(3), and 6(70)-(73) are Impaired under the Plan and entitled to vote. The Voting Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan of reorganization even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 5.      No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes, among other things, the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the Debtors or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Company's property subject to the liens.

*Unsecured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Interests*: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either:  (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greatest of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under clause (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

*Cram-Down*.  The Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting or deemed rejecting Class of Claims or Interests.  The Company does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Company believes that the Plan and the treatment of

all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## VIII.   PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

### A.   RISK FACTORS RELATED TO CONFIRMATION, EFFECTIVENESS, AND IMPLEMENTATION

#### 1.   Parties in Interest May Object to the Company's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

#### 3.   The Company May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code.

88

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Liquidation Analysis for the Debtors is attached as Exhibit B to this Disclosure Statement. Parties in interest in the Chapter 11 Cases may oppose Confirmation of the Plan by alleging that the liquidation value of one or more of the Debtors is higher than reflected in the Liquidation Analysis and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court may hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to valuation of the Debtors.

Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan (see Section V.I. above). There is a risk that some or all of the conditions to Confirmation may not be satisfied.

If the Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims and Interests would receive with respect to their Allowed Claims or Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.      Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted, or is deemed to have rejected, the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Company believes that the Plan satisfies these requirements and if a Class or Classes rejects the Plan, the Company will request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

5.      **A Party in Interest May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, a party in interest may object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

6.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  The occurrence of the Effective Date is subject to the conditions precedent listed in the Plan (*see* Section V.I.3. above).  Certain of the conditions precedent to the Effective Date described in Section V.I.3. above are waivable by the Debtors with the consent of the respective Agents for the Supporting Prepetition Lenders, which consent shall not be unreasonably withheld.  Such conditions precedent may not occur or be waived and, as a result, the Plan may not become effective and the Restructuring may not be consummated.

7.      **Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

8.      **Debtors' Exclusive Period Challenges**

Under the Bankruptcy Code, the Debtors have an exclusive period of 120 days to file a plan of reorganization and an additional 60 days to obtain confirmation of such a plan.  This period may be extended, on request by the Debtors, or it may be shortened, on request by a party in interest.  The Debtors intend to file the Plan immediately upon commencement of the Chapter 11 Cases and, thus, will have 180 days to obtain Confirmation of the Plan.  However, a party in interest may argue that the exclusive periods should be shortened.  Alternatively, a party in interest may argue that the exclusive periods should be terminated to enable them to file a competing plan.  The Debtors intend vigorously to oppose any such arguments.

B.      **RISK FACTORS RELATED TO THE BUSINESS OF THE REORGANIZED DEBTORS**

1.      **The global financial crisis has had, and may continue to have, an impact on the Company's business and financial condition**

Starting in late May 2010, the Baltic Dry Index, which measures the demand for shipping capacity versus the supply of dry bulk carriers, started to decline dramatically from a high of

4,209 on May 26, 2010 to a recent low of 1,043 on February 4, 2011. The Company's management believes that there are many reasons for this decline, including the large amount of additional tonnage from recent newbuilds in all vessel sizes as well as natural occurrences that significantly depressed the amount of available cargoes, such as the harsh summer in the grain growing regions of Russia and Ukraine and the recent devastating floods in Australia and Brazil. As a direct result of this imbalance of supply and demand, freight rates across the ocean shipping industry in all vessel sizes have declined dramatically as owners and charterers compete for cargoes.

**2.      The Company and the shipping industry experience very high volatility in revenues and costs**

Due to fluctuations in the level and pattern of global economic activity and oil prices, as well as heavy competition, the shipping industry historically has experienced very high volatility in freight rates and costs. Fluctuations in freight rates affect the Company's revenues, vessel charter rates and vessel values, and the Company experiences fluctuations in the Company's costs resulting from changes in the cost of fuel oil, crew expenses, port charges and currency exchange rates. In addition, increasing regulation of the sulfur content of fuel oil has caused and in the future may cause increases in the Company's fuel costs. Changes in marine regulatory regimes in the ports at which the Company's vessels call also may increase the Company's costs.

Shipping revenue is influenced by a number of factors that are difficult to predict with certainty, including global and regional economic conditions, developments in international trade, changes in seaborne and other transportation patterns, the effects of global climate change on developing economies and agricultural production, weather patterns, port congestion, canal closures, political developments, armed conflicts, acts of terrorism, embargoes and strikes.

Demand for the Company's transportation services is influenced by the demand for the goods shipped, including steel products, agricultural commodities, metal concentrates and aggregates, which in turn is affected by general economic conditions, commodity prices, and competition. Steel products, agricultural commodities, metal concentrates, and aggregates accounted for approximately 30.3%, 10.0%, 11.0%, and 15.4%, respectively, of the Company's total voyage revenues in the eleven months ended November 30, 2011. The softened demand for these products and commodities from 2008 through 2010 translated into a decreased demand for shipping.  Continuing or further declines in worldwide economic conditions could result in reduced demand for steel products, metal concentrates, and aggregates, which could adversely affect the Company's results of operations.

**3.      Significant recent additions to the fleets of many ocean shipping companies have contributed to an excess supply of dry bulk vessels in all classes and resulted in heavy pressure on freight rates**

The worldwide supply of shipping capacity is influenced by the number of newbuilding deliveries, the scrapping of older vessels, vessel casualties, and the number of vessels that are out of service.  As the global economy expanded in the years leading up to 2008, many ocean shipping companies placed orders for significant additions to their fleets.  Many of these new vessels began operating just as the credit crisis and global economic slowdown began.  As

owners and operators struggled to find cargoes for these new vessels at a time when letters of credit and other financing arrangements that underpin the global economy disappeared, freight rates dropped precipitously. Although the global economy has recovered from the end of 2008 and the beginning of 2009, the oversupply of vessels has continued to depress freight rates. It remains unclear whether the industry as a whole will take action to reduce the supply of vessels or that freight rates will recover at any time in the foreseeable future.

### 4. Adverse weather conditions have significantly decreased the volume of many dry bulk cargoes and may continue to do so in the future

As the global economy improved in 2010, unusually adverse weather conditions such as the extended heat wave in the grain growing regions of Russia and Ukraine and recent devastating floods in Australia and Brazil significantly reduced the quantity of cargoes that traditionally are shipped by dry bulk carriers. The impact of these reductions in supply of cargoes, coupled with the increase in capacity resulting from the influx of newbuild vessels, materially and adversely affected freight rates as ship owners and operators competed for available cargo. This imbalance of supply and demand may continue for an extended period.

### 5. High or volatile oil prices could adversely affect the global economy and the Company's results of operations, and the Company may be unable to pass along increased fuel costs to the Company's customers.

Rising or prolonged volatility in oil prices could weaken the global economy, which would significantly reduce the demand for ocean freight and increase the Company's fuel costs. A significant reduction in the demand for ocean freight would have a material and adverse impact on the Company's revenues, results of operations and financial condition. Oil prices recently have spiked as a result of turmoil in certain key oil producing nations in the Middle East and North Africa. The Company may be unable to pass along increased fuel costs to the Company's customers, which would adversely affect the Company's results of operations. The Company is particularly affected by rising fuel prices because a majority of the Company's revenue is derived from freight voyages for which the Company bears the fuel expense, in contrast to charters, for which the charterer bears the fuel expense. Fuel expense represented approximately 48% and 49% of the Company's voyage expense for the years ended December 31, 2010 and 2009, respectively.

### 6. Rising inflation in China could result in decreased demand for shipping services and further declines in shipping rates

The inflation rate in China increased in 2010 and may continue to rise, which may increase the cost of raw materials and finished goods exported from China. Increases in the cost of Chinese goods may reduce the global demand for Chinese goods and the volume of cargoes shipped from China, which could materially decrease the worldwide demand for shipping services, and may result in further declines in shipping rates and adversely affect the Company's results of operations and cash flows.

### 7. The Company's business depends to a significant degree on the stability and continued growth of the Asian and Latin American economies

Growth in the shipping industry in recent years has been attributable, to a significant degree, to the rapid growth of the Chinese economy. Economic growth in China caused unprecedented demand for raw materials from Latin America, including iron ore, bauxite, soybeans, timber, zinc, manganese, and copper. These raw materials generally are transported by ocean freight. The growth of the Chinese economy stimulated growth in other Asian economies as well. Any pronounced slowdown or decline in the Chinese economy could be expected to have significant adverse effects on the economies of Latin American and Asian countries and on the demand for the Company's services and could be expected to result in declines in freight rates and the value of the Company's vessels. The Company expects that a significant decline in the Asian and Latin American economies would have a materially adverse effect on the Company's results of operations.

8.      **Certain of the Company's vessel expenses are primarily inelastic, and any unexpected decrease in revenue would harm the Company's results**

Generally, vessel expenses, such as fuel, lube oil, crew wages, insurance, bunkers, stores, repairs and maintenance, do not vary significantly with freight rates or the amount of cargo carried. As a result, a change in the number of tons of cargo carried or a decrease in freight rates would have a disproportionate effect on the Company's results of operations and cash flows. Any pronounced slowdown or decline in demand for shipping may require us to run voyages at less than full capacity in an effort to maintain all of the Company's shipping routes. The Company's inability to fully book a ship would reduce revenue for a voyage, while the vessel and voyage costs would remain fairly constant. The Company does not have long-term contracts with the Company's customers and, if the Company are unable to fully book the Company's vessels, the Company may operate voyages at a loss. Accordingly, the Company's profitability and liquidity would be adversely affected.

9.      **A significant number of the Company's vessels will exceed their estimated economic useful life during the next three years**

The Company estimates that the economic useful life of most multipurpose tweendeckers and handysize/handymax bulk carriers is approximately 30 years, depending on market conditions, the type of cargo being carried, and the level of maintenance. The Company expects that 14 vessels out of the Company's controlled fleet of 41 vessels at January 30, 2012, will reach 30 years old on or before December 31, 2014—two vessels in 2012, three vessels in 2013 and nine in 2014. If the Company is unable to use these vessels profitably or replace these vessels after they exceed their estimated economic useful lives, the Company's results of operations and cash flows may be materially adversely affected.

10.     **As the Company's fleet ages, the risks associated with older vessels could adversely affect the Company's operations**

In general, the costs to maintain an ocean-going vessel in good operating condition increase with the age of the vessel. As of January 30, 2012, the average age of the 41 vessels in the Company's controlled fleet was 23.9 years. Some of the Company's dry bulk carriers are used to transport products such as coal, salt, or fertilizer that may damage the Company's vessels and reduce their useful lives, if the Company does not follow specified maintenance and cleaning

routines. Older vessels may develop unexpected mechanical and operational problems despite adherence to regular survey schedules and proper maintenance. Due to improvements in engine technology, older vessels typically are less fuel-efficient than more recently constructed vessels. Cargo insurance rates increase with the age of a vessel. Governmental regulations and safety or other equipment standards related to the age of vessels may require expenditures for alterations or the addition of new equipment, to the Company's vessels and may restrict the type of activities in which the Company's vessels may engage. The Company cannot assure you that the Company will be able to operate the Company's vessels profitably during the remainder of their projected useful lives or that the Company will be able to sell them profitably when the Company can no longer utilize them in the Company's fleet.

### 11. There are risks associated with the purchase and operation of secondhand vessels

Part of the Company's previous business strategy involved growing the Company's fleet through the purchase of secondhand vessels.  Secondhand vessels generally carry no warranties from the sellers or manufacturers. Although the Company inspected secondhand vessels prior to purchase, an inspection normally would not provide the Company with the same knowledge about their condition that the Company would have if they had been built for and operated exclusively by the Company. Secondhand vessels may have conditions or defects that the Company was not aware of when the Company bought them and that may require the Company to undertake costly repairs. These repairs may require the Company to put a vessel into dry-dock, which would reduce the Company's fleet utilization. The costs of drydock repairs are unpredictable and can be substantial. The Company may not have insurance sufficient to cover all of these repair costs or losses and may have to pay dry-docking costs not covered by the Company's insurance. The loss of earnings while the Company's vessels were being repaired in drydock and repositioned, as well as the actual cost of those repairs, would decrease the Company's income from operations. Additionally, the Company's future operating results could be adversely affected if some of the secondhand vessels do not perform as the Company expects.

### 12. Vessel dry-docking could adversely affect the Company's operations

Under applicable regulations, vessels must be dry-docked twice during a five-year cycle. The Company has a controlled fleet of 41 vessels which will require approximately 82 dry dockings over five years or to an average of approximately 17 vessels per year.  The Company estimates that vessel dry-docking that require less than 100 metric tons of steel renewal will take from 25 to 35 days and that vessel dry-docking that require 100 to 500 metric tons of steel renewal will take from 35 to 55 days. The Company capitalizes vessel improvements, including steel renewal and reinforcement, in connection with the first dry-docking after the Company acquires a vessel. In addition, the Company will need to reposition the Company's vessels or charter-in outside vessels to accommodate the Company's dry-docking schedule and business needs. Approximately 26 of the Company's vessels regularly trade in the Atlantic and Middle East region; consequently, dry-docking the Company's vessels in Chinese shipyards requires complex logistics planning.

In addition, it may be necessary to unexpectedly drydock a vessel if it suffers damage. The costs of drydock repairs are unpredictable and can be substantial.  The loss of earnings while

any vessel is dry-docked, as well as the repositioning of the Company's vessels in response to the dry-docking and the actual costs of the dry-docking and possible charter-in expense in response to the dry-docking could have a material adverse effect on the Company's cash flows and results of operations.  Furthermore, the Company may not have insurance sufficient to cover all of the costs or losses associated with an unexpected dry-docking.

### 13.    The South American joint venture, Log-Star, could result in unmet strategic business expectations and a greater than expected commitment of resources

In January 2010, the Company entered into a joint venture agreement and formed, Log-Star, a Brazilian corporation, to expand the Company's business, strengthen the Company's operational base and provide additional future growth by providing cabotage service in the Brazilian coast and Amazon River Basin.  The success of this joint venture is dependent on a growing Brazilian economy, successfully competing in the Brazilian marketplace, maintaining vessels, efficient and economical operations and the overall global economic recovery.  In the event of adverse changes in economic conditions or circumstances in the Brazilian marketplace, the success of the joint venture may be adversely affected.

### 14.    The Company depends upon a limited number of customers for a large part of the Company's revenue

The Company's top ten customers by revenue, accounted for, in the aggregate, approximately 28.6% of the Company's total consolidated revenue for the nine months ended September 30, 2011.  If any of these customers were to significantly reduce the amount of cargoes shipped using the Company's vessels, the Company's results of operations could be adversely affected.

### 15.    The Company's competitive advantage in niche markets may be eliminated

The Company's fleet primarily consists of vessels suited to niche markets not efficiently served by container ships or large dry bulk vessels. If the markets in which the Company successfully competes upgrade their port infrastructure to accommodate larger vessels, or if the volume of cargo shipped from these markets increases sufficiently, container ships or large dry bulk vessels would be able to serve these markets more efficiently. Because operators of container ships and large dry bulk vessels have significantly lower costs per cargo ton than the Company does, their entry into the Company's markets could result in increased price competition and affect the Company's ability to maintain the Company's rates. The Company's future operating results could be adversely affected if the Company is unable to identify and efficiently serve new niche markets in the face of more effective competition in the Company's current markets.

### 16.    In the highly competitive international shipping market, the Company may not be able to compete with new entrants or established companies with greater resources

The Company employs the Company's vessels in highly competitive markets that are capital-intensive and highly fragmented. Competition arises primarily from other vessel owners, many of whom have substantially greater resources than the Company has. Competition for the

95

transportation of cargo by sea is intense and depends on price, location, size, age, condition and the acceptability of the vessel and its operators. Due in part to the high fragmentation of the market, competitors with greater resources could enter the Company's market and operate larger fleets through consolidation or acquisitions and may be able to offer lower rates and higher quality vessels than the Company is able to offer.

### 17. Shortages of and rising costs to hire qualified crews, officers and engineers could adversely affect the Company's business

Crew costs are a significant operating expense for the Company's operations. Crew costs have increased as wage levels have increased in non-U.S. markets and may continue to increase. The cost of employing suitable crew is unpredictable and fluctuates based on events outside the Company's control, including the supply and demand for crew and the wages paid by other shipping companies. In addition, newbuilding programs, including the Company's own, have increased the demand for qualified crew, officers and engineers to work on the Company's vessels, and stringent certification standards required by national and international regulations, such as "Standards of Training, Certification and Watchkeeping for Seafarers," promulgated by the International Maritime Organization, or IMO, make it difficult to recruit qualified crewmembers. The Company uses three unaffiliated manning agents, Aboitiz Jebsen Bulk Transport Corp., Intermodal Shipping, Inc., and C.F. Sharp Crew Management, Inc. to provide Filipino officers and non-officers to crew the Company's vessels.

Any increase in crew costs may adversely affect the Company's results of operations. Furthermore, if the Company is unable to recruit and retain enough crew, engineers or vessel captains with the appropriate skills, the Company may be unable to satisfy any increased demand for the Company's shipping services, which could have an adverse effect on the Company's business, financial condition and results of operations.

### 18. The Company is subject to regulation and liability under environmental laws that could require significant expenditures and adversely affect the Company's financial condition, results of operations and cash flows

The Company's business and the operation of the Company's vessels are materially affected by government regulation in the form of international conventions, national, state and local laws and regulations in force in the jurisdictions in which the vessels operate, as well as in the country or countries of their registration. Because such conventions, laws, and regulations are often revised, the Company may not be able to predict the ultimate cost of complying with such conventions, laws and regulations or the impact thereof on the resale prices or useful lives of the Company's vessels. Additional conventions, laws and regulations may be adopted, which could limit the Company's ability to do business, cause us to incur the costs of retrofitting the Company's vessels or result in financial penalties, thereby adversely affecting the Company's financial condition, results of operations and cash flows.

The Company is required by various governmental and quasi-governmental agencies and other regulatory authorities to obtain permits, licenses and certificates in connection with the Company's operations. Some countries in which the Company operates have laws that restrict the carriage of cargoes depending on the registry of a vessel, the nationality of its crew and prior

and future ports of call, as well as other considerations relating to particular national interests. A failure to comply with these requirements could have a material adverse effect on the Company's results of operations.

19. **Failure to comply with international safety regulations could subject the Company to increased liability, adversely affect the Company's insurance coverage, and result in a denial of access to, or detention in, certain ports.**

The operation of the Company's vessels is affected by the requirements of the IMO's International Safety Management Code for the Safe Operation of Ships and Pollution Prevention (the "ISM Code"). The ISM Code requires shipowners and bareboat charterers to develop and maintain an extensive "Safety Management System" that includes the adoption of a safety and environmental protection policy setting forth instructions and procedures for safe operation and describing procedures for dealing with emergencies. Any material failure to comply with the ISM Code could subject the Company to increased liability, could invalidate existing insurance, or decrease available insurance coverage for the affected vessels and could result in a denial of access to or detention in certain ports, all of which could materially and adversely affect the Company's results of operations and liquidity.

20. **The shipping industry has inherent operational risks, which may not be adequately covered by insurance.**

The operation of any oceangoing vessel carries with it an inherent risk of marine disaster, environmental mishap, and collision or property loss. In the course of operating a vessel, marine disasters such as oil spills and other environmental mishaps, cargo loss or damage, business interruption due to political developments, labor disputes, strikes and adverse weather conditions could result in loss of revenues, liabilities or increased costs. The Company transports bulk cargoes such as fertilizer, salt, and coal which, if not transported properly, could pose a risk to the Company's vessels and to the environment. The insurance the Company maintains may not be sufficient to cover the cost of damages or the loss of income resulting from a vessel being removed from operation. Any significant loss or liability for which the Company is not insured, or for which the Company's insurers fail to pay, could have a material adverse effect on the Company's financial condition. In addition, the loss of a vessel would adversely affect the Company's cash flows and results of operations.

21. **Compliance with environmental and other laws and regulations could adversely affect the Company's business**

Extensive and changing environmental protection and other laws and regulations directly affect the operation of the Company's vessels. These laws and regulations take the form of international conventions and agreements, including the IMO conventions and regulations and the International Convention for the Safety of Life at Sea, or SOLAS, which are applicable to all internationally trading vessels, and national, state and local laws and regulations, all of which are amended frequently. Under these laws and regulations, various governmental and quasi-governmental agencies and other regulatory authorities may require the Company to obtain permits, licenses and certificates in connection with the Company's operations. Some countries in which the Company operates have laws that restrict the carriage of cargoes depending on the

97

registry of a vessel, the nationality of its crew and prior and future ports of call, as well as other considerations relating to particular national interests. Changes in governmental regulations and safety or other equipment standards may require unbudgeted expenditures for alterations, dry-docking or the addition of new equipment for the Company's vessels. Port authorities in various jurisdictions may demand that repairs be made before allowing a vessel to sail, even though that vessel may be certified as "in class" and in compliance with all relevant maritime conventions. Compliance with these laws and regulations may require significant expenditures, including expenses for ship modifications and changes in operating procedures or penalties for failure to comply with these laws and regulations, which could adversely affect the Company's results of operations.

Pursuant to regulations promulgated by the U.S. Coast Guard, responsible parties (as defined in such regulations) must establish and maintain evidence of financial responsibility. The P&I Associations, which historically provided shipowners and operators financial assurance, have refused to furnish evidence of insurance to responsible parties, and therefore responsible parties have obtained financial assurance from other sources at additional cost, including evidence of surety bond, guaranty or self-insurance. Any inability on the Company's part to continue to comply with these Coast Guard regulations would have a material adverse effect on the Company's results of operations.

Port state authorities in general and in certain jurisdictions in particular have become more active in inspecting older vessels visiting their ports and, in certain instances, demanding that repairs be made before allowing a vessel to sail, even though that vessel may be fully insured, in class and in compliance with all relevant maritime conventions including SOLAS. Vessels under certain flags are more likely to be subject to inspections by the Port state authorities. Additional expenses may be incurred for unscheduled repairs mandated by port state authorities.

The IMO has adopted regulations that are designed to reduce oil pollution in international waters. In complying with U.S. Oil Pollution Act of 1990, or OPA 90, and IMO regulations and other regulations that may be adopted, shipowners and operators may be forced to incur additional costs in meeting new maintenance and inspection requirements, in developing contingency arrangements for potential spills and in obtaining insurance coverage. Additional laws and regulations may be adopted that could have a material adverse effect on the Company's results of operations. In the United States and in other countries where the Company operates, the Company is subject to various federal, state or local environmental laws, ordinances and regulations and may be required to clean up environmental contamination resulting from a discharge of oil or hazardous substances, such as a discharge of fuel. The Company also may be held liable to a governmental entity or to third parties in connection with the contamination. These laws typically impose cleanup responsibility. Liability under these laws has been interpreted to be strict, joint and several, and subject to very limited statutory defenses. The costs of investigation, remediation or removal of such substances and damages resulting from such releases could be substantial and could adversely affect the Company's results of operations.

**22.    The majority of the Company's revenue is derived from operations outside the United States and may be adversely affected by actions taken by foreign**

> governments or other forces or events over which the Company has no
> control

The Company derives a significant portion of the Company's voyage revenue from operations in Latin America, Asia, Africa, and the Middle East. The Company's profitability may be affected by changing economic, political and social conditions in these regions. In particular, the Company's operations may be affected by war, terrorism, expropriation of vessels, the imposition of taxes, increased regulation, or other circumstances, any of which could reduce the Company's profitability, impair the Company's assets or cause us to curtail the Company's operations. The economies of the Latin American countries where the Company conducts operations have been volatile and subject to prolonged, repeated downturns, recessions and depressions. Adverse economic or political developments or conflicts in these countries could have a material adverse effect on the Company's operations.

### 23. Foreign currency exchange rates may adversely affect the Company's results

The Company is exposed to a variety of market risks, including the effects of changes in foreign currency exchange rates. In the third quarter of 2011, approximately 6% of the Company's operating expenses were incurred in currencies other than U.S. dollars. As of September 30, 2011, approximately 5.5% of the Company's outstanding accounts payable were denominated in currencies other than U.S. dollars. As a result, if the U.S. dollar weakens in relation to the currencies of the countries where the Company incur expenses, the Company's U.S. dollar reported expenses will increase and the Company's income will decrease. Changes in the relative values of currencies occur from time to time and may, in some instances, have a significant effect on the Company's operating results.

### 24. Acts of piracy on ocean-going vessels have increased recently in frequency and magnitude, which could adversely affect the Company's business

During the past few years, acts of piracy have risen steeply. While international efforts have been and continue to be made to prevent them, acts of piracy continue to occur, particularly off the coast of Somalia in the Gulf of Aden and in the South China Sea. If piracy attacks occur in regions in which the Company's vessels are deployed that become characterized by insurers as "war risk" zones or "war and strikes" listed areas, premiums payable for such insurance coverage could increase significantly and such insurance coverage may be more difficult to obtain. Crew costs, including those due to employing on-board security guards, could increase in such circumstances. In addition, while the Company believes the time charterer remains liable for charter payments when a vessel is seized by pirates for the period specified in the charter agreement, the charterer may dispute this belief and withhold charter fees until the vessel is released. A charterer also may claim that a vessel seized by pirates was not "on-hire" for a certain number of days and that it is therefore entitled to cancel the charter, a claim that the Company would dispute. The detention of any of the Company's vessels hijacked as a result of an act of piracy and any unrecoverable costs, increases in insurance premiums payable, or losses due to the unavailability of insurance coverage, could have a material adverse impact on the Company's financial condition, results of operations and cash flows.

99

25. **The Company could be adversely affected by violations of the U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws**

The U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. The Company's policies mandate compliance with these laws. The Company operates in many parts of the world that have experienced governmental corruption to some degree and, in certain circumstances, strict compliance with anti-bribery laws may conflict with local customs and practices. Despite the Company's training and compliance program, the Company's internal control policies and procedures may not always protect the Company from acts committed by the Company's employees or agents. Violations of these laws, or allegations of such violations, could disrupt the Company's business and result in a material adverse effect on the Company's business and operations.

26. **Marine claimants could arrest the Company's vessels, which could damage the Company's on-time performance reputation and result in a loss of cash flow.**

Under general maritime law in many jurisdictions, crew members, tort claimants, claimants for breach of certain maritime contracts, vessel mortgagors, suppliers of fuel, materials, goods and services to a vessel and consignees of cargo may be entitled to a maritime lien against a vessel for unsatisfied debts, claims, or damages. In many circumstances, a maritime lien holder may bring an action to enforce its lien by "arresting" a vessel. In some jurisdictions, under the "sister ship" theory of liability, a claimant may arrest not only the vessel subject to the claimant's maritime lien, but also any "associated" vessel owned or controlled by the legal or beneficial owner of that vessel. The arrest of one or more of the Company's vessels could result in a loss of cash flow or require us to pay substantial amounts to have the arrest lifted. Any interruption in the Company's sailing schedule and the Company's on-time performance could adversely affect the Company's customer relationships.

27. **Governments could requisition the Company's vessels during a period of war or emergency, resulting in a loss of earnings**

A government could requisition one or more of the Company's vessels for title or for hire. Requisition for title occurs when a government takes control of a vessel and becomes its owner, while requisition for hire occurs when a government takes control of a vessel and effectively becomes its charterer at dictated charter rates. Generally, requisitions occur during periods of war or emergency, however, governments may elect to requisition vessels in other circumstances. Although the Company would be entitled to compensation in the event of a requisition of one or more of the Company's vessels, the amount and timing of payment would be uncertain. Government requisition of one or more of the Company's vessels could have a material adverse effect on the Company's cash flows and results of operations.

28. **Legislative or regulatory action could materially and adversely affect the Company**

100

The Company's tax position could be adversely affected by changes in tax laws, tax treaties or tax regulations or the interpretation or enforcement thereof by any tax authority. For example, legislative proposals have been introduced in the U.S. Congress that, if enacted, could override tax treaties upon which the Company expects to rely, or could change the circumstances under which the Company would be treated as a U.S. person for U.S. federal income tax purposes, each of which could materially and adversely affect the Company's effective tax rate and require the Company to take further action, at potentially significant expense, to seek to preserve the Company's effective tax rate. The Company cannot predict the outcome of any specific legislative proposals. In particular, any future amendments to the current income tax treaties between Ireland and other jurisdictions, including the United States, could subject the Company to increased taxation and potentially significant expense.

### 29. The Company Relies, To A Significant Degree, Upon Affiliated Service Companies

The Company relies upon the Affiliate Management Companies and the Non-Affiliate Management Companies for agency services that are critical to the Company's business. These companies employ sales and customer service professionals who meet with shippers and consignees to anticipate the needs and address the concerns of the Company's customers. Although New TBS Parent will enter into the TBS Commercial Management Agreements that will govern its relationship with the Affiliate Management Companies, the Company's business, results of operations and liquidity may be materially adversely affected if the Affiliate Management Companies become unable to perform these services or their key employees leave their respective company. In addition, although New TBS Parent will enter into the TBS Commercial/Beacon Holdings Option Agreement which will give it the option acquire the services of the employees of the Affiliate Management Companies, there can be no assurance that such employees will agree to continue their employment with New TBS Parent.

## C. RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS

### 1. Financial Information Is Based on the Company's Books and Records and, Unless Otherwise Stated, No Audit Was Performed.

The financial information contained in this Disclosure Statement has not been audited unless otherwise stated. In preparing this Disclosure Statement, the Company relied on financial data derived from its books and records that was available at the time of such preparation. Although the Company has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 2. Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Company's ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Company's ability to maintain market strength and receive vendor support.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees. While the Company believes that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

## D.     RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN

### 1.     The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs, and Capital Expenditures.

The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows that they have assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the equity interests of the holders of then-existing Equity Interests could be diluted. While the Company's

projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the financial projections will be realized.

### 2. The New Common Stock is Speculative.

The New Common Stock will not be secured by collateral or any guarantees. If the Company's performance declines, the value of such New Common Stock could be worthless and holders thereof will lose their investment.

### 3. The New Common Stock and the Debt Issued Pursuant to the New Credit Agreements, the BOA/DVB Exit Facility, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility Are New Issues of Securities for Which There Is No Prior Market and the Trading Market for Equity Interests and the Debt Issued Pursuant to the New Credit Agreements, the BOA/DVB Exit Facility, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility May Be Limited.

The New Common Stock will be new securities for which there currently is no, and on issuance there will not be any, established trading market.

The debt issued pursuant to the New Credit Agreements will be new securities for which there currently is no, and on issuance there will not be any, established trading market. The Company does not intend to apply for listing of the debt issued pursuant to the New Credit Agreements on any securities exchange or for quotation in any automated dealer quotation system. Trading of debt issued pursuant to the New Credit Agreements may be further limited by securities law restrictions, or other restrictions, on transfer.

The debt issued pursuant to the BOA/DVB Exit Facility will be new securities for which there currently is no, and on issuance there will not be any, established trading market. The Company does not intend to apply for listing of the debt issued pursuant to the BOA/DVB Exit Facility on any securities exchange or for quotation in any automated dealer quotation system. Trading of debt issued pursuant to the BOA/DVB Exit Facility may be further limited by securities law restrictions, or other restrictions, on transfer.

The debt issued pursuant to the Credit Suisse Exit Facility will be new securities for which there currently is no, and on issuance there will not be any, established trading market. The Company does not intend to apply for listing of the debt issued pursuant to the Credit Suisse Exit Facility on any securities exchange or for quotation in any automated dealer quotation system. Trading of debt issued pursuant to the Credit Suisse Exit Facility may be further limited by securities law restrictions, or other restrictions, on transfer.

The debt issued pursuant to the New Senior Secured Loan Facility will be new securities for which there currently is no, and on issuance there will not be any, established trading market. The Company does not intend to apply for listing of the debt issued pursuant to the New Senior Secured Loan Facility on any securities exchange or for quotation in any automated dealer quotation system. Trading of debt issued pursuant to the New Senior Secured Loan Facility may be further limited by securities law restrictions, or other restrictions, on transfer.

4.    **The Company May be Required to Record a Significant Charge to Earnings If Its Long-Lived Assets or Goodwill Becomes Impaired.**

The Company reviews for impairment whenever events or circumstances indicate that the carrying amount of an asset may not be recoverable. Management performs impairment analyses when certain triggering events occur. Factors that would indicate potential impairment may include, but are not limited to, a significant decrease in the market value of the long-lived asset, a significant change in the long-lived asset's physical condition, and operating or cash flow losses associated with the use of the long-lived asset. The Company may be required to record a significant charge to earnings in its financial statements during the period in which any impairment of its long-lived assets is determined.

Goodwill is tested for impairment at least annually or when events or changes in circumstances indicate the carrying value may not be recoverable. Factors that may be considered a change in circumstances indicating that the reporting unit's carrying value of goodwill may not be recoverable include a decline in stock price and market capitalization, or other materially adverse events. The Company may be required to record a significant charge to earnings in its financial statements during the period in which any impairment of its goodwill is determined. This may adversely impact the Company's results of operations.

5.    **It May Be Difficult For Holders of New Common Stock to Obtain or Enforce Judgments Against New TBS Parent In the United States. The Same Applies For Creditors Under the New Credit Agreements, the Exit Facilities, the New Senior Secured Loan Facility in Respect of Judgments Against Borrowers and Guarantors of the Debt Issued Pursuant to Such New Credit Agreements, Exit Facilities, New Senior Secured Loan Facility.**

New TBS Parent will be incorporated under the laws of Bermuda, and a substantial portion of New TBS Parent's assets will be located outside of the United States. As a result, it may be difficult for United States holders of Interests in New TBS Parent to realize in the United States on any judgment against New TBS Parent or its officers and directors. Similarly, many of the borrowers and guarantors of the New Credit Agreements, the Exit Facilities, the New Senior Secured Loan Facility will be entities incorporated in jurisdictions other than the United States, a substantial portion of the assets of these borrowers and guarantors are located outside of the United States and as a result it may be difficult for United States creditors under the New Credit Agreements, the Exit Facilities, the New Senior Secured Loan Facility to realize in the United States any judgment against these borrowers and guarantors or their officers and directors. Therefore, any judgment obtained in any United States federal or state court against New TBS Parent or a borrower or guarantor under the New Credit Agreements, the Exit Facilities, the New Senior Secured Loan Facility or any of their respective officers and directors may have to be enforced in the courts of Bermuda, or such other foreign jurisdiction, as applicable. If there is no treaty or other applicable convention for the recognition of judgments between the United States and the jurisdiction where enforcement is sought (as is the case for Ireland), a judgment rendered by any United States federal or state court will not be recognized or enforced by the courts of such jurisdiction and the matter will, in principle, need to be re-litigated before the courts of that jurisdiction. The courts of Bermuda would generally recognize as a valid judgment, a final and conclusive judgment *in personam* obtained in a United States federal or state court under which a

sum of money is payable (other than a sum of money payable in respect of multiple damages, taxes or other charges of a like nature or in respect of a fine or other penalty) and would give a judgment based thereon provided that (a) such court had proper jurisdiction over the parties subject to such judgment; (b) such court did not contravene the rules of natural justice of Bermuda; (c) such judgment was not obtained by fraud; (d) the enforcement of the judgment would not be contrary to the public policy of Bermuda; (e) no new admissible evidence relevant to the action is submitted prior to the rendering of the judgment by the courts of Bermuda; and (f) there is due compliance with the correct procedures under the laws of Bermuda.  In other jurisdictions, however, this may be different.

> **6.      The Rights and Responsibilities of New Common Stock in New TBS Parent Will Be Governed by Bermuda Law and Will Differ in Some Respects From the Rights and Responsibilities of Shareholders Under U.S. Law, and Shareholder Rights Under Bermuda Law May Not Be as Clearly Established as Shareholder Rights Are Established Under the Laws of Some U.S. Jurisdictions.**

New TBS Parent will be a Bermuda company and the rights of its shareholders will be governed by Bermuda law and its memorandum of association and bye-laws.  the New TBS Parent LLC Agreement and the laws governing companies incorporated in Bermuda.  The rights of New TBS Parent's shareholders and the responsibilities of members of its board of directors under Bermuda law may not be as clearly established as under the laws of some U.S. jurisdictions.  In the performance of its duties, New TBS Parent's board of directors will be required by Bermuda law to act honestly and in good faith with a view to the best interests of New TBS Parent.  It is possible that New TBS Parent will have interests that are different from, or in addition to, the interests of specific holders of New TBS Parent equity Interests.

In addition, the rights of holders of ordinary shares of New TBS Parent and many of the rights of shareholders as they relate to, for example, the exercise of shareholder rights, will be governed by Bermuda law and New TBS Parent's memorandum of association and bye-laws, which differ from the rights of shareholders under U.S. law.  These differences include, among others, differences relating to interested director and officer transactions and shareholder lawsuits.

The provisions of Bermuda corporate law and New TBS Parent's memorandum of association and bye-laws have the effect of concentrating control over certain corporate decisions and transactions in the hands of New TBS Parent's board of directors.  As a result, holders of New TBS Parent's shares may have more difficulty in protecting their interests in the face of actions by members of New TBS Parent's board of directors than if New TBS Parent were incorporated in the United States.

Because New TBS Parent will be a holding company, its ability to pay cash dividends on its ordinary shares may be limited by restrictions on its ability to obtain sufficient funds through dividends from subsidiaries, including restrictions under the terms of the agreements governing its and its subsidiaries' indebtedness.  Under Bermuda law, New TBS Parent may not declare or pay dividends if there are reasonable grounds for believing that (i) the company is, or would after the payment be, unable to pay its liabilities as they become due or (ii) the realisable value of the

company's assets would thereby be less than its liabilities.  Subject to these limitations, the payment of cash dividends in the future, if any, will depend upon such factors as earnings levels, capital requirements, contractual restrictions, its financial condition and any other factors deemed relevant by New TBS Parent's board of directors.

**7.    Management Shareholders May Become the Holders of a Large Portion of New TBS Parent Shares.  In that Case, Management Shareholders Will Have Substantial Control Over New TBS Parent, Which Could Limit the Ability of Other Holders of New TBS Parent Equity Interests to Influence the Outcome of Key Transactions, Including a Change of Control.**

If the Plan is confirmed, the Management Shareholders will own 10% of the vested equity interests in the New TBS Common Stock, and will have the right to nominate 2 of the 5 directors.  Through achievement of various milestones, the Management Shareholders may own up to 55% of the New TBS Common Stock.  The Management Shareholders will be entitled to influence or control certain matters as provided by the Equity and Corporate Governance Term Sheet, including discretion for operational matters consistent with the approved budget and business plan or otherwise taken in the ordinary course of operating an ocean shipping business, including recommendations to sell vessels, purchase vessels, and enter into long-term charter commitments.  Management Shareholders may also have interests that differ from those of the other holders of New TBS Parent Interests and may vote in a way with which these holders disagree and which may be adverse to their interests.  The potential concentration of ownership in the Management Shareholders in the future may have the effect of delaying, preventing, or deterring a change of control of New TBS Parent, could deprive the other New TBS Parent Interests of an opportunity to receive a premium for their ordinary shares as part of a sale of New TBS Parent, and might ultimately affect the market price of New TBS Parent shares..

**8.    New TBS Parent Will Have Anti-Takeover Provisions In Its Memorandum of Association and Bye-Laws That May Discourage a Change of Control.**

New TBS Parent's memorandum of association and bye-laws will contain provisions that could make it more difficult for a third party to acquire ownership of New TBS Parent without the consent of its New Board.  Specifically, the New Board will have the power to determine the powers, preferences and rights of New TBS Parent's preference shares and to issue the preference shares without shareholder approval.  Bermuda law does not expressly prohibit companies from issuing share purchase rights or adopting a shareholder rights plan as an anti-takeover measure.  These powers of the New Board to issue shares outlined above could make it more difficult for a third party to acquire New TBS Parent, even if the third party's offer may be considered beneficial by many shareholders.  As a result, shareholders of New TBS Parent may be limited in their ability to obtain a premium for their shares.

**E.    DISCLOSURE STATEMENT DISCLAIMER**

**1.    Disclosure Statement Not Yet Approved**

The Debtors have not commenced bankruptcy cases under chapter 11 of the bankruptcy code at this time.  Because no bankruptcy cases have been commenced, this Disclosure

Statement has not been approved by any bankruptcy court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code. Nonetheless, if chapter 11 cases are subsequently commenced, the Debtors expect to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the bankruptcy code and determining that the solicitation of votes on the Plan by means of this Disclosure Statement was in compliance with section 1126(b) of the Bankruptcy Code.

### 2. Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes other than to determine how to vote on the Plan.

### 3. No Legal, Business, or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his, her or its own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 4. No Admissions Made

The information and statements contained in this Disclosure Statement shall neither (a) constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations or (b) constitute or be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors, the Reorganized Debtors, or any other Person.

### 5. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or the Plan. The Debtors and the Reorganized Debtors, as the case may be, may seek to investigate, file and prosecute litigation claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such litigation claims or Objections to Claims.

### 6. Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover Transfers and Assets

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Company or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Cause of Action of the Company or its Estate are specifically or generally identified herein.

7. **Information Was Provided by the Company and Was Relied Upon by the Company's Professionals**

Counsel to and other Professionals retained by the Company have relied upon information provided by the Company in connection with the preparation of this Disclosure Statement. Although counsel to and other Professionals retained by the Company have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

8. **Potential Exists for Inaccuracies, and the Company Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and Holders of Claims and Interests Reviewing this Disclosure Statement should not infer at the time of such review that there has not been any change in the information set forth herein since the date hereof unless so specified. While the Company has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Company may subsequently update the information in this Disclosure Statement, the Company has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

This Disclosure Statement contains projected financial information regarding the Reorganized Debtors and certain other forward-looking statements, all of which are based on various estimates and assumptions. The Debtors' management prepared the projections with the assistance of their professionals. The Debtors' management did not prepare the projections in accordance with GAAP, IFRS, or to comply with the rules and regulations of the SEC or any foreign regulatory authority.

The projections and forward looking statements herein are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. *See* Section VIII – "Plan-related Risk Factors and Alternatives to Confirmation and Consummation of the Plan." Consequently, actual events, circumstances, effects, and results may vary significantly from those included in or contemplated by the projected financial information and other forward-looking statements contained herein which, therefore, are not necessarily indicative of the future financial condition or results of operations of the Reorganized Debtors and should not be regarded as representations by the Debtors, the Reorganized Debtors, their advisors, or any other persons that the projected financial condition or results can or will be achieved. Neither the Debtors' independent auditors nor any other independent accountants have compiled, examined, or performed any procedures with respect to the financial projections and the liquidation analysis contained herein, nor have they expressed any opinion or any other form of assurance as to such information or its achievability.

The projections set forth herein are published solely for purposes of this Disclosure Statement. The projections are qualified in their entirety by the description thereof contained in this Disclosure Statement. There can be no assurance that the assumptions underlying the

financial projections will prove correct or that the Debtors' or Reorganized Debtors' actual results will not differ materially from the information contained within this Disclosure Statement. The Debtors and their professionals do not undertake any obligation, express or implied, to update or otherwise revise any projections or information disclosed herein to reflect any changes arising after the date hereof or to reflect future events, even if any assumptions contained herein are shown to be in error. Forward-looking statements are provided in this Disclosure Statement pursuant to the safe harbor established under the Private Securities Litigation Reform Act of 1995 and should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein, including the consummation and implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, commodity price fluctuations, currency exchange rate fluctuations, maintenance of good employee relations, existing and future governmental regulations and actions of governmental bodies, natural disasters and unusual weather conditions, acts of terrorism or war, industry-specific risk factors and other market and competitive conditions.

Holders of Claims and Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtors' control. The Debtors caution that no representations can be made or are made as to the accuracy of the projections or to the Reorganized Debtors' ability to achieve the projected results.

Some assumptions inevitably will be incorrect; moreover, events and circumstances occurring subsequent to the date on which the Debtors prepared the projections may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections and should consult with their own advisors.

In this Disclosure Statement, the Debtors rely on and refer to information and statistics regarding their industry. The Debtors obtained this market data from independent industry publications or other publicly available information. Although the Debtors believe that these sources are reliable, the Debtors have not independently verified and do not guarantee the accuracy and completeness of this information.

### 9.       No Representations Outside this Disclosure Statement Are Authorized

No person is authorized by the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation regarding this Disclosure Statement or the Plan other than as contained in this Disclosure Statement and the exhibits, appendices, and/or schedules attached hereto or incorporated by reference or referred to

herein, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

## F.    LIQUIDATION UNDER CHAPTER 7

If no plan can be Confirmed, the Company's Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Company for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Company's liquidation analysis is set forth in Section VII – "Confirmation Procedures" and the Liquidation Analysis attached hereto as Exhibit B.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended and as in effect on the date of this Disclosure Statement (the "**Tax Code**"), and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "**IRS**") will not take a contrary view with respect to one or more of the issues discussed below, and no opinion of counsel or ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtors and the "U.S. Holders" (as defined below) of Claims. For purposes of this summary, a "U.S. Holder" is a beneficial owner of a Claim that, for U.S. federal income tax purposes, is: (a) an individual citizen or resident of the United States; (b) a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over the trust's administration and (II) one or more United States persons (within the meaning of the Tax Code) have the authority to control all substantial decisions of such trust.

This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular Holder. The tax treatment of a Holder may vary depending upon such Holder's particular situation. The following discussion does not address state, local, foreign, or alternative minimum tax considerations that may be applicable to Holders. This summary does not address tax considerations applicable to Holders that may be subject to special tax rules, such as financial institutions, insurance companies, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an interest in a Debtor as a position in a "straddle" or as part of a

"hedging," "conversion," or "integrated" transaction for U.S. federal income tax purposes, U.S. Holders that have a "functional currency" other than the U.S. dollar, or persons that acquired an interest in a Debtor in connection with the performance of services.

If a partnership (or any other entity or arrangement treated as a partnership for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner or partnership should consult its tax advisor as to its tax consequences.

EACH HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE:**

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE TAX CODE. SUCH DESCRIPTION IS INCLUDED HEREIN BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## A.    TAX CONSIDERATIONS OF THE PLAN

In general, the modification of a debt instrument will be treated as an exchange of the unmodified debt instrument for the modified debt instrument if the modifications are considered a "significant modification" for U.S. federal income tax purposes.  The Debtors believe and the remainder of this discussion assumes that the modification of the indebtedness underlying the claims (the "***Old Debt***") will be a significant modification, resulting a deemed exchange of the Old Debt for the New Senior Secured Cash Pay Loan Tranche and the New Senior Secured PIK Loan Tranche (together, the "***New Debt***").

A U.S. Holder will generally recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the sum of (a) the fair market value of the New Common Stock treated as granted in exchange for the Old Debt (as discussed below), and (b) the issue price of the New Debt received, other than any amount representing accrued but unpaid interest, and (ii) the U.S. Holder's adjusted tax basis in its Old Debt.

The treatment of the receipt of New Common Stock by a U.S. Holder is not entirely clear.  It is possible that the New Common Stock is properly treated as a consent fee, which would generally cause a U.S. Holder to recognize ordinary income equal to the fair market value of the New Common Stock it receives.  Alternatively, the receipt of New Common Stock may be properly treated as granted, together with the New Debt, in exchange for Old Debt, which would generally increase any gain or reduce any loss in an amount equal to the fair market value of the New Common Stock received.  It is also possible that the receipt of the New Common Stock is properly treated in a different manner for U.S. federal income tax purposes, potentially resulting in different tax consequences from those outlined in this discussion.  U.S. Holders should consult their tax advisors regarding the appropriate treatment of the receipt of New Common Stock.

The determination of the issue price of the New Debt will depend upon whether the Old Debt and the New Debt will be considered to be "publicly traded" property for U.S. federal income tax purposes. The Old Debt and the New Debt will generally be considered to be "publicly traded" property if, at any time during the 60-day period ending 30 days after the date of the exchange, (i) they appear on a system of general circulation that provides a reasonable basis to determine the fair market value of the such notes by disseminating either (x) recent price quotations (including rates, yields, or other pricing information) of one or more identified brokers, dealers or traders or (y) actual prices (including rates, yields, or other pricing information) of recent sales transactions, or (ii) price quotations are readily available from dealers, brokers, or traders and certain exceptions do not apply.

If neither the Old Debt nor the New Debt is considered to be "publicly traded" property, the issue price of the New Debt will be its stated principal amount. If the New Debt is publicly traded, the issue price of the New Debt will generally be its fair market value as of its issue date. If the Old Debt (but not the New Debt) is publicly traded, the issue price of the New Debt will generally be the fair market value of the Old Debt as of the issue date of the New Debt.  The rules regarding the determination of issue price are complex and highly detailed, and it is uncertain whether the Old Debt or the New Debt will be considered to be "publicly traded" property for U.S. federal income tax purposes. U.S. Holders should consult their own tax advisors regarding the determination of the issue price of the New Debt, including whether the Old Debt or the New Debt is properly treated as publicly traded for U.S. federal income tax purposes.

Gain or loss recognized on the exchange should be capital gain or loss and should be long-term capital gain or loss if the U.S. Holder's holding period in the Old Debt surrendered in the exchange exceeds one year. Long-term capital gains of non-corporate taxpayers are generally subject to reduced rates of taxation. The deductibility of capital losses is subject to limitations. To the extent that any amount received by a Holder is attributable to accrued interest that has not been included in income, such amount should be taxable to the Holder as interest income. Conversely, a U.S. Holder may be able to recognize a deductible loss to the extent that any accrued interest on its Old Debt was previously included in the Holder's gross income but was not paid in full by the Debtors.

A Holder should obtain a tax basis in the New Common Stock received in the exchange equal to their fair market value on the Effective Date and a holding period that begins on the day following the Effective Date. A Holder should obtain a tax basis in the New Debt received in the

112

exchange equal to its issue price and a holding period that begins on the day following the Effective Date.

## B.      OWNERSHIP OF NEW DEBT

For U.S. federal income tax purposes, the New Debt will be issued with original issue discount ("**OID**") in an amount equal to the excess of the "stated redemption price at maturity" over the "issue price." In general, the stated redemption price at maturity of a debt instrument is equal to the sum of all payments to be made pursuant to the terms of the debt instrument other than payments of "qualified stated interest." A portion of the interest on the New Debt will be paid in cash and a portion will be paid by adding such interest to the accrued principal amount of the New Debt. The Debtors intend to take the position (and the remainder of this discussion assumes) that the portion of interest paid in cash will be treated as qualified stated interest, but that no other payments on the New Debt will be treated as qualified stated interest. Assuming that neither the Old Debt nor the New Debt will be treated a publicly traded for U.S. federal income tax purposes, the issue price of the New Debt should equal its face amount, less the fair market value of the New Common Stock received.

Because the New Debt will be issued with OID, U.S. Holders will be required to include as interest income each year, without regard to any cash payments of interest made with respect to the New Debt and without regard to their method of accounting for U.S. federal income tax purposes, a portion of the OID on each New Debt on a constant yield to maturity basis (resulting in increasing greater OID accruals over the term of the New Debt).

The amount of OID that must be included is the sum of the "daily portions" of OID with respect to the New Debt for each day during the taxable year or portion of the taxable year in which a U.S. Holder holds the New Debt, or the accrued OID. The daily portion is determined by allocating to each day in an "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" may be of any length and may vary in length over the term of the New Debt, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period is an amount equal to the product of the "adjusted issue price" (the issue price increased by the accrued OID for each prior accrual period and reduced by any cash payments made on or before the first day of the accrual period, other than cash payments of qualified stated interest) at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to a final accrual period is the difference between the amount payable at maturity (other than qualified stated interest) and the adjusted issue price at the beginning of the final accrual period.

Upon the sale, exchange, retirement, or other disposition of New Debt, a U.S. Holder will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, or other disposition and the U.S. Holder's adjusted tax basis in the New Debt. Such gain or loss will be capital gain or loss. Capital gains of individuals derived in respect of capital assets in which the holding period exceeds one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

## C.     OWNERSHIP OF NEW COMMON STOCK

New TBS Parent will elect to be treated as a partnership for U.S. federal income tax purposes.  As such, New TBS Parent will not be subject to federal income tax, and each holder of New Common Stock will be required to include in computing its federal income tax liability its allocable share of the items of gain, loss, income and deduction of New TBS Parent as if such amounts were incurred directly by the U.S. Holder, regardless of any distributions by New TBS Parent. New TBS Parent expects its sole material asset to be shares of TBS Holdings Limited. TBS Holdings Limited expects to be treated as a corporation for U.S. federal income tax purposes.

In general, a U.S. Holder will have an initial tax basis in its New Common Stock equal to the fair market value of the New Common Stock received as of the Effective Date.  The U.S. Holder's adjusted tax basis will generally be increased by allocations of taxable income and gain and decreased by allocations of deduction or loss.  A U.S. Holder's adjusted tax basis will generally also be increased by the amount of any capital contributions such U.S. Holder makes to NewCo and decreased by distributions made by NewCo to such U.S. Holder.

## D.     SALE, EXCHANGE OR OTHER TAXABLE DISPOSITION OF NEW TBS PARENT SHARES

For U.S. federal income tax purposes, a U.S. Holder will recognize taxable gain or loss on the sale, exchange or other taxable disposition of New TBS Parent Shares received pursuant to the Plan in an amount equal to the difference between the amount realized for the New TBS Parent Shares and the U.S. Holder's tax basis in the New TBS Parent Shares. Such gain or loss will generally be capital gain or loss and will be long-term capital gain or loss if the New TBS Parent Shares have been held for more than one year on the date of the disposition. Long term capital gains of non-corporate taxpayers are generally subject to reduced rates of taxation. The deductibility of capital losses is subject to limitations.  If TBS Holdings Limited is treated as either a PFIC or a CFC (both as defined below), the timing and the character of gain recognized on a sale, exchange, or other taxable disposition of New TBS Parent Shares may differ.

## E.     POSSIBLE TREATMENT OF TBS HOLDINGS LIMITED OR ITS SUBSIDIARIES AS A PASSIVE FOREIGN INVESTMENT COMPANY

The Debtors do not expect that TBS Holdings Limited or any of its subsidiaries will be a passive foreign investment company ("**PFIC**") for U.S. federal income tax purposes. There can be no assurance, however, that the IRS or a court will agree, or that the facts on which such expectation is predicated will not change. U.S. Holders are urged to consult their own tax advisors regarding whether TBS Holdings Limited or any of its subsidiaries will constitute a PFIC for U.S. federal income tax purposes and, if so, the U.S. federal, state, local, and foreign tax consequences of holding New Common Stock. The remainder of this discussion assumes that none of TBS Holdings Limited or any of its subsidiaries constitutes or will constitute a PFIC.

### F.    POSSIBLE TREATMENT OF TBS HOLDINGS LIMITED OR ITS SUBSIDIARIES AS A CONTROLLED FOREIGN CORPORATION

TBS Holdings Limited may be classified as a controlled foreign corporation ("*CFC*") for U.S. federal income tax purposes. In general, a foreign corporation will be classified as a CFC if more than 50% of the shares of the corporation, measured by reference to combined voting power or value, is owned (directly, indirectly or by attribution) by "U.S. Shareholders." A "U.S. Shareholder," for this purpose, is any U.S. person that possesses (directly, indirectly or by attribution) 10% or more of the combined voting power (generally the right to vote for directors of the corporation) of all classes of shares of a corporation.

If TBS Holdings Limited is treated as a CFC for U.S. federal income tax purposes, a U.S. Shareholder of TBS Holdings Limited would be treated, subject to certain exceptions, as receiving a deemed dividend at the end of the taxable year from TBS Holdings Limited in an amount equal to that person's pro rata share of the "Subpart F income" of TBS Holdings Limited to the extent of TBS Holdings Limited's earnings and profits, as determined under U.S. federal income tax principles. Such deemed dividend would be treated as income from sources within the United States for U.S. foreign tax credit limitation purposes to the extent that it is attributable to income of TBS Holdings Limited from sources within the United States. Among other items, and subject to certain exceptions, "Subpart F income" includes dividends, interest, annuities, gains from the sale or exchange of shares and securities, certain gains from commodities transactions, certain types of insurance income and income from certain transactions with or involving related parties.

Any actual distributions made by TBS Holdings Limited to a U.S. Holder (or, distributions from TBS Holdings Limited to New TBS Parent) will be taxable in the manner described below (*see* Section IX.G., below – "Treatment of Distributions if TBS Holdings Limited is not a CFC") to the extent that such amounts have not previously been included in income as a deemed dividend by such U.S. Holder.

The rules relating to CFCs are complex. U.S. Holders are urged to consult their own tax advisors regarding whether TBS Holdings Limited will constitute a CFC and, if so, the U.S. federal, state, local, and foreign tax consequences of holding New Common Stock.

### G.    TREATMENT OF DISTRIBUTIONS IF TBS HOLDINGS LIMITED IS NOT A CFC

If TBS Holdings Limited is not treated as a CFC for U.S. federal income tax purposes, a U.S. Holder of New TBS Parent Shares will not generally be subject to tax until the income earned by TBS Holdings Limited is actually distributed to New TBS Parent. In such case, the gross amount of any distribution of cash or property made to New TBS Parent with respect to the TBS Holdings Limited shares will generally be includible in gross income by each Holder of New Common Stock as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of TBS Holdings Limited, as determined under U.S. federal income tax principles.  A distribution by TBS Holdings Limited in excess of its current and accumulated earnings and profits will be treated as a return of capital to the extent of New TBS Parent's basis in its TBS Holdings Limited shares, and thereafter as capital gain.

**H.      LOSS OF SHIPPING TAX EXEMPTION**

Under the Internal Revenue Code, 50% of the gross shipping income of a corporation that owns or charters vessels that is attributable to transportation that begins or ends, but that does not both begin and end, in the United States is characterized as U.S. source transportation income. The Company's U.S. source transportation income will be subject to either a 4% U.S. federal income tax without allowance for any deductions or, if such income is effectively connected with business in the United States, a net basis tax at regular graduated U.S. federal income tax rates, and, possibly, an additional 30% branch profits tax on the Company's effectively connected earnings and profits, unless an exemption is available.

TBS Parent currently qualifies for exemption under Section 883 of the Internal Revenue Code, because TBS Parent and its subsidiaries currently are incorporated in jurisdictions that satisfy the country of organization requirement and TBS Parent satisfies the publicly traded test by virtue of TBS Parent's Class A ordinary being primarily traded on the Nasdaq Global Select Market. After the Confirmation Date, it is not expected that the Debtors will qualify for an exemption under Section 883.

**I.      BACKUP WITHHOLDING AND INFORMATION REPORTING FOR U.S. HOLDERS**

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate U.S. Holders of equity interests or debt obligations of the Debtors regardless of whether such equity interests or debt obligations existed prior to confirmation of the Plan or were issued pursuant to the Plan. Information reporting will generally apply to payments under the Plan and to payments of dividends on, interest on, and proceeds from the sale or redemption of such equity interests or debt obligations made within the United States to a Holder of the equity interests or debt obligations of the Debtors. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the sale or redemption of the, Debtors' equity interests or debt obligations within the United States to a U.S. Holder, other than an exempt recipient, if such U.S. Holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

The backup withholding tax is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

## X.      CERTAIN IRISH TAX CONSEQUENCES

**A.      CAPITAL GAINS TAX**

The transfer or cancellation of the shares in TBS Holdings Limited by TBS International Limited will be treated for tax purposes as a disposal of the shares by TBS International Limited. As TBS International Limited is an Irish tax resident company, any chargeable gains arising from the disposal would be subject to Irish corporation tax.  Any such chargeable gains would be

calculated by comparing the proceeds from the disposal to the tax basis of the shares in TBS International Limited.

In the Plan, TBS International Limited will not receive any material proceeds from the disposal of the shares in TBS Holdings Limited. However, it is possible that under Irish law the waiver of any outstanding guarantees from TBS International plc and/or TBS International Limited could be treated as consideration for the disposal of the shares, in which case the amount of proceeds (and the resulting chargeable gains) would depend on the value of the guarantees that were waived.

## B.    STAMP DUTY

As TBS Holdings Limited is a Bermuda incorporated company (and the shares are not being transferred in connection with Irish land or shares in an Irish incorporated company), no Irish stamp duty should arise on the transfer.

## C.    VALUE ADDED TAX

There should be no Irish value added tax on the transfer of shares in TBS Holdings Limited.

## D.    IRISH TAX ISSUES FOR THE SHAREHOLDERS

There should be no Irish tax on the cancellation of shares in TBS International plc for shareholders that are neither resident for tax purposes in Ireland nor hold their shares through an Irish company or an Irish branch or permanent establishment of a non-Irish company.

## XI.    CERTAIN BERMUDA TAX CONSEQUENCES

At the present time, there is no Bermuda income or profits tax, withholding tax, capital gains tax, capital transfer tax, estate duty or inheritance tax payable by New TBS Parent or by its shareholders in respect of its shares. New TBS Parent has obtained an assurance from the Minister of Finance of Bermuda under the Exempted Undertakings Tax Protection Act 1966 that, in the event that any legislation is enacted in Bermuda imposing any tax computed on profits or income, or computed on any capital asset, gain or appreciation or any tax in the nature of estate duty or inheritance tax, such tax shall not, until March 31, 2035, be applicable to New TBS Parent or to any of its operations or to its shares, debentures or other obligations except insofar as such tax applies to persons ordinarily resident in Bermuda or is payable by us in respect of real property owned or leased by New TBS Parent in Bermuda.

## XII.    CONCLUSION AND RECOMMENDATION

The Company believes the Plan is in the best interest of all creditors and urges the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Company's Balloting and Claims Agent no later than 5**:00 p.m. (Prevailing U.S. Eastern Time) on February 14, 2012.**

Dated: January 31, 2012

Respectfully submitted,

**TBS INTERNATIONAL PUBLIC LIMITED COMPANY, ON ITS OWN BEHALF AND ON BEHALF OF THE AFFILIATED DEBTORS LISTED ON APPENDIX 1**

**AS DEBTORS AND DEBTORS IN POSSESSION**

By:   /s/ Joseph E. Royce
       Name: Joseph E. Royce
       Title: President & Chief Executive Officer

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, NY 10166-0193
Telephone:   212.351.4000
Facsimile:   212.351.4035

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

## APPENDIX 1 – LIST OF AFFILIATED DEBTORS

### Affiliates of TBS Shipping Services Inc.:

TBS International Limited

TBS Holdings Limited

TBS International plc

Albemarle Maritime Corp.

Arden Maritime Corp.

Avon Maritime Corp.

Azalea Shipping & Chartering Inc.

Beekman Shipping Corp.

Birnam Maritime Corp.

Bristol Maritime Corp.

Chester Shipping Corp.

Compass Chartering Corp.

Cumberland Navigation Corp.

Darby Navigation Corp.

Dover Maritime Corp.

Elrod Shipping Corp.

Exeter Shipping Corp.

Fairfax Shipping Corp.

Frankfort Maritime Corp.

Glenwood Maritime Corp.

Hansen Shipping Corp.

Hartley Navigation Corp.

Henley Maritime Corp.

Hudson Maritime Corp.

Jessup Maritime Corp.

Leaf Shipping Corp.

Montrose Maritime Corp.

Oldcastle Shipping Corp.

Quentin Navigation Corp.

Rector Shipping Corp.

Remsen Navigation Corp.

Roymar Ship Management, Inc.

Sheffield Maritime Corp.

Sherman Maritime Corp.

Sterling Shipping Corp.

Stratford Shipping Corp.

Vedado Maritime Corp.

Vernon Maritime Corp.

Windsor Maritime Corp.

Westbrook Holdings Ltd.

Transworld Cargo Carriers, S.A.

Mercury Marine Ltd.

TBS Worldwide Services Inc.

Pacific Rim Shipping Corp.

TBS African Ventures Limited

TBS do Sul Ltd.

TBS Eurolines, Ltd.

TBS Latin America Liner, Ltd.

TBS Middle East Carriers, Ltd.

TBS North America Liner, Ltd.

TBS Ocean Carriers, Ltd.

TBS Pacific Liner, Ltd.

TBS Warehouse & Distribution Group Ltd.

TBS Warehouse & Equipment Holdings Ltd.

TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc.

TBSI New Ship Development Corp.

TBS Mining Limited

TBS U.S. Enterprises LLC

TBS Energy Logistics L.P.

Bedford Maritime Corp.

Brighton Maritime Corp.

Hari Maritime Corp.

Prospect Navigation Corp.

Hancock Navigation Corp.

Columbus Maritime Corp.

Whitehall Marine Transport Corp.

Claremont Shipping Corp.

Yorkshire Shipping Corp.

Amoros Maritime Corp.

Lancaster Maritime Corp.

Chatham Maritime Corp.

Sherwood Shipping Corp.

## APPENDIX 2 – CLASSIFICATION OF CLAIMS AND INTERESTS

| Class | Claims and Interests |
|---|---|
| Class 1(1) | Other Priority Claims against TBS International plc |
| Class 1(2) | Other Priority Claims against TBS International Limited |
| Class 1(3) | Other Priority Claims against TBS Holdings Limited |
| Class 1(4) | Other Priority Claims against TBS Shipping Services Inc. |
| Class 1(5) | Other Priority Claims against Albemarle Maritime Corp |
| Class 1(6) | Other Priority Claims against Arden Maritime Corp. |
| Class 1(7) | Other Priority Claims against Avon Maritime Corp. |
| Class 1(8) | Other Priority Claims against Azalea Shipping & Chartering Inc. |
| Class 1(9) | Other Priority Claims against Beekman Shipping Corp. |
| Class 1(10) | Other Priority Claims against Birnam Maritime Corp. |
| Class 1(11) | Other Priority Claims against Bristol Maritime Corp. |
| Class 1(12) | Other Priority Claims against Chester Shipping Corp. |
| Class 1(13) | Other Priority Claims against Compass Chartering Corp. |
| Class 1(14) | Other Priority Claims against Cumberland Navigation Corp. |
| Class 1(15) | Other Priority Claims against Darby Navigation Corp. |
| Class 1(16) | Other Priority Claims against Dover Maritime Corp. |
| Class 1(17) | Other Priority Claims against Elrod Shipping Corp. |
| Class 1(18) | Other Priority Claims against Exeter Shipping Corp. |
| Class 1(19) | Other Priority Claims against Fairfax Shipping Corp. |
| Class 1(20) | Other Priority Claims against Frankfort Maritime Corp. |
| Class 1(21) | Other Priority Claims against Glenwood Maritime Corp. |
| Class 1(22) | Other Priority Claims against Hansen Shipping Corp. |
| Class 1(23) | Other Priority Claims against Hartley Navigation Corp. |
| Class 1(24) | Other Priority Claims against Henley Maritime Corp. |
| Class 1(25) | Other Priority Claims against Hudson Maritime Corp. |
| Class 1(26) | Other Priority Claims against Jessup Maritime Corp. |
| Class 1(27) | Other Priority Claims against Leaf Shipping Corp. |
| Class 1(28) | Other Priority Claims against Montrose Maritime Corp. |
| Class 1(29) | Other Priority Claims against Oldcastle Shipping Corp. |
| Class 1(30) | Other Priority Claims against Quentin Navigation Corp. |
| Class 1(31) | Other Priority Claims against Rector Shipping Corp. |
| Class 1(32) | Other Priority Claims against Remsen Navigation Corp. |
| Class 1(33) | Other Priority Claims against Roymar Ship Management, Inc. |
| Class 1(34) | Other Priority Claims against Sheffield Maritime Corp. |

| Class | Claims and Interests |
|---|---|
| Class 1(35) | Other Priority Claims against Sherman Maritime Corp. |
| Class 1(36) | Other Priority Claims against Sterling Shipping Corp. |
| Class 1(37) | Other Priority Claims against Stratford Shipping Corp. |
| Class 1(38) | Other Priority Claims against Vedado Maritime Corp. |
| Class 1(39) | Other Priority Claims against Vernon Maritime Corp. |
| Class 1(40) | Other Priority Claims against Windsor Maritime Corp. |
| Class 1(41) | Other Priority Claims against Westbrook Holdings Ltd. |
| Class 1(42) | Other Priority Claims against Transworld Cargo Carriers, S.A. |
| Class 1(43) | Other Priority Claims against Mercury Marine Ltd. |
| Class 1(44) | Other Priority Claims against TBS Worldwide Services Inc. |
| Class 1(45) | Other Priority Claims against Pacific Rim Shipping Corp. |
| Class 1(46) | Other Priority Claims against TBS African Ventures Limited |
| Class 1(47) | Other Priority Claims against TBS do Sul Ltd. |
| Class 1(48) | Other Priority Claims against TBS Eurolines, Ltd. |
| Class 1(49) | Other Priority Claims against TBS Latin America Liner, Ltd. |
| Class 1(50) | Other Priority Claims against TBS Middle East Carriers, Ltd. |
| Class 1(51) | Other Priority Claims against TBS North America Liner, Ltd. |
| Class 1(52) | Other Priority Claims against TBS Ocean Carriers, Ltd. |
| Class 1(53) | Other Priority Claims against TBS Pacific Liner, Ltd. |
| Class 1(54) | Other Priority Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 1(55) | Other Priority Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 1(56) | Other Priority Claims against TBS Logistics Incorporated |
| Class 1(57) | Other Priority Claims against TBSI New Ship Development Corp. |
| Class 1(58) | Other Priority Claims against TBS Mining Limited |
| Class 1(59) | Other Priority Claims against TBS U.S. Enterprises LLC |
| Class 1(60) | Other Priority Claims against TBS Energy Logistics L.P. |
| Class 1(61) | Other Priority Claims against Bedford Maritime Corp. |
| Class 1(62) | Other Priority Claims against Brighton Maritime Corp. |
| Class 1(63) | Other Priority Claims against Hari Maritime Corp. |
| Class 1(64) | Other Priority Claims against Prospect Navigation Corp. |
| Class 1(65) | Other Priority Claims against Hancock Navigation Corp. |
| Class 1(66) | Other Priority Claims against Columbus Maritime Corp. |
| Class 1(67) | Other Priority Claims against Whitehall Marine Transport Corp. |
| Class 1(68) | Other Priority Claims against Claremont Shipping Corp. |
| Class 1(69) | Other Priority Claims against Yorkshire Shipping Corp. |

| Class | Claims and Interests |
|---|---|
| Class 1(70) | Other Priority Claims against Amoros Maritime Corp. |
| Class 1(71) | Other Priority Claims against Lancaster Maritime Corp. |
| Class 1(72) | Other Priority Claims against Chatham Maritime Corp. |
| Class 1(73) | Other Priority Claims against Sherwood Shipping Corp. |
| Class 2(1) | Other Secured Claims against TBS International plc |
| Class 2(2) | Other Secured Claims against TBS International Limited |
| Class 2(3) | Other Secured Claims against TBS Holdings Limited |
| Class 2(4) | Other Secured Claims against TBS Shipping Services Inc. |
| Class 2(5) | Other Secured Claims against Albemarle Maritime Corp |
| Class 2(6) | Other Secured Claims against Arden Maritime Corp. |
| Class 2(7) | Other Secured Claims against Avon Maritime Corp. |
| Class 2(8) | Other Secured Claims against Azalea Shipping & Chartering Inc. |
| Class 2(9) | Other Secured Claims against Beekman Shipping Corp. |
| Class 2(10) | Other Secured Claims against Birnam Maritime Corp. |
| Class 2(11) | Other Secured Claims against Bristol Maritime Corp. |
| Class 2(12) | Other Secured Claims against Chester Shipping Corp. |
| Class 2(13) | Other Secured Claims against Compass Chartering Corp. |
| Class 2(14) | Other Secured Claims against Cumberland Navigation Corp. |
| Class 2(15) | Other Secured Claims against Darby Navigation Corp. |
| Class 2(16) | Other Secured Claims against Dover Maritime Corp. |
| Class 2(17) | Other Secured Claims against Elrod Shipping Corp. |
| Class 2(18) | Other Secured Claims against Exeter Shipping Corp. |
| Class 2(19) | Other Secured Claims against Fairfax Shipping Corp. |
| Class 2(20) | Other Secured Claims against Frankfort Maritime Corp. |
| Class 2(21) | Other Secured Claims against Glenwood Maritime Corp. |
| Class 2(22) | Other Secured Claims against Hansen Shipping Corp. |
| Class 2(23) | Other Secured Claims against Hartley Navigation Corp. |
| Class 2(24) | Other Secured Claims against Henley Maritime Corp. |
| Class 2(25) | Other Secured Claims against Hudson Maritime Corp. |
| Class 2(26) | Other Secured Claims against Jessup Maritime Corp. |
| Class 2(27) | Other Secured Claims against Leaf Shipping Corp. |
| Class 2(28) | Other Secured Claims against Montrose Maritime Corp. |
| Class 2(29) | Other Secured Claims against Oldcastle Shipping Corp. |
| Class 2(30) | Other Secured Claims against Quentin Navigation Corp. |
| Class 2(31) | Other Secured Claims against Rector Shipping Corp. |

| Class | Claims and Interests |
|---|---|
| Class 2(32) | Other Secured Claims against Remsen Navigation Corp. |
| Class 2(33) | Other Secured Claims against Roymar Ship Management, Inc. |
| Class 2(34) | Other Secured Claims against Sheffield Maritime Corp. |
| Class 2(35) | Other Secured Claims against Sherman Maritime Corp. |
| Class 2(36) | Other Secured Claims against Sterling Shipping Corp. |
| Class 2(37) | Other Secured Claims against Stratford Shipping Corp. |
| Class 2(38) | Other Secured Claims against Vedado Maritime Corp. |
| Class 2(39) | Other Secured Claims against Vernon Maritime Corp. |
| Class 2(40) | Other Secured Claims against Windsor Maritime Corp. |
| Class 2(41) | Other Secured Claims against Westbrook Holdings Ltd. |
| Class 2(42) | Other Secured Claims against Transworld Cargo Carriers, S.A. |
| Class 2(43) | Other Secured Claims against Mercury Marine Ltd. |
| Class 2(44) | Other Secured Claims against TBS Worldwide Services Inc. |
| Class 2(45) | Other Secured Claims against Pacific Rim Shipping Corp. |
| Class 2(46) | Other Secured Claims against TBS African Ventures Limited |
| Class 2(47) | Other Secured Claims against TBS Do Sul Ltd. |
| Class 2(48) | Other Secured Claims against TBS Eurolines, Ltd. |
| Class 2(49) | Other Secured Claims against TBS Latin America Liner, Ltd. |
| Class 2(50) | Other Secured Claims against TBS Middle East Carriers, Ltd. |
| Class 2(51) | Other Secured Claims against TBS North America Liner, Ltd. |
| Class 2(52) | Other Secured Claims against TBS Ocean Carriers, Ltd. |
| Class 2(53) | Other Secured Claims against TBS Pacific Liner, Ltd. |
| Class 2(54) | Other Secured Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 2(55) | Other Secured Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 2(56) | Other Secured Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 2(57) | Other Secured Claims against TBSI New Ship Development Corp. |
| Class 2(58) | Other Secured Claims against TBS Mining Limited |
| Class 2(59) | Other Secured Claims against TBS U.S. Enterprises LLC |
| Class 2(60) | Other Secured Claims against TBS Energy Logistics L.P. |
| Class 2(61) | Other Secured Claims against Bedford Maritime Corp. |
| Class 2(62) | Other Secured Claims against Brighton Maritime Corp. |
| Class 2(63) | Other Secured Claims against Hari Maritime Corp. |
| Class 2(64) | Other Secured Claims against Prospect Navigation Corp. |
| Class 2(65) | Other Secured Claims against Hancock Navigation Corp. |

| Class | Claims and Interests |
|-------|---------------------|
| Class 2(66) | Other Secured Claims against Columbus Maritime Corp. |
| Class 2(67) | Other Secured Claims against Whitehall Marine Transport Corp. |
| Class 2(68) | Other Secured Claims against Claremont Shipping Corp. |
| Class 2(69) | Other Secured Claims against Yorkshire Shipping Corp. |
| Class 2(70) | Other Secured Claims against Amoros Maritime Corp. |
| Class 2(71) | Other Secured Claims against Lancaster Maritime Corp. |
| Class 2(72) | Other Secured Claims against Chatham Maritime Corp. |
| Class 2(73) | Other Secured Claims against Sherwood Shipping Corp. |
| Class 3(1) | DVB Syndicate Claims against TBS International plc |
| Class 3(2) | DVB Syndicate Claims against TBS International Limited |
| Class 3(3) | DVB Syndicate Claims against TBS Holdings Limited |
| Class 3(61) | DVB Syndicate Claims against Bedford Maritime Corp. |
| Class 3(62) | DVB Syndicate Claims against Brighton Maritime Corp. |
| Class 3(63) | DVB Syndicate Claims against Hari Maritime Corp. |
| Class 3(64) | DVB Syndicate Claims against Prospect Navigation Corp. |
| Class 3(65) | DVB Syndicate Claims against Hancock Navigation Corp. |
| Class 3(66) | DVB Syndicate Claims against Columbus Maritime Corp. |
| Class 3(67) | DVB Syndicate Claims against Whitehall Marine Transport Corp. |
| Class 4(1) | BOA Syndicate Claims against TBS International plc |
| Class 4(2) | BOA Syndicate Claims against TBS International Limited |
| Class 4(3) | BOA Syndicate Claims against TBS Holdings Limited |
| Class 4(4) | BOA Syndicate Claims against TBS Shipping Services Inc. |
| Class 4(5) | BOA Syndicate Claims against Albemarle Maritime Corp |
| Class 4(6) | BOA Syndicate Claims against Arden Maritime Corp. |
| Class 4(7) | BOA Syndicate Claims against Avon Maritime Corp. |
| Class 4(8) | BOA Syndicate Claims against Azalea Shipping & Chartering Inc. |
| Class 4(9) | BOA Syndicate Claims against Beekman Shipping Corp. |
| Class 4(10) | BOA Syndicate Claims against Birnam Maritime Corp. |
| Class 4(11) | BOA Syndicate Claims against Bristol Maritime Corp. |
| Class 4(12) | BOA Syndicate Claims against Chester Shipping Corp. |
| Class 4(13) | BOA Syndicate Claims against Compass Chartering Corp. |
| Class 4(14) | BOA Syndicate Claims against Cumberland Navigation Corp. |
| Class 4(15) | BOA Syndicate Claims against Darby Navigation Corp. |
| Class 4(16) | BOA Syndicate Claims against Dover Maritime Corp. |
| Class 4(17) | BOA Syndicate Claims against Elrod Shipping Corp. |

| Class | Claims and Interests |
|---|---|
| Class 4(18) | BOA Syndicate Claims against Exeter Shipping Corp. |
| Class 4(19) | BOA Syndicate Claims against Fairfax Shipping Corp. |
| Class 4(20) | BOA Syndicate Claims against Frankfort Maritime Corp. |
| Class 4(21) | BOA Syndicate Claims against Glenwood Maritime Corp. |
| Class 4(22) | BOA Syndicate Claims against Hansen Shipping Corp. |
| Class 4(23) | BOA Syndicate Claims against Hartley Navigation Corp. |
| Class 4(24) | BOA Syndicate Claims against Henley Maritime Corp. |
| Class 4(25) | BOA Syndicate Claims against Hudson Maritime Corp. |
| Class 4(26) | BOA Syndicate Claims against Jessup Maritime Corp. |
| Class 4(27) | BOA Syndicate Claims against Leaf Shipping Corp. |
| Class 4(28) | BOA Syndicate Claims against Montrose Maritime Corp. |
| Class 4(29) | BOA Syndicate Claims against Oldcastle Shipping Corp. |
| Class 4(30) | BOA Syndicate Claims against Quentin Navigation Corp. |
| Class 4(31) | BOA Syndicate Claims against Rector Shipping Corp. |
| Class 4(32) | BOA Syndicate Claims against Remsen Navigation Corp. |
| Class 4(33) | BOA Syndicate Claims against Roymar Ship Management, Inc. |
| Class 4(34) | BOA Syndicate Claims against Sheffield Maritime Corp. |
| Class 4(35) | BOA Syndicate Claims against Sherman Maritime Corp. |
| Class 4(36) | BOA Syndicate Claims against Sterling Shipping Corp. |
| Class 4(37) | BOA Syndicate Claims against Stratford Shipping Corp. |
| Class 4(38) | BOA Syndicate Claims against Vedado Maritime Corp. |
| Class 4(39) | BOA Syndicate Claims against Vernon Maritime Corp. |
| Class 4(40) | BOA Syndicate Claims against Windsor Maritime Corp. |
| Class 4(41) | BOA Syndicate Claims against Westbrook Holdings Ltd. |
| Class 4(42) | BOA Syndicate Claims against Transworld Cargo Carriers, S.A. |
| Class 4(43) | BOA Syndicate Claims against Mercury Marine Ltd. |
| Class 4(44) | BOA Syndicate Claims against TBS Worldwide Services Inc. |
| Class 4(45) | BOA Syndicate Claims against Pacific Rim Shipping Corp. |
| Class 4(46) | BOA Syndicate Claims against TBS African Ventures Limited |
| Class 4(47) | BOA Syndicate Claims against TBS do Sul Ltd. |
| Class 4(48) | BOA Syndicate Claims against TBS Eurolines, Ltd. |
| Class 4(49) | BOA Syndicate Claims against TBS Latin America Liner, Ltd. |
| Class 4(50) | BOA Syndicate Claims against TBS Middle East Carriers, Ltd. |
| Class 4(51) | BOA Syndicate Claims against TBS North America Liner, Ltd. |
| Class 4(52) | BOA Syndicate Claims against TBS Ocean Carriers, Ltd. |

| Class | Claims and Interests |
|-------|---------------------|
| Class 4(53) | BOA Syndicate Claims against TBS Pacific Liner, Ltd. |
| Class 4(54) | BOA Syndicate Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 4(55) | BOA Syndicate Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 4(56) | BOA Syndicate Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 4(57) | BOA Syndicate Claims against TBSI New Ship Development Corp. |
| Class 4(58) | BOA Syndicate Claims against TBS Mining Limited |
| Class 4(59) | BOA Syndicate Claims against TBS U.S. Enterprises LLC |
| Class 4(60) | BOA Syndicate Claims against TBS Energy Logistics L.P. |
| Class 5(1) | Credit Suisse Claims against TBS International plc |
| Class 5(2) | Credit Suisse Claims against TBS International Limited |
| Class 5(68) | Credit Suisse Claims against Claremont Shipping Corp. |
| Class 5(69) | Credit Suisse Claims against Yorkshire Shipping Corp. |
| Class 6(1) | AIG Claims against TBS International plc |
| Class 6(2) | AIG Claims against TBS International Limited |
| Class 6(3) | AIG Claims against TBS Holdings Limited |
| Class 6(70) | AIG Claims against Amoros Maritime Corp. |
| Class 6(71) | AIG Claims against Lancaster Maritime Corp. |
| Class 6(72) | AIG Claims against Chatham Maritime Corp. |
| Class 6(73) | AIG Claims against Sherwood Shipping Corp. |
| Class 7(1) | RBS Claims against TBS International plc |
| Class 7(2) | RBS Claims against TBS International Limited |
| Class 8(1) | General Unsecured Claims against TBS International plc |
| Class 8(2) | General Unsecured Claims against TBS International Limited |
| Class 8(3) | General Unsecured Claims against TBS Holdings Limited |
| Class 8(4) | General Unsecured Claims against TBS Shipping Services Inc. |
| Class 8(5) | General Unsecured Claims against Albemarle Maritime Corp |
| Class 8(6) | General Unsecured Claims against Arden Maritime Corp. |
| Class 8(7) | General Unsecured Claims against Avon Maritime Corp. |
| Class 8(8) | General Unsecured Claims against Azalea Shipping & Chartering Inc. |
| Class 8(9) | General Unsecured Claims against Beekman Shipping Corp. |
| Class 8(10) | General Unsecured Claims against Birnam Maritime Corp. |
| Class 8(11) | General Unsecured Claims against Bristol Maritime Corp. |
| Class 8(12) | General Unsecured Claims against Chester Shipping Corp. |

| Class | Claims and Interests |
|---|---|
| Class 8(13) | General Unsecured Claims against Compass Chartering Corp. |
| Class 8(14) | General Unsecured Claims against Cumberland Navigation Corp. |
| Class 8(15) | General Unsecured Claims against Darby Navigation Corp. |
| Class 8(16) | General Unsecured Claims against Dover Maritime Corp. |
| Class 8(17) | General Unsecured Claims against Elrod Shipping Corp. |
| Class 8(18) | General Unsecured Claims against Exeter Shipping Corp. |
| Class 8(19) | General Unsecured Claims against Fairfax Shipping Corp. |
| Class 8(20) | General Unsecured Claims against Frankfort Maritime Corp. |
| Class 8(21) | General Unsecured Claims against Glenwood Maritime Corp. |
| Class 8(22) | General Unsecured Claims against Hansen Shipping Corp. |
| Class 8(23) | General Unsecured Claims against Hartley Navigation Corp. |
| Class 8(24) | General Unsecured Claims against Henley Maritime Corp. |
| Class 8(25) | General Unsecured Claims against Hudson Maritime Corp. |
| Class 8(26) | General Unsecured Claims against Jessup Maritime Corp. |
| Class 8(27) | General Unsecured Claims against Leaf Shipping Corp. |
| Class 8(28) | General Unsecured Claims against Montrose Maritime Corp. |
| Class 8(29) | General Unsecured Claims against Oldcastle Shipping Corp. |
| Class 8(30) | General Unsecured Claims against Quentin Navigation Corp. |
| Class 8(31) | General Unsecured Claims against Rector Shipping Corp. |
| Class 8(32) | General Unsecured Claims against Remsen Navigation Corp. |
| Class 8(33) | General Unsecured Claims against Roymar Ship Management, Inc. |
| Class 8(34) | General Unsecured Claims against Sheffield Maritime Corp. |
| Class 8(35) | General Unsecured Claims against Sherman Maritime Corp. |
| Class 8(36) | General Unsecured Claims against Sterling Shipping Corp. |
| Class 8(37) | General Unsecured Claims against Stratford Shipping Corp. |
| Class 8(38) | General Unsecured Claims against Vedado Maritime Corp. |
| Class 8(39) | General Unsecured Claims against Vernon Maritime Corp. |
| Class 8(40) | General Unsecured Claims against Windsor Maritime Corp. |
| Class 8(41) | General Unsecured Claims against Westbrook Holdings Ltd. |
| Class 8(42) | General Unsecured Claims against Transworld Cargo Carriers, S.A. |
| Class 8(43) | General Unsecured Claims against Mercury Marine Ltd. |
| Class 8(44) | General Unsecured Claims against TBS Worldwide Services Inc. |
| Class 8(45) | General Unsecured Claims against Pacific Rim Shipping Corp. |
| Class 8(46) | General Unsecured Claims against TBS African Ventures Limited |
| Class 8(47) | General Unsecured Claims against TBS do Sul Ltd. |

| Class | Claims and Interests |
|-------|----------------------|
| Class 8(48) | General Unsecured Claims against TBS Eurolines, Ltd. |
| Class 8(49) | General Unsecured Claims against TBS Latin America Liner, Ltd. |
| Class 8(50) | General Unsecured Claims against TBS Middle East Carriers, Ltd. |
| Class 8(51) | General Unsecured Claims against TBS North America Liner, Ltd. |
| Class 8(52) | General Unsecured Claims against TBS Ocean Carriers, Ltd. |
| Class 8(53) | General Unsecured Claims against TBS Pacific Liner, Ltd. |
| Class 8(54) | General Unsecured Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 8(55) | General Unsecured Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 8(56) | General Unsecured Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 8(57) | General Unsecured Claims against TBSI New Ship Development Corp. |
| Class 8(58) | General Unsecured Claims against TBS Mining Limited |
| Class 8(59) | General Unsecured Claims against TBS U.S. Enterprises LLC |
| Class 8(60) | General Unsecured Claims against TBS Energy Logistics L.P. |
| Class 8(61) | General Unsecured Claims against Bedford Maritime Corp. |
| Class 8(62) | General Unsecured Claims against Brighton Maritime Corp. |
| Class 8(63) | General Unsecured Claims against Hari Maritime Corp. |
| Class 8(64) | General Unsecured Claims against Prospect Navigation Corp. |
| Class 8(65) | General Unsecured Claims against Hancock Navigation Corp. |
| Class 8(66) | General Unsecured Claims against Columbus Maritime Corp. |
| Class 8(67) | General Unsecured Claims against Whitehall Marine Transport Corp. |
| Class 8(68) | General Unsecured Claims against Claremont Shipping Corp. |
| Class 8(69) | General Unsecured Claims against Yorkshire Shipping Corp. |
| Class 8(70) | General Unsecured Claims against Amoros Maritime Corp. |
| Class 8(71) | General Unsecured Claims against Lancaster Maritime Corp. |
| Class 8(72) | General Unsecured Claims against Chatham Maritime Corp. |
| Class 8(73) | General Unsecured Claims against Sherwood Shipping Corp. |
| Class 9(1) | Intercompany Claims against TBS International plc |
| Class 9(2) | Intercompany Claims against TBS International Limited |
| Class 9(3) | Intercompany Claims against TBS Holdings Limited |
| Class 9(4) | Intercompany Claims against TBS Shipping Services Inc. |
| Class 9(5) | Intercompany Claims against Albemarle Maritime Corp |
| Class 9(6) | Intercompany Claims against Arden Maritime Corp. |
| Class 9(7) | Intercompany Claims against Avon Maritime Corp. |

| Class | Claims and Interests |
|---|---|
| Class 9(8) | Intercompany Claims against Azalea Shipping & Chartering Inc. |
| Class 9(9) | Intercompany Claims against Beekman Shipping Corp. |
| Class 9(10) | Intercompany Claims against Birnam Maritime Corp. |
| Class 9(11) | Intercompany Claims against Bristol Maritime Corp. |
| Class 9(12) | Intercompany Claims against Chester Shipping Corp. |
| Class 9(13) | Intercompany Claims against Compass Chartering Corp. |
| Class 9(14) | Intercompany Claims against Cumberland Navigation Corp. |
| Class 9(15) | Intercompany Claims against Darby Navigation Corp. |
| Class 9(16) | Intercompany Claims against Dover Maritime Corp. |
| Class 9(17) | Intercompany Claims against Elrod Shipping Corp. |
| Class 9(18) | Intercompany Claims against Exeter Shipping Corp. |
| Class 9(19) | Intercompany Claims against Fairfax Shipping Corp. |
| Class 9(20) | Intercompany Claims against Frankfort Maritime Corp. |
| Class 9(21) | Intercompany Claims against Glenwood Maritime Corp. |
| Class 9(22) | Intercompany Claims against Hansen Shipping Corp. |
| Class 9(23) | Intercompany Claims against Hartley Navigation Corp. |
| Class 9(24) | Intercompany Claims against Henley Maritime Corp. |
| Class 9(25) | Intercompany Claims against Hudson Maritime Corp. |
| Class 9(26) | Intercompany Claims against Jessup Maritime Corp. |
| Class 9(27) | Intercompany Claims against Leaf Shipping Corp. |
| Class 9(28) | Intercompany Claims against Montrose Maritime Corp. |
| Class 9(29) | Intercompany Claims against Oldcastle Shipping Corp. |
| Class 9(30) | Intercompany Claims against Quentin Navigation Corp. |
| Class 9(31) | Intercompany Claims against Rector Shipping Corp. |
| Class 9(32) | Intercompany Claims against Remsen Navigation Corp. |
| Class 9(33) | Intercompany Claims against Roymar Ship Management, Inc. |
| Class 9(34) | Intercompany Claims against Sheffield Maritime Corp. |
| Class 9(35) | Intercompany Claims against Sherman Maritime Corp. |
| Class 9(36) | Intercompany Claims against Sterling Shipping Corp. |
| Class 9(37) | Intercompany Claims against Stratford Shipping Corp. |
| Class 9(38) | Intercompany Claims against Vedado Maritime Corp. |
| Class 9(39) | Intercompany Claims against Vernon Maritime Corp. |
| Class 9(40) | Intercompany Claims against Windsor Maritime Corp. |
| Class 9(41) | Intercompany Claims against Westbrook Holdings Ltd. |
| Class 9(42) | Intercompany Claims against Transworld Cargo Carriers, S.A. |

| Class | Claims and Interests |
|---|---|
| Class 9(43) | Intercompany Claims against Mercury Marine Ltd. |
| Class 9(44) | Intercompany Claims against TBS Worldwide Services Inc. |
| Class 9(45) | Intercompany Claims against Pacific Rim Shipping Corp. |
| Class 9(46) | Intercompany Claims against TBS African Ventures Limited |
| Class 9(47) | Intercompany Claims against TBS do Sul Ltd. |
| Class 9(48) | Intercompany Claims against TBS Eurolines, Ltd. |
| Class 9(49) | Intercompany Claims against TBS Latin America Liner, Ltd. |
| Class 9(50) | Intercompany Claims against TBS Middle East Carriers, Ltd. |
| Class 9(51) | Intercompany Claims against TBS North America Liner, Ltd. |
| Class 9(52) | Intercompany Claims against TBS Ocean Carriers, Ltd. |
| Class 9(53) | Intercompany Claims against TBS Pacific Liner, Ltd. |
| Class 9(54) | Intercompany Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 9(55) | Intercompany Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 9(56) | Intercompany Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 9(57) | Intercompany Claims against TBSI New Ship Development Corp. |
| Class 9(58) | Intercompany Claims against TBS Mining Limited |
| Class 9(59) | Intercompany Claims against TBS U.S. Enterprises LLC |
| Class 9(60) | Intercompany Claims against TBS Energy Logistics L.P. |
| Class 9(61) | Intercompany Claims against Bedford Maritime Corp. |
| Class 9(62) | Intercompany Claims against Brighton Maritime Corp. |
| Class 9(63) | Intercompany Claims against Hari Maritime Corp. |
| Class 9(64) | Intercompany Claims against Prospect Navigation Corp. |
| Class 9(65) | Intercompany Claims against Hancock Navigation Corp. |
| Class 9(66) | Intercompany Claims against Columbus Maritime Corp. |
| Class 9(67) | Intercompany Claims against Whitehall Marine Transport Corp. |
| Class 9(68) | Intercompany Claims against Claremont Shipping Corp. |
| Class 9(69) | Intercompany Claims against Yorkshire Shipping Corp. |
| Class 9(70) | Intercompany Claims against Amoros Maritime Corp. |
| Class 9(71) | Intercompany Claims against Lancaster Maritime Corp. |
| Class 9(72) | Intercompany Claims against Chatham Maritime Corp. |
| Class 9(73) | Intercompany Claims against Sherwood Shipping Corp. |
| Class 10(1) | Subordinated Claims against TBS International plc |
| Class 10(2) | Subordinated Claims against TBS International Limited |
| Class 10(3) | Subordinated Claims against TBS Holdings Limited |

| Class | Claims and Interests |
|---|---|
| Class 10(4) | Subordinated Claims against TBS Shipping Services Inc. |
| Class 10(5) | Subordinated Claims against Albemarle Maritime Corp |
| Class 10(6) | Subordinated Claims against Arden Maritime Corp. |
| Class 10(7) | Subordinated Claims against Avon Maritime Corp. |
| Class 10(8) | Subordinated Claims against Azalea Shipping & Chartering Inc. |
| Class 10(9) | Subordinated Claims against Beekman Shipping Corp. |
| Class 10(10) | Subordinated Claims against Birnam Maritime Corp. |
| Class 10(11) | Subordinated Claims against Bristol Maritime Corp. |
| Class 10(12) | Subordinated Claims against Chester Shipping Corp. |
| Class 10(13) | Subordinated Claims against Compass Chartering Corp. |
| Class 10(14) | Subordinated Claims against Cumberland Navigation Corp. |
| Class 10(15) | Subordinated Claims against Darby Navigation Corp. |
| Class 10(16) | Subordinated Claims against Dover Maritime Corp. |
| Class 10(17) | Subordinated Claims against Elrod Shipping Corp. |
| Class 10(18) | Subordinated Claims against Exeter Shipping Corp. |
| Class 10(19) | Subordinated Claims against Fairfax Shipping Corp. |
| Class 10(20) | Subordinated Claims against Frankfort Maritime Corp. |
| Class 10(21) | Subordinated Claims against Glenwood Maritime Corp. |
| Class 10(22) | Subordinated Claims against Hansen Shipping Corp. |
| Class 10(23) | Subordinated Claims against Hartley Navigation Corp. |
| Class 10(24) | Subordinated Claims against Henley Maritime Corp. |
| Class 10(25) | Subordinated Claims against Hudson Maritime Corp. |
| Class 10(26) | Subordinated Claims against Jessup Maritime Corp. |
| Class 10(27) | Subordinated Claims against Leaf Shipping Corp. |
| Class 10(28) | Subordinated Claims against Montrose Maritime Corp. |
| Class 10(29) | Subordinated Claims against Oldcastle Shipping Corp. |
| Class 10(30) | Subordinated Claims against Quentin Navigation Corp. |
| Class 10(31) | Subordinated Claims against Rector Shipping Corp. |
| Class 10(32) | Subordinated Claims against Remsen Navigation Corp. |
| Class 10(33) | Subordinated Claims against Roymar Ship Management, Inc. |
| Class 10(34) | Subordinated Claims against Sheffield Maritime Corp. |
| Class 10(35) | Subordinated Claims against Sherman Maritime Corp. |
| Class 10(36) | Subordinated Claims against Sterling Shipping Corp. |
| Class 10(37) | Subordinated Claims against Stratford Shipping Corp. |
| Class 10(38) | Subordinated Claims against Vedado Maritime Corp. |

| Class | Claims and Interests |
|---|---|
| Class 10(39) | Subordinated Claims against Vernon Maritime Corp. |
| Class 10(40) | Subordinated Claims against Windsor Maritime Corp. |
| Class 10(41) | Subordinated Claims against Westbrook Holdings Ltd. |
| Class 10(42) | Subordinated Claims against Transworld Cargo Carriers, S.A. |
| Class 10(43) | Subordinated Claims against Mercury Marine Ltd. |
| Class 10(44) | Subordinated Claims against TBS Worldwide Services Inc. |
| Class 10(45) | Subordinated Claims against Pacific Rim Shipping Corp. |
| Class 10(46) | Subordinated Claims against TBS African Ventures Limited |
| Class 10(47) | Subordinated Claims against TBS do Sul Ltd. |
| Class 10(48) | Subordinated Claims against TBS Eurolines, Ltd. |
| Class 10(49) | Subordinated Claims against TBS Latin America Liner, Ltd. |
| Class 10(50) | Subordinated Claims against TBS Middle East Carriers, Ltd. |
| Class 10(51) | Subordinated Claims against TBS North America Liner, Ltd. |
| Class 10(52) | Subordinated Claims against TBS Ocean Carriers, Ltd. |
| Class 10(53) | Subordinated Claims against TBS Pacific Liner, Ltd. |
| Class 10(54) | Subordinated Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 10(55) | Subordinated Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 10(56) | Subordinated Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 10(57) | Subordinated Claims against TBSI New Ship Development Corp. |
| Class 10(58) | Subordinated Claims against TBS Mining Limited |
| Class 10(59) | Subordinated Claims against TBS U.S. Enterprises LLC |
| Class 10(60) | Subordinated Claims against TBS Energy Logistics L.P. |
| Class 10(61) | Subordinated Claims against Bedford Maritime Corp. |
| Class 10(62) | Subordinated Claims against Brighton Maritime Corp. |
| Class 10(63) | Subordinated Claims against Hari Maritime Corp. |
| Class 10(64) | Subordinated Claims against Prospect Navigation Corp. |
| Class 10(65) | Subordinated Claims against Hancock Navigation Corp. |
| Class 10(66) | Subordinated Claims against Columbus Maritime Corp. |
| Class 10(67) | Subordinated Claims against Whitehall Marine Transport Corp. |
| Class 10(68) | Subordinated Claims against Claremont Shipping Corp. |
| Class 10(69) | Subordinated Claims against Yorkshire Shipping Corp. |
| Class 10(70) | Subordinated Claims against Amoros Maritime Corp. |
| Class 10(71) | Subordinated Claims against Lancaster Maritime Corp. |
| Class 10(72) | Subordinated Claims against Chatham Maritime Corp. |
| Class 10(73) | Subordinated Claims against Sherwood Shipping Corp. |

| Class | Claims and Interests |
|---|---|
| Class 11(1) | Equity Securities of TBS International plc |
| Class 11(2) | Equity Securities of TBS International Limited |
| Class 11(3) | Equity Securities of TBS Holdings Limited |
| Class 11(4) | Equity Securities of TBS Shipping Services Inc. |
| Class 11(5) | Equity Securities of Albemarle Maritime Corp |
| Class 11(6) | Equity Securities of Arden Maritime Corp. |
| Class 11(7) | Equity Securities of Avon Maritime Corp. |
| Class 11(8) | Equity Securities of Azalea Shipping & Chartering Inc. |
| Class 11(9) | Equity Securities of Beekman Shipping Corp. |
| Class 11(10) | Equity Securities of Birnam Maritime Corp. |
| Class 11(11) | Equity Securities of Bristol Maritime Corp. |
| Class 11(12) | Equity Securities of Chester Shipping Corp. |
| Class 11(13) | Equity Securities of Compass Chartering Corp. |
| Class 11(14) | Equity Securities of Cumberland Navigation Corp. |
| Class 11(15) | Equity Securities of Darby Navigation Corp. |
| Class 11(16) | Equity Securities of Dover Maritime Corp. |
| Class 11(17) | Equity Securities of Elrod Shipping Corp. |
| Class 11(18) | Equity Securities of Exeter Shipping Corp. |
| Class 11(19) | Equity Securities of Fairfax Shipping Corp. |
| Class 11(20) | Equity Securities of Frankfort Maritime Corp. |
| Class 11(21) | Equity Securities of Glenwood Maritime Corp. |
| Class 11(22) | Equity Securities of Hansen Shipping Corp. |
| Class 11(23) | Equity Securities of Hartley Navigation Corp. |
| Class 11(24) | Equity Securities of Henley Maritime Corp. |
| Class 11(25) | Equity Securities of Hudson Maritime Corp. |
| Class 11(26) | Equity Securities of Jessup Maritime Corp. |
| Class 11(27) | Equity Securities of Leaf Shipping Corp. |
| Class 11(28) | Equity Securities of Montrose Maritime Corp. |
| Class 11(29) | Equity Securities of Oldcastle Shipping Corp. |
| Class 11(30) | Equity Securities of Quentin Navigation Corp. |
| Class 11(31) | Equity Securities of Rector Shipping Corp. |
| Class 11(32) | Equity Securities of Remsen Navigation Corp. |
| Class 11(33) | Equity Securities of Roymar Ship Management, Inc. |
| Class 11(34) | Equity Securities of Sheffield Maritime Corp. |
| Class 11(35) | Equity Securities of Sherman Maritime Corp. |

| Class | Claims and Interests |
|---|---|
| Class 11(36) | Equity Securities of Sterling Shipping Corp. |
| Class 11(37) | Equity Securities of Stratford Shipping Corp. |
| Class 11(38) | Equity Securities of Vedado Maritime Corp. |
| Class 11(39) | Equity Securities of Vernon Maritime Corp. |
| Class 11(40) | Equity Securities of Windsor Maritime Corp. |
| Class 11(41) | Equity Securities of Westbrook Holdings Ltd. |
| Class 11(42) | Equity Securities of Transworld Cargo Carriers, S.A. |
| Class 11(43) | Equity Securities of Mercury Marine Ltd. |
| Class 11(44) | Equity Securities of TBS Worldwide Services Inc. |
| Class 11(45) | Equity Securities of Pacific Rim Shipping Corp. |
| Class 11(46) | Equity Securities of TBS African Ventures Limited |
| Class 11(47) | Equity Securities of TBS do Sul Ltd. |
| Class 11(48) | Equity Securities of TBS Eurolines, Ltd. |
| Class 11(49) | Equity Securities of TBS Latin America Liner, Ltd. |
| Class 11(50) | Equity Securities of TBS Middle East Carriers, Ltd. |
| Class 11(51) | Equity Securities of TBS North America Liner, Ltd. |
| Class 11(52) | Equity Securities of TBS Ocean Carriers, Ltd. |
| Class 11(53) | Equity Securities of TBS Pacific Liner, Ltd. |
| Class 11(54) | Equity Securities of TBS Warehouse & Distribution Group Ltd. |
| Class 11(55) | Equity Securities of TBS Warehouse & Equipment Holdings Ltd. |
| Class 11(56) | Equity Securities of TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 11(57) | Equity Securities of TBSI New Ship Development Corp. |
| Class 11(58) | Equity Securities of TBS Mining Limited |
| Class 11(59) | Equity Securities of TBS U.S. Enterprises LLC |
| Class 11(60) | Equity Securities of TBS Energy Logistics L.P. |
| Class 11(61) | Equity Securities of Bedford Maritime Corp. |
| Class 11(62) | Equity Securities of Brighton Maritime Corp. |
| Class 11(63) | Equity Securities of Hari Maritime Corp. |
| Class 11(64) | Equity Securities of Prospect Navigation Corp. |
| Class 11(65) | Equity Securities of Hancock Navigation Corp. |
| Class 11(66) | Equity Securities of Columbus Maritime Corp. |
| Class 11(67) | Equity Securities of Whitehall Marine Transport Corp. |
| Class 11(68) | Equity Securities of Claremont Shipping Corp. |
| Class 11(69) | Equity Securities of Yorkshire Shipping Corp. |
| Class 11(70) | Equity Securities of Amoros Maritime Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 11(71) | Equity Securities of Lancaster Maritime Corp. |
| Class 11(72) | Equity Securities of Chatham Maritime Corp. |
| Class 11(73) | Equity Securities of Sherwood Shipping Corp. |

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 154 of 385

# EXHIBIT A

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Proposed Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |
|---|---|
| IN RE: | : Chapter 11 |
| TBS Shipping Services Inc., et al., | : Case No. _____ |
| Debtors. | : Jointly Administered |

-------------------------------------------------------------x

**JOINT PREPACKAGED PLAN OF REORGANIZATION FOR THE
DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated:  New York, New York
         January 31, 2012

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

I. DEFINED TERMS, RULES OF INTERPRETATION, AND
    COMPUTATION OF TIME ............................................................................ 1
    1.1    Definitions................................................................................................ 1
    1.2    Rules of Construction. ............................................................................. 1
    1.3    Computation of Time................................................................................ 2

II. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY
    TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIMS
    AGAINST THE DEBTORS ............................................................................ 2
    2.1    Administrative Expense Claims. .............................................................. 2
    2.2    Professional Compensation Claims. ........................................................ 2
    2.3    Priority Tax Claims.................................................................................. 2
    2.4    U.S. Trustee Fees..................................................................................... 3
    2.5    DIP Facility Claims................................................................................. 3
    2.6    Credit Suisse DIP Facility Claims. .......................................................... 3

III. CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN
    DEBTORS ....................................................................................................... 3
    3.1    Classification of Claims........................................................................... 3
    3.2    Classes..................................................................................................... 4
    3.3    Effect of Non-Voting; Modifications....................................................... 5

IV. TREATMENT OF CLAIMS AND INTERESTS AND DESIGNATION
    WITH RESPECT TO IMPAIRMENT ........................................................... 5
    4.1    Treatment of Classes 1(1)-(73): Other Priority Claims............................ 5
    4.2    Treatment of Classes 2(1)-(73): Other Secured Claims............................ 5
    4.3    Treatment of Classes 3(1), (2), (3), and (61)-(67): DVB Syndicate
          Claims. .................................................................................................... 5
    4.4    Treatment of Classes 4(1)-(60): BOA Syndicate Claims. ........................ 6
    4.5    Treatment of Classes 5(1), (2), (68), and (69): Credit Suisse Claims....... 6
    4.6    Treatment of Classes 6(1)-(3), and (70)-(73): AIG Claims. ..................... 7
    4.7    Treatment of Classes 7(1)-(2):  RBS Syndicate Claims. ......................... 7
    4.8    Treatment of Classes 8(1)-(73): General Unsecured Claims.................... 7
    4.9    Treatment of Classes 9(1)-(73): Intercompany Claims. ........................... 8
    4.10   Treatment of Classes 10(1)-(73): Subordinated Claims. .......................... 8
    4.11   Treatment of Classes 11(1)-(73): Interests. ............................................. 8

V. PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY
    IMPAIRED CLASSES, AND CONSEQUENCES OF NON-
    CONFIRMABILITY ....................................................................................... 9
    5.1    Voting Rights........................................................................................... 9

| | | |
|---|---|---|
| 5.2 | Acceptance Requirements. | 9 |
| 5.3 | Cram Down. | 9 |
| 5.4 | Global Enterprise/Tabulation of the Votes. | 10 |
| 5.5 | Non-Confirmability. | 10 |

**VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........... 10**

| | | |
|---|---|---|
| 6.1 | Assumption and Rejection of Contracts and Unexpired Leases. | 10 |
| 6.2 | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 11 |
| 6.3 | Cure of Defaults. | 11 |
| 6.4 | Contracts and Leases Entered into after the Petition Date. | 12 |
| 6.5 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 12 |
| 6.6 | Reservation of Rights. | 12 |

**VII. MEANS OF IMPLEMENTATION OF THE PLAN ....................... 12**

| | | |
|---|---|---|
| 7.1 | General Settlement of Claims. | 12 |
| 7.2 | Sources of Consideration for Plan Distributions. | 13 |
| 7.3 | Rule 2004 Examinations. | 14 |
| 7.4 | Continued Existence. | 14 |
| 7.5 | Revesting of Assets. | 14 |
| 7.6 | Implementation Transactions. | 14 |
| 7.7 | Cancellation of Securities and Agreements. | 15 |
| 7.8 | Reorganized Debtors. | 15 |
| 7.9 | Post Effective Date Management. | 16 |
| 7.10 | Directors and Officers of the Reorganized Debtors. | 16 |
| 7.11 | New Articles of Association and New Bylaws of the Reorganized Debtors. | 16 |
| 7.12 | Employment, Retirement, Indemnification, and Other Related Agreements. | 16 |
| 7.13 | Effectuating Documents; Further Transactions. | 17 |
| 7.14 | Entity Action. | 17 |
| 7.15 | Section 1146 Exemption. | 17 |
| 7.16 | Preservation of Causes of Action. | 18 |
| 7.17 | Nonoccurrence of Effective Date. | 18 |

**VIII. METHOD OF DISTRIBUTIONS UNDER THE PLAN AND CLAIMS RECONCILIATION ......................................................................... 18**

| | | |
|---|---|---|
| 8.1 | Distributions. | 18 |
| 8.2 | Distribution Record Date. | 19 |
| 8.3 | Cash Payments. | 19 |
| 8.4 | Delivery of Distributions. | 19 |
| 8.5 | Minimum Cash Distributions. | 19 |
| 8.6 | Withholding Taxes. | 19 |
| 8.7 | Unclaimed Property. | 19 |
| 8.8 | Disputed Claims. | 20 |
| 8.9 | Objections to Claims. | 20 |

8.10    Compromises and Settlements. ................................................................. 20
8.11    Reservation of Debtors' Rights. ............................................................... 20
8.12    No Distributions Pending Allowance. ...................................................... 20
8.13    No Postpetition Interest on Claims. .......................................................... 20
8.14    Claims Paid or Payable by Third Parties. ................................................. 21
8.15    Effect of Acceptance of Distribution. ....................................................... 21

**IX. EFFECT OF CONFIRMATION OF PLAN** ........................................................ **21**
9.1    Discharge. ................................................................................................. 21
9.2    Releases. ................................................................................................... 22
9.3    No Successor Liability. ............................................................................. 25
9.4    Release of Liens. ...................................................................................... 25
9.5    Term of Injunctions. ................................................................................. 25
9.6    Binding Effect. ......................................................................................... 25
9.7    Dissolution of the Committee. .................................................................. 26
9.8    Post-Confirmation Date Retention of Professionals. ................................ 26
9.9    Survival of Certain Indemnification Obligations. ..................................... 26

**X. EFFECTIVENESS OF THE PLAN** ...................................................................... **26**
10.1    Conditions Precedent. .............................................................................. 26
10.2    Effect of Failure of Conditions. ............................................................... 28

**XI. RETENTION OF JURISDICTION** ..................................................................... **28**
11.1    Bankruptcy Court. .................................................................................... 28

**XII. MISCELLANEOUS PROVISIONS** .................................................................... **30**
12.1    Plan Supplement. ...................................................................................... 30
12.2    Exemption for Registration Requirements. ............................................... 30
12.3    Statutory Fees. .......................................................................................... 30
12.4    Third Party Agreements. ........................................................................... 30
12.5    Amendment or Modification of Plan. ....................................................... 31
12.6    Severability. ............................................................................................. 31
12.7    Revocation or Withdrawal of Plan. ........................................................... 31
12.8    Rules Governing Conflicts Between Documents. ...................................... 32
12.9    Governing Law. ........................................................................................ 32
12.10    Notices. .................................................................................................... 32
12.11    Interest and Attorneys' Fees. .................................................................... 32
12.12    Binding Effect. ......................................................................................... 32
12.13    No Admissions. ........................................................................................ 33
12.14    Exhibits. ................................................................................................... 33

**APPENDIX A – list of affiliated debtors** .................................................................. **35**

**APPENDIX B – uniform glossary of terms** .............................................................. **38**

**APPENDIX C – list of classes** ................................................................................... **39**

## INTRODUCTION

TBS Shipping Services Inc. and the affiliated Debtors listed on Appendix A attached hereto, as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully propose the following Joint Prepackaged Plan of Reorganization pursuant to section 1121(a) of the Bankruptcy Code for the resolution of outstanding Claims against and Interests in each of the Debtors (the "***Plan***").

Reference is made to the Disclosure Statement with respect to the Plan, distributed contemporaneously herewith, for a discussion of the Debtors' history, businesses, properties, operations, and risk factors, and a summary and analysis of the Plan and certain related matters. Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors respectfully reserve the right to alter, amend, modify, revoke, or withdraw the Plan in the manner set forth herein prior to consummation of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

THIS PLAN SHOULD BE CONSIDERED ONLY IN CONJUNCTION WITH THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED HEREWITH. THE DISCLOSURE STATEMENT IS INTENDED TO PROVIDE YOU WITH THE INFORMATION THAT YOU NEED TO MAKE AN INFORMED JUDGMENT WHETHER TO ACCEPT OR REJECT THIS PLAN.

## I.
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**1.1    Definitions.**  As used in the Plan, capitalized terms not otherwise defined herein shall have the meanings specified in Appendix B.  Unless the context otherwise requires, any capitalized term used and not defined in the Plan, but that is defined in the Bankruptcy Code, shall have the meaning assigned to that term in the Bankruptcy Code.

**1.2    Rules of Construction.**  For purposes of the Plan, unless otherwise provided herein:  (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement, whether existing or contemplated, or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, all references in the Plan to the Introduction, Articles, Sections, and Exhibits are references to the Introduction, Articles, Sections, and Exhibits of or to the Plan, as the same may be amended, waived, or modified from time to time; (c) captions and headings to Articles and Sections are intended for convenience of reference only and are not intended to be part of or to affect interpretation of the Plan; (d) the words "herein," "hereof," "hereunder," "hereto," and other words of similar import refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) whenever it appears appropriate from the context, each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.3 Computation of Time.** In computing time prescribed or allowed by the Plan, unless otherwise expressly provided, Bankruptcy Rule 9006(a) shall apply.

**II.**

**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND PROFESSIONAL COMPENSATION CLAIMS AGAINST THE DEBTORS**

**2.1 Administrative Expense Claims.** Other than in respect of Professional Compensation Claims (which shall be treated pursuant to Section 2.2 hereof), on the later of (a) the Effective Date or (b) if an Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Expense Claim becomes Allowed, the Debtors shall either (i) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtors and such Holder shall have agreed upon; *provided*, *however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (i). Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (x) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (y) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the applicable Debtor (or after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Administrative Expense Claim without the need or requirement for the Holder of such Administrative Expense Claim to file a motion, application, claim, or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court.

**2.2 Professional Compensation Claims.** Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 45 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date. To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive: (a) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases, such payment to be made within the later of (i) the Effective Date or (ii) three Business Days after the order granting such Person's final fee application becomes a Final Order; or (b) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and the Reorganized Debtors (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Cases). All Professional Compensation Claims for services rendered after the Confirmation Date shall be paid by the Reorganized Debtors (or the Debtors prior to the Effective Date) upon receipt of an invoice therefor, or on such other terms as the Reorganized Debtors (or the Debtors prior to the Effective Date) and the Professional may agree, without the requirement of any order of the Bankruptcy Court.

**2.3 Priority Tax Claims.** Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release,

and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, or at the Debtors' election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code.

**2.4     U.S. Trustee Fees.**  U.S. Trustee Fees incurred prior to the Effective Date shall be paid on the Distribution Date in accordance with the applicable schedule for payment of such fees.  Until each of the Chapter 11 Cases is closed by entry of a final decree of the Bankruptcy Court, any additional U.S. Trustee Fees shall be paid by the Reorganized Debtors.

**2.5     BOA/DVB DIP Facility Claims.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims to the contrary, subject to the terms of the BOA/DVB DIP Facility, in full and final satisfaction, settlement, release, and discharge of the BOA/DVB DIP Facility Claims, on the Effective Date, the BOA/DVB DIP Facility Claims shall be repaid to the extent of Cash held by the Reorganized Debtors in excess of the minimum liquidity requirements of the BOA/DVB DIP Facility Agreement (as provided in the BOA/DVB DIP Facility Agreement), and, subject to Holders of BOA/DIP Facility Claims satisfying the New Credit Agreement Distribution Procedures, all remaining obligations of the Debtors to BOA/DVB DIP Lenders in respect of the BOA/DVB DIP Facility Claims shall be converted into obligations of New TBS Parent and the Reorganized Debtors party to the BOA/DVB Exit Facility Agreement under the BOA/DVB Exit Facility on a dollar-for-dollar basis (as provided in and subject to the terms of the BOA/DVB Exit Facility Agreement).

**2.6     Credit Suisse DIP Facility Claims.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims to the contrary, subject to the terms of the Credit Suisse DIP Facility and Holders of Credit Suisse DIP Facility Claims satisfying the New Credit Agreement Distribution Procedures, in full and final satisfaction, settlement, release, and discharge of the Credit Suisse DIP Facility Claim, on the Effective Date, the Credit Suisse DIP Facility Claims shall be converted into obligations of the New TBS Parent and the Reorganized Debtors party to Credit Suisse Exit Facility Agreement under the Credit Suisse Exit Facility on a dollar-for-dollar basis (as provided in and subject to the terms of the Credit Suisse Exit Facility Agreement).

### III.
### CLASSIFICATION OF CLAIMS AGAINST AND INTERESTS IN DEBTORS

**3.1     Classification of Claims.**  Pursuant to section 1122 of the Bankruptcy Code, set forth below in Section 3.2 is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date.  The fact that a particular Class of Claims is designated for a Debtor does not necessarily mean there are any Allowed

Claims in such Class against such Debtor. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8), respectively, of the Bankruptcy Code have not been classified and their treatment is set forth in Article II hereof. A complete list of Classes in the Chapter 11 Cases is annexed hereto on Appendix C.

**3.2 Classes.** The Claims against and Interests in the Debtors are classified as follows:

**3.2.1 Classes 1(1)-(73): Other Priority Claims**. Other Priority Claims in Classes 1(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.2 Classes 2(1)-(73): Other Secured Claims**. Other Secured Claims in Classes 2(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.3 Classes 3(1), 3(2), 3(3), and 3(61)-(67): DVB Syndicate Claims**. DVB Syndicate Claims in Classes 3(1), 3(2), 3(3) and 3(61)–(67) are Impaired and are entitled to vote on the Plan.

**3.2.4 Classes 4(1)-(60): BOA Syndicate Claims**. BOA Syndicate Claims in Classes 4(1)-(60) are Impaired and are entitled to vote on the Plan.

**3.2.5 Classes 5(1), 5(2), 5(68), and 5(69): Credit Suisse Claims**. Credit Suisse Claims in Classes 5(1), 5(2), 5(68), and 5(69) are Impaired and are entitled to vote on the Plan.

**3.2.6 Classes 6(1)-(3), and 6(70)-(73): AIG Claims**. AIG Claims in Classes 6(1)-(3), and 6(70)-(73) are Impaired and are entitled to vote on the Plan.

**3.2.7 Classes 7(1) and 7(2): RBS Syndicate Claims**. RBS Syndicate Claims in Classes 7(1) and 7(2) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.8 Classes 8(1)-(73): General Unsecured Claims**. General Unsecured Claims in Classes 8(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.9 Classes 9(1)-(73): Intercompany Claims**. Intercompany Claims in Classes 9(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.10 Classes 10(1)-(73): Subordinated Claims**. Subordinated Claims in Classes 10(1)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.11 Classes 11(1)-(73) Interests.** Interests in Classes 11(1)-(3) are Impaired, are deemed to reject the Plan and are not entitled to vote on the Plan. Intercompany Interests in

Classes 11(4)-(73) are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.3 Effect of Non-Voting; Modifications.** At the Confirmation Hearing, the Debtors will seek a ruling that if no Holder of a Claim or Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the Holders of such Claims or Interests in such Class for the purposes of section 1129(b) of the Bankruptcy Code. Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to modify the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, *provided*, such modifications are consistent with Section 12.5 below.

## IV.
## TREATMENT OF CLAIMS AND INTERESTS AND DESIGNATION WITH RESPECT TO IMPAIRMENT

**4.1 Treatment of Classes 1(1)-(73): Other Priority Claims.**

**4.1.1 Impairment and Voting**. Classes 1(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim in Classes 1(1)-(73) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.1.2 Treatment.** On the Distribution Date, each Holder of an Allowed Other Priority Claim shall receive in full satisfaction, release, and discharge of and in exchange for such Claim: (a) payment of Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment that the Debtors and such Holder shall have agreed upon in writing; *provided*, *however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (a) of this Section 4.1.2.

**4.2 Treatment of Classes 2(1)-(73): Other Secured Claims.**

**4.2.1 Impairment and Voting**. Classes 2(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Other Secured Claim in Classes 2(1)-(73) as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.2.2 Treatment.** Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Other Secured Claim in Classes 2(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired, and the applicable Reorganized Debtors shall remain liable for the Allowed Other Secured Claims.

**4.3 Treatment of Classes 3(1), 3(2), 3(3), and 3(61)-(67): DVB Syndicate Claims.**

**4.3.1 Impairment and Voting**. Classes 3(1), 3(2), 3(3), and 3(61)-(67) are Impaired by the Plan. Each Holder of an Allowed DVB Syndicate Claim in such Classes as of the Record Date is entitled to vote such Claim to accept or reject the Plan.

**4.3.2 Treatment.** Each Holder of Allowed DVB Syndicate Claims in Classes 3(1), 3(2), 3(3), and 3(61)-(67) shall, in full and final settlement of and in exchange for such Claims, receive its Pro Rata Share of (a) the New Senior Secured Cash Pay Loan Obligations; (b) the New Senior Secured PIK Loan Obligations; and (c) the New Class A Common Stock to be issued on the Effective Date (which shares of New Common Stock shall be subject to dilution pursuant to the New Management Incentive Plan). The DVB Lenders shall accept the distributions on account of the Allowed DVB Syndicate Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims in all applicable Classes arising under the Existing DVB Credit Agreement; *provided*, *however*, that as a condition precedent to its receipt of a portion of such Consideration, each Holder of Allowed DVB Syndicate Claims must first comply with the New Credit Agreement Distribution Procedures. **If a Holder of a DVB Syndicate Claim does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

**4.4    Treatment of Classes 4(1)-(60): BOA Syndicate Claims.**

**4.4.1 Impairment and Voting**. Classes 4(1)-(60) are Impaired by the Plan. Each Holder of an Allowed BOA Syndicate Claim in such Classes as of the Record Date is entitled to vote such Claim to accept or reject the Plan.

**4.4.2 Treatment.** Each Holder of Allowed BOA Syndicate Claims in Classes 4(1)-(60) shall, in full and final settlement of and in exchange for such Claims, receive its Pro Rata Share of (a) the New Senior Secured Cash Pay Loan Obligations; (b) the New Senior Secured PIK Loan Obligations; and (c) the New Class A Common Stock to be issued on the Effective Date (which shares of New Common Stock shall be subject to dilution pursuant to the New Management Incentive Plan). The BOA Lenders shall accept the distributions on account of the Allowed BOA Syndicate Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims in all applicable Classes arising under the Existing BOA Credit Agreement; *provided*, *however*, that as a condition precedent to its receipt of a portion of such Consideration, each Holder of Allowed BOA Syndicate Claims must first comply with the New Credit Agreement Distribution Procedures. **If a Holder of a BOA Syndicate Claim does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

**4.5    Treatment of Classes 5(1), 5(2), 5(68), and 5(69): Credit Suisse Claims.**

**4.5.1 Impairment and Voting**. Classes 5(1), 5(2), 5(68), and 5(69) are Impaired by the Plan. The Holder of Allowed Credit Suisse Claims in such Classes as of the Record Date is entitled to vote to accept or reject the Plan.

**4.5.2 Treatment.** The Holder of Allowed Credit Suisse Claims in Classes 5(1), 5(2), 5(68), and 5(69) shall, in full and final settlement of and in exchange for such Claims, receive the Credit Suisse Consideration; *provided*, *however*, that as a condition precedent to its receipt of such Consideration, the Holder of Allowed Credit Suisse Claims must first comply

with the New Credit Agreement Distribution Procedures. **If the Holder of Credit Suisse Claims does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

**4.6    Treatment of Classes 6(1)-(3), and 6(70)-(73): AIG Claims.**

**4.6.1    Impairment and Voting.** Classes 6(1)-(3), and 6(70)-(73) are Impaired by the Plan. The Holder of Allowed AIG Claims in such Classes as of the Record Date is entitled to vote to accept or reject the Plan.

**4.6.2    Treatment.** The Holder of Allowed AIG Claims in Classes 6(1)-(3), and 6(70)-(73) shall, in full and final settlement of and in exchange for such Claims, receive the AIG Consideration; *provided*, *however*, that as a condition precedent to its receipt of such Consideration, the Holder of Allowed AIG Claims must first comply with the New Credit Agreement Distribution Procedures. **If the Holder of AIG Claims does not opt out of the release provisions of Section 9.2.3, such Holder shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Claims and Causes of Action against the Released Parties as provided therein.**

**4.7    Treatment of Classes 7(1)-(2):  RBS Syndicate Claims.**

**4.7.1    Impairment and Voting.** Classes 7(1) and 7(2) are Unimpaired by the Plan. Each Holder of an Allowed RBS Syndicate Claim in such Classes as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.7.2    Treatment.** The Debtors intend to file the RBS Settlement Agreement Assumption Motion after the Petition Date and seek the Bankruptcy Court's approval of that Motion at or prior to the Confirmation Hearing. As a result of the RBS Settlement Agreement, prior to the Petition Date, the Debtors and their non-Debtor Affiliates have returned the vessels listed in the RBS Settlement Agreement that were Collateral under the RBS Credit Agreement and, in exchange, have been released from the RBS Syndicate Claims. If the RBS Settlement Agreement Assumption Motion is approved by the Bankruptcy Court, the Debtors and RBS will be obligated to perform the RBS Settlement Obligations, and any RBS claims against the Debtors with respect thereto will be Unimpaired. Accordingly, Holders of RBS Syndicate Claims in Classes 7(a) and (b) shall be deemed Unimpaired hereunder.

**4.8    Treatment of Classes 8(1)-(73): General Unsecured Claims.**

**4.8.1    Impairment and Voting.** Classes 8(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed General Unsecured Claim in such Classes is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.8.2    Treatment.** Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or has been paid prior to the Effective

Date, each Allowed General Unsecured Claim in Classes 8(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired and the applicable Reorganized Debtors shall remain liable for the Allowed General Unsecured Claim.  Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the applicable Debtor (or, after the Effective Date, by the applicable Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General Unsecured Claim.  The Debtors reserve their rights to dispute in the Bankruptcy Court or any other court with jurisdiction the validity of any General Unsecured Claim at any time prior to the Claims Objection Bar Date.

### 4.9    Treatment of Classes 9(1)-(73): Intercompany Claims.

**4.9.1   Impairment and Voting**.  Classes 9(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Intercompany Claim in Classes 9(1)-(73) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.9.2   Treatment.**   Except to the extent that a Holder of an Allowed Intercompany Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Intercompany Claim in Classes 9(1)-(73) shall be reinstated, paid in full, or otherwise rendered Unimpaired, and the applicable Reorganized Debtors shall remain liable for the Allowed Intercompany Claim.

### 4.10   Treatment of Classes 10(1)-(73): Subordinated Claims.

**4.10.1  Impairment and Voting**.  Classes 10(1)-(73) are Unimpaired by the Plan. Each Holder of an Allowed Subordinated Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.10.2  Treatment.**   Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment or has been paid prior to the Effective Date, each Allowed Subordinated Claim in Classes 10(1)-(73) shall be reinstated, paid in full or otherwise rendered Unimpaired, and the applicable Reorganized Debtors shall remain liable for the Allowed Subordinated Claim.

### 4.11   Treatment of Classes 11(1)-(73): Interests.

**4.11.1  Impairment and Voting**.  Class 11(1) is Impaired by the Plan.  Each Holder of an Allowed Interest in Class 11(1) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.  Class 11(2) is Impaired by the Plan.  Each Holder of an Allowed Interest in Class 11(2) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.  Class 11(3) is Impaired by the Plan.  Each Holder of an Allowed Interest in Class 11(3) is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.  Classes 11(4)-(73) are Unimpaired by the Plan.  Each Holder of an Interest in Classes 11(4)-(73) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**4.11.2 Treatment of TBS Parent Interests**.  Under the Plan, TBS Parent  shall be dissolved and its Interests shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The Holders of TBS Parent Interests shall not receive or retain any property under the Plan on account of such Interests.

**4.11.3 Treatment of TBS International Interests**.  Under the Plan, TBS International shall be dissolved and its Interests shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The Holders of TBS International Interests shall not receive or retain any property under the Plan on account of such Interests.

**4.11.4 Treatment of TBS Holdings Limited Interests**.  Under the Plan, Interests in TBS Holdings Limited previously held by TBS International shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The Holders of Interests in TBS Holdings Limited shall not retain or receive any property under the Plan on account of such Interests.

**4.11.5 Treatment of Other Interests**.  Interests in Classes 11(4)-(73) shall be reinstated.

# V.
# PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASSES, AND CONSEQUENCES OF NON-CONFIRMABILITY

**5.1     Voting Rights.**  Each Holder of an Allowed Claim as of the Voting Deadline in an Impaired Class of Claims or Interests that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim as of the Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the Ballot Instructions.  Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Scheduling Motion.  The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described in the Disclosure Statement.

**5.2     Acceptance Requirements.**  An Impaired Class of Claims shall have accepted the Plan if votes in favor of the Plan have been cast by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

**5.3     Cram Down.**  If all applicable requirements for Confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of subsection 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan.  If the Debtors determine that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code without eliminating the distribution to a junior Class or Classes, the Plan may, at the option of the Debtors and without the need for further action or solicitation of any kind, be modified to eliminate such distribution, the Class or Classes as to which

distributions are eliminated shall be deemed to be a rejecting Class or Classes, and the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan, as so modified, in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan.

**5.4  Global Enterprise/Tabulation of the Votes.**  The Debtors operate as a single, integrated worldwide enterprise.  Accordingly, the Plan constitutes a global resolution of all of the Claims against the Debtors.  In some instances, more than one of the Debtors is obligated, either as a borrower or guarantor, for a particular Claim.  In such cases, the applicable Creditor shall only be entitled to one vote to accept or reject the Plan, and such vote shall apply to all Debtors that are liable on such Claim.  If no Impaired Classes vote to accept the Plan, the Debtors reserve the right to modify the Plan.

**5.5  Non-Confirmability.**  If the Plan has not been accepted by the Classes of Claims entitled to vote with respect thereto in accordance with Section 5.2 hereof, and the Debtors determine that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of the Plan, the Debtors may seek to (a) propose a new plan or plans of reorganization for the Debtors, (b) amend the current Plan incorporated therein to satisfy any and all objections, (c) withdraw the Plan or (d) convert or dismiss the Chapter 11 Cases.

## VI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1  Assumption and Rejection of Contracts and Unexpired Leases.**  Except as otherwise provided herein or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Person, including, but not limited to, all Intercompany Contracts, shall be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date, except for any such contract or lease (a) that has been assumed, rejected, or renegotiated and either assumed or rejected on such renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) that is the subject of a motion to reject, or a motion to approve on renegotiated terms and to assume on such renegotiated terms, that has been filed and served prior to the Effective Date, or (c) that is identified on the Rejected Executory Contract and Unexpired Lease List or in this Plan.  Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases provided for herein.  As described in Section 4.7 hereof, the Debtors intend to file the RBS Settlement Agreement Assumption Motion on or after the Petition Date and seek the Bankruptcy Court's approval of that Motion at or prior to the Confirmation Hearing.  If approved, in addition to the Executory Contracts and Unexpired Leases to be assumed pursuant to this Section 6.1, the RBS Settlement Agreement shall be an assumed contract after the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to this Section 6.1 or by any order of the Bankruptcy Court, including, without limitation, the RBS Settlement Agreement, that has not been assigned to a third party prior to the Confirmation Date shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any

order of the Bankruptcy Court authorizing and providing for its assumption under section 365 of the Bankruptcy Code.

       **6.2**    **DVB Bareboat Charters.**  On the Effective Date, Beekman Shipping Corp. and Fairfax Shipping Corp. shall assume each of the DVB Bareboat Charters as modified by the Amended DVB Bareboat Charters. The assumption of the DVB Bareboat Charters (as modified by the Amended DVB Bareboat Charters) shall constitute a full and complete settlement of all claims of all parties arising under the DVB Bareboat Charters and any and all agreements executed or delivered in connection therewith and provide for a mutual release between the counterparties to the DVB Bareboat Charters.

       **6.3**    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**  A Proof of Claim with respect to a Claim arising from the rejection of an Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of the order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 4.8 of the Plan or, if determined to be Subordinated Claims, in accordance with Section 4.10 of the Plan.

       **6.4**    **Cure of Defaults.**  Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the Cure Claim, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 10 days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed Cure Claims to be sent to applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed and served in accordance with, and otherwise comply with, the provisions of the Scheduling Order related to assumption of Executory Contracts and Unexpired Leases. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.

       Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**6.5    Contracts and Leases Entered into after the Petition Date.** Contracts and leases entered into during the Postpetition Period by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**6.6    Modifications, Amendments, Supplements, Restatements, or Other Agreements.** Unless otherwise provided in the Plan or in the order assuming an Executory Contract or Unexpired Lease, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to any prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Postpetition Period shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**6.7    Reservation of Rights.** Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order to resolve and to alter their treatment of such contract or lease.

## VII.
## MEANS OF IMPLEMENTATION OF THE PLAN

**7.1    General Settlement of Claims.** As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies

resolved pursuant to the Plan. Subject to Article VIII hereof, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**7.2** **Sources of Consideration for Plan Distributions.**

    **7.2.1** **Debtors' Available Cash**. Cash will be available from the Debtors' operations, the proceeds of the BOA/DVB DIP Facility and the proceeds of the Credit Suisse DIP Facility. BOA/DVB DIP Facility Claims shall not be paid in Cash under the Plan; rather, pursuant to Section 2.5 hereof, such Claims shall be satisfied by a dollar-for dollar replacement of the DIP Facility with the BOA/DVB Exit Facility. Credit Suisse DIP Facility Claims shall not be paid in Cash under the Plan; rather, pursuant to Section 2.6 hereof, such Claims shall be satisfied by a dollar-for dollar replacement of the Credit Suisse DIP Facility with the Credit Suisse Exit Facility.

    **7.2.2** **The New Credit Agreements**. On the Effective Date, New TBS Parent and the applicable Reorganized AIG and Credit Suisse Debtors, as applicable, shall enter into the New Credit Agreements. Confirmation of the Plan shall be deemed approval of the New Credit Agreements (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the applicable Reorganized Debtors in connection therewith) and authorization and direction for the applicable Reorganized Debtors to enter into and execute the New Credit Agreements, subject to such modifications as they may deem to be reasonably necessary to consummate such New Credit Agreements.

    **7.2.3** **The BOA/DVB Exit Facility**. On the Effective Date, the BOA/DVB Exit Facility Obligors shall enter into the BOA/DVB Exit Facility Agreement with the BOA/DVB Exit Facility Agent and the other lenders thereto. Confirmation of the Plan shall be deemed approval of the BOA/DVB Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the BOA/DVB Exit Facility Obligors in connection therewith) and authorization and direction for the BOA/DVB Exit Facility Obligors to enter into and execute the BOA/DVB Exit Facility Agreement, subject to such modifications as they may deem to be reasonably necessary to consummate their entry into the BOA/DVB Exit Facility.

    **7.2.4** **The Credit Suisse Exit Facility**. On the Effective Date, to the extent there are remaining obligations under the Credit Suisse DIP Facility, the Credit Suisse Exit Facility Obligors shall enter into the Credit Suisse Exit Facility Agreement with the Credit Suisse Exit Facility Agent and the other lenders thereto. Confirmation of the Plan shall be deemed approval of the Credit Suisse Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Credit Suisse Exit Facility Obligors in connection therewith) and authorization for the Credit Suisse Exit Facility Obligors to enter into and execute the Credit Suisse Exit Facility Agreement, subject to such modifications as they may deem to be reasonably necessary to consummate their entry into the Credit Suisse Exit Facility.

    **7.2.5** **The New Senior Secured Loan Facility**. On the Effective Date, the BOA/DVB Exit Facility Obligors shall enter into the New Senior Secured Loan Facility. Confirmation shall be deemed approval of such facilities (including the transactions

contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the BOA/DVB Exit Facility Obligors in connection therewith) and authorization and direction for the BOA/DVB Exit Facility Obligors to enter into and execute all instruments, documents and agreements in connection therewith, subject to such modification as may be necessary to consummate their entry into the New Senior Secured Loan Facility.

          **7.2.6   Use of Proceeds**. Cash available on the Effective Date, after giving effect to any repayment of the BOA/DVB DIP Facility by the BOA/DVB DIP Facility Obligors required under the terms and conditions of the BOA/DVB DIP Facility, shall be used by the Reorganized Debtors (a) to fund the Debtors' exit from the Chapter 11 Cases, including, without limitation, the funding of (i) Allowed Administrative Expense Claims, (ii) Allowed Professional Compensation Claims, (iii) Allowed Priority Tax Claims, (iv) Allowed Other Priority Claims, and (v) Distributions to be made on the Distribution Date; and (b) to fund ongoing operating expenses of the Reorganized Debtors.

     **7.3   Rule 2004 Examinations.** The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 shall be expressly preserved following the Effective Date.

     **7.4   Continued Existence.** Except as provided herein and in the Implementation Memorandum, each Debtor will continue to exist on or after the Effective Date as a separate corporate or other applicable entity, with all the rights and powers applicable to such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under applicable law.

     **7.5   Re-vesting of Assets.** Except as expressly provided herein, the Assets of each Debtor's Estate shall re-vest with the respective Reorganized Debtor on the Effective Date. The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan. From and after the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, except as provided herein. As of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, except as, and to the extent, provided in the Plan.

     **7.6   Implementation Transactions.** In connection with implementation of the Plan, New TBS Parent and the Debtors (or, after the Effective Date, the Reorganized Debtors) (a) shall effectuate the Plan through the transactions described in the Implementation Memorandum, (b) may merge, amalgamate, dissolve, transfer assets, or otherwise consolidate any of the Debtors in furtherance of the Plan and (c) may engage in any other transaction in furtherance of the Plan.

     On the Effective Date, all of the assets of TBS Parent and TBS International (other than funds estimated by the Debtors as being reasonably necessary to pay all Allowed Class 8 General Unsecured Claims against such entities and to effectuate the dissolution of such entities under Irish and Bermuda law, as set forth in the Implementation Memorandum) shall be transferred to New TBS Parent as part of the consideration to Holders of BOA Syndicate Claims and DVB Syndicate Claims. After the Effective Date, TBS Parent and TBS International each shall be dissolved under Irish and Bermuda law, respectively. The Implementation Memorandum shall address the specifics and mechanics of such transfer and dissolution. Any unpaid remaining

allowed Class 8 General Unsecured Claims held against such entities shall be paid in full as provided hereunder. Certain Class 3, Class 4, Class 5 and/or Class 6 Claims against TBS Parent may survive the Effective Date solely for the purpose of aiding any consensual dissolution of TBS Parent and TBS International. The extent of such limited survival will be set forth in the Implementation Memorandum.

On the Effective Date, New TBS Parent (i) shall reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) to satisfy the required distributions of stock under the New Management Incentive Plan. The New Common Stock issued under the Plan shall be subject to dilution based upon (i) such shares of the New Common Stock as may be issued pursuant to the New Management Incentive Plan and (ii) any other shares of New Common Stock issued post-emergence.

**7.7    Cancellation of Securities and Agreements.**  On the Effective Date, the Plan shall be consummated in accordance with the provisions set forth herein and, upon the effectiveness of such transactions: (a) the Claims against the Debtors under the Prepetition Credit Agreements, or under any other Certificate, Interest, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are reinstated or, in the case of the Prepetition Credit Agreements, except as such Prepetition Credit Agreements are amended and restated pursuant to the New Credit Agreements or the New Senior Secured Loan Agreement, pursuant to the Plan), shall be cancelled, and the Reorganized Debtors shall not have any continuing obligations therefor; and (b) the Claims against and Interests in the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, formation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of or ownership interest in the Debtors that are specifically reinstated or, in the case of the Prepetition Credit Agreements, except as such Prepetition Credit Agreements are amended and restated pursuant to the New Credit Agreements or the New Senior Secured Loan Agreement pursuant to the Plan) shall be released and discharged; *provided, however*, that notwithstanding Confirmation or consummation, the Prepetition Credit Agreements and any other similar agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing such Holder to receive Distributions under and in accordance with the Plan.

**7.8    Reorganized Debtors; New TBS Parent.**  On the Effective Date, the New Boards of New TBS Parent and each Reorganized Debtor shall be appointed, and each shall adopt its New Articles of Association and/or New Bylaws (as applicable). New TBS Parent and the Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other action necessary and desirable to consummate the Plan. The Corporate Governance Documents will be substantially in the form filed in the Plan Supplement.

**7.9    Post Effective Date Management.**  Pursuant to the provisions of the Corporate Governance Documents and New TBS Parent's and the Reorganized Debtors' operative constituent documents, which may be amended from time to time, the operation, management, and control of New TBS Parent and the Reorganized Debtors shall be the responsibility of their respective boards of directors and senior officers (as provided under applicable law).  Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

**7.10    Directors and Officers of New TBS Parent and the Reorganized Debtors.**  On and after the Effective Date, the business and affairs of New TBS Parent and the Reorganized Debtors will be managed by the New Boards and the officers, directors, managers or other responsible persons identified in the Plan Supplement.  Biographical information regarding these proposed officers, directors, managers and other responsible persons will be set forth in the Plan Supplement.  A schedule of the annual compensation to be paid to persons serving as executives, officers, directors, managers or responsible persons as of the Effective Date will be set forth in the Plan Supplement.  On the Effective Date, New TBS Parent and the Reorganized Debtors will enter into the New Employment Agreements with four members of the Debtors' senior management—Joseph Royce, Gregg McNelis, Lawrence Blatte, and Fred Lepere.

**7.11    New Articles of Association and New Bylaws of the Reorganized Debtors.**  The New Bylaws and New Articles of Association (as applicable), among other things, shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, New TBS Parent and the Reorganized Debtors may amend and restate their New Bylaws and/or New Articles of Association (as applicable), as permitted under applicable laws, subject to the terms and conditions of such documents.

**7.12    Employment, Retirement, Indemnification, and Other Related Agreements.**  On the Effective Date, to the extent permitted by applicable law, the New Boards of New TBS Parent and the Reorganized Debtors shall, automatically and without further action on the part of the New Boards of New TBS Parent or the Reorganized Debtors, be authorized and directed to take any and all actions necessary and appropriate to perform under any employment agreements assumed by the Debtors, as provided herein.  The New Management Incentive Plan and the definitive documents evidencing same, shall be approved in the Confirmation Order and shall be approved by the New Boards and the holders of the New Common Stock immediately after the Effective Date in accordance with applicable law.  The New Employment Agreements shall become effective on the Effective Date, shall be approved in the Confirmation Order, and shall be approved by the New Boards and the holders of the New Common Stock immediately after the Effective Date in accordance with applicable law.  On and after the Effective Date, except as set forth above, New TBS Parent and the Reorganized Debtors shall have the authority, as determined by the New Boards, to: (a) maintain, amend, or revise existing employment, retirement, welfare, incentive, severance, indemnification, and other agreements with their active and retired directors or managers, officers, and employees, subject to the terms and conditions of any such agreement, and to continue to maintain and provide benefits, including all post-employment benefits, in connection therewith; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification, and other agreements for active and retired employees; *provided that*, as noted in Section 7.10, on the Effective Date, New TBS Parent and the Reorganized Debtors will enter into the New Employment Agreements with four members of

the Debtors' senior management.  The New Employment Agreements will be for a term of three years and will provide that the employees shall be compensated in an amount that is at least equal to their current base salaries.

**7.13    Effectuating Documents; Further Transactions.**  On and after the Effective Date, New TBS Parent, the Reorganized Debtors, and the officers and members of the New Boards, are authorized to and may, in the name of and on behalf of New TBS Parent and/or the applicable Reorganized Debtors, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**7.14    Entity Action.**  Upon the Effective Date, to the extent permitted by applicable law all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to:  (a) the selection of the directors and officers for New TBS Parent and the Reorganized Debtors; (b) the execution of and entry into the New Credit Agreements, the BOA/DVB Exit Facility Agreement, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility and related transaction security agreements and any other ancillary agreements relating to the foregoing, and the New Management Incentive Plan; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) and/or the Implementation Memorandum.  All matters provided for in the Plan involving the entity structure of the Debtors, the Reorganized Debtors, or New TBS Parent and any entity action required by the Debtors, the Reorganized Debtors, or New TBS Parent in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or New TBS Parent.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or New TBS Parent, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors and New TBS Parent, including the New Credit Agreements, the BOA/DVB Exit Facility Agreement, the Credit Suisse Exit Facility, the New Senior Secured Loan Facility, and any and all other agreements, documents, securities, and instruments relating to any of the foregoing.  The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under any non-bankruptcy law.

**7.15    Section 1146 Exemption.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**7.16** **Preservation of Causes of Action.** Unless expressly released or waived pursuant to Article IX of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**7.17** **Nonoccurrence of Effective Date.** In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## VIII.
## METHOD OF DISTRIBUTIONS UNDER THE PLAN AND CLAIMS RECONCILIATION

**8.1** **Distributions.** The Disbursing Agent shall make or cause to be made the Distributions required under the Plan to all Holders of Allowed Claims. No distribution shall be made to any Holder until such Holder satisfies any applicable distribution condition.

18

     **8.2     Distribution Record Date.**  For purposes of the Plan, as of 5:00 p.m. prevailing U.S. Eastern Time on the Distribution Record Date, the records of ownership of Claims against the Debtors (including the claims register in the Chapter 11 Cases) will be closed.  For purposes of the Plan, the Debtors, the Estates, the Reorganized Debtors, and the Disbursing Agent shall have no obligation to recognize the transfer of any of the Claims against the Debtors occurring after the Distribution Record Date, and shall be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

     **8.3     Cash Payments.**  Any Cash payments made pursuant to the Plan shall be made in U.S. dollars or, with respect to Holders of Allowed General Unsecured Claims, any currency (including U.S. dollars), as determined by the Disbursing Agent in its sole discretion.  Cash payments made pursuant to the Plan in the form of a check shall be null and void if not cashed within 180 days of the date of issuance thereof.

     **8.4     Delivery of Distributions.**  If the Distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of such Holder.  Undeliverable Distributions shall be held by the Disbursing Agent subject to Section 8.7 hereof.

     **8.5     Minimum Cash Distributions.**  Except with respect to Distributions on account of Allowed General Unsecured Claims, no Cash payment less than 25 dollars shall be made to any Holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

     **8.6     Withholding Taxes.**

     **8.6.1.**  The Disbursing Agent shall comply with all withholding, reporting, certification, and information requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification, and information requirements.

     **8.6.2.**  Persons entitled to receive Distributions hereunder shall, as a condition to receiving such Distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

     **8.6.3.**  Any Person that does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the Ballots) to obtain such information, may be deemed to have forfeited such Person's right to such Distributions, which shall be treated as unclaimed property under Section 8.7.

     **8.7     Unclaimed Property.**  Any Person that fails to claim any Distribution to be distributed hereunder (including, but not limited to, by failure to comply with the Distribution Procedures applicable to the relevant Distribution) by the Forfeiture Date will forfeit all rights to any Distributions hereunder, and shall have no claim whatsoever with respect thereto against

New TBS Parent, the Debtors or their Estates, the Reorganized Debtors, or any Holder of an Allowed Claim to which Distributions are made. Upon the forfeiture of Cash, such Cash shall be the property of the Debtors or the Reorganized Debtors, as applicable; upon the forfeiture of the right to Distributions of any debt issued under any of the New Credit Agreements, the BOA/DVB Exit Facility Agreement, the Credit Suisse Exit Facility Agreement, or the New Senior Secured Loan Facility, such Distributions shall be cancelled. Nothing herein shall require further efforts by any Person to attempt to locate or notify any other Person with respect to any forfeited property.

**8.8    Disputed Claims.**  If the Debtors, the Reorganized Debtors, or any other party in interest disputes any Claim against the Debtors, such dispute shall be (a) adjudicated in the Bankruptcy Court or in any other court having jurisdiction over such dispute, or (b) settled or compromised without any further notice to or action, order, or approval by the Bankruptcy Court, as the case may be, under applicable law. Among other things, the Debtors (on or before the Effective Date), or the Reorganized Debtors (after the Effective Date) may each elect, at their respective sole option, to object to or seek estimation under section 502 of the Bankruptcy Code with respect to any Proof of Claim filed by or on behalf of a Holder of a Claim against the Debtors.

**8.9    Objections to Claims.**  Unless a later or different time is set by Final Order or otherwise established by other provisions of the Plan, all objections to Claims must be filed by the Claims Objection Bar Date; *provided*, *however*, that no such objection may be filed with respect to any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim. The failure by any party in interest, including the Debtors and the Committee to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's rights to object to, or re-examine, any such Claim in whole or in part. After the Effective Date, no party in interest shall have the right to object to Claims against the Debtors or their Estates other than the Reorganized Debtors.

**8.10    Compromises and Settlements.**  From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtors may compromise and settle all Claims and Causes of Action, without any further approval of the Bankruptcy Court.

**8.11    Reservation of Debtors' Rights.**  Prior to the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or other claims they may have against other Persons.

**8.12    No Distributions Pending Allowance.**  If a Claim or any portion of a Claim is Disputed, no payment or Distribution will be made on account of the Disputed portion of such Claim (or the entire Claim, if the entire Claim is Disputed), unless such Disputed claim or portion thereof becomes an Allowed Claim.

**8.13    No Postpetition Interest on Claims.**  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

    **8.14    Claims Paid or Payable by Third Parties.**  The Disbursing Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Disbursing Agent.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the Distribution to the Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.  The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

    **8.15    Effect of Acceptance of Distribution.**  Acceptance of any Distribution or other property under the Plan will constitute the recipient's acknowledgement and agreement that all Claims, demands, liabilities, other debts against, or Interests in, the Debtors (other than those created by the Plan) have been discharged and enjoined in accordance with Article IX of the Plan.

**IX.**
**EFFECT OF CONFIRMATION OF PLAN**

    **9.1    Discharge.**

        **9.1.1    Discharge of Claims Against the Debtors and the Reorganized Debtors**.  Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (a) discharge the Debtors, the Reorganized Debtors or any of their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including without limitation all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based on such debt has accepted the Plan; and (b) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code.  The discharge provided in this provision shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

        **9.1.2    Injunction Related to the Discharge**.  Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors, or any Interest in any or all of the Debtors, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to

21

take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a Distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, the Reorganized Debtors, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (e) transferring or purporting to transfer, in whole or in part or any interest in, or asserting in any case, proceeding, or court in any jurisdiction, any Claim under any Prepetition Credit Agreement; and (f) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Such injunction shall extend to any successor of the Debtors, the Reorganized Debtors, and any of their Assets. Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

  **9.2**  **Releases.**

    **9.2.1**  **Releases by the Debtors**. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors in their individual capacity and as debtors in possession will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time on or prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

      **9.2.2   Certain Waivers.**  Although the Debtors do not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, each Debtor hereby understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtors.  Section 1542 of the California Civil Code provides:

      **§1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

**EACH DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND EACH DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.  TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, EACH DEBTOR WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

      **9.2.3   Releases by Holders of Claims and Interests**.  **For good and valuable consideration, on and after the Effective Date, Holders of Claims that (a) vote to accept or reject the Plan and (b) do not elect (as permitted on the Ballots) to opt out of the releases contained in this paragraph, shall be deemed to have released and forever waived and discharged all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other**

occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations (except Cure Claims that have not been filed timely) of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

        **9.2.4   Exculpation.  On and after the Effective Date**, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Cases or in connection with the preparation and filing of the Chapter 11 Cases, the formulation, negotiation, solicitation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  No provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action, or liabilities that the Debtors, the Estates, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Cases.

        **9.2.5   Injunction Related to Releases and Exculpation**.  To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released, waived, or exculpated pursuant to Sections 9.2.1, 9.2.2, 9.2.3, and 9.2.4 are permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities:  (a) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without

limitation any such actions arising from or related to the Prepetition Credit Agreements; (c) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such Lien or encumbrance arising from or related to the Prepetition Credit Agreements; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (e) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets.  Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

**9.3    No Successor Liability.**  Except as otherwise expressly provided herein, none of the Released Parties or the Exculpated Parties shall be determined to be successors to any of the Debtors or to any Person for which the Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character.  The Released Parties and Exculpated Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan.

**9.4    Release of Liens.**  Except as otherwise expressly provided in the Plan, the Confirmation Order will release any and all prepetition Liens against the Debtors, the Reorganized Debtors, and any of their Assets.

**9.5    Term of Injunctions.**  All injunctions or stays provided in, or in connection with, the Chapter 11 Cases, whether pursuant to section 105, section 362, or any other provision of the Bankruptcy Code, other applicable law or court order, in effect immediately prior to Confirmation will remain in full force and effect until the Effective Date and shall remain in full force and effect thereafter if so provided in the Plan, the Confirmation Order, or by their own terms.  In addition, the Confirmation Order shall incorporate various release, injunction, discharge, and exculpation provisions Plan that shall be in effect after the Effective Date and, on and after Confirmation Date, the Debtors may seek further orders to preserve the status quo during the time between the Confirmation Date and the Effective Date or to enforce the provisions of the Plan.

**9.6    Binding Effect.**  The Plan shall be binding upon, and inure to the benefit of, the Debtors and all Holders of Claims and Interests, and their respective successors and assigns, whether or not the Claims and Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

     **9.7**    **Dissolution of the Committee.**  The Committee shall be dissolved on the Effective Date and shall not continue to exist thereafter except for the limited purposes of filing any remaining fee applications, and the Professionals retained by the Committee shall be entitled to compensation for services performed and reimbursement of expenses incurred in connection therewith.  Upon dissolution of the Committee, the members of the Committee shall be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases.

     **9.8**    **Post-Confirmation Date Retention of Professionals.**  After the Confirmation Date, any requirement that Professionals employed by the Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

     **9.9**    **Survival of Certain Indemnification Obligations.**  Subject to Section 7.6 of the Plan, the obligations of the Debtors, pursuant to the Debtors' operating agreements, certificates of incorporation or formation, articles of association, by-laws, memoranda of association, or equivalent corporate governance documents, applicable statutes, or employment agreements, to indemnify individuals who prior to the Effective Date served as their respective directors, officers, managers, agents, employees, representatives, and Professionals, in respect of all present and future actions, suits, and proceedings against any of such officers, directors, managers, agents, employees, representatives, and Professionals, based upon any act or omission related to service with, for, or on behalf of the Debtors on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the reorganization contemplated by the Plan and shall be performed and honored by the Reorganized Debtors regardless of such confirmation, consummation, and reorganization.

## X.
## EFFECTIVENESS OF THE PLAN

     **10.1**    **Conditions Precedent.**  The Plan shall not become effective unless and until the following conditions have been satisfied or waived:

     **10.1.1  Conditions to Confirmation**.

          10.1.1.1    *Plan Supplement.*  All documents to be provided in the Plan Supplement are in a form that is reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

          10.1.1.2    *Confirmation Order.*  The Confirmation Order must be entered by the Bankruptcy Court in a form reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

     **10.1.2  Conditions to Effective Date**.

10.1.2.1     *Confirmation Order.*   The Bankruptcy Court shall have entered the Confirmation Order in a form reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

10.1.2.2     *No Stay of Confirmation.*   There shall not be in force any order, decree, or ruling of any court or governmental body having jurisdiction, restraining, enjoining, or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

10.1.2.3     *Receipt of Required Authorization.*   All authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

10.1.2.4     *New Loan Documentation.*   The documents evidencing the New Credit Agreements, the New Senior Secured Loan Agreement, the BOA/DVB Exit Facility, and the Credit Suisse Exit Facility shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

10.1.2.5     *Employment Agreements.*   The Employment Agreements and all exhibits and annexes thereto shall be in form acceptable to the Supporting Prepetition Lenders and shall be executed by the non-Debtor counterparties thereto.

10.1.2.6     *2012 Operating Budget.*   The 2012 Operating Budget shall be in form and substance satisfactory to the Supporting Prepetition Lenders.

10.1.2.7     *The New Management Incentive Plan.*   The New Management Incentive Plan shall be in form and substance satisfactory to the Supporting Prepetition Lenders.

10.1.2.8     *Organizational Documents.*   *The New Articles of Association, New Bylaws and* New TBS Parent Shareholder Agreement shall each be in form and substance satisfactory to the Supporting Prepetition Lenders.

10.1.2.9     *TBS Commercial.*   The TBS Commercial Management Agreements and TBS Commercial/Beacon Holdings Option Agreement shall each be in form and substance satisfactory to the Supporting Prepetition Lenders and shall be executed by the respective parties thereto, and all conditions precedent to the effectiveness of such documents shall have been satisfied or waived.

10.1.2.10     *Implementation Transactions.*   The transactions described in the Implementation Memorandum that are required to be completed on or before the Effective Date have been completed in a manner reasonably acceptable in all material respects to the Debtors and the respective Agents for the Supporting Prepetition Lenders.

10.1.2.11     *Assumption.*  The Bankruptcy Court shall have entered orders approving the RBS Settlement Agreement Motion and the Plan Support Agreement.

**10.1.3 Waiver.**  Any of the conditions set forth in Sections 10.1.1 and 10.1.2 hereof may be waived by the Debtors with the consent of the respective Agents for the Supporting Prepetition Lenders, which consent shall not be unreasonably withheld.

**10.2     Effect of Failure of Conditions.**  In the event that the conditions specified in Section 10.1 have not been satisfied or waived in accordance with Section 10.1.3 hereof on or before 120 days after the Confirmation Date, then, the Debtors may seek an order from the Bankruptcy Court vacating the Confirmation Order.  Such request shall be served upon counsel for the respective Agents for the Supporting Prepetition Lenders, the Committee, the DIP Agents, and the U.S. Trustee.  If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects, (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court, and (c) the time within which the Debtors may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 60 days after the date the Confirmation Order is vacated.

# XI.
# RETENTION OF JURISDICTION

**11.1     Bankruptcy Court.**  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

**11.1.1.**  allow, disallow, determine, liquidate, classify, estimate, or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

**11.1.2.**  hear and rule upon all Causes of Action retained by the Debtors and commenced and/or pursued by the Debtors or the Reorganized Debtors;

**11.1.3.**  resolve any matters related to (a) the rejection, assumption, or assumption and assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, and (c) any dispute regarding whether a contract or lease is or was executory or expired;

**11.1.4.**  ensure that Distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

**11.1.5.**    decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

**11.1.6.**    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

**11.1.7.**    enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

**11.1.8.**    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

**11.1.9.**    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

**11.1.10.**    approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

**11.1.11.**    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtors, or the Reorganized Debtors, as applicable, only upon allowance thereof pursuant to the order of the Bankruptcy Court; *provided*, *however*, that the fees and expenses of the Debtors incurred after the Confirmation Date, including attorneys' fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

**11.1.12.**    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation of the Plan, implementation, or enforcement of the Plan or the Confirmation Order;

**11.1.13.**    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**11.1.14.** enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if Distributions pursuant to the Plan are enjoined or stayed;

**11.1.15.** determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

**11.1.16.** enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

**11.1.17.** hear and determine all matters related to (a) the property of the Debtors and the Estates from and after the Confirmation Date and (b) the all disputes regarding the existence, nature or scope of the Debtors' discharge;

**11.1.18.** enter an order or final decree concluding or closing the Chapter 11 Cases; and

**11.1.19.** hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

# XII.
# MISCELLANEOUS PROVISIONS

**12.1     Plan Supplement.**  No later than 10 days prior to the Confirmation Hearing, the Debtors shall File with the Bankruptcy Court the Plan Supplement, which shall contain the documents identified herein and such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Balloting and Claims Agent.

**12.2     Exemption From Registration Requirements.**  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and Distribution of any securities contemplated by the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  In addition, any securities contemplated by the Plan will be tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code; and (ii) the restrictions, if any, on the transferability of such securities and instruments.

**12.3     Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

**12.4     Third Party Agreements.**  The Distributions to the various Classes of Claims and Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ

any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.

> **12.5    Amendment or Modification of Plan.**  As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before Confirmation, *provided*, that, to the extent any such modification would require the consent of the Supporting Prepetition Lenders (or some subset thereof), acting reasonably, under the Plan Support Agreement and such consent is not obtained, such parties, to the extent applicable, may revoke their vote in favor of the Plan, as modified, and *provided further*, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Debtors may modify the Plan at any time after Confirmation and before consummation of the Plan, *provided*, *however*, that to the extent any such modification would require the consent of the Supporting Prepetition Lenders (or some subset thereof), acting reasonably, under the Plan Support Agreement and such consent is not obtained, such parties, to the extent applicable, may revoke their vote in favor of the Plan, as modified, and *provided further*, *however*, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, the Debtors shall have complied with section 1125 of the Bankruptcy Code, the Bankruptcy Court, after notice and a hearing, shall have confirmed the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  Except as specifically provided herein, a Holder of a Claim that has accepted the Plan prior to modification shall be deemed to have accepted such Plan as modified, *provided*, *however*, that the Plan, as modified, does not materially and adversely change the treatment of the Claim or Interest of such Holder.

> **12.6    Severability.**  In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, the Debtors may, at their option, (a) treat such provision as invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Interests that the provision is determined to be invalid, void, or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

> **12.7    Revocation or Withdrawal of Plan.**  The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing at any time prior to the occurrence of the Effective Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

> For the avoidance of doubt, if the Confirmation Hearing is adjourned, the Debtors reserve the right to amend, modify, revoke, or withdraw the Plan and/or submit any new plan of

reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

**12.8    Rules Governing Conflicts Between Documents.**  In the event of a conflict between the terms or provisions of the Plan and any Plan Documents other than the Plan, the terms of the Plan shall control over such Plan Documents.  In the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.

**12.9    Governing Law.**  Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

**12.10   Notices.**  Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, charges prepaid.  If to the Debtors, any such notice shall be directed to the following at the addresses set forth below:

> TBS International plc
> 612 E. Grassy Sprain Road
> Yonkers, New York 10710
> Attention:      Ferdinand V. Lepere
>                    Senior Executive Vice President &
>                      Chief Financial Officer
>
> -- with copies to –
>
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166-0193
> Attention:      Michael A. Rosenthal, Esq.
>                    Matthew K. Kelsey, Esq.

**12.11   Interest and Attorneys' Fees.**  Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law.  No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

**12.12   Binding Effect.**  The Plan shall be binding upon the Debtors, the Reorganized Debtors, the Holders of all Claims and Interests, parties in interest, Persons, and Governmental Units and their respective successors and assigns.  To the extent any provision of the Disclosure

Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

**12.13  No Admissions.**  As to contested matters, adversary proceedings, and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, the Disclosure Statement, or other Plan Documents shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.  The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors or any of their subsidiaries and Affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

**12.14  Exhibits.**  All Exhibits and Schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

The undersigned have executed this Joint Plan of Reorganization as of the 31st day of January, 2012.

Dated:  January 31, 2012

Respectfully submitted,

**TBS INTERNATIONAL PUBLIC LIMITED COMPANY, ON ITS OWN BEHALF AND ON BEHALF OF THE AFFILIATED DEBTORS LISTED ON APPENDIX A**

**AS DEBTORS AND DEBTORS IN POSSESSION**

By:      /s/ Joseph E. Royce
    Name:  Joseph E. Royce
    Title:    President & Chief Executive Officer

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)

200 Park Avenue
New York, NY 10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

100995228

**APPENDIX A – list of affiliated debtors**

**Affiliates of TBS Shipping Services Inc.:**

TBS International Limited

TBS Holdings Limited

TBS International plc

Albemarle Maritime Corp.

Arden Maritime Corp.

Avon Maritime Corp.

Azalea Shipping & Chartering Inc.

Beekman Shipping Corp.

Birnam Maritime Corp.

Bristol Maritime Corp.

Chester Shipping Corp.

Compass Chartering Corp.

Cumberland Navigation Corp.

Darby Navigation Corp.

Dover Maritime Corp.

Elrod Shipping Corp.

Exeter Shipping Corp.

Fairfax Shipping Corp.

Frankfort Maritime Corp.

Glenwood Maritime Corp.

Hansen Shipping Corp.

Hartley Navigation Corp.

Henley Maritime Corp.

Hudson Maritime Corp.

Jessup Maritime Corp.

Leaf Shipping Corp.

Montrose Maritime Corp.

Oldcastle Shipping Corp.

Quentin Navigation Corp.

Rector Shipping Corp.

Remsen Navigation Corp.

Roymar Ship Management, Inc.

Sheffield Maritime Corp.

Sherman Maritime Corp.

Sterling Shipping Corp.

Stratford Shipping Corp.

Vedado Maritime Corp.

Vernon Maritime Corp.

Windsor Maritime Corp.

Westbrook Holdings Ltd.

Transworld Cargo Carriers, S.A.

Mercury Marine Ltd.

TBS Worldwide Services Inc.

Pacific Rim Shipping Corp.

TBS African Ventures Limited

TBS do Sul Ltd.

TBS Eurolines, Ltd.

TBS Latin America Liner, Ltd.

TBS Middle East Carriers, Ltd.

TBS North America Liner, Ltd.

TBS Ocean Carriers, Ltd.

TBS Pacific Liner, Ltd.

TBS Warehouse & Distribution Group Ltd.

TBS Warehouse & Equipment Holdings Ltd.

TBS Logistics Incorporated n/k/a TBS Shipping
Houston, Inc.

TBSI New Ship Development Corp.

TBS Mining Limited

TBS U.S. Enterprises LLC

TBS Energy Logistics L.P.

Bedford Maritime Corp.

Brighton Maritime Corp.

Hari Maritime Corp.

Prospect Navigation Corp.

Hancock Navigation Corp.

Columbus Maritime Corp.

Whitehall Marine Transport Corp.

Claremont Shipping Corp.

Yorkshire Shipping Corp.

Amoros Maritime Corp.

Lancaster Maritime Corp.

Chatham Maritime Corp.

Sherwood Shipping Corp.

**APPENDIX B – uniform glossary of terms**

## APPENDIX C – List of Classes

| **Class** | **Claims and Interests** |
|---|---|
| Class 1(1) | Other Priority Claims against TBS International plc |
| Class 1(2) | Other Priority Claims against TBS International Limited |
| Class 1(3) | Other Priority Claims against TBS Holdings Limited |
| Class 1(4) | Other Priority Claims against TBS Shipping Services Inc. |
| Class 1(5) | Other Priority Claims against Albemarle Maritime Corp |
| Class 1(6) | Other Priority Claims against Arden Maritime Corp. |
| Class 1(7) | Other Priority Claims against Avon Maritime Corp. |
| Class 1(8) | Other Priority Claims against Azalea Shipping & Chartering Inc. |
| Class 1(9) | Other Priority Claims against Beekman Shipping Corp. |
| Class 1(10) | Other Priority Claims against Birnam Maritime Corp. |
| Class 1(11) | Other Priority Claims against Bristol Maritime Corp. |
| Class 1(12) | Other Priority Claims against Chester Shipping Corp. |
| Class 1(13) | Other Priority Claims against Compass Chartering Corp. |
| Class 1(14) | Other Priority Claims against Cumberland Navigation Corp. |
| Class 1(15) | Other Priority Claims against Darby Navigation Corp. |
| Class 1(16) | Other Priority Claims against Dover Maritime Corp. |
| Class 1(17) | Other Priority Claims against Elrod Shipping Corp. |
| Class 1(18) | Other Priority Claims against Exeter Shipping Corp. |
| Class 1(19) | Other Priority Claims against Fairfax Shipping Corp. |
| Class 1(20) | Other Priority Claims against Frankfort Maritime Corp. |
| Class 1(21) | Other Priority Claims against Glenwood Maritime Corp. |
| Class 1(22) | Other Priority Claims against Hansen Shipping Corp. |
| Class 1(23) | Other Priority Claims against Hartley Navigation Corp. |
| Class 1(24) | Other Priority Claims against Henley Maritime Corp. |
| Class 1(25) | Other Priority Claims against Hudson Maritime Corp. |
| Class 1(26) | Other Priority Claims against Jessup Maritime Corp. |
| Class 1(27) | Other Priority Claims against Leaf Shipping Corp. |
| Class 1(28) | Other Priority Claims against Montrose Maritime Corp. |
| Class 1(29) | Other Priority Claims against Oldcastle Shipping Corp. |
| Class 1(30) | Other Priority Claims against Quentin Navigation Corp. |
| Class 1(31) | Other Priority Claims against Rector Shipping Corp. |
| Class 1(32) | Other Priority Claims against Remsen Navigation Corp. |
| Class 1(33) | Other Priority Claims against Roymar Ship Management, Inc. |
| Class 1(34) | Other Priority Claims against Sheffield Maritime Corp. |
| Class 1(35) | Other Priority Claims against Sherman Maritime Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 1(36) | Other Priority Claims against Sterling Shipping Corp. |
| Class 1(37) | Other Priority Claims against Stratford Shipping Corp. |
| Class 1(38) | Other Priority Claims against Vedado Maritime Corp. |
| Class 1(39) | Other Priority Claims against Vernon Maritime Corp. |
| Class 1(40) | Other Priority Claims against Windsor Maritime Corp. |
| Class 1(41) | Other Priority Claims against Westbrook Holdings Ltd. |
| Class 1(42) | Other Priority Claims against Transworld Cargo Carriers, S.A. |
| Class 1(43) | Other Priority Claims against Mercury Marine Ltd. |
| Class 1(44) | Other Priority Claims against TBS Worldwide Services Inc. |
| Class 1(45) | Other Priority Claims against Pacific Rim Shipping Corp. |
| Class 1(46) | Other Priority Claims against TBS African Ventures Limited |
| Class 1(47) | Other Priority Claims against TBS do Sul Ltd. |
| Class 1(48) | Other Priority Claims against TBS Eurolines, Ltd. |
| Class 1(49) | Other Priority Claims against TBS Latin America Liner, Ltd. |
| Class 1(50) | Other Priority Claims against TBS Middle East Carriers, Ltd. |
| Class 1(51) | Other Priority Claims against TBS North America Liner, Ltd. |
| Class 1(52) | Other Priority Claims against TBS Ocean Carriers, Ltd. |
| Class 1(53) | Other Priority Claims against TBS Pacific Liner, Ltd. |
| Class 1(54) | Other Priority Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 1(55) | Other Priority Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 1(56) | Other Priority Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 1(57) | Other Priority Claims against TBSI New Ship Development Corp. |
| Class 1(58) | Other Priority Claims against TBS Mining Limited |
| Class 1(59) | Other Priority Claims against TBS U.S. Enterprises LLC |
| Class 1(60) | Other Priority Claims against TBS Energy Logistics L.P. |
| Class 1(61) | Other Priority Claims against Bedford Maritime Corp. |
| Class 1(62) | Other Priority Claims against Brighton Maritime Corp. |
| Class 1(63) | Other Priority Claims against Hari Maritime Corp. |
| Class 1(64) | Other Priority Claims against Prospect Navigation Corp. |
| Class 1(65) | Other Priority Claims against Hancock Navigation Corp. |
| Class 1(66) | Other Priority Claims against Columbus Maritime Corp. |
| Class 1(67) | Other Priority Claims against Whitehall Marine Transport Corp. |
| Class 1(68) | Other Priority Claims against Claremont Shipping Corp. |
| Class 1(69) | Other Priority Claims against Yorkshire Shipping Corp. |
| Class 1(70) | Other Priority Claims against Amoros Maritime Corp. |
| Class 1(71) | Other Priority Claims against Lancaster Maritime Corp. |
| Class 1(72) | Other Priority Claims against Chatham Maritime Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 1(73) | Other Priority Claims against Sherwood Shipping Corp. |
| Class 2(1) | Other Secured Claims against TBS International plc |
| Class 2(2) | Other Secured Claims against TBS International Limited |
| Class 2(3) | Other Secured Claims against TBS Holdings Limited |
| Class 2(4) | Other Secured Claims against TBS Shipping Services Inc. |
| Class 2(5) | Other Secured Claims against Albemarle Maritime Corp |
| Class 2(6) | Other Secured Claims against Arden Maritime Corp. |
| Class 2(7) | Other Secured Claims against Avon Maritime Corp. |
| Class 2(8) | Other Secured Claims against Azalea Shipping & Chartering Inc. |
| Class 2(9) | Other Secured Claims against Beekman Shipping Corp. |
| Class 2(10) | Other Secured Claims against Birnam Maritime Corp. |
| Class 2(11) | Other Secured Claims against Bristol Maritime Corp. |
| Class 2(12) | Other Secured Claims against Chester Shipping Corp. |
| Class 2(13) | Other Secured Claims against Compass Chartering Corp. |
| Class 2(14) | Other Secured Claims against Cumberland Navigation Corp. |
| Class 2(15) | Other Secured Claims against Darby Navigation Corp. |
| Class 2(16) | Other Secured Claims against Dover Maritime Corp. |
| Class 2(17) | Other Secured Claims against Elrod Shipping Corp. |
| Class 2(18) | Other Secured Claims against Exeter Shipping Corp. |
| Class 2(19) | Other Secured Claims against Fairfax Shipping Corp. |
| Class 2(20) | Other Secured Claims against Frankfort Maritime Corp. |
| Class 2(21) | Other Secured Claims against Glenwood Maritime Corp. |
| Class 2(22) | Other Secured Claims against Hansen Shipping Corp. |
| Class 2(23) | Other Secured Claims against Hartley Navigation Corp. |
| Class 2(24) | Other Secured Claims against Henley Maritime Corp. |
| Class 2(25) | Other Secured Claims against Hudson Maritime Corp. |
| Class 2(26) | Other Secured Claims against Jessup Maritime Corp. |
| Class 2(27) | Other Secured Claims against Leaf Shipping Corp. |
| Class 2(28) | Other Secured Claims against Montrose Maritime Corp. |
| Class 2(29) | Other Secured Claims against Oldcastle Shipping Corp. |
| Class 2(30) | Other Secured Claims against Quentin Navigation Corp. |
| Class 2(31) | Other Secured Claims against Rector Shipping Corp. |
| Class 2(32) | Other Secured Claims against Remsen Navigation Corp. |
| Class 2(33) | Other Secured Claims against Roymar Ship Management, Inc. |
| Class 2(34) | Other Secured Claims against Sheffield Maritime Corp. |
| Class 2(35) | Other Secured Claims against Sherman Maritime Corp. |
| Class 2(36) | Other Secured Claims against Sterling Shipping Corp. |
| Class 2(37) | Other Secured Claims against Stratford Shipping Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 2(38) | Other Secured Claims against Vedado Maritime Corp. |
| Class 2(39) | Other Secured Claims against Vernon Maritime Corp. |
| Class 2(40) | Other Secured Claims against Windsor Maritime Corp. |
| Class 2(41) | Other Secured Claims against Westbrook Holdings Ltd. |
| Class 2(42) | Other Secured Claims against Transworld Cargo Carriers, S.A. |
| Class 2(43) | Other Secured Claims against Mercury Marine Ltd. |
| Class 2(44) | Other Secured Claims against TBS Worldwide Services Inc. |
| Class 2(45) | Other Secured Claims against Pacific Rim Shipping Corp. |
| Class 2(46) | Other Secured Claims against TBS African Ventures Limited |
| Class 2(47) | Other Secured Claims against TBS do Sul Ltd. |
| Class 2(48) | Other Secured Claims against TBS Eurolines, Ltd. |
| Class 2(49) | Other Secured Claims against TBS Latin America Liner, Ltd. |
| Class 2(50) | Other Secured Claims against TBS Middle East Carriers, Ltd. |
| Class 2(51) | Other Secured Claims against TBS North America Liner, Ltd. |
| Class 2(52) | Other Secured Claims against TBS Ocean Carriers, Ltd. |
| Class 2(53) | Other Secured Claims against TBS Pacific Liner, Ltd. |
| Class 2(54) | Other Secured Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 2(55) | Other Secured Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 2(56) | Other Secured Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 2(57) | Other Secured Claims against TBSI New Ship Development Corp. |
| Class 2(58) | Other Secured Claims against TBS Mining Limited |
| Class 2(59) | Other Secured Claims against TBS U.S. Enterprises LLC |
| Class 2(60) | Other Secured Claims against TBS Energy Logistics L.P. |
| Class 2(61) | Other Secured Claims against Bedford Maritime Corp. |
| Class 2(62) | Other Secured Claims against Brighton Maritime Corp. |
| Class 2(63) | Other Secured Claims against Hari Maritime Corp. |
| Class 2(64) | Other Secured Claims against Prospect Navigation Corp. |
| Class 2(65) | Other Secured Claims against Hancock Navigation Corp. |
| Class 2(66) | Other Secured Claims against Columbus Maritime Corp. |
| Class 2(67) | Other Secured Claims against Whitehall Marine Transport Corp. |
| Class 2(68) | Other Secured Claims against Claremont Shipping Corp. |
| Class 2(69) | Other Secured Claims against Yorkshire Shipping Corp. |
| Class 2(70) | Other Secured Claims against Amoros Maritime Corp. |
| Class 2(71) | Other Secured Claims against Lancaster Maritime Corp. |
| Class 2(72) | Other Secured Claims against Chatham Maritime Corp. |
| Class 2(73) | Other Secured Claims against Sherwood Shipping Corp. |
| Class 3(1) | DVB Syndicate Claims against TBS International plc |

| **Class** | **Claims and Interests** |
|---|---|
| Class 3(2) | DVB Syndicate Claims against TBS International Limited |
| Class 3(3) | DVB Syndicate Claims against TBS Holdings Limited |
| Class 3(61) | DVB Syndicate Claims against Bedford Maritime Corp. |
| Class 3(62) | DVB Syndicate Claims against Brighton Maritime Corp. |
| Class 3(63) | DVB Syndicate Claims against Hari Maritime Corp. |
| Class 3(64) | DVB Syndicate Claims against Prospect Navigation Corp. |
| Class 3(65) | DVB Syndicate Claims against Hancock Navigation Corp. |
| Class 3(66) | DVB Syndicate Claims against Columbus Maritime Corp. |
| Class 3(67) | DVB Syndicate Claims against Whitehall Marine Transport Corp. |
| Class 4(1) | BOA Syndicate Claims against TBS International plc |
| Class 4(2) | BOA Syndicate Claims against TBS International Limited |
| Class 4(3) | BOA Syndicate Claims against TBS Holdings Limited |
| Class 4(4) | BOA Syndicate Claims against TBS Shipping Services Inc. |
| Class 4(5) | BOA Syndicate Claims against Albemarle Maritime Corp |
| Class 4(6) | BOA Syndicate Claims against Arden Maritime Corp. |
| Class 4(7) | BOA Syndicate Claims against Avon Maritime Corp. |
| Class 4(8) | BOA Syndicate Claims against Azalea Shipping & Chartering Inc. |
| Class 4(9) | BOA Syndicate Claims against Beekman Shipping Corp. |
| Class 4(10) | BOA Syndicate Claims against Birnam Maritime Corp. |
| Class 4(11) | BOA Syndicate Claims against Bristol Maritime Corp. |
| Class 4(12) | BOA Syndicate Claims against Chester Shipping Corp. |
| Class 4(13) | BOA Syndicate Claims against Compass Chartering Corp. |
| Class 4(14) | BOA Syndicate Claims against Cumberland Navigation Corp. |
| Class 4(15) | BOA Syndicate Claims against Darby Navigation Corp. |
| Class 4(16) | BOA Syndicate Claims against Dover Maritime Corp. |
| Class 4(17) | BOA Syndicate Claims against Elrod Shipping Corp. |
| Class 4(18) | BOA Syndicate Claims against Exeter Shipping Corp. |
| Class 4(19) | BOA Syndicate Claims against Fairfax Shipping Corp. |
| Class 4(20) | BOA Syndicate Claims against Frankfort Maritime Corp. |
| Class 4(21) | BOA Syndicate Claims against Glenwood Maritime Corp. |
| Class 4(22) | BOA Syndicate Claims against Hansen Shipping Corp. |
| Class 4(23) | BOA Syndicate Claims against Hartley Navigation Corp. |
| Class 4(24) | BOA Syndicate Claims against Henley Maritime Corp. |
| Class 4(25) | BOA Syndicate Claims against Hudson Maritime Corp. |
| Class 4(26) | BOA Syndicate Claims against Jessup Maritime Corp. |
| Class 4(27) | BOA Syndicate Claims against Leaf Shipping Corp. |
| Class 4(28) | BOA Syndicate Claims against Montrose Maritime Corp. |
| Class 4(29) | BOA Syndicate Claims against Oldcastle Shipping Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 4(30) | BOA Syndicate Claims against Quentin Navigation Corp. |
| Class 4(31) | BOA Syndicate Claims against Rector Shipping Corp. |
| Class 4(32) | BOA Syndicate Claims against Remsen Navigation Corp. |
| Class 4(33) | BOA Syndicate Claims against Roymar Ship Management, Inc. |
| Class 4(34) | BOA Syndicate Claims against Sheffield Maritime Corp. |
| Class 4(35) | BOA Syndicate Claims against Sherman Maritime Corp. |
| Class 4(36) | BOA Syndicate Claims against Sterling Shipping Corp. |
| Class 4(37) | BOA Syndicate Claims against Stratford Shipping Corp. |
| Class 4(38) | BOA Syndicate Claims against Vedado Maritime Corp. |
| Class 4(39) | BOA Syndicate Claims against Vernon Maritime Corp. |
| Class 4(40) | BOA Syndicate Claims against Windsor Maritime Corp. |
| Class 4(41) | BOA Syndicate Claims against Westbrook Holdings Ltd. |
| Class 4(42) | BOA Syndicate Claims against Transworld Cargo Carriers, S.A. |
| Class 4(43) | BOA Syndicate Claims against Mercury Marine Ltd. |
| Class 4(44) | BOA Syndicate Claims against TBS Worldwide Services Inc. |
| Class 4(45) | BOA Syndicate Claims against Pacific Rim Shipping Corp. |
| Class 4(46) | BOA Syndicate Claims against TBS African Ventures Limited |
| Class 4(47) | BOA Syndicate Claims against TBS do Sul Ltd. |
| Class 4(48) | BOA Syndicate Claims against TBS Eurolines, Ltd. |
| Class 4(49) | BOA Syndicate Claims against TBS Latin America Liner, Ltd. |
| Class 4(50) | BOA Syndicate Claims against TBS Middle East Carriers, Ltd. |
| Class 4(51) | BOA Syndicate Claims against TBS North America Liner, Ltd. |
| Class 4(52) | BOA Syndicate Claims against TBS Ocean Carriers, Ltd. |
| Class 4(53) | BOA Syndicate Claims against TBS Pacific Liner, Ltd. |
| Class 4(54) | BOA Syndicate Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 4(55) | BOA Syndicate Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 4(56) | BOA Syndicate Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 4(57) | BOA Syndicate Claims against TBSI New Ship Development Corp. |
| Class 4(58) | BOA Syndicate Claims against TBS Mining Limited |
| Class 4(59) | BOA Syndicate Claims against TBS U.S. Enterprises LLC |
| Class 4(60) | BOA Syndicate Claims against TBS Energy Logistics L.P. |
| Class 5(1) | Credit Suisse Claims against TBS International plc |
| Class 5(2) | Credit Suisse Claims against TBS International Limited |
| Class 5(68) | Credit Suisse Claims against Claremont Shipping Corp. |
| Class 5(69) | Credit Suisse Claims against Yorkshire Shipping Corp. |
| Class 6(1) | AIG Claims against TBS International plc |
| Class 6(2) | AIG Claims against TBS International Limited |

| **Class** | **Claims and Interests** |
|---|---|
| Class 6(3) | AIG Claims against TBS Holdings Limited |
| Class 6(70) | AIG Claims against Amoros Maritime Corp. |
| Class 6(71) | AIG Claims against Lancaster Maritime Corp. |
| Class 6(72) | AIG Claims against Chatham Maritime Corp. |
| Class 6(73) | AIG Claims against Sherwood Shipping Corp. |
| Class 7(1) | RBS Claims against TBS International plc |
| Class 7(2) | RBS Claims against TBS International Limited |
| Class 8(1) | General Unsecured Claims against TBS International plc |
| Class 8(2) | General Unsecured Claims against TBS International Limited |
| Class 8(3) | General Unsecured Claims against TBS Holdings Limited |
| Class 8(4) | General Unsecured Claims against TBS Shipping Services Inc. |
| Class 8(5) | General Unsecured Claims against Albemarle Maritime Corp |
| Class 8(6) | General Unsecured Claims against Arden Maritime Corp. |
| Class 8(7) | General Unsecured Claims against Avon Maritime Corp. |
| Class 8(8) | General Unsecured Claims against Azalea Shipping & Chartering Inc. |
| Class 8(9) | General Unsecured Claims against Beekman Shipping Corp. |
| Class 8(10) | General Unsecured Claims against Birnam Maritime Corp. |
| Class 8(11) | General Unsecured Claims against Bristol Maritime Corp. |
| Class 8(12) | General Unsecured Claims against Chester Shipping Corp. |
| Class 8(13) | General Unsecured Claims against Compass Chartering Corp. |
| Class 8(14) | General Unsecured Claims against Cumberland Navigation Corp. |
| Class 8(15) | General Unsecured Claims against Darby Navigation Corp. |
| Class 8(16) | General Unsecured Claims against Dover Maritime Corp. |
| Class 8(17) | General Unsecured Claims against Elrod Shipping Corp. |
| Class 8(18) | General Unsecured Claims against Exeter Shipping Corp. |
| Class 8(19) | General Unsecured Claims against Fairfax Shipping Corp. |
| Class 8(20) | General Unsecured Claims against Frankfort Maritime Corp. |
| Class 8(21) | General Unsecured Claims against Glenwood Maritime Corp. |
| Class 8(22) | General Unsecured Claims against Hansen Shipping Corp. |
| Class 8(23) | General Unsecured Claims against Hartley Navigation Corp. |
| Class 8(24) | General Unsecured Claims against Henley Maritime Corp. |
| Class 8(25) | General Unsecured Claims against Hudson Maritime Corp. |
| Class 8(26) | General Unsecured Claims against Jessup Maritime Corp. |
| Class 8(27) | General Unsecured Claims against Leaf Shipping Corp. |
| Class 8(28) | General Unsecured Claims against Montrose Maritime Corp. |
| Class 8(29) | General Unsecured Claims against Oldcastle Shipping Corp. |
| Class 8(30) | General Unsecured Claims against Quentin Navigation Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 8(31) | General Unsecured Claims against Rector Shipping Corp. |
| Class 8(32) | General Unsecured Claims against Remsen Navigation Corp. |
| Class 8(33) | General Unsecured Claims against Roymar Ship Management, Inc. |
| Class 8(34) | General Unsecured Claims against Sheffield Maritime Corp. |
| Class 8(35) | General Unsecured Claims against Sherman Maritime Corp. |
| Class 8(36) | General Unsecured Claims against Sterling Shipping Corp. |
| Class 8(37) | General Unsecured Claims against Stratford Shipping Corp. |
| Class 8(38) | General Unsecured Claims against Vedado Maritime Corp. |
| Class 8(39) | General Unsecured Claims against Vernon Maritime Corp. |
| Class 8(40) | General Unsecured Claims against Windsor Maritime Corp. |
| Class 8(41) | General Unsecured Claims against Westbrook Holdings Ltd. |
| Class 8(42) | General Unsecured Claims against Transworld Cargo Carriers, S.A. |
| Class 8(43) | General Unsecured Claims against Mercury Marine Ltd. |
| Class 8(44) | General Unsecured Claims against TBS Worldwide Services Inc. |
| Class 8(45) | General Unsecured Claims against Pacific Rim Shipping Corp. |
| Class 8(46) | General Unsecured Claims against TBS African Ventures Limited |
| Class 8(47) | General Unsecured Claims against TBS do Sul Ltd. |
| Class 8(48) | General Unsecured Claims against TBS Eurolines, Ltd. |
| Class 8(49) | General Unsecured Claims against TBS Latin America Liner, Ltd. |
| Class 8(50) | General Unsecured Claims against TBS Middle East Carriers, Ltd. |
| Class 8(51) | General Unsecured Claims against TBS North America Liner, Ltd. |
| Class 8(52) | General Unsecured Claims against TBS Ocean Carriers, Ltd. |
| Class 8(53) | General Unsecured Claims against TBS Pacific Liner, Ltd. |
| Class 8(54) | General Unsecured Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 8(55) | General Unsecured Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 8(56) | General Unsecured Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 8(57) | General Unsecured Claims against TBSI New Ship Development Corp. |
| Class 8(58) | General Unsecured Claims against TBS Mining Limited |
| Class 8(59) | General Unsecured Claims against TBS U.S. Enterprises LLC |
| Class 8(60) | General Unsecured Claims against TBS Energy Logistics L.P. |
| Class 8(61) | General Unsecured Claims against Bedford Maritime Corp. |
| Class 8(62) | General Unsecured Claims against Brighton Maritime Corp. |
| Class 8(63) | General Unsecured Claims against Hari Maritime Corp. |
| Class 8(64) | General Unsecured Claims against Prospect Navigation Corp. |
| Class 8(65) | General Unsecured Claims against Hancock Navigation Corp. |
| Class 8(66) | General Unsecured Claims against Columbus Maritime Corp. |
| Class 8(67) | General Unsecured Claims against Whitehall Marine Transport Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 8(68) | General Unsecured Claims against Claremont Shipping Corp. |
| Class 8(69) | General Unsecured Claims against Yorkshire Shipping Corp. |
| Class 8(70) | General Unsecured Claims against Amoros Maritime Corp. |
| Class 8(71) | General Unsecured Claims against Lancaster Maritime Corp. |
| Class 8(72) | General Unsecured Claims against Chatham Maritime Corp. |
| Class 8(73) | General Unsecured Claims against Sherwood Shipping Corp. |
| Class 9(1) | Intercompany Claims against TBS International plc |
| Class 9(2) | Intercompany Claims against TBS International Limited |
| Class 9(3) | Intercompany Claims against TBS Holdings Limited |
| Class 9(4) | Intercompany Claims against TBS Shipping Services Inc. |
| Class 9(5) | Intercompany Claims against Albemarle Maritime Corp |
| Class 9(6) | Intercompany Claims against Arden Maritime Corp. |
| Class 9(7) | Intercompany Claims against Avon Maritime Corp. |
| Class 9(8) | Intercompany Claims against Azalea Shipping & Chartering Inc. |
| Class 9(9) | Intercompany Claims against Beekman Shipping Corp. |
| Class 9(10) | Intercompany Claims against Birnam Maritime Corp. |
| Class 9(11) | Intercompany Claims against Bristol Maritime Corp. |
| Class 9(12) | Intercompany Claims against Chester Shipping Corp. |
| Class 9(13) | Intercompany Claims against Compass Chartering Corp. |
| Class 9(14) | Intercompany Claims against Cumberland Navigation Corp. |
| Class 9(15) | Intercompany Claims against Darby Navigation Corp. |
| Class 9(16) | Intercompany Claims against Dover Maritime Corp. |
| Class 9(17) | Intercompany Claims against Elrod Shipping Corp. |
| Class 9(18) | Intercompany Claims against Exeter Shipping Corp. |
| Class 9(19) | Intercompany Claims against Fairfax Shipping Corp. |
| Class 9(20) | Intercompany Claims against Frankfort Maritime Corp. |
| Class 9(21) | Intercompany Claims against Glenwood Maritime Corp. |
| Class 9(22) | Intercompany Claims against Hansen Shipping Corp. |
| Class 9(23) | Intercompany Claims against Hartley Navigation Corp. |
| Class 9(24) | Intercompany Claims against Henley Maritime Corp. |
| Class 9(25) | Intercompany Claims against Hudson Maritime Corp. |
| Class 9(26) | Intercompany Claims against Jessup Maritime Corp. |
| Class 9(27) | Intercompany Claims against Leaf Shipping Corp. |
| Class 9(28) | Intercompany Claims against Montrose Maritime Corp. |
| Class 9(29) | Intercompany Claims against Oldcastle Shipping Corp. |
| Class 9(30) | Intercompany Claims against Quentin Navigation Corp. |
| Class 9(31) | Intercompany Claims against Rector Shipping Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 9(32) | Intercompany Claims against Remsen Navigation Corp. |
| Class 9(33) | Intercompany Claims against Roymar Ship Management, Inc. |
| Class 9(34) | Intercompany Claims against Sheffield Maritime Corp. |
| Class 9(35) | Intercompany Claims against Sherman Maritime Corp. |
| Class 9(36) | Intercompany Claims against Sterling Shipping Corp. |
| Class 9(37) | Intercompany Claims against Stratford Shipping Corp. |
| Class 9(38) | Intercompany Claims against Vedado Maritime Corp. |
| Class 9(39) | Intercompany Claims against Vernon Maritime Corp. |
| Class 9(40) | Intercompany Claims against Windsor Maritime Corp. |
| Class 9(41) | Intercompany Claims against Westbrook Holdings Ltd. |
| Class 9(42) | Intercompany Claims against Transworld Cargo Carriers, S.A. |
| Class 9(43) | Intercompany Claims against Mercury Marine Ltd. |
| Class 9(44) | Intercompany Claims against TBS Worldwide Services Inc. |
| Class 9(45) | Intercompany Claims against Pacific Rim Shipping Corp. |
| Class 9(46) | Intercompany Claims against TBS African Ventures Limited |
| Class 9(47) | Intercompany Claims against TBS do Sul Ltd. |
| Class 9(48) | Intercompany Claims against TBS Eurolines, Ltd. |
| Class 9(49) | Intercompany Claims against TBS Latin America Liner, Ltd. |
| Class 9(50) | Intercompany Claims against TBS Middle East Carriers, Ltd. |
| Class 9(51) | Intercompany Claims against TBS North America Liner, Ltd. |
| Class 9(52) | Intercompany Claims against TBS Ocean Carriers, Ltd. |
| Class 9(53) | Intercompany Claims against TBS Pacific Liner, Ltd. |
| Class 9(54) | Intercompany Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 9(55) | Intercompany Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 9(56) | Intercompany Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 9(57) | Intercompany Claims against TBSI New Ship Development Corp. |
| Class 9(58) | Intercompany Claims against TBS Mining Limited |
| Class 9(59) | Intercompany Claims against TBS U.S. Enterprises LLC |
| Class 9(60) | Intercompany Claims against TBS Energy Logistics L.P. |
| Class 9(61) | Intercompany Claims against Bedford Maritime Corp. |
| Class 9(62) | Intercompany Claims against Brighton Maritime Corp. |
| Class 9(63) | Intercompany Claims against Hari Maritime Corp. |
| Class 9(64) | Intercompany Claims against Prospect Navigation Corp. |
| Class 9(65) | Intercompany Claims against Hancock Navigation Corp. |
| Class 9(66) | Intercompany Claims against Columbus Maritime Corp. |
| Class 9(67) | Intercompany Claims against Whitehall Marine Transport Corp. |
| Class 9(68) | Intercompany Claims against Claremont Shipping Corp. |

| **Class** | **Claims and Interests** |
| --- | --- |
| Class 9(69) | Intercompany Claims against Yorkshire Shipping Corp. |
| Class 9(70) | Intercompany Claims against Amoros Maritime Corp. |
| Class 9(71) | Intercompany Claims against Lancaster Maritime Corp. |
| Class 9(72) | Intercompany Claims against Chatham Maritime Corp. |
| Class 9(73) | Intercompany Claims against Sherwood Shipping Corp. |
| Class 10(1) | Subordinated Claims against TBS International plc |
| Class 10(2) | Subordinated Claims against TBS International Limited |
| Class 10(3) | Subordinated Claims against TBS Holdings Limited |
| Class 10(4) | Subordinated Claims against TBS Shipping Services Inc. |
| Class 10(5) | Subordinated Claims against Albemarle Maritime Corp |
| Class 10(6) | Subordinated Claims against Arden Maritime Corp. |
| Class 10(7) | Subordinated Claims against Avon Maritime Corp. |
| Class 10(8) | Subordinated Claims against Azalea Shipping & Chartering Inc. |
| Class 10(9) | Subordinated Claims against Beekman Shipping Corp. |
| Class 10(10) | Subordinated Claims against Birnam Maritime Corp. |
| Class 10(11) | Subordinated Claims against Bristol Maritime Corp. |
| Class 10(12) | Subordinated Claims against Chester Shipping Corp. |
| Class 10(13) | Subordinated Claims against Compass Chartering Corp. |
| Class 10(14) | Subordinated Claims against Cumberland Navigation Corp. |
| Class 10(15) | Subordinated Claims against Darby Navigation Corp. |
| Class 10(16) | Subordinated Claims against Dover Maritime Corp. |
| Class 10(17) | Subordinated Claims against Elrod Shipping Corp. |
| Class 10(18) | Subordinated Claims against Exeter Shipping Corp. |
| Class 10(19) | Subordinated Claims against Fairfax Shipping Corp. |
| Class 10(20) | Subordinated Claims against Frankfort Maritime Corp. |
| Class 10(21) | Subordinated Claims against Glenwood Maritime Corp. |
| Class 10(22) | Subordinated Claims against Hansen Shipping Corp. |
| Class 10(23) | Subordinated Claims against Hartley Navigation Corp. |
| Class 10(24) | Subordinated Claims against Henley Maritime Corp. |
| Class 10(25) | Subordinated Claims against Hudson Maritime Corp. |
| Class 10(26) | Subordinated Claims against Jessup Maritime Corp. |
| Class 10(27) | Subordinated Claims against Leaf Shipping Corp. |
| Class 10(28) | Subordinated Claims against Montrose Maritime Corp. |
| Class 10(29) | Subordinated Claims against Oldcastle Shipping Corp. |
| Class 10(30) | Subordinated Claims against Quentin Navigation Corp. |
| Class 10(31) | Subordinated Claims against Rector Shipping Corp. |
| Class 10(32) | Subordinated Claims against Remsen Navigation Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 10(33) | Subordinated Claims against Roymar Ship Management, Inc. |
| Class 10(34) | Subordinated Claims against Sheffield Maritime Corp. |
| Class 10(35) | Subordinated Claims against Sherman Maritime Corp. |
| Class 10(36) | Subordinated Claims against Sterling Shipping Corp. |
| Class 10(37) | Subordinated Claims against Stratford Shipping Corp. |
| Class 10(38) | Subordinated Claims against Vedado Maritime Corp. |
| Class 10(39) | Subordinated Claims against Vernon Maritime Corp. |
| Class 10(40) | Subordinated Claims against Windsor Maritime Corp. |
| Class 10(41) | Subordinated Claims against Westbrook Holdings Ltd. |
| Class 10(42) | Subordinated Claims against Transworld Cargo Carriers, S.A. |
| Class 10(43) | Subordinated Claims against Mercury Marine Ltd. |
| Class 10(44) | Subordinated Claims against TBS Worldwide Services Inc. |
| Class 10(45) | Subordinated Claims against Pacific Rim Shipping Corp. |
| Class 10(46) | Subordinated Claims against TBS African Ventures Limited |
| Class 10(47) | Subordinated Claims against TBS do Sul Ltd. |
| Class 10(48) | Subordinated Claims against TBS Eurolines, Ltd. |
| Class 10(49) | Subordinated Claims against TBS Latin America Liner, Ltd. |
| Class 10(50) | Subordinated Claims against TBS Middle East Carriers, Ltd. |
| Class 10(51) | Subordinated Claims against TBS North America Liner, Ltd. |
| Class 10(52) | Subordinated Claims against TBS Ocean Carriers, Ltd. |
| Class 10(53) | Subordinated Claims against TBS Pacific Liner, Ltd. |
| Class 10(54) | Subordinated Claims against TBS Warehouse & Distribution Group Ltd. |
| Class 10(55) | Subordinated Claims against TBS Warehouse & Equipment Holdings Ltd. |
| Class 10(56) | Subordinated Claims against TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 10(57) | Subordinated Claims against TBSI New Ship Development Corp. |
| Class 10(58) | Subordinated Claims against TBS Mining Limited |
| Class 10(59) | Subordinated Claims against TBS U.S. Enterprises LLC |
| Class 10(60) | Subordinated Claims against TBS Energy Logistics L.P. |
| Class 10(61) | Subordinated Claims against Bedford Maritime Corp. |
| Class 10(62) | Subordinated Claims against Brighton Maritime Corp. |
| Class 10(63) | Subordinated Claims against Hari Maritime Corp. |
| Class 10(64) | Subordinated Claims against Prospect Navigation Corp. |
| Class 10(65) | Subordinated Claims against Hancock Navigation Corp. |
| Class 10(66) | Subordinated Claims against Columbus Maritime Corp. |
| Class 10(67) | Subordinated Claims against Whitehall Marine Transport Corp. |
| Class 10(68) | Subordinated Claims against Claremont Shipping Corp. |
| Class 10(69) | Subordinated Claims against Yorkshire Shipping Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 10(70) | Subordinated Claims against Amoros Maritime Corp. |
| Class 10(71) | Subordinated Claims against Lancaster Maritime Corp. |
| Class 10(72) | Subordinated Claims against Chatham Maritime Corp. |
| Class 10(73) | Subordinated Claims against Sherwood Shipping Corp. |
| Class 11(1) | Equity Securities of TBS International plc |
| Class 11(2) | Equity Securities of TBS International Limited |
| Class 11(3) | Equity Securities of TBS Holdings Limited |
| Class 11(4) | Equity Securities of TBS Shipping Services Inc. |
| Class 11(5) | Equity Securities of Albemarle Maritime Corp |
| Class 11(6) | Equity Securities of Arden Maritime Corp. |
| Class 11(7) | Equity Securities of Avon Maritime Corp. |
| Class 11(8) | Equity Securities of Azalea Shipping & Chartering Inc. |
| Class 11(9) | Equity Securities of Beekman Shipping Corp. |
| Class 11(10) | Equity Securities of Birnam Maritime Corp. |
| Class 11(11) | Equity Securities of Bristol Maritime Corp. |
| Class 11(12) | Equity Securities of Chester Shipping Corp. |
| Class 11(13) | Equity Securities of Compass Chartering Corp. |
| Class 11(14) | Equity Securities of Cumberland Navigation Corp. |
| Class 11(15) | Equity Securities of Darby Navigation Corp. |
| Class 11(16) | Equity Securities of Dover Maritime Corp. |
| Class 11(17) | Equity Securities of Elrod Shipping Corp. |
| Class 11(18) | Equity Securities of Exeter Shipping Corp. |
| Class 11(19) | Equity Securities of Fairfax Shipping Corp. |
| Class 11(20) | Equity Securities of Frankfort Maritime Corp. |
| Class 11(21) | Equity Securities of Glenwood Maritime Corp. |
| Class 11(22) | Equity Securities of Hansen Shipping Corp. |
| Class 11(23) | Equity Securities of Hartley Navigation Corp. |
| Class 11(24) | Equity Securities of Henley Maritime Corp. |
| Class 11(25) | Equity Securities of Hudson Maritime Corp. |
| Class 11(26) | Equity Securities of Jessup Maritime Corp. |
| Class 11(27) | Equity Securities of Leaf Shipping Corp. |
| Class 11(28) | Equity Securities of Montrose Maritime Corp. |
| Class 11(29) | Equity Securities of Oldcastle Shipping Corp. |
| Class 11(30) | Equity Securities of Quentin Navigation Corp. |
| Class 11(31) | Equity Securities of Rector Shipping Corp. |
| Class 11(32) | Equity Securities of Remsen Navigation Corp. |
| Class 11(33) | Equity Securities of Roymar Ship Management, Inc. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 11(34) | Equity Securities of Sheffield Maritime Corp. |
| Class 11(35) | Equity Securities of Sherman Maritime Corp. |
| Class 11(36) | Equity Securities of Sterling Shipping Corp. |
| Class 11(37) | Equity Securities of Stratford Shipping Corp. |
| Class 11(38) | Equity Securities of Vedado Maritime Corp. |
| Class 11(39) | Equity Securities of Vernon Maritime Corp. |
| Class 11(40) | Equity Securities of Windsor Maritime Corp. |
| Class 11(41) | Equity Securities of Westbrook Holdings Ltd. |
| Class 11(42) | Equity Securities of Transworld Cargo Carriers, S.A. |
| Class 11(43) | Equity Securities of Mercury Marine Ltd. |
| Class 11(44) | Equity Securities of TBS Worldwide Services Inc. |
| Class 11(45) | Equity Securities of Pacific Rim Shipping Corp. |
| Class 11(46) | Equity Securities of TBS African Ventures Limited |
| Class 11(47) | Equity Securities of TBS do Sul Ltd. |
| Class 11(48) | Equity Securities of TBS Eurolines, Ltd. |
| Class 11(49) | Equity Securities of TBS Latin America Liner, Ltd. |
| Class 11(50) | Equity Securities of TBS Middle East Carriers, Ltd. |
| Class 11(51) | Equity Securities of TBS North America Liner, Ltd. |
| Class 11(52) | Equity Securities of TBS Ocean Carriers, Ltd. |
| Class 11(53) | Equity Securities of TBS Pacific Liner, Ltd. |
| Class 11(54) | Equity Securities of TBS Warehouse & Distribution Group Ltd. |
| Class 11(55) | Equity Securities of TBS Warehouse & Equipment Holdings Ltd. |
| Class 11(56) | Equity Securities of TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc. |
| Class 11(57) | Equity Securities of TBSI New Ship Development Corp. |
| Class 11(58) | Equity Securities of TBS Mining Limited |
| Class 11(59) | Equity Securities of TBS U.S. Enterprises LLC |
| Class 11(60) | Equity Securities of TBS Energy Logistics L.P. |
| Class 11(61) | Equity Securities of Bedford Maritime Corp. |
| Class 11(62) | Equity Securities of Brighton Maritime Corp. |
| Class 11(63) | Equity Securities of Hari Maritime Corp. |
| Class 11(64) | Equity Securities of Prospect Navigation Corp. |
| Class 11(65) | Equity Securities of Hancock Navigation Corp. |
| Class 11(66) | Equity Securities of Columbus Maritime Corp. |
| Class 11(67) | Equity Securities of Whitehall Marine Transport Corp. |
| Class 11(68) | Equity Securities of Claremont Shipping Corp. |
| Class 11(69) | Equity Securities of Yorkshire Shipping Corp. |
| Class 11(70) | Equity Securities of Amoros Maritime Corp. |

| **Class** | **Claims and Interests** |
|---|---|
| Class 11(71) | Equity Securities of Lancaster Maritime Corp. |
| Class 11(72) | Equity Securities of Chatham Maritime Corp. |
| Class 11(73) | Equity Securities of Sherwood Shipping Corp. |

100995228.25

## APPENDIX B – UNIFORM GLOSSARY OF TERMS

**JOINT PREPACKAGED PLAN OF REORGANIZATION
FOR THE DEBTORS UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE
Dated January 31, 2012**

**proposed by**

**TBS SHIPPING SERVICES INC.
AND ITS AFFILIATED DEBTORS**

## Uniform Glossary of Defined Terms for Plan Documents

Unless the context otherwise requires, the following terms, when used in initially capitalized form in the Disclosure Statement, related exhibits, and Plan Documents, shall have the following meanings. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in capitalized form that is not defined herein but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term by the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the event of a conflict or ambiguity). Certain defined terms used in only one Section of the Disclosure Statement are defined in such Section. The rules of construction set forth herein and in section 102 of the Bankruptcy Code shall apply. All references to the "*Plan*" shall be construed, where applicable, to include references to the Plan and all its exhibits, appendices, schedules, and annexes (and any amendments made in accordance with their terms or applicable law).

1.     *2012 Operating Budget* means that certain annual operating budget for the Reorganized Debtors for the period commencing on the Effective Date and ending December 31, 2012. The 2012 Operating Budget shall be filed with the Plan Supplement.

2.     *Administrative Expense* means any cost or expense of administration of the Chapter 11 Cases incurred before the Effective Date and allowable under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code including: (a) any actual and necessary postpetition cost or expense of preserving the Estates or operating the businesses of the Debtors; (b) any payment required to cure a default on an assumed Executory Contract or Unexpired Lease; (c) any postpetition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by a Debtor in the ordinary course of its business; and (d) any cost or expense in respect of a Professional Compensation Claim.

3.     *Administrative Expense Claim* means any Claim for the payment of an Administrative Expense.

4.     *Affiliate* has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.     *Agent* means an administrative agent under the New Senior Secured Loan Agreement, a Prepetition Credit Agreement, or a New Credit Agreement, as applicable.

6.     *AIG* means AIG Commercial Equipment Finance, Inc.

7.     *AIG Claims* means any and all Claims arising under the Existing AIG Credit Agreement and owed to the Holders thereof, including, without limitation, all accrued and unpaid interest, fees, and expenses, and other obligations owed to Holders of such Claims under the Existing AIG Credit Agreement, and any unsecured deficiency portion of such Claims.

8.     *AIG Consideration* means the treatment afforded to the Holders of AIG Claims under the Plan on account of such Claims, which treatment shall be substantially as set forth in the AIG Term Sheet.

9.    **AIG Debtors** means Amoros Maritime Corp., Lancaster Maritime Corp., Chatham Maritime Corp., Sherwood Shipping Corp., each a corporation organized under the laws of the Republic of the Marshall Islands, TBS International, TBS Holdings Limited, and TBS Parent.

10.    **AIG Grantors** means Amoros Maritime Corp., Lancaster Maritime Corp., Sherwood Shipping Corp., and Chatham Maritime Corp.

11.    **AIG Term Sheet** means that certain term sheet, attached as Exhibit F to the Disclosure Statement, that sets forth the terms and conditions of the restructuring of the AIG Claims under the Plan. The terms and conditions set forth in the AIG Term Sheet shall be incorporated into the Amended and Restated AIG Credit Agreement, which shall be substantially in the form filed in the Plan Supplement.

12.    **Allowed** means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is scheduled by the Debtors on their Schedules (to the extent the Debtors file Schedules in the Chapter 11 Cases) as neither disputed, contingent, nor unliquidated, and as to which the Debtors or other party in interest have not Filed an objection by the Claims Objection Bar Date; (b) a Claim that either is not a Disputed Claim or has been Allowed by a Final Order; (c) a Claim that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been Allowed by Final Order; or (e) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Bar Date.

13.    **Allowed Amount** of any Claim or Interest means the amount at which that Claim or Interest is Allowed.

14.    **Allowed Claim; Allowed Interest** means any Claim or Interest in any of the Debtors or their respective Estates, as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise seek recovery from the Holder of the Claim or Interest, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.

15.    **Amended and Restated AIG Credit Agreement** means that certain post-Effective Date loan agreement, including and incorporating any agreements, documents, or supplements related thereto or delivered in connection therewith, between the New TBS Parent, the AIG Debtors, and AIG evidencing the AIG Consideration. The Amended and Restated AIG Credit Agreement shall be substantially in the form filed in the Plan Supplement.

16.    **Amended and Restated Credit Suisse Credit Agreement** means that certain post-Effective Date loan agreement, including and incorporating any agreements, documents, or supplements related thereto or delivered in connection therewith, between the New TBS Parent, the Credit Suisse Debtors, and Credit Suisse evidencing the Credit Suisse Consideration. The Amended and Restated Credit Suisse Credit Agreement shall be substantially in the form filed in the Plan Supplement.

17. ***Amended DVB Bareboat Charters*** means those certain amendments to the DVB Bareboat Charters that are described in the Bareboat Charter Term Sheet. The Amended DVB Bareboat Charters shall be substantially in the form filed in the Plan Supplement.

18. ***Assets*** means all property wherever located in which the Debtors hold a legal or equitable interest, including all property described in section 541 of the Bankruptcy Code and all property disclosed in the Debtors' respective Schedules (to the extent Schedules are filed in the Chapter 11 Cases) and the Disclosure Statement.

19. ***Ballot*** means each of the ballot forms for voting to accept or reject the Plan distributed to all Holders of Impaired Claims entitled to vote on the Plan.

20. ***Ballot Instructions*** means the instructions for completion of a Ballot; the Ballot Instructions applicable to a Ballot shall be distributed to a Holder concurrently with the Ballot.

21. ***Balloting and Claims Agent*** means GCG, Inc., which has been retained by the Debtors (subject to the approval of the Bankruptcy Court).

22. ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made, to the extent applicable to the Chapter 11 Cases.

23. ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

24. ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made, to the extent applicable to the Chapter 11 Cases.

25. ***Bareboat Charter Term Sheet*** means that term sheet, attached as Exhibit K to the Disclosure Statement, that sets forth the terms and conditions of the Debtors' assumption of the DVB Bareboat Charters, as modified.

26. ***Beacon Holdings*** means Beacon Holdings Ltd.

27. ***BOA*** means Bank of America, N.A.

28. ***BOA Agent*** means BOA, in its capacity as administrative agent under the Existing BOA Credit Agreement.

29. ***BOA Debtors*** means Albemarle Maritime Corp., Arden Maritime Corp., Avon Maritime Corp., Birnam Maritime Corp., Bristol Maritime Corp., Chester Shipping Corp., Cumberland Navigation Corp., Darby Navigation Corp., Dover Maritime Corp., Elrod Shipping Corp., Exeter Shipping Corp., Frankfort Maritime Corp., Glenwood Maritime Corp., Hansen Shipping Corp., Hartley Navigation Corp., Henley Maritime Corp., Hudson Maritime Corp., Jessup Maritime Corp., Montrose Maritime Corp., Oldcastle Shipping Corp., Quentin Navigation Corp., Rector Shipping Corp., Remsen Navigation Corp., Sheffield Maritime Corp., Sherman

3

Maritime Corp., Sterling Shipping Corp., Stratford Shipping Corp., Vedado Maritime Corp., Vernon Maritime Corp., Windsor Maritime Corp., Beekman Shipping Corp., Fairfax Shipping Corp., Leaf Shipping Corp., and Pacific Rim Shipping Corp. each a corporation organized under the laws of the Republic of the Marshall Islands, Westbrook Holdings Ltd., Transword Cargo Carriers, S.A., Mercury Marine Ltd., TBS Worldwide Services Inc., Pacific Rim Shipping Corp., TBS African Ventures Limited, TBS Do Sul Ltd., TBS Eurolines, Ltd., TBS Latin America Liner, Ltd., TBS Middle East Carriers, Ltd., TBS North America Liner, Ltd., TBS Ocean Carriers, Ltd., TBS Pacific Liner, Ltd., TBS Warehouse & Distribution Group Ltd., TBS Warehouse & Equipment Holdings Ltd., TBS Logistics Incorporated n/k/a TBS Shipping Houston, Inc., TBSI New Ship Development Corp., TBS Mining Limited, TBS U.S. Enterprises LLC, TBS Energy Logistics LP, TBS Parent, TBS International Limited, TBS Holdings Limited, and TBS Shipping Services Inc.

30.     ***BOA Lenders*** means the Holders of Claims arising under the Existing BOA Credit Agreement.

31.     ***BOA Syndicate Claims*** means the Claims held by the BOA Lenders arising under the Existing BOA Credit Agreement, including, without limitation, all outstanding principal and accrued and unpaid interest, fees, and expenses, L/C Claims, and other obligations owed to the BOA Lenders under the Existing BOA Credit Agreement, and any unsecured deficiency portion of such Claim.

32.     ***BOA/DVB Debt Term Sheet*** means that certain term sheet, attached as Exhibit E to the Disclosure Statement, that sets forth the terms of the New Senior Secured Loan Facility.

33.     ***BOA/DVB DIP Commitment Letter*** means that certain commitment letter, attached as Exhibit I to the Disclosure Statement, that was executed prior to the filing of the Chapter 11 Cases by certain BOA Lenders and DVB Lenders and committed them to underwrite the BOA/DVB DIP Facility.

34.     ***BOA/DVB DIP Facility*** means the $41.3 million debtor in possession term loan facility to be extended by the BOA/DVB DIP Lenders, subject to approval by the Bankruptcy Court.

35.     ***BOA/DVB DIP Facility Agreement*** means that certain agreement implementing the BOA/DVB DIP Facility.  The BOA/DVB DIP Facility Agreement shall be filed on or around the Petition Date in connection with the Debtors' motion to approve entry into the BOA/DVB DIP Facility.

36.     ***BOA/DVB DIP Facility Claims*** means those Claims arising under the BOA/DVB DIP Facility.

37.     ***BOA/DVB DIP Facility Obligors*** means the Debtor borrowers and guarantors under the BOA/DVB DIP Facility that, for the avoidance of doubt, shall include the BOA Debtors and DVB Debtors, but exclude the AIG Grantors and the Credit Suisse Grantors.

38.     ***BOA/DVB DIP Facility Term Sheet*** means that certain term sheet, attached as Exhibit J to the Disclosure Statement, that sets forth the terms of the BOA/DVB DIP Facility and the BOA/DVB Exit Facility.

39.     ***BOA/DVB DIP Lenders*** means the lenders under the BOA/DVB DIP Facility.

40.     ***BOA/DVB Exit Facility*** means the new senior secured first priority term loan credit facility to be entered into by the BOA/DVB Exit Facility Obligors on the Effective Date to refinance any then unpaid amounts under the BOA/DVB DIP Facility as set forth in section 2.5 of the Plan.

41.     ***BOA/DVB Exit Facility Agent*** means BOA, or such other party as identified in the Exit Facility Agreement as acting in the capacity as administrative agent under the BOA/DVB Exit Facility.

42.     ***BOA/DVB Exit Facility Agreement*** means that certain credit agreement to be executed on or before the Effective Date, including and incorporating any agreements, documents, or supplements related thereto or delivered in connection therewith, the terms of which shall be substantially in accordance with the terms set forth in the BOA/DVB DIP Facility Term Sheet.  The BOA/DVB Exit Facility Agreement shall be substantially in the form filed in the Plan Supplement.

43.     ***BOA/DVB Exit Facility Obligors*** means New TBS Parent along with those Reorganized Debtors which were DIP Obligors prior to the Effective Date.

44.     ***Business Day*** means any day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

45.     ***Cash*** means the legal tender of the United States of America, or the Euro, as applicable.

46.     ***Causes of Action*** means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, in each case held by the Debtors, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

47.     ***Certificate*** means any instrument evidencing a Claim or an Interest.

48.     ***Chapter 11 Cases*** means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

49.      *Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code against any Debtor or any Estate, whether or not asserted.

50.      *Claimant* means the Holder of a Claim.

51.      *Claims Objection Bar Date* means, with respect to any Claim, the 120th day following the latest of the Effective Date, the date such Claim is Filed, and such later date as may be established from time to time by the Bankruptcy Court as the last date for filing objections to such Claims.

52.      *Class* means a category of Holders of Claims or Interests, as set forth in Articles III and IV of and Appendix C to the Plan, pursuant to section 1122 of the Bankruptcy Code.

53.      *Collateral* means any property or interest in property of an Estate that is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

54.      *Committee* means the official committee of unsecured creditors for the Debtors, if any, appointed by the U.S. Trustee.

55.      *Confirmation Date* means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

56.      *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

57.      *Confirmation Objection Deadline* means the last day set by the Bankruptcy Court for the filing of objections to Confirmation of the Plan.

58.      *Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code, approving the Disclosure Statement, and approving the Debtors' solicitation procedures.

59.      *Confirmation, Confirmation of the Plan, or Plan Confirmation* means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

60.      *Corporate Governance Documents* means the documents evidencing the corporate governance and equity structure applicable to New TBS Parent and the Reorganized Debtors, which documents will implement the provisions of the Equity and Corporate Governance Term Sheet and will be substantially in the forms filed in the Plan Supplement.

61.      *Credit Suisse* means Credit Suisse, AG.

62.      *Credit Suisse Claims* means any and all Claims held by Credit Suisse arising under the Existing Credit Suisse Credit Agreement, including, without limitation, all accrued and unpaid interest, fees, and expenses, and other obligations owed to Credit Suisse under the Existing Credit Suisse Credit Agreement, and any unsecured deficiency portion of such Claim.

63.     ***Credit Suisse Consideration*** means the treatment afforded on account of the Credit Suisse Claims under the Plan, which treatment shall be substantially as set forth in the Credit Suisse Term Sheet.

64.     ***Credit Suisse Debtors*** means Claremont Shipping Corp. Yorkshire Shipping Corp., TBS International, and the TBS Parent.

65.     ***Credit Suisse DIP Agent*** means the administrative and collateral agent under the Credit Suisse DIP Facility.

66.     ***Credit Suisse DIP Facility*** means the $1.5 million debtor in possession revolving credit facility, subject to approval by the Bankruptcy Court, extended by Credit Suisse to enable the Debtors to make certain payments related to the vessels pledged to secure the Existing Credit Suisse Credit Agreement.

67.     ***Credit Suisse DIP Facility Agreement*** means that certain agreement implementing the Credit Suisse DIP Facility.  The Credit Suisse DIP Facility Agreement will be filed on or around the Petition Date in connection with the Debtors' motion to approve entry into the Credit Suisse DIP Facility.

68.     ***Credit Suisse DIP Facility Claims*** means those Claims arising under the Credit Suisse DIP Facility.

69.     ***Credit Suisse DIP Lender*** means the lender under the Credit Suisse DIP Facility.

70.     ***Credit Suisse DIP Obligors*** means the Debtor borrowers and guarantors under the Credit Suisse DIP Facility which, for the avoidance of doubt, shall include the Credit Suisse Debtors.

71.     ***Credit Suisse Exit Facility*** means the new senior secured first priority term loan credit facility to be entered into by the Credit Suisse Exit Facility Obligors on the Effective Date, which credit facility will refinance in full the Credit Suisse DIP Facility and will contain the terms and conditions set forth in the Credit Suisse Term Sheet.

72.     ***Credit Suisse Exit Facility Agent*** means Credit Suisse, or such other party as identified in the Credit Suisse Exit Facility Agreement as acting in the capacity as administrative agent under the Credit Suisse Exit Facility.

73.     ***Credit Suisse Exit Facility Agreement*** means that certain credit agreement to be executed on or before the Effective Date, including and incorporating any agreements, documents, or supplements related thereto or delivered in connection therewith, to effectuate the Credit Suisse Exit Facility.  The Credit Suisse Exit Facility Agreement will be substantially in the form filed in the Plan Supplement.

74.     ***Credit Suisse Exit Facility Obligors*** means New TBS Parent along with those Reorganized Debtors which were Credit Suisse DIP Obligors prior to the Effective Date.

75.     ***Credit Suisse Grantors*** means Claremont Shipping Corp. and Yorkshire Shipping Corp.

76.     ***Credit Suisse Term Sheet*** means that certain term sheet, attached as Exhibit G to the Disclosure Statement, that sets forth the terms and conditions of (a) the restructuring of the Credit Suisse Claims under the Plan and (b) the Credit Suisse DIP Facility and Credit Suisse Exit Facility.  The terms and conditions set forth in the Credit Suisse Term Sheet shall be incorporated into the Credit Suisse DIP Facility Agreement, which shall be filed on or around the Petition Date, and the Amended and Restated Credit Suisse Credit Agreement and the Credit Suisse Exit Facility Agreement, which will each be substantially in the form filed in the Plan Supplement.

77.     ***Creditor*** means any Person holding a Claim against a Debtor's Estate or against property of the Debtor that arose or is deemed to have arisen on or prior to the Petition Date.

78.     ***Cure Claim*** means a Claim based upon the Debtors' defaults under an Executory Contract or Unexpired Lease existing as of the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

79.     ***Debtor*** means any of the Debtors.

80.     ***Debtors*** means TBS Shipping Services Inc. and the other Persons listed on Appendix A to the Plan.

81.     ***DIP Agents*** means the administrative and collateral agent and the co-agent under the BOA/DVB DIP Facility.

82.     ***Disbursing Agent*** means the Debtors, the Reorganized Debtors or such other Person or Persons identified in the Plan Supplement as the disbursing agent for the Distributions required under the Plan.

83.     ***Disclosure Statement*** means that certain "Disclosure Statement" Filed in support of the Plan for the Debtors, dated January 31, 2012, including all exhibits attached thereto or referenced therein, pursuant to section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court in the Confirmation Order, as such Disclosure Statement may be further amended, supplemented, or modified from time to time with the further approval of the Bankruptcy Court.

84.     ***Disputed*** means, with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order, a Claim (a) as to which no request for payment or Proof of Claim has been timely filed, that is listed in the Schedules (to the extent the Debtors file Schedules in the Chapter 11 Cases) as unliquidated, contingent, or disputed; (b) as to which a request for payment or Proof of Claim has been timely filed, but as to which an objection or request for estimation has been filed by the applicable Claims Objection Bar Date, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) as to which a request for payment or Proof of Claim was required to be timely filed, but as to which a request for payment or Proof of Claim was not timely or properly filed; (d) that is disputed in accordance with the

provisions of the Plan; or (e) if not otherwise Allowed, as to which the applicable Claims Objection Bar Date has not expired.

85.     *Distribution* means any distribution by the Disbursing Agent to the Holders of Allowed Claims pursuant to Article VIII of the Plan.

86.     *Distribution Date* means the date that shall take place as soon as practicable after the later of: (a) the Effective Date; (b) the date a Claim becomes payable pursuant to any agreement with the Disbursing Agent; or (c) for any other Claim that is not an Allowed Claim on the Effective Date, expressly including any Allowed General Unsecured Claim which becomes due and payable after the Effective Date, on or as soon as reasonably practicable after the date on which such Claim becomes an Allowed Claim, but no later than 30 days after the date upon which the Claim becomes an Allowed Claim.

87.     *Distribution Record Date* means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be five Business Days before the Confirmation Date.

88.     *DVB* means DVB Group Merchant Bank (Asia) Ltd.

89.     *DVB Agent* means DVB, in its capacity as administrative agent under the Existing DVB Credit Agreement.

90.     *DVB Bareboat Charters* means the Seminole Princess Charter and the Laguna Belle Charter.

91.     *DVB Debtors* means Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., each a corporation organized under the laws of the Republic of the Marshall Islands, TBS International, TBS Holdings Limited and TBS Parent.

92.     *DVB Lenders* means the Holders of Claims arising under the Existing DVB Credit Agreement.

93.     *DVB Syndicate Claims* means the Claims arising under the Existing DVB Credit Agreement and owed to the DVB Lenders, including, without limitation, all outstanding principal and accrued and unpaid interest, fees, and expenses, and other obligations owed to the DVB Lenders under the Existing DVB Credit Agreement, and any unsecured deficiency portion of such Claim.

94.     *Effective Date* means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect and shall be substantially consummated, which date shall be after the later of (a) the date on which the Confirmation Order shall have been entered and is no longer subject to any stay; and (b) the date on which the conditions to the Effective Date provided for in Section 10.1.2 of the Plan have been satisfied or waived.

95. ***Equity and Corporate Governance Term Sheet*** means that certain term sheet, attached as Exhibit O to the Disclosure Statement, which sets forth the key equity and corporate governance provisions that will relate to New TBS Parent and the Reorganized Debtors from and after the Effective Date.

96. ***Equity Security*** means (a) shares of common stock, Preferred Stock, other forms of ownership interest, or any interest or right to convert into such an equity or ownership interest or to acquire any equity or ownership interest or any interest or right for which the amount owing is determined by reference to an equity or ownership interest, in any Debtor that was in existence immediately prior to or on the Petition Date for such Debtor, and (b) Allowed Claims against TBS Parent arising out of, relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code.

97. ***Estate(s)*** means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case and, collectively, the estates of all Debtors in the Chapter 11 Cases, created pursuant to section 541 of the Bankruptcy Code.

98. ***Exculpated Parties*** means (a) the Debtors, (b) the Committee and its members, (c) the BOA/DVB DIP Lenders and the Credit Suisse DIP Lender, (d) the Supporting Prepetition Lenders, and (e) Credit Suisse, AIG and each of the respective Agents for the Prepetition Credit Agreements, and the officers, directors, employees, professionals, Professionals and agents of the Persons listed in subsections (a) through (e) of this definition, along with the successors and assigns of each of the foregoing.

99. ***Executory Contract*** means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

100. ***Existing AIG Credit Agreement*** means that certain Loan Agreement, dated as of February 29, 2008 by and among (a) the AIG Debtors and (b) AIG, as agent and lender (as amended, supplemented, or otherwise modified, and together with all Finance Documents (as defined in the Existing AIG Credit Agreement)) and mortgages, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith.

101. ***Existing BOA Credit Agreement*** means that certain Second Amended and Restated Credit Agreement, dated as of January 27, 2011, by and among (a) the BOA Debtors, (b) the BOA Lenders, and (c) BOA Agent, as administrative agent, swing line lender and L/C issuer (as amended, supplemented, or otherwise modified from time to time, and together with all Loan Documents (as defined in the Existing BOA Credit Agreement)) and mortgages, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith, including without limitation, that certain ISDA Master Agreement and Schedule, dated as of June 28, 2005, as amended July 24, 2006, between TBS International Limited, Albemarle Maritime Corp., Arden Maritime Corp., Asia-America Ocean Carriers Ltd., Birnam Maritime Corp., Bristol Maritime Corp., Chester Shipping Corp., Darby Navigation Corp., Dover Maritime Corp., Frankfort Maritime Corp., Glenwood Maritime Corp., Hansen Shipping Corp., Henley Maritime Corp., Hudson Maritime Corp., Kensington Shipping Corp., Newkirk Navigation Corp., Oldcastle Shipping Corp., Rector Shipping Corp., Remsen Navigation Corp., Sheffield Maritime Corp., Sherman Maritime Corp., Sterling Shipping Corp.,

Stratford Shipping Corp., Vernon Maritime Corp. and Windsor Maritime Corp., collectively, as Party B, and Bank of America, N.A., as Party A.

102.    ***Existing Credit Suisse Credit Agreement*** means that certain Loan Agreement dated December 7, 2007 by and among the Credit Suisse Debtors and Credit Suisse (as amended, supplemented, or otherwise modified, and together with all Finance Documents (as defined in the Existing Credit Suisse Credit Agreement)) and mortgages, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith, including, without limitation, that certain ISDA Master Agreement and Schedule, dated as of December 7, 2007, between Claremont Shipping Corporation and Yorkshire Shipping Corporation, as Party B, and Credit Suisse, as Party A.

103.    ***Existing DVB Credit Agreement*** means that certain Fifth Amendatory Agreement dated as of January 27, 2011 by and among (a) the DVB Debtors, (b) DVB Group Merchant Bank (Asia) Ltd., as Lender, Facility Agent and Security Trustee, (c) the DVB Lenders, (d) DVB, (e) the Governor and Company of the Bank of Ireland, and (f) Natixis (as amended, supplemented, or otherwise modified, and together with all Finance Documents (as defined in the Existing DVB Credit Agreement)) and mortgages, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, including without limitation, (x) that certain ISDA Master Agreement and Schedule, dated as of January 23, 2008, between Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., as Party B, and DVB Bank AG, as Party A, (y) that certain ISDA Master Agreement and Schedule, dated as of January 23, 2008, between Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., as Party B, and The Governor and Company of the Bank of Ireland, as Party A, and (z) that certain ISDA Master Agreement and Schedule, dated as of January 23, 2008, between Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., as Party B, and Natixis, as Party A.

104.    ***Federal Judgment Rate*** means the federal judgment interest rate which was in effect as of the Petition Date.

105.    ***File or Filed*** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

106.    ***Final Order*** means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, reargument, or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

107. **Forfeiture Date** means the date that is the one year anniversary of the Effective Date.

108. **General Unsecured Claim** means any Claim, other than an Intercompany Claim or a Subordinated Claim, that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code; *provided*, *however*, that General Unsecured Claims do not include L/C Claims, RBS Syndicate Claims, or Claims arising under the Prepetition Credit Agreements. A General Unsecured Claim shall be Allowed, to the extent such Claim is reflected in the books and records of the Debtors, in the amount reflected in such books and records, subject to the right of the Claimant to object to such amount in accordance with normal and customary practice; a General Unsecured Claim that is not reflected in the books and records of the Debtors shall be Allowed, except to the extent Disputed by the Debtors pursuant to the dispute resolution procedures in the Plan.

109. **Governmental Unit** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

110. **Holder** means any Person holding an Interest or Claim.

111. **Impaired** means a Claim or a Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

112. **Implementation Memorandum** means the memorandum describing the restructurings, transfers, or other corporate transactions that the Debtors determine to be necessary or appropriate to effect the Restructuring in compliance with the Bankruptcy Code and, to the maximum extent possible, in a tax efficient manner. The Implementation Memorandum shall be filed in the Plan Supplement.

113. **Intercompany Claim** means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor.

114. **Intercompany Contracts** means any Executory Contract by or between or among any of the Debtors.

115. **Intercompany Interests** means the Interests held in a Debtor by another Debtor.

116. **Interests** means, as to each Debtor, any: (a) Equity Security of such Debtor, including all shares or similar securities in any Debtor, whether or not transferable or denominated "stock", and whether issued, unissued, authorized, or outstanding; (b) any warrants, options, or contractual rights to purchase, sell, subscribe or acquire such Equity Security at any time and all rights arising with respect thereto; and (c) any similar interest in a Debtor.

117. **Laguna Belle Charter** means that certain Bareboat Charter, dated as of January 24, 2007, by and between Beekman Shipping Corp., as charterer, and Rushmore Shipping LLC, as owner of the M/V Laguna Belle, as amended on Effective Date pursuant to the Amended DVB Bareboat Charters.

118.    ***L/C Claims*** means Claims that are the beneficiary of a letter of credit issued for the benefit of the Debtors under the Existing BOA Credit Agreement or under any other applicable agreement; anything herein or in the Plan to the contrary notwithstanding, L/C Claims do not include the Claim of any issuer of a letter of credit on behalf of the Debtors.

119.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

120.    ***Liquidation Analysis*** means the liquidation analysis attached as Exhibit B to the Disclosure Statement.

121.    ***New Articles of Association*** means, as to any Reorganized Debtor that is a U.S. entity, the Articles of Association of such entity, and as to New TBS Parent and any Reorganized Debtor that is not a U.S. entity, any equivalent corporate governance document, in either case, which documents shall be substantially in the forms filed in the Plan Supplement.

122.    ***New Boards*** means the initial boards of directors (or their equivalents under applicable law) of New TBS Parent and the Reorganized Debtors.

123.    ***New Bylaws*** means, as to any Reorganized Debtor that is a U.S. entity, the bylaws of such entity, and as to New TBS Parent and any Reorganized Debtor that is not a U.S. entity, any equivalent corporate governance document, in either case, which documents shall be substantially in the forms filed in the Plan Supplement.

124.    ***New Class A Common Stock*** means the new class A shares of New TBS Parent to be allocated among holders of BOA Syndicate Claims and DVB Syndicate Claims in accordance with Equity and Corporate Governance Term Sheet. The New Class A Common Stock shall represent 90% of the issued, outstanding and vested New Class A Common Stock and New Class B Common Stock on the Effective Date; provided, however, that the New Class A Common Stock will be subject to dilution by the New Class C Common Stock, if issued, to the extent provided in the New Management Incentive Plan and/or the Implementation Memorandum.  The New Class A Common Stock shall have such other characteristics and rights, including a preferred return of $500,000, as described in the Equity and Corporate Governance Term Sheet and the definitive documents implementing such term sheet.

125.    ***New Class B Common Stock*** means the new class B shares of New TBS Parent to be allocated to plan recipients under the New Management Incentive Plan.  The initial recipients of the New Class B Common Stock will receive, on the Effective Date, vested Class B shares representing 10% of the issued, outstanding and vested New Class A Common Stock and New Class B Common Stock on the Effective Date; provided, however, that the New Class B Common Stock will be subject to dilution by the New Class C Common Stock, if issued, to the extent provided in the New Management Incentive Plan and/or the Implementation Memorandum.  The New Class B Common Stock shall have such other characteristics and rights, including a catch-up return of $55,555, as described in the Equity and Corporate Governance Term Sheet and the definitive documents implementing such term sheet.

126.    ***New Class C Common Stock*** means the new initially unvested class C shares of New TBS Parent which, pursuant to the Implementation Memorandum, may be issued and allocated to recipients under the New Management Incentive Plan.  If shares of New Class C

Common Stock are issued, the vesting schedule for New Class C Common Stock and milestones related thereto shall be subject to the terms and conditions of the New Management Incentive Plan, the New TBS Parent Shareholder Agreement or the Implementation Memorandum. Immediately upon vesting, shares of New Class C Common Stock shall automatically convert into shares of New Class B Common Stock. The New Class C Common Stock shall have such other characteristics and rights as described in the Equity and Corporate Governance Term Sheet and the definitive documents implementing such term sheet.

127. *New Common Stock* means, collectively, the New Class A Common Stock, the New Class B Common Stock and the New Class C Common Stock of New TBS Parent. The New Class A Common Stock, the New Class B Common Stock and the New Class C Common Stock may, if necessary to implement the restructuring as provided herein, be in the form of preferred stock of New TBS Parent. The character and terms of the New Common Stock will be set forth in the New TBS Parent Shareholder Agreement, and documents related thereto, that will be filed in the Plan Supplement.

128. *New Credit Agreements* means the Amended and Restated Credit Suisse Credit Agreement, and the Amended and Restated AIG Credit Agreement.

129. *New Credit Agreement Distribution Procedures* means, as to any (a) lender under the BOA/DVB Exit Facility or the Credit Suisse Exit Facility or (b) Claimant in Classes 3(1), (2), (3), and (61)-(67); 4(1)-(60); 5(1), (2), and (68)-(69); and 6(1), (2), (3), and (70)-(73), compliance by such Claimant with the following procedures, unless the applicable Agent, or BOA/DVB Exit Facility Agent determines that the lender or Claimant would still be bound by the applicable documents notwithstanding the failure to execute them:

    i.    Execution of the BOA/DVB Exit Facility Agreement, Credit Suisse Exit Facility Agreement, New Credit Agreement and/or New Senior Secured Loan Agreement applicable to such lender or Claimant or an accession letter, acceptable to the Agent with respect to such BOA/DVB Exit Facility Agreement, Credit Suisse Exit Facility Agreement, New Credit Agreement and/or New Senior Secured Loan Agreement, binding such lender or Claimant to the provisions of the BOA/DVB Exit Facility Agreement, Credit Suisse Exit Facility Agreement, New Credit Agreement and/or New Senior Secured Loan Agreement, and the other finance documents related thereto, including any applicable intercreditor agreement;

    ii.    Provision of such information and documentation as the Debtors and the Agent under the applicable BOA/DVB Exit Facility Agreement, Credit Suisse Exit Facility Agreement, New Credit Agreement and/or New Senior Secured Loan Agreement may reasonably require to ensure compliance with applicable withholding and reporting requirements, including delivery of the applicable Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9; and

iii.        Provision of any other item required by the Agent under the applicable BOA/DVB Exit Facility Agreement, Credit Suisse Exit Facility Agreement, New Credit Agreement and/or New Senior Secured Loan Agreement.

130.     **New Employment Agreements** means the four new employment agreements between the New TBS Parent and the Reorganized Debtors, on the one hand, and each of Joseph Royce, Gregg McNelis, Lawrence Blatte, and Ferdinand Lepere, on the other hand, which New Employment Agreements shall become effective on the Effective Date. The terms of the New Employment Agreements shall be substantially in accordance with the terms set forth in the New Employment Agreement Term Sheet. Each of the New Employment Agreements shall be substantially in the form filed in the Plan Supplement and, in addition to being approved in the Confirmation Order, shall be approved by the New Boards.

131.     **New Employment Agreement Term Sheet** means that certain term sheet, attached as Exhibit L to the Disclosure Statement, that sets forth the terms of the New Employment Agreements for Joseph Royce, Gregg McNelis, Lawrence Blatte, and Ferdinand Lepere applicable to New TBS Parent on and after the Effective Date.

132.     **New Management Incentive Plan** means the new management incentive plan applicable to New TBS Parent and the Reorganized Debtors on and after the Effective Date, the terms of which shall be substantially in accordance with the terms set forth in the New Management Incentive Plan Term Sheet. The New Management Incentive Plan shall be substantially in the form filed in the Plan Supplement and, in addition to being approved in the Confirmation Order, shall be approved by the New Boards and the holders of the New Common Stock immediately after the Effective Date in accordance with applicable law.

133.     **New Management Incentive Plan Term Sheet** means that certain term sheet, attached as Exhibit M to the Disclosure Statement that sets forth the terms of the New Management Incentive Plan applicable to New TBS Parent and the Reorganized Debtors on and after the Effective Date.

134.     **New Senior Secured Cash Pay Loan Obligations** means the obligations of New TBS Parent and certain Reorganized Debtors under the New Senior Secured Cash Pay Loan Tranche of the New Senior Secured Loan Facility, to be distributed among holders of BOA Syndicate Claims and DVB Syndicate Claims on the Effective Date, as provided in Article IV of the Plan.

135.     **New Senior Secured Cash Pay Loan Tranche** means the cash pay tranche of the New Senior Secured Loan Facility, which tranche shall have an aggregate principal amount of $30,000,000.

136.     **New Senior Secured Loan Agent** means BOA or any successor administrative agent under the New Senior Secured Loan Facility.

137.     **New Senior Secured Loan Agreement** means that certain post-Effective Date loan agreement executed and delivered in connection with the New Senior Secured Loan

Facility, including and incorporating any agreements, documents, or supplements related thereto or delivered in connection therewith.

138.    *New Senior Secured Loan Facility* means a new second lien term loan credit facility comprised of the New Senior Secured Cash Pay Loan Tranche and the New Senior Secured PIK Loan Tranche, in the aggregate amount of approximately $151,000,000 plus any additional accrued and unpaid interest (including interest paid in kind), fees, swap termination obligations (if any) and other obligations arising under both the Existing BOA Credit Agreement and Existing DVB Credit Agreement), to be entered into by New TBS Parent, the Reorganized Debtors (other than the AIG Grantors and the CS Grantors), and the New Senior Secured Loan Agent on the Effective Date, the terms of which shall be substantially in accordance with the terms set forth in the BOA/DVB Debt Term Sheet. The New Senior Secured Loan Facility will be substantially in the form filed in the Plan Supplement.

139.    *New Senior Secured PIK Loan Obligations* means the obligations of New TBS Parent and the Reorganized Debtors under the New Senior Secured PIK Loan Tranche of the New Senior Secured Loan Facility, to be distributed among holders of BOA Syndicate Claims and DVB Syndicate Claims on the Effective Date, as provided in Article IV of the Plan.

140.    *New Senior Secured PIK Loan Tranche* means the payment-in-kind tranche of the New Senior Secured Loan Facility, which tranche shall have an aggregate amount of approximately $121,000,000 plus any additional accrued and unpaid interest (including interest paid in kind), fees, swap termination obligations (if any) and other obligations arising under both the Existing BOA Credit Agreement and Existing DVB Credit Agreement).

141.    *New TBS Parent* means the new parent entity of the Reorganized Debtors to be formed prior to the Effective Date which formation shall be performed as set forth in the Implementation Memorandum. New TBS Parent shall hold 100% of the issued and outstanding common shares in Reorganized TBS Holdings Limited.

142.    *New TBS Parent Shareholder Agreement* means that certain agreement, to be entered into as of the Effective Date, by and among New TBS Parent and the holders of New Common Stock, the terms of which shall be substantially in accordance with the terms set forth in the Equity and Corporate Governance Term Sheet. The New TBS Parent Shareholder Agreement will be substantially in the form filed in the Plan Supplement.

143.    *Other Priority Claim* means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

144.    *Other Secured Claim* means any Secured Claim that is not a Claim under a Prepetition Credit Agreement. For the avoidance of doubt, Claims of the issuer of any letter of credit that is not issued under a Prepetition Credit Agreement are Other Secured Claims.

145.    *Person* means any person, including without limitation, any individual, entity, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, estate, trust, unincorporated association or organization,

official committee, ad hoc committee or group, governmental agency or political subdivision thereof, the U.S. Trustee, and any successors or assigns of any of the foregoing.

146. **_Petition Date_** means the date on which the Chapter 11 Cases were commenced with the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

147. **_Plan_** means the Joint Prepackaged Plan of Reorganization for the Debtors under Chapter 11 of the Bankruptcy Code proposed by the Debtors, dated January 31, 2012, and all annexes and exhibits attached thereto or referenced therein including, without limitation, the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

148. **_Plan Documents_** means the Plan, the Plan Supplement, the Disclosure Statement, and all documents, attachments, annexes, and exhibits attached to the Plan or the Disclosure Statement that aid in effectuating the Plan, as the same may be amended, modified, or supplemented, in accordance with their terms.

149. **_Plan Supplement_** means the supplement to the Plan to be filed by the Debtors with the Bankruptcy Court not later than 10 days prior to the Confirmation Hearing, which supplement shall contain forms of substantially final documents required for the implementation of the Plan.

150. **_Plan Support Agreement_** means that certain Plan Support Agreement, by and among the Debtors, the Supporting Prepetition Lenders, Joseph Royce, Gregg McNelis, Lawrence Blatte, and Ferdinand Lepere, attached as Exhibit D to the Disclosure Statement.

151. **_Postpetition Period_** means the period of time following the Petition Date through the Confirmation Date.

152. **_Preferred Stock_** means the Series A and Series B preference shares issued by TBS Parent.

153. **_Prepetition Credit Agreements_** means the Existing BOA Credit Agreement, the Existing DVB Credit Agreement, the Existing Credit Suisse Agreement, and the Existing AIG Credit Agreement.

154. **_Prepetition Lenders_** means the lenders under the Prepetition Credit Agreements.

155. **_Priority Tax Claim_** means a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code.

156. **_Pro Rata Share_** means, with reference to any Distribution on account of any Allowed Claim or Allowed Interest in (a) Classes 3(1), (2), (3) and (61)-(67) and Classes 4(1)-(60), a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Claim bears to the aggregate amount of all Allowed Claims in Classes 3(1), (2), (3) and (61)-(67) and Classes 4(1)-(60) combined and (b) any other Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such claim bears to the aggregate amount of all Allowed Claims or Allowed Interests in the same Class.

157.     ***Professional Compensation Claim*** means each Administrative Expense Claim for compensation, indemnification, or reimbursement of expenses incurred by Professionals through the Confirmation Date pursuant to section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Cases.

158.     ***Professionals*** means those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(1) of the Bankruptcy Code and/or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court or is sought pursuant to section 503(b)(4) of the Bankruptcy Code.

159.     ***Proof of Claim*** means any proof of claim filed with the Bankruptcy Court or the Balloting and Claims Agent with respect to a Debtor pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002.

160.     ***RBS*** means Royal Bank of Scotland plc.

161.     ***RBS Agent*** means RBS, as agent under the RBS Credit Agreement.

162.     ***RBS Credit Agreement*** means that certain Loan Agreement dated as of March 29, 2007 by and among (a) the RBS Obligors, (b) RBS, as lead arranger and agent, and (c) the RBS Lenders (as amended, supplemented, or otherwise modified from time to time, and together with all Finance Documents (as defined in the RBS Credit Agreement)) and mortgages, documents, notes, instruments, and any other agreements delivered pursuant thereto or in connection therewith, including without limitation, that certain ISDA Master Agreement and Schedule, dated as of March 29, 2007, between Argyle Maritime Corp., Caton Maritime Corp., Dorchester Maritime Corp., Longwoods Maritime Corp., McHenry Maritime Corp. and Sunswyck Maritime Corp., as Party B, and The Royal Bank of Scotland plc, as Party A, any Account Security Deeds and any other documents related to or issued under or in connection with the RBS Credit Agreement, including but not limited to documents executed in connection with the January 27, 2011 restructuring of TBS Parent and its affiliates, and any engagement or fee letter with advisors (whether legal or financial) to RBS and/or the RBS Lenders.

163.     ***RBS Lenders*** means the Holders of Claims arising under the RBS Credit Agreement.

164.     ***RBS Obligors*** means Argyle Maritime Corp., Caton Maritime Corp., Dorchester Maritime Corp., Longwoods Maritime Corp., McHenry Maritime Corp., and Sunswyck Maritime Corp..

165.     ***RBS Settlement Agreement*** means that certain RBS Vessel Turnover Term Sheet, dated as of January 4, 2012, by and between the RBS Agent and the RBS Obligors that provides for the return of certain vessels and certain other assets constituting Collateral under the RBS Credit Agreement, and for a full and final settlement all Claims of the RBS Agent and the RBS Lender against the Debtors and certain of their non-Debtor Affiliates arising under the RBS

Credit Agreement, subject to the provisions of the RBS Vessel Turnover Term Sheet. The RBS Settlement Agreement is attached as Exhibit H to the Disclosure Statement.

166. ***RBS Settlement Agreement Assumption Motion*** means the motion, filed by the Debtors, to assume the RBS Settlement Agreement pursuant to section 365 of the Bankruptcy Code, which the Debtors intend to file after the Petition Date and seek to have approved by the Bankruptcy Court at the Confirmation Hearing.

167. ***RBS Settlement Obligations*** means the continuing obligations of RBS and the Debtors under the RBS Settlement Agreement.

168. ***RBS Syndicate Claims*** means any and all claims of the RBS Agent, the RBS Lenders or any other parties against the Debtors or certain of their non-Debtor affiliates party to the RBS Credit Agreement that have arisen or may arise under the RBS Credit Agreement, including without limitation, obligations for principal, interest, fees, charges, expenses, professional reimbursement and restructuring fees.

169. ***Record Date*** means 5:00 pm (prevailing U.S. Eastern Time) on January 23, 2011.

170. ***Rejected Executory Contract and Unexpired Lease List*** means the list (as may be amended from time to time), as determined by the Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to Article VI of the Plan.

171. ***Released Parties*** means (a) the Debtors, (b) the Committee and its members, (c) the BOA/DVB DIP Lenders and the Credit Suisse DIP lender, and (d) AIG, Credit Suisse, the other Prepetition Lenders, and each of the respective Agents for the Prepetition Credit Agreements, and the respective officers, directors, employees, professionals, Professionals and agents of the Persons identified in subsections (a) through (d) of this definition, along with the successors and assigns of each of the foregoing.

172. ***Reorganized*** means, when used with reference to a Debtor, such Debtor on and after the Effective Date.

173. ***Reorganized Debtors*** means, subject to the Restructuring Transactions, individually, any Reorganized Debtor or its successor and collectively, all Reorganized Debtors and their successors, on or after the Effective Date.

174. ***Restructuring*** means the restructuring of the Debtors' capital structure implemented by the Plan and the transactions contemplated in connection therewith.

175. ***Restructuring Transactions*** means the corporate and operational restructuring transactions provided for in Section 7.6 of the Plan.

176. ***Schedules*** means the schedules, statements, and lists, if any, filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, if any, as may be amended or supplemented from time to time.

177. *Scheduling Motion* means the motion filed by the Debtors, substantially contemporaneously with the filing of the Chapter 11 Cases, satisfying the criteria set forth for a Scheduling Motion in Part III.A. of that certain General Order M-387, dated November 24, 2009, entered in the United States Bankruptcy Court for the Southern District of New York by The Honorable Stuart M. Bernstein and captioned In the Matter of the Adoption of Prepackaged Chapter 11 Case Amended Guidelines, Amending General Order 203.

178. *Scheduling Order* means the order granting the Scheduling Motion and scheduling the Confirmation Hearing.

179. *Seminole Princess Charter* means that certain Bareboat Charter, dated as of January 24, 2007, by and between Fairfax Shipping Corp., as charter, and Adirondack Shipping LLC, as owner of the M/V Seminole Princess, as amended by the Amended DVB Bareboat Charters.

180. *Secured* means when referring to a Claim: (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law, or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan. For the avoidance of doubt, a Claim shall be "Secured" hereunder if such security would be recognized as valid and enforceable under applicable law of the foreign jurisdiction pursuant to which such security was created.

181. *Securities Act* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77m, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Cases.

182. *Solicitation Package* means the package mailed to Holders of Claims entitled to vote to accept or reject the Plan, which package contains, among other things, (a) a copy of the Plan, (b) a copy of the Disclosure Statement, and (c) the appropriate Ballot, Ballot Instructions, and Ballot return envelope.

183. *Subordinated Claim* means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court and that is subordinated to General Unsecured Claims.

184. *Supporting Prepetition Lenders* means those Holders of Claims who are parties to the Plan Support Agreement.

185. *TBS Commercial* means TBS Commercial Group Ltd.

186. *TBS Commercial/Beacon Holdings Option Agreement* means that certain option agreement between TBS Commercial, Beacon Holdings and New TBS Parent pursuant to which New TBS Parent shall have the option until June 30, 2012 to require TBS Commercial and Beacon Holdings to dissolve foreign operations, close foreign offices used exclusively by TBS Commercial or Beacon Holdings, and use reasonable efforts to transition the workforce of TBS

Commercial and Beacon Holdings to New TBS Parent or one or more of its direct and indirect subsidiaries (to the extent requested by New TBS Parent), in each case pursuant to the terms and conditions of the TBS Commercial/Beacon Holdings Option Agreement. The TBS Commercial/Beacon Holdings Option Agreement will be substantially in the form filed in the Plan Supplement and substantially in accordance with the terms set forth in the TBS Commercial Term Sheet.

187. **TBS Commercial Management Agreements** means those certain management agreements dated as of the Effective Date, under which TBS Commercial and Beacon Holdings, and their subsidiaries, shall agree to provide services to New TBS Parent and its direct and indirect subsidiaries. The TBS Commercial Management Agreements will be substantially in the forms to be negotiated by the respective parties thereto and filed in the Plan Supplement.

188. **TBS Commercial Term Sheet** means that certain term sheet, attached as Exhibit N to the Disclosure Statement, that sets forth the terms of the TBS Commercial Management Agreements and the TBS Commercial/Beacon Holdings Option Agreement.

189. **TBS International** means TBS International Limited, an entity organized under the laws of Bermuda, and the direct subsidiaries of TBS Parent and direct parent of TBS Holdings Limited.

190. **TBS Parent** means TBS International public limited company, an entity organized under the laws of the Republic of Ireland.

191. **U.S. Trustee** means the United States Trustee for the Southern District of New York.

192. **U.S. Trustee Fees** means all fees and charges assessed against the Estates under section 1930 of title 28 of the United States Code, and interest, if any, for delinquent quarterly fees pursuant to section 3717 of title 31 of the United States Code.

193. **Unclaimed Property** means unclaimed Cash held by the Disbursing Agent and any Distributions returned to or otherwise held by the Disbursing Agent on the Forfeiture Date as well as any other Distributions not claimed on the Forfeiture Date.

194. **Unexpired Lease** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

195. **Unimpaired** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

196. **Voting Deadline** means 5:00 p.m. (Prevailing U.S. Eastern Time) on February 14, 2012, which is the deadline for submitting Ballots.

197. **Voting Report** means the report prepared by the Balloting and Claims Agent which reports the results of the tabulation of votes to accept or reject the Plan.

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 234 of 385

Exhibit B

**TBS International plc - Consolidated**

## Table I: Assets Available for Distribution

| ($ in 000's) | Global Notes | Unaudited Balances (i) Nov 30, 2011 | Estimated Asset Realization Percentage Low | High | Hypothetical Liquidation Values Low | High |
|---|---|---|---|---|---|---|
| **Cash & Cash Equivalents** | A | | | | | |
| Cash & Cash Equivalents (Unrestricted) | | $ 7,699 | 100% | 100% | $ 7,699 | $ 7,699 |
| Restricted Cash | | 400 | 40% | 60% | 160 | 240 |
| Total Cash & Cash Equivalents | | 8,099 | | | 7,859 | 7,939 |
| **Charter Hire Receivables, Net of Allowance** | B | 32,774 | 40% | 60% | 13,110 | 19,664 |
| **Freight Receivables due from Affiliates** | C | - | n/a | n/a | - | - |
| **Inventories** | D | 17,604 | 0% | 5% | - | 880 |
| **Prepaid Expenses & Other Assets** | E | 6,298 | 20% | 30% | 1,260 | 1,889 |
| **Accounts Receivables Collected by Affiliates** | F | - | n/a | n/a | - | - |
| **Advances/Intercompany Transactions** | G | | | | | |
| Advances to Affiliates in Combination | | 97,543 | 0% | 0% | - | - |
| Advances to Affiliates not in Combination | | 1,450 | 20% | 40% | 290 | 580 |
| Total Advances | | 98,993 | | | 290 | 580 |
| **Fixed Assets, Net** | H | 293,178 | 41% | 47% | 120,367 | 138,676 |
| **Other Assets and Deferred Charges** | I | 25,200 | 2% | 5% | 504 | 1,260 |
| **Goodwill** | | - | n/a | n/a | - | - |
| **Total Assets and Net Proceeds Available for Distribution** | | $ 482,146 | | | $ 143,389 | $ 170,889 |
| | | | | | 30% | 35% |

## Table II: Estimated Chapter 7 Expenses

| ($ in 000's) | Global Notes | Estimated Balance / Allowed Claim | Estimated Creditor Recovery Percentage Low | High | Hypothetical Creditor Recovery Values Low | High |
|---|---|---|---|---|---|---|
| Net Operational Winddown Costs | J | 38,359 | | | $ 38,359 | $ 38,359 |
| Chapter 7 Trustee Fees (ii) | J | | | | 4,302 | 5,127 |
| Chapter 7 Professional Fees & Costs (iii) | J | | | | 5,730 | 5,140 |
| Total Chapter 7 Administrative Claims | | | | | 48,391 | 48,626 |
| **Net Proceeds after Chapter 7 Administrative Claims** | | | | | $ 94,998 | $ 122,263 |

**TBS International plc - Consolidated**

**Table III: Estimated Creditor Recoveries**

| ($ in 000's) | Notes | Estimated Consolidated Claims | | Estimated Creditor Recovery Percentage | | Hypothetical Creditor Recovery Values | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| Administrative Claims | K | - | - | | | $ - | $ - |
| Priority Tax Claims | L | - | - | | | - | - |
| Classified Claims | | | | | | | |
| Class 1: Priority Non-Tax Claims | L | 533 | 533 | 100% | 100% | 533 | 533 |
| Class 2: Other Secured Claims | M | - | - | | | - | - |
| Class 3: DVB Syndicate Claims | N | 25,186 | 25,186 | 39% | 56% | 9,732 | 13,989 |
| Class 4: BOA Syndicate Claims | O | 120,284 | 120,284 | 40% | 56% | 48,174 | 67,201 |
| Class 5: Credit Suisse Claims | P | 18,969 | 18,969 | 45% | 61% | 8,538 | 11,560 |
| Class 6: AIG Claims | Q | 4,656 | 4,656 | 65% | 86% | 3,022 | 3,981 |
| Class 7: RBS Syndicate Claims | | - | - | | | - | - |
| Class 8: General Unsecured Claims (iv) | R | 114,798 | 142,063 | 18% | 22% | 25,000 | 25,000 |
| Class 9: Intercompany Claims | S | - | - | | | - | - |
| Class 10: Subordinated Claims | S | - | - | | | - | - |
| Class 11: Interests | S | - | - | | | - | - |
| Total Consolidated Claims (net of Deficiency Claim) | | 212,061 | 212,061 | | | 94,998 | 122,263 |
| **Net Proceeds Available to Equityholders** | | | | | | $ - | $ - |

**Notes:**

i   Balances are as of November 30, 2011 (unaudited) adjusted for vessel sales through January 31, 2012.

ii  Chapter 7 Trustee Fees assume 3% on gross proceeds available for distribution.

iii Chapter 7 Professional Fees assumes 12-month wind down period to assist in winding down the estate and completing any necessary accounting work.

iv  Estimated foreign vendors unsecured claims required to be paid to prevent vessels from being arrested and allowing Trustee to execute on sale/liquidation of vessel.

**Global Notes to the Liquidation Analysis**

### *Conversion Date and Appointment of a Chapter 7 Trustee*

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on February 6, 2012 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a single chapter 7 trustees (the "Trustee") to oversee the liquidation of the Debtors' Estates. Thus, this Liquidation Analysis estimates the recovery for Allowed Claims on a consolidated basis.

### *Primary Assets of the Debtors*

The Liquidation Analysis assumes a liquidation of all of the Assets, which primarily consist of vessels owned by the Debtors as of the Conversion Date. Assets also include receivables, inventories, and other assets related to vessel voyages and general operations; non-vessel assets such as furniture, fixtures, and computer-related equipment; cash on hand; and the Debtors' interests in all non-Debtor Affiliates after third-party claims against such Affiliates are satisfied. The Liquidation Analysis assumes a range of recoveries for these Assets assuming a forced liquidation asset sale process conducted by the Debtors' Trustee. The liquidation value generated for Debtors' Assets has been included with any other potential realizable Assets held by the Debtors. The Debtors' management believes that values generated in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the going concern valuation of the Assets.

### *Forced Liquidation Sale Process*

The estimated liquidation proceeds generated for the Debtors were derived assuming a forced liquidation and wind down of all of the Debtors' operations. The Debtors' management derived a range of potential recovery values for each class of assets based on a number of factors, including the following: (i) the age and quality of the Assets; (ii) recent vessel sale transactions and/or estimated scrap values; (iii) the current supply/oversupply of various types of vessels as well as new-buildings in progress; and (iv) the potential alternative uses for such Assets by other competitors or other industrial uses for such Assets. Reductions to going-concern valuations or appraisals were applied to reflect the forced sale nature of a chapter 7 liquidation. These reductions were derived by considering such factors as the shortened time period involved in the sale process, discounts buyers would require given a shorter due diligence period and minimal seller warranties (if any) which would potentially result in higher risks buyers might assume, potentially negative perceptions involved in liquidation sales, the current state of the capital markets as well as the additional oversupply of vessels for sale caused by concurrent liquidation by the Debtors, the limited universe of prospective buyers, and the "bargain hunting" mentality of liquidation sales.

The Liquidation Analysis assumes a liquidation of the Assets occurs to sell all of the physical Assets of the Debtors, including each vessel, immediately after the completion of such vessel's current voyage. This reflects an estimate of the time required to dispose of the material physical Assets upon completion of each vessel's current voyage and wind down the physical operations related to the Debtors' businesses. Once cargo is loaded on board a vessel, that vessel is obligated under the contract of carriage and maritime law to complete the voyage and deliver the cargo at its intended destination or provide alternate arrangements for such completion and delivery. Breach of that duty may give rise to a maritime lien, which could expose the vessel to arrest in a foreign jurisdiction. It is assumed, therefore, that the Debtor's Estate is best served by completing all current voyages. The analysis assumes an average of 60 days from the Conversion Date for all vessels to complete their current voyages and be sold. The analysis further assumes an additional 10 months to wind down the legal, tax, and accounting affairs of the consolidated Estates. This period of time would provide the appointed Trustee the necessary time to

resolve claims as well as distribute proceeds from the sale of the physical Assets. It is further assumed that incremental customer freight revenue and new cargo loadings related to the Debtors' fleet would be virtually eliminated immediately after announcing a conversion to a chapter 7 liquidation. The analysis also assumes all executory contracts would be rejected during the pendency of the liquidation and potential claim estimates have not been included in the analysis and would likely be de minimis in amount. The Debtors' management cannot anticipate Claims by creditors for such contract rejections and assumes contract rejection claim estimates may be significantly understated in the analysis. This Liquidation Analysis also assumes that roughly 50% of the existing staff currently employed by the Debtors will remain with the Debtors for a 60 day period while physical Assets are liquidated. Costs have been included for the Trustee to maintain employment to collect and liquidate all of the Debtors' property during the property liquidation phase of this analysis. Additional general and administrative costs have been included for staff necessary to wind down the accounting, legal, and tax affairs of the consolidated Debtor Estates. If the cash flows from the sale of the Debtors' Assets are not sufficient to fund the ongoing operations during this period, the Trustee may have to lower expectations related to potential recovery value for the material Assets and further reduce the recovery estimates contained in this Liquidation Analysis.

This Liquidation Analysis assumes that net proceeds from Asset liquidations would not generate any tax liabilities based on the tax basis of the Assets and the Debtors' existing taxing jurisdiction(s). Should the tax treatment and effect of these transactions result in net tax liabilities, recovery percentages in the Liquidation Analysis could change materially.

### *Substantive Consolidation of the Estates*

This Liquidation Analysis assumes that each case related to the Debtors' business operations will be converted into a chapter 7 liquidation and a single Trustee would be appointed to administer the Debtors' Estates. This Liquidation Analysis further assumes that the net sale proceeds of each vessel could be directed to the appropriate lender with a Lien on such vessel, but the residual net proceeds from the remainder of the Debtor's Estates would be applied to classes of potential Claims consistent with a chapter 7 liquidation. Each vessel owning Debtor subsidiary's specific guarantee of debt has not been included in the calculation of recoveries for the Debtors' hypothetical recovery analysis. The decision to substantively consolidate the non-vessel owning Debtor entities for purpose of this liquidation analysis was made after arduous analysis of the non-vessel Assets, the Debtors' cash management system and the Debtors' affairs. The effect of substantive consolidation of the non-vessel owning Debtor entities for purpose of this liquidation analysis will be a review of the pooled assets and liabilities of such entities and the satisfaction of creditor Claims from the resulting common pool of funds and sale proceeds.

### *Factors Considered in Valuing Hypothetical Liquidation Proceeds*

Certain factors may limit the amount of the liquidation proceeds (the "Liquidation Proceeds") available to the Trustee. Certain of these factors that relate specifically to the liquidation of the Assets are discussed in further detail below. In addition, it is possible that distribution of the Liquidation Proceeds would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' businesses and operations. This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

## Specific Notes to the Asset Assumptions Contained in the Liquidation Analysis

The Liquidation Analysis refers to certain categories of Assets. The alphabetical designation below corresponds to the line items listed in the attached chart with a specific reference to global notes.

### A. Cash and Cash Equivalents

Cash and cash equivalents represent existing Cash and short-term investments that the Debtors maintain at various banks as a part of their normal cash management system as well as any Restricted Cash held as collateral for letters of credit. The Debtors' cash management systems consolidate daily cash activity into main operating accounts held at TBS International Limited, TBS Pacific Liner Limited, TBS Worldwide Services, Inc., and TBS Shipping Services Inc. The Debtors also maintain cash balances to fund regular operating disbursements for the fleet at Westbrook Holdings Limited and Roymar Ship Management Inc. The Debtors maintain cash within certain accounts for ancillary businesses at Compass Chartering Corp., TBS Shipping Houston, Inc., and TBS Do Sul Limited. Since the Debtors fund operating disbursements on a fleet basis, this analysis assumes this daily cash consolidation and cash management system continues upon the conversion to a chapter 7 liquidation and that Cash and cash equivalents are available for use and distribution on a consolidated basis. This analysis assumes that the Debtors and Trustee would fund the wind down of the Estates with proceeds from asset sales and available Cash. Recovery of Restricted Cash is assumed to be reduced by estimated outstanding amounts due under the terms of the associated letters of credit. Given the current state of credit markets and the nature of the Debtors' businesses, the Trustee would be forced to liquidate the Assets of the Estates in an expedited time frame in order to have cash on hand necessary to wind down the affairs of the Debtor. Recoveries for the Debtors' creditors could be further impacted to the extent the Trustee cannot obtain enough cash to fund the wind down of their operations and would then be forced to further reduce the potential sales prices of the Debtors' specific Assets.

### B. Charter Hire Receivables

In addition to Cash and Cash Equivalents, the Debtors have a significant amount of working capital in the form of accounts receivables. The recovery percentage related to these Assets is based on the estimated range of value that may be obtained in collecting current accounts receivable related to customer freight, demurrage, and time charters. The recovery percentages contemplate the Debtors' management's best estimate of collection given the parameters of this wind down analysis; minimal recovery for demurrage receivables which typically represent approximately 15% to 20% of the outstanding receivables balance; and that certain customers, the bulk of whom are foreign, may withhold payments in light of the operational wind down. Cash received from the collection of accounts receivable would be used by the Trustee for the costs necessary to wind down the affairs of the Debtors.

### C. Freight Receivables due from Affiliates

Freight receivables due from affiliates generally represent intercompany transactions to fund general fleet operating disbursements. Based on a consolidated liquidation of the Estate, all Intercompany Claims between individual Debtors are assumed to be settled without cash payments. As such, no recovery is forecasted for these Assets.

### D. Inventories

Inventories for the Debtors primarily consist of bunkers, spares, and other miscellaneous items on board vessels. The low range of recoveries associated with these Assets assume inventories will be markedly depleted as vessels complete their current voyages, the inability to return inventories of a consumable nature to suppliers, and buyers under a liquidation scenario would be unlikely to provide any credit for inventories on board vessels.

### E. Prepaid Expenses & Other Assets

Prepaid expenses and other assets include insurance premiums, tax and registration dues, and other general trade vendor deposits and prepayments. Many of these Assets are assumed to be consumed as the fleet completes their current voyages and through the wind down period. Aside from an estimate for insurance claims receivable, a de minimis amount is forecasted to be recoverable on other Prepaid expenses and other assets.

### F. Accounts Receivables Collected by Affiliates

Accounts receivables are typically collected, maintained, and used to make operating disbursements on a consolidated basis for the Debtors' fleet. Similar to Freight receivables due from affiliates, any of these Intercompany Claims between individual Debtors is assumed to be settled without cash payments. As such, no recovery is forecasted for these Assets.

### G. Advances/Intercompany Transactions

As mentioned above, Intercompany Claims between individual Debtors is assumed to be settled without cash payments. The recovery percentage related to these Assets is based on the estimated range of value that may be obtained in collecting advances to non-Debtor affiliates. The recovery percentages for Advances to non-Debtor affiliates contemplate a reduction in the balance of such advances during the wind down period as well as the estimated ability of non-Debtor affiliates, some of which rely on foreign partners, to refund any such advances.

### H. Fixed Assets, Net

The Debtors' primary physical Assets represent vessels owned by individual Debtors. More specifically, the Assets consist of a fleet of multipurpose tweendeckers and handysize / handymax bulk carriers, including specialized heavy-lift vessels. Many of these vessels are purpose-built and/or specialized for certain ports, cargoes, and trade lanes. In determining the potential recovery for such Assets, the Debtors' management considered (i) the age and quality of the Assets; (ii) recent vessel sale transactions and/or estimated scrap values; (iii) the current supply/oversupply of various types of vessels as well as new-buildings in progress; and (iv) the potential alternative uses for such Assets by other competitors or other industrial uses for such Assets. It is assumed that the market for older vessels at or near the end of their expected useful lives will realize their respective estimated scrap values as a minimum. It is assumed that all other vessels will be sold for the higher of their scrap values or reasonable discount from most recent going concern appraisal values to compensate for a liquidation scenario.

The recovery percentages would be affected by the time frame necessary for liquidating such Assets as well as the significant amount of oversupply of vessels for sale as the Debtors' vessels are offered for sale concurrent with one another. Recovery percentages were applied against the Debtors' current net book value of such Assets to develop a range of potential recoveries. In addition to the estimates the Debtors' management used to develop these ranges of recoveries, the Debtors' management has assumed that the Trustee would be able to locate all of the Assets at their final berthing ports and collect the Assets for such a sales process. While costs to locate and gather the equipment has been included in this analysis, given the geographic diversity of the locations where final berthing may occur, the cost estimates may be understated and require the Trustee to incur additional costs to retrieve the physical Assets of the Estate and potentially ballast certain vessels to alternative locations in order to facilitate such a sale as contemplated by this analysis. Such additional costs have not been assumed in the Liquidation Analysis and could further reduce recoveries as illustrated in this Liquidation Analysis.

A de minimis amount of recovery is assumed for non-vessel fixed assets, including grabs, office furniture, fixtures, computer equipment, and software.

### I.  Other Assets

Other Assets are comprised of intangibles, bareboat charter deposits, interests in joint ventures, and other miscellaneous Assets such as deferred charges.  Intangible Assets, deposits, and deferred charges would have no specific recovery in the Liquidation Analysis.  Recovery for interests in joint ventures are minimal as the value in such joint ventures are specific to the Debtors' business operations.  The recovery related to interests in joint ventures is limited to readily salable physical assets, such as warehouses and real property.

**Specific Notes to the Liability Assumptions Contained in the Liquidation Analysis**

This Liquidation Analysis sets forth an allocation of the Liquidation Proceeds to Holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages for Claims and Interests upon the Trustee's application of the Liquidation Proceeds.  The high and low recovery ranges reflect a high and low range of estimated Liquidation Proceeds from the Trustee's sales of the Assets.

### J.  Estimated Chapter 7 Expenses

Wind-down costs consist of operating expenses for the completion of final voyages, general and administrative costs required to operate the Assets during the liquidation process, and the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors.  This Liquidation Analysis assumes that the each specific Debtors' business operations will wind down after completion of the vessel's current voyage and the physical Assets will be collected and sold approximately 60 days, on average, after the liquidation process begins.  These costs include estimates for expenses needed to complete current voyages, discharge cargoes, and arrange for skeletal crew and/or security for vessels until each vessel is sold.  Chapter 7 Trustee fees necessary to facilitate the sale of the Debtors' Assets were assumed at the statutory maximum rate of 3% of available Liquidation Proceeds.  These fees would be used specifically for developing marketing materials and facilitating the solicitation process for the parties, as well as other preparatory requirements to sell the physical Assets.  Given the complexity and nature of the Debtors' Estates, this Liquidation Analysis assumes that in addition to the two month operational wind down and sale of Assets, an additional 10 months would be required to settle claims and wind down the accounting, legal, and tax affairs of the estate.  This estimate also takes into account the time that will be required for the Trustee and any professionals to become educated with respect to the Debtors' businesses and the Chapter 11 Cases.

### K.  Administrative Claims

Administrative Claims consist of Claims entitled to administrative expense priority under section 503 of the Bankruptcy Code.  Among other things, this category includes postpetition payables, outstanding Professional Fees, Claims arising prior to any post-conversion rejection of executory contracts and unexpired leases, Claims arising under any executory contracts and unexpired leases that were assumed during the Chapter 11 Cases or entered into after the Petition Date but before the Conversion Date.  Notably, costs and expenses relating to the Trustee's continued use of certain Debtor leased premises are included in estimated costs relating to the wind down of their operations, not in Administrative Claims.  Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

### L.  Priority Tax Claims and Other Priority Claims

Priority Tax Claims and Other Priority Claims consist of Claims that are entitled to priority under section 507 of the Bankruptcy Code, including non-tax claims related to employee wages and benefits. Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

### M.  Other Secured Claims

Other Secured Claims include certain vendor and miscellaneous obligations secured by Liens on certain of the Assets.  The Liquidation Analysis assumes that all trade vendors during the wind-down period will be paid in full with proceeds from Asset sales and available cash on hand, and as such, no valid liens will be placed against vessels and no claims are assumed in this class.  However, should the Debtors be unable to provide for all postpetition trade claims, vendors may assert maritime liens and claims against certain vessels which may result in claims and recoveries for this class.

### N.  DVB Syndicate Claims

DVB Syndicate Claims comprise Claims arising from or related to the DVB Syndicate Prepetition Secured Credit Agreement, including estimated swap liabilities as well as deferred interest and fees due to the DVB Syndicate, if any.  The recovery for these Claims is primarily based on estimated sale proceeds from seven vessels owned by the Debtors, which represent Assets specifically securing the DVB Syndicate Credit Agreement.

### O.  Bank of America Syndicate Claims

Bank of America Syndicate Claims comprise Claims arising from or related to the Bank of America Syndicate Prepetition Secured Credit Agreements, including estimated swap liabilities as well as deferred interest and fees due to the Bank of America Syndicate, if any.  The recovery for these Claims is primarily based on estimated sale proceeds from 28 vessels owned by the Debtors, which represent Assets specifically securing the Bank of America Credit Agreements.

### P.  Credit Suisse Claims

Credit Suisse Claims comprise Claims arising from or related to the Credit Suisse Prepetition Secured Credit Agreements, including estimated swap liabilities as well as deferred interest and fees due to Credit Suisse, if any.  The recovery for these Claims is primarily based on estimated sale proceeds from two vessels owned by the Debtors, which represent Assets specifically securing the Credit Suisse Credit Agreements.

### Q.  AIG Claims

AIG Claims comprise Claims arising from or related to the AIG Prepetition Secured Credit Agreement, including estimated swap liabilities as well as deferred interest and fees due to AIG, if any. The recovery for these Claims is primarily based on estimated sale proceeds from two vessels owned by the Debtors, which represent Assets specifically securing the AIG Credit Agreement.

### R.  General Unsecured Claims

General Unsecured Claims represent prepetition trade claims and other liabilities.  It is assumed that recovery for certain prepetition trade claims will be required to satisfy foreign claims in order to present vessels from being arrested in foreign jurisdictions, which would prevent Trustees from being

able to execute sales of the vessels.  The Liquidation Analysis assumes insufficient proceeds for all other General Unsecured Claims.

### S.   All Other Classes

There are insufficient Liquidation Proceeds for any recovery in the Liquidation Analysis by any Holders of Claims and Interests in any other Class.

**EXHIBIT C**

**REORGANIZED DEBTORS' FINANCIAL PROJECTIONS**

|  | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
|  | Total | Total | Total | Total | Total |
| **Income Statement** |  |  |  |  |  |
| Revenue |  |  |  |  |  |
| Voyage revenue | $ 241,632 | $ 307,612 | $ 343,715 | $ 368,957 | $ 395,233 |
| Time charter revenue | 50,684 | 20,973 | 15,088 | 16,485 | 18,519 |
| Other revenue | 400 | 400 | 400 | 400 | 400 |
| Total revenue | 292,716 | 328,985 | 359,203 | 385,842 | 414,152 |
| Operating expenses |  |  |  |  |  |
| Voyage | 127,870 | 129,609 | 130,079 | 130,821 | 131,595 |
| Vessel | 102,552 | 121,446 | 128,648 | 131,313 | 134,498 |
| Depreciation and amortization of vessels and other | 61,780 | 49,812 | 46,502 | 46,502 | 46,502 |
| General and administrative | 35,969 | 33,895 | 34,605 | 35,474 | 36,619 |
| Restructuring professional fees | 11,550 | - | - | - | - |
| Net loss (gain) from sale of vessels | 40,043 | 8,972 | - | - | - |
| Total operating expense | 379,764 | 343,734 | 339,833 | 344,110 | 349,215 |
| Income (loss) from operations | (87,049) | (14,750) | 19,369 | 41,732 | 64,937 |
| Other (expenses) and income |  |  |  |  |  |
| Interest expense | (17,190) | (13,082) | (12,175) | (10,966) | (10,292) |
| Total other (expense) and income, net | (17,190) | (13,082) | (12,175) | (10,966) | (10,292) |
| Net Income (loss) | (104,238) | (27,831) | 7,194 | 30,766 | 54,645 |
| Less: Net (loss) attributed to noncontrolling interests | - | - | - | - | - |
| Net Income (loss) attributable to TBS International plc | $ (104,238) | $ (27,831) | $ 7,194 | $ 30,766 | $ 54,645 |
| EBITDA | $ 26,324 | $ 44,034 | $ 65,872 | $ 88,234 | $ 111,440 |

|  | FY 2012 Total | FY 2013 Total | FY 2014 Total | FY 2015 Total | FY 2016 Total |
|---|---|---|---|---|---|
| **Balance Sheet** |  |  |  |  |  |
| Current assets |  |  |  |  |  |
| Cash and cash equivalents | $ 26,441 | $ 27,425 | $ 29,556 | $ 57,446 | $ 83,035 |
| Restricted cash | 400 | 400 | 400 | 400 | 400 |
| Charter hire receivables, net | 22,050 | 25,343 | 27,308 | 29,599 | 31,684 |
| Fuel and other inventories | 17,152 | 17,152 | 17,152 | 17,152 | 17,152 |
| Prepaid expenses and other current assets | 13,646 | 13,646 | 13,646 | 13,646 | 13,646 |
| Total current assets | 79,690 | 83,967 | 88,062 | 118,243 | 145,917 |
| Fixed assets, net | 243,225 | 187,996 | 171,956 | 163,917 | 147,878 |
| Other assets and deferred charges | 14,108 | 13,262 | 12,895 | 12,895 | 12,895 |
| Total assets | $ 337,022 | $ 285,224 | $ 272,914 | $ 295,055 | $ 306,690 |
| Liabilities |  |  |  |  |  |
| Accounts payable and accrued expenses | 41,856 | 44,609 | 45,129 | 45,640 | 45,984 |
| Voyages in progress and other liabilities | 6,893 | 6,893 | 6,893 | 6,893 | 6,893 |
| DIP / Exit Financing | 14,783 | - | - | - | - |
| Debt, total | 190,856 | 178,918 | 158,893 | 149,758 | 106,403 |
| Total liabilities | 254,387 | 230,420 | 210,915 | 202,290 | 159,280 |
| Shareholders' equity |  |  |  |  |  |
| Total shareholders' equity | 82,636 | 54,805 | 61,999 | 92,765 | 147,410 |
| Total liabilities and sheholders' equity | $ 337,022 | $ 285,224 | $ 272,914 | $ 295,055 | $ 306,690 |

| | FY 2012 Total | FY 2013 Total | FY 2014 Total | FY 2015 Total | FY 2016 Total |
|---|---|---|---|---|---|
| **Cash Flow Statement** | | | | | |
| | | | | | |
| EBITDA | 26,324 | 44,034 | 65,872 | 88,234 | 111,440 |
| Less: professional restructuring fees | (11,550) | - | - | - | - |
| Change in working capital | | | | | |
|   Charter hire receivables, net | 1,312 | (3,293) | (1,965) | (2,290) | (2,085) |
|   Other assets and deferred charges | 6,451 | 1,026 | 87 | - | - |
|   Accounts payable and accrued expenses | 2,745 | 2,753 | 521 | 511 | 344 |
| Change in working capital | 10,508 | 486 | (1,357) | (1,780) | (1,740) |
| | | | | | |
| Capital expenditure | | | | | |
|   Capital improvements | (15,540) | (16,811) | (16,563) | (16,563) | (16,563) |
|   Drydock | (11,541) | (12,194) | (13,900) | (16,400) | (13,900) |
|   Asset disposals | 84,710 | 25,450 | - | - | - |
|   New vessel acquisitions | (22,548) | - | - | (5,500) | - |
| Total capital expenditure | 35,080 | (3,555) | (30,463) | (38,463) | (30,463) |
| | | | | | |
| Free cash flow available for debt repayment | 60,363 | 40,966 | 34,052 | 47,991 | 79,236 |
| | | | | | |
| DIP / Exit drawdown / (repayment) | 14,783 | (14,783) | - | - | - |
| Transaction fees | (1,449) | (500) | - | - | - |
| Principal drawdown / (repayment) | (43,488) | (20,985) | (29,670) | (18,836) | (52,226) |
| Interest expense | (10,208) | (3,715) | (2,252) | (1,266) | (1,422) |
| | | | | | |
| **Free cash flow** | $ 20,000 | $ 984 | $ 2,130 | $ 27,890 | $ 25,589 |
| | | | | | |
| | | | | | |
| **Beginning cash balance** | 6,441 | 26,441 | 27,425 | 29,556 | 57,446 |
| **Ending cash balance** | 26,441 | 27,425 | 29,556 | 57,446 | 83,035 |

**Notes to the Income Statement and Cash Flow Statement**

*Approach*

The Income Statement consolidates the financial performance of the Debtors' operating segments using an approach established by the Debtors' management and professionals to forecast operating results. The Income Statement accounts for conditions specific to each service line and region in which the Debtors' operate including competitive pressures as well as the current state of the global shipping industry. The Debtors' management team has considered various factors in developing the Financial Projections based on specific assumptions and information available to the Debtors. The Debtors considered macroeconomic factors as well in preparing the Financial Projections given that the Debtors' business can be impacted by such factors as global trade and the level of oil prices as well as other economic factors. The Financial Projections should be reviewed in conjunction with the risk factors contained in the Disclosure Statement.

The Financial Projections were prepared on a "bottom-up" basis, specific to each region and/or service line within a reporting segment. Revenue and voyage expense were based on detailed estimates for a broad range of typical voyages expected to be made during the projection period and presented in "model voyages" for every key trade route. The model voyage shows the unique operating economics of each trade route that are caused by differences in types of cargo typically handled, voyage duration and ports called on. The differences cause variations in freight rates, voyage costs and time charter equivalent (TCE) rates between services. Vessels costs were based on current cost for maintaining the fleet of tweendeckers and handysize and handymax bulk carriers. Specific adjustments were made to account for any operational improvements implemented, or to be implemented, by the Debtor's management team. Expenses to operate the Debtors' corporate infrastructure were included to arrive at consolidated operating results.

Revenues were categorized in 3 major categories: 1) voyage revenue, 2) time charter revenue, and 3) other. Similarly, operating expense were broken out into: 1) voyage expense, 2) vessel expense, and 3) selling, general and administrative expense

*Operational Drivers*

TBS projects revenue as voyage revenue, reflecting the operations of the vessels that are not chartered out, and charter revenue, reflecting the operations of the vessels that have been chartered out to third parties. For voyages, both revenue and expenses were projected on commencement basis recognizing both the revenue and the expense for each voyage at the time it begins. Revenue from time charters is calculated using the daily charter hire rate multiplied by the number of charter-out days that the vessel was on-hire during a period. Vessel operating expenses for both voyage and time charters are calculated based on an estimated daily rate times the number of vessel days during a period.

Voyage revenue consists of freight charges paid for the transport of customers' cargo. Freight rates are set by the market and depend on the relationship between the demand for ocean freight transportation and the availability of appropriate vessels. The key factors driving voyage revenue are the number of vessels in the fleet, freight voyage days, revenue tons carried and the freight rates.

Time charter revenue consists of a negotiated daily hire rate for the duration of a voyage. It is based on the number of remaining available days after vessel allocations are made to the various service routes. The key factors driving time charter revenue are the number of days vessels are chartered out and the daily charter hire rates.

Other revenue consists of commissions earned from outside unrelated parties for the fixture of charters. The key factor driving other revenue is the number of charters fixed.

### Cost of Services and Selling, General and Administrative Expenses

Voyage expenses consist of costs attributable to specific voyages. The number of voyage days is a significant determinant of voyage expense, which primarily consists of fuel costs, commissions, port call, stevedoring and lashing materials. Fuel (bunker) expense, which typically accounts for approximately half of the voyage expense, is projected based on estimated average voyage fuel consumption and bunker price for the areas that the vessels will be bunkering.

Vessel expense consists of three components: owned vessels expense, controlled vessel expense and charter-in vessel expense. Owned vessel expenses consist of crew costs, maintenance and repair, insurance, lube oil, freight charges and other vessel related expense for owned and controlled vessels and are budgeted on a per vessel day basis. The vessel days are the number of days the Company operates its controlled fleet during a period. The controlled vessel expense represents the cost of bareboat chartered vessels and is calculated based on daily charter-in rate. The charter-in vessel expense are short term vessel charters aimed at meeting customer needs when owned vessels are not available or to take advantage of favorable chartering opportunities. They are also based on estimated daily charter-in rates.

Depreciation and amortization expense is principally depreciation on vessels and improvements, which is computed on a straight-line basis using a 30-year useful life from the time the vessel was originally delivered by the shipyard. Amortization of deferred drydock costs were computed using 2.5 year amortization period. New equipment, major upgrades and other non-vessels equipment is depreciating using 2.5 to 5 year life.

Selling, general and administrative ("SG&A") expenses are the costs necessary to operate the corporate infrastructure. The SG&A expenses consist primarily of salary and related payroll costs necessary to operate functions such as: technical management, operations, commercial/sales, accounting / finance, IT, claims management. Benefit related expenses were projected based on the current costs associated with the Debtor's program of health and welfare benefits. The other major categories of SG&A expense for which estimates were made include: professional fees, occupancy and travel and entertainment.

The net loss or gain on sale of vessels represents the difference between the estimated sales price and the net book value of the vessel.

### Restructuring Charges

Management estimates that the Debtors will incur approximately $11.6 million of restructuring charges in 2012. These expenses represent the professional fees relating to the Chapter 11 Cases. Professional fees were projected by examining the run-rate for professionals billing at hourly and fixed-rates and account for success fees.

### Interest Expense

Interest expense for 2012 includes payments incurred and/or made to Holders of senior secured claims. During the pendency of the Chapter 11 Cases, the projections assume payment of adequate protection to the DIP Lenders and holders of senior secured claims that participate in the DIP Facility.

Interest expense for the projection period after the Effective Date has been determined based on terms of the Term Sheets for the different classes of senior secured claims that will be outstanding after the Effective Date.

*Capital Expenditures*

Capital expenditures are categorized in two main categories: 1) drydock costs and, 2) vessel improvements / new equipment and other fixed assets. No new vessels are assumed to be purchased in projected period.

Vessels (both owned and controlled) must be drydocked two times every five years. Projected drydocking costs are assumed to be in line with the currently incurred cost on a per vessels basis for similar type of vessels.

Vessel improvements and equipment and other fixed assets projected in the Plan are primarily maintenance in nature and include estimates to keep the vessels operating and to replace and refurbish old equipment. The Debtors operate a significant amount of physical assets. Therefore, there will be expenditures necessary to maintain and refurbish the existing equipment as it ages over the ordinary course of operations. Projected capital expenditures are in line with the historical actual expenditures on a per vessel basis for similar type and age vessels.

**Balance Sheet and Pro Forma Balance Sheet**

The Pro Forma Balance Sheet contains certain adjustments as a result of consummation of the Plan. Liabilities subject to compromise will be extinguished and receive treatment based on the Plan. Certain liabilities subject to compromise will receive equity as a result of the Reorganized Debtors' issuance of New Common Stock to satisfy certain Allowed Claims and Allowed Interests under the Plan.

On the Effective Date, the Reorganized Debtors will use existing Cash to satisfy Allowed Administrative Expense Claims, Allowed Professional Compensation Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims in full in Cash. Allowed General Unsecured Claims and Allowed Subordinated Claims will be reinstated and paid in full. Actual Cash on the Effective Date may vary from Cash reflected in the Pro Forma Balance Sheet because of variances in the Financial Projections and potential changes in the Debtors' need for Cash in connection with Consummation.

The Financial Projections assume the Debtors will emerge with approximately $227.2 million] of senior secured debt pursuant to the Exit Facility, New Credit Agreements, New Senior Secured Cash Pay Loan Facility and New Senior Secured PIK Term Loan Facility.

Proceeds from asset sales will be used to pay down secured debt after the Effective Date.

Exhibit D

# PLAN SUPPORT AGREEMENT

This Plan Support Agreement is made and entered into as of January 31, 2012 by and among (i) TBS International plc ("**TBS**"), (ii) the affiliates of TBS set forth on **Annex A** hereto (each an "**Affiliate**", and collectively with TBS, the "**TBS Group**"), (ii) the holders of Prepetition Indebtedness (defined below) that execute the Plan Support Agreement, (iii) Bank of America N.A., as Agent and as Swap Counterparty, (iv) Credit Suisse, as Lender and as Swap Counterparty, (v) DVB Group Merchant Bank (Asia) Ltd., as Agent, (vi) DVB Bank SE (as successor to DVB Bank AG), as Swap Counterparty, (vii) AIG Commercial Equipment Finance, Inc., as Lender, (viii) The Governor and Company of the Bank of Ireland, as Swap Counterparty, (ix) Natixis; as Swap Counterparty, (x) Rushmore Shipping LLC, as Owner under the Laguna Belle Charter (as defined below), (xi) Adirondack Shipping LLC, as Owner under the Seminole Princess Charter (as defined below) (each such holder that executes the Plan Support Agreement as of the date hereof or in the future, a "**Supporting Prepetition Lender**," and collectively, the "**Supporting Prepetition Lender Group**"), and (xii) Beacon Holdings Ltd. and TBS Commercial Group Ltd. (together "**TBS Commercial**").  The TBS Group and each Supporting Prepetition Lender are each referred to herein individually as a "**Party**" and collectively as the "**Parties**."  As used herein, the phrase "**hereto**," and phrases of like import shall mean the Plan Support Agreement.

# RECITALS

WHEREAS, TBS and certain of its Affiliates are borrowers and/or guarantors under the following credit facilities:

(i)     that certain Second Amended and Restated Credit Agreement, dated as of January 27, 2011, by and among (a) Albemarle Maritime Corp., Arden Maritime Corp., Avon Maritime Corp., Birnam Maritime Corp., Bristol Maritime Corp., Chester Shipping Corp., Cumberland Navigation Corp., Darby Navigation Corp., Dover Maritime Corp., Elrod Shipping Corp., Exeter Shipping Corp., Frankfort Maritime Corp., Glenwood Maritime Corp., Hansen Shipping Corp., Hartley Navigation Corp., Henley Maritime Corp., Hudson Maritime Corp., Jessup Maritime Corp., Montrose Maritime Corp., Oldcastle Shipping Corp., Quentin Navigation Corp., Rector Shipping Corp., Remsen Navigation Corp., Sheffield Maritime Corp., Sherman Maritime Corp., Sterling Shipping Corp., Stratford Shipping Corp., Vedado Maritime Corp., Vernon Maritime Corp. and Windsor Maritime Corp., each a corporation organized under the laws of the Republic of the Marshall Islands, (b) TBS, (c) TBS International Limited, (d) TBS Holdings Limited, (e) TBS Shipping Services Inc., (f) each lender from time to time party thereto, and (g) Bank of America, N.A., as administrative agent, swing line lender and L/C issuer (as amended, supplemented, or otherwise modified from time to time, the "**BofA Credit Agreement,**" and together with all Loan Documents (as defined in the BofA Credit Agreement) and agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "**BofA Credit Facility**", and the lenders thereunder, the "**BofA Lenders**");

(ii)    that certain Loan Agreement dated as of January 16, 2008 by and among (a) Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp.,

Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., as joint and several borrowers, (b) TBS International Limited, TBS Holdings Limited, and TBS, as guarantors; (c) DVB Group Merchant Bank (Asia) Ltd., as Lender, Facility Agent and Security Trustee, and (d) DVB Bank SE (as successor-in-interest to DVB Bank AG), The Governor and Company of the Bank of Ireland, and Natixis, as swap banks (as amended, supplemented, or otherwise modified, the "***DVB Credit Agreement,***" and together with all Finance Documents (as defined in the DVB Credit Agreement) and agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "***DVB Credit Facility***", and the lenders thereunder, the "***DVB Lenders***" and together with the BofA Lenders, the "***Participating Lenders***");

(iii)    that certain Loan Agreement dated December 7, 2007 by and among Claremont Shipping Corp. and Yorkshire Shipping Corp., as borrowers, and Credit Suisse, as lender (as amended, supplemented, or otherwise modified, the "***Credit Suisse Credit Agreement,***" and together with all Finance Documents (as defined in the Credit Suisse Credit Agreement) and agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "***Credit Suisse Credit Facility***", and the lender thereunder, "***Credit Suisse***");

(iv)    that certain Loan Agreement, dated as of February 29, 2008 by and among (a) Amoros Maritime Corp., Lancaster Maritime Corp. and Chatham Maritime Corp., as borrowers, (b) TBS International Limited, Sherwood Shipping Corp., TBS Holdings Limited, and TBS, as guarantors, and (c) AIG Commercial Equipment Finance, Inc., as lender (as amended, supplemented, or otherwise modified, the "***AIG Credit Agreement,***" and together with all Loan Documents (as defined in the AIG Credit Agreement) and agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "***AIG Credit Facility***", and the lender thereunder, "***AIG***"); and

(v)    (a) that certain ISDA Master Agreement and Schedule, dated as of January 23, 2008, between Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., collectively, as Party B, and DVB Bank AG, as Party A, (b) that certain ISDA Master Agreement and Schedule, dated as of January 23, 2008, between Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., collectively, as Party B, and The Governor and Company of the Bank of Ireland, as Party A, (c) that certain ISDA Master Agreement and Schedule, dated as of January 23, 2008, between Bedford Maritime Corp., Brighton Maritime Corp., Hari Maritime Corp., Prospect Navigation Corp., Hancock Navigation Corp., Columbus Maritime Corp. and Whitehall Marine Transport Corp., collectively, as Party B, and Natixis, as Party A; (d) that certain ISDA Master Agreement and Schedule, dated as of June 28, 2005, as amended July 24, 2006, between TBS International Limited, Albemarle Maritime Corp., Arden Maritime Corp., Asia-America Ocean Carriers Ltd., Birnam Maritime Corp., Bristol Maritime Corp., Chester Shipping Corp., Darby Navigation Corp., Dover Maritime Corp., Frankfort Maritime Corp., Glenwood Maritime Corp., Hansen Shipping Corp., Henley Maritime Corp., Hudson Maritime Corp., Kensington Shipping Corp., Newkirk Navigation Corp., Oldcastle Shipping Corp., Rector Shipping Corp., Remsen Navigation Corp., Sheffield Maritime Corp., Sherman Maritime Corp., Sterling Shipping Corp.,

Stratford Shipping Corp., Vernon Maritime Corp. and Windsor Maritime Corp., collectively, as Party B, and Bank of America, N.A., as Party A; (e) that certain ISDA Master Agreement and Schedule, dated as of March 29, 2007, between Argyle Maritime Corp., Caton Maritime Corp., Dorchester Maritime Corp., Longwoods Maritime Corp., McHenry Maritime Corp. and Sunswyck Maritime Corp., collectively, as Party B, and The Royal Bank of Scotland plc, as Party A; and (f) that certain ISDA Master Agreement and Schedule, dated as of December 7, 2007, between Claremont Shipping Corporation and Yorkshire Shipping Corporation, collectively, as Party B, and Credit Suisse, as Party A. (collectively, the "**Swap Facilities**" and the swap counterparties thereunder, the "**Swap Lenders**");

WHEREAS, in connection with the arrangements with respect to certain vessels, certain affiliates of TBS have entered into the following bareboat charters, each of which is to be amended initially prior to the Petition Date (as hereinafter defined) and amended further, and assumed by the TBS Group as further amended, pursuant to the Plan (as hereinafter defined) pursuant to the terms set forth in the term sheet (the "**Bareboat Charter Term Sheet**") annexed hereto as **Annex C**:

(i)    Bareboat Charter, dated as of January 24, 2007, by and between Beekman Shipping Corp., as charterer, and Rushmore Shipping LLC, as owner of the M/V Laguna Belle (the "**Laguna Belle Charter**") and

(ii)    Bareboat Charter, dated as of January 24, 2007, by and between Fairfax Shipping Corp., as charter, and Adirondack Shipping LLC, as owner of the M/V Seminole Princess ("**Seminole Princess Charter**" and together with the Laguna Belle Charter, the "**DVB Bareboat Charters**");

WHEREAS, in connection with the BofA Credit Facility, the DVB Credit Facility, the Credit Suisse Credit Facility, the AIG Credit Facility and the Swap Facilities (collectively the "**Prepetition Credit Facilities**"), the TBS Group has granted rights in certain collateral (the "**Collateral**") as security for repayment of the Prepetition Indebtedness (as defined below) to or for the benefit of the BofA Lenders, the DVB Lenders, Credit Suisse, AIG and the Swap Lenders (collectively, the "**Prepetition Lenders**");

WHEREAS, as of the date hereof, the TBS Group owes approximately $167,946,000 in aggregate principal amount in respect of the Prepetition Credit Facilities plus accrued and unpaid interest, fees and expenses (the "**Prepetition Indebtedness**");

WHEREAS, certain of the Participating Lenders party hereto have agreed to provide the TBS Group with debtor-in-possession financing (the "**DVB/BOA DIP Loan**") pursuant to the terms set forth in the term sheet (the "**DVB/BOA DIP Term Sheet**") annexed hereto as **Annex B**;

WHEREAS, certain of Credit Suisse has agreed to provide the TBS Group with debtor-in-possession financing (the "**CS DIP Loan**") pursuant to the terms set forth in the term sheet (the "**CS DIP Term Sheet**") annexed hereto as **Annex D**;

WHEREAS, the claims arising under each of the Prepetition Credit Facilities constitutes a separate class of claims for each relevant obligor in the TBS Group (each, a "**Debt Class**" and,

collectively, the "**Debt Classes**") for purposes of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, the Parties now desire to implement a consensual financial restructuring (the "**Restructuring**") of the TBS Group through a confirmed joint chapter 11 plan which will be consistent in all material respects with the Term Sheets (as hereinafter defined) attached hereto and made a part hereof (including all exhibits and financing commitments referenced in the Plan, the "**Plan**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") substantially in the form annexed hereto as **Annex E** or otherwise reasonably satisfactory to the Requisite Supporting Prepetition Lenders (as hereinafter defined);

WHEREAS, the Term Sheets consist of the following: (a) BOA/DVB Term Sheet; (b) AIG Term Sheet; (c) Credit Suisse Term Sheet; (d) BOA/DVB DIP Facility Term Sheet; (e) New Employment Agreement Term Sheet; (f) New Management Incentive Plan Term Sheet; (g) TBS Commercial Term Sheet; and (h) Equity and Corporate Governance Term Sheet (the "**Term Sheets**");

WHEREAS, the board of directors (or equivalent) of each member of the TBS Group have (i) reviewed the Term Sheets and the Plan and (ii) determined in their business judgment that it is in the best interests of such entity to vote to approve the terms thereof and the proposed Restructuring contemplated thereby;

WHEREAS, each of the Parties has reviewed, or has had the opportunity to review, this Plan Support Agreement, the Term Sheets, the DVB/BOA DIP Term Sheet, the CS DIP Term Sheet and the Plan and the Disclosure Statement (as hereinafter defined) with the assistance of legal and financial advisors of its or their own choosing, as applicable;

WHEREAS, pursuant to the terms of this Plan Support Agreement, the Parties have agreed to support the Plan and the Debtors' acquisition of postpetition financing materially consistent with the DVB/BOA DIP Term Sheet and the CS DIP Term Sheet and, with respect to the Supporting Prepetition Lender Group, vote to accept the Plan;

WHEREAS, the TBS Group has commenced solicitation of votes of the Prepetition Lenders, to the extent such Prepetition Lenders under each Debt Class are entitled to vote on the Plan under the Bankruptcy Code, to accept or reject the Plan in accordance with the relevant provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the standing order of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") with respect to prepackaged chapter 11 bankruptcy cases (the "**Prepack Standing Order**");

WHEREAS, consistent with the relevant provisions of the Prepack Standing Order, the TBS Group shall provide the Prepetition Lenders with 14 days from the date upon which the Plan is mailed by the TBS Group (or its agent) to the Prepetition Lenders to submit votes to accept or reject the plan (the "**Solicitation Period**") in accordance with the procedures set forth in the Disclosure Statement (defined below);

WHEREAS, the TBS Group intends, as soon as reasonably practicable prior to, or after, the conclusion of the Solicitation Period, to file voluntary petitions commencing cases under the

Bankruptcy Code for each member of the TBS Group (the "***Chapter 11 Cases***") in the Bankruptcy Court;

WHEREAS, the TBS Group intends to use reasonable best efforts, upon commencement of the Chapter 11 Cases, to seek interim Bankruptcy Court approval of the DVB/BOA DIP Loan and, before 30 days after the commencement of the Chapter 11 Cases, seek final Bankruptcy Court approval of the DVB/BOA DIP Loan;

WHEREAS, the TBS Group intends to use reasonable best efforts to file the Plan and related disclosure statement (the "***Disclosure Statement***") concurrently with the filing of the Chapter 11 Cases, or as soon thereafter as reasonably practicable, and to seek Bankruptcy Court approval of the Disclosure Statement and, subject to the satisfaction of the conditions required to confirm the Plan pursuant to section 1129 of the Bankruptcy Code, confirmation of the Plan;

WHEREAS, the TBS Group intends to use reasonable best efforts to obtain Bankruptcy Court approval of the Plan in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Prepack Standing Order, and on terms consistent with the Plan Support Agreement or otherwise reasonably satisfactory to the Requisite Supporting Prepetition Lenders; and

WHEREAS, in expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable law, including the Bankruptcy Code, the Bankruptcy Rules, the Prepack Standing Order, or the fiduciary duties of the TBS Group or any other Party having such duties.

## <u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**1.** <u>**Defined Terms.**</u>  All capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.  In the event of any inconsistencies between the terms of this Plan Support Agreement and the Plan, the Plan shall govern.

**2.** <u>**The TBS Group's Support**</u>.  The TBS Group believes that prompt consummation of the Plan will best facilitate the TBS Group's business and financial restructuring and is in the best interests of the TBS Group's creditors and other parties-in-interest. Accordingly, the TBS Group has sought votes in favor of, and approval by the Bankruptcy Court of, the Plan.  Without limiting the foregoing, for so long as the Plan Support Agreement remains in effect, and subject to the Supporting Prepetition Lender Group fulfilling its obligations as contemplated herein, the TBS Group agrees:

a.    to use reasonable best efforts to commence, as soon as reasonably practicable, the Chapter 11 Cases in the Bankruptcy Court prior to, or after, the conclusion of the Solicitation Period;

b.      as soon as reasonably practicable after the commencement of the Chapter 11 Cases, to use reasonable best efforts to file and prosecute the Plan and the Disclosure Statement with the Bankruptcy Court;

c.      as soon as reasonably practicable after the commencement of the Chapter 11 Cases, to use reasonable best efforts to obtain interim Bankruptcy Court approval of the DVB/BOA DIP Loan and, before 30 days (with the applicable appeal period having not expired) after the commencement of the Chapter 11 Cases (the date of such commencement, the "***Petition Date***"), to use reasonable best efforts to obtain final Bankruptcy Court approval of the DBV/BOA DIP Loan;

d.      to use reasonable best efforts to obtain (i) assumption of this Plan Support Agreement on or before the 20th day following commencement of the Chapter 11 Cases; (ii) approval of the Disclosure Statement on or before the 60th day following commencement of the Chapter 11 Cases; (iii) confirmation of the Plan concurrently with approval of the Disclosure Statement, and in any event on or before the 60th day following commencement of the Chapter 11 Cases, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Prepack Standing Order, and on terms consistent with the Plan Support Agreement, and to take such actions as may be necessary or appropriate to obtain approval of the Plan and (iv) approval of all transactions contemplated by the Plan.

e.      not to pursue, propose, support, or encourage the pursuit, proposal, or support of, any plan or reorganization for, or the liquidation of, the TBS Group that is inconsistent with the Plan or this Plan Support Agreement;

f.      to negotiate in good faith with the Supporting Prepetition Lenders regarding any and all definitive documents that are reasonably necessary to implement the Plan; and

g.      to use reasonable best efforts to otherwise take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by the Plan and this Plan Support Agreement (including, without limitation, the satisfaction of all conditions precedent to the Plan) at the earliest date practicable.

In all events, the agreements of the TBS Group in this Section 2 shall not:

(i)      prevent TBS Group company's board of directors (or its equivalent, the "***Board***") from receiving any proposal for a refinancing, recapitalization or other extraordinary transaction from a third party (an "***Alternative Transaction***") and negotiating such proposal with a third party and providing due diligence information regarding the TBS Group to such third party if the Board of directors, on advice of its financial and legal advisors, determines that such proposal would reasonably be expected to result in a transaction that is more favorable to the TBS Group than the Restructuring (a "***Superior Proposal***"). In the event that the TBS Group receives any proposal from a third party that the Board believes may constitute a Superior Proposal, it will promptly notify the

Supporting Prepetition Lenders of the terms thereof, including the identity of the proposing party or parties. In the event that the Board, after consultation with its financial and legal advisors, determines in good faith that it has received a written Superior Proposal, not conditioned on the receipt of additional due diligence or third party financing, and that, pursuant to its fiduciary duties, it can no longer support or recommend the Restructuring, the TBS Group shall promptly (in any event no later than one (1) business day following such determination) so inform the Supporting Prepetition Lenders (including as to the terms of any such proposal that the Board has determined is a Superior Proposal). In the event that the Board decides to pursue an Alternative Transaction as a result of a determination by the Board that such Alternative Transaction constitutes a Superior Proposal, and the Supporting Prepetition Lenders disagree with such determination, nothing in this Plan Support Agreement shall prevent the Supporting Prepetition Lender from seeking relief with the Bankruptcy Court with respect to such determination;

(ii)     require any TBS Group company to breach any legal or statutory requirement or any order or direction of any court or governmental body (where such impediment cannot be overcome taking reasonable steps); and

(iii)     restrict, or attempt to restrict, any director or officer of any TBS Group Affiliate (taken as a whole) from complying with any legal obligation to commence insolvency proceedings in respect of the relevant Affiliate of the TBS Group (after advice from its legal counsel).

3. **Supporting Prepetition Lenders' Agreement**.  For so long as the Plan Support Agreement is not terminated in the manner set out in Sections 8 and 9 and does not otherwise cease to be effective, and subject to the TBS Group fulfilling its obligations as provided herein:

a.     each member of the Supporting Prepetition Lender Group agrees: (i) to support confirmation of the Plan and approval of the Disclosure Statement (including all exhibits thereto); (ii) to timely vote in favor of the Plan and any amendments, waivers, or consents required in connection with the Plan to the extent such amendments, waivers, or consents are materially consistent with the terms of the Plan Support Agreement and any exhibit or annex hereto (a) all Prepetition Indebtedness held, directly or indirectly, by such Supporting Prepetition Lender or for which it is the nominee, investment manager, or advisor for beneficial holders thereof with respect to which it has the authority to vote; and (b) any and all Claims (as defined by section 101(5) of the Bankruptcy Code) against the TBS Group, now or hereafter owned or held, directly or indirectly, by such Supporting Prepetition Lender or for which it is the nominee, investment manager, or advisor for beneficial holders thereof with respect to which it has the authority to vote; (iii) not to withdraw, change, or revoke (or cause to be withdrawn, changed, or revoked) its vote with respect to the Plan; (iv) not pursue, propose, support, or encourage the pursuit, proposal, or support of, any chapter 11 plan or other restructuring or reorganization for, or the liquidation of, the TBS Group (directly or indirectly) that is inconsistent with the Plan; (v) not to encourage any other person or entity to delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Plan; (vi) not to commence any proceeding or prosecute, join in, or otherwise support any objection opposing confirmation or otherwise objecting to the Plan; (vii) to forbear and refrain from

exercising any rights or remedies against the Collateral; (viii) to forbear and refrain from demanding or requiring any payments by the TBS Group of principal, interest, fees, or any other amounts due under the Prepetition Credit Facilities, with the exception of such payments (A) as specifically provided under the Plan and (B) as the TBS Group may be directed to make pursuant to an order or orders of the Bankruptcy Court; (ix) to support the TBS Group in all desirable or necessary steps to secure the confirmation of the Plan for all entities to be bound thereby; and (x) to negotiate in good faith with TBS Group regarding any and all definitive documents that are reasonably necessary to implement the Plan. Notwithstanding the foregoing, nothing in the Plan Support Agreement shall be construed to prohibit any Supporting Prepetition Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, as long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the Plan Support Agreement and the Plan and are not for the purpose of hindering, delaying, or preventing the consummation of the Plan; and

        b.    each member of the Supporting Prepetition Lender Group further agrees (i) to support any motion filed by the TBS Group in the Chapter 11 Cases to assume and/or approve that certain RBS Vessel Turnover Term Sheet, dated January 4, 2012 (the "**RBS Term Sheet**") attached hereto as **Annex F**, by and between certain members of the TBS Group and The Royal Bank of Scotland plc in its capacity as Agent and Security Trustee for certain lenders under a Loan Agreement, dated 29 March 2007, as amended, and swap agreements related thereto, provided such motion is materially consistent with the Plan Support Agreement and the Plan, (ii) to support any motion or motions seeking court approval of the DVB/BOA DIP Loan and the CS DIP Loan, provided such motions are materially consistent with the DVB/BOA DIP Term Sheet or the CS DIP Term Sheet, as applicable and (iii) to negotiate in good faith regarding any definitive documentation required by, or to implement, the Plan.

    **4.**   **Acknowledgements.**

        a.    While the Parties agree herein to support approval of the Plan on the terms set forth herein, the Plan Support Agreement is not, and shall not be deemed to be, a solicitation for consent to the Plan in contravention of section 1125(b) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, any obligation set forth above is expressly conditioned upon the execution and delivery of definitive documentation reasonably acceptable to the Parties.

        b.    Each Party acknowledges that no securities of the TBS Group are being offered or sold hereby and that the Plan Support Agreement constitutes neither an offer to sell nor a solicitation to buy any securities of the TBS Group.

        c.    Each of the Parties hereto agrees to negotiate in good faith all amendments and modifications to the Plan as may be reasonably necessary and appropriate to obtain Bankruptcy Court confirmation of the Plan pursuant to final order of the Bankruptcy Court, provided that such amendments and modifications do not materially adversely affect the rights of any Supporting Prepetition Lender.

    **5.**   **Limitations on Transfer of Prepetition Indebtedness.**   As long as this Plan Support Agreement has not been terminated pursuant to Sections 8 and 9 hereof and the

confirmation and Effective Date of the Plan have not occurred, no Supporting Prepetition Lender may, (i) directly or indirectly, sell, assign, transfer, hypothecate, grant any option or right to acquire, or otherwise dispose of its right, title, or interest (legal, beneficial, or otherwise) in respect of any of such Supporting Prepetition Lender's Prepetition Indebtedness, in whole or in part, or any interest therein, or (ii) grant any proxies, deposit any of such Supporting Prepetition Lender's Prepetition Indebtedness into a voting trust, or enter into a voting agreement with respect to any such Prepetition Indebtedness (the actions set forth in clauses (i) and (ii) of this Section 5 are individually and collectively referred to as, a "***Transfer***"), unless the Transfer is carried out in compliance with the terms of the applicable Prepetition Credit Facilities and the purchaser, assignee, or transferee (the "***Transferee***") agrees in writing, in the form attached hereto (with any minor amendments as may be required) as __Annex G__ (such writing a "***Transferee Acknowledgement***"), at the time of such Transfer, to be bound by all of the terms of this Plan Support Agreement in its entirety, without revisions, as a Party hereto.  Upon execution of the Transferee Acknowledgement, the Transferee shall be deemed to be a Supporting Prepetition Lender.  Any Transfer not affected in accordance with the foregoing shall be deemed void *ab initio*.  In the event of a Transfer, the transferor (the "***Transferor***") shall, within three business days after such Transfer, provide notice of such transfer to the TBS Group, together with a copy of the Transferee Acknowledgement and, if the transferor has transferred all of its claims subject to this Plan Support Agreement, then such transferor shall upon the transfer becoming effective automatically be released from any further obligations hereunder.

      6.  __Further Acquisition of Prepetition Indebtedness.__  The Plan Support Agreement shall in no way be construed to preclude any member of the Supporting Prepetition Lender Group, or any of its subsidiaries or controlled affiliates, from acquiring additional Prepetition Indebtedness or other claims against the TBS Group.   Any such additional Prepetition Indebtedness or claims so acquired shall be automatically subject to the terms of the Plan Support Agreement and such acquiring member of the Supporting Prepetition Lender Group, or any of its subsidiaries or controlled affiliates, shall promptly inform counsel to the TBS Group of the acquisition of such additional Prepetition Indebtedness or other claims so that __Annex A__ hereto may be updated.  No Supporting Prepetition Lender may create a subsidiary or affiliate for the purpose of acquiring any Prepetition Indebtedness or any other claims against or interests in the TBS Group without causing such subsidiary or affiliate to become a Party hereto upon acquiring such Prepetition Indebtedness.

      7.  __Termination Events.__  The Plan Support Agreement may     terminate upon the occurrence of any of the following events (each, a "***Termination Event***"):

      a.      Any of the Parties shall have breached any of its obligations under the Plan Support Agreement as set forth herein;

      b.      A determination by the Board to pursue an Alternative Transaction in accordance with Section 2(g)(i);

      c.      As between any Party and the TBS Group, upon the written agreement among the TBS Group, such Part, and the Requisite Supporting Prepetition Lenders;

d.      The TBS Group fails to commence the Chapter 11 Cases in the Bankruptcy Court on or before 11:59 p.m. (New York time), February 15, 2012;

e.      The TBS Group fails to file motions, in the Bankruptcy Court as soon as reasonably practicable after the Petition Date but in no event later than five business days after the Petition Date, to (a) assume this Plan Support Agreement (the "***Plan Support Motion***"), (b) approve the Disclosure Statement and schedule a hearing to consider confirmation of the Plan, and (c) approve the DIP Loan on an interim basis and schedule a hearing to consider approval of the DVB/BOA DIP Loan on a final basis;

f.      The Bankruptcy Court (i) shall have not entered an interim order (the "***Interim DIP Order***") on or before the day that is fifteen days after the commencement of the Chapter 11 Case providing interim approval of the DVB/BOA DIP Loan or (ii) shall have entered an Interim DIP Order which provides for either non-consensual priming or non-consensual junior liens on encumbered assets;

g.      The Bankruptcy Court (i) shall have not have entered a Final Order approving the DVB/BOA DIP Loan (the "***Final DIP Order***") on or before the day that is 30 days after the commencement of the Chapter 11 Case (it being understood that the relevant appeal period may not have elapsed by such date) or (ii) shall have entered a Final DIP Order which provides for either non-consensual priming or non-consensual junior liens on encumbered assets;

h.      The order approving the Disclosure Statement as containing "adequate information" as such term is used in section 1125 of the Bankruptcy Code (the "***Disclosure Statement Approval Order***") shall not have been entered by the Bankruptcy Court on or before the day that is 60 days after the commencement of the Chapter 11 Case;

i.      The order confirming the Plan and approving all exhibits, appendices, Plan supplement documents and all related documents (the "***Confirmation Order***") shall not have been entered by the Bankruptcy Court on or before the day that is  60  days after the commencement of the Chapter 11 Case;

j.      Any of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Approval Order or the Confirmation Order shall have been reversed on appeal or vacated;

k.      The Bankruptcy Court shall have declared, in an order that shall not have been stayed, modified, or vacated on appeal (a "***Final Order***"), the Plan Support Agreement to be unenforceable;

l.      Entry of a Final Order by the Bankruptcy Court denying confirmation of the Plan or approval of the Plan Support Motion;

m.      The Effective Date of the Plan shall not have occurred on or before May 31, 2012;

n.      Acceleration or maturity of the DVB/BOA DIP Loan;

o.       Any of the Chapter 11 Cases, once commenced, shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, an interim or permanent trustee shall have been appointed in any of the Chapter 11 Cases, or a responsible officer or examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

p.       The TBS Group files, propounds, or otherwise supports any plan of reorganization in the Chapter 11 Cases other than the Plan or files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with the Plan Support Agreement or the Plan and such motion or pleading is not withdrawn within the notice period specified in Section 8(c) below;

q.       The TBS Group withdraws the Plan or publicly announces its intention not to support the Plan; and

r.       There shall occur an event which has a Material Adverse Effect (defined below) on the business, condition, operations or assets of the TBS Group (taken as a whole) (other than the commencement of a case under chapter 11 of the Bankruptcy Code, the transactions contemplated by the Plan and the turnover of vessels constituting collateral to The Royal Bank of Scotland plc or effects that customarily occur as a result of events leading up to and following any of the foregoing).  For purposes of this Agreement, "***Material Adverse Effect***" means a material adverse effect occurring after the date of execution of this Plan Support Agreement on (i) the business or condition (financial or otherwise) of the TBS Group, taken as whole, (ii) the ability of the TBS Group to consummate the transactions contemplated herein or to perform when due their respective obligations hereunder or (iii) the ability of the Supporting Prepetition Lenders to enforce this Plan Support Agreement and the obligations of the TBS Group hereunder; provided, however, that none of the following shall be deemed to constitute, and none of the following (or the effects thereof) shall be taken into account in determining whether there has been, a Material Adverse Effect: (x) (A) events normally (for chapter 11 filers in general and chapter 11 filers engaged in the shipping industry in particular) leading up to and following the commencement of a case under chapter 11 of the Bankruptcy Code, (B) general changes or developments in any of the industries in which the TBS Group operates that does not disproportionately affect TBS Group, (C) the announcement or pendency of this Plan Support Agreement and the transactions contemplated hereby, (D) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby, (E) the taking of any action contemplated by the RBS Agreement , or (F) any sale of Collateral completed not in violation of the applicable Prepetition Credit Facility or otherwise consented to by the applicable Prepetition Lenders with a lien on such Collateral; and (y) any existing circumstance with respect to which the applicable party has or reasonably should have had knowledge as of the date hereof.

## 8.   <u>Termination of the Plan Support Agreement</u>.

a.       Upon the occurrence of any of the Termination Events described in Sections 7(c), (d), (e), (j), (k), (l), (n) (provided that such termination shall be reversed if the acceleration of the DVB/BOA DIP Loan is rescinded) or (o), the Plan Support Agreement shall terminate automatically and without further notice or action by any Party.

b.      Upon the occurrence of the Termination Event described in Sections 7(b) and (q) herein, the Plan Support Agreement shall terminate upon receipt of written notice from the TBS Group to each of the other Parties.

c.      Upon the occurrence of any Termination Event set forth in Sections 7(a) (if the TBS Group is the breaching Party), (f), (g), (h), (i), (m), (p), (q), or (r), the Plan Support Agreement  (i) shall automatically terminate as to a Party if the Plan Support Agreement has not yet been assumed by order of the Bankruptcy Court, provided that such termination shall reverse if the TBS Group has cured the Termination Event within  five days after receiving notification that the Termination Event has occurred and (ii) shall terminate after the Plan Support Agreement has been assumed by order of the Bankruptcy Court only upon the TBS Group's receipt of written notice from such Party, and a failure by the TBS Group to remedy such breach within three business days after receipt of such written notice and the failure by such other Party to rescind such written termination notice within three days of TBS Group's receipt of such notice.

d.      Upon the occurrence of any Termination Event set forth in Section 7(a) herein (if a Party other than the TBS Group is the breaching Party), the Plan Support Agreement shall terminate with respect to the breaching Party upon the breaching Party's receipt of written notice from the TBS Group, and a failure by such breaching Party to remedy such breach within three business days after receipt of such written notice; provided, however, that the right of the TBS Group to terminate the Plan Support Agreement with respect to the breaching Party shall not preclude any non-breaching Party from seeking specific performance or any other remedy (equitable or otherwise) against the breaching Party available under applicable law for breach of the Plan Support Agreement.

e.      The Plan Support Agreement, including, without limitation, the Parties' agreement herein to support confirmation of the Plan, is intended as a binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of the Plan Support Agreement are uncertain at the time of entering into the Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine with certainty. It is understood and agreed that money damages would not be an adequate or sufficient remedy for any breach of this Plan Support Agreement and that each non-breaching Party shall each be entitled to specific performance, injunctive relief, or other equitable relief as remedies for any such breach, and further agree to waive, and to use their best efforts to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with such remedy.  Such remedies shall not be deemed to be the exclusive remedies for the breach of this Plan Support Agreement by any Party or its representatives.  Notwithstanding anything to the contrary contained herein, the provisions of this Section 8(e) shall not be applicable to or enforceable against the TBS Group upon the occurrence of a Termination Event described in Section 7(b), in accordance with Section 2(g), or Section 7(p) herein. Notwithstanding anything contained herein to the contrary, in no event shall any Supporting Prepetition Lender be liable for any special, indirect, incidental, punitive or consequential damages of any kind or nature whatsoever.

9. **Effect of Termination.** Upon termination of this Plan Support Agreement, all obligations hereunder shall terminate and shall be of no further force and effect; <u>provided, however,</u> that (a) no claim for breach shall exist against the TBS Group upon the occurrence of a Termination Event described in Section 7(b), in accordance with Section 2(g) herein, and (b) any claim for breach of this Plan Support Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; <u>provided, further,</u> that the breach of the Plan Support Agreement by one or more Parties shall not create any rights or remedies against any non-breaching Party unless such non-breaching Party has participated in or aided and abetted the breach by a breaching Party or Parties. Except as set forth above in this Section 9, upon such termination, any obligations of the non-breaching Parties set forth in the Plan Support Agreement shall be null and void *ab initio* and all claims, causes of actions, remedies, defenses, setoffs, rights, or other benefits of such non-breaching Parties shall be fully preserved without any estoppel, evidentiary, or other effect of any kind or nature whatsoever.

Except as expressly provided for in this Plan Support Agreement, nothing herein is intended to, nor does anything herein, waive, limit, impair or restrict the ability of each Supporting Prepetition Lender to protect and preserve its rights, remedies or interests, including its claims against the TBS Group. If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties fully reserve any and all of their rights and defenses. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence or any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than (i) a proceeding to enforce the Plan Support Agreement, or (ii) the Chapter 11 Cases in order to evidence support for the Restructuring.

10. **Representations and Warranties.** The TBS Group and each other Party hereto represent and warrant to each other Party, severally but not jointly, and as to itself only, that the following statements are true, correct, and complete as of the date hereof or as of the date of the execution of the Plan Support Agreement by a Party:

a. **Corporate Power and Authority.** It is duly organized, validly existing, and in good standing under the laws of the state of its organization and has all requisite corporate, partnership, or other power and authority to enter into the Plan Support Agreement and to carry out the transactions contemplated by, and to perform its respective obligations under, the Plan Support Agreement;

b. **Authorization.** The execution and delivery of the Plan Support Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, or other actions on the Party's part;

c. **Binding Obligation.** The Plan Support Agreement has been duly executed and delivered by the Party and constitutes its legal, valid, and binding obligation, enforceable against the Party in accordance with the terms hereof except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court;

d. **No Reliance.** Each Supporting Prepetition Lender acknowledges that it is a sophisticated investor and has made its own investigation, review, and analysis regarding the TBS Group and the transactions contemplated hereby, which investigation, review, and analysis were conducted by each Supporting Prepetition Lender together with advisors that such Parties have for such purposes. Each Supporting Prepetition Lender further acknowledges that it is not relying on any statement, representation, or warranty, oral or written, express or implied, made by the TBS Group or any of their employees, affiliates, or representatives, except as expressly set forth in this Plan Support Agreement;

e. **No Conflicts.** The execution, delivery, and performance by a Party (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it, or any of its subsidiaries, or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party; and

f. **Amount of Prepetition Indebtedness.** Each Supporting Prepetition Lender represents and warrants that, as of the date of this Agreement, it is the beneficial owner of, or the nominee, investment manager, or advisor for beneficial holders of, the face amount of Prepetition Indebtedness, as such Supporting Prepetition Lender has represented in writing in its execution block to this Agreement or a Transferee Acknowledgment.

**11. <u>Holding Company Dissolution.</u>** The TBS Group shall take any actions as may be reasonably necessary to effect a corporate restructuring of its overall corporate structure. The restructuring may include the liquidation and dissolution of TBS and liquidation, dissolution or other restructuring transaction in respect of its direct subsidiary TBS International Limited ("***TBSI***"), pursuant to applicable Irish or Bermuda law respectively. In connection with any liquidation or dissolution of TBS or liquidation, dissolution or other restructuring transaction in respect of TBSI, the Supporting Prepetition Lenders party hereto, upon the reasonable request of the TBS Group or its counsel, shall: (a) execute and/or deliver appropriate petitions, applications, demands, affidavits, declarations, notices, resolutions, proofs of claim, notifications, agreements or other documents reasonably required for such dissolution, liquidation or other restructuring, in any case, containing terms that satisfy the reasonable requirements of applicable law, provided that such terms do not, and could not be reasonably expected to, directly or indirectly cause the Supporting Prepetition Lenders to incur any expense or any obligations of any nature to any member of the TBS Group or to any third party; and (b) take all other actions that TBS Group determines to be reasonably necessary, including passing any resolutions and making any filings or recordings that may be reasonably required by applicable law in connection with a TBS or TBSI liquidation, dissolution or other restructuring provided that such actions do not, and could not be reasonably expected to, directly or indirectly cause the Supporting Prepetition Lenders incur any expense or any obligations of any nature to any member of the TBS Group or to any third party. In addition, the Supporting Prepetition Lenders acknowledge that the survival of Prepetition Indebtedness against either TBSI or TBS after the Effective Date shall not constitute a Termination Event hereunder or materially conflict with the terms of the Plan; provided that, such Prepetition Indebtedness shall be deemed cancelled at or before the dissolution of the applicable Debtor entity. Each Supporting Prepetition Lender acknowledges that the TBS Group

may need to establish a reserve or reserves to fund costs reasonably necessary to fund the liquidation, dissolution and/or other restructuring of TBSI or TBS.

12. **Treatment of Certain Information; Confidentiality.**  Until publicly disclosed by the TBS Group, this Plan Support Agreement (including, without limitation, all modifications, supplements, amendments, and annexes hereto) is subject to all confidentiality provisions contained in the Prepetition Credit Facilities.

13. **Further Assurances**.  In connection with the Plan Support Agreement and the transactions contemplated hereby, each Party to the Plan Support Agreement will execute and deliver any additional documents and perform any additional acts that may be reasonably necessary or appropriate to effectuate and perform its obligations under the Plan Support Agreement and the transactions contemplated hereby.

14. **Public Disclosures**.  Prior to the issuance of any public disclosures regarding the Restructuring, the TBS Group shall, in good faith and in a manner consistent with the facts and circumstances surrounding such disclosures, including any applicable time constraints, consult with the respective Agent for the relevant Supporting Prepetition Lender Group as to the form and substance of such public disclosures, <u>provided</u> that at all times the TBS Group shall be solely responsible for each public disclosure made by it.

15. **Amendment or Waiver.**

    a. Except as otherwise specifically provided herein, the Plan Support Agreement or any attachments, exhibits, or annexes hereto, including without limitation, the Plan, may not be materially modified, waived, amended, or supplemented unless such material modification, waiver, amendment, or supplement is in writing and has been signed by the TBS Group and by the Supporting Prepetition Lenders holding at least 51% of the outstanding indebtedness held by all Supporting Prepetition Lenders in each Debt Class (except for pursuant to each Debt Class in respect of the DVB Credit Facility, where 66.7% shall be required); *provided*, *however*, that for any economic modification, waiver, amendment or supplement to the Plan Support Agreement or any attachments, exhibits, or annexes hereto, including without limitation, the Plan, that is materially adverse to any Supporting Prepetition Lender shall also require the written consent of such Supporting Prepetition Lender; *provided further*, *however*, that if the modification or amendment at issue materially adversely impacts the economic treatment or rights of any Supporting Prepetition Lender differently than other Supporting Prepetition Lenders, the agreement in writing of such Supporting Prepetition Lender whose economic treatment or rights are materially adversely impacted in a different manner than the other Supporting Prepetition Lenders shall also be required for such modification or amendment to be effective (in any case, the Supporting Prepetition Lenders required for a writing or consent pursuant to this section being the "***Requisite Supporting Prepetition Lenders***").

b. Notwithstanding the foregoing, non-material modifications, waivers, amendments or supplements by the TBS Group to the Plan, the Disclosure Statement, or any exhibit or supplement thereto shall not require the consent or approval of any Supporting Prepetition Lender or Requisite Supporting Prepetition Lender hereunder.

c. No waiver of any of the provisions of the Plan Support Agreement or the Plan shall be deemed to constitute a waiver of any other provision of the Plan Support Agreement or the Plan, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

16. **Exculpation.**

a. The Supporting Prepetition Lenders hereby agree to opt in to the release provisions of Section 9.2.3 of the Plan, as permitted under Article IV of the Plan.

b. The Plan, as initially filed, shall include the Prepetition Lenders in the definition of "Exculpated Parties", and the TBS Group shall use reasonable best efforts to provide the Prepetition Lenders with the benefits of Section 9.2.4 of the Plan; *provided that,* any modification of the Plan, at the direction of the Bankruptcy Court or to resolve an objection of the United States Trustee, to (i) remove all or some of the Prepetition Lenders from the definition of "Exculpated Parties" in the Plan or any annex thereto or (ii) otherwise deny any or all of the Prepetition Lenders the benefit of exculpation under Section 9.2.4 of the Plan shall be deemed a non-material modification, waiver, amendment or supplement, subject to Section 15(b) hereof, so long as the period established for the purpose of challenging the amount, validity, or priority of the obligations arising under one or more of the Prepetition Credit Facilities or the liens arising thereunder pursuant to the Order of the Bankruptcy Court approving the DIP Loan shall have expired and no such challenge or related adversary proceeding shall be pending, or if an adversary proceeding shall have been filed with respect to the foregoing, such proceeding shall have been withdrawn or otherwise resolved.

17. **TBS Commercial Group Agreement**.  TBS Commercial Group Agreement. Subject to its rights under the TBS Commercial/Beacon Holdings Option Agreement (as defined in the Plan), TBS Commercial shall agree that TBS Commercial and its commercial agency subsidiaries and affiliates except (i) the Latin America Shipping Agency, a cooperative, and (ii) the subsidiaries and affiliates located in Ecuador and Peru (collectively, with TBS Commercial, the "Affiliate Management Companies") shall continue to operate and perform their agreements with the TBS Group in the ordinary course, subject to the following limitations:  (a) TBS Commercial intends to effect the closure of some or all of the Affiliate Management Companies located in Brazil and Chile, and TBS Commercial shall be entitled to do so, provided that, such closure will not have a material adverse commercial or business impact on the TBS Group, or on

TBS Group's ability to either comply with the budget delivered in connection with the DVB/BOA DIP Loan or meet the then existing TBS Group business plan; (b) TBS Commercial will be entitled to reduce, cease or discontinue operations of any other Affiliate Management Company if such reduction, cessation or discontinuance will not have any material adverse business or commercial impact on TBS Group and no costs associated therewith will be borne by TBS Group; (c) TBS Commercial will be entitled to reduce, cease or discontinue operations at any other Affiliate Management Company where a material commercial or business impact on TBS Group may occur, only with the prior consent of the BOA/DVB DIP Facility Agent (as such term is defined in the Plan); and (d) no Affiliate Management Company shall be required to fund any amount to another Affiliate Management Company to ensure its continued operations. For the avoidance of doubt, the subsidiaries identified in sub-points (i) and (ii) are not Affiliate Management Companies..

     **18. Notices.**  Any notice required or desired to be served, given, or delivered under the Plan Support Agreement shall be in writing, and shall be deemed to have been validly served, given, or delivered if provided by personal delivery, or upon receipt of electronic mail delivery, as follows:

     a.    If to the TBS Group, TBS International plc, 612 E. Grassy Sprain Road, Yonkers, New York 10710 (Attn: Ferdinand V. Lepere, Executive Vice President and Chief Financial Officer, **fvl@nyc.tbsship.com**), with copies for informational purposes only to Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 (Attn: Michael A. Rosenthal, **mrosenthal@gibsondunn.com** and Matthew K. Kelsey, **mkelsey@gibsondunn.com**); and

     b.    If to any other Party, to the physical or email address set forth on its signature page affixed hereto.

     **19. Governing Law; Jurisdiction.**

     a.    THE PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

     b.    By its execution and delivery of the Plan Support Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with the Plan Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court.  By execution and delivery of the Plan Support Agreement, each of the Parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

     c.    In the event the Bankruptcy Court does not have or refuses to exercise jurisdiction with respect to the Plan Support Agreement and any disputes arising therefrom, any

legal action, suit, or proceeding against the Parties with respect to any matter under or arising out of or in connection with the Plan Support Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the courts of the State of New York or any federal court, in each case located in the Southern District of New York, and by execution and delivery of the Plan Support Agreement, each Party hereto irrevocably accepts and submits itself to the non-exclusive jurisdiction of those courts.

20. **Headings.**  The headings of the sections, paragraphs, and subsections of the Plan Support Agreement are inserted for convenience only and shall not affect the interpretation hereof.

21. **Interpretation.**  The Plan Support Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted the Plan Support Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

22. **Severability.**  If any portion of this Plan Support Agreement shall be held to be invalid, void, or otherwise unenforceable, then that portion shall be deemed modified (only to the extent necessary and in a manner consistent with the remainder of this Plan Support Agreement) so as to be valid and enforceable, or if such modification is not reasonably feasible, shall be deemed to have been severed out of this Plan Support Agreement, and the Parties acknowledge that the balance of this Plan Support Agreement shall in any event be valid and enforceable unless the effect shall be to materially alter the terms and conditions of this Plan Support Agreement.

23. **Successors and Assigns.**  The Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, permitted transferees, executors, administrators, and representatives.

24. **No Third-Party Beneficiaries.**  Unless expressly stated herein, the Plan Support Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof.

25. **No Waiver of Participation and Reservation of Rights.**  Except as expressly provided in the Plan Support Agreement and in any amendment among each of the Parties, nothing herein is intended to, or does, in any manner, waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases.  If the transactions contemplated by the Plan Support Agreement or in the Plan are not consummated, or if the Plan Support Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Except as expressly provided in this Plan Support Agreement and in any amendment among each of the Parties, nothing herein shall affect the existence of any Event of Default, or any forbearance, under the Prepetition Credit Facilities, as the term "Event of Default" is defined in each of the above collection of relevant documents.

26.  **No Admissions.**  The Plan Support Agreement shall in no event be construed as, or be deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  No Party shall have, by reason of the Plan Support Agreement, a fiduciary relationship in respect of any other Party or any person or entity, or the TBS Group, and nothing in the Plan Support Agreement, expressed or implied, is intended to, or shall be so construed as to, impose upon any Party any obligations in respect of the Plan Support Agreement except as expressly set forth herein.

27.  **Counterparts.**  The Plan Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Plan Support Agreement.  Delivery of an executed signature page of the Plan Support Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed signature page of the Plan Support Agreement.

28.  **Representation by Counsel.**  Each Party acknowledges that it has been represented by counsel in connection with the Plan Support Agreement and the transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of the Plan Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

29.  **Entire Agreement.**  The Plan Support Agreement and the Annexes hereto constitute the entire agreement among the Parties, and supersede all prior and contemporaneous agreements, representations, warranties, and understandings of the Parties, whether oral, written, or implied, as to the subject matter hereof.

30.  **Consideration**.  It is hereby acknowledged by the Parties that no payment or additional consideration shall be due or paid to the Supporting Prepetition Lenders for their agreement to vote in accordance with and otherwise comply with the terms and conditions of this Plan Support Agreement, other than the obligations of other Parties hereunder.

31. **Fees and Expenses**.  In any action or proceeding brought by a Party hereto against any other Party hereto to enforce any provision of this Plan Support Agreement, or to seek damages for a breach of any provision hereof, or where any provision hereof is validly asserted as a defense, the prevailing Party shall be entitled to recover the reasonable fees of attorneys, accountants, and financial advisors in connection with such action and costs from the other Party, in addition to any other available remedy.

32. **Effectiveness of the Agreement**.  This Plan Support Agreement shall be effective as to any Supporting Prepetition Lender executing this Plan Support Agreement on the date on which the Plan Support Agreement has been executed by Supporting Prepetition Lenders representing more than 66 2/3% in aggregate outstanding principal amount of, and constituting more than 50% of the holders in, such Supporting Prepetition Lender's respective Debt Class; provided that, a Supporting Prepetition Lender may rescind its execution of this Plan Support Agreement, if the Plan Support Agreement does not become effective as to the Supporting Prepetition Lenders in each Debt Class by February 15, 2012.  With respect to any Party who

becomes a Party hereto after the date hereof, including Transferees pursuant to Section 5 hereof, this Plan Support Agreement shall be effective as of the date such Party delivers a duly executed copy of the Transferee Acknowledgment.

33. **Several Not Joint.**    The agreements, representations, and obligations of the Parties under the Plan Support Agreement are, in all respects, several and not joint.  Any breach of the Plan Support Agreement by any Party shall not result in liability for any other non-breaching Party. Failure by a Party to perform its obligations under the Plan Support Agreement does not affect the obligations of any other Party under this Plan Support Agreement, except as set out in Section 8(c) hereof.

34. **Specific Performance.**  The Parties acknowledge and agree that money damages would not be an adequate or sufficient remedy for any breach of this Plan Support Agreement, and each non-breaching Party shall be entitled to specific performance, injunctive relief, or other equitable relief for any such breach.

[SIGNATURE PAGES AND ANNEXES OMITTED]

Exhibit E

THIS TERM SHEET REPRESENTS AN OUTLINE OF THE POSSIBLE BASIS ON WHICH THE LENDERS MAY AGREE TO RESTRUCTURE THEIR EXISTING CREDIT FACILITIES IN CONNECTION WITH A PROPOSED PLAN OF REORGANIZATION OF THE BORROWERS AND GUARANTORS.  IT IS FOR DISCUSSION PURPOSES ONLY, AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO AMEND THE TERMS OF THEIR RESPECTIVE CREDIT FACILITIES.  IT IS NOT EXHAUSTIVE AS TO ALL TERMS AND CONDITIONS WHICH WOULD GOVERN THE PROPOSED CREDIT FACILITIES.  THE ACTUAL TERMS AND CONDITIONS UPON WHICH THE LENDERS MIGHT AGREE TO RESTRUCTURE THEIR CREDIT FACILITIES ARE SUBJECT TO SATISFACTORY COMPLETION OF DUE DILIGENCE, INDIVIDUAL LENDER INTERNAL CREDIT APPROVALS, SATISFACTORY DOCUMENTATION AND SUCH OTHER TERMS AND CONDITIONS AS ARE DETERMINED BY THE LENDERS.

## SUMMARY OF TERMS AND CONDITIONS
## OF TBS HOLDINGS LIMITED AND SUBSIDIARIES
## RESTRUCTURED AND COMBINED SENIOR CREDIT FACILITY

**BORROWERS:**  All Borrowers under the Second Amended and Restated Credit Agreement dated as of January 27, 2011 among TBS Shipping Services Inc., the other Borrowers thereunder, TBS International plc, TBS International Limited and TBS Holdings Limited, as Guarantors and the other guarantors thereunder, Bank of America, N.A., as Administrative Agent, and the Lenders party thereto (as amended, the "***Existing Bank of America Credit Agreement***"), all Borrowers under the Loan Agreement dated as of January 16, 2008 among TBS International plc, certain of its subsidiaries, the lenders party thereto and DVB Group Merchant Bank (Asia) Ltd. as administrative agent (as amended, the "***Existing DVB Loan Agreement***"), and together with the Existing Bank of America Credit Agreement and the Existing DVB Loan Agreement, the "***Existing Credit Agreements***") and certain subsidiaries 100% owned by TBS Holdings Limited, as the case may be, that are single purpose/single asset subsidiaries of TBS Holdings Limited organized and existing under jurisdictions acceptable to the Administrative Agent and created for the purpose of owning vessels (the "***Vessels***") (the "***Borrowers***"). Notwithstanding the foregoing, those entities that are debtors, but not reorganized debtors, under the Plan (defined below) will not be Borrowers.

**GUARANTORS:**  TBS Holdings Limited ("***THL***"), a Bermuda corporation, and its respective existing and future direct and indirect subsidiaries (including without limitation any formed in connection with the Plan or contemplated by the Plan) (other than the AIG and CS vessel owning subsidiaries) shall be guarantors of the Obligations and any parent company of THL formed in connection with the Plan shall be a guarantor of the Obligations (collectively, the "***Guarantors***").

| | |
|---|---|
| **ADMINISTRATIVE AGENT:** | Bank of America, N.A. (the "**Administrative Agent**" or "**Bank of America**") will act as sole and exclusive administrative agent. |
| **CO-AGENT:** | **DVB** Bank Group Merchant Bank (Asia) Ltd. ("**DVB**" or the "**Co-Agent**", and together with the Administrative Agent, the "**Agents**") |
| **LENDERS:** | The Lenders under the Existing Credit Agreements (collectively, the "**Lenders**"). |
| **SENIOR CREDIT FACILITY:** | In connection with the Borrowers' and Guarantors' proposed Plan of Reorganization (the "**Plan**") under their Chapter 11 Cases (the "**Cases**") to be filed in the Bankruptcy Court of the Southern District of New York (the "**Bankruptcy Court**"), all outstanding obligations under the Existing Credit Facilities and all hedging obligations owed to any of the lenders thereunder and secured by the same collateral (to the extent the same have been terminated), will be restructured into (a) a senior secured (cash pay) term loan 1 facility in the aggregate amount of $30,000,000 ("**Term Loan 1**") and (b) a senior secured PIK/Toggle term loan 2 facility in the amount of $[_____] reflecting the remaining amount of the outstanding obligations under the Existing Credit Agreements [to include all principal, interest (including default interest), PIK accrual and fees] and related hedging obligations ("**Term Loan 2**").  Each Lender will be allocated a pro rata portion of each of Term Loan 1 and Term Loan 2. The Term Loan 1 and Term Loan 2 facilities are collectively referred to herein as the "**Senior Credit Facility**". |
| **DIP/EXIT FACILITY:** | In addition to the Senior Credit Facility, the Borrowers and Guarantors will have entered into a first priority senior secured term loan (the "**Exit Facility**") with certain of the Lenders, Bank of America as administrative agent (the "**Exit Facility Agent**") and DVB as co-agent which will refinance the DIP Credit Facility provided by certain of the Lenders to the debtors in the Cases in connection with the Plan.  The Exit Facility will have lien priority over the collateral securing the Senior Credit Facility, and will be repaid from proceeds of asset sales and excess cash prior to payment of the Senior Credit Facility. |
| **OTHER FACILITIES:** | THL and the other applicable reorganized debtors shall also have entered into restructured credit facilities with each of Credit Suisse and AIG Commercial Equipment Finance, Inc. providing for payments to such lenders solely from (a) the cash flows associated from their respective collateral, after deducting all costs of operation of such vessels, including allocated overhead and all drydocking and other maintenance costs associated therewith (which shall be reserved as appropriate) and (b) net cash sales proceeds of such vessels. |
| **CLOSING DATE:** | Upon the effective date of the Plan, execution of definitive documentation and satisfaction of all conditions to effectiveness thereof, to occur on or before [_____], 2012 (the "**Closing Date**"). |

| | |
|---|---|
| **INTEREST RATES:** | As set forth in Addendum I. |
| **MATURITY:** | The Senior Credit Facility shall mature on June 30, 2017; provided that The Term Loan 1 will mature on September 30, 2016. |
| **SCHEDULED AMORTIZATION:** | The Senior Credit Facility will amortize in quarterly installments of $3,000,000 each, commencing on June 30, 2014. All installments will first be applied to Term Loan 1, and after repayment in full of Term Loan 1, all remaining amortization payments shall be applied to Term Loan 2. |
| **MANDATORY PREPAYMENTS:** | In addition to the amortization set forth above and mandatory prepayments for asset sales and debt incurrence as set forth in the definitive Credit Agreement for the Senior Credit Facility, 100% of the Borrowers' Excess Cash, calculated semi-annually, shall be required to repay the Loans (after payment in full of the Exit Facility) within 15 days after the end of any relevant semi-annual period. All mandatory prepayments will be applied to repay the outstanding Loans after repayment in full of the Exit Facility. Mandatory prepayments from asset sales and incurrence of indebtedness shall be applied first to Term Loan 1, without reducing scheduled amortization, and after repayment in full of Term Loan 1, to Term Loan 2 in the inverse order of Maturity. Mandatory prepayments from Excess Cash shall be applied first to Term Loan 1 reducing scheduled amortization in the direct order of Maturity, and if Term Loan 1 is repaid in full, to Term Loan 2 reducing scheduled amortization in the direct order of Maturity. Excess Cash shall be defined as aggregate cash and cash equivalents as at June 30 and December 31 of each year, commencing December 31, 2012, _minus_ the sum of (i) Permitted Rollover Capital Expenditures (defined below), (ii) insurance proceeds held for vessel repairs, (iii) net proceeds of sale of encumbered assets outside of the ordinary course of business (including vessels mortgaged to other creditors) to the extent used (or anticipated to be used within 30 days) to repay debt secured by such assets, (v) prior to repayment in full of the CS and AIG Credit Facilities, respectively, net cash from the operations of the vessels securing the CS and AIG credit facilities, after deducting all allocations of overhead, working capital and vessel related costs, drydock and related reserves; all such net cash amounts shall be segregated for the specified purposes in separate accounts and periodically reported to the Lenders to support the Excess Cash calculations and (vi) $20,000,000, and _plus_ (x) the amount of any net working capital that exceeds $2,000,000 at any test date in 2012 or 2013, $3,000,000 at any test date in 2014, $4,000,000 at any test date in 2015 or $5,000,000 at any test date thereafter. Excess Cash will be calculated after giving effect to cash interest paid on Term Loan 1, and following repayment in full of Term Loan 1, after cash interest paid in the period since the prior Excess Cash calculation in respect of Term Loan 2. |
| **OPTIONAL** | |

**PREPAYMENTS
AND COMMITMENT
REDUCTIONS:**

The Borrowers may prepay the Senior Credit Facility in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs, if any, in the case of prepayment of LIBOR borrowings. Any optional prepayments will be applied first to Term Loan 1, without reducing scheduled amortization, and after repayment in full of Term Loan 1, to Term Loan 2 in the inverse order of Maturity.

**SECURITY:**

The Borrowers and each of the Guarantors shall maintain and grant, as applicable, in favor of the Administrative Agent and the Lenders, valid and perfected first priority (subject to certain exceptions to be set forth in the loan documentation) liens and security interests of the same scope and covering all Collateral as currently securing the Existing Credit Agreements, as well as any unencumbered assets. The Borrowers and Guarantors will enter into three party "springing" control agreements with the Administrative Agent and their respective account banks with respect to all collection and concentration accounts utilized in their business, pursuant to which the Borrowers and Guarantors shall maintain access to funds in such bank accounts until the occurrence of an Event of Default under the Senior Credit Facility. Notwithstanding anything to the contrary herein, the Senior Credit Facility will not be secured by the account at RBS for so long as the Prepetition RBS Credit Facility is outstanding, and the proceeds and collateral pledged to AIG or CS in connection either with the provision of adequate protection, debtor in possession financing or exit or restructured financing provided by AIG or CS, in each case related solely to the vessels pledged to AIG or CS, respectively, securing the debtors' obligations to AIG or CS, provided, that insurance proceeds associated with repairs of the Zuni Princess will be pledged to secure the Senior Credit Facility.

The Security shall ratably secure the relevant party's obligations in respect of the Senior Credit Facility, any treasury management arrangements and any interest rate swap or similar agreements in each case with a Lender under the Senior Credit Facility or any of its affiliates.

**CONDITIONS PRECEDENT
TO CLOSING:**

The Closing of the Senior Credit Facility will be subject to satisfaction or waiver of the following conditions precedent and such other mutually acceptable conditions deemed appropriate by the Administrative Agent, the Lenders and the Borrowers:

(i)     The negotiation, execution and delivery of definitive documentation (including, without limitation, reasonably satisfactory legal opinions, all relevant local opinions in connection with security, and other customary closing documents) for the Senior Credit Facility satisfactory to the Administrative Agent and the Lenders.

(ii)    The Plan shall have been confirmed by the Bankruptcy Court pursuant to a Confirmation Order on terms and conditions satisfactory to the Agents and Lenders (the "Confirmation Order"). The Confirmation Order shall not be subject to a stay and, unless otherwise agreed to by the Lenders, (i) at least 14 days shall have passed since the entry of the Confirmation Order and (ii) no appeal shall have been lodged to the Confirmation Order that in the opinion of the Lenders might adversely affect the Senior Credit Facility, impair in any material respect the post-effectiveness of the Plan or impair in any material respect the financial condition, business or prospects of any of the Borrowers or Guarantors. All conditions precedent to the effectiveness of the Plan shall have been satisfied or waived or shall be satisfied or waived concurrently in the reasonable judgment of the Agents and the Agents shall be satisfied that the administrative expenses, cure payments and trade claims paid or to be paid in connection with the Plan are consistent with the Budget. Except as consented to by the Lenders, the Bankruptcy Court's retention of jurisdiction under the Confirmation Order shall not govern the enforcement of the loan documentation for the Senior Credit Facility or any rights or remedies related thereto.

(iii)    The corporate, capital and ownership structure of the Borrowers and Guarantors shall be as set forth in the Plan.

(iv)    Receipt by the Lenders of satisfactory corporate resolutions, and other evidence of appropriate corporate authorization (including legal opinions) of the proposed transactions.

(v)    There shall have occurred no material adverse change in (i) the business, condition, operations or assets of the Borrowers and Guarantors (taken as a whole) since the commencement of the Case (other than the commencement of the Case, the transactions contemplated by the Plan and the turnover of vessels constituting collateral to The Royal Bank of Scotland plc), (ii) the ability of the Borrowers or Guarantors to perform when due their respective obligations under the loan documents, or (iii) the ability of the Administrative Agent or Lenders to enforce the loan documents and the obligations of the Borrowers and Guarantors thereunder (collectively, a "***Material Adverse Effect***").

(vi)    The Borrowers and Guarantors shall have an amount of unrestricted cash on the Closing Date of approximately $20,000,000.

(vii)    Receipt by the Administrative Agent, for the benefit of the Lenders and the Agents, of all fees and expenses due and payable in connection with the transactions contemplated hereby.

(viii)   An intercreditor agreement shall have been entered into by the Borrower and Guarantors, the Exit Facility Agent (on behalf of the Exit Facility lenders) and the Administrative Agent (on behalf of the Lenders), addressing the subordination of the liens securing the Senior Credit Facility to the liens securing the Exit Facility and on terms and conditions satisfactory to the Administrative Agent and Lenders.  The intercreditor agreement will include an adjustment to priorities of payment under the Senior Credit Facility in connection with a post-default liquidation of collateral, that will provide a $1,200,000 priority allocation to the Existing DVB Credit Facility lenders until the Exit Facility is repaid, reducing to $800,000 until Term Loan 1 is repaid, and $0 thereafter.  The senior priority of the Exit Facility will not be affected by the above-referenced adjustment.

(ix)   All conditions to the closing of the Exit Facility shall have been satisfied or waived by the lenders thereto.

(x)   Each of the restructured credit facilities with Credit Suisse and AIG Commercial Equipment Finance, Inc. shall have been entered into on terms acceptable to the Agents, and all conditions to such facilities shall have been satisfied or waived by the lenders thereto.

(xi)   The Lenders shall have received satisfactory evidence that the Administrative Agent (on behalf of the Lenders) shall have a valid and perfected preferred mortgage, lien and security interest in the collateral referred to under the section "*Security*" set forth above to secure the obligations referred to in such section; with respect to the Mortgaged Vessels and all other collateral.

(xii)   The absence of any action, suit, investigation or proceeding pending or, to the knowledge of the Borrowers and Guarantors, threatened in any court or before any arbitrator or governmental authority that could reasonably be expected to have a Material Adverse Effect.

(xiii)   The Lenders shall have received their respective pro rata shares of the equity securities issued under the Plan to the holders of allowed claims being restructured in the Senior Credit Facility.

(xiv)   The Lenders shall be satisfied as to any arrangements to be entered into with TBS Commercial, Beacon and certain of their subsidiaries ("*Commercial Affiliates*") as to the potential dissolution of such entities, the creation of certain new subsidiaries to continue certain of the business previously conducted by such entities, and the financial impact of such changes on the Borrowers and Guarantors; the Borrowers shall have a call option to employ certain of the Commercial Affiliates' current employees and perform certain of the services now performed by the Commercial Affiliates through newly

created subsidiaries substantially as described in the TBS Commercial Term Sheet attached to the Disclosure Statement. All arrangements with the Commercial Affiliates (and any of their subsidiaries) that will continue in effect shall be evidenced by agreements approved by the Agents.

**REPRESENTATIONS AND WARRANTIES:** Usual and customary for facilities of this type, including without limitation: existence, qualification and power of obligors, authorization, noncontravention, binding effect of agreements, delivery of financial statements, no material adverse effect, no material adverse litigation, no default, ownership of property, liens, investments, environmental compliance, insurance, taxes, ERISA compliance, subsidiaries, margin regulations, investment company act, disclosure, compliance with laws, intellectual property, solvency, casualty, employment matters, collateral documents, foreign asset control regulations, ownership of subsidiaries, vessels, bank accounts and related matters.

**AFFIRMATIVE COVENANTS:** Usual and customary for transactions of this type, to include without limitation: (i) delivery of financial statements; (ii) delivery of certificates and other information (including compliance certificates, audit reports and vessel appraisals); (iii) delivery of notices including notices of default, material governmental proceedings or investigations, collateral summaries, management reports, material litigation, ERISA and environmental proceedings, material changes in accounting or financial reporting practices, vessel dispositions and events of loss; (iv) payment of obligations; (v) preservation of existence; (vi) maintenance of properties; (vii) use of proceeds; (viii) maintenance of insurance; (viii) compliance with laws; (ix) books and records; (x) inspection rights; (xi) obligation to guarantee and give security; (xii) compliance with environmental laws; (xiii) preparation of environmental reports; (xiv) further assurances; (xv) charters; (xvi) lien and title searches; (xvii) charters of excluded subsidiaries; (xviii) valuations and inspections (such provisions to provide for valuations to be conducted no earlier than 30 days prior to the end of each fiscal quarter and delivered on the first day of the following fiscal quarter); (xix) recognition by Philippine Maritime Industry Authority; (xx) concerning the vessels, etc.

**NEGATIVE COVENANTS:** Usual and customary for transactions of this type, to include without limitation: limitations on (i) liens; (ii) indebtedness (such provisions to prohibit the incurrence of indebtedness for new vessel acquisitions (other than purchases in connection with permitted investments in chartered vessels), new vessel construction and other unsecured indebtedness, but will permit, so long as no default exists or would result, a basket of $1,500,000 for cash secured letters of credit, and existing guaranties of the Prepetition AIG Credit Facility and Prepetition CS Credit Facility, and guaranties by the same guarantors (and by New TBS Parent created pursuant to the Plan) of any debtor in possession, exit or restructured financing provided by AIG or CS relating to the vessels securing the obligations of TBS and certain of its subsidiaries to such entities); (iii) investments (such provisions to prohibit new vessel construction,

investments in joint ventures and vessel acquisitions (other than purchases in connection with exercise of purchase options for chartered vessels at any time following the later to occur of (a) June 30, 2015 and (b) the repayment in full of Term Loan 1, provided that (w) such purchase shall be financed with outside financing with no recourse against any person or entity other than the applicable vessel-owning subsidiary (and the related nonrecourse financing will be permitted), (x) the Administrative Agent shall have received evidence of pro forma financial covenant compliance and no default, (y) if the total amount purchase price in respect of such purchase exceeds 65% of the appraised value of the vessel to be acquired, the prior written consent of the Agents shall be required for such purchase and (z) the purchase price paid for all such purchases in any six month period shall not exceed $7,500,000 in the aggregate)); (iv) fundamental changes; (v) dispositions (such provisions to permit planned dispositions of Mortgaged Vessels in the ordinary course, subject to credit agreement compliance and so long as the purchase price equals or exceeds appraised value (and with consent of Agents as to any lower price); all net proceeds shall be applied to repayment of the Senior Credit Facility, and to prohibit dispositions of other collateral outside of the ordinary course of business); (vi) restricted payments (such provisions to prohibit dividend payments or other distributions); (vii) vessels; (viii) approved manager; (ix) change in nature of business; (x) transactions with affiliates; (xi) burdensome agreements; (xii) use of proceeds; (xiii) financing agreements; (xiv) amendments to organizational documents; (xv) accounting changes; (xvi) prepayments of indebtedness; (xvii) holding company; (xviii) net present rental value (e.g. off-balance sheet operating leases and payments associated with vessels chartered in) (such provision (a) to permit such arrangements having a term of one year or less, (b) to permit such arrangements having a fixed term of greater than one year but no more than two years with consent of the Agents, and (c) to permit three vessels to be chartered in on a long term basis (in excess of two years), with the number of permitted long term charters being increased by one for each two Mortgaged Vessels sold (it being understood that the Manhattan Princess shall be deemed to be the first such vessel sold), up to a total of eight such long term charters. In the event that the remaining term of any such eight long term charters falls below two years, such charter may be replaced with an additional long term charter, provided, that if such event occurs before January 1, 2014, consent of the Agents is required. Additionally, in the event the Borrowers sell additional vessels, for each two additional vessels sold, the Borrowers will be permitted to long term charter in one additional vessel, subject to no default and compliance with an incurrence leverage test in accordance with the table below. The bareboat charters of the Laguna Belle and Seminole Maiden will be permitted, subject to amendments that, among other matters will reduce the charter rate to $4,000 per day during the period through February 1, 2015 and $4,500 per day thereafter if extended for an additional year, provide a call option to the Borrowers at a price of $8,500,000 per vessel (minus the seller's credit of $2,750,000 per vessel, which shall be payable upon repayment in full of the Senior Credit Facility so long as the amended bareboat charters are not terminated as a result of an event

of default thereunderr), and on other terms satisfactory to the Lenders); (xix) capital expenditures; (xx) cash management, etc.

Incurrence Leverage Test Levels:

| Four Quarter Period Ending | Maximum Leverage Incurrence Test |
|---|---|
| Closing - 3/30/13[annualized for period elapsed since 4/1/12] | 6.50:1.00 |
| 3/31/13 - 6/29/13 | 6.20:1.00 |
| 6/30/13 - 9/29/13 | 5.75:1.00 |
| 9/30/13 - 12/30/13 | 5.35:1.00 |
| 12/31/13 - 3/30/14 | 4.90:1.00 |
| 3/31/14 - 6/29/14 | 4.50:1.00 |
| 6/30/14 - 9/29/14 | 3.80:1.00 |
| 9/30/14 - 12/30/14 | 3.55:1.00 |
| 12/31/14 - 12/30/15 | 3.15:1.00 |
| 12/31/15 - 12/30/16 | 1.95:1.00 |
| 12/31/16 and thereafter | 1.00:1.00 |

Compliance with financial covenants as follows:

• Maintain Minimum Cash Liquidity (unrestricted cash and cash equivalents ("**Qualified Cash**")) of at least $10,000,000 daily closing balance on average for any week, <u>provided</u>, that a failure to maintain at least $10,000,000 daily closing balance on average for any week shall not result in a default or event of default so long as (i) at least $7,5000,000 daily closing balance of Qualified Cash is maintained on average for each week, (ii) the failure to maintain $10,000,000 daily closing balance of Qualified Cash does not continue for more than two consecutive weeks, and (iii) the relevant thirteen-week cash flow report delivered to the Administrative Agent each week indicates that the weekly average of Qualified Cash will be at least $10,000,000 no later than the third week following the week in which such deficiency was first reported. No more than $500,000 in the aggregate included in Qualified Cash may be held in any bank not a

Lender. Any cash pledged to support letters of credit will not be included in the calculation of Qualified Cash.

• Maximum Consolidated Leverage Ratio: At any time commencing with the fiscal quarter ending June 30, 2014, during any period of four consecutive fiscal quarters as set forth in the table below:

| Four Quarter Period Ending | Maximum Leverage |
|---|---|
| 6/30/14 - 9/29/14 | 5.40:1.00 |
| 9/30/14 - 12/30/14 | 4.85:1.00 |
| 12/31/14 - 12/30/15 | 4.35:1.00 |
| 12/31/15 - 12/30/16 | 2.90:1.00 |
| 12/31/16 and thereafter | 1.70:1.00 |

EBITDA for purposes of the covenant calculations shall be defined similarly to the Existing Bank of America Credit Agreement. Total Debt for purposes of the Leverage Test at 6/30 and 12/31 will be calculated after giving effect to the anticipated cash sweep amount to be effected 15 days after the quarter end. Intermediate quarterly stepdowns during 2015 and 2016 will be included in final documentation.

Capital Expenditures (not including those for insured repairs and deductible payments with respect to such insured repairs) shall be limited to $30,000,000 for FY 2012, $33,000,000 for FY 2013, $34,000,000 for FY 2014, $37,000,000 for FY 2015, and $34,000,000 for each fiscal year thereafter. Permitted Rollover Capital Expenditures shall mean permitted Capital Expenditures committed to be made in any period, but actually incurred in the fiscal quarter following the relevant measurement period.

Financial reporting covenants will be modified to require monthly management report delivered within 15 days after month end, quarterly unaudited statements within 45 days after quarter end, and annual audited financial statements within 90 days after year end and other reporting reasonably requested by the Agents. Thirteen week cash flow reports and weekly average cash balances will continue to be delivered on Wednesday of every week.

**EVENTS OF DEFAULT:** Usual and customary for transactions of this type (including grace periods as may be mutually agreed), to include without limitation: (i) nonpayment of principal, interest, fees or other amounts; (ii) any representation or warranty proving to have been incorrect when made or confirmed; (iii) failure to perform or observe covenants set forth in the

loan documentation within a specified period of time, where customary and appropriate, after such failure; (iv) cross-default to other indebtedness in an amount to be agreed; (v) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (vi) monetary judgment defaults in an amount to be agreed; (vii) actual or asserted invalidity of any loan documentation; (viii) change of control; (ix) customary ERISA defaults; (x) invalidity of liens or perfection; (xi) any proceeding against a Financed Vessel that could reasonably be expected to cause a Material Adverse Effect, and (xii) failure to preserve existence of Holdings, etc.

**VOTING RIGHTS:** The consent of the Agents and Lenders holding more than 50% of the Loans ("***Majority Lenders***") shall be required for amendments and waivers, and the following items, among others, shall require the consent of all Lenders directly affected thereby: (1) decreases in interest rates of fees (<u>provided</u> the waiver of default interest or a default or event of default shall not constitute a decrease in interest rate or fees) or forgiveness of principal; (2) extensions of final maturity; (3) release of all or substantially all of the collateral (other than permitted asset sales) or obligors; and (4) changes in the percentage constituting Majority Lenders or the terms of voting rights provisions.

**ASSIGNMENTS AND PARTICIPATIONS:** The Lenders will be permitted to grant participations of their loans and commitments so long as such participants are entitled to voting rights only on matters requiring consent of all Lenders affected by a particular matter. Any Lender will be permitted to assign a portion of the Senior Credit Facility (which assignments may be effected with respect to either or both Term Loans) to a Lender, Lender Affiliate, Approved Fund or other Eligible Assignee (as such terms shall be defined in the definitive loan documentation) in minimum amounts of $2,000,000, subject to consent of the Agents, which consent will not be unreasonably withheld, and notice to the Borrowers within a reasonable time. The Administrative Agent shall receive a $3,500 processing and recordation fee from each assignee upon each assignment.

**INDEMNIFICATION:** The Borrowers will indemnify and hold harmless the Administrative Agent, the Co-Agent, each Lender and their respective affiliates and their officers, directors, employees, agents and advisors from and against all losses, liabilities, claims, damages or expenses arising out of or relating to the transactions contemplated hereby, the Senior Credit Facility, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs, <u>provided</u> that such indemnity shall not be available to the extent such losses, liabilities, claims, damages or expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee or (y) result from a claim brought by a Borrower against an indemnitee for breach in bad faith of such indemnitee's obligations under the Senior Credit Facility, if such Borrower has obtained a final and nonappealable judgment in its favor

on such claim as determined by a court of competent jurisdiction..  This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:**      State of New York.

**PRICING/FEES/**
**EXPENSES:**      As set forth in Addendum I.

**OTHER:**      This Summary of Terms is intended as an outline of certain of the material terms of the proposed restructuring of the Existing Credit Facilities and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Senior Credit Facility contemplated hereby.

**ADDENDUM I**
**PRICING, FEES AND EXPENSES**

**INTEREST RATES:** At the Borrowers' option, the Loans under the Senior Credit Facility will bear interest at a rate equal to (i) LIBOR plus 4.00% or (ii) the Base Rate plus 3.00%. LIBOR shall be defined as the higher of the Eurodollar Rate (as defined in the Existing Credit Agreement) and 1.00% per annum. Base Rate shall be defined as the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus .50%, (c) one month LIBOR plus 1.00% and (d) 2.00% per annum. In the event that, at the Company's option, interest on the Term Loan 2 is not paid in cash on any interest payment date, it shall instead accrue at a PIK interest rate of 2.00% in excess of the otherwise applicable cash pay rate per annum (compounding quarterly) and payable on the maturity date of Term Loan 2.

The Borrowers may select interest periods of 1, 2 or 3 months for LIBOR loans, subject to availability. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

A default rate shall apply on all obligations in the event of default under the Senior Credit Facility at a rate per annum of 2% above the applicable interest rate.

**EQUITY ALLOCATION:** Pro Rata allocation based on respective amounts of debt restructured.

**CALCULATION OF INTEREST AND FEES:** Other than calculations in respect of interest on Base Rate Loans (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**COST AND YIELD PROTECTION:** Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**EXPENSES:** The Borrowers will pay all reasonable and documented costs and expenses associated with the preparation, due diligence, administration, of the Senior Credit Facility, including, without limitation, the reasonable legal fees of counsel to the Administrative Agent and Co-Agent, and the costs of all valuations, inspections and consultants regardless of whether or not the proposed Senior Credit Facility is closed. The Borrowers will also pay the expenses of the Administrative Agent, Co-Agent and each Lender in connection with the enforcement of any loan documentation.

# Exhibit F

TBS INTERNATIONAL

OUTLINE OF TBS TERM SHEET
WITH AIG

1.      Conditions Precedent

        a.      Execution of Chapter 11 plan support agreement with AIG in form acceptable to AIG

        b.      Restructure and payment of AIG Debt, as provided herein, implemented through a confirmed Chapter 11 plan

2.      BofA/DVB and CS DIP Facilities - no DIP funds from either BofA/DVB or CS facilities available to support AIG vessels.  No DIP facilities shall be granted priming, replacement or junior liens on any collateral securing the AIG Debt (the "AIG Collateral") without specific prior written consent of AIG.

3.      Senior Secured Debt Terms and Provisions – AIG Debt

        a.      Terms of Restructured Debt – on the Effective Date, the existing AIG senior secured debt of  approximately \$4,899,092.73[1] (as of January 23, 2012) (the "AIG Debt") shall be modified through issuance of a replacement note (the "Replacement AIG Note").  The terms of the Replacement AIG Note shall be as follows:

                i.      Interest – existing interest rate, payable in cash to the extent of available Net AIG Cash Collateral; otherwise payable in kind; interest payments shall be due and payable, on a quarterly basis, in arrears

                ii.     Term – 180 days after the effective date of the Plan

                iii.    Amortization – solely from proceeds from vessel sales and Net AIG Cash Collateral as provided herein

                iv.     Security – The payment obligations under the Replacement AIG Note shall continue to be secured by a perfected first priority lien on all of the AIG Collateral.  AIG's liens on the AIG Collateral shall not be subordinated or primed under the DIP Facility, under any other loan arrangement or otherwise.

        b.      Sale of AIG Collateral

                i.      The Debtor shall take such actions as are necessary to promptly sell the AIG Collateral as reasonably practical.

---

[1]  Number supplied by AIG, subject to reconciliation.

ii.      Sales of AIG Collateral – all net cash proceeds of AIG Collateral (including, without limitation, AIG vessel sales) will be applied to AIG Debt, which proceeds shall be applied first to the payment of all fees and expenses of AIG (including without limitation, fees and expenses of AIG's counsel), second, to interest due and, thereafter, to principal.

c.      Covenants

i.      Pre-packaged Chapter 11 plan of reorganization (the "Plan") to be confirmed by the bankruptcy court, in form and substance acceptable to AIG, no later than 120 days from the initial filing of such plan (unless AIG agrees in writing that such 120-day period is to be extended).

ii.      The order confirming the Plan shall provide that on or after 180 days after the effective date of the Plan, AIG shall be free, notwithstanding anything to the contrary, to exercise all rights and remedies available to AIG under the AIG Debt, at law or in equity, including without limitation, the exercise of any and all rights of foreclosure against any remaining AIG Collateral.

d.      Payment from Net AIG Cash Collateral

i.      Use of Cash Collateral – during the pendency of the chapter 11 case, AIG shall consent to the use of, and TBS shall be entitled to use, AIG cash collateral in accordance with a budget previously approved by AIG; in exchange, AIG shall be provided, on a dollar-for-dollar basis and solely to the extent of available Net AIG Cash Collateral, with (i) adequate protection payments, to be applied against first, any outstanding fees and expenses of AIG (including, without limitation, outstanding fees and expenses of AIG's counsel), and second, outstanding interest due on the Replacement AIG Note, and (ii) adequate protection replacement liens on AIG Collateral, including AIG cash collateral.  Adequate protection payments shall be made solely from Net AIG Cash Collateral.  Net AIG Cash Collateral means, for any quarterly period, cash generated by the AIG vessels less operating expenses incurred by those vessels, allocated overhead attributable to such vessels, and, Capex and necessary repair costs attributable to such AIG Vessels incurred in the measurement quarter or reasonably anticipated to be incurred in the following quarter. No other lender shall be granted priming, replacement or junior liens on AIG Collateral without the specific prior written consent of AIG, and neither shall AIG be granted or require priming, replacement or junior liens on any property other than the AIG Collateral.

In connection with the foregoing, TBS shall agree, so long as the Replacement AIG Note is outstanding, to deliver to AIG no later than ten (10) days prior to the beginning of each calendar month a certificate of a duly authorized officer of TBS setting forth in reasonable detail a calculation of the Net AIG Cash Collateral expected for such calendar month, such certificate to be in form and substance reasonably satisfactory to AIG.

2

      ii.     Post-Effective Date Net AIG Cash Collateral - Subsequent to the effective date of the Plan, TBS shall pay Net AIG Cash Collateral to AIG , to be applied against <u>first</u>, any outstanding fees and expenses of AIG (including, without limitation, outstanding fees and expenses of AIG's counsel), <u>second</u>, any outstanding interest due on the Replacement AIG Note, and <u>thereafter</u>, any outstanding principal due on the Replacement AIG Note.

4.     Operational Provisions

     a.     AIG will not oppose employment agreements with key executives as provided in the Employment Agreement Term Sheet.

     b.     AIG will not oppose (a) vessel sales and charters as provided in BOA/DVB Debt Term Sheets, (b) the amended DVB bareboat charter as provided in the DVB Bareboat Charter Term Sheet or (c) the TBS Commercial arrangements as provided in the TBS Commercial Term Sheet.

     c.     BofA/DVB shall not oppose any sale of AIG Collateral, or the application of proceeds thereof, in each case, as provided in this term sheet.

     d.     Excess Cash Sweep –

      i.     AIG will not participate in any Excess Cash Sweep mechanism implemented for BofA/DVB

      ii.     Net cash generated from the use or sale of AIG Collateral (including, without limitation, the use or sale of AIG vessels) will not be included in the calculation of the Excess Cash Sweep or in the $20 million threshold for determining what is available to be distributed in connection with the Excess Cash Sweep.

     e.     Notwithstanding anything to the contrary contained herein, under no circumstances shall AIG have any obligation to advance any funds to TBS, any lender or any other person or entity in connection with (i) providing any loan, extension of credit or other form of advance, or (ii) the payment of operating or other costs and expenses, including without limitation, expenses relating to drydocking.

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 290 of 385

# Exhibit G

## TBS - Credit Suisse Financing – Key Restructuring Considerations

This indicative outline proposal sets out the key terms upon which Credit Suisse AG in its capacity as lender (hereinafter, the "Lender") to Claremont Shipping Corp., Marshall Islands and Yorkshire Shipping Corp., Marshall Islands (with the guarantor, TBS International Limited, Bermuda and its affiliates, the "TBS Group") would be prepared to consider a restructuring of its existing exposure with the TBS Group. These terms are provided for confidential settlement discussions only and not to be construed as a commitment of any kind. This proposal remains strictly subject to (i) provision of such further information as the Lender may require (ii) further review and legal advice by the Lender's US legal counsel Seward & Kissel (iii) credit committee approval by the Lender (iv) loan documentation being in form and substance acceptable to the Lender and (v) implementation of this financial restructuring into an overall restructuring concept for the TBS Group (the "Restructuring Concept"). The Restructuring Concept shall be agreed by the requisite majority of each group of existing financial lenders to the TBS Group, other than the RBS lender group (in lieu of the sale of the RBS financed fleet and repayment of their loan outstanding), and shall be implemented through the filing of chapter 11 cases and confirmation of a pre-packaged or pre-negotiated chapter 11 plan for the TBS Group by the bankruptcy court (the "Chapter 11 Plan"), which shall be supported by the requisite majority of each such group of existing financial lenders through execution of a Chapter 11 plan support agreement (the "Plan Support Agreement"). The Plan Support Agreement and Chapter 11 Plan shall be on terms acceptable to the Lender in its sole discretion.

| | |
|---|---|
| Borrowers: | Jointly and severally Claremont Shipping Corp., Marshall Islands and Yorkshire Shipping Corp., Marshall Islands (as per Existing Facility) |
| Existing Guarantor: | TBS International Limited, Bermuda (as per Existing Facility) |
| New Guarantor: | TBS Holdings Ltd., Bermuda or such other top tier holding company that TBS may form on the Effective Date (defined below) to hold, directly or indirectly, ownership of the Borrowers [replacing the Existing Guarantor on the Effective Date]; the New Guarantor and its implementation into the TBS Group to be in form and substance acceptable to the Lender in its sole discretion |

CS Facilities:

**A.)  Existing Facility:**
A senior secured amortizing loan facility entered into by the Borrowers, the Existing Guarantor and the Lender in December 2007 with a current principal outstanding loan amount of USD 18,192,000 plus accrued interest and cost

**B.)  Swap:**
That certain swap arrangement related to the Existing Facility and senior secured by the collateral package related to such facility comprising of the following two existing interest rate swaps between the Borrowers and the Lender:

| Notional amount | Fixed rate | Final Maturity |
|---|---|---|
| USD 10,000,000 | 3.72% p.a. | 20/05/2013 |
| USD 10,000,000 | 3.46% p.a. | 12/03/2013 |

(the "Swap")



The Swap shall remain in place on same terms and conditions as currently existing and any documentation of the New CS Facilities shall ensure that the Swap is senior secured by the then prevailing collateral package in the same manner as currently under the Existing Facility.

### C.) Post-petition DIP credit facilities to be made available to the Borrowers

(in addition to the Existing Facility and the Swap) after filing of the Chapter 11 cases until occurrence of the Effective Date, subject to customary conditions (e.g., satisfaction in the Lender's sole discretion with respective documentation, form(s) and substance of court orders and the protections granted to the Lender thereunder, attainment of certain milestones during the Chapter 11 proceedings, non-occurrence of certain events):

<u>DIP Facility A:</u> Senior secured revolving credit facility in an amount of up to USD 1,000,000 to reimburse the Lender for any financial and legal advisory cost incurred in connection with the negotiation and implementation of the Restructuring Concept, any prior forbearance agreements, the Chapter 11 proceedings and the implementation of the New CS Facilities under the Chapter 11 Plan ("Reimbursable Expenses").

<u>DIP Facility B:</u> Senior secured revolving credit facility in an amount of up to USD 500,000 to provide working capital to the Borrowers for operating the CS Vessels and fund any payments due under the Swap if necessary.

(DIP Facility A and DIP Facility B together the "<u>DIP Facilities</u>" and together with the Existing Facility the "<u>Chapter 11 Facilities</u>")

*In addition to customary conditions to the provision of the DIP Facilities, the DIP Facilities shall terminate and become immediately due and payable in cash if (i) the Actual Effective Date does not occur on or before the Outside Date (defined below), (ii) the Chapter 11 cases are converted to Chapter 7, (iii) the Chapter 11 cases are dismissed, (iv) a trustee is appointed in the Chapter 11 cases, or (v) the Lenders' claims or liens under the Existing Facilities are challenged (each a "Cancellation Event", together "Cancellation Events").*

### D.) "Exit" Facilities to be made available to the Borrowers on the Effective Date:

<u>Working Capital Facility:</u> Senior secured revolving credit facility in an amount of up to USD 500,000 replacing the DIP Facility B on the Effective Date.

<u>Term Loan Facility A:</u> Senior secured term loan facility of up to USD 1,000,000 refinancing outstanding indebtedness under DIP Facility A on the Effective Date.

<u>Term Loan Facility B:</u> Amortizing term loan facility to refinance outstanding indebtedness under the Existing Facility (including any outstanding and unpaid interest, and any interest accrued under the Existing Facility during the Chapter 11 proceedings (but only to the extent the Lender agrees in



writing to defer payment of current interest during a Chapter 11 proceeding based on rationale set out herebelow and only up to the earlier of the actual Drawdown date and the Final Availability Date of the Term Loan Facility).

(the Working Capital Facility, the Term Loan Facility A, the Term Loan Facility B together the  "New CS Facilities"; the DIP Facilities, the Existing Facility, the Swap and the New CS Facilities together "CS Facilities").

*The New CS Facilities shall not be available to the Borrowers if a Cancellation Event has occurred.*

CS Vessels:   Arapaho Belle, a bulk carrier of 24,021dwt built 1998 and Oneida Princess, a bulk carrier of 24.251dwt built 1998 as per Existing Facility

Effective Date:   The date upon which the Chapter 11 Plan becomes effective (hereinafter referred to as "Actual Effective Date")such date to occur in any event by no later than June 30, 2012 ("Outside Date").

Drawdown and
Final Availability:   **DIP Facilities:**

DIP Facility A: To be made available for multiple drawings until the earlier of the Actual Effective Date and the Outside Date has occurred (unless and until a Cancellation Event has occurred), with any undrawn amount to be irrevocably and unconditionally cancelled promptly and without further action at such time; provided, however, that DIP Facility A may be drawn on the Actual Effective Date to pay Reimbursable Expenses incurred on or prior to the Effective Date, but not billed or, if applicable, allowed by the Bankruptcy Court on such date. For such purpose, subject funds shall be paid into a designated account held with and pledged in favour of the Lender on such date with subsequent payments of the relevant Reimbursable Expenses being effected out of such account with the approval of the Lender (the "Designated Account").

DIP Facility B: Available for multiple drawings in minimum amounts of USD 100,000 until the earlier of the Actual Effective Date and the Outside Date has occurred, with any amount repaid being available for reborrowing (unless and until a Cancellation Event has occurred).

**New CS Facilities:**

Working Capital Facility: To be made available for multiple drawings in minimum amounts of USD 100,000 from the Effective Date until three months prior to its Final Maturity with any amount repaid being available for reborrowing.

Term Loan Facility A and Term Loan Facility B: To be made available in one drawing on the Effective Date. Any amount undrawn on the Effective Date shall be irrevocably and unconditionally cancelled. For the avoidance of doubt, to the extent funds from DIP Facility A are drawn on the Effective



Date to pay Reimbursable Expenses incurred on or prior to the Actual Effective Date, but not billed or, if applicable, allowed by the Bankruptcy Court by such date and such funds therefore initially placed into the Designated Account, Term Loan Facility A will include the amount of such funds.

**Swap:**
Subject to the provisions hereof, the Swap will be continued until Final Maturity.

Final Maturity:

**DIP Facilities:**
On the earlier of (i) the Actual Effective Date (ii) the Outside Date and (iii) the date a Cancellation Event has occurred

**New CS Facilities:**
Working Capital Facility: June 30, 2017
Term Loan Facility A: Upon the earlier of (i) the date upon which the Term Loan Facility A is fully repaid out of Excess Cash Sweep Funds and (ii) June 30, 2014
Term Loan Facility B: June 30, 2017

**Swap:**
May 20, 2013 being the latest final maturity date of the two existing interest rate swaps in accordance with the existing final maturity dates set out in the table under "Swap" above.

Required Vessel Sale:

It is a condition precedent for the Lender for entering into a Plan Support Agreement with the TBS Group and offering the terms outlined in this Proposal, that starting with the filing of the Chapter 11 cases and for as long as there is any amount outstanding under any of the CS Facilities (including interest and cost), the Borrowers shall be required to sell and complete the delivery of a CS Vessel to a respective buyer within 4 months from the date where any of the following events has occurred:

(i)   the Borrowers (or any of the Existing Guarantor or the New Guarantor, as
applicable at such point in time, on behalf of the Borrowers) are unable
  (a)   prior to the occurrence of the Initial Required Vessel Sale (as defined herebelow) if it occurs before June 2014, to pay Interest (or any part thereof) when due under the New CS Facilities, and/or effect any payments due under the Swap and/or pay the Fixed Amortization (if any) when due under Term Loan Facility B.
  (b)   subsequent to the occurrence of the Initial Required Vessel Sale (as defined herebelow) if it occurs before June 2014, to pay Interest (or any part thereof) when due under the New CS Facilities and/or effect any payments due under the Swap.



(c)    from and after June 2014, to pay Interest (or any part thereof) when due under the New CS Facilities and/or pay the Fixed Amortization when due under the Term Loan Facility B.

(ii)    the actual cost incurred by the Borrowers exceed the cost outlined in the then prevailing Approved Budget by more than 15% in any financial quarter.

(the events being the "Sale Events", the sale of the first CS Vessel being the "Initial Required Vessel Sale")

After an Initial Required Vessel Sale the same mechanics shall apply for the second CS Vessel if another Sale Event occurs (the "Second Required Vessel Sale", together with the Initial Required Vessel Sale the "Required Vessel Sales").

**Fixed Amortization:**    No fixed amortization on the Chapter 11 Facilities, the Working Capital Facility and the Term Loan Facility A. The Term Loan Facility B shall be repaid by way of 20 quarterly repayment installments of USD 660,000 (with the quarterly repayment installments being reduced to USD 330,000 per each installment in case of a sale of a CS Vessel, whether by way of a voluntary sale of a CS Vessel or an Initial Required Vessel Sale) the first one being due on September 30, 2012 with the residual outstanding principal becoming due and payable by way of a balloon payment together with the final repayment installment upon Final Maturity of the Term Loan Facility B.

Notwithstanding the foregoing paragraph, upon the occurrence of an Initial Required Vessel Sale or a voluntary sale of a CS Vessel, in each case prior to June 2014, the Borrower shall not be required to make any Fixed Amortization from the occurrence of the Sale Event giving rise to the Initial Required Vessel Sale (in case of the Initial Required Vessel Sale) or from the sale date (in case of a voluntary sale of a CS Vessel) up to and until June 2014 with the requirements in respect of fixed amortization payments being reinstated starting on such date. Irrespective whether a Sale Event has occurred or whether a CS Vessel has actually been sold, the Excess Cash Sweep Funds mechanism shall remain in effect.

**Mandatory Prepayments:**    For any CS Vessel sold by the Borrowers (either by way of a Required Vessel Sale or otherwise) or declared actual, constructive, agreed or compromised total loss, the Borrowers shall apply any proceeds in the order listed herein.

A.) <u>During the pendency of the Chapter 11 cases (but before the Effective Date):</u>

To (i) prepay DIP Facility A to 50% of the maximum original available amount of that facility (and on an ongoing basis, the maximum available facility amount under the DIP Facility A shall be 50% of the maximum original amount); (ii) prepay the DIP Facility B to 50% of the maximum original available amount of that facility (and on an ongoing basis, the maximum available facility amount under the DIP Facility B shall be 50% of the maximum original amount) (iii) pay such termination cost applicable for unwinding such nominal amount on the Swap necessary to ensure that the



remaining notional amount of the Swap does not exceed the notional amount outstanding under the Chapter 11 Facilities after the prepayment (iv) prepay the Existing Facility to 50% of its outstanding indebtedness
all plus corresponding accrued interest, commitment fees and cost; (v) to the Borrowers for operation of any remaining CS Vessel in accordance with the Approved Budget and/or inclusion in the Chapter 11 Cash Sweep Funds.

B.) <u>After the Effective Date:</u>
To (i) fully prepay any amount outstanding under the Term Loan Facility A which shall be irrevocably and unconditionally cancelled; (ii) prepay the Working Capital Facility to 50% of the maximum original available amount of that Facility  (and on an ongoing basis, the maximum available facility amount under the Working Capital Facility shall be 50% of the maximum original amount) (iii) pay such termination cost applicable for unwinding such nominal amount on the Swap necessary to ensure that the remaining notional amount of the Swap does not exceed the notional amount outstanding under the New CS Facilities after  the prepayment (iii) prepay the Term Loan Facility B(with quarterly regular repayment installments being reduced to USD 330,000 and any additional funds being credited against the balloon, provided that if the amount prepaid under Term Loan Facility B does exceed 50% of its previously outstanding indebtedness (including interest and cost), additionally the two next regular repayment installments shall be reduced to zero with the respective amount being added to the balloon), all plus corresponding accrued interest, commitment fees and cost.

If both CS Vessels are sold (irrespectively whether by way of consecutive Required Vessel Sales or otherwise), the CS Facilities (then effective) including accrued interest, commitment fees and cost are to be repaid in full and the Swap will need to be unwound at the cost of the Borrowers. No sale of a CS Vessel (whether under a Required Vessel Sale or otherwise) without the consent of the Lender if net sale proceeds are not in an amount sufficient to repay (i) the DIP Facilities and the Swap or the Term Loan Facility A, the Working Capital Facility and the Swap (as applicable at such point in time) in the manner contemplated above plus (ii) at least 50% of the aggregate outstanding indebtedness under the Existing Facility or the Term Loan Facility B (as applicable at such point in time). Notwithstanding the foregoing, any such proceeds shall be applied as above.

In case a Cancellation Event has occurred, the DIP Facilities shall be prepaid in full in cash and any outstanding commitment under such facilities shall be cancelled with immediate effect.

Any amount maintained on the Designated Account which has not been used for settlement of Reimbursable Expenses within a 3 months time frame after the Effective Date shall be used to prepay Term Loan Facility A at the end of the next financial quarter.



Cash Sweep:    A.) During the pendency of the Chapter 11 cases (but before the Effective Date):

Applicable from filing of the Chapter 11 proceedings until the Effective Date or a Cancellation Event has occurred for any Net Cash (as defined below) generated from operations of the CS Vessels exceeding USD 500,000 per CS Vessel or USD 1,000,000 in aggregate, whichever is the lower (with USD 250,000 per CS Vessel or USD 500,000 in aggregate, whichever is the lower, being retained with the Lender as Minimum Liquidity and the balance remaining available for working capital purposes). Net Cash means the starting balance of cash held by the Borrowers and/or by other members of the TBS Group related to the CS Vessels at the beginning of the relevant financial quarter plus cash generated from operation of the CS Vessels within the relevant financial quarter after payment of operating expenses, allocation of G&A expenses, payment of expenses incurred related to repair and/or drydocking of any CS Vessel and any quarterly settlement payments regularly due under the Swap within the relevant financial quarter (if any).
At the end of each financial quarter any such Net Cash relating to the CS Vessels ("Chapter 11 Cash Sweep Funds") shall be used to
(a) first, effect any adequate protection payments and/or Interest and Commitment Fee payments then due under the Chapter 11 Facilities;
(b) second, repay any amount outstanding under the DIP Facility A;
(c) third, repay any amount outstanding under the DIP Facility B and
(d) fourth, prepay the Existing Facility

Chapter 11 Cash Sweep Funds to be determined at the end of each financial quarter and certified to their correctness by the CFO of the TBS Group [calculation methodology and content of certificate to be further defined and
 agreed].

B.)  After the Effective Date:

Applicable from the Effective Date and until repayment of all outstanding indebtedness to the Lender (including interest and cost) for any Net Cash (as defined under A.) above generated from operations of the Vessels after Fixed Amortization (if any) and Interest exceeding USD 500,000 per CS Vessel or USD 1,000,000 in aggregate, whichever is the lower (with USD 250,000 per CS Vessel or USD 500,000 in aggregate, whichever is the lower, being retained with the Lender as Minimum Liquidity and the balance remaining available for working capital purposes). At the end of each financial quarter any Net Cash relating to the CS Vessels ("Excess Cash Sweep Funds") shall be used to
(a) first, repay any amount outstanding under the Term Loan Facility A (if any); following repayment of this facility in full
(b) second, repay any amount outstanding under the Working Capital Facility (if any) and
(c) third, prepay the Term Loan Facility B; any such funds shall be applied against Term Loan Facility B in inverse order of maturity (starting with the balloon payment).



Excess Cash Sweep Funds to be determined at the end of each financial quarter and certified to their correctness by the CFO of the TBS Group [calculation methodology and content of certificate to be further defined and agreed].

**Interest:**  Libor + Mandatory Cost + Margin;
Default Interest to be Interest Rate + 2% p.a.

Default Interest during the pendency of the chapter 11 cases (but before the Effective Date): Default Interest under the Existing Facility shall accrue during the pendency of the Chapter 11 cases. Provided the Chapter 11 Plan is confirmed and becomes effective on or before the Outside Date the Lender shall waive the right for payment of the Default Interest (and instead shall accept non-default interest at the rate applicable under the Existing Facility) then due by the Borrowers. If the Effective Date does not occur on or beforel the Outside Date or if a Cancellation Event has occurred, the Lender shall have the right to demand cash payment of the accrued and accruing Default Interest from the date of the commencement of the Chapter 11 cases or such earlier date upon which Default Interest was triggered under the Existing Facility.

Interest shall be payable in cash in arrears at the end of each financial quarter. Neither the Chapter 11 Facilities nor the New CS Facilities will include any payment-in-kind regulations on interest, provided that subject to the restrictions set forth under "Use of Cash Collateral" herein below, the Lender shall be prepared to accept accrual of Interest on the Existing Facility at the non-default Interest rate during pendency of the Chapter 11 cases (until the Effective Date). For the avoidance of doubt, such exception does not prevail for any quarterly amount due under the Swap which shall continue to be settled in cash on the relevant existing payment date (whereas such payment can be made out of the Working Capital Facility if required).

**Margin:**  DIP Facility A / Term Loan Facility A: 400bps p.a.
DIP Facility B, Working Capital Facility and Term Loan Facility B: 300bps p.a.
if and so long as loan outstanding under the then existing CS Facilities over market value of the Vessels ("LtV") exceeds 70%;
250bps p.a. otherwise.

**Mandatory Cost:**  Any cost of complying with any applicable regulatory requirements of any relevant regulatory authority.

**Restructuring Fee:** USD 1,500,000 being due upon signing of the restructuring documentation for the New CS Facilities and payable as follows: 500,000 on the earlier of the Initial Required Vessel Sale (if any) and 30. June 2014 and USD 1,000,000 upon total repayment of the New CS Facilities but in any event by no later than June 30, 2017.

**Commitment Fee:**  100bps p.a. on any available undrawn amount under any of the CS Facilities from the date such facilities become effective until the earlier of (i) the date,



|  |  |
|---|---|
| | the facilities have been repaid in full and irrevocably and unconditionally been cancelled or (ii) their Final Maturity. |
| **Security:** | |

- Irrevocable and unconditional corporate guarantee by the Existing Guarantor and/or the New Guarantor (as applicable [to be further discussed])
- Pledges of shares in the Borrowers
- First priority or preferred mortgage over the CS Vessels including accompanying deed of covenants where applicable
- First preferred assignment of all earnings of the CS Vessels, including specific assignment of any employment contracts with a duration of more than 12 months to be notified to and acknowledged by the respective counterparties; any contract exceeding 12 months to be in form and substance acceptable to the Lender in its discretion
- First preferred assignment of all insurances in relation to the CS Vessels; such insurances to be in form and substance satisfactory to the Lender in its sole discretion
- Pledge over the Designated Account
- Pledge over the CS Vessels operating accounts, which are to be held with the Lender; all earnings and operating expenses attributable to the Vessels to be paid into / settled out of these accounts. [Note: Earnings-/cost visibility on accounts maintained with the Lender is a key requirement for the Lender going forward with payment mechanics/practicalities to be further discussed]. Notwithstanding the foregoing, the Borrowers shall be entitled to transfer funds to the Borrowers accounts at other financial institutions to the extent necessary to pay G&A charges allocable to the CS Vessels.

All securities to secure any amount outstanding under the CS Facilities (including, for the avoidance of doubt, the Swap) on a fully cross-collateralized and pari passu basis.

**Key Conditions and covenants:**   Including but not limited to the following:

- Acceptable technical and commercial management; inspection rights of the CS Vessels for the Lender at the cost of the Borrowers; no additional debt on the Borrowers or encumbrances over the CS Vessels; CS Vessels to fly a flag acceptable to the Lender and to maintain class  with a first class classification society and other ship and information covenants customary for this kind of transaction.

- No change in management of the TBS Group without the prior consent of the Lender (such consent not to be unreasonably withheld)

- No payment of dividends by the Borrowers, the New Guarantor and/or the Existing Guarantor (as applicable)

- No further provision of Performance Guarantees

CREDIT SUISSE

- Minimum Liquidity applicable to the CS Vessels of USD 500,000 to be maintained on accounts (whether on the operating accounts or otherwise) with the Lender at all times.

- Starting June 30, 2014, the outstanding indebtedness under the CS Facilities has to be covered at all times by 130% of the aggregate CS Vessels' Market Value ("Asset Cover Ratio").

- Corporate Covenants to be discussed and harmonized with DVB/BofA Facility to the Lender's satisfaction

- Cross default provisions with the DVB/BofA facility or any other facilities of the TBS Group

- Starting 2012 the Borrowers shall provide annual budgets for the CS Vessels including expected capex, dry docking and special survey cost, operating and G&A expenses, expected legal and financing cost; such budgets to be in form and substance acceptable to and approved by the Lender in its discretion (the "**Approved Budget**"). The Borrowers to provide quarterly updates on actual performance against the Approved Budget. The accrued actual cost incurred at any point in time shall not exceed the accrued cost under the Approved Budget in any financial quarter by more than 15%. In case any budget provided by the Borrowers is not approved by the Lender, the Approved Budget for the previous year shall be considered as Approved Budget for the relevant year as well.

- **Use of Cash Collateral:** During the pendency of the Chapter 11 cases (but before the Effective Date) and subject to (i) no Cancellation Event having occurred (ii) provision of an Approved Budget and (iii) provision of 13-weeks cash flow forecasts acceptable to the Lender (which 13-week cash flow forecast requirement shall be satisfied by providing the Lender with a copy of the consolidated 13-weeks cash flow forecast of the TBS Group (including but not limited to the Borrowers and the CS Vessels and being in line with the applicable forecasts provided to the Bank of America/DVB facility lenders), the Lender shall consent to the use of, and the Borrowers shall be entitled to use the Lender's, cash collateral in line with such an Approved Budget (with a maximum upward deviation of actual accrued cost of 15% versus the Approved Budget in any financial quarter); in turn, it is a condition precedent for the Lender for accepting the Chapter 11 Plan and entering into the Plan Support Agreement that the Borrowers shall provide for adequate protection payments in cash in an amount of at least the then unpaid current interest at the non-default rate plus Commitment Fees (if any) under the Existing Facility and the Chapter 11 Facilities (to the extent effective) during the continuation of the Chapter 11 cases, provided such payments can be made out of Net Cash generated by the CS Vessels after payment of corresponding operating expenses and administrative cost. In case the interest and/or commitment fees under the DIP Facilities (to the extent effective) cannot be borne out of cash flow, the Borrowers shall be entitled to effect such payments out of the



respective DIP Facilities. The Lender shall be satisfied in its sole discretion with the documentation, including court order(s), concerning the use of Lender's cash collateral.

- In accordance with the general lending policies of the Lender, the Borrowers, the New Guarantor and the Existing Guarantor shall agree to a "sanctions clause" confirming that they will not provide any benefits of the CS Facilities to and conduct any business activity related to the CS Vessels with
  (a) any persons being subject to sanctions by major trading nations and/or supranational bodies as outlined in such clause (the "Regulative Bodies") and/or
  (b) countries or their governmental bodies which are subject to sanctions imposed  by any of the Regulative Bodies ("Restricted Countries") and/or
  (c) any persons located, domiciled, resident or incorporated in Restricted Countries and/or
  (d) owned by, controlled by or affiliated with such persons or Restricted Countries as per (a) (b) and (c) above.

- TBS Group affirmations and ratifications of obligations under existing facilities (subject to the changes described herein), and releases and waivers against Lender.

All other main terms and conditions to conform substantially to the terms and conditions of the Existing Facility.

**CREDIT SUISSE AG**

Gunnar Kordes                          Gianrichy Giamboi

The parties agree that all information, orders and instructions related or connected to the offering or making of this facility by the bank can be sent via e-mail. The contracting party herewith expressly authorizes the bank to send information by e-mail. This includes communication via e-mail with third parties (including but not limited to lawyers and/or any other consultant) who are in any way affected or involved in the facility or by the services provided by the bank. The bank is entitled to assume that all the orders and instructions e-mailed by the contracting party or a third party are from an authorized individual, irrespective of any existing signatory rights in accordance with the commercial register or the specimen signature.



The contracting party is aware of the following risks of exchanging information electronically:

– Unencrypted information is transported over an open, publicly accessible network and can, in principle,

  be viewed by others, thereby allowing conclusions to be drawn about an existing banking relationship.

– Information can be changed by a third party.

– The identity of the sender (e-mail address) can be assumed or otherwise manipulated.

- The exchange of information can be delayed or interrupted due to transmission errors, technical faults,

  interruptions, malfunctions, illegal interventions, network overload, the malicious blocking of electronic

  access by third parties, or other shortcomings on the part of the network provider. Time-critical orders

  and instructions might not be processed in due time. Therefore, the contracting party is advised to use

  another suitable means of communication for these types of orders and instructions.



# Exhibit H

EXECUTION VERSION
1/4/2012

TBS INTERNATIONAL PLC

RBS VESSELTURNOVER TERM SHEET
("TERM SHEET")
January 4, 2012

1.      Overview – At RBS's sole election as to whether the transfer (as described below) shall be of the Vessels (as defined below) and/or the Shares (as defined below), (i) the TBS vessels, Rockaway Belle, Dakota Princess, Montauk Maiden, Omaha Belle, Comanche Maiden and Maya Princess (each a "Vessel" and, collectively, the "Vessels") and/or (ii) all of the outstanding shares (individually, the "Shares") of each of Argyle Maritime Corp., Caton Maritime Corp., Dorchester Maritime Corp., McHenry Maritime Corp., Longwoods Maritime Corp. and Sunswyck Maritime Corp. (individually, a "Shipowner" and, collectively, the "Shipowners") will be transferred to entities designated by RBS in exchange for a full release by RBS, on behalf of itself and as agent for those certain lenders (the "RBS Syndicate Lenders") under a Loan Agreement, dated 29 March 2007, as amended (the "Loan Agreement"), of any and all claims against TBS International PLC, and any of its direct and indirect subsidiaries (collectively, "TBS"), that have arisen or may arise under the Loan Agreement, any and all Corporate Guarantees and supplements thereto issued in connection with the Loan Agreement, any and all mortgages issued as security for obligations thereunder, the ISDA Master Agreement, dated 29 March 2007 (the "Swap Agreement"), any Account Security Deeds and any other documents related to or issued under or in connection with the Loan Agreement, including but not limited to documents executed in connection with the January 27, 2011 restructuring of TBS and engagement and fee letters with advisors (whether legal or financial) to RBS and/or the RBS Syndicate Lenders (collectively, the "Loan Documents").

2.      Parties – The Royal Bank of Scotland plc in its capacity as Agent and Security Trustee for the syndicate of banks and as Swap Bank under the Loan Agreement and related documents ("RBS"), and Argyle Maritime Corp., Caton Maritime Corp., Dorchester Maritime Corp., McHenry Maritime Corp., Longwoods Maritime Corp., and Sunswyck Maritime Corp., as joint and several borrowers under the Loan Agreement, and all other TBS entities that are obligors or guarantors under the Loan Documents or any other documents related to or issued under or in connection with the Loan Agreement, including TBS International Limited and TBS International plc, as guarantors, Westbrook Holdings Ltd., as Shareholder under the Loan Agreement, and TBS Pacific Liner, in all capacities referenced in the Loan Agreement, Account Security Deeds or other related documents.

EXECUTION VERSION
1/4/2012

3.      Transfer of the Vessels

        a.      Each of the Vessels and/or the Shares covered by the Loan Documents will be
transferred (i) to entities to be designated by RBS in full and complete satisfaction of all claims
of RBS and the RBS Syndicate Lenders against TBS and its affiliates under the Loan
Documents; and (ii) free and clear of all claims, taxes, encumbrances, mortgages, maritime liens,
charters or any other debts, other than the liens and other interests created in favor of RBS as
security for obligations under the Loan Documents.

        b.      Transfer Mechanics

                i.      Each Vessel will complete its current voyage and fully discharge
        its cargo (for each vessel, "Charter Completion").  No further chartering of any
        Vessel will occur.

                ii.      Upon Charter Completion, each Vessel will be deemed to be
        initially delivered at the last port of such voyage (the "Initial Delivery"); such
        Initial Delivery will be on an as is/where is basis with the Vessel in class.  Initial
        Delivery of any Vessel that, as of December 20, 2011, had completed its voyage
        shall be deemed to be 00:01 Greenwich Mean Time on December 20, 2011.
        From and after Initial Delivery of each Vessel, RBS shall be responsible for and
        shall pay, as provided in 3(b)(iii) below, any and all documented, actual and
        direct out-of-pocket vessel operating expenses related to such Vessel paid or
        incurred to the crew members and third parties not affiliated with TBS, including
        any such expenses incurred to ballast the Vessel to a port designated by RBS as
        provided in 3(b)(iii) below and all insurance expenses with respect to such
        Vessel incurred from and after its Initial Delivery until the date on which a new
        technical ship manager has been appointed by RBS or its nominee (the "RBS
        Delivery Expenses"), it being understood that TBS shall continue to maintain
        such insurance in place until Final Delivery occurs.  The RBS Delivery Expenses
        shall not include any amount payable to TBS for direct or indirect services
        provided by TBS in connection with the Final Delivery, and TBS shall not
        charge RBS for such services.  The RBS Delivery Expenses shall include the
        costs related to termination and repatriation of the crew of such Vessel;
        repatriation shall be booked on economy travel.  After Final Delivery of each
        Vessel, all but four (4) to six (6) crew members shall disembark the Vessel; the
        crew members to remain on the Vessel shall be determined by mutual agreement
        of Wallem Group Limited and Roymar Ship Management, Inc.  The crew
        members that remain on the Vessel shall, for a 72-hour period after Final
        Delivery, cooperate in good faith with RBS or its nominee to familiarize a new
        crew with the Vessel, and after such 72-hour period shall disembark the Vessel.
        Crew wages for crew members that remain on the Vessel after Final Delivery
        shall be an RBS Delivery Expense and, whether a crew member disembarks on
        Final Delivery or after the 72-hour period, the termination and repatriation
        expense for such crew member shall be an RBS Delivery Expense as provided in
        the preceding sentence of this subparagraph 3(b)(ii).  Upon termination and
        repatriation of each crew member and final payment to such crew member by the

EXECUTION VERSION
1/4/2012

manning agent of any amounts due, such crew member shall execute a receipt and release substantially in the form annexed hereto as Exhibit A. TBS agrees that it will provide RBS with as much notice as reasonably practicable, under the circumstances, of any RBS Delivery Expenses known to TBS so that RBS can pay such expenses directly or advance funds to TBS to pay such expenses on a timely basis. Without limiting the generality of the foregoing, the parties will cooperate in good faith with each other to develop a mutually acceptable arrangement to address advance funding logistics for RBS Delivery Expenses not paid directly by RBS. If TBS incurs or pays RBS Delivery Expenses that are not covered by an RBS advance of funds, RBS shall, within three (3) business days' notice of such payment or incurrence, reimburse TBS for such amounts.

      iii.      After Initial Delivery of each Vessel, RBS may, within three business days thereafter, instruct TBS to ballast the Vessel to any alternative port designated by RBS. Once each Vessel arrives in the port designated by RBS, TBS shall notify RBS, in accordance with the notice provisions herein, specifically including notice via facsimile machine (each, an "Arrival Notice"). Within seven (7) days of the receipt of an Arrival Notice, RBS shall notify TBS of the transfer of the Shares of the relevant Shipowner (each, a "Share Transfer Notice") and/or of the transfer of the Vessel and the entity to which such Shares and/or Vessel are being transferred, which transfer shall be effective at 00:01 GMT on the day following the transmittal of the Share Transfer Notice. Upon the issuance of a Share Transfer Notice and/or a notice with respect to transfer of a Vessel, final delivery of the Vessel shall occur (the "Final Delivery"). If RBS fails to give, within three business days after Initial Delivery, instructions to ballast a Vessel to an alternative port, TBS shall, in its discretion, issue an Arrival Notice for any Vessel so affected and, seven (7) days thereafter, a Share Transfer Notice shall be deemed to have been given in favor of RBS' nominee, such nominee to be identified to TBS within three (3) days of execution of this Term Sheet, and Final Delivery of the Vessel shall be deemed to have occurred. During the period between issuance of the Arrival Notice and Final Delivery, only the crew members engaged by the Shipowner shall be aboard the Vessel. RBS shall be responsible for and shall pay the RBS Delivery Expenses, and shall, at its option, either (x) promptly advance funds to TBS in an amount sufficient to cover such RBS Delivery Expenses or (y) pay such RBS Delivery Expenses directly. Within three (3) business days after RBS has advanced funds for payment of an RBS Delivery Expense, TBS shall provide to RBS written documentation evidencing that payment of such RBS Delivery Expense has been made. After Initial Delivery of a Vessel, TBS shall not be obligated to advance funds, pay expenses, obtain credit or incur any other liability with respect to such Vessel, except to the extent and only to the extent that RBS has advanced funds to TBS to pay RBS Delivery Expenses, and TBS's failure to advance funds, pay expenses, obtain credit or incur any other liability with respect to such Vessel shall not result in a default under this Term Sheet, the Forbearance Agreement or any other Loan Document, except to the extent and only to the extent that (i) RBS has advanced funds to TBS to pay RBS Delivery Expenses or (ii) or TBS has failed to notify RBS of a known RBS Delivery Expense and TBS fails to pay such known

3

EXECUTION VERSION
1/4/2012

RBS Delivery Expense, subject to RBS's obligation to reimburse TBS for such payment.

iv.    Upon Final Delivery of each Vessel, TBS shall transfer (x) title of each Vessel and/or (y) the Shares of the relevant Shipowner to a person, trust or other entity to be designated by RBS.  Upon Final Delivery of each Vessel, (A) the Shipowner shall be fully released from its obligations under the Loan Documents, unless RBS directs the transfer of the Shares of such entities, (B) the obligation of the other TBS entities under the Loan Documents shall be reduced by an amount equal to the portion of the debt owed to RBS and the RBS Syndicate Lenders under the Loan Documents allocated to such Vessel, as set forth in the schedule attached hereto as Exhibit B (the "Allocated Share") and (C) TBS's obligation under the Loan Documents to maintain minimum cash at RBS shall be reduced by that percentage attributable to such Vessel and as denoted in column (a) of Exhibit B, so that upon Final Delivery of the last Vessel, the total debt owed by TBS to RBS and the RBS Syndicate Lenders under the Loan Documents shall be paid in full and the obligation of TBS to maintain minimum cash at RBS shall be eliminated.  To the extent permissible, TBS, upon Final Delivery, shall assign any warranties for the Vessels or equipment thereon.

v.    If, at Final Delivery, RBS elects to transfer the Shares of the relevant Shipowner, pursuant to a Share Transfer Notice, and/or the Vessel to a designated person, trust or other entity, TBS, without any representations or any warranties other than those described in the next sentence, shall transfer title to such Vessel and/or Shares to the person, trust or other entity designated by RBS; if no such transfer mechanism or party has been so designated prior to Final Delivery, TBS shall transfer the Shares to RBS 's nominee, such nominee to be identified to TBS within three (3) days of execution of this Term Sheet,.  In any event, upon Final Delivery to RBS or the designated person, trust or other entity, TBS shall transfer title by delivering a bill of sale and such other documents necessary to effectuate transfer of the Vessel and/or the Shares of the relevant Shipowner, as the case may be, in each case warranting that such transfer is free and clear of all taxes, encumbrances, mortgages, maritime liens, charters or any other debts or claims, other than the liens and other interests created in favor of RBS as security for obligations under the Loan Documents.  Prior to Final Delivery, TBS may remove from the Vessel all non-statutory required communications and information technology equipment, including servers, computers and printers, all software, portable equipment (for example, U.T. tester for the cargo holds, portable filtering equipment for cranes and main engine torque meter), Company proprietary manuals, plans, instructions, forms, and library, that are exclusively for use in TBS's vessels, as well as any of the crew's personal belongings, Master's slop chest, equipment on hire (for example, gas bottles on hire (such as, Oxygen, Acetylene, Freon, Nitrogen), and any portable container fittings.  The transfer shall include all fuel, lube oils, consumables, stores and spare parts aboard the Vessel as of Initial Delivery.

4

EXECUTION VERSION
1/4/2012

c.      Provided that TBS is in compliance with its obligations under this Term Sheet and the Forbearance Agreement, RBS agrees that it will not arrest or otherwise interfere with the voyage of any Vessel or any other vessel owned by TBS, and that it will not commence any action against TBS.  RBS reserves the right to intervene in an arrest by any third party of any Vessel and to take all steps RBS deems appropriate to protect the liens, claims, and other interests of RBS and the RBS Syndicate Lenders with respect to such Vessel.

4.      Payments

a.      Except as expressly provided herein, no party hereto shall be obligated to make any payment to any other party hereto.

b.      At the Closing, RBS shall pay (i) to TBS an amount equal to any unpaid amounts owed to TBS for RBS Delivery Expenses, including any such costs incurred to ballast the Vessels to ports designated by RBS and, in the event RBS has elected to pay vendors directly (ii) to the applicable vendors any unpaid amounts owed to such vendors for costs related to the Vessels after Initial Delivery, including any such costs incurred to ballast the Vessels to ports designated by RBS.  TBS shall not be paid for any inventory of fuel, lube oil, consumables, stores and spare parts aboard the Vessels as of Initial Delivery.

c.      Provided that Final Delivery has occurred as to all of the Vessels, TBS shall not be obligated to pay any amount to RBS, the RBS Syndicate Lenders or their professionals on account of principal, interest, swap termination payments, adequate protection payments (in the event of filings under title 11 of the United States Code (the "Bankruptcy Code") for TBS or any party to this Term Sheet), fees (financial advisor, legal or otherwise), deferred payments or other costs or expenses.  If Final Delivery does not occur, the liens, claims and other interests of RBS and the RBS Syndicate Lenders shall be unaffected and remain in full force and effect as to the Vessels as to which Final Delivery has not occurred, and the Shares of the Shipowners related to such Vessels, and all the rights of RBS and the RBS Syndicate Lenders, on the one hand, and TBS, on the other hand, are reserved in that regard; provided, however, that the outstanding principal amount owed to RBS and the RBS Syndicate Lenders shall be reduced by the Allocated Value attributed to the Vessels for which Final Delivery has occurred.

5.      Transfer of Account Funds

a.      Provided that TBS is in compliance with its obligations under this Term Sheet and the Forbearance Agreement, RBS shall not setoff funds held in any TBS accounts at RBS, including any TBS Pacific Liner account, shall allow TBS full access to such funds prior to the Closing and, in connection with the Closing, shall permit TBS to transfer any and all remaining balance of TBS funds then held in such accounts to accounts designated by TBS (the "TBS Funds' Transfer").

b.      From and after the Closing Date, RBS shall promptly remit to TBS any funds received by RBS on behalf of TBS.

6.      Cooperation in Marketing of Vessels

EXECUTION VERSION
1/4/2012

      c.     Provided that TBS is in compliance with its obligations under this Term Sheet and the Forbearance Agreement, RBS agrees that it will not arrest or otherwise interfere with the voyage of any Vessel or any other vessel owned by TBS, and that it will not commence any action against TBS. RBS reserves the right to intervene in an arrest by any third party of any Vessel and to take all steps RBS deems appropriate to protect the liens, claims, and other interests of RBS and the RBS Syndicate Lenders with respect to such Vessel.

4.      Payments

      a.     Except as expressly provided herein, no party hereto shall be obligated to make any payment to any other party hereto.

      b.     At the Closing, RBS shall pay (i) to TBS an amount equal to any unpaid amounts owed to TBS for RBS Delivery Expenses, including any such costs incurred to ballast the Vessels to ports designated by RBS and, in the event RBS has elected to pay vendors directly (ii) to the applicable vendors any unpaid amounts owed to such vendors for costs related to the Vessels after Initial Delivery, including any such costs incurred to ballast the Vessels to ports designated by RBS. TBS shall not be paid for any inventory of fuel, lube oil, consumables, stores and spare parts aboard the Vessels as of Initial Delivery.

      c.     Provided that Final Delivery has occurred as to all of the Vessels, TBS shall not be obligated to pay any amount to RBS, the RBS Syndicate Lenders or their professionals on account of principal, interest, swap termination payments, adequate protection payments (in the event of filings under title 11 of the United States Code (the "Bankruptcy Code") for TBS or any party to this Term Sheet), fees (financial advisor, legal or otherwise), deferred payments or other costs or expenses. If Final Delivery does not occur, the liens, claims and other interests of RBS and the RBS Syndicate Lenders shall be unaffected and remain in full force and effect as to the Vessels as to which Final Delivery has not occurred, and the Shares of the Shipowners related to such Vessels, and all the rights of RBS and the RBS Syndicate Lenders, on the one hand, and TBS, on the other hand, are reserved in that regard; provided, however, that the outstanding principal amount owed to RBS and the RBS Syndicate Lenders shall be reduced by the Allocated Share attributed to the Vessels for which Final Delivery has occurred.

5.      Transfer of Account Funds

      a.     Provided that TBS is in compliance with its obligations under this Term Sheet and the Forbearance Agreement, RBS shall not setoff funds held in any TBS accounts at RBS, including any TBS Pacific Liner account, shall allow TBS full access to such funds prior to the Closing and, in connection with the Closing, shall permit TBS to transfer any and all remaining balance of TBS funds then held in such accounts to accounts designated by TBS (the "TBS Funds' Transfer").

      b.     From and after the Closing Date, RBS shall promptly remit to TBS any funds received by RBS on behalf of TBS.

6.      Cooperation in Marketing of Vessels

EXECUTION VERSION
1/4/2012

    a.    TBS shall cooperate in good faith with RBS with respect to the marketing of the Vessels. Cooperation shall include, but not be limited to:

        i.    Execution of a consent to allow RBS to disclose, on a confidential basis, specifications relative to the Vessels to a prospective purchaser or operator, which consent shall be in the form executed by TBS and delivered to RBS on December 5, 2011.

        ii.    Within (3) business days of the effective date of this Term Sheet, subject to reasonable confidentiality restrictions, TBS shall, on reasonable terms and during reasonable business hours, provide RBS or its nominee (at TBS's offices in Yonkers, New York, or at such location mutually acceptable to TBS and RBS) with (i) reasonable access to TBS' technical manager and operational staff, who shall remain accessible to RBS or its nominee until 90 days after the date on which all Vessels and/or Shares, as the case may be, have been transferred to RBS; and (ii) at RBS's expense, copies of the Vessel records maintained by the Vessels' technical managers (with the originals of all Vessel records to be transferred to RBS or its nominee, at RBS's expense, no later than the date of transfer of each Vessel, provided that TBS will be permitted to retain copies of such documents for its records).

        iii.    Providing RBS and its prospective nominees access to the Vessels for physical inspection at reasonable times and on reasonable terms.

    b.    TBS shall not be obligated to incur any cost in connection with the marketing of the Vessels, nor shall it be required to provide any representations or warranties to a prospective purchaser or operator of such Vessels and/or purchaser of the Shares of any Shipowner.

7.    Releases

    a.    At the Closing, RBS and the RBS Syndicate Members and their subsidiaries and affiliates, on the one hand, and TBS, on the other hand, shall execute and deliver mutual releases (the "Releases") fully and finally releasing each other, and their officers, directors, employees, shareholders and affiliates, successors and assigns from any and all claims, including but not limited to all claims arising under any of the following:

        i.    Any and all obligations arising under any loan or swap agreement, or any amendments thereto, including but not limited to any such obligations, whether for principal, interest, fees, expenses or other charges, arising under the Loan Documents;

        ii.    Any and all obligations to pay restructuring fees related to the early 2011 restructure of TBS's obligations; and

        iii.    Any and all obligations to advisors, financial or legal, to RBS.

    b.    Exceptions from Releases – the Releases shall not release any party from (i) claims for fraud, gross negligence or willful misconduct (the "Excepted Claims"), or (ii) their

EXECUTION VERSION
1/4/2012

obligations under the Term Sheet, including but not limited to any obligation to make the payments required herein and any obligation to deliver the Vessels and/or Shares free and clear of all claims, liens and encumbrances, other than the liens and other interests created in favor of RBS and/or the RBS Syndicate Lenders under the Loan Documents (the "Excepted Obligations"), which Excepted Obligations shall survive unaffected by, and be unimpaired in, any case filed under the Bankruptcy Code by TBS or any other party to this Term Sheet.

     c.     At or prior to Closing, TBS shall obtain a release from the existing technical ship manager, in form and substance reasonably satisfactory to RBS, of any claim the existing technical ship manager may have against TBS for fees or other amounts payable relating to termination of its management agreement with respect to the Vessels (the "Existing Manager Release").

8.     Conditions Precedent to Closing

     a.     Final Delivery of all Vessels shall have occurred;

     b.     In the event that, prior to Closing, TBS, in its discretion, shall file cases under the Bankruptcy Code for TBS or any other party to this Term Sheet, TBS shall have obtained an order of the Bankruptcy Court, in form and substance reasonably satisfactory to RBS (the "Approval Order"), authorizing TBS to consummate and enter into the transactions contemplated herein. The Approval Order shall provide, among other things, that the Excepted Claims and the Excepted Obligations shall survive confirmation of any chapter 11 plan and shall be unimpaired thereby and remain unaffected and fully enforceable in accordance with their terms. Promptly upon the filing of any case under the Bankruptcy Code by TBS, TBS shall file an application with the Bankruptcy Court, in form and substance reasonably satisfactory to RBS, requesting entry of the Approval Order. TBS shall provide RBS with as much advance notice of any bankruptcy filings as is practical under the circumstances. RBS shall, in good faith, support entry of the Approval Order.

     c.     TBS shall have obtained the executed Existing Manager Release.

9.     Closing

     a.     The Closing shall occur on the Closing Date. The Closing Date shall be a date mutually selected by the parties, but in no event later than five (5) business days after satisfaction of all Conditions Precedent set forth in paragraph 8.

     b.     At the Closing:

          i.     The executed Releases and the Existing Manager Release shall be delivered by the parties;

          ii.     The parties shall pay any unpaid amounts due under this Term Sheet; and

          iii.     RBS shall honor, by wire transfer, any TBS Funds' Transfer.

EXECUTION VERSION
1/4/2012

10.     Forbearance – On December 14, 2011, RBS and the RBS Syndicate entered into an amendment to the Forbearance Agreement and Waiver dated September 7, 2011 (which expired on December 15, 2011) to extend the forbearance and waivers thereunder through February 15, 2012 or such later date as required to effect the Closing.

11.     Binding Term Sheet; Further Assurances; Definitive Documents.

        This Term Sheet shall be binding upon the parties hereto.  The parties agree, however, that certain transactions, including the title transfers and Releases contemplated by this Term Sheet, will be implemented through definitive documentation which shall be reasonably acceptable to RBS and TBS, each acting in good faith in a timely and reasonable manner (the "Definitive Documents").  The parties hereto agree to promptly execute, acknowledge and deliver such further documents and do such other acts and things as either party may reasonably request in order to effect fully the purposes of this Term Sheet, including, without limitation, to cause the existing technical ship manager reasonably to cooperate (whether prior or subsequent to the transfer of any Shares) in the transition to a new technical ship manager to be appointed by RBS or its nominee.

12.     Applicable Law.

        THIS TERM SHEET AND THE DEFINITIVE DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF NEW YORK, APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND WITHOUT REFERENCE TO CONFLICTS OF LAWS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  The parties hereto agree that any legal action or proceeding by or against any party hereto or with respect to or arising out of this Term Sheet or any Definitive Document may be brought in or removed to the courts of the State of New York, in and for the County of New York, or of the United States of America for the Southern District of New York.  By execution and delivery of this Term Sheet, the parties hereto accept, for themselves and in respect of their property, generally and unconditionally, the jurisdiction of the aforesaid courts.  The parties hereto hereby waive any right to stay or dismiss any action or proceeding under or in connection with this Term Sheet or the Definitive Documents brought before the foregoing courts on the basis of forum non-conveniens.

13.     Due Authorization.

        This Term Sheet constitutes the legal, valid and binding obligations   of the parties hereto, has been duly authorized by such parties and is enforceable against them in accordance with the terms hereof, except as enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of, creditors' rights and except to the extent that availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding may be brought.

14.     Integration.

EXECUTION VERSION
1/4/2012

This Term Sheet and any agreement, document or instrument referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof. In the event of any conflict between the terms, conditions and provisions of this Term Sheet and any such agreement, document or instrument, the terms, conditions and provisions of this Term Sheet shall prevail.

15.    Multiple Counterparts. This Term Sheet may be executed in multiple counterparts, but all such counterparts taken together shall constitute one instrument.

16.    Notices. Notices required hereunder shall be given, by email, to the parties at the following addresses:

a.    TBS – Fred V. Lepere, fvl@nyc.tbsship.com, and Joseph Royce, jer@nyc.tbsship.com, with a copy to Michael A. Rosenthal, mrosenthal@gibsondunn.com, and Tulio Prieto, tprieto@cardillocorbett.com. Notice in accordance with this paragraph shall also be given via facsimile to Michael A. Rosenthal at 212-351-6258 and Tulio Prieto at 212-797-1212.

b.    RBS – Neil Bivona, neil.bivona@rbs.com and Michael Fabiano, Michael.fabiano@rbs.com, with a copy to Gregory Petrick, Gregory.petrick@cwt.com, and Neil Quartaro, nquartaro@wfw.com. Notice in accordance with this paragraph shall also be given via facsimile to Neil Quartaro at 212-922-1512 and Gregory Petrick at 212-504-6666.

**IN WITNESS WHEREOF**, the parties have executed this Term Sheet as of the 4th of January 2012 in New York, New York.

(SIGNATURES ON FOLLOWING PAGES)

9

EXECUTION VERSION
1/4/2012

**TBS, ON ITS OWN BEHALF AND ON
BEHALF OF ITS AFFILIATES**

By _____

**Its Authorized Officer**

10

EXECUTION VERSION
1/4/2012

**RBS, AS AGENT AND SECURITY TRUSTEE
FOR THE BANK SYNDICATE AND SWAP
BANK UNDER THE LOAN DOCUMENTS**

By _____

Its Authorized Officer

101196697.11

11

EXECUTION VERSION
1/4/2012

EXHIBIT A

**M/V** _____
*[Vessel name]*

CREW WAGE COMPENSATION

ACKNOWLEDGEMENT OF RECEIPT OF PAY AND RELEASE OF VESSEL

The undersigned individual hereby acknowledges receipt of all crew wages from his service aboard the above-named vessel. I hereby release the vessel from any claim I may have for crew wages for service aboard her.

Name: _____

Position on Ship: _____

Pay period:      Through _____, 20 ____
                            *[day, month, year]*

Acknowledged this _____, 20 ___, by recipient,
                     *[day, month]*


_____
*CREWMAN*


_____
**WITNESS**

EXECUTION VERSION
1/4/2012

EXHIBIT B

## TBS Allocated Shares per Vessel (1)

| | (a) Pro Rata % Based Upon Principal Due | (b) Principal | (c) Interest through 12/15/11 | (d) RBS Swap Obligation MtM[2] | (e) Deferred Restructuring Fee | (f) Balance of Evercore Fee | (g) Subtotal | (h) Post 12/15/11 Accrued Interest and Fees | (i) Reimbursement of Outstanding and Future Legal Fees |
|---|---|---|---|---|---|---|---|---|---|
| Comanche Maiden | 18.7226350900% | $26,982,500.00 | $441,463.67 | $1,179,526.01 | $274,661.06 | $112,335.81 | $28,990,486.55 | pro rata[3] | pro rata[3] |
| Dakota Princess | 16.1903176580% | $23,332,999.97 | $381,753.81 | $1,019,990.01 | $237,511.96 | $97,141.91 | $25,069,397.65 | pro rata[3] | pro rata[3] |
| Maya Princess | 18.7226350900% | $26,982,500.00 | $441,463.67 | $1,179,526.01 | $274,661.06 | $112,335.81 | $28,990,486.55 | pro rata[3] | pro rata[3] |
| Montauk Maiden | 17.0559333770% | $24,580,500.06 | $402,164.31 | $1,074,523.83 | $250,210.55 | $102,335.60 | $26,409,734.35 | pro rata[3] | pro rata[3] |
| Omaha Belle | 13.4113256510% | $19,327,999.97 | $316,227.56 | $844,913.51 | $196,744.15 | $80,467.95 | $20,766,353.14 | pro rata[3] | pro rata[3] |
| Rockaway Belle | 15.8971529700% | $22,910,499.94 | $374,841.21 | $1,001,520.64 | $233,211.23 | $95,382.92 | $24,615,455.94 | pro rata[3] | pro rata[3] |
| | 100.0000000000% | $144,116,999.94 | $2,357,914.23 | $6,300,000.00 | $1,467,000.00 | $600,000.00 | $154,841,914.17 | | |

(1) Allocated Share for each Vessel, as used in the Term Sheet, is the sum of columns (g) + (h) + (i)
(2) Subject to adjustment based upon final MtM upon termination of swap
(3) Based upon principal amount of debt on each vessel

13

# Exhibit I

Bank of America, N.A.      DVB Group Merchant      TD Bank, N.A.
100 Federal Street      Bank (Asia) Ltd      P.O. Box 9540
Boston, MA 02110    77 Robinson Road #30-02    Portland, ME 04112
Singapore 068896

January ___, 2012

TBS International plc
Arthur Cox Building
Earlsfort Terrace
Dublin 2
Ireland

Attention: Mr. Ferdinand V. Lepere

**$41,300,000 Senior Secured Super Priority
Priming Debtor in Possession Credit Facility**

Ladies and Gentlemen:

Bank of America, N.A. ("Bank of America") is pleased to offer to be the sole and exclusive administrative agent (in such capacity, the "Administrative Agent") and DVB Group Merchant Bank (Asia) Ltd. ("DVB") is pleased to offer to be the co-agent (in such capacity, the "Co-Agent" and together with the Administrative Agent, collectively, the "Agents"), in each case, for the proposed $41,300,000 Senior Secured Super Priority Priming Debtor in Possession Credit Facility (the "DIP Facility") to TBS Holdings Limited, TBS Shipping Services Inc., the other Borrowers now party to the Participating Prepetition Credit Facilities (as defined in the Summary of Terms (as defined below)) and certain additional vessel owning subsidiaries (collectively, the "Borrowers") of TBS International plc ("you" or the "Company") in connection with the cases proposed to be filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (individually, and collectively with any cases filed under Chapter 11 of the Bankruptcy Code with respect to any of your affiliates, the "Chapter 11 Case") and (i) Bank of America is pleased to offer its several (not joint) commitment to lend up to an aggregate of $13,766,666.67 of the DIP Facility, (ii) DVB is pleased to offer its several (not joint) commitment to lend up to an aggregate of $13,766,666.67 of the DIP Facility, and (iii) TD Bank, N.A. ("TD" and together with Bank of America and DVB, collectively, the "Commitment Parties") is pleased to offer its several (not joint) commitment to lend up to an aggregate of $13,766,666.66 of the DIP Facility, in each case, upon and subject to the terms and conditions of this letter and the Summary of Terms and Conditions attached hereto (the "Summary of Terms"). The DIP Facility would be in addition to and not in replacement of the Participating Prepetition Credit Facilities and would provide additional financing to the Borrowers. Each of Merrill Lynch Pierce Fenner & Smith Incorporated ("MLPF&S"), DVB and TD is pleased to advise you of its willingness in connection with the foregoing commitment, to act as lead arranger and book runner (in such capacities, each a "Lead Arranger" and collectively, the "Lead Arrangers") for the DIP Facility.

Bank of America will act as sole and exclusive Administrative Agent for the DIP Facility, DVB will act as Co-Agent for the DIP Facility and MLPF&S, DVB and TD, collectively, will act as

exclusive Lead Arrangers for the DIP Facility. No additional agents, co-agents or arrangers will be appointed and no other titles will be awarded without your and our prior written approval. You hereby agree that, effective upon your acceptance of this Commitment Letter and continuing through February 29, 2012, you shall not solicit any other bank, investment bank, financial institution, person or entity to provide, structure, arrange or syndicate the DIP Facility or any other senior financing similar to (other than that certain debtor in possession financing facility with Credit Suisse) or as a replacement of the DIP Facility (or a refinancing of any Participating Prepetition Credit Facility).

The commitments of the Commitment Parties hereunder and the undertakings of the Lead Arrangers to provide the services described herein are subject to the satisfaction of each of the following conditions precedent in a manner acceptable to the Agents and the Lead Arrangers: (a) the accuracy and completeness of all representations that you and your affiliates make to the Agents and the Lead Arrangers and your compliance with the terms of this Commitment Letter (including the Summary of Terms) and the Fee Letter (as hereinafter defined); (b) prior to and during the syndication of the DIP Facility there shall be no competing offering, placement or arrangement of any debt securities or bank financing (other than that certain debtor-in-possession financing facility with Credit Suisse) by or on behalf of the Borrowers or any of the Company's subsidiaries; (c) the negotiation, execution and delivery of definitive documentation for the DIP Facility consistent with the Summary of Terms and otherwise satisfactory to the Agents and the Lead Arrangers; (d) in connection with the Chapter 11 Case, the entry by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") of (i) an interim order approving, among other things, the DIP Facility and transactions contemplated thereby and (ii) as to amounts in excess of the Interim Order Amount (as defined in the Summary of Terms) a final order approving the DIP Facility and (e) to the extent that commitments have been received from, and loans under the DIP Facility have been funded by, Lenders other than the Commitment Parties for any amount of the DIP Facility on the terms and conditions referred to herein and in the Summary of Terms, the permanent reduction of the commitments of each of the Commitment Parties by the amount of such additional loans funded on a pro rata basis.

We intend to syndicate the DIP Facility to a group of lenders identified by us in consultation with you (and together with the Commitment Parties, the "Lenders"). Each of the Lead Arrangers intends to commence syndication efforts promptly upon your acceptance of this Commitment Letter and the Fee Letter (as hereinafter defined). You agree to actively assist the Lead Arrangers in achieving a syndication of the DIP Facility that is satisfactory to it. Such assistance shall include (a) your providing and causing your advisors to provide the Agents, the Lead Arrangers and the other Lenders upon request with all information reasonably deemed necessary by the Agents and the Lead Arrangers to complete syndication; (b) your assistance in the preparation of an Information Memorandum to be used in connection with the syndication of the DIP Facility; and (c) otherwise assisting the Agents and the Lead Arrangers in their syndication efforts, including by making your senior management and advisors available from time to time, at reasonable hours and upon reasonable notice, to attend and participate in presentations regarding the business and prospects of the Company and its subsidiaries, as appropriate, at one or more meetings of prospective Lenders.

It is understood and agreed that the Lead Arrangers will manage and control all aspects of the syndication in consultation with you, including decisions as to the selection of prospective Lenders and any titles offered to proposed Lenders, when commitments will be accepted and the

final allocations of the commitments among the Lenders. It is understood that no Lender participating in the DIP Facility will receive compensation from you in order to obtain its commitment, except on the terms contained herein and in the Summary of Terms. It is also understood and agreed that the distribution of the fees among the Lenders will be at the sole discretion of the Agents and the Lead Arrangers.

You hereby represent, warrant and covenant that (a) all information, other than information of a general economic or general industry nature and Projections (defined below), which has been or is hereafter made available to the Agents, the Lead Arrangers or the Lenders by you or any of your representatives (or on your or their behalf) in connection with the transactions contemplated hereby (the "Information") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading, and (b) all financial projections concerning the Company and its subsidiaries and each Borrower that have been or are hereafter made available to the Agents, the Lead Arrangers or the Lenders by you or any of your representatives (the "Projections") have been or will be prepared in good faith based upon assumptions that are believed to be reasonable at the time made, it being understood that projections are, by their nature, inherently uncertain, should not be viewed as fact and actual results may vary materially from the Projections. You agree to furnish us with such Information and Projections as we may reasonably request and to supplement the Information and the Projections from time to time until the closing date for the DIP Facility (the "Closing Date") so that the representation, warranty and covenant in the preceding sentence is correct on the Closing Date. In issuing this commitment and in arranging and syndicating the DIP Facility, the Agents and the Lead Arrangers are and will be using and relying on the Information and the Projections (collectively, the "Pre-Commitment Information") without independent verification thereof.

You hereby acknowledge that (a) the Administrative Agent will make available Information and Projections (collectively, "Borrower Materials") to the proposed syndicate of Lenders by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the proposed Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender").

By executing this Commitment Letter, regardless of whether the Closing Date occurs, you agree to reimburse the Agents and the Lead Arrangers for all reasonable and documented out-of-pocket fees and expenses (including, but not limited to, (a) the reasonable and documented fees, disbursements and other charges of (i) Bingham McCutchen LLP, as counsel to the Bank of America and MLPF&S, (ii) Weil, Gotshal & Manges LLP, as counsel to DVB, and (iii) special and local counsel to the Lenders retained by the Agents or Lead Arrangers, (b) due diligence expenses, and (c) all CUSIP fees for registration with the Standard & Poor's CUSIP Service Bureau) incurred in connection with the DIP Facility, the syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated hereby.

You agree to indemnify and hold harmless the Agents, the Lead Arrangers, the Commitment Parties, each other Lender and each of their affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable

fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter or any related transaction or (b) the DIP Facility and any other financings or any use made or proposed to be made with the proceeds thereof except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from (i) such Indemnified Party's gross negligence or willful misconduct or (ii) a bad faith breach by an Indemnified Party of its obligations under this Commitment Letter. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equity holders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. It is further agreed that the Commitment Parties shall only have liability to you (as opposed to any other person), and that each of the Commitment Parties shall be liable solely in respect of its own commitment to the DIP Facility on a several, and not joint, basis with any other Lender, and that such liability shall only arise to the extent damages have been caused by a breach of the obligations of such Commitment Party hereunder to negotiate in good faith definitive documentation for the DIP Facility on the terms set forth herein, as determined in a final, nonappealable judgment by a court of competent jurisdiction. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems.

This Commitment Letter and the fee letter among you, the Agents and the Lead Arrangers dated as of the date hereof (the "Fee Letter") and the contents hereof and thereof are confidential and, except for disclosure hereof or thereof on a confidential basis to your accountants, attorneys and other professional advisors retained by you in connection with the DIP Facility or as otherwise required by law, may not be disclosed in whole or in part to any person or entity without our prior written consent; provided, however, it is understood and agreed that you may disclose this Commitment Letter (including the Summary of Terms) but not the Fee Letter after your acceptance of this Commitment Letter and the Fee Letter, in filings with the Securities and Exchange Commission, the Bankruptcy Court and other applicable regulatory authorities and stock exchanges. The Agents and the Lead Arrangers hereby notify you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Act"), each of them is required to obtain, verify and record information that identifies you, which information includes your name and address and other information that will allow each Agent and each Lead Arranger, as applicable, to identify you in accordance with the Act.

You acknowledge that the Agents and the Lead Arrangers or their affiliates may be providing financing or other services to parties whose interests may conflict with yours. The Agents and the Lead Arrangers agree that they will not furnish confidential information obtained from you to any of their other customers and that they will treat confidential information relating to you and your affiliates with the same degree of care as they treat their own confidential information. The Agents and the Lead Arrangers further advise you that they will not make available to you confidential information that they have obtained or may obtain from any other customer. In connection with the services and transactions contemplated hereby, you agree that the Agents and the Lead Arrangers are permitted to access, use and share with any of their bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives any information concerning you or any of your affiliates that is or may come into the possession of the Agents, the Lead Arrangers or any of such affiliates.

In connection with all aspects of each transaction contemplated by this letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that: (i) the DIP Facility and any related arranging or other services described in this letter is an arm's-length commercial transaction between you and your affiliates, on the one hand, and the Agents and the Lead Arrangers, on the other hand, and you are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated by this letter; (ii) in connection with the process leading to such transaction, each Agent and each Lead Arranger is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for you or any of your affiliates, stockholders, creditors or employees or any other party; (iii) neither any Agent nor any Lead Arranger has assumed or will assume an advisory, agency or fiduciary responsibility in your or your affiliates' favor with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether any Agent or Lead Arranger has advised or is currently advising you or your affiliates on other matters) and neither any Agent nor any Lead Arranger has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this letter; (iv) the Agents, the Lead Arrangers and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and your affiliates and neither any Agent nor any Lead Arrangers has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) neither any Agent nor any Lead Arrangers has provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate. You hereby waive and release, to the fullest extent permitted by law, any claims that you may have against any Agent and/or any Lead Arranger with respect to any breach or alleged breach of agency or fiduciary duty.

The provisions of the immediately preceding five paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the DIP Facility shall be executed and delivered, and notwithstanding the termination of this letter or any commitment or undertaking hereunder.

This Commitment Letter and the Fee Letter may be executed in counterparts which, taken together, shall constitute an original. Delivery of an executed counterpart of this Commitment Letter or the Fee Letter by telecopier or facsimile shall be effective as delivery of a manually executed counterpart thereof.

This Commitment Letter and the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  You and we hereby irrevocably and unconditionally submit to the jurisdiction of any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the transactions contemplated by this Commitment Letter or the Fee Letter or the performance of services hereunder or thereunder.  You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum.  Each of you, the Agents and the Lead Arrangers hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including, without limitation, the Summary of Terms), the Fee Letter, the transactions contemplated hereby and thereby or the actions of the Agents and the Lead Arrangers in the negotiation, performance or enforcement hereof.  The commitments and undertakings of the Agents and the Lead Arrangers may be terminated by us, if you fail to perform your obligations under this Commitment Letter or the Fee Letter on a timely basis.

This Commitment Letter, together with the Summary of Terms and the Fee Letter, embodies the entire agreement and understanding among the Agents, the Lead Arrangers, you and your affiliates with respect to the DIP Facility and supersedes all prior agreements and understandings relating to the specific matters hereof.  However, please note that the terms and conditions of the commitments of the Commitment Parties and the undertakings of the Lead Arrangers hereunder are not limited to those set forth herein or in the Summary of Terms.  Those matters that are not covered or made clear herein or in the Summary of Terms or the Fee Letter are subject to mutual agreement of the parties.  No party has been authorized by any Agent or Lead Arranger to make any oral or written statements that are inconsistent with this Commitment Letter.  This Commitment Letter is not assignable by the Company or any Borrower without our prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties.

This offer will expire at 5:00 p.m. eastern time on January 30, 2012 unless you execute this letter and the Fee Letter and return them to us prior to that time (which may be by facsimile transmission), whereupon this letter and the Fee Letter (each of which may be signed in one or more counterparts) shall become binding agreements.  Thereafter, this undertaking and commitment will expire if the DIP Facility does not close, or the DIP Facility is not funded for any reason, on or before February 29, 2012 and, notwithstanding any further discussions, negotiations or other actions taken after such date, no Lender or any of its affiliates shall have any liability to any person in connection with its refusal to fund the DIP Facility or any portion thereof after such date.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**BANK OF AMERICA, N.A.**


By:_____
Name:
Title:


**MERRILL LYNCH PIERCE FENNER & SMITH INCORPORATED**


By:_____
Name:
Title:

**DVB GROUP MERCHANT BANK (ASIA) LTD.**


By:_____
Name:
Title:

**TD BANK, N.A.**

By:_____
Name:
Title:

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:


**TBS INTERNATIONAL PLC**



By:_____
Name:
Title:

Case 1:18-cv-04363-GBD-BCM   Document 70-1   Filed 08/01/18   Page 329 of 385

Exhibit J

**THIS TERM SHEET REPRESENTS AN OUTLINE OF THE POSSIBLE BASIS ON WHICH CERTAIN LENDERS MAY PROVIDE DEBTOR IN POSSESSION FINANCING TO TBS INTERNATIONAL PLC AND ITS SUBSIDIARIES. IT IS FOR DISCUSSION PURPOSES ONLY, AND DOES NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT TO LEND. IT IS NOT EXHAUSTIVE AS TO ALL TERMS AND CONDITIONS WHICH WOULD GOVERN ANY PROPOSED FINANCING. THE ACTUAL TERMS AND CONDITIONS UPON WHICH THE LENDERS MIGHT EXTEND CREDIT ARE SUBJECT TO SATISFACTORY COMPLETION OF DUE DILIGENCE, INDIVIDUAL LENDER INTERNAL CREDIT APPROVALS, SATISFACTORY DOCUMENTATION AND SUCH OTHER TERMS AND CONDITIONS AS ARE DETERMINED BY THE LENDERS.**

## TBS INTERNATIONAL plc

### and its Subsidiaries

SUMMARY OF TERMS AND CONDITIONS
PROPOSED $[41,300,000] SECURED SUPER PRIORITY PRIMING DEBTOR IN POSSESSION
FACILITY

JANUARY [__], 2012

| | |
|---|---|
| **Borrowers:** | TBS Holdings Limited, TBS Shipping Services Inc., each Borrower under either of the Participating Prepetition Credit Facilities (defined below) and each subsidiary of TBS International plc ("TBS") owning an unencumbered vessel on the date the Chapter 11 Case (defined below) is filed (the "*Petition Date*") as debtors and debtors in possession in cases filed under Chapter 11 of the Bankruptcy Code (individually, and collectively with any cases filed under Chapter 11 of the Bankruptcy Code for the Guarantors, the "*Chapter 11 Case*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"). |
| **Guarantors**: | TBS, TBS International Limited, all other debtors in the Chapter 11 Case, including each subsidiary of TBS that is a Guarantor under any Participating Prepetition Credit Facility (whether or not a debtor in the Chapter 11 Case) and each other subsidiary that is an obligor under any of the Prepetition Credit Facilities other than the subsidiaries that own the vessels mortgaged to RBS (the "*RBS Vessel Owning Subsidiaries*"), AIG or Credit Suisse. The Guarantors and the Borrowers, collectively, are hereinafter referred to as the "*Combined Lender Group Obligors*"). |

| | |
|---|---|
| **Administrative Agent**: | Bank of America, N.A. (the "*Administrative Agent*") shall act as Administrative Agent for the Combined DIP Facility (as defined below). |
| **Co-Agent:** | DVB Group Merchant Bank (Asia) Ltd. (the "*Co-Agent*"). |
| **Collateral Agent**: | Bank of America, N.A. ("*Bank of America*") shall act as Collateral Agent (the "*Collateral Agent*"; the Collateral Agent together with the Administrative Agent and the Co-Agent, each an "*Agent*" and collectively, the "*Agents*"). |
| **Lead Arrangers and Book Runners:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated ("*MLPF&S*"), DVB Group Merchant Bank (Asia) Ltd and TD Bank, N.A. |
| **Credit Facility**: | A secured super priority priming senior term loan facility in the aggregate amount of $[41,300,000] ("*Combined DIP Facility*"). The Combined DIP Facility shall be secured by a first priority priming lien on the collateral securing the Participating Prepetition Credit Facilities (including post-petition collateral of the same type (other than the account at RBS for so long as the Prepetition RBS Credit Facility is outstanding, and the proceeds and collateral pledged to AIG or CS in connection either with the provision of adequate protection or debtor in possession financing provided by AIG or CS, in each case related solely to the vessels pledged to AIG or CS, respectively, securing certain of the debtors' obligations to AIG or CS, underlined provided, that insurance proceeds associated with repairs of the Zuni Princess will be pledged to secure the Combined DIP Facility), all unencumbered assets of the Borrowers and Guarantors, a junior lien on certain prepetition lenders' collateral (to the extent consented to by such prepetition lenders) and the other collateral described below, and will be provided by the Combined DIP Lenders (as defined below). |
| **Prepetition Credit Facilities**: | The credit facilities under: (i) that certain Loan Agreement, dated as of March 29, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition RBS Credit Facility*") by and among certain subsidiaries of TBS, the lenders from time to time parties thereto and The Royal Bank of Scotland plc, as the agent and security trustee (the "*RBS Facility Agent*"), (ii) that certain Second Amended and Restated Credit Agreement, dated as of January 27, 2011 (as amended, supplemented or otherwise modified from time to time, the "*Prepetition Bank of America Credit Facility*") by and among TBS, certain of its subsidiaries, the lenders party thereto and Bank of America as administrative agent (the "*Bank of America Facility Agent*"), (iii) that certain Loan Agreement dated as of January 16, 2008 (as amended, supplemented or otherwise modified from time to time, the "*Prepetition DVB Credit Facility*") among TBS, certain of its subsidiaries, the lenders party thereto and DVB Group Merchant Bank (Asia) Ltd. as facility agent and security trustee (the "*DVB Facility Agent*"), (iv) that certain Loan Agreement dated as of February 29, 2008 (as amended, supplemented or otherwise modified from time to time, the "*Prepetition AIG Credit Facility*"), among TBS, certain of its subsidiaries and AIG |

A/74549949.20

Commercial Equipment Finance, Inc. ("*AIG*"), and (v) that certain Loan Agreement dated as of December 7, 2007 (as amended, supplemented or otherwise modified from time to time, the "*Prepetition CS Credit Facility*"), among TBS, certain of its subsidiaries and Credit Suisse AG ("*CS*"). Collectively, the Prepetition Bank of America Credit Facility and the Prepetition DVB Credit Facility are referred to herein as the "*Participating Prepetition Credit Facilities*". Collectively, the Participating Prepetition Credit Facilities, the Prepetition AIG Credit Facility, the Prepetition CS Credit Facility and the Prepetition RBS Credit Facility and all hedging agreements entered into with lenders under any of such facilities and secured by the same collateral, are referred to herein as the "*Prepetition Credit Facilities*".

**Combined DIP Lenders**:

Such lenders party to the Participating Prepetition Credit Facilities who may agree to participate, and their successors and permitted assigns ("*Combined DIP Lenders*"). All lenders under the Participating Prepetition Credit Facilities will be invited to participate in the Combined DIP Facility pro rata, based on their prepetition debt amounts with an opportunity to participate in an overallocation if any lenders decline to participate.

**Use of Proceeds**:

To finance working capital, scheduled capital expenditures and other general corporate purposes in accordance with a DIP Budget for the period through June 1, 2012 provided by the Borrowers and approved by the Majority DIP Lenders ("*DIP Budget*"). No proceeds of the Combined DIP Facility shall be used to support the operations of the RBS Vessel Owning Subsidiaries, the AIG Vessels or the CS Vessels (other than certain prepetition obligations and allocated overhead, which are intended to be covered and included in the DIP Budget), or to make any adequate protection payments to any lenders under the Prepetition RBS Credit Facility, the Prepetition AIG Credit Facility or the Prepetition CS Credit Facility. The DIP Budget will reflect the operation by TBS and its subsidiaries of their vessels and business other than the RBS Vessel Owning Subsidiaries in a manner reasonably satisfactory to the Majority DIP Lenders.

**Mandatory Prepayments;**
**Optional Prepayments:**

Mandatory prepayments and commitment reductions shall be required to be made from net proceeds of asset dispositions (after satisfaction of any prior debt (other than the Participating Prepetition Credit Facilities) secured by such assets), casualty and condemnation recoveries (subject to reinvestment rights to be agreed). Proceeds of collateral dispositions may, with the concurrence of the Majority DIP Lenders, be held as cash collateral for application in connection with the consummation of the Plan (defined below).

The Exit Facility (defined below) will be subject to mandatory prepayments from net proceeds of collateral dispositions, casualty and condemnation recoveries on the same basis as the Combined DIP Facility, with all such payments being applied first to the Exit Facility and then to the restructured senior credit facilities comprising a portion

of the Plan treatment of the Participating Prepetition Credit Facilities (the "Restructured Senior Credit Facilities"). The Exit Facility will also be subject to repayment from Excess Cash on the same terms as the Restructured Senior Credit Facilities, with such payments first being applied to the Exit Facility and then to the Restructured Senior Credit Facilities to reduce scheduled amortization payments in the order in which such payments become due.

The Borrowers may optionally prepay the Combined DIP Facility or the Exit Facility, with all such payments being applied pro rata.

**Closing Date**:   The closing of the Combined DIP Facility will occur upon the entry of the Interim Order (as defined below) that has not been stayed and satisfaction of the other conditions to closing, but in any event not later than February __, 2012.

**Maturity**:   That date which is the earlier of (a) the date occurring (i) 30 days after the Closing Date if a Final Order (defined below) is not entered by such date (it being understood that the applicable appeal period may not have elapsed by such time), or (ii) otherwise, six months after the Closing Date and (b) the effective date (the "*Effective Date*") of the Borrowers' Plan (as defined below). All amounts outstanding under the Combined DIP Facility shall be due and payable in full in cash at Maturity, provided, that after application of liquidity above $20,000,000 to repayment of the Combined DIP Facility (liquidity will be calculated as the closing cash balances on the day before the Effective Date, after giving effect to (A) Effective Date payments under the Plan, (B) a reserve (set aside solely for such purpose) for permitted capital expenditures and drydock expenses included in the DIP Budget but not expended prior to the Effective Date (including, if the Tayrona Princess has not been sold and related drydock expense not incurred prior to the Effective Date, the budgeted Tayrona Princess drydock expense), (C) a reserve (set aside for such purpose) in an amount equal to a good faith estimate of payments to be made after the Effective Date on account of accrued and unpaid fees and expenses of Professional Persons (as defined below) incurred or accrued prior to the Effective Date (such reserve to be in an amount not in excess of the unexpended amount included in the DIP Budget for such fees and expenses) together with accrued and unpaid fees and expenses of other professionals the Borrowers are obligated to pay under the Plan), whether or not such fees have been billed or allowed by the Bankruptcy Court as of the Effective Date, and (D) only if agreed by Majority DIP Lenders prior to the Effective Date, a reserve (set aside for such purpose) for severance obligations associated with the exercise of the Borrowers' option to employ certain individuals now employed by TBS Commercial and Beacon or their subsidiaries and perform services currently being performed by them through newly created subsidiaries, the Combined DIP Facility will be refinanced with exit financing provided by the Combined DIP Lenders, subject to conditions set forth or referred to herein, and in connection with the consummation of the Plan (defined below) (the "*Exit Facility*").

The Exit Facility will mature on June 30, 2014.

**Security**:

Subject to the Carve Out (as defined below), all borrowings and all other obligations under the Combined DIP Facility will be entitled to (a) super priority claim status pursuant to §364(c)(1) of the Bankruptcy Code, and (b) (i) a first priority perfected security interest (subject to pre-existing validly perfected liens having priority over the liens securing the Participating Prepetition Credit Facilities) pursuant to §364(c)(2) and §364(d) of the Bankruptcy Code in all presently owned and hereafter acquired assets of the type constituting collateral for the Participating Prepetition Credit Facilities (other than the account at RBS for so long as the Prepetition RBS Credit Facility is outstanding, and the proceeds and collateral pledged to AIG or CS in connection either with the provision of adequate protection or debtor in possession financing provided by AIG or CS, in each case related solely to the vessels pledged to AIG or CS, respectively, securing certain of the debtors' obligations to AIG or CS provided, that insurance proceeds associated with repairs of the Zuni Princess will be pledged to secure the Combined DIP Facility), (ii) a first priority perfected preferred mortgage and security interest, as applicable, in all currently or hereafter unencumbered assets of all Combined Lender Group Obligors, (iii) subject to entry of a Final Order, proceeds of any avoidance actions brought pursuant to §§547, 548 or 549 of the Bankruptcy Code to recover any preferential, fraudulent or post-petition transfers, and (iv) subject to entry of a Final Order, by the Combined Lender Group Obligors' rights under §506(c) of the Bankruptcy Code and the proceeds thereof.

The term "*Carve Out*" shall mean (a) any unpaid fees due to the United States Trustee pursuant to 28 U.S.C. §1930 (a)(6) and any fees due to the clerk of the Bankruptcy Court, (b) all fees and expenses of professionals or professional firms retained pursuant to §§327, 328, 330, 331 or 1103 of the Bankruptcy Code (the "*Professional Persons*") that were incurred through the date upon which the Debtors receive from the DIP Agent a notice of an Event of Default, whether or not such fees and expenses of the Professional Persons have been billed or allowed by the Bankruptcy Court as of the date of receipt of such notice of Event of Default by the Debtors, and (c) after the date upon which the Debtors receive from the Agent a notice of an Event of Default, to the extent allowed by the Bankruptcy Court at any time, the payment of the fees and expenses of Professional Persons in the aggregate amount not to exceed $[2,500,000].

The Exit Facility will be secured by a first priority mortgage, lien and security interest in all of the collateral securing the Combined DIP Facility. The Administrative Agent and Collateral Agent will enter into an intercreditor agreement (the "*Intercreditor Agreement*") with the agents under the Restructured Senior Credit Facilities and the Borrowers and Guarantors, addressing the subordination of the liens securing the Restructured Senior Credit Facilities to the liens securing the Exit Facility.

**Adequate Protection**

A/74549949.20

**Payments and Liens**: As adequate protection for the priming of the liens securing the Participating Prepetition Credit Facilities and the use of the collateral of the lenders under the Participating Prepetition Credit Facilities (the "*Prepetition Lenders*") (in addition to replacement liens on post petition collateral as described below), the Combined Lender Group Obligors will acknowledge the validity and amount of the Prepetition Lenders' claims, the priority and perfection of prepetition liens, and make adequate protection payments in an amount equal to interest on all obligations under the Participating Prepetition Credit Facilities at the highest non-default cash pay contract rate applicable to the Participating Prepetition Credit Facilities and reasonable and documented professional fees of the Agents under the Participating Prepetition Credit Facilities. With respect to the Prepetition RBS Facility, the Prepetition CS Credit Facility, the Prepetition AIG Credit Facility and/or any hedging obligations secured by the same collateral as the Prepetition RBS Facility, the Prepetition CS Credit Facility or the Prepetition AIG Credit Facility, no adequate protection payments shall be funded from any loans under the Combined DIP Facility or use of the DIP Lenders' or Prepetition Lenders' (other than Prepetition RBS Lenders', Prepetition AIG Credit Facility lender's or Prepetition CS Credit Facility lender's, as the case may be) cash collateral. Additionally, the Prepetition Lenders will receive as adequate protection (a) replacement liens on postpetition assets of the type constituting prepetition collateral (other than the account at RBS for so long as the Prepetition RBS Credit Facility is outstanding, and the proceeds and collateral pledged to AIG or CS in connection either with the provision of adequate protection or debtor in possession financing provided by AIG or CS, in each case related solely to the vessels pledged to AIG or CS, respectively, securing certain of the debtors' obligations to AIG or CS), junior only to the liens securing the Combined DIP Facility, and (b) as to each Participating Prepetition Credit Facility, liens on the collateral securing the other Participating Prepetition Credit Facility, junior to the Combined DIP Facility and such other Participating Prepetition Credit Facility. The Combined Lender Group Obligors will affirm their obligations with respect to payment of fees and expenses of the respective financial advisors and legal advisors engaged by the Agents under the Participating Prepetition Credit Facilities.

**Combined DIP Facility Funding and Cash Management**: The Combined DIP Facility will be drawn in up to two installments, the first on the Closing Date in the Interim Order Amount (as defined below), and the second upon entry of the Final Order (and satisfaction of the conditions to drawdown) in the remaining amount of the Combined DIP Facility. A portion of the Combined DIP Facility in the amount of $1.5 million will be reserved for drydock capital expenditures that may be incurred if certain anticipated collateral vessel sales do not occur as planned (the "*Drydock Reserve*"). The Drydock Reserve would be available to be utilized subject to certification by the Borrowers as to the applicable drydock expenditures for the Tayrona Princess. Amounts drawn shall be funded into a controlled loan account at Bank of America from which (in the absence of an Event of Default), the Borrowers will be entitled to draw to pay expenses in accordance with the DIP Budget

A/74549949.20

after utilizing cash collateral (subject to a liquidity cushion to be agreed). Bank of America (or another bank acceptable to the Agents and Combined DIP Lenders holding greater than 50% of the outstanding loans under the Combined DIP Facility ("*Majority DIP Lenders*") shall remain throughout the term of the Combined DIP Facility the concentration bank for the Borrowers' and Guarantors' cash management. All collections and proceeds from sales of collateral will be deposited either directly into a controlled account or accounts with the Administrative Agent or into an account or accounts at an institution for which the Administrative Agent has in place an account control agreement reasonably satisfactory to the Majority DIP Lenders ("*Collateral Accounts*").

In connection with the foregoing, the Borrowers and Guarantors shall seek the entry of appropriate first day orders, satisfactory to the Agents, providing for the continuation of the Borrowers' and Guarantors' prepetition cash management system and deposit and disbursement accounts with the changes outlined above.

| | |
|---|---|
| **Interest Rates and Fees**: | As set forth in Addendum I |
| **Default Pricing**: | 2.00% per annum above the then applicable rate. |
| **Documentation**: | The Combined DIP Facility will be evidenced by a DIP Credit Agreement which will contain customary representations and warranties, funding and yield protection provisions, conditions precedent, covenants, events of default and other provisions appropriate for transactions of this size, type and purpose, subject to materiality thresholds and exceptions as is reasonable and customary and are mutually agreed, and shall be acceptable to the Administrative Agent, the Co-Agent, the Collateral Agent, the Majority DIP Lenders and the Combined Lender Group Obligors in all respects, it being understood that the DIP Credit Agreement will not contain financial covenants other than those described herein. The Exit Facility Credit Agreement will contain representations and warranties, covenants and events of default consistent with the Restructured Senior Credit Facilities documentation. |
| **Financial Covenants**: | *Compliance with DIP Budget*. The Combined Lender Group Obligors will be required to comply with the DIP Budget, tested weekly (reported by Wednesday of the following week) on a rolling 4 week basis (the first such test to be for the first 4 weeks of the Chapter 11 Case), subject to a 20% variance for receipts in any 4 week period and a 10% variance for expenses in any 4 week period. Variances will be tested separately for expenses (excluding principal payments from vessel sales and Specified Charges (same scope as Specified Charges line item in DIP Budget)) and receipts (excluding net proceeds from vessel sales). An additional test of cumulative Specified Charges (excluding lender professional fees) will be required weekly, subject to a 10% cumulative variance. Agents have the discretion to waive any particular DIP Budget variance noncompliance if Borrowers remain in compliance with the Minimum Liquidity test. |

A/74549949.20

The Combined Lender Group Obligors will be required to maintain weekly average daily closing balances of qualified cash, plus, prior to the funding or expiration of the remaining commitment under the Combined DIP Facility, the unfunded commitment under the Combined DIP Facility, minus any increase in accounts payable from the aggregate amount of accounts payable on the Petition Date after taking into account settlement payments to bring overdue accounts payable current (as enumerated in the DIP Budget at $[5.3] million) ("*Liquidity*") in an amount for each week equal to or in excess of the then applicable Minimum Liquidity Amount (defined below). Qualified cash will include cash pledged to the Combined DIP Lenders and available for use by the Combined Lender Group Obligors, but will not include cash required to be maintained at RBS in accordance with the RBS Vessel Turnover Term Sheet or other restricted cash. Minimum Liquidity Amount means for each week, (a) the amount of Liquidity forecast for such week in the DIP Budget, minus, (b) (i) in each of the first three weeks after the Petition Date, $7,500,000, (ii) in the fourth week, $7,000,000, (iii) in the fifth week, $6,500,000, (iv) in the sixth week, $6,000,000, (v) in the seventh week, $5,500,000, and (vi) for each week thereafter $5,000,000.

The Exit Facility financial covenants will be consistent with the financial covenants in the Restructured Senior Credit Facilities.

**Other Covenants**:   Other affirmative and negative covenants (subject to materiality thresholds and exceptions as mutually agreed) to include, but not be limited to:

(a)   Usual and customary financial reporting requirements, including monthly management report within 10 days after month end, weekly updates and reconciliation to actual performance for rolling 13 week (or such longer period as remains until Plan exit) cash flow and liquidity forecasts, including cash balances, weekly and cumulative comparison of actual performance to DIP Budget as part of the weekly financial package, weekly reporting as to termination of any existing material contracts (it being understood that all customer contracts will be deemed material) with a duration in excess of 3 months ("*Material Contracts*"), monthly reporting as to new Material Contracts, modifications and extensions of existing Material Contracts with summary of financial impact, each in form and substance reasonably satisfactory to the Agents, all other financial information and reporting provided under any of the Prepetition Credit Facilities currently and such other reports as reasonably requested by any Agent or Majority DIP Lenders. The Exit Facility financial reporting requirements will be consistent with the Restructured Senior Credit Facilities.

(b)   Maintenance of properties and insurance (consistent with the Prepetition Credit Facilities), payment of taxes, compliance with

laws, contracts and permits; preparation of and reporting as to DIP Budget; ERISA covenants.

(c)   Limitations on indebtedness, guarantees, liens, negative pledges, investments, loans and mergers and acquisitions (other than existing guaranties of the Prepetition AIG Credit Facility, Prepetition CS Credit Facility and prepetition RBS Credit Facility, and guaranties by the same guarantors of any debtor in possession financing provided by AIG or CS to provide funding relating to the vessels securing the obligations of TBS and certain of its subsidiaries to such entities).  During the period the Combined DIP Facility is in effect, limitations will not permit any such matters except for those in the ordinary course and specifically contemplated in the definitive documentation; upon the effectiveness of the Exit Facility, limitations shall be consistent with those applicable to the Restructured Senior Credit Facilities.

(d)   Limitations on transactions with affiliates; all arrangements with affiliates shall be required to be documented and confirmed as to arms length terms and no adverse change from existing arrangements with such affiliates.

(e)   No dividends or distributions by Borrowers or Guarantors, except intercompany transfers between Combined Lender Group Obligors (other than to TBS or TBS International Limited, except to the extent required under the Plan to consummate the Plan).

(f)   Limitations on asset sales subject to certain exceptions to be mutually agreed, except those in the ordinary course of business and those planned asset sales previously disclosed provided, that any such sales at prices below appraised value shall have been approved by the Agents.

(g)   The Combined DIP Lenders shall have the right to visit and inspect any of the Combined Lender Group Obligors' properties at reasonable times and upon reasonable notice during normal business hours, including their respective books and records, and to discuss their respective business affairs with the Combined Lender Group Obligors' management and may contact the Combined Lender Group Obligors' advisors; Combined Lender Group Obligors' management and advisors to cooperate with the Agents and Combined DIP Lenders and their advisors.

(h)   Payment of trade payables on a current basis, in accordance with terms.

(i)   Other covenants to be determined as mutually agreed.

A/74549949.20

**Events of Default**:  Usual and customary for facilities of this type, including but not limited to:

(a)  Failure to pay interest, principal, or fees when due; any representation or warranty found to be materially incorrect when made or requested; breach of any affirmative, negative or financial covenant; any post-petition judgment in excess of an amount to be agreed or which would operate to divest any of the Combined Lender Group Obligors of any assets; any of the Combined Lender Group Obligors being enjoined from conducting business; disruption of business operations of any of the Combined Lender Group Obligors for more than a period to be agreed; material uninsured damage to or loss of assets; failure to comply with the DIP Budget within agreed variances; conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; the dismissal of the Chapter 11 Case; the appointment in the Chapter 11 Case of a Chapter 11 trustee or an examiner with enlarged powers (relating to the operation of the business); the grant of any super priority administrative expense claim or any lien which is pari passu with or senior to those of the Administrative Agent and the Combined DIP Lenders (other than pari passu claims on certain of the debtors arising from any debtor in possession financing provided by AIG or CS); any payment of pre-petition debt (other than pre-petition trade debt and employee claims and payments of prepetition claims authorized by Bankruptcy Court order in the first day orders or subsequently approved by the Agents); the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of any Combined Lender Group Obligor of a value in excess of an amount to be agreed; any reversal, revocation or modification in a manner adverse to the Combined DIP Lenders without the consent of the Majority DIP Lenders of the Interim Order, the Final Order or any other order of the Bankruptcy Court with respect to the Chapter 11 Case and affecting the Combined DIP Facility,

(b)  The Bankruptcy Court shall have not have entered a final order (the "*Final Order*") on or prior to 30 days after the petition date (it being understood that the relevant appeal period may not have elapsed by such date) in form and substance satisfactory to the Administrative Agent, the Combined DIP Lenders and the Borrowers authorizing the transactions contemplated by the Combined DIP Facility, the granting of superpriority claim status and the liens contemplated hereby, modifying the automatic stay to permit the creation and perfection of the liens contemplated hereby, providing for the default remedies and enforcement contemplated herein and finding that the Combined DIP Lenders are extending credit in good faith within the meaning of Section 364(e) of the Bankruptcy Code, and having such other terms as may be acceptable to the Combined DIP Lenders including the adequate protection provided for herein, which order shall not have been reversed, modified, amended or stayed,

(c)  Failure by the Borrowers to:

(i) on or before the day that is 30 days after the commencement of the Chapter 11 Case, obtain an order of the Bankruptcy Court assuming the Plan Support Agreement,

(ii) on or before the day that is 60 days after the commencement of the Chapter 11 Case, obtain an order of the Bankruptcy Court approving a disclosure statement for the Plan (defined below) , or

(iii) on or before the day that is 90 days after the commencement of the Chapter 11 Case, obtain an order confirming the Plan,

[substitute following (c) if prepackaged plan:

(i) on or before the day that is 45 days after the commencement of the Chapter 11 Case, obtain an order of the Bankruptcy Court approving the disclosure statement for the Plan (defined below); or

(ii) on or before the day that is 60 days after the commencement of the Chapter 11 Case, obtain an order of the Bankruptcy Court confirming the Plan.]

(d)      Except as otherwise agreed by the Combined DIP Lenders in connection with the Plan, any Combined Lender Group Obligor shall file a plan of reorganization in the Chapter 11 Case that does not contain a provision for termination of the Combined DIP Facility and payment in full in cash upon effectiveness of such plan of all obligations under the Combined DIP Facility, and

(e)      Any Borrower shall (i) fail to observe or act in accordance with any provision of the Plan Support Agreement, (ii) act in any manner which contravenes or otherwise interferes with any provision of the Plan Support Agreement or (iii) any other event occurs, the effect of which is to cause or permit the termination of the Plan Support Agreement in accordance with the terms thereof.

(f)      Documentation will also include Events of Default similar to those in the Participating Prepetition Credit Facilities relating to postpetition judgments, certain postpetition ERISA events, invalidity of Loan Documents, Change of Control (except in accordance with the Plan), perfection and priority of liens, actions against vessels and holding company status.

The Exit Facility shall contain defaults and events of default consistent with the Restructured Senior Credit Facilities.

**Remedies**:        In addition to other customary remedies, upon the occurrence of an Event of Default and following the giving of five business days' notice to the Borrowers, the official committee(s) of unsecured creditors, if any, of the Borrowers  and the United States Trustee, the Administrative Agent shall

have relief from the automatic stay and the Administrative Agent and Collateral Agents may foreclose on all or any portion of the Collateral, occupy the Borrowers' premises, or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law and the debtors' exclusive period to file a Plan shall be terminated. During such five business-day notice period, the Borrowers shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred, and the Borrowers will have no right to seek to use cash collateral except to meet payroll obligations and make other payments essential to the preservation of the debtors. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred, the automatic stay, as to the Combined DIP Lenders and the Administrative Agent, shall be automatically terminated at the end of such notice period and without further notice or order.

**Conditions of
Initial Extension
of Credit**:

The obligation to provide the initial extension of credit shall be subject to the satisfaction (or waiver) of conditions, including, without limitation, the following conditions:

(a)     The Bankruptcy Court shall have entered an interim order (the "*Interim Order*") in form and substance satisfactory to the Agents and the Combined DIP Lenders authorizing the transactions contemplated by the Combined DIP Facility, the granting of superpriority claim status and the liens contemplated hereby, the funding of extensions of credit in an amount not greater than [$17 million] (the "*Interim Order Amount*"), and setting a time limit reasonably acceptable to the Agents for challenges to the Prepetition Credit Facilities, which order shall not have been reversed, modified, amended or stayed.

(b)     Negotiation, execution and delivery of loan, guarantee and collateral security documentation satisfactory to the Agents and the Combined DIP Lenders which shall create the perfected security interests and liens contemplated herein (including as to Vessels and other foreign collateral) and address intercreditor arrangements, and containing representations and warranties, conditions, provisions for capital adequacy and additional costs, covenants and events of default referred to herein.

(c)     Receipt by the Agents of satisfactory corporate resolutions, legal opinions and other evidence of appropriate corporate authorization of the proposed transactions.

(d)     There shall have occurred no material adverse change in (i) the business, condition, operations or assets of TBS and its subsidiaries (taken as a whole) since the commencement of the Chapter 11 Case (other than the commencement of the Chapter 11 Case, the transactions contemplated by the Plan and the

turnover of vessels constituting collateral to The Royal Bank of Scotland plc), (ii) the ability of any of the Combined Lender Group Obligors to perform when due their respective obligations under the loan documents, or (iii) the ability of the Administrative Agent or Combined DIP Lenders to enforce the loan documents and the obligations of the Combined Lender Group Obligors thereunder.

(e)      Receipt by the Combined DIP Lenders and the Agents of an approved DIP Budget and the January, 2012 monthly management report.

(f)      Receipt by the Administrative Agent, for the benefit of the Combined DIP Lenders and the Administrative Agent, of all fees and expenses due and payable in connection with the transactions contemplated hereby (such payment may be effected from the funding of the Interim Order Amount). Receipt by the Agents of evidence of payment by the debtors (from the funding of the Interim Order Amount) of all accrued and unpaid professional fees of the Agents under the Participating Prepetition Credit Facilities (whether incurred prepetition or postpetition) as are approved in connection of the funding of the Interim Order Amount, _provided_, that the Borrowers shall take all commercially reasonable steps in good faith to cause the Bankruptcy Court to approve the payment of such fees and expenses in full.

(g)      Receipt by the Administrative Agent of evidence of receipt of all necessary consents of the lenders under the Prepetition Credit Facilities and any other necessary third party consents and governmental authorizations.

(h)      Receipt by the Administrative Agent of evidence of insurance.

(i)      Receipt by the Administrative Agent of evidence of (i) satisfactory arrangements between the RBS Facility Agent and lenders and the Debtors with respect to the turnover of the RBS Vessel Owning Subsidiaries and/or their assets, the funding of the RBS Vessel Owning Subsidiaries for the period prior to the disposition thereof (including allocated overhead) and (ii) evidence of settlement arrangements with respect to the satisfaction and release of debt and guaranty claims of the RBS Facility Agent and lenders in form reasonably satisfactory to the Agents to be submitted to the Bankruptcy Court for approval as a part of the first day proceedings. Arrangements in accordance with the terms of the RBS Vessel Turnover Term Sheet delivered to the DIP Lenders will be deemed to satisfy this requirement.

(j)      Evidence satisfactory to the Agents as to the agreement by Credit Suisse and AIG to treatment during the Chapter 11 Case and in

the Plan consistent with the Plan Support Agreement and this term sheet.

(k)     Evidence satisfactory to the Agents as to the restructuring of the bareboat charters of the Laguna Bell and Seminole Princess on terms acceptable to the Agents.

(l)     The Plan Support Agreement entered into among the Borrowers and Guarantors, certain TBS shareholders, the Combined DIP Lenders and certain lenders under the Prepetition Credit Facilities, including AIG and Credit Suisse, with respect to an approved proposed plan of reorganization in the Chapter 11 Case (the "*Plan*") shall remain in effect and no event permitting termination thereof shall have occurred.

(m)    [if prepackaged Plan] Votes in favor of the Plan shall have been obtained from at least 2/3 in amount and 50% in number of the holders of Allowed Claims in each impaired class of claims in the Chapter 11 Case.

(n)     The Agents shall have received information and analysis of the potential dissolution of TBS Commercial and/or Beacon, and/or certain of their subsidiaries, and the creation of certain new subsidiaries to continue certain of the business previously conducted by such entities, and the financial impact of such changes on the Borrowers and Guarantors.

**Conditions of Each Extension of Credit**:

The obligation to provide each extension of credit (including the extension of credit on the Closing Date and upon entry of the Final Order) shall be subject to the satisfaction of the following conditions:

(a)     No default or continuing event of default shall have occurred and be continuing after giving effect to the proposed extension of credit;

(b)     Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent that such representations and warranties expressly relate to a prior date, in which case they shall be true and correct in all material respects as of such earlier date;

(c)     Receipt of a notice of borrowing from the Administrative Borrower; and

(d)     Evidence of compliance with the minimum liquidity covenant after giving effect to such extension of credit and any application of the proceeds thereof.

The obligation to provide the extension of credit on the entry of the Final Order shall also be conditioned on receipt by the Agents of all professional fees and expenses referred to in paragraph (f) above not paid upon entry of the Interim Order, or arrangements for such payment having been made in a manner acceptable to the Agents.

The request by the Borrowers for, and the acceptance by the Borrowers of, each extension of credit shall be deemed to be a representation and warranty by the Borrowers that the conditions specified above have been satisfied.

Conditions to the effectiveness of the Exit Facility shall be consistent with the conditions to effectiveness of the Restructured Senior Credit Facilities (with appropriate conforming changes).

**Assignments**:
Any Combined DIP Lender will be permitted to assign a portion of the Combined DIP Facility to a Combined DIP Lender, Lender Affiliate, Approved Fund or other Eligible Assignee (which, during the pendency of the Chapter 11 Case shall include only lenders under (and parties joining simultaneously as lenders under) the Participating Prepetition Credit Facilities) in minimum amounts of $2,000,000, subject to consent of the Administrative Agent, which consent will not be unreasonably withheld, and notice to the Borrowers within a reasonable time. The Administrative Agent shall receive a $3,500 processing and recordation fee from each assignee upon each assignment.

**Voting Rights**:
The consent of Majority DIP Lenders shall be required for amendments and waivers, and the following items, among others, shall require the consent of all Combined DIP Lenders directly affected thereby: (1) increases in a Combined DIP Lender's commitment shall require consent of such Combined DIP Lender, increase in other Combined DIP Lenders' commitments shall require Majority DIP Lenders' consent; (2) decreases in interest rates or fees (provided the waiver of default interest or a default or event of default shall not constitute a decrease in interest rate or fees) or forgiveness of principal; (3) extensions in final maturity; (4) release of all or substantially all of the collateral (other than permitted asset sales and use of cash collateral) or obligors; and (5) changes in the percentage constituting Majority DIP Lenders or the terms of the voting rights provisions. Voting provisions for the Exit Facility shall be consistent with the Combined DIP Facility.

**Indemnification**:
The Borrowers jointly and severally agree to indemnify and hold the Agents, the Combined DIP Lenders and their respective shareholders, directors, agents, officers, subsidiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the Combined DIP Facility, this term sheet, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such indemnified persons is a party

thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party. In all such litigation, or the preparation therefor, the Agents and the Combined DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Borrowers jointly and severally agree to pay promptly the reasonable fees and expenses of such counsel. The same indemnification provisions shall apply to the Combined DIP Facility and the Exit Facility.

**Expenses**:                  See Addendum I.

**Governing Law**:             The State of New York.

A/74549949.20

**ADDENDUM I**
**PRICING, FEES AND EXPENSES**

**Upfront Fees/Closing Fees**:     As set forth in the fee letter.

**Interest Rates:**     At the Borrowers' option, any loan under the Combined DIP Facility that is made to them will bear interest at a rate equal to the Applicable Margin, as set forth below, plus one of the following indexes: (i) LIBOR and (ii) the Base Rate (to be defined as the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus .50% and (c) one month LIBOR plus 1.0%). The same interest rates and margins will apply to the Combined DIP Facility and the Exit Facility.

The Borrowers may select interest periods of 1, 2 or 3 months for LIBOR loans, subject to availability. LIBOR interest periods during the pendency of the Chapter 11 Case will be limited to 1 month, and shall be available for periods of 1, 2 or 3 months after the consummation of the Plan under the Exit Facility. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

A default rate shall apply on all obligations in the event of default under the Combined DIP Facility at a rate per annum of 2% above the applicable interest rate.

**Applicable Margin:**     Base Rate Applicable Margin:   4.50%
LIBOR Applicable Margin:    5.50%; LIBOR Floor:1.50%

**Calculation of**
**Interest and Fees:**     Other than calculations in respect of interest at the Base Rate (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**Cost and Yield Protection:**     Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**Expenses:**     The Borrowers will pay all reasonable and documented costs and expenses associated with the preparation, due diligence, administration, syndication and closing of all loan documentation, including, without limitation, collateral monitoring, appraisal, examination, financial advisory and other consultants' fees and expenses and the legal fees of counsel to the Administrative Agent, the Co-Agent, the Collateral Agent and the Lead Arrangers, regardless of whether or not the Combined DIP Facility is closed. The Borrowers will also pay the expenses of the Administrative Agent, the Co-Agent, the Collateral Agent and each Combined DIP Lender in connection with the enforcement of any loan

1Case 1:18-cv-04363-GBD-BCM   Document 70-1   Filed 06/01/18   Page 347 of 385

documentation.  The same expense reimbursement provisions shall apply to the Combined DIP Facility and the Exit Facility.

# Exhibit K

TBS INTERNATIONAL PLC

THE BAREBOAT CHARTER TERM SHEET

1. **Background**.  Prepetition, Beekman Shipping Corp. ("***Beekman***") and Fairfax Shipping Corp. ("***Fairfax***"), Debtor affiliates of TBS International plc ("***TBS***"), entered into the following bareboat charters:

     a.    Bareboat Charter, dated as of January 24, 2007, by and between Beekman, as charterer, and Rushmore Shipping LLC ("***Rushmore***"), as owner of the M/V Laguna Belle (the "***Laguna Belle Charter***"); and

     b.    Bareboat Charter, dated as of January 24, 2007, by and between Fairfax, as charter, and Adirondack Shipping LLC ("***Adirondack***"), as owner of the M/V Seminole Princess ("***Seminole Princess Charter***" and together with the Laguna Belle Charter, the "***DVB Bareboat Charters***").

     c.    On [__], TBS and certain of its affiliates (collectively, the "***Debtors***") entered into that certain Plan Support Agreement, dated [__], between and among [__] (the "***Plan Support Agreement***").

2. **Prepetition Modification**.  On February _, 2012, the parties to each of the DVB Bareboat Charters shall enter into interim agreements modifying the terms and conditions of the DVB Bareboat Charters for the pendency of the chapter 11 cases of TBS and its affiliated debtors and debtors in possession, as follows:

     a.    Rate.  Beekman and Fairfax shall pay Rushmore and Adirondack a charter rate equal to $4,000 per day per vessel in cash and any amounts in excess of $4,000 are deferred (the "***Deferrals***").

     b.    Cross-Defaults.  A default on the DIP Loan (as defined in the Plan Support Agreement) or the Plan Support Agreement is a default under the DVB Bareboat Charters.

3. **Assumption**:  On the Effective Date, Beekman and Fairfax (either individually or along with their affiliated debtors) shall assume the DVB Bareboat Charters, subject to the following modified terms (the "***Exit Amendment***"):

     a.    Term.  The term of each of the DVB Bareboat Charters shall end on February 1, 2015 (the "***Termination Date***") with a one year extension option.

     b.    Rate.  Beekman and Fairfax shall pay Rushmore and Adirondack a charter rate equal to $4,000 per day per vessel, and $4,500 during the one year extension period.

c. <u>Call Option</u>. Rushmore shall agree to provide Beekman with the exclusive right to buy the M/V Laguna Belle at the Termination Date at a purchase price equal to $8,500,000, subject to the seller's credit, if available. Adirondack shall agree to provide Fairfax with the exclusive right to buy the M/V Seminole Princess at the Termination Date at a purchase price equal to $8,500,000, subject to the seller's credit, if available.

e. <u>Seller's Credit</u>: Rushmore and Adirondack shall each acknowledge that, (a) if either Beekman or Fairfax executes the Call Option described above, that such entity shall retain a seller's credit equal to $2,750,000 per vessel and (b) if both Beekman and Fairfax execute a Call Option, they shall retain a combined sellers' credit $5,500,000 for both vessels; ***provided*** that, either entity's seller's credit shall only be available if DVB Bank SE (or an affiliate thereof), as lender or charter counterparty, [has received payment in full in cash on account of its interests in, as of the effective date of the Plan, the BOA/DVB Exit Facility, the New Senior Secured Cash Pay Loan Facility, the New Senior Secured PIK Loan Facility, and the DVB Bareboat Charters.][1] In addition, the seller's credit shall be extinguished upon default under either DVB Bareboat Charter, and shall expire upon termination of the applicable DVB Bareboat Charter, if the relevant Call Option is not exercised.

4. **Settlement and Releases**

a. The settlement agreement providing for the assumption of the DVB Bareboat Charters, as modified, except as set forth herein, shall constitute the settlement of any and all claims (including with respect to the Deferrals) arising under the terms of both of the DVB Bareboat Charters and any agreements executed or delivered in connection therewith.

b. The settlement agreement providing for the assumption of the DVB Bareboat Charters, as modified, except as set forth herein, shall provide that each of the parties thereto fully releases the other parties thereto from any and all claims (including with respect to the Deferrals) arising under the DVB Bareboat Charters or any agreement executed or delivered in connection therewith.

**c.** Pursuant to the settlement agreement, Rushmore and Adirondack shall each acknowledge that the Cure amount due upon assumption of the DVB Bareboat Charters shall be limited to any accrued but unpaid charter amount.

5. **Conditions Precedents and Defaults**

a. The Exit Amendment and the settlement are conditioned upon (a) confirmation and effectiveness of the Plan (as defined in the Plan Support

---

[1] The bracketed portion is subject to further negotiations between the parties.

       Agreement), and (b) that no Termination Event (as defined in the Plan Support Agreement) has occurred and is continuing.

b.      Subject to cure (if applicable), a default by the Debtors under any debt issued or restructured pursuant to the Plan or breach by the Debtors or the Debtors' management of any material agreements entered into in connection with the Plan shall be a default under each DVB Bareboat Charter.

c.      Subject to cure, a termination for cause of the Debtors' management shall be a default under each of the DVB Bareboat Charters.

101224205.5

# Exhibit N

## TBS INTERNATIONAL
## EMPLOYMENT AGREEMENT TERM SHEET

This document is not a contract and the terms set forth herein shall not bind any party unless they are reduced to a written agreement that is signed on behalf of each party thereto.

1. Position/Duties:

Position and duties shall be as follows: [SUPPLY DETAIL FOR EACH MEMBER OF SENIOR MANAGEMENT]; full time, attention, energy and best efforts; compliance with all policies, etc. Typical carveouts for charitable activities and managing own investments, provided that they don't interfere with discharge of employment duties. Initial location of employment shall be the current offices of the Company at 612 East Grassy Sprain Road, Yonkers, N.Y. or, as a result of effectively having to be on call 24/7 in an international shipping company, in the individual home office of the Employee in the same manner as in the past three years.

2. Employment Term:

From Commencement Date until day prior to third anniversary of Commencement Date, unless sooner terminated under the termination provisions below; provided, however, that commencing on the third anniversary of the Commencement Date and on each anniversary thereafter the Employment Term shall be automatically extended for an additional period of one year unless, not later than 90 days prior to such automatic extension date, either party shall have given notice to the other that it does not wish to extend the Employment Term, in which case the Employment Term shall end on the day prior to such automatic extension date. A non-extension by the Company shall be treated as a termination without "Cause" except that the severance provisions (base salary, bonus, COBRA) shall not apply.

3. Compensation:

During employment:

(a) Base Salary annualized at current base salary; reviewed annually; may be increased but shall not be reduced to less than initial base salary amount.

(b) Performance Bonus; in sole discretion of the Board. Bonus plan to be established annually by the Board.

(c) Equity -- will be allocated to employees in accordance with the management equity grant arrangements and will vest at certain milestones according to the corresponding vesting arrangements (see Exhibit A); acceleration of future unvested equity

interests upon Sale of Company or similar transaction in connection with which all loan obligations are repaid in full and according to the vesting schedule.

4. Benefits:

Current benefits, subject to review and approval by the BOA Agent and the DVB Agent.

5. Termination reasons, payments, and treatment of equity:

(a) By Company for Cause: base salary through termination date; forfeit vested and unvested equity.

(b) By Company without Cause or Employee for Good Reason during term of Agreement:  base salary through termination date; after employee executes release (subject to compliance with post-employment covenants), retain vested but no continued vesting of equity.  Severance equal to (i) salary continuation at normal payroll periods for the remainder of the Employment Term (the "Severance Period"), (ii) a portion of any bonus earned in accordance with the terms and conditions of the bonus plan established by the Board, pro-rated according to the days employee worked during the year of termination and paid at such time as the Company pays bonuses to employees generally for the year of termination, and (iii) Company-paid COBRA for the Severance Period.  No offset or duty to mitigate.

(c) By Employee during term of Agreement other than for Good Reason: base salary through termination date; after employee executes release, and subject to compliance with post-employment covenants, initial and vested equity retained, subject to repurchase right in favor of Company at fair market value; forfeit unvested equity.  Fair market value will be determined by the Board in good faith.

(d) Death or Permanent Disability during term of Agreement: base salary through termination date; after executing release (or such execution by heirs, etc.) and subject (w/r/t Permanent Disability) to compliance with post-employment covenants, retain vested equity, forfeit unvested equity.

"Cause" shall mean (w) your breach of a material term of the Governance Documents, the employment agreement or any material written policy of the Company; provided, however, that the Company shall give you written notice specifying the breach in reasonable detail and you shall have a 15-day period, commencing with the date notice is given to you, within which to cure such breach, if cure is possible; (x) breach, arising directly or indirectly by an act or omission by you, by a Management Related Company (as defined below) of a material term of any agreement between such company, on the one hand, and the Company or any of its affiliates, on the other hand, which breach could reasonably be expected to result in material harm to the Company and its affiliates; provided, however, that, for the avoidance of doubt, none of the following shall constitute "Cause" under this subparagraph (x): (1) the closure of the Management Related Companies in Brazil and Chile or the breach of agreements with the Company related thereto, provided, that such closure will have no material adverse commercial or business impact on TBS, or on the ability of TBS to comply with the DIP Budget or meet the

TBS business plan, (2) any significant reduction, cessation or discontinuation of the operations of any other Management Related Company that does not materially and adversely impact the Company, (3) any significant reduction, cessation or discontinuation of the operations of any other Management Related Company that would materially and adversely impact the Company and that has the consent of the Co-Agents for the Senior Secured Debt Facility, (4) the failure of any Management Related Company to fund any amount to another Management Related Company to ensure its continued operations, or (5) the failure of Employee to provide debt or equity funding to any Management Related Company or otherwise incur any monetary obligations (including guarantees) on behalf of such Management Related Company; (y) breach of your fiduciary duty or your fraudulent, unlawful, grossly negligent or willful misconduct with respect to the performance of your duties; and (z) your conviction of or entry of no contest plea to any felony crime or fraud.

"Management Related Company" shall mean TBS Commercial, Beacon Holdings and their subsidiaries other than LASA and the TBS Commercial subsidiaries in Peru and Ecuador.

"Good Reason" shall mean any of the following without Employee's consent: (w) material adverse reduction in duties; (x) reduction in base salary below the initial base salary; (y) required relocation of more than 35 miles; or (z) the Company's material breach of a material term of this Agreement or any equity grant agreement; provided, however, that Employee shall have provided the Company written notice of the grounds constituting Good Reason and the Company shall have failed to cure such grounds within 15 days.

"Permanent Disability" shall mean that you are unable, with any accommodation required by applicable law, to render and perform the services required of you under this Agreement because of physical or mental disability or incapacity.

Any Employee who ceases to be employed by the Company for any reason shall not be eligible to serve as a member of the Company's board of directors, and shall be subject to removal as a director if serving in such capacity at the time he ceases to be employed by the Company.

6. Restrictive Covenants

        Acknowledgements:  Employee acknowledges and agrees that (i) the worldwide shipping solutions business is an intensely competitive business, (ii) as a result of Employee's association with the Company, Employee has had access to, and is and will be in possession of, confidential customer and client information, trade secrets relating to the business practices of the Company and other information pertaining to the goodwill of the Company and its customers and vendors (including but not limited to Confidential Information), (iii) the use by Employee for Employee's own account or the disclosure by Employee to any existing or potential competitors of the Company of the Confidential Information would place the Company at a serious competitive disadvantage and would cause irreparable harm to the business of the Company, (iv) the Company's current, former, and prospective customers and clients ("Clients") are located throughout the United States of America and throughout the world, and (v) any statements or actions taken by Employee to induce any Client to enter into any business arrangement with any person or entity other than the Company would cause irreparable harm to

the Company.  Employee further acknowledges and agrees that if Employee were to compete, directly or indirectly, with the Company's business, the Company would suffer irreparable harm.

(a) Confidential Information

Maintain as confidential at all times during and after employment.

(b) Return of Company property

Upon termination of employment.

(c) Intellectual Property

Created by Employee while employed remains property of Company at all times.

(d) Non-competition

Duration:      The "Non-Compete Restricted Period": (i) If Employee resigns other than for Good Reason, Company terminates employment for Cause, or employment terminates due to Permanent Disability, then during employment and until the latter of (x) the third anniversary of the Commencement Date and (y) the first anniversary of the date Employee's employment terminates; and (ii) if Company terminates Employee's employment without Cause or Employee resigns for Good Reason (including a deemed termination without Cause due to a failure by the Company to extend the initial employment term), then during employment and until the end of the Severance Period.

Geographic area: Anywhere in the world where Company does or is actively seeking to do business

Scope: Any business directly or indirectly competitive with any material business conducted by the Company as of the date of Employee's termination of  employment with the Company; provided, however, nothing herein shall prohibit Employee from engaging in other activities related to ocean shipping that are not otherwise described in this sentence or being a shareholder or equity holder in any publicly traded entity whose business is similar to, related to or competitive with, the business heretofore conducted, or conducted at any time during the Restricted Period, by the Company, so long as such Employee does not hold more than a one percent (1%) equity interest in such publicly traded entity.  Employee acknowledges that the Non-Compete Restricted Period in this section is appropriate given the unique nature of the services that Employee will provide the Company and Employee further acknowledges that Employee's fulfillment of the Employee's agreed obligations during the Non-Compete Restricted Period in this section will not cause Employee substantial economic hardship and will not render Employee unemployable within the shipping industry.

(e) Non-solicitation; non-interference

Duration:      The "Non-Solicit/Non-Interference Restricted Period": (i) If Employee resigns other than for Good Reason, Company terminates employment for Cause, or

employment terminates due to Permanent Disability, then during employment and until the latter of (x) the third anniversary of the Commencement Date and (y) the first anniversary of the date Employee's employment terminates; and (ii) if Company terminates Employee's employment without Cause of Employee resigns for Good Reason (including a deemed termination without Cause due to a failure by the Company to extend the initial employment term), then during employment and until the first anniversary of the last day of the Severance Period.

Employee covenants and agrees that Employee will not, for whatever reason, whether for Employee's account or for the account of any other person or entity, (i) make any statements or take any actions that may interfere with the Company's business relationships with any Client; (ii) contact either directly or indirectly any Client or otherwise induce or attempt to induce any Client to enter into any business relationship with any person or entity other than the Company with respect to the business conducted by the Company; (iii) accept any business from any Client other than on behalf of the Company in any business conducted by the Company except as otherwise disclosed to and approved by the Board of Directors; or (iv) hire or attempt to hire any person or entity who or which is at the time, or was at any time during the twelve (12) months preceding the date of hire, employed by or associated with the Company or any Management Related Company as an executive, officer or employee. In addition to the foregoing, Employee covenants and agrees that Employee will not (w) assist in hiring any such person or entity for or by any other person or entity; (x) encourage any such person or entity to terminate his, her or its employment or other business relationship with the Company; (y) encourage any Client to terminate its relationship with the Company; or (z) take any actions that may interfere with the Company's property rights in lists of Clients or vendors or otherwise diminish the value of such lists to the Company. Employee acknowledges that the Non-Solicit/Non-Interference Restricted Period in this section is appropriate given the unique nature of the services that Employee will provide the Company and Employee further acknowledges that Employee's fulfillment of the Employee's agreed obligations during the Non-Solicit/Non-Interference Restricted Period in this section will not cause Employee substantial economic hardship and will not render Employee unemployable within the shipping industry.

(g) Notification of new employer of employee's restrictive covenant obligations

Company and Employee shall have right to do so.

(h) Non-disparagement

At all times during and after employment, Employee shall not disparage the Company or any of its equity holders, officers or directors and the Company's board members and executives shall not disparage Employee.

(i) Remedies; enforcement

Employee agrees that the restrictions are reasonable and necessary and that any breach or threatened breach will cause irreparable injury to the Company and/or related entities and that money damages will not provide an adequate remedy therefore. Company and/or related entities, as the case may be, shall have the right and remedy, in addition to and not in

limitation of any other remedy that may be available at law or in equity, to have the provisions of hereof specifically enforced by any court having jurisdiction through immediate injunctive and other equitable relief. Such injunction shall be available without the posting of any bond or other security, and the Employee hereby consents to the issuance of such injunction.

7. Dispute resolution.

   Mediation and arbitration (with carve-out for enforcement of non-compete); waiver of jury trial

8. Choice of law.

   New York

9. Indemnification of Employee/Insurance.

   The Company will adopt such D&O insurance coverage and indemnification policies as it deems appropriate. Such insurance coverage and indemnification policies shall be applicable to directors and executive officers on substantially similar terms.

**Exhibit A**

**Milestones**

A/74737473.4

## Receive all awards and repay debt 24 months early

| Category | Date Achieved | Equity Awarded | | Total |
| --- | --- | --- | --- | --- |
| | | **Prior to Full Debt Pay-down** | **Post Full Debt Pay down** | |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Jun-15 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $50m and  < 75% LTV | Jun-15 | 2.50% | 2.50% | 5.00% |
| Full Pay-down of All Debt | Jun-15 | | 20.00% | 20.00% |
| **Total Equity Ownership to Management** | | **22.50%** | **32.50%** | **55.00%** |

Repay All Debt 24 months early

## Receive all awards and repay debt 18 months early

| Category | Date Achieved | Equity Awarded | | Total |
| --- | --- | --- | --- | --- |
| | | Prior to Full Debt Pay-down | Post Full Debt Pay down | |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Dec-15 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $50m and < 75% LTV | Dec-15 | 2.50% | 2.50% | 5.00% |
| Full Pay-down of All Debt | Dec-15 | | 17.50% | 17.5% |
| **Total Equity Ownership to Management** | | **22.50%** | **30.00%** | **52.50%** |

## Receive all awards and repay debt between maturity and one year prior

| Category | Date Achieved | Equity Awarded | | Total |
|---|---|---|---|---|
| | | Prior to Full Debt Pay-down | Post Full Debt Pay down | |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Dec-15 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $50m and < 75% LTV | Dec-16 | 2.50% | 2.50% | 5.00% |
| Full Pay-down of All Debt | Jun-17 | | 15.00% | 15.0% |
| **Total Equity Ownership to Management** | | **22.50%** | **27.50%** | **50.00%** |

Repay All Debt 12 months early

## Company receives 1st 3 awards but does not repay debt until maturity

| Category | Date Achieved | Prior to Full Debt Pay-down | Post Full Debt Pay down | Total |
|---|---|---|---|---|
| | | **Equity Awarded** | | |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Jun-16 | 0.00% | 0.00% | 0.00% |
| Reduction in restructured debt < $50m and < 75% LTV | Jun-17 | 0.00% | 0.00% | 0.00% |
| Full Pay-down of All Debt | Jun-17 | | 15.00% | 15.0% |
| **Total Equity Ownership to Management** | | **17.50%** | **22.50%** | **40.00%** |

Partial Awards pay June 2017

## Company hits Maturities (no achievement of awards) and repays all amounts when due

| Category | Date Achieved | Equity Awarded | | Total |
| | | Prior to Full Debt Pay-down | Post Full Debt Pay down | |
|---|---|---|---|---|
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-14 | 0.00% | 0.00% | 0.00% |
| Repayment of Cash Pay Debt | Dec-16 | 0.00% | 0.00% | 0.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Jun-17 | 0.00% | 0.00% | 0.00% |
| Reduction in restructured debt < $100m | Jun-16 | 0.00% | 0.00% | 0.00% |
| Reduction in restructured debt < $50m and  < 75% LTV | Jun-17 | 0.00% | 0.00% | 0.00% |
| Full Pay-down of All Debt | Jun-17 | | 15.00% | 15.0% |
| **Total Equity Ownership to Management** | | **10.00%** | **15.00%** | **25.00%** |

Maturities Throughout

**TBS International**
**Management Equity Ownership**

| | Goals | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec-12 | Jun-13 | Dec-13 | Jun-14 | Dec-14 | Jun-15 | Dec-15 | Jun-16 | Dec-16 | Jun-17 | Dec-17 |
| **Opening Equity Grant** | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| **DIP/Exit Repayment** | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Repayment of Cash Pay Debt** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Cash Interest payment on PIK debt** | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Reduction in Restructured Debt < $100m** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Reduction in Restructured Debt < $50m and LTV < 75%** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% |
| **Full Pay-out of All Debt** | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 17.50% | 15.00% | 15.00% | 15.00% | 0.00% |
| **Total Equity Ownership** | **55.00%** | **55.00%** | **50.00%** | **45.00%** | **45.00%** | **45.00%** | **37.50%** | **30.00%** | **30.00%** | **25.00%** | **10.00%** |

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 366 of 385

# Exhibit M

## TBS INTERNATIONAL PLC

## MANAGEMENT INCENTIVE PLAN TERM SHEET
## FOR NEWCO

1. **Basic Terms**

   a. MIP, and initial distributions, approved in connection with confirmation of chapter 11 plan and ratified by Board on Effective Date; form of MIP to be filed in the Plan Supplement

   b. MIP authorized with respect to 550,000 Class B shares [or 50,000 Class B shares and 500,000 Class C shares convertible into Class B Shares if and when vested] ;represents entire issuance of Class B shares [and, if applicable, Class C shares] [*See Note in Equity and Corporate Governance Term Sheet regarding possibility of convertible Class C shares with respect to unvested portion*]

   c. All Class B shares [*See Note in Equity and Corporate Governance Term Sheet regarding possibility of convertible Class C shares with respect to unvested portion*] to be issued on the Effective Date, subject to forfeiture as specified in the vesting schedule as provided in Exhibit A (the "Vesting Schedule")

   d. Class B shares vesting on the Effective Date shall be issued to Joe Royce, Gregg McNelis, Larry Blatte and Fred Lepere (the "Executive Officers") in the proportions set forth in the Plan Supplement (which proportions may be reduced in the Plan Supplement to reflect grants to other employees of the Company recommended by the Executive Officers and approved by the lenders).

   e. All Class B shares vesting after the Effective Date shall be vested in accordance with the Vesting Schedule and allocated after the Effective Date to Joe Royce, Gregg McNelis, Larry Blatte and Fred Lepere in accordance with their respective grant agreements

2. **Vesting**

   a. 50,000 Class B shares (representing 10% of fully-diluted vested equity on the Effective Date) vest on the Effective Date; such vesting to be approved by Board, without exercising discretion, as provided in confirmation order

   b. Remaining Class B [*Note: or C Shares*] vest as provided in Exhibit A

   c. See TBS International Employment Agreement Term Sheet for consequences of termination of employment

3. **Tax Matters**

   Holders of Class B Shares are responsible for all tax consequences of the receipt and vesting of Class B shares

4. **Shareholder Rights** – as provided in Equity and Corporate Governance Term Sheet, including that changes in the terms of MIP that would materially and adversely affect MIP grantees would require consent of majority in interest of such grantees

5.    Other Terms

    a.    Vesting, forfeiture and repurchase conditions to be consistent with employment agreements (e.g., definition of "Cause" and "Good Reason", forfeiture provisions, etc.)

    b.    Class B Shares are subject to preferred distribution ($500,000) to Class A shares, and have benefit of catch-up distribution provided in Equity and Corporate Governance Term Sheet

    c.    Vested shares to be transferable (but remain subject to forfeiture and other conditions set forth in the TBS International Employment Agreement Term Sheet and Equity and Corporate Governance Term Sheet)

    d.    MIP will be subject to the terms of plan and grant agreement documentation which is consistent with the terms of this term sheet, the TBS International Employment Agreement Term Sheet and the Equity and Corporate Governance Term Sheet, and otherwise in form and substance acceptable to the lenders and in the form filed in the Plan Supplement

    e.    MIP will be ratified by the Board on the Effective Date.

**Exhibit A**

**Milestones**

A/74737473.4

## Receive all awards and repay debt 24 months early

| Category | Date Achieved | Equity Awarded | | Total |
| --- | --- | --- | --- | --- |
| | | Prior to Full Debt Pay-down | Post Full Debt Pay down | |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Jun-15 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $50m and  < 75% LTV | Jun-15 | 2.50% | 2.50% | 5.00% |
| Full Pay-down of All Debt | Jun-15 | | 20.00% | 20.00% |
| **Total Equity Ownership to Management** | | **22.50%** | **32.50%** | **55.00%** |

## Receive all awards and repay debt 18 months early

| Category | Date Achieved | Prior to Full Debt Pay-down | Post Full Debt Pay down | Total |
|---|---|---|---|---|
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Dec-15 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $50m and  < 75% LTV | Dec-15 | 2.50% | 2.50% | 5.00% |
| Full Pay-down of All Debt | Dec-15 | | 17.50% | 17.5% |
| **Total Equity Ownership to Management** | | **22.50%** | **30.00%** | **52.50%** |

| **Receive all awards and repay debt between maturity and one year prior** | | | | |
|---|---|---|---|---|
| | | **Equity Awarded** | | |
| | | Prior to Full Debt | Post Full Debt | |
| **Category** | **Date Achieved** | **Pay-down** | **Pay down** | **Total** |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Dec-15 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $50m and  < 75% LTV | Dec-16 | 2.50% | 2.50% | 5.00% |
| Full Pay-down of All Debt | Jun-17 | | 15.00% | 15.0% |
| **Total Equity Ownership to Management** | | **22.50%** | **27.50%** | **50.00%** |

Repay All Debt 12 months early

| | | Equity Awarded | | |
|---|---|---|---|---|
| **Category** | **Date Achieved** | **Prior to Full Debt Pay-down** | **Post Full Debt Pay down** | **Total** |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-13 | 2.50% | 2.50% | 5.00% |
| Repayment of Cash Pay Debt | Jun-15 | 2.50% | 2.50% | 5.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Dec-13 | 2.50% | 2.50% | 5.00% |
| Reduction in restructured debt < $100m | Jun-16 | 0.00% | 0.00% | 0.00% |
| Reduction in restructured debt < $50m and < 75% LTV | Jun-17 | 0.00% | 0.00% | 0.00% |
| Full Pay-down of All Debt | Jun-17 | | 15.00% | 15.0% |
| **Total Equity Ownership to Management** | | **17.50%** | **22.50%** | **40.00%** |

**Company receives 1st 3 awards but does not repay debt until maturity**

Partial Awards pay June 2017

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 374 of 385

## Company hits Maturities (no achievement of awards) and repays all amounts when due

| Category | Date Achieved | Equity Awarded | | Total |
| --- | --- | --- | --- | --- |
| | | **Prior to Full Debt Pay-down** | **Post Full Debt Pay down** | |
| Opening Equity Grant | | 10.00% | | 10.00% |
| DIP/Exit Repayment | Jun-14 | 0.00% | 0.00% | 0.00% |
| Repayment of Cash Pay Debt | Dec-16 | 0.00% | 0.00% | 0.00% |
| Cash Interest payment on PIK debt (irrevocable election) | Jun-17 | 0.00% | 0.00% | 0.00% |
| Reduction in restructured debt < $100m | Jun-16 | 0.00% | 0.00% | 0.00% |
| Reduction in restructured debt < $50m and  < 75% LTV | Jun-17 | 0.00% | 0.00% | 0.00% |
| Full Pay-down of All Debt | Jun-17 | | 15.00% | 15.0% |
| **Total Equity Ownership to Management** | | **10.00%** | **15.00%** | **25.00%** |

**TBS International**
**Management Equity Ownership**

| | Goals | | | | | | | | | | Dec-17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec-12 | Jun-13 | Dec-13 | Jun-14 | Dec-14 | Jun-15 | Dec-15 | Jun-16 | Dec-16 | Jun-17 | Dec-17 |
| **Opening Equity Grant** | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| **DIP/Exit Repayment** | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Repayment of Cash Pay Debt** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Cash Interest payment on PIK debt** | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Reduction in Restructured Debt < $100m** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Reduction in Restructured Debt < $50m and LTV < 75%** | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 0.00% | 0.00% |
| **Full Pay-out of All Debt** | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 17.50% | 15.00% | 15.00% | 15.00% | 0.00% |
| **Total Equity Ownership** | **55.00%** | **55.00%** | **50.00%** | **45.00%** | **45.00%** | **45.00%** | **37.50%** | **30.00%** | **30.00%** | **25.00%** | **10.00%** |

Case 1:18-cv-04263-CBD-BCM   Document 70-1   Filed 10/01/18   Page 376 of 385

# Exhibit N

TBS INTERNATIONAL PLC

TBS COMMERCIAL TERM SHEET


1. TBS Commercial Group Ltd. ("Commercial Group") and Beacon Holdings Ltd. ("Beacon" and, collectively with TBS Commercial, "TBS Commercial"), will become party to the PSA. TBS Commercial will agree that TBS Commercial and their wholly owned Commercial Agency subsidiaries and affiliates except the Latin America Ship Agency (a cooperative) and the subsidiaries and affiliates located in Ecuador and Peru (collectively, with TBS Commercial, the "Affiliate Management Companies") will continue to operate and perform their agreements with TBS International PLC and its subsidiaries (collectively, "TBS") in the ordinary course, subject to the following limitations: (1) the parties understand that TBS Commercial intends to effect the closure of the Affiliate Management Companies in Brazil and Chile, and TBS Commercial shall be entitled to do so, provided, that such closure will have no material adverse commercial or business impact on TBS, or on the ability of TBS to comply with the DIP Budget or meet the TBS business plan; (2) TBS Commercial will be entitled to reduce, cease or discontinue operations of any other Affiliate Management Company if such reduction, cessation or discontinuance will not have any material adverse business or commercial impact on TBS and no costs associated therewith will be borne by TBS, and (3) TBS Commercial may reduce, cease or discontinue operations at any other Affiliate Management Company where a material commercial or business impact on TBS could occur, only with the prior consent of the Co-Agents for the BOA/DVB DIP Facility (the "Agents").


2. TBS Commercial and TBS will enter into an agreement (the "TBS Commercial Call Option Agreement") pursuant to which, through the end of June 2012, TBS Holdings Limited or New TBS Parent shall have the option (exercisable on one or multiple occasions) to have TBS pay specified costs (as set forth in the TBS Commercial Call Option Agreement) in connection with the continuance, discontinuance, closure or reduction in business of any of the Affiliate Management Companies (which may include Brazil and Chile) and related performance of services and/or transfer of certain operations thereof to TBS, so long as (a) TBS demonstrates to the satisfaction of the Agents that it can achieve cost savings or revenue enhancements to offset such costs so that the DIP Budget and the TBS business plan will not be adversely affected, (b) TBS demonstrates to the satisfaction of the Agents the benefits to TBS from exercising such option, (c) such costs do not exceed $1,000,000 in the aggregate (or such higher amount as may be agreed by the Agents and set forth in the TBS Commercial Call Option Agreement) and (d) the Agents have consented to the relevant exercise of the option.


3. The TBS Commercial Call Option Agreement shall be substantially in the form filed in the Plan Supplement, shall be acceptable to the Agents and shall be approved by the Bankruptcy Court and become effective on the Effective Date of the Plan, unless TBS, TBS Commercial and the Agents agree to implement the TBS Commercial Call Option Agreement prior to the Effective Date and obtain Bankruptcy Court approval to do so.

4.      Nothing herein shall obligate or be deemed to obligate Joseph Royce, Gregg McNelis, Larry Blatte or Fred Lepere to fund any amounts, or incur any monetary obligations (including guarantees), to ensure the continued operations of any Affiliate Management Company.  Nothing herein shall require, or be deemed to require any Affiliate Management Company to fund any amount to another Affiliate Management Company to ensure its continued operations.  Nothing herein shall obligate, or be deemed to obligate, any Agent to consent to any proposed reduction, closure, incurrence of costs or adverse impact on TBS.  Nothing herein shall relieve, or be deemed to relieve, any party of any obligations such party may have under other agreements or applicable law.

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 379 of 385

# Exhibit O

# Restructured TBS International

## Equity and Corporate Governance Term Sheet

- Structure of Entity: a Bermuda exempted company ("NewCo")

  - NewCo will elect to be treated as a partnership for U.S. tax purposes, and will be the sole direct parent of TBS Holdings Limited and, indirectly, all of its subsidiaries (other than those indirect subsidiaries transferred to RBS as part of the RBS vessel turnover)

  - Key governance and voting provisions to be set forth in Memorandum of Association, Bye-laws and Shareholders Agreement (collectively, the "Governance Documents")

- Classes of NewCo Equity Interests

  - Class A shares (450,000 shares)

    - 100% of Class A equity in NewCo issued to DVB and BOA lenders

    - On Effective Date of Plan, this would represent 90% of issued and outstanding, vested Class A and Class B shares; Class A would be subject to dilution to 45% of outstanding equity if all milestones achieved and all Class B vested

    - entitled to a preferred return of $500,000

  - Class B shares (550,000 shares)

    - 100% of Class B equity in NewCo issued on Effective Date pursuant to MIP

    - On Effective Date, 9.0909% of Class B vested; balance of Class B unvested; if fully vested by virtue of achievement of all milestones, Class B equity would represent 55% of outstanding equity [*NOTE: In light of PLC structure, unvested Class B equity may need to be reclassified as unvested convertible Class C equity, which would be non-voting, not entitled to dividends and otherwise not entitled to any economic participation unless and until converted*].

    - Entitled to "catch-up" return of $55,555 paid after distribution of preferred return to Class A shares

    - Unvested portion earned by employees upon satisfaction of milestones

101212275.1

- The terms of the MIP, including the agreed vesting schedule and milestones, are set forth on the Management Incentive Plan Term Sheet attached hereto

- Subsequent to preferred and catch-up return, distributions in accordance with the total number of Class A and vested Class B shares outstanding at the time of such distributions, pro rata in accordance with the aggregate number of outstanding Class A shares and vested Class B shares; provided that there will be no distributions made in respect of the Class B equity until all loan obligations are paid in full

- Class A and Class B shares will vote as a single class except that each class will vote separately (i) to the extent required by law, (ii) with respect to any proposed amendment to the Governance Documents[1] or proposed change in the Company's tax status, legal structure or accounting principles, in each case which would materially and disproportionately affect one class adversely vis-à-vis the other class and (iii) with respect to the issuance of new Class A or Class B shares or creation of any other class of equity interests (except for (x) junior classes of equity and proposed issuances of equity in respect of which the holders of Class B shares are granted pre-emptive or participation rights, (x) shares to be issued in connection with an initial public offering, (y) re-issuances or grants to employees of the Company of forfeited vested and unvested Class B and/or Class C shares) and (z) in accordance with an equity compensation plan previously approved by class vote; voting to be based on relative ownership of outstanding Class A shares and vested Class B shares, except as provided below under "Transfer Restrictions"; <u>provided</u>, that any split, subdivision, consolidation or reverse split of the Company's equity interests that does not affect all classes of equity equally will be deemed to materially and disproportionately affect each class.


- Board of Directors and Observers

  - Board consists of five directors and will act by simple majority (<u>i.e.</u>, 3 of 5 directors) on all matters

  - Class A holders (subject to voting restrictions set forth below under "Transfer Restrictions") nominate three directors

  - Class B directors nominate two directors

---

[1] By way of clarification, those documents would address board composition and size, as well as the respective economic rights of the equity securities.

2

- All holders required to vote affirmatively for all five directors at each relevant meeting

- Directors serve for two year terms; successors chosen in the same manner as initial directors

- Regular quarterly board meetings with normal board information books distributed in advance

- Until such time as Class A holders cease to own more than 50% of the equity of the company, the board will have two observers: one designated by the administrative agent of the BofA/DVB Exit Facility and one designated by the vote of all holders of Class A shares other than the administrative agent and any co-agent

- The board observers will be entitled to attend all meetings and to receive all board materials, in each case, except to the extent regarding certain subjects to be agreed

- Board observers would be subject to customary confidentiality obligations


- Executive officers and key employees

  - The four members of the current senior management team – Joseph Royce, Gregg McNelis, Larry Blatte and Fred Lepere

  - Three year employment agreements, the terms of which are set forth in more detail on the Employment Agreement Term Sheet attached hereto

  - Subject to the Board's supervision, the management team will have discretion for operational matters consistent with approved budget and business plan[2] or otherwise taken in the ordinary course of operating an ocean shipping business, including

---

[2] Confirmation of the Chapter 11 Plan will constitute approval of the 2012 business operating plan for the balance of 2012, including with respect to vessel sales and long-term charters that are consistent with the assumptions and conditions set forth in the operating plan. No further board approval will be required during 2012 for management to implement this operating plan provided that the assumptions and conditions stated in such business plan remain true and are satisfied. For subsequent years, long term charters on terms consistent with those approved in that year's business plan will not be subject to further board review.

3

recommendations to sell vessels, purchase vessels and enter into long-term charter commitments

- Board approval will be required for all material matters affecting the Company, including, without limitation, with respect to:

    - Approval of annual budgets and business plan[3]

    - Retention and terms of employment of new key employees

    - Increases in compensation of key employees (subject to recusal of any interested director)

    - Sale of vessels, purchase of vessels, or entry into long-term charter commitments recommended by executive officers (for the avoidance of doubt, the recommendation of the executive officers shall be required for any sale of vessels, purchase of vessels, or entry into long-term charter commitments (other than in connection with post default remedies on secured debt))

    - Terminating key employees (with any interested director disqualified from voting and participating in the relevant Board deliberations), subject to the terms of any applicable employment agreement

    - Changing the independent auditors

    - Approval of any split, subdivision, consolidation or reverse split of equity interests

    - Any merger, amalgamation, consolidation or sale of substantially all of the consolidated assets of the Company

    - Changes to legal structure, accounting principles or tax status (subject to class voting rights in the circumstances described above)

    - Amending or restating organizational documents  (subject to class voting rights in the circumstances described above)

    - Initial public offering or other sale of debt or equity securities by the Company

---

[3] See note 2 above.

4

- Approval of any dividends on or repurchases of equity interests

- Material change in the nature of the Company's business

- Issuance of new equity interests (other than Class B shares that vest), including, without limitation, any issuance of new equity interests or similar rights under any equity compensation plan (and material changes to the material terms of any such equity compensation plan); provided that, in addition to the class voting approvals referred to above, any proposed new issuance of equity interests (other than Class B shares that vest and reissuances and grants to employees of vested and unvested B and/or C shares that have been forfeited) must be approved by the affirmative vote of a majority in interest of Class A and vested Class B shares voting as a single class

- Transfer restrictions

  - All Class A shares are subject to customary restrictions intended to address specified regulatory or other legal considerations

  - Class A shares may be transferred, provided that:

    - except as provided below, any such proposed transfer on a detached basis will be subject to a right of first offer in favor of the other Class A members;

    - to the extent that Class A holders do not agree to purchase all first offer shares, any remaining first offer shares would be offered to Class B members;

    - the right of first offer time period shall be established such that the process is completed in a maximum of 20 days;

    - the rights of first offer will not apply to sales by Class A holders in any ninety day period which in the aggregate (taking into account all sales by Class A holders) do not represent greater than 10% of the total outstanding Class A Shares of the Company;

    - until the principal amount of Exit Facility PIK Toggle Debt outstanding is less than $50 million, only a holder of Class A Shares which is also a holder of Exit Facility PIK Toggle Debt (and then only to the extent of those Class A shares which represent a proportion of all outstanding Class A shares no greater than the proportion of all outstanding Exit Facility PIK Toggle Debt held by such holder) will be entitled to vote such shares for the election of directors and on all other matters subject to a vote of equity holders of the Company (including with respect to such matters as are

5

Case 1:18-cv-04363-GBD-BCM    Document 70-1    Filed 10/01/18    Page 385 of 385

proposed for class voting, but excluding in the case of holders of Class A shares votes relating to the issuance of new equity interests as described in more detail above); and

- any Class A shares purchased by or on behalf of Class B holders or their affiliates will be subject to voting arrangements requiring that such purchased Class A shares be disregarded for all quorum and voting purposes [voting mechanism subject to review with Bermuda counsel]

- No transfer of Class B shares permitted except to other Class B holders (in the case of vested interest only) and, family members or trusts (and in all cases subject to all provisions that relate to such shares under the this Term Sheet, the MIP Term Sheet and the TBS International Employment Agreement Term Sheet)

- No transfer permitted to competitors (to be defined)

- Any permitted transfer in a transaction that would constitute a change of control (to be defined) would be subject to tag-along and drag-along rights

- Nothing in this governance proposal shall otherwise amend or modify the lender consent rights and other provisions set forth in the proposed DIP and restructured debt term sheets.

GDC #74720230v11_ACTIVE_ - 101212275_1 DOCX.DOCX

A/74737696.5