**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Attorneys for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                   :

| | |
|---|---|
| IN RE: | :   **Chapter 11** |
| **TBS SHIPPING SERVICES INC.**, *et al.*, | : |
|     Debtors. | :   **Case No. 12-22224 (RDD)** |
| | : |
| | :   **Jointly Administered** |
| | : |

-------------------------------------------------------------x

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION OF JOINT PREPACKAGED PLAN OF REORGANIZATION FOR THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (WITH TECHNICAL MODIFICATIONS)

          TBS Shipping Services, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), submit this omnibus reply to the two filed objections to confirmation of the *Joint Prepackaged Plan of Reorganization for the Debtors under Chapter 11 of the Bankruptcy Code (with Technical Modifications)*, dated as of March 2, 2012 [Docket No. 97] (as the same may be amended or modified from time to time, the "***Plan***"),[1] and approval of the related Disclosure Statement [Docket No. 20] and respectfully submit as follows:

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT

The Debtors had depleted virtually all of their available cash by the time they filed the Chapter 11 Cases.  In fact, the Debtors avoided a liquidation only because a subset of the Debtors' secured lenders (the "***Prepetition Secured Lenders***") agreed to provide the Debtors with up to $42.8 million in debtor in possession financing.  This financing did not occur in a vacuum.  Rather, it occurred in recognition that a liquidation would yield exceedingly low recoveries for the Prepetition Secured Lenders, and, by contrast, a comprehensive restructuring plan, negotiated in good faith and at arms-length with the Debtors, would provide lenders with the opportunity to realize going concern, rather than liquidation, recoveries through their restructured below-market debt and ongoing ownership of the Debtors.  Absent receiving the benefits that the restructuring promises, the Debtors have no viable strategy to exit from chapter 11 or to escape liquidation.  They cannot require the debtor in possession lenders (collectively, the "***DIP Lenders***") to roll the debtor in possession financing facility into an exit facility, and have no access to cash to pay off such facility on the Effective Date, as required by the Bankruptcy Code; they also have no ability to require the Prepetition Secured Lenders to restructure their indebtedness on the terms set forth in the Plan or to cramdown a result on the Prepetition Secured Lenders that preserves value for Equity Security Holders.  Most importantly, without the participation of the Prepetition Secured Lenders and the DIP Lenders, the Debtors have no cash to continue operating and inevitably a liquidation of the Debtors' assets would occur.  In such a liquidation, the Debtors' creditors would suffer significant losses and Equity Security Holders would realize no value.

Thus, while the Debtors are sympathetic to the arguments raised by the two shareholder objections to the Plan, these arguments must be rejected, and the Plan confirmed, if the Debtors

are going to have any opportunity to reorganize.  Given the Debtors' capital structure, including

approximately $175 million in prepetition secured debt owed to the Prepetition Secured Lenders,

debtor in possession financing of $42.8 million to keep the Debtors' doors open, millions of

dollars of unsecured trade claims, and a deeply distressed shipping industry, the reality of the

Chapter 11 Cases is that the value of the Debtors' business does not support a full recovery to

their Prepetition Secured Lenders, much less to Equity Security Holders.  The further reality is

that, without the new debtor in possession financing and the agreement of the DIP Lenders and

the Prepetition Secured Lenders to roll that financing and their prepetition debt into post-

Effective Date exit facilities, the Debtors would quickly spiral into a straight liquidation that

would yield even less value for the Debtors' creditor constituencies.

      The Debtors' Plan enjoys overwhelming support from creditors at all levels.  Given its

level of support, it is not surprising that no creditor objected to the Plan.  Unhappy with the

reality that they were out of the money, two shareholders filed objections:  (a) the *Objection* of

Robert W. McReynolds, dated as of March 1, 2012 (the "**McReynolds Objection**") [Docket No.

104] and (b) the *Objection of Father Securities Ltd. and Maxim Naumov*[2] *To Disclosure*

*Statement and Joint Prepackaged Plan of Reorganization for the Debtors under Chapter 11 of*

*the Bankruptcy Code*, dated as of March 8, 2012 (the "**Father Securities Objection**" and,

collectively with the McReynolds Objection, the "**Objections**") [Docket No. 105].  The

Objections argue that (a) the Disclosure Statement lacks adequate information to support the

Debtors Liquidation Analysis; (b) the Debtors' assets are undervalued; (c) the Plan is not fair to

shareholders, provides overbroad and improper non-debtor release and exculpation protections,

---

[2]  For purposes hereof, "**Father Securities**" refers to both Father Securities Ltd. and Maxim Naumov.

and was not proposed in good faith; and (d) the objectors were not provided with adequate notice to respond.[3]

These arguments lack evidentiary or factual support, are refuted by the current record and are without merit. The short answer to each of these allegations is as follows:

- Inadequate Information: The Disclosure Statement provides more than adequate information to enable voting creditors to make a determination whether to accept or reject the Plan, including more than adequate information about the Debtors' prepetition unsuccessful efforts to explore other options and the unavailability of any feasible alternative other than liquidation. Testimony to the adequacy of the Disclosure Statement is that no member of a voting Class has objected to it. Moreover, under applicable case law, as a member of a non-voting Class of Interests, Father Securities lacks standing to object to the adequacy of the Disclosure Statement. Finally, the record establishes that the Liquidation Analysis is reasonable and relies on reasonable assumptions, all properly disclosed in the Disclosure Statement, which reflect the economic realities of the current shipping market;

- Best Interests Test: The evidence simply does not support the argument propounded by Father Securities regarding failure of the Best Interests Test. The record establishes that the Debtors, despite diligent effort by the Debtors and their financial advisors, have been unable to identify any restructuring alternative, other than the Plan, that allows preservation of going concern value. The Liquidation Analysis demonstrates that, in every reasonable liquidation scenario, liquidation provides substantially less recovery to creditors and no value to Equity Security Holders. On the other hand, Father Securities provides no evidence that a longer liquidation timeline would improve recoveries – an argument intensely disputed by the Debtors and their professionals – or that, even if liquidation values were increased via use of a longer liquidation timeline, the resulting increase in value would be sufficient to yield value to preferred much less common shareholders;

- Cram-down: The objectors' cramdown argument reflects a fundamental misunderstanding of the economic reality of the Debtors' financial predicament

---

[3] The McReynolds Objection also includes statements as to the 2011 Preferred Stock issuance and Mr. McReynolds' intention to file a complaint with the Securities and Exchange Commission. The Debtors submit that these are not objections to either the Plan or the Disclosure Statement and require no response from the Debtors here. At the same time, the Court should know that every common shareholder had the right to participate in the 2011 Preferred Stock issuance, neither of the objectors chose to participate, the 2011 Preferred Stock issuance raised over $10 million (substantially all of which was invested by the Debtors' management team) and, most importantly, the Plan does not provide for any recovery on that Preferred Stock investment, which itself has a priority over distributions to common shareholders.

and market conditions.  Market searches by the Debtors and their financial advisor, Lazard Freres & Co. ("*Lazard*"), confirm that there is no ongoing funding available for the Debtors to continue operating except the funding provided by the Prepetition Secured Lenders in the form of the exit facility and restructured senior debt facilities.  In the absence of this funding, the Debtors have no alternative but liquidation.[4]  In a liquidation, insufficient proceeds are available to pay in full the Prepetition Secured Lenders, much less more junior classes, such as unsecured claims, preferred stock and common stock;

- <u>Invalid Exculpation and Release</u>:  Contrary to the argument in the Objections, the third party releases included in the Plan are purely consensual and the other release, injunction and exculpation provisions comply with governing Second Circuit case law;

- <u>Good Faith</u>:  Father Securities' argument as to good faith is directly undermined by previous rulings of this Court, evidence regarding the Debtors' unsuccessful efforts to market their assets, evidence regarding the Debtors' good faith negotiations with the Prepetition Secured Lenders, and governing case law; and

- <u>Notice</u>:  Mr. McReynolds' assertions as to insufficient notice should be overruled because the Debtors' confirmation schedule and notice procedures complied with the Federal Bankruptcy Rules, the SDNY Prepack Guidelines (as defined below), and orders of this Court.

The reality, and the record of the Chapter 11 Cases, is that the Debtors, in consultation with their professional advisors, spent months leading up to the Petition Date negotiating at arms' length and in good faith with key stakeholders to pursue confirmation of a chapter 11 plan that achieves for the Debtors a viable and sustainable post-emergence capital structure.  In connection with those negotiations, the Debtors' financial advisor, Lazard, searched extensively, but unsuccessfully, for capital from sources other than the existing Prepetition Secured Lenders, and the Debtors and their advisors considered, but ultimately were unable to identify, alternative

---

[4]  Notably, Father Securities does not suggest that it or any other party is willing to provide funding to avoid liquidation.  If such funding is available, the Debtors would be happy to learn of it.  As the Court knows, the Debtors have retained a fiduciary out in the Plan Support Agreement, but it would be foolish, not to mention inappropriate, for the Debtors to exercise that fiduciary out in the absence of a binding, money good, commitment with respect to a better alternative.

restructuring scenarios that might generate more value for the Debtors' business, including value

that would inure to the benefit of the Equity Security Holders.

Facing tremendous cash, operational and time pressures, forbearances set to expire and a

shipping market that continued to erode, the Debtors and their Prepetition Secured Lenders were

able to reach consensus on an agreement that, with funding from the lenders, would preserve the

going concern value of the Debtors' business.[5]  The proposed restructuring, as memorialized in

the Plan, reflects a view shared by the Debtors and their lenders, and each of their respective

professionals, that going concern yields greater value than liquidation and that the value of the

Debtors' business directly correlates to the ability to maintain the support of the Debtors' major

vendors and customers.  The goal of the Chapter 11 Cases, therefore, has always been to

rationalize the Debtors' capital structure without impairing the Debtors' operations.  *See* Lepere

Declaration,[6] ¶ 60.  Ultimately, the parties reached agreement on (a) the current Plan which,

among other things, unimpairs General Unsecured Claims through the agreement of the

Prepetition Secured Lenders to allow value to be distributed on account of such Claims and (b)

an expedited confirmation process.  By emerging expeditiously from chapter 11, the Debtors will

---

[5]  Lazard has advised the Debtors for the reasons stated herein, that the only relevant valuation of the Debtors' business is the liquidation value.  However, Lazard has indicated that it believes that, in any event, the value of the Debtors on the Effective Date is far short of the claims of the Prepetition Secured Lenders and DIP Lenders.  Furthermore, any valuation must be based on the availability of the $42.8 million in additional financing that allowed the Debtors to continue in business during the Chapter 11 Cases and that will roll into an exit facility that will allow the reorganized Debtors to continue to do business after the Effective Date of the Plan.  For the reasons explained herein, this financing is only available in connection with the Plan, no alternative financing is possible and, without financing, the Debtors have no alternative but to liquidate, yielding even less value for creditors and none for Equity Security Holders.

[6]  The "**Lepere Declaration**" is the *Declaration of Ferdinand V. Lepere, Senior Executive Vice President of TBS International plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions and in Accordance with Local Rule 1007-2*, dated as of February 6, 2012 [Docket No. 23].

6

protect their brands, preserve jobs and maintain important trade and customer relationships that will influence the long-term viability of their business.

Everyone involved with the company wishes that there were more going concern value to preserve. However, there is not, and the objections do not provide any factual or legal basis to deny approval of the Disclosure Statement or confirmation of the Plan. Lacking factual evidence that value exists for Equity Security Holders, the objectors resort to unsubstantiated valuation arguments and general assertions of bad faith, all in a desperate effort to de-rail the Debtors' progress towards exit from chapter 11 pursuant to the Plan. In the context of a consensual restructuring where the Prepetition Secured Lenders are impaired and unwilling to agree that value can be distributed to old Equity Security Holders and the only feasible alternative to the Plan is a liquidation of the Debtors, the Objections must be denied.

## ARGUMENT

## I. THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" AND SHOULD BE APPROVED

1. Father Securities objects to the Disclosure Statement on the basis that it fails to provide "adequate information" in violation of section 1125(a) of the Bankruptcy Code. In support of this objection, Father Securities argues that the Disclosure Statement, among other things, fails to demonstrate (a) why the Plan is a better alternative to a structured liquidation under chapter 11, (b) why no meaningful alternatives were presented, and (c) why no marketing process was undertaken with respect to the Debtors' assets. Without pursuing such alternatives, Father Securities argues that the Debtors have essentially breached their duty to creditors and Equity Security Holders by engaging in a "fire sale". Father Securities Objection ¶ 15. This argument has no basis in law or fact and is without merit.

### A. The Disclosure Statement Does Contain Sufficient Information.

7

2.      The Disclosure Statement contains more than sufficient information to enable
voting creditors to make the determination whether to accept or reject the Plan.  Section 1125 of
the Bankruptcy Code requires Debtors to provide "information of a kind, and in sufficient detail,
as far as is reasonably practicable in light of the nature and history of the debtor and the
condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of
the relevant class to make an informed judgment about the plan".  11 U.S.C. § 1125(a)(1).  The
Disclosure Statement provides all of the information necessary for a reasoned judgment by
creditors.  This is demonstrated most starkly by the fact that no creditor filed an objection to the
sufficiency of the Disclosure Statement.

3.      Moreover, the Debtors take strong issue with the assertion that their assets are
being sold at a fire sale.  No reasonable person can read the Disclosure Statement, with its
lengthy explanation of the current shipping market, the Debtors' financial difficulties, the efforts
the Debtors expended to identify other alternatives and the negotiations and issues that led to the
Plan, and conclude that the Debtors' engaged in a fire sale.  In fact, the very parties who engaged
in those negotiations on behalf of the Debtors, the Debtors' management team, have substantially
more to lose from the restructuring than does Father Securities.  They own virtually half of the
common stock of the Debtors, and will receive no distribution under the Plan on account of that
ownership.  They also very recently invested over $10 million to purchase Preferred Stock in the
Debtors which, also, will receive no distribution under the Plan.  It is nonsensical to contend that
management had, but did not pursue, a feasible alternative that would have allowed them to
generate value for Equity Security Holders and, thereby, recoup their very substantial equity
investment in the Debtors.  The reality is that the Plan is not only a better alternative to
liquidation but the only available one.

8

**B.** **Father Securities Does Not Have Standing to Challenge the Adequacy of the Disclosure Statement**

4.        Separate from whether the Disclosure Statement is adequate, Father Securities has no basis upon which to challenge the Disclosure Statement.  The purpose of any disclosure statement is to provide creditors entitled to a vote with sufficient information to make an informed decision.  *In re Babayoff*, 445 B.R. 64, 78 (Bankr. E.D.N.Y. 2011) ("The disclosure statement is necessary to provide creditors with sufficient information to enable them to cast an informed vote on the plan."); *In re Ferretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991) ("The purpose of a disclosure statement is to provide 'adequate information' to creditors to enable them to decide whether to accept or reject the proposed plan.").  Creditors who receive nothing under a proposed plan are deemed to reject the plan and therefore are not entitled to vote.  11 U.S.C. § 1126(g).

5.        Courts have determined that creditors that cannot vote on a plan of reorganization do not have standing to challenge the adequacy of the disclosure statement.  *See In re Zenith Electronics Corp.*, 241 B.R. 92, 98 -99 (Bankr. D. Del. 1999) (finding that equity holders who receive no value under a plan do not have standing to challenge the adequacy of the disclosure statement); *In re Middle Plantation of Williamsburg, Inc.*, 47 B.R. 884, 891 (D.C. Va. 1984) (stating that "holders of impaired claims who have been induced to vote in favor of a plan are the only ones who may raise the issue of the adequacy of the Disclosure Statement.").  Indeed as one court accurately noted:

> There is a compelling logic behind this view of standing to object to the disclosure statement. The bankruptcy process, by its very nature, requires all interested parties to practice self-preservation. If a creditor does not press his claim, then all other creditors and the estate benefit from the larger pool of assets available to meet other claims. The onus is therefore on the creditors to assure that the disclosure statement is satisfactory to them, as they will be the only ones hurt

9

by a statement's inadequacy as to them. Other classes of creditors should therefore
have no concern over the adequacy of a statement that does not apply to them.

*Matter of Snyder*, 56 B.R. 1007, 1010 -1011 (N.D. Ind.1986).  The sufficiency of a disclosure

statement as to a party without the right to vote is irrelevant.

6.      Here, as noted above, all classes of creditors entitled to vote were solicited shortly

before the Petition Date, and such classes voted overwhelmingly to approve the Plan.  Only one

creditor entitled to vote, actually voted to reject the plan.  *See Declaration of Craig E. Johnson of*

*The Garden City Group, Inc. Certifying (I) Methodology for the Tabulation of Votes on Joint*

*Prepackaged Plan of Reorganization of TBS Shipping Services Inc. and its Affiliates and (II)*

*Voting Results* [Docket No. 96].  Moreover, no creditor objected to, or otherwise raised issue

with, the sufficiency or adequacy of the information contained in the Disclosure Statement.

7.      The Equity Security Holders, meanwhile, stand to receive nothing under the Plan,

and are, therefore, deemed to have rejected it.  *See* Plan § 4.11.  *In re Zenith Electronics Corp.*

confirms that, in this situation, Equity Security Holders (here, including the objectors), do not

have standing to challenge the adequacy of the Disclosure Statement.

**C.      The Debtors' Liquidation Analysis Provides Adequate Support for the Plan**

8.      Father Securities argues that the Liquidation Analysis (annexed as <u>Exhibit B</u> to

the Disclosure Statement and <u>Annex A</u> hereto) provides an "artificially depressed valuation" and

that a structured, going concern liquidation under chapter 11 would provide greater value.  This

argument is both wrong and uninformed.

9.      First, a 60-day liquidation under chapter 7 is presented as the only alternative to

the Plan, because no other viable alternative exists.  As stated in the Lepere Declaration, the

Debtors limped into bankruptcy, with only $3 million in cash on hand.  Lepere Declaration Ex.

A, ¶ 89.  Meanwhile, the Debtors face an increasingly hostile shipping market, where daily

shipping rates and demand are severely depressed and operating costs, particularly fuel, continue
to escalate.  And, there are no signs that the shipping market will change any time soon.

10.     A prolonged chapter 11 process is simply not an option.  Abandoning the Plan
constitutes a breach of the Plan Support Agreement and a basis for termination of the debtor in
possession financing.  *See* BOA/DVB DIP Facility Agreement § 8.01(u), Credit Suisse DIP
Facility Agreement § 18.1(f).  What is painfully clear from the efforts of the Debtors and their
financial advisors before the filing of the Chapter 11 Cases is that, based on the above conditions
faced by the Debtors, there is no other source of new money to support a lengthy chapter 11
process.  Notably, no such alternative source has emerged during the Chapter 11 Cases either,
and the objectors have neither offered to provide, nor offered an available source for, such
financing.  Even more clear is that every day that the Debtors expend in chapter 11 reduces the
value of the Debtors' business.  While many companies might be able to thrive in chapter 11, the
Debtors' experience is that their customers, by and large, have taken a wait and see approach
with some key customers indicating that they would not resume shipments with the Debtors until
they emerge from chapter 11.  Without those customers, the Debtors' business model is sorely
taxed, and this can only be reversed through rapid emergence from chapter 11, not through a
protracted chapter 11 case.  The longer the Debtors remain in chapter 11, the more revenue they
will lose and the more likely a chapter 7 liquidation becomes.  By contrast, the objectors
desperately need a home run strategy to create value for Equity Security Holders, and any such
home run strategy requires the Debtors to stay in business long enough for shipping markets and
rates, which show no immediate signs of recovery, to recover.  The Prepetition Secured Lenders,
and the DIP lenders, will not allow their capital to be used to fund a miraculous turnaround that

benefits Equity Security Holders.  Lacking necessary funds, it is not only impossible but imprudent for the Debtors to pursue a home run strategy.

11.     As the Liquidation Analysis demonstrates, a chapter 7 or 11 liquidation, far from creating value for Equity Security Holders, is the worst result for all constituencies.  First, the Debtors' primary assets are vessels, which even when they are at anchor, carry heavy carrying costs related to fuel, crew, insurance, capital maintenance expenditures, and administrative overhead.  In a liquidation scenario, the only funds available are those generated from vessel sales as there is no voyage revenue and no debtor in possession financing available.  As the Debtors cannot pay the carrying costs of their vessels in this scenario, it is critical that the vessels be sold as soon as possible.  Yet, dumping 41 vessels on an already over-saturated market will result in an extremely low return.  This will substantially lower returns for the Prepetition Secured Lenders, and it will certainly not generate value for Equity Security Holders who would be even further out of the money.

12.     The Debtors' negotiations regarding the Plan occurred against the backdrop of the disastrous shipping market, their immediate need for cash, the impossibility of prolonged chapter 11 cases and the reduced value associated with liquidation of the Debtors' assets.  The sole reason that the Debtors have been able to avert liquidation is their access to the debtor in possession financing which no party, other than the DIP Lenders, was willing to provide.  The $42.8 million of debtor in possession postpetition financing (with below market rates and terms) not only allows the Debtors to maintain their assets during the cases, but its convertibility on the Effective Date into advantageous exit financing allows the Debtors to emerge from chapter 11. The Plan, in fact, is premised on the availability of such financing at the onset of the Chapter 11

Cases and its conversion to exit financing at the conclusion. Absent the infusion of postpetition

financing,[7] the Debtors' business would have failed for the following reasons:

(a) First, foremost and last, the Debtors would have run out of cash. As found by this Court in its DIP Orders,[8] the credit provided pursuant to the BOA/DVB DIP Facility and the Credit Suisse DIP Facility (together the "*DIP Facilities*") has been critical in order to enable the Debtors to continue operations and to administer and preserve the value of their Estates and Assets;

(b) The Debtors would have been unable to pay critical vendors and foreign creditors, whose support is critical to the success of the Debtors' business, and assure customers and employees that they should continue to work for and entrust their shipments to the Debtors;

(c) The Debtors would have had insufficient funds to confirm a plan of reorganization that allowed the Debtors to emerge from chapter 11. In this regard, there are significant costs associated with the Debtors' proposed emergence from chapter 11 (*e.g.* payment of Administrative Expense Claims, Professional Compensation Claims, priority claims and General Unsecured Claims). The terms of the debtor in possession financing, which rolls into exit facility, makes payment of these costs possible;

13. Father Securities' argument that the Debtors' failed to undertake any "sale

process" is extremely naïve and simply not true. It is naïve because it fails to recognize that the

world is in the midst of a global shipping crisis where vessels are selling at record low prices

---

[7] It is also relevant to note that there is a considerable degree of urgency associated with confirmation of the Plan. Pursuant to the DIP Facilities, the debtor in possession financing may be terminated as soon as April 7, 2012 if a Plan is not confirmed.

[8] The "*DIP Orders*" are (a) the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Superpriority Financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(a), 364(d) and 364(e), (B) Authorizing the Debtors' Use of Cash Collateral pursuant to 11 U.S.C. § 363, (C) Granting Liens and Superpriority Claims to DIP Lenders pursuant to 11 U.S.C. § 364, (D) Providing Adequate Protection pursuant to 11 U.S.C. § 361, 362, 363 and 364, and (E) Modifying the Automatic Stay* [Docket No. 75] and (b) *Final Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing the Debtors to Obtain Postpetition Superpriority Financing from Credit Suisse as DIP Lender, (II) Authorizing the Debtors To Use of Cash Collateral of, and Provide Adequate Protection to, Credit Suisse as Prepetition Lender, (III) Granting Liens and Superpriority Claims to Credit Suisse as DIP Lender and (IV) Modifying the Automatic Stay* [Docket No. 89].

and, due to various factors described in the Disclosure Statement and in the Lepere Declaration, there is too little demand and an excess supply of vessels. These dynamics are not factored into Father Securities' unsubstantiated conclusion that a sale process would have yielded value sufficient for a recovery for Equity Security Holders. Moreover, as the record clearly reflects, beginning in June 2011, the Debtors and Lazard aggressively marketed the Debtors' assets, canvassing the capital markets for additional sources of equity and/or debt capital. Lepere Declaration Ex. A, ¶ 88. During the prepetition marketing period, the Debtors received no offers for equity financing and no offers for debt financing on terms that were not acceptable to the Debtors and the Prepetition Secured Lenders. Given their inability to raise additional capital on acceptable terms, it became clear that the Debtors would need to negotiate the internal restructuring that led to the Plan. Lepere Declaration Ex. A. ¶ 89.

II.  **THE PLAN OF REORGANIZATION SATISFIES THE BEST INTERESTS TEST WITH RESPECT TO EQUITY INTERESTS BECAUSE HOLDERS OF EQUITY INTERESTS WOULD RECEIVE NO RECOVERY IN A LIQUIDATION SCENARIO**

14.  Father Securities next objects to the Plan on the basis that it violates section 1129(a)(7) of the Bankruptcy Code (the best interests test). In particular, Father Securities asserts that the Debtors' alleged failure to "market test" their assets has resulted in undervaluing available asset sale proceeds in a hypothetical chapter 7 liquidation. Father Securities Objection ¶ 20. This argument is directly rebutted by available facts, is without merit, and should be overruled.

15.  As an initial matter, as discussed above, Father Securities' assertion that the Debtors failed to market test the proposed restructuring is rebutted by facts already on the record.

16.  The Liquidation Analysis further demonstrates that in both "high" and "low" scenarios, equity would receive no recovery. The aggregate value of the Debtors' assets in a

liquidation is insufficient to satisfy prepetition secured financial debt Claims (for which TBS International plc is jointly and severally liable), Administrative Expense Claims, priority claims, chapter 7 expenses, General Unsecured Claims and Preferred Stock, all of which must be paid before common shareholders would be entitled to a recovery.   In the high recovery scenario, total projected claims amount to $212 million while $122 million of net proceeds are available for distribution, resulting in an unrecovered shortfall of $90 million to creditors.  In the low recovery scenario, total projected claims amount to $212 million while only $95 million of net proceeds are available for distribution, resulting in an even greater unrecovered shortfall of $117 million to creditors.  And, neither of these scenarios considers that, before common shareholders receive a dime, preferred shareholders must be paid their $10+ million liquidation preference.

17.    Bottom line, none of the liquidation scenarios show any possibility of recovery to Equity Security Holders.  To the contrary, these scenarios show that liquidation adversely affect creditors.  In the high recovery scenario, projected recoveries for Prepetition Secured Lenders range from a low of 56% (for DVB Syndicate Claims) to a high of 86% (for AIG Claims).  In the low recovery scenario, that projected range drops to 39% (for DVB Syndicate Claims) and to 65% (for AIG Claims).  General Unsecured Claims also fair far worse in a liquidation. Unsecured creditors are projected to receive a 22% recovery in the high recovery scenario and an 18% recovery in the low recovery scenario.

18.    Father Securities has not, and frankly cannot, produce evidence that a liquidation would yield recoveries to Equity Security Holders.  Rhetoric, rather than evidence, supports the allegation that the Liquidation Analysis "severely undervalues" liquidation proceeds; rhetoric has no evidentiary value and should be disregarded.  Moreover, there is no evidence that, even if the liquidation values were increased, the increase in value would be sufficient to yield value for

15

common shareholders after payment in full of all creditors, plus the $10+ million liquidation

preference of the preferred shareholders.

19.     For these reasons, Father Securities' argument that the Debtors have failed to

satisfy the best interests test under section 1129(a)(7) is utterly without merit and should be

overruled.

**III.    THE PLAN OF REORGANIZATION SATISFIES THE FAIR AND EQUITABLE REQUIREMENT OF SECTION 1129(B) BECAUSE SECURED CREDITORS ARE NOT RECEIVING MORE THAN PAYMENT IN FULL AND NO JUNIOR CLASS IS RECEIVING VALUE**

20.     Father Securities argues that the Plan is not fair and equitable because the Plan

"enables creditors and insiders to receive significantly more than they are entitled to" and

because the Debtors did not ascribe a "true enterprise value" to the consolidated enterprise.

Father Securities Objection ¶ 23.  This objection is without merit and should be overruled.

21.     For a plan to be fair and equitable with respect to an impaired class of interests

that rejects (or is deemed to reject) the plan, the plan must comply with the absolute priority rule

and satisfy the requirements of section 1129(b)(2) of the Bankruptcy Code.  11 U.S.C.

§ 1129(b)(2).

22.     Father Securities' objection ignores economic reality.  The Prepetition Secured

Lenders have a security interest in all of the Debtors' assets, and the claims of these Lenders are

impaired.  While they receive debt with a nominal face amount equal to their prepetition debt,

the actual value of that debt is substantially lower than face because the restructured debt carries

far below market terms – low interest rates, the ability to pay interest in kind, minimal covenants,

to name just a few.  The equity that the Prepetition Secured Lenders receive in New TBS Parent

is valuable only if the reorganized Debtors remain operational long enough to benefit from a

reversal in the shipping industry; it has no value on the Effective Date of the Plan.  Moreover,

16

whatever value is preserved under the Plan derives from the willingness of the Prepetition

Secured Lenders to enter into the restructuring and provide essential debtor in possession

financing.  Unsecured creditors are only receiving distributions under the Plan because the

Prepetition Secured Lenders recognize that, without the support of the Debtors vendors and

customers, there is no business of the Debtors to save.  By contrast, Holders of Series A and

Series B Preferred Stock will receive no distribution under the Plan.

23.     The economic reality is that there is no value available for Equity Security

Holders.  Far from providing the Prepetition Secured Lenders with greater than 100% recoveries,

these lenders are impaired under the Plan.  It is axiomatic in chapter 11 that creditors must be

paid in full before equity holders receive anything, unless creditors consent to give up value to

equity.  Here, the Prepetition Secured Lenders are unwilling to give up value to equity and

provided funding to the Debtors to avoid suffering even greater losses.  Without this new money,

the Debtors would be liquidated, there would be even less value for the Prepetition Secured

Lenders, and the Equity Security Holders would be even further out of the money.

24.     Father Securities' argues that the Debtors fail to provide a "true" enterprise value

for the Debtors.  The Debtors do not understand this argument.  After reviewing all available

alternatives in the marketplace, the Debtors negotiated the terms of the Plan.  The Debtors

believe the proposed transaction generates the maximum value of the Debtors' business.  The

alternative to the Plan is a liquidation which yields even less value.  If Father Securities has a

definitive proposal which it believes is feasible and will generate more value, it should

immediately make this proposal (and its committed financing) known to the Debtors, and Father

Securities should clearly provide how this proposal will fund repayment in full of the claims and

interests entitled to be paid ahead of Father Securities, including the debtor in possession

financing, the amounts owed to the Prepetition Secured Lenders, the unsecured creditors and the

preferred shareholders.  While the Debtors can entertain this proposal under the provisions of the

Plan Support Agreement,  Plan Support Agreement § 2(g), they highly doubt that Father

Securities can offer a better alternative and, in fact, has not done so at this point. In this regard, it

is important to note that, on the Petition Date, potential investors interested in purchasing the

Debtors' assets had immediate access to the terms of Plan, the Disclosure Statement and the Plan

Support Agreement.  Yet, no alternative offer whatsoever materialized, much less an offer that

provided value to Equity Security Holders.  Indeed, to date, the Debtors, with assistance from

Lazard and AlixPartners, two of the premiere financial restructuring and turnaround firms in the

world, have not been able to identify any alternative, whether in the form of an internal

restructuring or a third party sale, that would generate more value than the Plan, much less

positive equity value.  *In re Granite Broadcasting Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y.

2007) ("there is no dispute that in many circumstances the best evidence of value is what a third

party is willing to pay in an arm's length transaction.").

25.     There is no violation of the absolute priority rule here.  Each of the impaired

Classes under the Plan voted overwhelmingly to accept the Plan.  No holder of a Claim or

Interest junior to the objectors' common stock will receive any recovery under the Plan on

account of such Claim or Interest.  This is precisely the result that application of section 1129(b)

of the Bankruptcy Code requires.

## IV.    THE PLAN'S RELEASE AND EXCULPATION PROVISIONS ARE IN ACCORDANCE WITH APPLICABLE LAW AND SHOULD BE APPROVED

26.     Father Securities objects to the Plan on the basis that its release, exculpation and

injunction provisions violate applicable bankruptcy law.  Father Securities Objection ¶¶ 24-31.

Specifically, Father Securities argues that these provisions impermissibly shield non-debtor third

18

parties from liability without adequate consent.  Not only does Father Securities not have standing to raise this argument, but it is without merit.

27.     The third party release in section 9.2.3 of the Plan is a valid consensual third-party release given only by voting creditors who chose not to opt out of the release provision in the Plan.  As no third party release is sought from, nor given by, Father Securities, Father Securities has no standing to raise the third party release argument.  In short, only a party adversely impacted by the release has standing to object to it.  Father Securities is not subject to the third party release and has no standing.  The parties who have given the third party release have not raised it.

28.     Putting aside the standing question, it is clear that in the Second Circuit, third party releases are permissible where the affected creditors provide their consent. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent."); *In re DBSD N. Am., Inc. (DBSD)*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (observing that third party releases may be used "if the affected creditors consent").  Consent to third party releases, contrary to the argument raised by Father Securities, can in fact be established where a creditor does not affirmatively opt out of the release provision, provided that they "were given adequate notice that they would be granting the release by acting in such a manner." *DBSD*, 419 B.R. at 218 (*citing In re Calpine Corp.*, 2007 Bankr. LEXIS 4390, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 17, 2007)); *See also In re Almatis B.V.*, Case No. 10-12308 (MG) (Bankr. S.D.N.Y. September 20, 2010) [Docket No. 444] (confirming plan and holding that third party release provision that required holders of claims to opt out was in the best interests of the Debtors and their estates and was not forbidden by law).

29.     Here, the third-party release was consensual and in conformity with prevailing Second Circuit law because the release was only given by those who actually voted on the plan and chose not to opt out of the release.  Moreover, the Plan, the Disclosure Statement, and each Ballot clearly identified in bold typeface the procedure for opting out of the third-party release and notified creditors that if they voted on the Plan and did not opt out of the release provisions they would be deemed to have forever released and discharged all claims and causes of action against the Released Parties.  No voting creditor opted out of the third-party releases.

30.     Further, courts in this District have approved third-party releases similar to the one provided in section 9.2.3 of the Plan.  *See*, *e.g.*, *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (approving a third-party release provision which released, among others, the debtors and the debtors' officers and directors as well as "the Prepetition Agent [and] all Prepetition Lenders…and each of the foregoing Entities' or Persons' respective officers, directors, employees, partners, members, attorneys, financial advisors, accountants, investment bankers, agents, representatives and professionals" over an objection raised (though apparently not pursued) by the equity committee); *In re DJK Residential LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving a third-party release provision that released, among many others, "the New Credit Facility Agent, the New Credit Facility Lenders, the Second Lien Credit Facility Agent, and the Second Lien Facility Lenders…the Prepetition Agent and the Prepetition Lenders…LaSalle Bank, in its capacity as agent under the Receivables Sale agreement, and the other purchasers party to the Receivables Sale Agreement…."); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395 (BRL), 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (approving a third-party release provision that released, among others, "the Holders of Prepetition Lenders Claims and the agents under the Prepetition

Credit Agreement…the Prepetition Senior Notes Indenture Trustee and each Prepetition Senior

Noteholder…the Prepetition Senior Subordinated Notes Indenture Trustee and each Prepetition

Senior Subordinated Noteholder…each Backstop Party…the Prepetition Noteholders

Committee… [and] the New Investors"). Accordingly, the third-party release is appropriate

under applicable case law.

31.     Similarly, courts in this District have approved exculpation clauses where, as

here, relevant third parties are included who are either indemnified by the debtors or provided

substantial consideration to the reorganization. *In re DJK Residential LLC*, No. 08-10375

(Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that

included the "New Credit Facility Agent, the New Credit Facility Lenders, the Second Lien

Credit Facility Agent, and the Second Lien Facility Lenders…the Prepetition Lenders…LaSalle

Bank, in its capacity as agent under the Receivables Sale agreement, and the other purchasers

party to the Receivables Sale Agreement…[and] such Entities' subsidiaries, affiliates, officers,

directors, principals, employees, agents, financial advisors, attorneys, accountants, investment

bankers, consultants, representatives, and other Professionals"); *Bally*, 2007 WL 2779438, at *8

(approving an exculpation provision that exculpated, among others, "the Holders of Prepetition

Lenders Claims and the agents under the Prepetition Credit Agreement…the Prepetition Senior

Notes Indenture Trustee and each Prepetition Senior Noteholder…the Prepetition Senior

Subordinated Notes Indenture Trustee and each Prepetition Senior Subordinated

Noteholder…each Backstop Party…the Prepetition Noteholders Committee…[and] the New

Investors"). Here, each of the Exculpated Parties has either been indemnified by the Debtors for

the claims that are exculpated or has contributed substantial consideration to the reorganization

effort; *In re Almatis B.V.*, Case No. 10-12308 (MG) (Bankr. S.D.N.Y. September 20, 2010)

[Docket No. 444] (approving exculpation provision that provided protection to "the Debtors, the Estates, DIC, the DIC Investor, the Security Trustee, the Mezzanine Agent, the Second Lien Lenders, the Mezzanine Lenders, the Junior Mezzanine Lenders, the Senior Secured Noteholders, the Revolving Credit Parties, Oaktree . . .").

32.     Finally, Section 9.2.5 of the Plan is an injunction provision relating to the release and exculpation provisions and should be approved as such.  The injunction provision here is necessary to preserve and enforce the debtor release, the third-party release and the exculpation. In compliance with Bankruptcy Rule 3016(c), the Disclosure Statement states in bold letters all acts to be enjoined and identifies all entities that would be subject to the injunction.  The applicable release, exculpation, and injunction provisions are clearly identified in the Plan and Disclosure Statement, are displayed in bold font, and specifically identify all acts to be enjoined and all entities that would be subject to the injunction.  Arguments that these provisions are vague, overbroad or invalid are wholly without merit.

## V.     THE PLAN WAS PROPOSED IN GOOD FAITH

33.     Father Securities further objects to the Plan on the basis it violates section 1129(a)(3) of the Bankruptcy Code, which requires that a plan of reorganization be proposed in "good faith."  Father Securities Objection ¶ 32.  Specifically, Father Securities alleges that the Plan (a) undervalues the post-emergence entity and thereby, provides a windfall to a few select creditors; (b) provides disparate treatment to similarly situated equity holders; and (c) through the New Management Incentive Plan overcompensates management.  These arguments are without merit and should be overruled.

34.     To meet the good faith standard, the Second Circuit has required only that the Debtors or plan proponents make a showing that "the plan [was] proposed with honesty and

good intentions and with a basis for expending that a reorganization can be effected." *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988); *see also Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 765 (1st Cir. 1983) (a plan "must bear some relation to the statutory objective of resuscitating a financially troubled corporation"). There is ample evidence on the record as to the Debtors good intentions in filing the Plan and a basis for seeking the proposed restructuring to support a finding of good faith.

### A.  The Valuation of the Debtors Was Completed in Good Faith

35.    As an initial matter, this Court's February 28, 2012 order approving the Debtors' assumption of the Plan Support Agreement (the "***Plan Support Agreement Order***") [Docket No. 80] directly supports a finding of good faith here. The Plan Support Agreement constitutes a central component of the proposed restructuring and obligates the Debtors and the Supporting Prepetition Lenders (as defined in the Plan Support Agreement) to support confirmation of the Plan (subject to the Debtors' fiduciary out, as described above), which Plan is to be materially consistent with the term sheets attached to the Disclosure Statement, including the New Management Incentive Plan Term Sheet. *See* Plan Support Agreement Arts. 2-3. Postpetition, the Debtors sought and received permission from this Court to assume the Plan Support Agreement. In the Plan Support Agreement Order, this Court found that such assumption constituted "a sound exercise of [the Debtors'] sound business judgment" and was "consistent with [the Debtors'] fiduciary duties." Plan Support Agreement Order ¶ A. Further, the Court found that the Plan Support Agreement was "fair and reasonable" and was "negotiated at arm's length and in good faith." *Id* at ¶ B.

23

36.     The preceding paragraphs of this Reply rebut Father Securities' objections as to the Debtors' "true enterprise value."  Those paragraphs describe how the Debtors and their advisors market tested the Debtors' assets prepetition and were unable to identify any alternative proposal, whether an internal restructuring or a third party transaction, that generated equity value.  To date, the Debtors have received no third party proposal or indication of interest suggesting the existence of equity value.

37.     A brief review of the Debtors' prepetition negotiations with their lenders also undermines any assertion that the Plan as proposed undervalues the Debtors' assets.  Since 2009, the Debtors have struggled to maintain compliance with the terms of their secured debt facilities.  Prepetition, the Debtors pro-actively negotiated a series of out-of-court amendments to avoid default, many of which directly concerned the lagging value of the Debtors's assets.  In particular, in May 2010, the Debtors obtained waivers for their failure to comply with collateral coverage requirements <u>and</u> ultimately amended the loan documentation to eliminate minimum consolidated tangible net worth requirements.  Eight months later, the credit documents were restated to amend financial covenants.  Finally, in late 2011, the Debtors were forced to seek forbearances because of their inability to comply with principal amortization schedules.  Only through the restructuring contemplated by the Plan can the Debtors feasibly reorganize and maximize whatever value is available for creditors given the dire condition of the shipping industry.

38.     Finally, the argument that the Plan seeks to benefit a few select creditors overlooks a key component of the Plan, the unimpairment of <u>thousands</u> of general unsecured creditors and the payment of many such creditors with the proceeds of the BOA/DVB DIP

24

Facility. Secured creditors are directly financing the Debtors' efforts to maintain the strength of their customer and vendor relationships.

### B. The Plan Complies with Section 1123(a)(4) of the Bankruptcy Code

39. Although the objection by Father Securities alleges that the Plan is submitted in bad faith because it violates section 1123(a)(4) of the Bankruptcy Code, there is no discussion why the Plan violates such section. In fact, there is no credible argument that the Plan violates section 1123(a)(4). Similarly situated Claims and Interests in each of the Debtor's estates are classified and treated similarly. There is no provision of disparate treatment to any class of creditors or Interests. Accordingly, section 1123(a)(4) is satisfied and any objection based on or asserting a violation of section 1123(a)(4) should be overruled.

### C. The New Management Incentive Plan Is a Product of the Debtors' Good Business Judgment and Arm's Length Negotiations

40. Continuation of the Debtors' existing management team is essential to the success of the Debtors' reorganization efforts and a central component of the Plan. Indeed, the customer, vendor and other shipping contacts and relationships cultivated over many years by the management team are cornerstones of the Debtors' business, and the management team has the confidence and respect of the Debtors' employees, customers, vendors and the Prepetition Secured Lenders. To ensure the continued participation of the management team, the lender parties to the Plan Support Agreement insisted that the members of the management team execute the Plan Support Agreement and agree to enter into employment contracts binding them to provide their knowledge and expertise to the reorganized Debtors. The New Management Incentive Plan (the "*MIP*") is a normal outgrowth of employment of a senior management team. The MIP was negotiated at arm's length and in good faith by and among the Prepetition Secured Lenders under the BOA and DVB credit facilities (the "*Future Lender Owners*") and the

25

existing management team.  The goal of the MIP, similar to the goal of countless management incentive plans put in place every single day in the business world, is to align the interests of management with those of the Future Lender Owners.  That is precisely what the MIP accomplishes and it does so by providing the management team with a reasonable initial interest in the reorganized Debtors (10%).  This is a reasonable initial equity percentage to provide to management.  *In re Elec. Components Intern. Inc.*, 2010 WL 3350305, *18 (Bankr. D. Del. May 11, 2010).[9]  The initial shares issued to management are subject to a $500,000 liquidation preference in favor of the shares issued to the Future Lender Owners.  In addition, the issuance of additional shares to management is contingent on the prepayment of the reorganized Debtor's secured indebtedness before it is due.  *See* Disclosure Statement Ex. M.

41.     Further, awards under the MIP come at the expense of the Future Lender Owners, not the existing Equity Security Holders.  As part of the restructuring, the Future Lender Owners agreed to restructure the obligations owed to them by the Debtors and accept below market interest rates and other contractual terms.  These below market rates and other terms create a clear financial incentive for the Future Lender Owners to link early repayment of this below market debt with the issuance of additional shares to management, diluting the Future Lender Owners' ownership of the company.  The equity grants under the MIP incent management to work to prepay this debt using specific repayment milestones.

---

[9] The MIP provides for management to receive additional equity in the reorganized Debtors provided that certain performance targets are satisfied.  These targets are, by no means, readily achievable.  In effect, the targets are only achieved if the reorganized Debtors pay off certain amounts of their debt <u>before</u> that debt is due.  Moreover, even when a target is met, 50% of the additional equity is deferred until all of the reorganized Debtors' debt is repaid.

42. Finally, the case on which Father Securities' relies, *In re Granite Broadcasting Corp.*, 369 B.R. at 138, to oppose the MIP, actually supports the MIP. In *Granite Broadcasting*, the Court found that an insider's negotiation of compensation and benefits in a restructuring did not comprise bad faith, in part because the Plan was "overwhelmingly approved by the Secured Noteholders, who will hold equity." *Id.* Such rationale, founded in the notion that the Future Lender Owners have determined that it is in their best interest to engage existing management to maximize the ongoing value of the business, is equally true here.

43. For the foregoing reasons, all assertions of bad faith should be overruled.

## VI. THE OBJECTORS RECEIVED ADEQUATE NOTICE OF THE COMBINED HEARING

44. Finally, in the McReynolds Objection, Mr. McReynolds asserts that the Debtors provided inadequate notice of the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**"). The Debtors sympathize with Mr. McReynolds. However, the expedient nature of the Chapter 11 Cases is structured to minimize their impact on the Debtors' business and operations. Moreover, the notice provided to Mr. McReynolds and others complies with the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and this Court's *Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York* (General Administrative Order 387) (the "**SDNY Prepack Guidelines**") and *Order (A) Scheduling a Combined Hearing To Consider the Adequacy of the Disclosure Statement and Confirmation of the Plan; (B) Establishing Deadlines and Procedures To File Objections; (C) Approving the Form and Manner of the Notice of Combined Hearing; and (D) Directing the United States Trustee Not To Convene a Meeting of Creditors or Equity Security Holders and Not To Appoint any Statutory Committee* [Docket No. 42] (the "**Scheduling Order**").

27

45.     Bankruptcy Rules 2002(b) and 3017(a) provide that parties in interest should generally be given at least 28 days' notice prior to a disclosure statement hearing and a confirmation hearing.  However, the SDNY Prepack Guidelines indicate that in prepackaged cases where key constituencies have been provided with copies of the plan and disclosure statement prior to the petition date, notice of the combined hearing only needs to be mailed 21 days prior to the combined hearing date.  *See* SDNY Prepack Guidelines ¶ X.D.

46.     GCG, Inc., the Debtors' claims and noticing agent, served the Court-approved notice of the Combined Hearing on February10, 2012, a full 35 days prior to the initially scheduled Combined Hearing (and 47 days prior to the currently scheduled Combined Hearing). On the Petition Date, the Debtors filed their Plan and related Disclosure Statement and made them available via the Debtors' claims and noticing website, www.tbsrestructuring.com.  The Combined Hearing notice directed recipients that they could obtain copies of the Plan and Disclosure Statement at such restructuring website.  Accordingly, notice of the Combined Hearing complied with applicable law.  Moreover, the Debtors' notice procedures were explicitly approved by this Court in the Scheduling Order.

47.     For the foregoing reasons, all objections as to the Debtors' failure to provide adequate notice are unfounded and should be overruled.

## CONCLUSION

For the reasons set forth herein, the Debtors submit that the Plan and the Disclosure Statement fully satisfy requirements of the Bankruptcy Code and respectfully request that this Court overrule the objections.

Dated: New York, New York
      March 12, 2012

GIBSON, DUNN & CRUTCHER LLP

/s/ Michael A. Rosenthal

Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION

Case 1:18-cv-04363-GBD-BCM    Document 70-2    Filed 10/01/19    Page 30 of 39

# ANNEX A

# THE LIQUIDATION ANALYSIS

**TBS International plc - Consolidated**

### Table I: Assets Available for Distribution

| ($ in 000's) | Global Notes | Unaudited Balances (i) Nov 30, 2011 | Estimated Asset Realization Percentage | | Hypothetical Liquidation Values | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **Cash & Cash Equivalents** | A | | | | | |
| Cash & Cash Equivalents (Unrestricted) | | $ 7,699 | 100% | 100% | $ 7,699 | $ 7,699 |
| Restricted Cash | | 400 | 40% | 60% | 160 | 240 |
| Total Cash & Cash Equivalents | | 8,099 | | | 7,859 | 7,939 |
| **Charter Hire Receivables, Net of Allowance** | B | 32,774 | 40% | 60% | 13,110 | 19,664 |
| **Freight Receivables due from Affiliates** | C | - | n/a | n/a | - | - |
| **Inventories** | D | 17,604 | 0% | 5% | - | 880 |
| **Prepaid Expenses & Other Assets** | E | 6,298 | 20% | 30% | 1,260 | 1,889 |
| **Accounts Receivables Collected by Affiliates** | F | - | n/a | n/a | - | - |
| **Advances/Intercompany Transactions** | G | | | | | |
| Advances to Affiliates in Combination | | 97,543 | 0% | 0% | - | - |
| Advances to Affiliates not in Combination | | 1,450 | 20% | 40% | 290 | 580 |
| Total Advances | | 98,993 | | | 290 | 580 |
| **Fixed Assets, Net** | H | 293,178 | 41% | 47% | 120,367 | 138,676 |
| **Other Assets and Deferred Charges** | I | 25,200 | 2% | 5% | 504 | 1,260 |
| **Goodwill** | | - | n/a | n/a | - | - |
| **Total Assets and Net Proceeds Available for Distribution** | | $ 482,146 | | | $ 143,389 | $ 170,889 |
| | | | | | 30% | 35% |

### Table II: Estimated Chapter 7 Expenses

| ($ in 000's) | Global Notes | Estimated Balance / Allowed Claim | Estimated Creditor Recovery Percentage | | Hypothetical Creditor Recovery Values | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| Net Operational Winddown Costs | J | 38,359 | | | $ 38,359 | $ 38,359 |
| Chapter 7 Trustee Fees (ii) | J | | | | 4,302 | 5,127 |
| Chapter 7 Professional Fees & Costs (iii) | J | | | | 5,730 | 5,140 |
| Total Chapter 7 Administrative Claims | | | | | 48,391 | 48,626 |
| **Net Proceeds after Chapter 7 Administrative Claims** | | | | | $ 94,998 | $ 122,263 |

**TBS International plc - Consolidated**

## Table III: Estimated Creditor Recoveries

| ($ in 000's) | Notes | Estimated Consolidated Claims | | Estimated Creditor Recovery Percentage | | Hypothetical Creditor Recovery Values | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| Administrative Claims | K | - | - | | | $ - | $ - |
| Priority Tax Claims | L | - | - | | | - | - |
| Classified Claims | | | | | | | |
|   Class 1: Priority Non-Tax Claims | L | 533 | 533 | 100% | 100% | 533 | 533 |
|   Class 2: Other Secured Claims | M | - | - | | | - | - |
|   Class 3: DVB Syndicate Claims | N | 25,186 | 25,186 | 39% | 56% | 9,732 | 13,989 |
|   Class 4: BOA Syndicate Claims | O | 120,284 | 120,284 | 40% | 56% | 48,174 | 67,201 |
|   Class 5: Credit Suisse Claims | P | 18,969 | 18,969 | 45% | 61% | 8,538 | 11,560 |
|   Class 6: AIG Claims | Q | 4,656 | 4,656 | 65% | 86% | 3,022 | 3,981 |
|   Class 7: RBS Syndicate Claims | | - | - | | | - | - |
|   Class 8: General Unsecured Claims (iv) | R | 114,798 | 142,063 | 18% | 22% | 25,000 | 25,000 |
|   Class 9: Intercompany Claims | S | - | - | | | - | - |
|   Class 10: Subordinated Claims | S | - | - | | | - | - |
|   Class 11: Interests | S | - | - | | | - | - |
| Total Consolidated Claims (net of Deficiency Claim) | | 212,061 | 212,061 | | | 94,998 | 122,263 |
| **Net Proceeds Available to Equityholders** | | | | | | $ - | $ - |

**Notes:**

i  Balances are as of November 30, 2011 (unaudited) adjusted for vessel sales through January 31, 2012.

ii  Chapter 7 Trustee Fees assume 3% on gross proceeds available for distribution.

iii  Chapter 7 Professional Fees assumes 12-month wind down period to assist in winding down the estate and completing any necessary accounting work.

iv  Estimated foreign vendors unsecured claims required to be paid to prevent vessels from being arrested and allowing Trustee to execute on sale/liquidation of vessel.

Case 1:18-cv-04363-GBD-BCM   Document 70-2   Filed 10/01/19   Page 33 of 39

**Global Notes to the Liquidation Analysis**

*Conversion Date and Appointment of a Chapter 7 Trustee*

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on February 6, 2012 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a single chapter 7 trustees (the "Trustee") to oversee the liquidation of the Debtors' Estates. Thus, this Liquidation Analysis estimates the recovery for Allowed Claims on a consolidated basis.

*Primary Assets of the Debtors*

The Liquidation Analysis assumes a liquidation of all of the Assets, which primarily consist of vessels owned by the Debtors as of the Conversion Date. Assets also include receivables, inventories, and other assets related to vessel voyages and general operations; non-vessel assets such as furniture, fixtures, and computer-related equipment; cash on hand; and the Debtors' interests in all non-Debtor Affiliates after third-party claims against such Affiliates are satisfied. The Liquidation Analysis assumes a range of recoveries for these Assets assuming a forced liquidation asset sale process conducted by the Debtors' Trustee. The liquidation value generated for Debtors' Assets has been included with any other potential realizable Assets held by the Debtors. The Debtors' management believes that values generated in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the going concern valuation of the Assets.

*Forced Liquidation Sale Process*

The estimated liquidation proceeds generated for the Debtors were derived assuming a forced liquidation and wind down of all of the Debtors' operations. The Debtors' management derived a range of potential recovery values for each class of assets based on a number of factors, including the following: (i) the age and quality of the Assets; (ii) recent vessel sale transactions and/or estimated scrap values; (iii) the current supply/oversupply of various types of vessels as well as new-buildings in progress; and (iv) the potential alternative uses for such Assets by other competitors or other industrial uses for such Assets. Reductions to going-concern valuations or appraisals were applied to reflect the forced sale nature of a chapter 7 liquidation. These reductions were derived by considering such factors as the shortened time period involved in the sale process, discounts buyers would require given a shorter due diligence period and minimal seller warranties (if any) which would potentially result in higher risks buyers might assume, potentially negative perceptions involved in liquidation sales, the current state of the capital markets as well as the additional oversupply of vessels for sale caused by concurrent liquidation by the Debtors, the limited universe of prospective buyers, and the "bargain hunting" mentality of liquidation sales.

The Liquidation Analysis assumes a liquidation of the Assets occurs to sell all of the physical Assets of the Debtors, including each vessel, immediately after the completion of such vessel's current voyage. This reflects an estimate of the time required to dispose of the material physical Assets upon completion of each vessel's current voyage and wind down the physical operations related to the Debtors' businesses. Once cargo is loaded on board a vessel, that vessel is obligated under the contract of carriage and maritime law to complete the voyage and deliver the cargo at its intended destination or provide alternate arrangements for such completion and delivery. Breach of that duty may give rise to a maritime lien, which could expose the vessel to arrest in a foreign jurisdiction. It is assumed, therefore, that the Debtor's Estate is best served by completing all current voyages. The analysis assumes an average of 60 days from the Conversion Date for all vessels to complete their current voyages and be sold. The analysis further assumes an additional 10 months to wind down the legal, tax, and accounting affairs of the consolidated Estates. This period of time would provide the appointed Trustee the necessary time to

resolve claims as well as distribute proceeds from the sale of the physical Assets.  It is further assumed that incremental customer freight revenue and new cargo loadings related to the Debtors' fleet would be virtually eliminated immediately after announcing a conversion to a chapter 7 liquidation. The analysis also assumes all executory contracts would be rejected during the pendency of the liquidation and potential claim estimates have not been included in the analysis and would likely be de minimis in amount.  The Debtors' management cannot anticipate Claims by creditors for such contract rejections and assumes contract rejection claim estimates may be significantly understated in the analysis.   This Liquidation Analysis also assumes that roughly 50% of the existing staff currently employed by the Debtors will remain with the Debtors for a 60 day period while physical Assets are liquidated.  Costs have been included for the Trustee to maintain employment to collect and liquidate all of the Debtors' property during the property liquidation phase of this analysis.  Additional general and administrative costs have been included for staff necessary to wind down the accounting, legal, and tax affairs of the consolidated Debtor Estates.  If the cash flows from the sale of the Debtors' Assets are not sufficient to fund the ongoing operations during this period, the Trustee may have to lower expectations related to potential recovery value for the material Assets and further reduce the recovery estimates contained in this Liquidation Analysis.

This Liquidation Analysis assumes that net proceeds from Asset liquidations would not generate any tax liabilities based on the tax basis of the Assets and the Debtors' existing taxing jurisdiction(s). Should the tax treatment and effect of these transactions result in net tax liabilities, recovery percentages in the Liquidation Analysis could change materially.

### *Substantive Consolidation of the Estates*

This Liquidation Analysis assumes that each case related to the Debtors' business operations will be converted into a chapter 7 liquidation and a single Trustee would be appointed to administer the Debtors' Estates.  This Liquidation Analysis further assumes that the net sale proceeds of each vessel could be directed to the appropriate lender with a Lien on such vessel, but the residual net proceeds from the remainder of the Debtor's Estates would be applied to classes of potential Claims consistent with a chapter 7 liquidation.  Each vessel owning Debtor subsidiary's specific guarantee of debt has not been included in the calculation of recoveries for the Debtors' hypothetical recovery analysis.  The decision to substantively consolidate the non-vessel owning Debtor entities for purpose of this liquidation analysis was made after arduous analysis of the non-vessel Assets, the Debtors' cash management system and the Debtors' affairs.  The effect of substantive consolidation of the non-vessel owning Debtor entities for purpose of this liquidation analysis will be a review of the pooled assets and liabilities of such entities and the satisfaction of creditor Claims from the resulting common pool of funds and sale proceeds.

### *Factors Considered in Valuing Hypothetical Liquidation Proceeds*

Certain factors may limit the amount of the liquidation proceeds (the "Liquidation Proceeds") available to the Trustee.  Certain of these factors that relate specifically to the liquidation of the Assets are discussed in further detail below.  In addition, it is possible that distribution of the Liquidation Proceeds would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' businesses and operations.  This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

## Specific Notes to the Asset Assumptions Contained in the Liquidation Analysis

The Liquidation Analysis refers to certain categories of Assets.  The alphabetical designation below corresponds to the line items listed in the attached chart with a specific reference to global notes.

### A.   Cash and Cash Equivalents

Cash and cash equivalents represent existing Cash and short-term investments that the Debtors maintain at various banks as a part of their normal cash management system as well as any Restricted Cash held as collateral for letters of credit.  The Debtors' cash management systems consolidate daily cash activity into main operating accounts held at TBS International Limited, TBS Pacific Liner Limited, TBS Worldwide Services, Inc., and TBS Shipping Services Inc.  The Debtors also maintain cash balances to fund regular operating disbursements for the fleet at Westbrook Holdings Limited and Roymar Ship Management Inc.  The Debtors maintain cash within certain accounts for ancillary businesses at Compass Chartering Corp., TBS Shipping Houston, Inc., and TBS Do Sul Limited.  Since the Debtors fund operating disbursements on a fleet basis, this analysis assumes this daily cash consolidation and cash management system continues upon the conversion to a chapter 7 liquidation and that Cash and cash equivalents are available for use and distribution on a consolidated basis.  This analysis assumes that the Debtors and Trustee would fund the wind down of the Estates with proceeds from asset sales and available Cash.  Recovery of Restricted Cash is assumed to be reduced by estimated outstanding amounts due under the terms of the associated letters of credit.  Given the current state of credit markets and the nature of the Debtors' businesses, the Trustee would be forced to liquidate the Assets of the Estates in an expedited time frame in order to have cash on hand necessary to wind down the affairs of the Debtor.  Recoveries for the Debtors' creditors could be further impacted to the extent the Trustee cannot obtain enough cash to fund the wind down of their operations and would then be forced to further reduce the potential sales prices of the Debtors' specific Assets.

### B.   Charter Hire Receivables

In addition to Cash and Cash Equivalents, the Debtors have a significant amount of working capital in the form of accounts receivables.  The recovery percentage related to these Assets is based on the estimated range of value that may be obtained in collecting current accounts receivable related to customer freight, demurrage, and time charters.  The recovery percentages contemplate the Debtors' management's best estimate of collection given the parameters of this wind down analysis; minimal recovery for demurrage receivables which typically represent approximately 15% to 20% of the outstanding receivables balance; and that certain customers, the bulk of whom are foreign, may withhold payments in light of the operational wind down.  Cash received from the collection of accounts receivable would be used by the Trustee for the costs necessary to wind down the affairs of the Debtors.

### C.   Freight Receivables due from Affiliates

Freight receivables due from affiliates generally represent intercompany transactions to fund general fleet operating disbursements.  Based on a consolidated liquidation of the Estate, all Intercompany Claims between individual Debtors are assumed to be settled without cash payments.  As such, no recovery is forecasted for these Assets.

### D.   Inventories

Inventories for the Debtors primarily consist of bunkers, spares, and other miscellaneous items on board vessels.  The low range of recoveries associated with these Assets assume inventories will be markedly depleted as vessels complete their current voyages, the inability to return inventories of a consumable nature to suppliers, and buyers under a liquidation scenario would be unlikely to provide any credit for inventories on board vessels.

### E.  Prepaid Expenses & Other Assets

Prepaid expenses and other assets include insurance premiums, tax and registration dues, and other general trade vendor deposits and prepayments.  Many of these Assets are assumed to be consumed as the fleet completes their current voyages and through the wind down period.  Aside from an estimate for insurance claims receivable, a de minimis amount is forecasted to be recoverable on other Prepaid expenses and other assets.

### F.  Accounts Receivables Collected by Affiliates

Accounts receivables are typically collected, maintained, and used to make operating disbursements on a consolidated basis for the Debtors' fleet.  Similar to Freight receivables due from affiliates, any of these Intercompany Claims between individual Debtors is assumed to be settled without cash payments. As such, no recovery is forecasted for these Assets.

### G.  Advances/Intercompany Transactions

As mentioned above, Intercompany Claims between individual Debtors is assumed to be settled without cash payments.  The recovery percentage related to these Assets is based on the estimated range of value that may be obtained in collecting advances to non-Debtor affiliates.  The recovery percentages for Advances to non-Debtor affiliates contemplate a reduction in the balance of such advances during the wind down period as well as the estimated ability of non-Debtor affiliates, some of which rely on foreign partners, to refund any such advances.

### H.  Fixed Assets, Net

The Debtors' primary physical Assets represent vessels owned by individual Debtors.  More specifically, the Assets consist of a fleet of multipurpose tweendeckers and handysize / handymax bulk carriers, including specialized heavy-lift vessels.  Many of these vessels are purpose-built and/or specialized for certain ports, cargoes, and trade lanes.  In determining the potential recovery for such Assets, the Debtors' management considered (i) the age and quality of the Assets; (ii) recent vessel sale transactions and/or estimated scrap values; (iii) the current supply/oversupply of various types of vessels as well as new-buildings in progress; and (iv) the potential alternative uses for such Assets by other competitors or other industrial uses for such Assets.  It is assumed that the market for older vessels at or near the end of their expected useful lives will realize their respective estimated scrap values as a minimum.  It is assumed that all other vessels will be sold for the higher of their scrap values or reasonable discount from most recent going concern appraisal values to compensate for a liquidation scenario.

The recovery percentages would be affected by the time frame necessary for liquidating such Assets as well as the significant amount of oversupply of vessels for sale as the Debtors' vessels are offered for sale concurrent with one another.  Recovery percentages were applied against the Debtors' current net book value of such Assets to develop a range of potential recoveries.  In addition to the estimates the Debtors' management used to develop these ranges of recoveries, the Debtors' management has assumed that the Trustee would be able to locate all of the Assets at their final berthing ports and collect the Assets for such a sales process.  While costs to locate and gather the equipment has been included in this analysis, given the geographic diversity of the locations where final berthing may occur, the cost estimates may be understated and require the Trustee to incur additional costs to retrieve the physical Assets of the Estate and potentially ballast certain vessels to alternative locations in order to facilitate such a sale as contemplated by this analysis.  Such additional costs have not been assumed in the Liquidation Analysis and could further reduce recoveries as illustrated in this Liquidation Analysis.

A de minimis amount of recovery is assumed for non-vessel fixed assets, including grabs, office furniture, fixtures, computer equipment, and software.

### I.  Other Assets

Other Assets are comprised of intangibles, bareboat charter deposits, interests in joint ventures, and other miscellaneous Assets such as deferred charges.  Intangible Assets, deposits, and deferred charges would have no specific recovery in the Liquidation Analysis.  Recovery for interests in joint ventures are minimal as the value in such joint ventures are specific to the Debtors' business operations.  The recovery related to interests in joint ventures is limited to readily salable physical assets, such as warehouses and real property.

**Specific Notes to the Liability Assumptions Contained in the Liquidation Analysis**

This Liquidation Analysis sets forth an allocation of the Liquidation Proceeds to Holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.  The Liquidation Analysis provides for high and low recovery percentages for Claims and Interests upon the Trustee's application of the Liquidation Proceeds.  The high and low recovery ranges reflect a high and low range of estimated Liquidation Proceeds from the Trustee's sales of the Assets.

### J.  Estimated Chapter 7 Expenses

Wind-down costs consist of operating expenses for the completion of final voyages, general and administrative costs required to operate the Assets during the liquidation process, and the costs of any professionals the Trustee employs to assist with the liquidation process, including investment bankers, attorneys, and other advisors.  This Liquidation Analysis assumes that the each specific Debtors' business operations will wind down after completion of the vessel's current voyage and the physical Assets will be collected and sold approximately 60 days, on average, after the liquidation process begins.  These costs include estimates for expenses needed to complete current voyages, discharge cargoes, and arrange for skeletal crew and/or security for vessels until each vessel is sold.  Chapter 7 Trustee fees necessary to facilitate the sale of the Debtors' Assets were assumed at the statutory maximum rate of 3% of available Liquidation Proceeds.  These fees would be used specifically for developing marketing materials and facilitating the solicitation process for the parties, as well as other preparatory requirements to sell the physical Assets.  Given the complexity and nature of the Debtors' Estates, this Liquidation Analysis assumes that in addition to the two month operational wind down and sale of Assets, an additional 10 months would be required to settle claims and wind down the accounting, legal, and tax affairs of the estate.  This estimate also takes into account the time that will be required for the Trustee and any professionals to become educated with respect to the Debtors' businesses and the Chapter 11 Cases.

### K.  Administrative Claims

Administrative Claims consist of Claims entitled to administrative expense priority under section 503 of the Bankruptcy Code.  Among other things, this category includes postpetition payables, outstanding Professional Fees, Claims arising prior to any post-conversion rejection of executory contracts and unexpired leases, Claims arising under any executory contracts and unexpired leases that were assumed during the Chapter 11 Cases or entered into after the Petition Date but before the Conversion Date.  Notably, costs and expenses relating to the Trustee's continued use of certain Debtor leased premises are included in estimated costs relating to the wind down of their operations, not in Administrative Claims.  Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

### L.  Priority Tax Claims and Other Priority Claims

Priority Tax Claims and Other Priority Claims consist of Claims that are entitled to priority under section 507 of the Bankruptcy Code, including non-tax claims related to employee wages and benefits. Based on the Liquidation Analysis, these Claims will be satisfied in full in a chapter 7 liquidation case.

### M. Other Secured Claims

Other Secured Claims include certain vendor and miscellaneous obligations secured by Liens on certain of the Assets.  The Liquidation Analysis assumes that all trade vendors during the wind-down period will be paid in full with proceeds from Asset sales and available cash on hand, and as such, no valid liens will be placed against vessels and no claims are assumed in this class.  However, should the Debtors be unable to provide for all postpetition trade claims, vendors may assert maritime liens and claims against certain vessels which may result in claims and recoveries for this class.

### N.  DVB Syndicate Claims

DVB Syndicate Claims comprise Claims arising from or related to the DVB Syndicate Prepetition Secured Credit Agreement, including estimated swap liabilities as well as deferred interest and fees due to the DVB Syndicate, if any.  The recovery for these Claims is primarily based on estimated sale proceeds from seven vessels owned by the Debtors, which represent Assets specifically securing the DVB Syndicate Credit Agreement.

### O.  Bank of America Syndicate Claims

Bank of America Syndicate Claims comprise Claims arising from or related to the Bank of America Syndicate Prepetition Secured Credit Agreements, including estimated swap liabilities as well as deferred interest and fees due to the Bank of America Syndicate, if any.  The recovery for these Claims is primarily based on estimated sale proceeds from 28 vessels owned by the Debtors, which represent Assets specifically securing the Bank of America Credit Agreements.

### P.  Credit Suisse Claims

Credit Suisse Claims comprise Claims arising from or related to the Credit Suisse Prepetition Secured Credit Agreements, including estimated swap liabilities as well as deferred interest and fees due to Credit Suisse, if any.  The recovery for these Claims is primarily based on estimated sale proceeds from two vessels owned by the Debtors, which represent Assets specifically securing the Credit Suisse Credit Agreements.

### Q.  AIG Claims

AIG Claims comprise Claims arising from or related to the AIG Prepetition Secured Credit Agreement, including estimated swap liabilities as well as deferred interest and fees due to AIG, if any. The recovery for these Claims is primarily based on estimated sale proceeds from two vessels owned by the Debtors, which represent Assets specifically securing the AIG Credit Agreement.

### R.  General Unsecured Claims

General Unsecured Claims represent prepetition trade claims and other liabilities.  It is assumed that recovery for certain prepetition trade claims will be required to satisfy foreign claims in order to present vessels from being arrested in foreign jurisdictions, which would prevent Trustees from being

able to execute sales of the vessels.  The Liquidation Analysis assumes insufficient proceeds for all other General Unsecured Claims.

### S.    All Other Classes

There are insufficient Liquidation Proceeds for any recovery in the Liquidation Analysis by any Holders of Claims and Interests in any other Class.