UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED: 08/20/2019
```

HELEN MEIMARIS, on behalf of herself
and as Executrix and Legal Representative of
the Estate of Alkiviades Meimaris,

        Plaintiff,

-against-

JOSEPH E. ROYCE, et al.,

        Defendants.

18-CV-04363 (GBD) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. GEORGE B. DANIELS**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Helen Meimaris (Ms. Meimaris), suing on her own behalf and as executrix and legal representative of the estate (Estate) of her late husband Alkiviades Meimaris (Captain Meimaris), alleges in her Third Amended Complaint (TAC) (Dkt. No. 62) that Captain Meimaris's former business associates Joseph E. Royce and Lawrence A. Blatte, together with attorney Tulio Prieto, squeezed him out of his stock in a NASDAQ-listed public company that plaintiffs call TBS Shipping International (TBS International), as well as his 10% ownership stake in a privately-held affiliate called TBS Commercial Group, all in connection with TBS International's "prepackaged" Chapter 11 bankruptcy reorganization. Plaintiffs asserts claims against Royce, Blatte, and Prieto (collectively the Individual Defendants) for fraud, breach of fiduciary duty, and conspiracy to commit fraud. *See* TAC ¶ 62-127. In addition, plaintiffs seek damages from the reorganized debtor, TBS Shipping Services Inc. (TBS Shipping Services), now known as Guardian Navigation Services, Inc. (Guardian), for "knowledge of fraud." *Id.* ¶¶ 158-64.[1]

---

[1] Three other defendants named in the TAC – Jaime Leroux, Grupo Sedei, and Technisea – were never served and never appeared. Plaintiffs voluntarily dismissed their claims against these defendants on May 13, 2019. (Dkt. No. 109.)

Defendants' alleged schemes were all carried out from 2008 through early 2012. *See* TAC ¶¶ 6-13. The bankruptcy case was filed on February 6 and substantially resolved on March 29, 2012, when the United States Bankruptcy Court for the Southern District of New York (Bankruptcy Court) confirmed the debtors' Plan of Reorganization, leaving defendant TBS Shipping Services as the reorganized debtor.[2] Captain Meimaris was diagnosed with metastatic lung cancer in October 2013 and passed away on December 7, 2013, *see* TAC ¶¶ 56, 59, after preparing an "affidavit outlining what Defendants had done." *Id.* ¶¶ 16, 57; *see also* Affidavit of Captain Alkiviades Neoklis Meimaris dated Nov. 30, 2013 (Captain Meimaris Affidavit) (Dkt. No. 90-1). Plaintiffs' attorney Alkistis Meimaris – who is a daughter of Captain and Ms. Meimaris – prepared a "parallel Affidavit" supporting her father's testimony. TAC ¶¶ 16, 57.[3]

Now before me for report and recommendation (*see* Dkt. No. 46) are three separate motions to dismiss plaintiffs' claims and for related relief. Defendants Royce and Blatte move to dismiss all claims against them, and for a stay of discovery, pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(6), 12(f), and 26(c). (Dkt. No. 69.) Defendant Prieto moves to dismiss the claims against him pursuant to Rule 12(b)(6). (Dkt. No. 72.) TBS Shipping Services and Guardian[4] (collectively,

---

[2] *See* Findings of Fact, Conclusions of Law, and Order, *In re TBS Shipping Services Inc., et al.*, No. 12-22224 (RDD) (hereinafter, *In re TBS Shipping Service*) (Br. S.D.N.Y. Mar. 29, 2012) (Confirmation Order) (Dkt. No. 140). A copy of the Confirmation Order is attached as Ex. 3 to the Declaration of Adam Rodriguez dated Oct. 1, 2018 (Rodriguez Decl.) (Dkt. No. 70). The Effective Date of the Plan of Reorganization was April 12, 2012. *See* Notice of Effective Date, *In re TBS Shipping Services* (Apr. 18, 2012) (Dkt. No. 155).

[3] The Captain Meimaris Affidavit is before the Court as Exhibit 1 to the Supplemental Affirmation of Alkistis G. Meimaris dated Oct. 19, 2018 (Supp. Alkistis Meimaris Aff.) (Dkt. No. 90). The parallel affidavit prepared by Alkistis Meimaris has not been submitted.

[4] As discussed *infra* in section I(C), TBS Shipping Services became Guardian when it changed its name in 2018. Rather than substitute Guardian for TBS Shipping Services in the caption, however, plaintiff added Guardian as a new defendant without dropping TBS Shipping Services.

the Company Defendants) move to dismiss the claim against them, and for a stay of discovery, pursuant to Rules 9(b), 12(b)(1), 12(b)(6), and 26(c). (Dkt. No. 75.)

For the reasons set forth below, I conclude that Ms. Meimaris has no standing to sue except in her representative capacity, on behalf of the Estate, and that all of the Estate's claims against the moving defendants are time-barred. I therefore recommend, respectfully, that defendants' motions be GRANTED; that Ms. Meimaris's individual claims be DISMISSED WITHOUT PREJUDICE pursuant to Rule 12(b)(1); and that all remaining claims be DISMISSED WITH PREJUDICE pursuant to Rule 12(b)(6).

## I.    BACKGROUND

### A.    Factual Allegations

Unless otherwise indicated, the following facts are taken from (i) the TAC; (ii) the Captain Meimaris Affidavit; (iii) TBS International's public filings with the Securities and Exchange Commission (SEC); and (iv) the public record of the proceedings before the Bankruptcy Court in *In re TBS Shipping Services*.[5]

#### 1.    The Creation and Growth of TBS International

Captain Meimaris was an experienced shipping industry executive when he joined defendant Royce and non-party Gregg McNelis, in or around 1993, to form TBS International and TBS Commercial Group. TAC ¶ 3. The business grew substantially over the next decade, and in

---

[5] As discussed *infra* in section II(B), the Court may rely on all of these materials in determining defendants' motions to dismiss. The Captain Meimaris Affidavit is referenced in and "integral to" the complaint, *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); moreover, plaintiffs vouched for its authenticity and relevance by submitting it in opposition to the motions to dismiss. *See* Supp. Alkistis Meimaris Aff. ¶¶ 3, 5. The existence and content of SEC filings are judicially noticeable, *see Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000), as are the proceedings of other courts of record – "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

2005, TBS International went public and was listed on the NASDAQ. *Id*. ¶ 4. Thereafter, Captain Meimaris owned 369,322 Class A Shares and 609,888 Class B Shares of TBS International stock. *Id*. ¶ 29.[6] TBS Commercial Group remained a private entity held by four shareholders – Captain Meimaris, McNelis, and defendants Royce and Blatte. *Id*. ¶¶ 3-4. Captain Meimaris owned a 10% stake in TBS Commercial Group.  *Id*. ¶ 29.[7]

In 2006, at the age of 75, Captain Meimaris retired from TBS International, TAC ¶ 5, but "remained as a consultant through 2011," *id*. ¶ 33, and continued to attend annual meetings and advise Royce – whom he considered a "close friend" – when needed. *Id*. ¶ 33. He received no "founder or partner compensation or severance" when he retired, but retained his stock in TBS International and his ownership interest in TBS Commercial Group. *Id*. ¶ 33. The TAC implies (though it does not expressly allege) that Royce and Blatte continued as executives of TBS International and/or TBS Commercial Group after Captain Meimaris retired.[8]

---

[6] These figures are corroborated by the new public company's prospectus, *see* TBS Int'l Ltd., Prospectus (Form 424B4), at 103 (June 27, 2005), https://www.sec.gov/Archives/edgar/data/ 1065648/000095013605003757/file001.htm, and by the stock certificates submitted by plaintiffs in opposition to defendants' motions to dismiss. *See* Supplemental Affirmation of Alkistis G. Meimaris dated Oct. 19. 2018 (Second Supp. Alkistis Meimaris Aff.) (Dkt. No. 91), Ex. 3. The new public company was incorporated in Bermuda and named "TBS International Limited," not "TBS Shipping International," as alleged by plaintiffs. In December 2009, TBS International Limited was reincorporated in Ireland as "TBS International plc." *See* TBS Int'l plc, 2009 Annual Report, at 5 (May 10, 2010), https://www.sec.gov/Archives/edgar/vprr/1001/10012677.pdf.

[7] TBS Commercial Group Ltd. was a "Bermuda-based holding company" that provided services to the public company through "25 operating companies that operate commercial and port agencies in South America, Europe, and Asia." TBS Int'l plc, 2009 Annual Report, at F-26. Royce and Blatte owned 31% and 9%, respectively, of TBS Commercial Group. *Id*. at 26.

[8] According to TBS International's SEC filings, Royce was its President, Chief Executive Officer, and Chairman of the Board of Directors, and Blatte was a Senior Executive Vice President, throughout the events alleged in this action. *See* TBS Int'l plc, 2010 Annual Report, at 19 (May 5, 2011), https://www.sec.gov/Archives/edgar/vprr/1100/11007573.pdf.

### 2.    The Scheme to Prevent Captain Meimaris from Selling Stock

Once Captain Meimaris retired, he tried on "various occasions" to sell his TBS International shares in the open market,  TAC ¶¶ 77, but was discouraged from doing so by Royce and Blatte, who advised him that he could only sell "within the trading window as mandated by the company" and told him that "if a major shareholder of the company sold shares it would not look good to the public." *Id*. ¶¶ 78-79. In reliance on the statements of Royce and Blatte, which plaintiffs now describe as "false," Captain Meimaris "did not sell any of his shares." *Id*. ¶ 80.

The TAC identifies one such incident as occurring in May 2008, when Captain Meimaris "was asked to stop selling his shares by the defendants." TAC ¶ 81. He did so, relying on defendants' false statement "that it would hurt the Company." *Id*. ¶ 82. However, Royce and Blatte themselves "sold over 1,600,000 shares in the period of time between May 2008 and August 2008," when the stock price was $51 per share. *Id*. ¶ 83.

In accordance with applicable SEC regulations, TBS International publicly reported the sales by Royce and Blatte.[9] Nonetheless, plaintiffs allege that Captain Meimaris "was not aware" of those sales and did not realize that "he had been lied to."  *Id*.  ¶ 83. Plaintiffs further allege that Royce and Blatte "tricked" Captain Meimaris into holding his shares "so that they could sell their own shares." *Id*. ¶ 84. Plaintiffs do not explain why or how it benefitted Royce and Blatte to have Captain Meimaris refrain from selling. Nor do they identify any dates after May 2008 on which Captain Meimaris was discouraged or prevented from selling his shares by defendants.

---

[9] On May 28, 2008, TBS International filed a series of reports on Form 4 (Statement of Changes in Beneficial Ownership) disclosing that Blatte sold 100,000 shares of the company's Class A stock that day at a price of $51 per share; that Royce sold 700,000 shares the same day, also at $51 per share; and that Royce's wife Elaine Royce sold 700,000 shares on May 23, 2008, also at $51 per share. These reports, like the company's annual reports, appear on the SEC's publicly-accessible EDGAR website at https://www.sec.gov/edgar/searchedgar/companysearch.html.

### 3.    The Forgone Ecuadorian Business Opportunity

In 2011, Jamie Leroux, described as "President of TBS Ecuador, one of the companies under TBS Commercial Group," TAC ¶ 50, asked Captain Meimaris to "buy some of his interest in a property he was thinking about buying." *Id*.[10] This would have been "an unrelated venture to TBS Commercial Group," involving "the purchase of property and/or buildings." *Id*. ¶ 63. However, when he informed Royce and Blatte about the offer, they "told Captain Meimaris he could not buy the interest. Instead, Mr. Blatte and Mr. Royce purchased the property in the name of TBS Commercial Group and, on information and belief, in their own names." *Id*. ¶ 40; *see also id*. ¶¶ 64-67 (alleging that Royce and Blatte "falsely represented" that the business opportunity would be a conflict of interest when in fact it "had nothing to do with Captain Meimaris'[s] interests in TBS Commercial Group or his interests in TBS International").

On an unspecified date prior to November 30, 2013, Captain Meimaris learned from Leroux that Royce and Blatte "wanted the opportunity for themselves." *Id*. ¶ 69; *see also* Captain Meimaris Aff. ¶ 20 ("I was told by Jaime Leroux, that Royce, McNelis, and Blatte chose to take this opportunity for themselves" and realized that "my partners managed to oust me of a business opportunity that would have been profitable"). The TAC contains no further description of the business opportunity and alleges no facts to support plaintiffs' assertion that it "would have been profitable."

---

[10] According to TBS International's 2010 Annual Report, "TBS Ecuador TBSEC, S.A." was a subsidiary of TBS Commercial Group. TBS Int'l plc, 2010 Annual Report, at F-27. According to the Captain Meimaris Affidavit (at ¶ 20), Leroux's offer was made "[a]t some point between 2009-2011."

### 4.   The Bankruptcy Proceeding Leaves Captain Meimaris with No Ownership in the Restructured Debtor

By 2010 or 2011, TBS International was struggling financially, and "the decision was made to enter into a [bankruptcy] reorganization." TAC ¶ 37.[11] During the same period of time, the "founding shareholders of TBS International were working on an agreement whereby they would put $10 million into the Company." *Id*. ¶ 92. Captain Meimaris "asked Mr. Royce on a few occasions 'if he needed to put any money in for the deal,'" but Royce told him "not to worry about it, that they were handling it, that he would let Captain Meimaris know if they needed anything and that they were protecting his interests." *Id*. ¶ 93.

In February 2012, a "Reorganization Plan was introduced to the Bankruptcy Court" which "provided for the banks owning 90% of the Company and for 10% of the Company to be owned by Mr. Royce, Mr. Blatte and Mr. McNelis." TAC ¶ 96; *see also* Disclosure Statement, *In re TBS Shipping Services* (Feb. 6, 2012) (Dkt. No. 20).[12] That is when Captain Meimaris learned that Royce, Blatte, and McNelis "took preferred shares in TBS International," *id*. ¶ 94, which they used

---

[11] Plaintiff alleges that the company's financial difficulties in 2010-11 were caused by bad business decisions made by Royce and Blatte. TAC ¶ 37. Royce and Blatte attribute those difficulties to "the infamous 2008 financial crisis which decimated the worldwide shipping sector in general and TBS and its stock value in particular." Royce/Blatte Mem. dated Oct. 1, 2018 (Dkt. No. 71), at 1.

[12] The Plan of Reorganization, which was publicly filed as an exhibit to the Disclosure Statement on February 6, 2012, was somewhat more complex than the description provided in the TAC. *See* Disclosure St. Ex A. Among other things, the Plan provided that 90% of the restructured debtor (referred to therein as "New TBS Parent"), would initially be owned by two groups of secured creditors through the issuance of New Class A Common Stock. Disclosure St. at 6. The remaining 10% "will be initially granted to the senior management team that will manage the Reorganized Debtors – Joseph Royce, Gregg McNelis, Lawrence Blatte, and Fred Lepere," in the form of New Class B Common Stock. *Id*.; *see also id*. at 106 ("If the Plan is confirmed, Management Shareholders will own 10% of the vested equity interests in the New TBS Common Stock, and will have the right to nominate 2 of the 5 directors."). Interests in TBS International would be "cancelled" and the pre-petition entities would "dissolved." *Id*. at 6. Even before the Disclosure Statement was filed, Captain Meimaris was told – by Royce, in December 2011 – that after TBS International filed for bankruptcy "the banks would own 90% and 10% would be held by Joe, Larry and Gregg." Capt. Meimaris Aff. ¶ 26.

"to remain as shareholders in the reorganization." *Id*. ¶ 96.[13] Plaintiffs allege that, by preventing Captain Meimaris from "participating with the other defendants in the Agreement/Deal," Royce and Blatte "fraudulently pushed him out of 10% ownership of the new TBS." *Id*. ¶ 97. The TAC does not explain on what basis Captain Meimaris was entitled – or would have been permitted by the creditors – either to purchase preference shares in TBS International or to have New TBS Parent grant him New Class B Stock.[14]

The Bankruptcy Court approved the Reorganization Plan on March 29, 2012, after overruling two objections (neither of them from Captain Meimaris). *See* Confirmation Order at 3. In his November 30, 2013 affidavit, Captain Meimaris wrote, "It seems that the Company did not disclose to the SEC or existing shareholders that the TBS Executives (Royce, McNelis, Blatte, and now Lepere) would be holding 10% of the shares in the new company." Capt. Meimaris Aff. ¶ 27.[15]

### 5.   TBS Commercial Group

From October through December 2011, defendant Royce, together with TBS International's attorney, defendant Prieto, "tried on several occasions to have Captain Meimaris give up his shares (10% ownership) in TBS Commercial Group." TAC ¶ 105. Captain Meimaris did not agree to sign any document that relinquished his TBS Commercial Group shares. *Id*.

---

[13] According to the Disclosure Statement, TBS International's creditors agreed to restructure its pre-petition credit facilities in 2011, but "[a]s a condition to this restructuring, required three significant shareholders – all of whom are key members of management . . . – to provide up to $10 million of new equity capital in the form of preference shares."  Disclosure St. at 20.

[14] In their briefs, plaintiffs offer only that, as a "founder of TSBI," he "should have automatically been a partner in the deal." Pl. Mem. in Opp. to Royce/Blatte Mtn. dated Oct. 16, 2018 (Dkt. No. 79), at 6.

[15] In fact, as noted above, this arrangement was described the Disclosure Statement filed on February 6, 2012.

¶¶ 6-10; 104-08. Nor did he agree to have TBS Commercial Group "used in the TBS International Reorganization." *Id*. ¶ 109. Nonetheless, plaintiffs allege, "TBS Commercial Group was a condition precedent to the TBS International Reorganization." *Id*. ¶ 109.[16] Defendants did not tell Captain Meimaris that they were "using" TBS Commercial Group in that manner. *Id*. ¶ 124.[17]

Thereafter, in the summer of 2013, Captain Meimaris learned "that his shares in the TBS Commercial Group no longer existed, that his friends and partners had squeezed him out of TBS Commercial Group and had used TBS Commercial Group as part of the Reorganization package with the banks for TBS International." TAC at ¶ 13. Plaintiffs allege, on information and belief, that defendants must have "either forged Captain Meimaris'[s] consent to the use of TBS Commercial Group, or closed and reopened the Companies in the TBS Commercial Group under other names and ownership, or they simply unilaterally dropped Captain Meimaris from his position in the Companies in the[] Group." TAC ¶ 116; *see also* Capt. Meimaris Aff. ¶ 32 ("It has come to my knowledge, that my partners have closed many of the companies under the commercial group and reopened them under other names.")

---

[16] Plaintiffs do not further explain this allegation. It appears to be a reference to certain agreements – described in the Disclosure Statement as the "TBS Commercial Management Agreements" and the "TBS Commercial/Beacon Holdings Option Agreement" – under which TBS Commercial Group and its affiliates would "continue to operate and perform their agreements," but would be entitled to close affiliates in Brazil and Chile and "reduce, cease, or discontinue operations" elsewhere, so long as "such reduction, cessation, or discontinuance will not have any material adverse business or commercial impact on TBS." Disclosure St. at 7; *id.* Ex. N, ¶ 1. In addition, New TBS Parent would have the option, exercisable through June 30, 2012, to require certain of TBS Commercial Group's affiliates "to dissolve foreign operations, close foreign offices . . . and use reasonable commercial efforts to transition [their] workforce . . . to New TBS Parent and its direct and indirect subsidiaries." Disclosure St. at 7. Entry into the TBS Commercial Management Agreements and the TBS Commercial/Beacon Holdings Option Agreement was "a condition precedent to the Effective Date" of the Plan of Reorganization. *Id.*

[17] In fact, as noted above, this arrangement was described in the Disclosure Statement filed on February 6, 2012.

Plaintiffs allege that TBS Commercial Group "was not at liberty to be used in the reorganization without the consent of its 10% shareholder, Captain Meimaris," TAC ¶ 123, and that defendants "materially misled the Banks into believing that all of the members of the TBS Commercial Group agreed," thereby committing "Fraud on the Banks as well as on Captain Meimaris." *Id.* ¶¶ 117-22. According to plaintiffs, "the reorganization should be deemed null and void based upon such a material misrepresentation." *Id.* ¶ 123.[18]

Plaintiffs do not explain why Captain Meimaris's 10% ownership required defendants to obtain his consent before TBS Commercial Group entered into the TBS Commercial Management Agreements or the TBS Commercial/Beacon Holdings Option Agreement. Nor do they identify the companies that were "closed and reopened" (other than "the company in Ecuador," *see* Capt. Meimaris Aff. ¶ 31), the dates on which this happened, or their new names or ownership.

### 6.   TBS Ecuador

In either 2012 or 2013, Leroux asked Captain Meimaris for paperwork documenting his interests in TBS Commercial Group. TAC ¶¶ 52 (June 2013), 129 (2012). Sometime in 2013, Leroux promised to "protect Captain Meimaris'[s] interests" from Royce and Blatte. *Id.* ¶¶ 52-53, 130. He specifically promised to protect "[t]he Captain['s] interests in TBS Ecuador from Mr. Royce, Mr. Blatte, and Mr. McNelis." *Id.* ¶ 53.

In 2014, after Captain Meimaris's death, Leroux met with his wife, and daughter Alkistis, and told them that "Meimaris'[s] shares [in TBS Ecuador] no longer existed and that the shares were in the hands of Mr. Blatte, Mr. Royce, and Mr. McNelis." TAC ¶¶ 54, 131. Although he also told the Meimarises that "he had nothing to do with this," *id.* ¶ 131, plaintiffs allege, upon

---

[18] In their Prayer for Relief, however, plaintiffs seek compensatory, special, exemplary, and punitive damages. TAC at 24-25. No equitable relief is requested. *Id.*

information and belief, that Leroux, as President of TBS Ecuador, "facilitated the transfer of Captain Meimaris'[s] shares to Mr. Royce, Mr. Blatte, and Mr. McNelis or the closing of the original TBS Ecuador and reopening a new TBS Ecuador without Captain Meimaris as a shareholder." *Id*. ¶ 132; *see also id*. ¶ 135 (on information and belief, Leroux "helped to effectuate the transfer"). In so doing, Leroux breached the promises that he had made to Captain Meimaris, "that his shares would be safe with Mr. Leroux as President." *Id*. ¶ 133. In retrospect, plaintiffs believe that Leroux "intended to deceive Captain Meimaris" all along. *Id*. ¶ 136.

### B.   Plaintiffs' Claims

The TAC contains seven causes of action, each brought by Ms. Meimaris in her individual capacity and as executrix of the Estate. The First Cause of Action alleges that Royce and Blatte (along with dismissed defendant Leroux) committed "breach of fiduciary duty based on fraud" by usurping Captain Meimaris's opportunity to invest in "property and/or buildings" in Ecuador. TAC ¶¶ 62-75.

The Second Cause of Action charges Royce and Blatte with "fraudulently inducing Captain Meimaris not to sell his shares in TBS International," including in 2008, when the price was $51 per share, "leaving him with almost a million shares which were valueless because the Company went into reorganization [in 2012] before Captain Meimaris had the chance to sell them." TAC ¶¶ 76-90.

The Third Cause of Action asserts that Royce and Blatte are liable to plaintiffs for "breach of fiduciary duty based on fraudulently pushing Captain Maimaris out of the bank reorganization deal." TAC ¶¶ 91-103.

The Fourth Cause of Action names Royce, Blatte, and Prieto, accusing them of "fraudulently stealing Captain Meimaris'[s] shares and interest in TBS Commercial Group."  TAC

¶¶ 104-127. Prieto's liability, according to plaintiffs, stems from his having "sent Captain Meimaris a document to sign" that "stated that [he] was giving up all of his rights and interests in TBS Commercial Group." *Id*. ¶ 106. Captain Meimaris did not sign that document. *Id*. Prieto is not alleged to have done or said anything else in furtherance of the alleged fraud.

The Fifth Cause of Action, which names only dismissed defendant Leroux, alleges that he transferred Captain Meimaris's interests in TBS Ecuador after promising to protect them. TAC ¶¶ 128-140.

The Sixth Cause of Action accuses Royce, Blatte, and Prieto of "conspiracy to commit fraud," alleging that they "conspired to deprive Captain Meimaris of his interest in TBS Commercial Group," conspired to usurp the Ecuadorian business opportunity, conspired to deprive Captain Meimaris of his "rights to obtain preferred shares in TBS International" and his "rights to cash in his shares to TBS International," and conspired to "deprive him of his shares in TBS Ecuador." TAC ¶¶ 141-157.

The Seventh Cause of Action – the only one to name TBS Shipping Services – seeks damages for "knowledge of fraud," alleging that TBS Shipping Services ("and its principals") knew that Captain Meimaris had an ownership stake in TBS Commercial Group but "failed to question" his "exclusion from new agreements involving TBS Commercial Group." TAC ¶¶ 158-60. Plaintiffs add that "[t]his Defendant had the opportunity to opt out of the wrongdoings" but "chose not to." *Id*. ¶ 162.

Plaintiffs seek $20 million in compensatory damages for the "loss of the 10% interest in TBS Commercial Group," "[s]pecial damages in the amount of $20 million," representing what Captain Meimaris "could have received had he been allowed to sell his shares from all Defendants and representing all of the breach of fiduciary duties by the Defendants," "exemplary damages" in

the amount of $20 million, because defendants' conduct was "wanton" and "willful," and another $50 million in "punitive damages" for defendants' "wanton, willful and intentional" breaches, plus costs and attorney's fees. TAC at 24-25.

### C.   Procedural History

The Third Amended Complaint now before the Court is the seventh in a series of similar pleadings filed by plaintiffs in two courts. Ms. Meimaris and the Estate first filed suit in New York Supreme Court, New York County, on April 3, 2018, against Royce, Blatte, Prieto, Leroux, and TBS Shipping Services, asserting six causes of action for fraud, breach of fiduciary duty, and conspiracy. *See* Complaint and Demand for Jury Trial, *Estate of Alkiviadis Meimaris v. Royce*, Index No. 651588/2018 (hereafter *Estate of Meimaris*) (N.Y. Sup. Ct., N.Y. Co. April 3, 2018) (NYSCEF Doc. No. 1). Ten days later, plaintiffs filed an Amended Complaint, adding a seventh cause of action, against TBS Shipping Services, for "knowledge of fraud." *See* Amended Complaint and Demand for Jury Trial, *Estate of Meimaris* (April 13, 2018) (NYSCEF Doc. No. 5).

On May 14, 2018, plaintiffs dismissed their state court action without prejudice, *see* Notice of Discontinuing Action, *Estate of Meimaris* (May 14, 2018) (NYSCEF Doc. No. 11), and on May 17, 2018, they commenced this action, asserting the same seven causes of action against the same defendants. (Dkt. Nos. 1, 4, 8, 10, 12).[19] Beginning on May 21, plaintiffs attempted to file an Amended Complaint adding Guardian to the caption as a defendant (Dkt. Nos. 7, 8), and on May 23, 2018, they succeeded in doing so. (Dkt. No. 16.) However, Guardian appeared *only* in the caption; it was not mentioned elsewhere in the Amended Complaint. *Id*. One week later, on June

---

[19] The Complaint was filed numerous times, apparently due to counsel's difficulties with this Court's Electronic Case Filing Rules & Instructions.

1, 2018 – without having obtained defendants' consent or the Court's approval, *see* Fed. R. Civ. P. 15(a) – plaintiffs filed a Second Amended Complaint (SAC) in which Guardian appeared in the caption and the first two paragraphs, but not thereafter. (Dkt. No. 25.)

On June 25, 2018, defendants Royce and Blatte moved to transfer this action to this Court's White Plains Division.  (Dkt. No. 33.) Plaintiffs opposed the motion.  (Dkt. Nos. 35, 36.)

On July 3, 2018 defendant Prieto moved to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6), arguing that plaintiffs failed to state any cognizable claim against him and that all of their claims were barred by New York's six-year statute of limitations. (Dkt. Nos. 39, 40.)

The next day, plaintiffs moved for leave to further amend their pleading, stating that their earlier efforts suffered from a "technical deficiency" in that they had listed the Estate as a plaintiff rather than Ms. Meimaris in her capacity as the executrix of the Estate. *See* Pl. Mem. dated July 4, 2018 (Dkt. No. 42), at 1. In addition, plaintiffs explained, TBS Shipping Services had recently "changed its name to Guardian Navigation Services, Inc.," such that Guardian was a "necessary party and should be added as a defendant. *Id*. at 2.[20] Plaintiffs also sought to add Grupo Sedei and Tecnisea as defendants, explaining that they were "owned and operated by Defendant, Jaime Leroux in Ecuador," and should be parties because they constitute or conduct the "business opportunity" that defendants usurped from Captain Meimaris. *Id*. After the Clerk's Office rejected those motion papers as procedurally insufficient, plaintiffs refiled the motion on July 12, 2018 (Dkt. Nos. 47, 48), along with a copy of the Letters Testamentary naming Ms. Meimaris executrix of the Estate (Dkt. No. 47-1) and a Proposed Third Amended Complaint (Proposed TAC) (Dkt.

---

[20] Plaintiffs' motion papers did not discuss the fact that they had already named Guardian as an additional defendant in the Amended Complaint and in the SAC.

No. 47-2), which added Grupo Sedei and Tecnisea to the caption as defendants (but did not mention them elsewhere in the document).

On July 13, 2018, Royce and Blatte filed a letter-brief opposing the motion, arguing that the Proposed TAC suffered from "a number of fatal defects," Royce/Blatte Ltr. dated July 13, 2018 (Dkt. No. 49), at 1, including that (i) Ms. Meimaris had no standing to sue in her individual capacity; (ii) some of plaintiffs' claims were barred by *res judicata* as a result of the Bankruptcy Court proceedings; and (iii) others were time-barred under New York's six-year statute of limitations for fraud claims. *Id*. at 2. Royce and Blatte sought a pre-motion conference or, in the alternative, 30 days to respond to the TAC. *Id*. at 2-3.

Three days later, plaintiffs filed a sharply-worded reply letter charging that Royce and Blatte had "wasted the Court[']s time and Plaintiffs['] time with a letter filled with falsities, misrepresentations, and inaccuracies." Pl. Ltr. dated July 16, 2018 (Dkt. No. 50), at 4-5. According to plaintiffs, the Proposed TAC had "no fatal defects." *Id*. at 2. In counsel's view, defendants were "patently wrong" about standing, *id*. at 2; there was "absolutely" no *res judicata* issue arising from the bankruptcy proceedings, *id*. at 3; and defendants were "well aware that Plaintiffs are well within the statute of limitations period." *Id*. at 4. Plaintiffs accused Royce and Blatte of stalling and urged the Court not to hold a conference or grant defendants any additional time to respond to the TAC. *Id*. at 4-5.

On August 22, 2018, the Hon. George B. Daniels, United States District Judge, denied the Royce/Blatte motion to transfer, granted plaintiffs' motion for leave to amend, denied Prieto's motion to dismiss the SAC, without prejudice to renewal after the filing of the Proposed TAC, and gave all defendants until October 1, 2018, to respond to the Proposed TAC. Mem. Dec. & Order

dated Aug. 18, 2018 (Dkt. No. 58), at 1-6. In addition, Judge Daniels reminded plaintiffs that they could not further amend their complaint "without leave of this Court." *Id*. at 7.

Five weeks later, on September 24, 2018, plaintiffs filed the TAC.[21] On the same day, they filed a letter-motion seeking leave to file a Fourth Amended Complaint so as to "more accurately describe the roles which TBS International, Guardian Navigation, Gruposedei and Tecnisea played in the current matter and present any and all factual allegations against these defendants." Pl. Ltr. dated Sept. 24, 2018 (Dkt. No. 63), at 1. No proposed Fourth Amended Complaint was attached. I denied the motion by Order dated September 25, 2018, noting that Ms. Meimaris had thus far "filed six versions of her pleading in two different Courts" and had earlier contended, through counsel, that the Proposed TAC "has no fatal defects." (Dkt. No. 65.)

### D.   Defendants' Motions

On October 1, 2018, defendants filed their motions to dismiss and for related relief. Defendants Royce and Blatte argue, as they did in their earlier letter, that Ms. Meimaris lacks standing to bring this action in her personal capacity because she had no "involvement or personal interest" in any of the shares or other interests at issue in this action. *See* Royce/Blatte Mem. at 6. They further contend that all of plaintiffs' claims are untimely, *see id*. at 7-8, 13, 15-16, 19, 21, whether measured by the three-year statute of limitations set forth in N.Y. C.P.L.R. (CPLR) § 214(4), applicable to certain fiduciary duty claims, or the six-year statute of limitations for fraud. *See* CPLR § 213(8). Royce and Blatte also argue that plaintiffs have failed to plead the elements

---

[21] The TAC that plaintiffs filed on September 24 is not identical to the Proposed TAC that they attached to their motion papers and sought leave to file on July 12. *Compare*, *e.g*., Prop. TAC at 1 with TAC at 1 (adding a mention of Grupo Sedei and Tecnisea as defendants in an unnumbered introductory paragraph and correcting a typographical error in ¶ 1). However, the changes are minor and do not affect my recommendation. For the sake of efficiency, therefore, I consider the TAC to be the operative complaint.

of either breach of fiduciary duty or fraud as to them, Royce/Blatte Mem. at 9-10, 11-14, 18-20, and that the Third Cause of Action is an impermissible collateral attack on the Bankruptcy Court's Confirmation Order. *Id*. at 16-17.

Defendant Prieto moves to dismiss the Fourth and Sixth Causes of Action as against him. He too argues that plaintiffs' claims are time-barred. Prieto Mem. dated Oct. 1, 2018 (Dkt. No. 73), at 11. He also argues that he was not Captain Meimaris's lawyer and owed him no fiduciary duty, and that the TAC contains no allegation "that Prieto made any fraudulent statement, misrepresentation, or omission upon which Meimaris relied or which caused him any damages," as required for a fraud claim. *Id*.

TBS Shipping Services (and Guardian) argue that plaintiffs have not stated any cognizable claim against them. TBS Mem. dated Oct. 1, 2018 (Dkt. No. 76), at 11. They note that the first six claims do not even mention the Company Defendants and argue that the Seventh Cause of Action – which they construe as a claim for aiding and abetting fraud – fails to allege the elements of that tort. *Id*. at 14, 17.

On October 16, 2018, plaintiffs filed three opposition briefs, each accompanied by an attorney affirmation describing nine exhibits that counsel apparently intended (but failed) to attach. (Dkt. Nos. 80, 82, 84.) Three days later, on October 19, 2019, plaintiffs filed a series of four supplemental attorney affirmations which together attached the nine exhibits (Dkt. Nos. 90-94), including the Captain Meimaris Affidavit. Plaintiffs argue that Ms. Meimaris has standing to sue in her individual capacity because she was her husband's partner "in every sense of the word" and because she, along with him, "suffered pecuniary and emotional injury at the hands of these defendants." *See*, *e.g*., Pl. Mem. in Opp. to Royce/Blatte Mtn. at 7. Relying on the doctrine of "continuous wrong," plaintiffs contend that none of their claims are time-barred. *Id*. at 7. In their

view, the TAC pleads a conspiracy to defraud Captain Meimaris of his ownership in the business (including both TBS International and TBS Commercial Group) that began sometime in 2008 and "end[ed] only recently with the sale and dissolution of the [TBS Commercial Group] companies." *Id*. At the earliest, plaintiffs argue, the six-year fraud statute commenced running with the "close" of the bankruptcy proceedings on June 29, 2012 (not the approval of the Plan of Reorganization three months earlier, on March 29, 2012), rendering this action timely because it was filed on May 17, 2018. *Id*. at 9. Plaintiffs insist, once again, that their pleading has "no fatal defects," *id*. at 4, and assert that they have adequately pleaded every element of every claim against every defendant. *Id.* at 7; *see also* Pl. Mem. in Opp. to Prieto Mtn. (Dkt. No. 83), at 5; Pl. Mem. in Opp. to TBS Shipping Services Mtn. (Dkt. No. 81), at 1.

Defendants filed their reply papers on October 29, 2018. (Dkt. Nos. 95-98.) The following day, plaintiff requested leave to file sur-replies, complaining that defendants "continuously and consistently misstate the allegations in Plaintiffs' documents." Pl. Ltr. dated Oct. 30, 2018 (Dkt. No. 99), at 2. The Court denied that application on October 31, 2018. (Dkt. No. 100.)

Due primarily to the pendency of the motions to dismiss, discovery has not yet commenced.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

"[T]he standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [her] behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotations omitted). Because that question is rooted in Article III of the Constitution, which limits the subject-matter jurisdiction of the federal courts to actual "cases" and "controversies," U.S. Const. art. III § 2, standing is "the threshold question in every federal case,

determining the power of the court to entertain the suit," *Warth*, 422 U.S. at 499, and is properly raised pursuant to Rule 12(b)(1).

The requirement of subject-matter jurisdiction "can never be forfeited or waived," *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (quoting *United States v. Cotton,* 535 U.S. 625, 630 (2002)), and may be raised "at any time." *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) (citing *Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 740 (1976)); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The standard used to decide a Rule 12(b)(1) motion, however, depends upon when, and on what basis, it is made. Where, as here, the motion is made prior to discovery and is "based solely on the allegations of the complaint," the plaintiff "has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). The task of the district court is simply to determine whether the complaint "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)) (alterations in the original). In making this determination, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501; *accord Carter*, 822 F.3d at 56-57.

To establish standing, a plaintiff must allege facts that demonstrate "a distinct and palpable injury to [her]self" that is the "direct result of the putatively illegal conduct of the [adverse party]" and "likely to be redressed by the requested relief." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (quoting *Torres v. $36,256.80 U.S. Currency,* 25 F.3d 1154, 1157 (2d Cir. 1994). This means, among other things, that (except when acting in a representative capacity) a plaintiff "cannot rest [her] claim to relief on the legal rights or interests of third parties." *Warth*,

422 U.S. at 499. Rather she must demonstrate that she personally suffered a "concrete and particularized injury in fact" as a result of defendants' alleged conduct. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559 (1992).

### B.      Rule 8(a)(2) and Rule 12(b)(6)

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If a complaint fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Rule 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

When faced with a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted) (quoting *Twombly*, 550 U.S. at 555, 557). The courts must not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.

In addition to the complaint itself, the district court may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint,'" *L-7 Designs*, 647 F.3d at 422 (quoting *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir. 2004)). Before the court may rely on an "integral" document that is neither attached to nor incorporated into the complaint, it must be "clear on the record that no dispute exists" regarding the authenticity or relevance of the document. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The court may also consider "public disclosure documents" that are "required by law to be, and that have been, filed with the SEC." *Rothman*, 220 F.3d at 88 (quoting *Kramer,* 937 F.2d at 774), and other matters of which it may take judicial notice, including filings in other judicial proceedings. *Kramer*, 937 F.2d at 774; *see also*, *e.g.*, *Webster v. Wells Fargo Bank, N.A.*, 2009 WL 5178654, at *1 n.2 (S.D.N.Y. Dec. 23, 2009) (dismissing lawsuit alleging fraud in connection with foreclosure of plaintiffs' home after taking judicial notice of "the documents filed in both the New York Supreme Court and Appellate Division foreclosure proceedings"), *aff'd sub nom. Webster v. Penzetta*, 458 F. App'x 23 (2d Cir. 2012), *as amended* (Jan. 24, 2012).

## C.  Rule 9(b)

A higher pleading standard applies to claims alleging "fraud or mistake." The plaintiff must "state with particularity the circumstances constituting" the alleged fraud. Fed. R. Civ. P. 9(b); *see also Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (Rule 9(b) "governs the pleading of fraud claims and it requires that plaintiff plead fraud with particularity."). Rule 9(b) "ordinarily requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *United States ex rel. Chorches*

*for Bankr. Estate of Fabula v. Am. Med. Response, Inc*., 865 F.3d 71, 81 (2d Cir. 2017) (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)). "Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex. Rel. Polansky v. Pfizer, Inc*, 2009 WL 145682 (E.D.N.Y. May 22, 2009) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

"Failure to satisfy the Rule 9(b) standard, if applicable, is grounds for dismissal." *McBeth v. Porges*, 171 F. Supp. 3d 216, 223 (S.D.N.Y. 2016) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) and *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Moreover, Rule 9(b) applies to all claims that sound in fraud, including claims for "a breach of fiduciary duty that involves fraud." *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014).

## III.    ANALYSIS

### A.    Ms. Meimaris Lacks Standing to Sue in Her Individual Capacity

Defendants do not contest Ms. Meimaris's standing to sue on behalf of the Estate, but contend that she lacks constitutional standing to sue in her individual capacity, because she had no ownership or other personal stake in the shares and other business interests at issue in this action, and therefore could not have suffered any direct injury as a result of the fraud and related torts that allegedly victimized her late husband. *See* Royce/Blatte Mem. at 6; TBS Mem. at 20-21. Defendants are correct.

In order to allege the necessary "personal stake in the outcome of the controversy," *Warth*, 422 U.S. at 498-99, each plaintiff who seeks to invoke the jurisdiction of the federal courts must demonstrate an invasion of her own "legally-protected interest." *Kounitz v. Slaatten*, 901 F. Supp.

650, 654 (S.D.N.Y. 1995) (quoting *Lujan,* 504 U.S. at 559).  In this case, the TAC demonstrates the opposite.

All of the interests that defendants allegedly invaded belonged to Captain Meimaris.  It was Captain Meimaris, not his wife, who formed and owned stock in TBS International and TBS Commercial Group. TAC ¶¶ 3, 29, 39, 111 (TBS Commercial Group was "owned solely by Captain Meimaris, Mr. Royce, Mr. McNelis, and Mr. Blatte"); *see also* Capt. Meimaris Aff. ¶¶ 12, 22; Second Supp. Alkistis Meimaris Aff. Ex. 3 (stock certificates). Similarly, it was Captain Meimaris who allegedly who owned "interests" or "shares" in TBS Ecuador, TAC ¶¶ 52-54, 130-31, and who was offered – but then denied – a "lucrative business opportunity" to purchase additional properties in Ecuador. TAC ¶¶ 50, 63, 72; Capt. Meimaris Aff. ¶ 20. Moreover, it was Captain Meimaris, as a founding shareholder of the public company and a 10% owner of the private affiliate, who allegedly had a right to "participat[e] with the other defendants" in TBS International's 2011 debt restructuring, TAC ¶¶ 92-98, and a right to veto the "use of TBS Commercial Group" in the bankruptcy proceeding. *Id.* ¶¶ 109-13, 123. Thus, not surprisingly, the TAC repeatedly alleges that defendants defrauded, misled, and/or breached their fiduciary duties to Captain Meimaris – but never alleges that any defendant had, or breached, any such duties to Ms. Meimaris. *See*, *e,g.*, TAC ¶¶ 14, 40, 45, 48, 55, 60, 64, 71-74, 88, 98, 100, 125, 155; *id.* at 24 (Prayer for Relief ¶¶ B-F, H).

In response, plaintiffs argue that "[d]efendants['] conduct not only caused Mrs. Meimaris to lose a substantial amount of money, but also, their conduct caused her emotional harm, as she watched her beloved husband, suffer at the hands of the Defendants." Pl. Mem. in Opp. to Royce/Blatte Mtn., at 8. According to plaintiffs, Helen and Alkiviades Meimaris "were partners in every sense of the word. They held bank accounts jointly, they held all of their real property jointly

and there business' [sic] and various companies jointly. They had reciprocal wills leaving all of their interests not to their children, but to the surviving spouse, each other." *Id*. at 7-8. Moreover, plaintiffs claim that Ms. Meimaris has standing to sue "[a]s a beneficiary under Captain Meimaris'[s] will." *Id*. at 8.  Even assuming, *arguendo*, that these allegations appeared in the TAC,[22] they would not suffice to confer standing upon Ms. Meimaris to sue individually for the harms allegedly inflicted on her late husband by his former business associates.

Many spouses share home ownership, bank accounts, and reciprocal wills. Many – indeed, most – are financially and emotionally affected, for good or for ill, by the rise or fall of the other spouse's financial fortunes. It is well-settled, however, that this commonplace reality does not automatically give wives (or husbands) standing to sue for economic injuries allegedly inflicted on their marital partners. *See Kounitz,* 901 F. Supp. at 654 (husband lacked standing to sue for the financial and emotional harm he suffered as a result of the termination of his wife's employment); *Hui Yu v. U.S. Dep't of Homeland Sec.*, 568 F. Supp. 2d 231, 234 (D. Conn. 2008) (husband lacked standing to sue for the return of his wife's passport or the expenses incurred in seeking replacement documents, because "jurisdiction cannot be invoked solely on the basis of harms to a plaintiff's

---

[22] They do not. The TAC says nothing about bank accounts, reciprocal wills, or title to real property. It is well-settled that a plaintiff cannot "cure the complaint's deficiencies by alleging additional facts in the memorandum in opposition to the motions to dismiss." *Llanos v. Brookdale Univ. Hosp. & Med. Ctr.*, 2011 WL 809615, at *4 (E.D.N.Y. Mar. 2, 2011); *see also Khanukayev v. Times Square All.*, 2010 WL 2000552, at *2 n.4 (S.D.N.Y. May 20, 2010) (on a motion to dismiss, the court "disregards allegations made in a memorandum of law"), *report and recommendation adopted,* 2010 WL 2836818 (S.D.N.Y. July 7, 2010); *Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co.,* 475 F. Supp. 2d 400, 405 (S.D.N.Y. 2007) (it is "error" to "rely on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss") (internal quotation marks, bracketing, and citations omitted). To the extent plaintiffs intend to suggest, in their briefs, that Captain and Ms. Meimaris held joint title to the stock of TBS International, TBS Commercial Group, or TBS Ecuador, they are of course bound by the contrary allegations made expressly in the TAC and by the documentary evidence, submitted by their counsel, showing that the stock was purchased and held by Captain Meimaris.

spouse"); *United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338*, 617 F. Supp. 2d 103, 116 (E.D.N.Y. 2007) (wife lacked standing to challenge the civil forfeiture of her husband's bank account, despite having "involvement with and directing activity in one of the accounts," and  the "right to use funds from the account"); *Galtieri v. Kelly,* 441 F. Supp. 2d 447, 456 (E.D.N.Y. 2006) (wife of policeman lacked standing to challenge the New York City Police Department's decision to garnish her husband's disability benefits).

Similarly, a beneficiary under the will of a decedent does not have standing, on that basis, to sue third parties for economic injuries allegedly inflicted on the testator during his lifetime. *See Gass v. Mamedova-Braz*, 2017 WL 3588944, at \*7, n.13 (S.D.N.Y. Aug. 18, 2017) (individual plaintiffs who were beneficiaries of their father's estate lacked standing to challenge the transfer of their father's properties prior to his death because  "any damages Plaintiffs suffered as a result of any alleged breach . . . depends on their property rights as provided by the estate" and thus, their claims "belong exclusively to the estate"). In this case, moreover, New Jersey law – which governs Ms. Meimaris's capacity to sue, *see* Fed. R. Civ. P. 17(b)[23] – expressly permits "executors and administrators," but not heirs or beneficiaries, to sue "for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living." N.J. Stat. Ann. § 2A:15-3; *see also Endl v. New Jersey*, 5 F. Supp. 3d 689, 696 (D.N.J. 2014) ("the class of persons entitled to sue is restricted to the administrator ad prosequendum or executor").

Because Ms. Meimaris does not (and cannot) allege that her personal interests were invaded, or that she personally suffered a "concrete and particularized injury in fact" at defendants'

---

[23]  Rule 17(b) provides that the capacity to sue for "an individual not acting in a representative capacity" is determined by "the law of the of the individual's domicile." Ms. Meimaris is domiciled in New Jersey. TAC ¶ 24.

hands, *see Lujan,* 504 U.S. at 559, all of the claims that she has brought in her individual capacity should be dismissed, without prejudice, for lack for subject-matter jurisdiction.

**B.      The Fifth Cause of Action Should be Dismissed**

Plaintiffs' Fifth Cause of Action, captioned "Fraudulent transfer of Captain Meimaris'[s] interests in TBS Ecuador by Leroux," *see* TAC at 19, runs only against former defendant Leroux (who was never served), and for that reason was dismissed when plaintiffs voluntarily dismissed all of their claims against Leroux on May 13, 2019.

In their opposition briefs, plaintiffs attempt to recast the Fifth Cause of Action as a claim against Royce and Blatte. *See*, *e.g*., Pl. Mem. in Opp. to Royce/Blatte Mtn., at 4 ("The fifth cause of action asserts that Messrs. Royce and Blatte breached the fiduciary duty owed to Captain Meimaris by virtue of them being business partners by causing and being part of the fraudulent transfer and disappearance of Captain Meimaris'[s] shares in TBS Ecuador."). These assertions, however, are at odds with plaintiffs' actual pleading, which alleges that Leroux asked for documents regarding Captain Meimaris's ownership; personally assured Captain Meimaris that he would "protect" his interests in TBS Ecuador (causing Captain Meimaris to rely on those assurances); but then "facilitated the transfer of Captain Meimaris's shares" to Royce, Blatte, and/or McNelis. TAC ¶¶ 130-32.

Other than the vague and entirely conclusory assertion that "Captain Meimaris'[s] shares [were] stolen from him by Mr. Royce and Mr. Blatt," TAC ¶ 135, making all defendants liable for "statutory fraud and common law fraud," TAC ¶ 138, the misconduct described in the Fifth Cause of action was all allegedly committed by Leroux. There is no allegation that Royce or Blatte made any representation with regard to Captain Meimaris's shares in TBS Ecuador, much less that they

promised, but failed, to protect those shares.[24] If and to the extent the Fifth Cause of Action was not dismissed by plaintiffs themselves, therefore, is should now be dismissed as against the remaining defendants, pursuant to Rule 12(b)(6), for failure to state any cognizable claim against them.

### C.    The Remaining Claims are Time-Barred

The remaining claims, all belonging to the Estate, involve alleged misconduct which took place prior to or in connection with the Plan of Reorganization, which was approved by the Bankruptcy Court on March 29 and became effective on April 12, 2012. Captain Meimaris discovered the misconduct before his death in December 2013, and described it, in detail, in his November 30, 2013 affidavit.  Yet plaintiffs did not file this action until May 17, 2018 – more than six years after approval of the Plan of Reorganization and approximately four and a half years after Captain Meimaris executed the affidavit upon which the TAC is largely based. Therefore, defendants argue, all of the Estate's remaining claims are time-barred under CPLR    § 213(8), which states that "an action based upon fraud" must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." *See* Royce/Blatte Mem. at 7; TBS Mem. at 19. Defendants are again correct.[25]

---

[24] Alleging in conclusory terms that a defendant committed "theft" or "fraud" is not enough to state a cognizable claim, even under the relatively relaxed standard of Rule 8(a). *See Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 385 (S.D.N.Y. 2009) (Rule 8(a) "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation marks omitted). Moreover, such allegations do not begin to meet the heightened standard required by Rule 9(b) to state a claim for fraud or fraudulent breach of fiduciary duty. *See Chorches*, 865 F.3d at 81; *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

[25] In defendants' view, the First, Third, Fifth (to the extent it survived plaintiffs' voluntary dismissal) and Seventh Causes of Action, which seek money damages for defendants' alleged fiduciary breaches, are subject to the three-year statute of limitations set forth in CPLR § 214(4), governing actions "to recover damages for an injury to property." *See, e.g.*, Royce/Blatte Mem. at

The statute of limitations is "normally an affirmative defense," *Bano v. Union Carbide Corp.,* 361 F.3d 696, 710 (2d Cir. 2004), but may be raised on a motion to dismiss if it "appears on the face of the complaint," *Bruno v. Casella Waste Sys., Inc.*, 616 F. App'x 20, 20 n.1 (2d Cir. 2015) (quoting *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014)), is apparent from documents attached to or integral to the complaint, or arises from "matters of which judicial notice may properly be taken." *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 128 (E.D.N.Y. 2013) (dismissing securities fraud claims as time-barred in reliance on media reports and prior court filings).

Under New York law, "[a] tort claim accrues as soon as 'the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint.'" *IDT Corp.*, 12 N.Y.3d at 140, 907 N.E.2d at 273 (quoting *Kronos, Inc. v AVX Corp.*, 81 N.Y.2d 90, 94, 612 N.E.2d 289, 292 (1993)). "Because damage is an essential element of most tort claims, they are "not enforceable until damages are sustained," *Kronos*, 81 N.Y.2d at 94, 612 N.E.2d at 292. Once a plaintiff has "first suffered loss," however, the limitations period commences. *IDT Corp.*, 12 N.Y.3d at 141, 907 N.E.2d at 273; *see also Tarazi v. Truehope Inc.*, 2017 WL 5957665, at *14 (S.D.N.Y. July 28, 2017) (breach of fiduciary duty claim was time-barred because plaintiffs "first

---

8, 15-16, 21. Under New York law, a breach of fiduciary duty claim seeking money damages, rather than equitable relief, is governed by § 214(4). *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139, 907 N.E.2d 268, 272 (2009). However, "where an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213(8)." *Id.*; *see also Kaufman v. Cohen*, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157, 164 (1st Dep't 2003). If an allegation of fraud is made, but "is only incidental to the claim asserted," the three-year statute applies; "otherwise fraud would be used as a means to litigate stale claims." *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 120, 490 N.Y.S.2d 190, 192 (1st Dep't 1985), *aff'd sub nom. Powers Mercantile Co. v. Feinberg*, 67 N.Y.2d 981, 494 N.E.2d 106 (1986). In this case, because all of the Estate's remaining claims are barred by § 213(8), the Court need not determine whether any of them were also barred by operation of § 214(4).

suffered loss from the alleged breach" in December 2012 but did not file claim until more than three years later), *report and recommendation adopted,* 2017 WL 5957745 (S.D.N.Y. Nov. 30, 2017); *D. Penguin Bros. v. Nat'l Black United Fund, Inc.*, 137 A.D.3d 460, 461, 26 N.Y.S.3d 524, 526 (1st Dep't 2016) (six-year statute applicable to claim for aiding and abetting a breach of fiduciary duty based on "actual fraud" accrued "when plaintiffs first suffered losses by transferring funds into an escrow account").

The First Cause of Action, as noted above, alleges that, at some point between 2009 and 2011, Royce and Blatte usurped a vaguely-described business opportunity in Ecuador, presented to Captain Meimaris by Leroux, by telling him that he "could not could not enter into the agreement with Mr. Leroux as it was in conflict with his interests in TBS." TAC ¶¶ 63-65; Capt. Meirmaris Aff. ¶ 20. The tort was complete when Captain Meimaris, in reliance on defendants' statements, "did not enter into the agreement with Mr. Leroux, thereby losing this business opportunity." *Id.* ¶ 68. Although the TAC does not specify when this decision was made, the Captain Meimaris Affidavit states that he told Royce that he would "respect his [Royce's] wishes" the same day Royce made the alleged misrepresentation, which occurred no later than 2011. Capt. Meimaris Aff. ¶ 20. Moreover, by the time Captain Meimaris executed that affidavit, he had discovered the perfidy and in fact intended to sue. *Id.* ¶ 36. The First Cause of Action is therefore time-barred.

The Second Cause of Action alleges that Royce and Blatte fraudulently induced Captain Meimaris *not* to sell his shares in TBS International in 2008, when the stock was at $51 per share. TAC ¶¶ 81-84. Under New York's "out-of-pocket rule," this is a "holder" claim and therefore is not actionable as fraud. *See Varga v. McGraw Hill Fin., Inc.*, 147 A.D.3d 480, 481, 48 N.Y.S.3d 24, 26 (1st Dep't 2017) ("To the extent plaintiffs allege 'holder' claims, *i.e.*, fraudulent inducement to continue to hold the securities, these claims violate the 'out-of-pocket' rule governing damages

recoverable for fraud, and are not actionable."), *leave to appeal denied,* 29 N.Y.3d 908, 80 N.E.3d 405 (2017).

Even if otherwise cognizable, however, the Second Cause of Action is clearly time-barred. Captain Meimaris was injured as soon as the stock price fell below $51. According to his affidavit, "the market took a turn at the end of 2008 and the TBS shares started to plummet in value," Capt. Meimaris Aff. ¶ 17, becoming "valueless" by the time the company "went into reorganization" on February 6, 2012. TAC ¶ 87. Moreover, on May 28, 2008, TBI International publicly disclosed that Royce and Blatte had made substantial sales of their own stock. Even absent that disclosure, the tort was necessarily complete, and Captain Meimaris knew of it or "could with reasonable diligence have discovered it," CPLR § 213(8), long before the price of his shares dropped to zero. It is now far too late for his Estate to complain that his failure to sell in 2008 was due to fraud.

The Third Cause of Action alleges that Royce and Blatte breached their fiduciary duty to Captain Meimaris by "pushing [him] out of the Bank Reorganization deal," TAC ¶ 91, 94, 97-100, and thereby (according to the TAC) leaving him with no equity in the reorganized debtor. *Id*. ¶¶ 96. The alleged misconduct took place sometime in 2011, TAC ¶ 92, when defendants failed to include Captain Meimaris in the restructuring of TBS International's pre-petition credit facilities – under which the four senior management shareholders invested $10 million and were issued "new equity capital in the form of preference stock," *see* Disclosure St. at 20 – and was complete by the time the Plan of Reorganization was filed with the Bankruptcy Court on February 6, 2012. TAC ¶ 96 (acknowledging that "the Reorganization Plan provided for the Banks owning 90% of the Company and for 10% of the Company to be owned by Mr. Royce, Mr. Blatte, and Mr. McNelis"); Disclosure St. Ex. A. Moreover, Captain Meimaris knew that he had been "pushed out" even earlier, in December 2011, when Royce came to his home and told him "that TBS was

filing Chapter 11," that it was "declaring all existing Class A stock worthless," and that "the banks would own 90% and 10% would be held by Joe Larry and Gregg."  Capt. Meimaris Aff. ¶ 26. Captain Meimaris was "devastated." *Id*. ¶ 26. However, neither he nor his estate pursued any claims arising out of these events until 2018, by which time all such claims were time-barred.

The Fourth Cause of Action accuses Royce, Blatte, and Prieto of "fraudulently stealing Captain Meimaris'[s] shares and interest in TBS Commercial Group." TAC ¶¶ 104-127. Plaintiffs allege that Royce falsely stated that other shareholders were relinquishing their interests in TBS Commercial Group, *see* TAC ¶¶ 45, 107; however, Captain Meimaris was not fooled, and did not "sign over his shares." *Id*. ¶ 108. The gravamen of the Fourth Cause of Action, therefore, cannot be fraud; rather, the claim is that defendants violated their fiduciary duties to Captain Meimaris by secretly "us[ing] TBS Commercial Group as part of the TBS International Reorganization without the knowledge or consent of Captain Meimaris." *Id*. ¶ 118.

Assuming, *arguendo*, that such duties existed, and that defendants breached them by giving "New TBS Parent" the right to require TBS Commercial Group to dissolve or close foreign affiliates and transition their workforce to the restructured debtor, *see* Disclosure St. at 23, this tort was necessarily complete – and had already been publicly disclosed – when the Bankruptcy Court approved the Plan of Reorganization on March 29, 2012 (or, at the latest, on the Effective Date of the Plan fourteen days later). *See* Confirmation Order at 12-13 (finding that the debtors "proposed the Plan in good faith," with "legitimate and honest purposes"); *id*. at 22 (approving and confirming the Plan); *id*. at 29 (decreeing that, upon the Effective Date, "all actions contemplated by the Plan shall be deemed ratified, authorized, and approved," including "the TBS Commercial Agreement"). The Fourth Cause of Action is therefore time-barred even under the six-year fraud statute.

The Sixth Cause of Action alleges that Royce, Blatte, and Prieto "conspired" to commit all of the torts alleged in the TAC, and the Seventh Cause of Action appears to allege that TBS Shipping Services aided and abetted those torts. Both of these claims are somewhat difficult to decipher, and neither appears to plead a cognizable cause of action.[26]  Moreover, there can be no liability for conspiracy to commit a civil tort, nor for aiding and abetting a tort, unless the plaintiff has pleaded a "viable" primary tort. *See Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474, 905 N.Y.S.2d 585, 587 (1st Dep't 2010) ("to establish a claim of civil conspiracy, the plaintiff must demonstrate the primary tort"); *Kirschner*, 648 F. Supp. 2d at 533 (aiding and abetting claims "require the existence of a primary violation"); *Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 110, 890 N.Y.S.2d 16, 31 (1st Dep't 2009) ("Since none of plaintiff's tort claims are viable and timely, those claims cannot form the basis for a civil conspiracy cause of action.")

Here, as in *Thome*, none of the Estate's primary tort claims is "viable and timely." 70 A.D.3d at 110, 890 N.Y.S.2d at 31. Therefore, even if the claims for conspiracy and for aiding and abetting were otherwise adequately pleaded, they would fail.

---

[26] Among other things, the Sixth Cause of Action rests almost entirely on the liberal use of the words "conspired" and "conspiracy," *see* TAC ¶¶ 142, 146, 147, 148, 149, 150, 151, 152, 154, 155, 156, in place of any concrete factual allegations demonstrating, as to each underlying primary tort, a "corrupt agreement between two or more persons," an "overt act," and all parties' "intentional participation" in the agreed-upon plan, as required for civil conspiracy under New York law. *See Transit Mgmt., LLC v. Watson Indus., Inc*., 23 A.D.3d 1152, 1155-56 (4th Dep't 2005). The Seventh Cause of Action alleges only that TBS Shipping Services "had knowledge of" Captain Meimaris's ownership stake in TBS Commercial Group, "failed to question" his "exclusion" from "new agreements" involving that entity, and "had the opportunity to opt out of the wrongdoings and illegal actions of [the Individual] Defendants, yet they [sic] chose not to." TAC ¶¶ 159-62. These allegations fail to demonstrate either "actual knowledge" of the alleged primary torts by the restructured debtor or "substantial assistance" in the commission of those torts. *See Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009) ("Under New York law, the elements of aiding and abetting a breach of fiduciary duty, aiding and abetting a conversion, and aiding and abetting a fraud are substantially similar. The claims require the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance.").

The Estate argues that all of its claims are timely under the "continuous wrong doctrine," which tolls the limitations period "to the commission of the last wrongful act." Pl. Opp. to Royce/Blatte Mtn. at 9. According to plaintiffs:

> Defendants began their scheme of fraud in 2008, when they prevented Captain Meimaris from selling his shares in TBSI. The last wrongful act could either be construed as the date the Bankruptcy case was concluded, June 29, 2012 or as recent as this year with the closing of the TBSG companies.

*Id*. (punctuation and capitalization as in the original).

The Estate misconstrues the theory upon which it relies. "[C]ertain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act." *Comm Trade USA, Inc. v. INTL FCStone, Inc.*, 2014 WL 787912, at *9 (S.D.N.Y. Feb. 27, 2014) (quoting *Leonhard v. United States,* 633 F.2d 599, 613 (2d Cir.1980), *cert.* denied*, 101 S. Ct. 1975 (1981)). However, the continuing wrong doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." *Henry v. Bank of Am.*, 147 A.D.3d 599, 601, 48 N.Y.S.3d 67, 70 (N.Y. App. Div. 2017) (internal quotations omitted). *See also Quintana v. Wiener*, 717 F. Supp. 77, 80 (S.D.N.Y. 1989) (where landlord fraudulently increased tenant's rent in the 1970s, but tenant failed to sue until 1992, his monthly rent bills did not constitute "continuing wrongs" and could not save any portion of his fraud claim); *Piracci Const. Co. v. Skidmore, Owings & Merrill*, 490 F. Supp. 314, 321 (S.D.N.Y.) ("The accrual date does not change on the theory that the alleged misconduct created continuing consequential damages."), *aff'd sub nom. Piracci Constr. Co. v. Skidmore, Owings & Merrill*, 646 F.2d 562 (2d Cir. 1980). Where the continuing wrong doctrine does apply, the defendant is liable only for the wrongs committed within the applicable limitations period. *See*, *e.g.*, *Butler v. Gibbons*, 173 A.D.2d 352, 353, 569 N.Y.S.2d 722, 723 (1st Dep't 1991) (continuing wrong doctrine applied to claim that defendant repeatedly failed to turn over plaintiff's share of

rental proceeds, making plaintiff's action timely, but only "as to any such proceeds which were retained by defendant during the six years preceding the commencement of the action").

Here, each of the Estate's surviving claims is predicated upon distinct conduct that occurred more than six years before this action was filed. Some of the wrongful acts occurred well prior to TBS International's bankruptcy, including those alleged in the First and Second Causes of Action (arising out of the usurped business opportunity in Ecuador and the thwarted stock sales in 2008). Others occurred in preparation for the bankruptcy proceeding, including those alleged in the Third and Fourth Causes of Action (arising out of defendants' failure to include Captain Meimaris in the 2011 debt restructuring or obtain his permission before committing TBS Commercial Group to a contract that obligated it to close its operations at the option of TBS Shipping Services). These acts, by definition, took place before the Plan of Reorganization was filed on February 6, 2012, and the alleged torts were complete when the Bankruptcy Court approved the Plan of Reorganization on March 29, 2012 (or, at the latest, on the April 12, 2012 Effective Date). The TAC does not allege any cognizable "bad acts," after that date, by any of the moving defendants.[27]

The Estate's fallback position – that the "last wrongful act" could be "construed as the date the Bankruptcy case was concluded, June 29, 2012" – does not appear to be grounded in anything other than the calendar. March 29, 2012, was the date on which the Bankruptcy Court approved

---

[27] There are no allegations in the TAC or the Captain Meimaris Affidavit about "the closing" of any companies "as recent as this year." That claim appears – unsourced – only in plaintiffs' briefs. To the extent the Fifth Cause of Action alleges specific wrongful acts that extended into 2014, those acts are attributed to former defendant Leroux in his capacity as President of TBS Ecuador. *See* TAC ¶¶ 130-32. As discussed *supra* in section III(B), the conclusory allegation that Royce and Blatte somehow "stole" Captain Meimaris's TBS Ecuador shares, TAC ¶ 135, does not plausibly state any claim – much less any post-bankruptcy claim – against either of them. *See Tarazi*, 2017 WL 5957665, at *14 (allegations that defendants' "breaches are ongoing" are "too conclusory to stand on their own and do not make the 2012 claim timely").

the Plan of Reorganization, and April 12, 2012, was the date on which the Plan became effective, thereby binding debtors and creditors alike. The administrative close of the bankruptcy docket on June 29, 2012, did not constitute an "act" by any defendant and is not otherwise relevant to the pending motions to dismiss.

Because the Estate's remaining claims are time-barred, and are not saved by the continuing wrong doctrine, I need not determine whether plaintiffs' factual allegations would otherwise be "enough to raise [their] right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The First, Second, Third, Fourth, Sixth and Seventh Claims should be dismissed pursuant to Rule 12(b)(6).[28]

---

[28] I do not recommend that plaintiffs be given another opportunity to amend. First, they have already amended six times, including, most recently, *after* defendant Prieto first moved to dismiss and *after* defendants Royce and Blatte previewed their own motion. Rather than make any effort to address the deficiencies identified by these defendants, plaintiffs accused them of wasting time and insisted that the Proposed TAC had "no fatal defects." Pl. Ltr. dated July 16, 2018, at 2. "Denial of leave to amend may be appropriate where, as here, the plaintiff declined an invitation to amend its complaint, even after potential defects in the complaint had been pointed out and the plaintiff has been given opportunity to cure them." *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*, 2010 WL 309009, at *2-3 (S.D.N.Y. Jan. 22, 2010). Second, while plaintiffs now assert in general terms that they "can amend their complaint" if "the Court deems it necessary," Pl. Opp. to Royce/Blatte Mtn. at 7, they have "failed to provide any detail as to what facts they would (or could) plead to cure their pleading deficiencies." *DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 33 (2d Cir. 2014) (affirming district court's decision to deny leave to amend). Third, and most importantly, the defects requiring dismissal of the TAC are indeed "fatal." No additional factual allegations could confer standing on Ms. Meimaris to sue in her individual capacity for injuries to her late husband's business interests. Nor is there any set of facts – consistent with those already pleaded – that would render the Estate's claims timely.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend that defendants' motions be GRANTED; that Ms. Meimaris's individual claims be DISMISSED WITHOUT PREJUDICE pursuant to Rule 12(b)(1); and that all remaining claims be DISMISSED WITH PREJUDICE pursuant to Rule 12(b)(6).

Dated: New York, New York
      August 20, 2019

**BARBARA MOSES**
**United States Magistrate Judge**

### NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. George B. Daniels at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned Magistrate Judge. Any request for an extension of time to file objections must be directed to Judge Daniels. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).